IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| THRIVING CHILDREN ADVOCATES, LLC, THRIVING CHARITY ADVOCATES, LLC, WESLEY CAMPBELL, NEWSBOYS, INC., NEWSBOYS TOURING, LLC <br>       Plaintiffs <br> v. <br> WATERLAND PRIVATE EQUITY INVESTMENTS, B.V.; WATERLAND PRIVATE EQUITY APS.; WATERLAND HOLDINGS, LLC.; CHRISTIAN LUND MADSEN; NICKLAS GULDBERG; USLIVE OPCO, INC. DBA LIVECO AND TPR.; USLIVE, LLC.; USLIVE HOLDING, LLC; USLIVE INTERMEDIATE HOLDCO, INC.; BRIAN BECKER; TPR ENTERTAINMENT, LLC.; PREMIER PRODUCTIONS HOLDINGS, LLC; MICHAEL PUGH; SHANE QUICK; USLIVE RUSH, LLC; RUSH CONCERTS, LTD.; JACOB REISER; USLIVE TRANSPARENT, LLC; TRANSPARENT PRODUCTIONS, LLC; TRANSPARENT PROCESSING LLC; TIMOTHY TABER; THE ROYS REPORT NFP; JULIE ROYS, JESSICA MORRIS; MERCYME, INC.; BART MILLARD; ROBIN "ROBBY" SHAFFER; NATHAN COCHRAN; MIKE SCHEUCHZER; SCOTT BICKELL; BRICKHOUSE ENTERTAINMENT, LLC; MICAH BEGNAUD AKA MICAH TYLER; and <br><br> WORLD VISION, INC. <br>       Defendants. | §§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§ | Civil Action No. _____ <br> Jury Trial Demanded |

**COMPLAINT**

| | | | Page |
|---|---|---|---|
| I. | | INTRODUCTION AND STATEMENT OF THE CASE…………..... | 1 |
| | A. | NICOLE TOLD FARGO POLICE THE ENCOUNTER WAS CONSENSUAL ………………………………………….......... | 10 |
| | B. | NICOLE WAS NOT DRUGGED………………………………….. | 11 |
| | C. | THERE WAS NO COVER-UP AS THERE WAS NOTHING TO COVER UP………………………………………………………….. | 13 |
| II. | | PARTIES…………………………………………………….. | 14 |
| | A. | PLAINTIFFS………………………………………………….. | 14 |
| | B. | DEFENDANTS………………………………………………….. | 15 |
| | i. | The Waterland Defendants ...…..…………………….... | 15 |
| | ii. | The Defamation Defendants ..……………………….. | 18 |
| | iii. | The MercyMe Defendants ..……………………………. | 19 |
| | iv. | Other Defendants Including World Vision, Inc. …………….. | 19 |
| III. | | JURISDICTION AND VENUE ……………………………………… | 20 |
| IV. | | BACKGROUND FACTS OF THE CHRISTIAN CONCERT MARKET AND KEY PLAYERS ……………………………………… | 23 |
| | A. | CCM PERFORMING ARTISTS..…………………………………….. | 24 |
| | B. | CCM PROMOTERS ………………………………………….. | 24 |
| | C. | SPONSORING NON-PROFIT CHARITIES ……………………………. | 25 |
| | D. | THRIVING CHILDREN ADVOCATES, LLC ………………………….. | 28 |
| | E. | WORLD VISION, INC ……………………………………………. | 29 |
| | F. | THE PANDEMIC AND THE ROLL UP OF POWERFUL PROMOTERS INTO A MONOPOLIST -- LIVECO/TPR ……………………………. | 30 |

G. LIVECO/TPR PLANS FOR ACQUISITION OF TCA THWARTED FOR ANTI-COMPETITIVE REASONS ……………………………………… 36

H. THE WATERLAND DEFENDANTS CONCLUDE THEIR DEAL WITH TRANSPARENT/TABER AND ARE JOINED BY WORLD VISION ..…… 38

I. THE NEWSBOYS ARE UNLAWFULLY BOYCOTTED ………………... 40

J. THE WATERLAND DEFENDANTS AND WORLD VISION REVEAL THEIR HAND IN THEIR ATTEMPT TO CAPTURE MERCYME ………. 45

K. THE WATERLAND DEFENDANTS JOINED BY WORLD VISION, WEAPONIZE THE FARGO FABRICATION TO CONVINCE MM TO BREACH THEIR CONTRACT WITH TCA AND ALIGN THEMSELVES WITH THE MONOPOLY CREATED BY THE WATERLAND DEFENDANTS AND WORLD VISION ……………………………… 47

L. BANDS CONTRACTING WITH TCA ……………………………….. 50

  i. MercyMe ..……………………………………………….. 50

  ii. Newsboys ..…………………………………………….. 51

  iii. Tauren Wells and Danny Goyke ...………………………….. 52

  iv. Other Artists ..…………………………………………….. 52

M. THE COORDINATED SCHEME TO ELIMINATE TCA AS A COMPETITOR ……………………………………………………... 52

<div style="background:black;"> </div>

V. CLAIM FOR RELIEF FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT AND SECTION 7 OF THE CLAYTON ACT (ASSERTED AGAINST THE WATERLAND DEFENDANTS, WORLD VISION, THE MERCYME DEFENDANTS AND THE BICKELL PARTIES) …………...…………………………………... 55

A. BACKGROUND ……………………………………………………. 55

B. SOME OF THE BASES FOR DEFENDANTS' INVOLVEMENT IN ARTICLE V CLAIMS ..……………………………………………….. 55

C. CCM TOURING MARKET ..…………………………………………. 60

D. THE NONPROFIT SPONSORSHIP MARKET …………………………. 63

E. CCM CONCERT PROMOTERS AND THEIR CONSOLIDATION ……….. 66

| | | | |
|---|---|---|---|
| | i. | Period 1 -- From January 1, 2018, until November 15, 2022 .. | 68 |
| | ii. | Period 2-- From November 16, 2022, to November 16, 2023 . | 69 |
| | iii. | Period 3-- From November 17, 2023 to December 31, 2025 .. | 71 |
| F. | | CONTROL OF VERTICAL AND HORIZONTAL ESSENTIAL INPUTS ....... | 73 |
| G. | | WORLD VISION JOINS THE WATERLAND DEFENDANTS …............. | 75 |
| H. | | MONOPOLY POWER; MARKET POWER IN THE MARKET ..………… | 76 |
| | i. | Waterland Defendants' Monopoly Power Over CCM Touring Market ...…………………………………………… | 76 |
| | ii. | Waterland Defendants' Have Monopoly Power Over NPS Market As It Is Interlinked With The CCM Touring Market ……………………………………………... | 79 |
| | iii. | Waterland Defendants' Have Monopoly Power Over NPS Market As They Have Created A Competing Platform To The Artists' Platforms .....…………………………………… | 80 |
| | iv. | Anticompetitive Impact On Competition Vis a Vis Impact On Artists ...……………………………………………. | 82 |
| | v. | Anticompetitive Impact On Competition Vis a Vis Nonprofits ...………………………………………….. | 82 |
| | vi. | Anticompetitive Impact On Competition Vis a Vis TCA and Plaintiffs ...……………………………………………. | 84 |
| | vii. | Employing Dirty Tricks to Throttle Competition.…………… | 85 |
| | viii. | Insurmountable Barriers to Entry Have Been Erected ..……... | 85 |
| I. | | UNLAWFUL ACQUISITIONS IN VIOLATION OF CLAYTON ACT §7 ...... | 87 |
| J. | | MONOPOLIZATION IN VIOLATION OF SHERMAN ACT §2 ..………… | 88 |
| K. | | VIOLATIONS OF SHERMAN ACT §1 (INCLUDING TYING) AND CLAYTON ACT §14 ...…………………………………………... | 89 |
| L. | | MARKET AND CUSTOMER ALLOCATIONS IN VIOLATION OF SHERMAN ACT §1 ...…………………………………………… | 92 |
| M. | | GROUP BOYCOTT IN VIOLATION OF SHERMAN ACT §1 ..………… | 93 |
| N. | | ANTITRUST INJURY …………………………………………….. | 95 |

| | | |
|---|---|---|
| VI | | CLAIM FOR RELIEF FOR VIOLATIONS OF TENN. CODE ANN. §§ 47-25-101&102 [TENNESSEE ANTITRUST ACT] (ASSERTED AGAINST THE WATERLAND DEFENDANTS, WORLD VISION, THE MERCYME DEFENDANTS AND THE BICKELL PARTIES) …………………………………………..……….. 98 |
| VII. | | CAUSES OF ACTIONS AND CLAIMS FOR RELIEF ASSERTED AGAINST WATERLAND DEFENDANTS FOR MISAPPROPRIATION OF TRADE SECRETS, BREACHES OF CONTRACTS AND RELATED CLAIMS......…………………… 98 |
| | A. | BACKGROUND FACTS APPLICABLE TO ALL CLAIMS UNDER THESE CAUSES OF ACTIONS …………………………………………… 99 |
| | B. | VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1836 ET SEQ. ......…………………………………………… 104 |
| | C. | VIOLATION OF THE TENNESSEE UNIFORM TRADE SECRETS ACT, TENN. CODE ANN. § 47-25-1701 ET SEQ. …...…………………….. 109 |
| | D. | BREACH OF CONFIDENTIALITY AND RESTRICTED USE AGREEMENTS …………………………………………………... 110 |
| | E. | BREACH OF CONTRACT TO ACQUIRE TCA ……………………….. 113 |
| VIII. | | CAUSE OF ACTION AND CLAIM FOR RELIEF FOR DEFAMATION, FALSE LIGHT, ETC. ASSERTED AGAINST THE DEFAMATION DEFENDANTS ….……………….. 118 |
| | A. | THE ARTICLE FALSELY ASSERTS NICOLE WAS RAPED BY NEWSBOYS' EMPLOYEE WHEN NICOLE TOLD THE POLICE AND OTHERS HER ENCOUNTER WAS CONSENSUAL -- A FACT THE ARTICLE KNOWINGLY OMITTED ...……………………………….. 119 |
| | i. | The Article did Not Disclose Nicole's Statements To Police Of Consensual Sex ...………………………………………….. 120 |
| | ii. | Nicole Told the Fargo Hospital and Friends a Combination of Stories Ranging From Consensual Sex to Amnesia ...……… 123 |

v

B. THE ARTICLE CLAIMS NICOLE MUST HAVE BEEN DRUGGED BASED ON NOTHING OTHER THAN NICOLE'S SELECTIVE, SELF-PROCLAIMED PARTIAL AMNESIA ...…………………………………… 125

C. THE ARTICLES FALSELY CHARACTERIZED TAIT'S JUNE 10, 2025 STATEMENT AS AN "ADMISSION OF GUILT" AND KNOWINGLY MISREPRESENT ITS CONTENTS ...………………………………… 135

D. THE ARTICLES' CLAIMS THE NEWSBOYS "COVERED UP" NICOLE'S RAPE AND DRUGGING WAS A LITERAL IMPOSSIBILITY SINCE EVERYONE KNEW EVERYTHING ...…………………………………... 136

E. THE FEBRUARY 12, 2026, ARTICLE RESTATED THE ORIGINAL ARTICLE WITH MATERIALLY ALTERED AND EXPANDED DEFAMATIONS ABOUT THE ALLEGED "COVER UP" ALLEGATION IMPLICATING WES CAMPBELL PERSONALLY IN THE MATTERS COVERED BY THE ORIGINAL ARTICLE ...………………………… 143

F. DEFAMATION DEFENDANTS ARE RESPONSIBLE FOR EACH SUBSEQUENT REPUBLICATION ...………………………………… 144

G. PLAINTIFFS HAVE BEEN DAMAGED BY THESE DEFAMATIONS ...…… 145

██████████████████████████████████████████

IX. CLAIM FOR RELIEF FOR CONSPIRACY AND AIDING AND ABETTING DEFAMATION AGAINST THE WATERLAND DEFENDANTS ……………………………………………………… 146

██████████████████████████████████████████

X. CLAIM FOR RELIEF FOR VIOLATIONS OF LANHAM ACT ASSERTED AGAINST THE WATERLAND DEFENDANTS AND WORLD VISION ………………………………………………......…... 148

██████████████████████████████████████████

XI. CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST MERCYME DEFENDANTS ...…………………………….. 155

A. BACKGROUND FACTS RELEVANT TO THE CAUSES OF ACTION AND CLAIMS HEREUNDER ...…………………………………… 156

B. BREACH OF CONTRACT CLAIM AND RELATED CLAIMS AGAINST THE MM DEFENDANTS ...………………………………… 159

|  |  | i. | Collins' Resignation Involved An Act Of Moral Turpitude Triggering No Termination Right ...……………………... | 159 |

|  |  | ii. | Collins' Resignation for No Reason Did Not Trigger Tight to Terminate …..………………………………………… | 160 |

|  |  | iii. | MM Parties Did Not Exercise Termination Right in Good Faith ...…………………………………………………. | 160 |

|  |  | iv. | Plaintiffs were Denied Contractual Cure Rights ...………… | 161 |

|  |  | v. | MM Defendants Breached (Ex. 4, p. 10, ¶9(c) of MM Contract ...……………………………………………... | 162 |

|  |  | vi. | MM Defendants Breached MM Contract By Denying Matching Rights ...……………………………………….. | 163 |

|  |  | vii. | MM Defendants Breach Duty of Good Faith ...……………... | 165 |

|  |  | viii. | Conversion of Plaintiffs' Property ...……………………... | 166 |

|  | C. |  | VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1836 ET SEQ. ..……………………………………… | 167 |

|  | D. |  | DAMAGES ...……………………………………………. | 167 |

|  | E. |  | UNJUST ENRICHMENT AND IMPOSITION OF CONSTRUCTIVE TRUST AGAINST THE MM DEFENDANTS ...…………………………….. | 169 |

|  | F. |  | CLAIM FOR INDEMNITY ...……………………………………… | 171 |

|  | G. |  | TORTIOUS INTERFERENCE WITH TCA'S CONTRACT AND BUSINESS RELATIONS WITH CHILDREN INTERNATIONAL ..………………… | 171 |

|  | H |  | TORTIOUS INTERFERENCE WITH COLLINS' CONTRACT …………… | 173 |

|  | I |  | CLAIM FOR RELIEF FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF ASSERTED AGAINST MERCYME …………….. | 173 |

|  | J. |  | SUMMARY OF CLAIMS AGAINST THE MM DEFENDANTS ..……….. | 173 |

| XII. |  |  | CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST WATERLAND DEFENDANTS RELATED TO THE MM CONTRACT AND OTHER TORTIOUS ACTS ...……………... | 175 |

|  | A. |  | GENERAL ALLEGATIONS APPLICABLE TO THESE CLAIMS ..……… | 175 |

Case 3:26-cv-00484    Document 1    Filed 04/17/26    Page 7 of 204 PageID #: 7

B.      CONSPIRACY TO BREACH MM CONTRACT ………………………..    176

C.      TORTIOUS INTERFERENCE WITH MM CONTRACT ………………….    176

D.      TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL AND BUSINESS RELATIONS WITH MM ...…………………………….    177

E.      TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL AND BUSINESS RELATIONS WITH BRANDON LAKE AND OTHERS ..………    177

F.      BREACH OF FIDUCIARY DUTY ...……………………………………..    178

     i.      Breach of Fiduciary Duty Regarding Concert Jointly Featuring Artists Tauren Wells and Danny Gokey Who Were Under Contract With TCA .…………………………    178

     ii.      Breach of Fiduciary Duty Arising Out of the Purchase Agreement ...…………………………………………...    179

G.      TORTIOUS INTERFERENCE WITH WELLS AND GOKEY CONTRACTS …………………………………………………    180

XIII.      CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST WORLD VISION RELATED TO THE TCA PURCHASE AGREEMENT AND OTHER TORTIOUS ACTS …………………...    180

XIV      CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST MICHAH TYLER FOR BREACH OF CONTRACT …….    183

A.      BACKGROUND FACTS RELEVANT TO THE CLAIMS AGAINST MICAH TYLER …………………………………………………….    183

B.      BREACH OF CONTRACT BY MICAH TYLER ………………………..    184

C.      CLAIMS FOR INDEMNITY AGAINST MICAH TYLER ………………..    185

D.      SUMMARY OF RELIEF SOUGHT AGAINST MICAH TYLER ………….    186

XV.      CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST THE BICKELL PARTIES RELATED TO THE MM CONTRACT AND TYLER CONTRACT ……………………………    186

A.      CONSPIRACY TO BREACH MM CONTRACT ………………………..    188

B. TORTIOUS INTERFERENCE WITH MM CONTRACT ..................... 188

C. TORTIOUS INTERFERENCE WITH THE TYLER CONTRACT ............. 189

XVI. DAMAGES FOR VIOLATIONS OF TENN. CODE ANN. § 48-101-520 IN CONNECTION WITH THE SOLICITATION OF CHARITABLE FUNDS ..................................................... 189

XVII. CONSPIRACY (ALL DEFENDANTS) ..................................... 190

XVIII. CONDITIONS PRECEDENT ................................................ 191

XIX. ATTORNEYS FEES ........................................................ 192

JURY TRIAL DEMANDED ................................................... 192

PRAYER FOR RELIEF ...................................................... 192

EXHIBITS

| Ex. No. | Description |
|---|---|
| 1 | Article Roys Report dated June 19, 2025 |
| 2 | Fargo Police Report (redacted by the Police) |
| 3 | New Article Roys Report dated February 12, 2026 |
| 4 | MercyMe Contract |

Plaintiffs Thriving Children Advocates, LLC ("TCA"), Thriving Charity Advocates, LLC, Wesley Campbell, Newsboys, Inc., and, Newsboys Touring, LLC, ("Plaintiffs") bring this Complaint against Waterland Private Equity Investments, B.V.; Waterland Private Equity Aps; Waterland Holdings, LLC; Christian Lund Madsen; Nicklas Guldberg; USLive OpCo, Inc. Dba LiveCo And TPR.; USLive, LLC; US Live Holding, LLC; USLive Intermediate Holdco, Inc.; Brian Becker; TPR Entertainment, LLC; Premier Productions Holdings, LLC; Michael Pugh; Shane Quick; USLive Rush, LLC; Rush Concerts, Ltd; Jacob Reiser; USLive Transparent, LLC; Transparent Productions, LLC; Transparent Processing LLC; Timothy Taber; The Roys Report NFP; Julie Roys; Jessica Morris; MercyMe, Inc.; Bart Millard; Robin "Robby" Shaffer; Nathan Cochran; Mike Scheuchzer; Scott Bickell; Brickhouse Entertainment, LLC; Micah Begnaud aka Micah Tyler; and World Vision, Inc. (collectively "Defendants") stating as follows:

## I.     INTRODUCTION AND STATEMENT OF THE CASE

1.     In this case, Wes Campbell, and the four musicians comprising the Christian musical artists known as the "Newsboys," their families, and the ministries they have dedicated their lives to build, have been destroyed by the actions of the Defendants, including their publication of defamatory articles fueled by competitors with anticompetitive motives. These actions were not isolated, but part of a coordinated scheme involving anticompetitive misconduct, misappropriation of confidential information, contractual breaches, and the dissemination of statements known to be false. And there appears to be no end in sight. The Plaintiffs must thus turn to the courts to set forth the truth in a fair and impartial forum as opposed to continually battling untrue rumors circulated with impunity by tabloids and competitors.

2.     In brief summary of the facts set forth in this Complaint, on June 19, 2025, the Roys Report, a tabloid that proclaims itself to be a "watchdog" over the Christian world, published a

1

false and defamatory article concerning the Plaintiffs, a copy of which is attached as **Exhibit 1**. They published a second, related defamatory article concerning the Plaintiffs on February 12, 2026, a copy of which is attached as **Exhibit 3**. Together they are called the "Articles." The defamatory Articles were written by Defendant Jessica Morris. The publisher and editor in chief of the Roys Report is Julie Roys, who approved their publication (the Roys Report, Julie Roys and Morris are herein sometimes collectively called the "*Defamation Defendants*"). The Articles concerned an event alleged to have happened almost 11 years earlier. The headline of the first defamatory Article read as follows and every word of it was false:



3. The Article spread through the Christian community. It told a devastating but false story. Members of the Christian community reacted to the Article as if the story it told was factual. But this Complaint demonstrates that the story the Article told was not true.

Contemporaneous police reports, video evidence from the hotel itself, and the accuser's own prior statements, tell a totally different story -- one that was intentionally hidden from the public.

4. The woman the Defamation Defendants identified in the Articles was given the pseudonym "Nicole."[1] Although the headline and Article repeatedly proclaimed Nicole had been raped, Nicole had told the police in Fargo, North Dakota three short days after the events there, that her encounter with Matt Brewer in Fargo was "**consensual**."  In other words, there had been no rape.  Further, the evidence conclusively showed the Defamation Defendants knew there had been no rape -- they had the Police Report -- yet printed it any way.   The question of why they reported this story when they knew it was false, is in part what this suit will reveal.

5. But in short summary, as this Complaint alleges, the "non-story" of Nicole's consensual liaison in 2014 that had 11 years later morphed into a story of rape, cannot be understood  apart from the anticompetitive battle that was going on between on the one hand, Wes Campbell and his companies and on the other Waterland, a Dutch venture capital hedge fund.  Solving the mystery starts and ends there.

6. Waterland was the primary antagonist behind the anticompetitive battle in which the defamatory Articles were to play a large part, as were its newly acquired subsidiaries, Transparent Productions, LLC ("Transparent"), Premier Productions Holdings, LLC ("Premier") and Rush Concerts, Ltd. ("Rush").   Transparent, Premier and Rush together promoted almost 80% of the Christian music concerts in America.  And when Waterland acquired them in near simultaneous acquisitions through its newly formed holding company called "LiveCo" or "TPR," in one stroke Waterland had acquired almost an 80% market share in the Christian music concert market (the "CCM Touring Market).  In short, it had created a monopoly.

---

[1] Nicole was the pseudonym used by the Defamation Defendants cloaking the identity of the actual person the Articles were about and use of that pseudonym will be continued in this Complaint.

3

7. Artists in the CCM Touring Market are dependent on nonprofit charities who, with the artists' consent, solicit donors during CCM concerts (donors are referred to as "sponsors"). CCM music artists had what the industry calls "Public Platforms." While explained in detail hereafter, that term refers to the general ability of an artist to attract large audiences at faith-based CCM concerts.

8. Nonprofit charities who have used artists' "Public Platforms" to generate donors or "sponsors," have historically paid the artists based on the number of sponsors generated at each concert. Nonprofits would normally pay approximately $200 per sponsor depending on the artist and other factors.

9. Campbell was both the founder of the highly successful Christian music group called the "Newsboys," and also the owner of another company named Thriving Children Advocates, LLC ("Thriving Children" or "TCA"). TCA had an established and profitable track record of acquiring artists' Public Platforms and effectively marketing them to nonprofits for raising sponsors at CCM concerts but doing so in in compliance with the numerous state law reporting requirements imposed on "Professional Solicitors" as defined in Tennessee law.

10. Concert promoters did not participate in those nonprofit payments. Artists would not typically share their sponsorship payments with promoters; and if a promoter tried to force them to do so, artists had several other promoters to whom they could turn.

11. The Waterland Defendants approached Campbell to acquire his company, TCA, in order to make TCA their "nonprofit" sponsorship arm. After the acquisition, with TCA operating as a part of LiveCo, the promoters would finally be able to participate to some degree in sponsorship payments.

4

12. After signing comprehensive confidentiality agreements, (defined hereafter as Confidentiality and Restricted Use Agreements), TCA disclosed its confidential information as to (i) artists TCA had contracted with, (ii) what those artists were being paid for use of their Public Platform to generate sponsors, (iii) the term of expiration of TCA's agreements, (iv) the revenues TCA made for services to nonprofits in connection with sponsorship generation, and (v) the candid competitive challenges TCA saw in the market place, all of which was disclosed by TCA in the strictest confidence.

13. Realizing TCA's value and the potential for the now-combined promoters to receive some benefit from nonprofit sponsorship payments, the Waterland Defendants offered to purchase TCA for approximately $50,000,000. TCA accepted that offer.

14. A few days later, however, the Waterland Defendants told TCA they needed to postpone closing to allow them to raise more capital. That was not true. In truth they realized that they had actually formed a monopoly of America's top concert promoters with control of over 80% of the domestic CCM touring market. With this newly created monopoly they now had collective power none of them had had before. They realized they could now dictate the terms on which CCM Touring occurred. And as a result of that control, they realized they had created a new "Platform" of their own which they could now market to nonprofits for sponsorship payments that would come directly to them, bypassing the artists. If artists did not like it, the artists had nowhere else to go. The monopoly they had created had turned the tables.

15. As certain of the Waterland Defendants would later admit to TCA, they had struck a secret deal with World Vision, the world's largest charity, who had agreed to pay the Waterland Defendants an astounding $500 (or more) for each sponsorship generated at concerts promoted by the Waterland Defendants, in exchange for exclusive or near exclusive rights.

5

16. To put that number into perspective, applying it to a mega group with a large Platform like MercyMe ("MM") -- a group then under contract with TCA --- is instructive. Such a group may have 60 concerts a year, with average attendance at around 4000 people per concert or 240,000 total annual concert attendees. If 6% of those attendees, or 14,400 people, became donors, with payments to the Waterland Defendants at $500 per donor, the annual payment the Waterland Defendants would receive would be $7,200,000. And that was just for one artist for one year. With Waterland promoting as many as 1000 concerts and selling as many as 2,000,000 tickets a year, as their website boasts, revenue from their annual ticket sales would be around $80,000,000. But a payment of $500 per sponsorship would add for Waterland an additional $60,000,000 annually to their top line -- almost a 75% increase in revenue at little to no extra expense.

17. While sponsorship money would have previously gone to artists, the monopoly power to control over 80% of the concerts allowed Waterland to not only now itself receive those payments but to receive them at a massive premium. The ability to charge a premium was tied to Waterland's control of the CCM concert market -- its monopoly. Without that control, lower amounts would have been paid and they would have been paid to Christian artists.

18. Behind this paradigm shift in how the market worked, was World Vision who had made the offer to the Waterland Defendants and had thus become their horizontal partner, vertical funding source and co-conspirator.

19. The Waterland Defendants now had the monopoly control, TCA's confidential information, and the financial backing of the largest nonprofit charity in the world, World Vision. At that point, TCA was no longer needed. Instead, the Waterland Defendants decided to use their monopoly, TCA's information and their partnership with World Vision, to begin to destroy

6

the current business model and industry expectations which held that Platforms and sponsorship payments belonged to the artists, and to replace that with a new paradigm, which was that Platforms and sponsorship payments belonged to the promoter who held the power to decide if an artist toured or didn't and the terms on which they would be compensated.

20.  That effort to re-write the current business model and re-shape industry expectations reached its zenith in August 2024.  The Waterland Defendants knew that one of TCA's biggest contracted artists was the mega music group MercyMe whose contract with TCA was then up for renewal.  From the confidential information TCA had given them, the Waterland Defendants knew the precise contours of MercyMe's sponsorship compensation structure.  The Waterland Defendants and World Vison thus approached Mercy Me with an offer to pay for some of MM's production costs that MercyMe would otherwise have to pay themselves, but only if MM would forgo sponsorship payments from TCA.  The amounts offered to MercyMe were intended to replace the sponsorship money TCA had offered and TCA would likely offer again, but the key was to modify MM's thinking so they would no longer think in terms of dollars per sponsor.

21.  MercyMe's agent, Scott Bickell, took to TCA the Waterland Defendants' offer of significant production cost payments in exchange for a waiver of sponsorship money.  TCA then translated that into a new per sponsorship payment, which MM agreed to.  MercyMe then told the Waterland Defendants that MM was opting to re-sign with TCA, keeping its model of sponsorship revenue intact.  This was a major competitive blow for the Waterland Defendants and World Vision.

22.  Together, Waterland Defendants and World Vision thus realized that even with (i) TCA's plans and models acquired under strict confidentiality (ii) the financial backing of

7

Waterland as a private equity firm and (iii) the financial backing of World Vision, the world's largest charity, Campbell, TCA, and the Newsboys, would still be an irritant to them in the competitive marketplace frustrating their ability to maximize the potential of their monopoly.

23. This led them to the realization they had to permanently remove Campbell, TCA and the Newsboys from the competitive markets. And to accomplish this, they began to search for any weapon they could find to destroy Campbell. This, in turn, led them to Nicole, who is believed to have surfaced via one of the bands Transparent promoted. They found her shortly after they lost their contracting possibility regarding MercyMe and by October 2024, Nicole was conveniently working for them as a fulltime employee. Her consensual liaison in 2014 with Matt Brewer, thereafter became in 2024 a false tale of drugging, rape, and coverup.

24. As a new employee, Nicole repeatedly met with the Defamation Defendants, with the full knowledge and blessing of the Waterland Defendants, her employer, as was their plan. Other personnel of the Waterland Defendants, or close associates, also met with the Defamation Defendants, as arranged, encouraged and abetted by the Waterland Defendants.

25. A "whispering" campaign was initiated by the Waterland Defendants, telling parties looking to work with the Newsboys and/or TCA that there was a "devastating" article coming out. Prospective counterparties were told that when the defamatory Article did come out, Campbell and his companies would be pariahs and anyone publicly associated with them would suffer as well. This resulted in a loss of business clients and customers from TCA and an effective boycott of the Newsboys music group, as they intended. This was not merely reputational harm, but exclusionary conduct that foreclosed Plaintiffs' ability to compete, restricted output, and impaired access to customers and essential commercial opportunities in the CCM Touring and Nonprofit Sponsorship Markets, as hereafter identified.

8

26. But it was also a constructed falsehood. What actually happened in that Ramada Inn in Fargo, North Dakota 11 years earlier, was far different than the story the defamatory Article, assiduously instigated by the Waterland Defendants, portrayed.

27. In reality, on December 16, 2014, in Fargo North Dakota, Nicole, a single woman, was captured by hotel video freely walking down hotel corridors to the hotel room of Matt Brewer, a single man who was an independent contractor lighting technician doing contract work for the Newsboys on their tour. It was after 1 a.m. In Brewer's room, Nicole and Brewer had _**consensual**_ sexual interactions for approximately 30-45 minutes until shortly after 2 a.m., when she left and returned to her own hotel room.

28. For the brief time she was in Brewer's room, Nicole was apparently not answering her cell phone although hotel video footage showed her texting. Apparently, however, she had missed calls from her friends. Later, on the morning of December 16, after the brief tryst with Brewer, when Nicole's Christian friends, co-workers and employer asked her where she had been, she found herself deeply embarrassed and told them that she could not remember what had happened.

29. Because she claimed "amnesia," her employer drove her to a hospital in Fargo that very morning -- i.e., December 16. At the hospital that morning, Nicole made no claim she had been raped and refused to allow the hospital to do any testing that would have established or refuted any claims of having been drugged or raped. In fact, had she even insinuated she had been raped the hospital would have been required by law to contact the police and they did not. N.D.C.C. § 43-17.41 (mandating that medical personnel report sexual assault as soon as is practicable).

9

30. Her former employer who drove her to the hospital, Matt Best, the tour promoter/manager, would later deny he ever told anyone there had been a rape. In the aftermath, Best, in fact interviewed virtually everyone, including Newsboys Touring Manager Steve Campbell, and Nicole as well. Best, Steve Campbell, and Michael Tait also met together with the tour owner, Evangelist Nick Hall. The result of these meetings was that Nicole was terminated by her employer and sent home while the tour continued with Brewer staying on in his role as an independent lighting contractor. Sending Nicole home and continuing with Brewer, while harsh, was perhaps in keeping with punishment for consensual sex perceived as unbecoming in a Christian concert context, but it was not punishment for being a rape victim.

31. At home in Minnesota, Nicole was again confronted with the embarrassment of explaining to family/friends why she had been terminated and therefore again said she could not remember what had happened. In Minnesota, her family/friends, presumably, then made her go back to a hospital, the date now being December 19, three days after her voluntary sexual encounter with Brewer. Having gone to the hospital in Fargo the day of the incident (December 16), there would be no reason to go again three days later (December 19) unless she was forced by her family/friends.

A. *NICOLE TOLD FARGO POLICE THE ENCOUNTER WAS CONSENSUAL.*

32. At the second hospital in Minnesota, Nicole told the hospital attendants she could not recall what happened, but someone appears to have mentioned the possibility of rape. Thus, the Minnesota hospital then called the Minnesota police as they were required to do by law, who then called the Fargo Police. The Fargo Police having now been notified, interviewed Nicole to take her "statement," which she gave under penalty of committing a crime if she made a false statement or reported a crime falsely. N.D. Cent. Code § 12.1-11-03.

10

33.     In that interview with Fargo Police that occurred three days after the incident, Nicole repeatedly told the Fargo police that her encounter with Brewer had been **consensual**, the Fargo Police writing precisely what Nicole told them in their official Police Report:

> "*She does, agree, though that any interaction that she would have had with Matt **would have been consensual**...*"  (Ex. 2, p. 5)
>
> <div align="center">*****</div>
>
> "*Matthew Best is not the same person as who [Nicole] was **having consensual relations with**.*" (Ex. 2, p. 6)

Thus, Nicole's own statements to the Fargo Police in 2014, three days after the incident, established there was no rape.  Yet, while the Defamation Defendants had the very police report that so stated, the Article mentions none of this and instead proclaims that Nicole was victimized.

### B. *NICOLE WAS NOT DRUGGED.*

34.     The defamatory Article also falsely proclaimed she had been drugged, not because of any testing of her blood or urine (which she refused) or because anyone witnessed a drug being put in a drink.  Rather, the allegation of drugging was made because before Nicole went to Brewer's room, she was in a bar in the hotel's lobby, where Michael Tait, then lead singer for the music group Newsboys music group, also happened to be.  According to the Article, Tait ordered three tequila shots at the bar, one for himself and one for a co-worker named John Burch who was standing beside Tait at the bar.  The Article then claims Tait "shouted" to Nicole to come join him and Burch for the third shot. Brewer was nowhere around.

35.     The defamatory Articles essentially claimed Tait *must have* put some kind of date rape drug into one of the three tequila shots, a statement made with no evidence or support other than Nicole's self-proclaimed amnesia.  It was not true. An independent observer, John Burch, was literally standing right beside Tait when the three shots were poured by the bartender and affirmatively confirmed nothing was put into those shot glasses, but the tequila poured by the

<div align="center">11</div>

bartender.   Neither did the bartender see anything put in by anyone.   Yet the Defamation Defendants did not make any attempt to speak to Burch or the bartender and neither did they disclose any of these facts.

36.     Furthermore, the Fargo Police wrote in their official report, that Nicole had not been given any "date rape" drug, based in part on their own investigation, including their viewing of the hotel video footage after which the Fargo Police wrote in their report repeatedly:

> "*there is no indication of her being drugged in any way for this to have happened*"; (Ex. 2, p. 5)
>
> <div align="center">***</div>
>
> "[there was no] *indication that she had been given a date rape drug which would have incapacitated her.*" (Ex. 2, p. 6)

And again, although the Defamation Defendants knew this because they had the Police Report, the Police Departments' own expert opinion was not disclosed in the defamatory Articles either.   In further contradiction of the assertion she had been given a "date rape" drug and raped, the Police Report stated that Nicole herself told the police she *"remembers 'Matt' trying to have sex with her and giving 'Matt' oral sex..."* (Ex. 2, p. 3).   The defamatory Articles distort this by stating Nicole said all she remembered was "the feeling of my head being pushed down between someone's legs. I... guess oral sex, or an attempt, but I don't fully remember," which is starkly inconsistent with Nicole telling the Police she remembered giving Brewer oral sex.

37.     Apart from that glaring inconsistency, had she been given a "date rape" drug, according to medical science, she would not have selectively remembered "giving Matt oral sex," as the Fargo Police Report states she told them.   A person incapacitated by such a drug does not have "selective recall" and having "selective recall" is materially inconsistent with the effects of an incapacitating substance as alleged in the Articles.   As a practical matter, neither would Nicole

<div align="center">12</div>

have remained in a room if she did suddenly awaken to find herself somehow "involuntarily" or unconsciously giving a stranger fellatio.

38.     The Article perversely concluded Nicole *must have been* "drugged" because she proclaimed to them in 2025 that she had no attraction to Brewer and thus would not have been involved with him otherwise.  It was a preposterous, baseless assertion but the Articles made it anyway.

C.  *THERE WAS NO COVER-UP AS THERE WAS NOTHING TO COVER UP.*

39.     Neither was there any "cover-up," as there was nothing to be covered up.  To the contrary, afterwards Nicole had talked to her friends, her employer, and evangelist Nick Hall who was the tour owner for whom Best worked.  She had been to two different hospitals where she had spoken with doctors and nurses in both and talked extensively to the Fargo Police.  Multiple independent parties had direct knowledge of and involvement in the events.   And none of that was within Plaintiffs' control.

40.     But the real question was why a 2014 consensual liaison in Fargo, North Dakota between two consenting adults that lasted 30-45 minutes, was suddenly surfacing in 2025 and being morphed into a charge of drugging, rape, and cover-up, shortly after Nicole went to work for the Waterland Defendants.  And as stated above, the answer is that the fabricated story was formed, facilitated and fomented, to destroy Campbell and his companies as a competitor, seize his business for themselves and thereby further consolidate and maintain their monopoly power.

41.     And as will be demonstrated, when the defamatory Article came out in June 2025, it proved pivotal in the Waterland Defendants' efforts to convince MercyMe to terminate their August 2024 contract with TCA -- the very contract TCA had bested them to get -- and work with

LiveCo/TPR. This Complaint addresses these facts and related causes of action arising from Defendants' coordinated scheme.

## II. PARTIES

### A. PLAINTIFFS

42. Plaintiff Thriving Children Advocates, LLC ("TCA") is a limited liability company organized under the laws of Tennessee, whose sole member is Thriving Charity Advocates, LLC.

43. Plaintiff Thriving Charity Advocates, LLC ("Thriving Charity") is a limited liability company organized under the laws of the US Virgin Islands. Its sole member is a US Virgin Island trust and the residence of its trustees, one of whom is Wes Campbell, is: Tennessee and the US Virgin Islands.

44. Plaintiff Wes Campbell, the founder of the Newsboys and Thriving Children Advocates, LLC, is an individual who resides in Tennessee.

45. Plaintiff Newsboys, Inc. is a Tennessee corporation.

46. Plaintiff Newsboys Touring, LLC is a Tennessee limited liability company whose members are one individual who resides in Tennessee and a trust whose trustees are Tennessee residents. [2]

### B. DEFENDANTS

---

[2] Plaintiffs Newsboys, Inc. and Newsboys Touring, LLC, while separate legal entities formed for liability and operational purposes, function as a single, integrated economic enterprise in the marketplace. Newsboys, Inc. is wholly owned by Plaintiff Wes Campbell. Newsboys Touring, LLC is owned by Plaintiff Wesley Campbell and a trust, the trustees of which are Campbell and his wife. Both entities operate under the common direction and control of Campbell and function in a coordinated and interdependent manner as the musical group known commercially as the "Newsboys." Newsboys Touring, LLC conducts nationwide concert tours, generating live performance revenue and public exposure, while Newsboys, Inc. owns and exploits intellectual property rights in sound recordings, compositions, and related licensing, including those generated from live performances. These functions are economically inseparable: touring activity drives fan engagement, brand visibility, and demand for recorded music, while the popularity of recorded music drives ticket sales, sponsorship opportunities, and touring demand. Together, they comprise a unified commercial platform through which the Newsboys compete in the Contemporary Christian Music marketplace and will be referred to hereafter jointly as "Newsboys."

14

47. Waterland Private Equity Investments, B.V. ("Waterland PEI") is a private equity firm organized under the laws of the Netherlands, with its principal place of business believed to be at Brediusweg 16, 1401 AG Bussum, The Netherlands. Waterland PEI may be served pursuant to FRCP 4(h)(2) and 4(f), including through the Hague Service Convention, or by such other means as the Court may direct, including alternative service under Rule 4(f)(3).

48. Waterland Private Equity ApS ("Waterland PE") is a private equity firm believed to be organized under the laws of Denmark, with its principal place of business believed to be Kay Fiskers Plads 11, Public Tower, 19th Floor, 2300 Copenhagen S, Denmark. Waterland PE may be served pursuant to FRCP 4(h)(2) and 4(f), including through the Hague Service Convention, or by such other means as the Court may direct, including alternative service under Rule 4(f)(3).

49. Waterland Holdings, LLC, is a Delaware limited liability company which may be served with process by serving Maples Fiduciary Services Inc, its registered agent at 4001 Kennett Pike, Suite 302, Wilmington, Delaware 19807.

50. Christian Lund Madsen ("Madsen") is an individual and an executive with Waterland PEI and Waterland PE and on information and belief resides at or can be located at Stenseminde Holding ApS, Brorholtvej 36, 9430 Vadum, Denmark. He may be served pursuant to FRCP 4(f), including through the Hague Service Convention, or by such other means as the Court may direct, including alternative service under Rule 4(f)(3).

51. Nicklas Guldberg ("Guldberg") is an individual and an executive with Waterland PEI and Waterland PE and on information and belief resides at or can be located at Kay Fiskers Plads 11, Public Tower, 19th Floor, 2300 Copenhagen S, Denmark. He may be served pursuant to

FRCP 4(f), including through the Hague Service Convention, or by such other means as the Court may direct, including alternative service under Rule 4(f)(3).

52.  USLive OpCo, Inc., is a Delaware corporation which may be served with process by serving Corporation Service Company, its registered agent at 251 Little Falls Drive, Wilmington, Delaware 19808.  US Live OpCo is believed to be operating under two assumed names: "TPR." and "LiveCo" and is named as a defendant for the actions undertaken for those names.  If "TPR." and "LiveCo" are not assumed trade names but names of actual companies, then they are hereby named as parties' defendant.

53.  USLive, LLC is a Delaware limited liability company which may be served with process by serving Corporation Service Company, its registered agent at 251 Little Falls Drive, Wilmington, Delaware 19808.

54.  USLive Holding, LLC is a Delaware limited liability company which may be served with process by serving Corporation Service Company, its registered agent at 251 Little Falls Drive, Wilmington, Delaware 19808

55.  USLive Intermediate HoldCo, Inc. is a Delaware corporation which may be served with process by serving Corporation Service Company, its registered agent at 251 Little Falls Drive, Wilmington, Delaware 19808.

56.  Brian Becker is an individual believed to reside at 2727 Kirby Drive, Houston, Texas 77098 where he may be served with process.

57.  TPR Entertainment, LLC is a Delaware limited liability company which may be served with process by serving Corporation Service Company, its registered agent at 251 Little Falls Drive, Wilmington, Delaware 19808.

58. Premier Productions Holdings, LLC is a South Carolina corporation which may be served with process by serving Gary B Gentry, its registered agent at 206 Riverside CT, Suite A, Greer, South Carolina 29650.

59. Michael Pugh is an individual who may be served with process at his principal place of business at 421 3rd Avenue, Suite 225, Cullman, Alabama.

60. Shane Quick is an individual believed to reside at 1505 Rose Street NW, Cullman, Alabama 35055 where he may be served with process.

61. USLive Rush, LLC is a Delaware limited liability company which may be served with process by serving Corporation Service Company, its registered agent at 251 Little Falls Drive, Wilmington, Delaware 19808.

62. Rush Concerts, Ltd. is an Ohio limited liability company which may be served with process by serving Cliff Reiser, its registered agent, at 131 Park Ave., Marysville, Ohio 43040.

63. Jacob Reiser is an individual believed to reside at 9888 State Route 161, Mechanicsburg, Ohio 43044, where he may be served with process.

64. USLive Transparent, LLC is a Delaware limited liability company which may be served with process by serving Corporation Service Company, its registered agent at 251 Little Falls Drive, Wilmington, Delaware 19808.

65. Transparent Productions, LLC is a California limited liability company which may be served with process at 1072 Bristol Street, #100, Costa Mesa, California 92626.

66. Transparent Processing LLC is a Delaware limited liability company which may be served with process by serving United States Corporation Agents, Inc., its registered agent at 221 Broad St., Suite 3A, Middletown, Delaware 19808.

17

67.     Timothy Taber is an individual believed to reside at 1116 Corona Lane, Costa Mesa, California, 92626, where he may be served with process.

68.     The entities and individuals identified in ¶¶41-61 are referred to as the "Waterland Defendants."  In 2024, the faith-based concert promotion operations of Transparent, Premier, and Rush were announced to have consolidated or merged into a single entity or division, which they publicly refer to as "TPR."  The entity referred to as TPR Entertainment, LLC may be the entity that resulted from that merger.  Third-party industry sources, including Pollstar, report that the Waterland Defendants' concert promotion activity discussed hereafter has been self-reported by them as having been conducted under the designations "USLive" and "USLive/TPR."  Therefore, referring to them as a unified group makes for easier digestion of this Complaint, and it is accurate.

### ii.     THE DEFAMATION DEFENDANTS

69.     The Roys Report NFP is an entity incorporated as a non-profit organization under the laws of the state of Illinois and where it may be served with process by serving its registered agent, Richard J. Hendricks at 217 Hilltop Lane, Sleepy Hollow, Illinois 60118.

70.     Julie Roys is the founder and editor in chief of The Roys Report and publisher of the defamatory Articles identified herein.  She and may be served with process at 217 Hilltop Lane, Sleepy Hollow, Illinois 60118.

71.     Jessica Morris is a journalist for The Roys Report who on information and belief resides in Melbourne, Australia.  She may be served pursuant to FRCP 4(f), including through the Hague Service Convention, or by such other means as the Court may direct, including alternative service under Rule 4(f)(3).

72.     The Roys Report, Julie Roys and Morris are herein sometimes collectively referred to as the "Defamation Defendants."

73.     MercyMe, Inc. is a Texas corporation which may be served with process by serving Robby Shaffer, its registered agent at 1200 Chianti Lane, Roanoke, Texas 76262.

74.     Bart Millard is an individual believed to reside at 6493 Peytonsville Arno Road, College Grove, Tennessee 37046, where he may be served with process, or alternatively by serving him at 106 Mission Court, Suite 1202, Franklin, Tennessee, 37067, the address where he has contractually agreed service of process may occur.

75.     Robin "Robby" Shaffer is an individual believed to reside at 1200 Chianti Lane, Roanoke, Texas 76262, where he may be served with process, or alternatively by serving him at 106 Mission Court, Suite 1202, Franklin, Tennessee, 37067, the address where he has contractually agreed service of process may occur.

76.     Nathan Cochran is an individual believed to reside at 5816 Bending Chestnut Road, Franklin, Tennessee 37064, where he may be served with process, or alternatively by serving him at 106 Mission Court, Suite 1202, Franklin, Tennessee, 37067, the address where he has contractually agreed service of process may occur.

77.     Mike Scheuchzer is an individual believed to reside at 4259 Crowder Road, Franklin, Tennessee 37064, where he may be served with process, or alternatively by serving him at 106 Mission Court, Suite 1202, Franklin, Tennessee, 37067, the address where he has contractually agreed service of process may occur.

*iv.*     *Other Defendants Including World Vision, Inc.*

78.     World Vision, Inc. is a California nonprofit corporation that may be served with process by serving its registered agent, CSC – Lawyers Incorporating Service, at 2710 Gateway Oaks Drive, Sacramento, California 95833.

79.     Scott Bickell is an individual whose office address is 106 Mission Ct. Suite 1202, Franklin, Tennessee 37067 where he may be served with process.

80.     Brickhouse Entertainment, LLC, is a Tennessee limited liability company whose registered agent for service of process is Scott Bickell who may be served at 106 Mission Ct. Suite 1202, Franklin, Tennessee 37067.

81.     Micah Begnaud aka Micah Tyler is an individual believed to reside at 600 Country Road 786, Buna, TX 77612 where he may be served with process.

### III.     JURISDICTION AND VENUE.

82.     This Court has subject matter jurisdiction over the claims asserted against the Waterland Defendants, World Vision, the MercyMe Defendants, Scott Bickell and Brickhouse Entertainment, LLC, pursuant to 28 U.S.C. §1331 because Plaintiffs assert claims against the Waterland Defendants, World Vision and the MercyMe Defendants, arising under the laws of the United States, including (a) Sections 1 and 2 of the Sherman Act [15 U.S.C. § 1 & 2]; and (b) Section 7 of the Clayton Act [15 U.S.C. § 18].  Plaintiffs assert claims against them arising under the Sherman Act and the Clayton Act based on their participation in the anticompetitive scheme and conspiracy alleged herein.

83.     This Court has subject matter jurisdiction over the claims asserted against the Waterland Defendants, World Vision and the MercyMe Defendants  pursuant to 28 U.S.C. §1331 because Plaintiffs assert claims against the Waterland Defendants, World Vision and the MercyMe Defendants, arising under the Federal Defend Trade Secrets Act, 18 U.S.C. §1836.

84.     This Court has subject matter jurisdiction over the claims asserted against the Waterland Defendants and World Vision pursuant to Section 43(a) of the Lanham Act [15 U.S.C. § 1051 et seq.].

20

85. This Court also has subject matter jurisdiction over the claims asserted against the Defamation Defendants, World Vision and Michah Tyler pursuant to 28 U.S.C. §1332 because the claims asserted against them by Plaintiffs are claims arising between citizens of different States and/or foreign states, and the amount in controversy exceeds $75,000, exclusive of interest and costs

86. This Court has supplemental jurisdiction over Plaintiffs' related state-law claims pursuant to 28 U.S.C. §1367(a), and Scott Bickell and Brickhouse Entertainment LLC because claims against those parties form part of the same case or controversy as Plaintiffs' federal claims, and arise from the same common nucleus of operative fact as Plaintiffs' federal antitrust and other federal claims, including the coordinated course of conduct described in Section IV.M, through which the Waterland Defendants and others sought to impair Plaintiffs' business relationships, damage its reputation, and eliminate it as a competitive force in the relevant markets.

87. The claims asserted against the MercyMe Defendants likewise arise from the same series of transactions and occurrences as Plaintiffs' federal claims. As alleged herein, among other reasons, the termination of MercyMe's contractual relationship with Plaintiff TCA was induced and coordinated in connection with the same course of conduct through which the Waterland Defendants and sought to eliminate Plaintiff TCA as a competitor.

88. All claims asserted in this action involve overlapping parties, witnesses, communications, and documentary evidence, and will require resolution of common factual issues concerning Defendants' conduct, intent, and its effects on Plaintiffs' business. The exercise of supplemental jurisdiction will therefore promote judicial economy, convenience, and the consistent resolution of these claims in a single proceeding.

89. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (re because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

90. Venue is further proper in this District pursuant to 28 U.S.C. §1391(c) and (d) because the Defendants have engaged in substantial, continuous, and systematic business within this District.

91. Upon information and belief, each Defendant has committed acts in furtherance of the conduct alleged herein that were directed at, or had foreseeable effects within, this District, and has availed itself of the privilege of conducting business in this District such that the exercise of personal jurisdiction is proper.

## IV. BACKGROUND FACTS OF THE CHRISTIAN CONCERT MARKET AND KEY PLAYERS.

92. As used herein, Contemporary Christian music is referred to as "CCM." Assertions are made in this Article IV that are elaborated on in the Causes of Action that follow.

93. The CCM live concert market is not a subset of, or interchangeable with, the broader live secular music industry, but instead constitutes a fundamentally distinct commercial and cultural ecosystem. Venues, audiences and performances are very different.

94. In earlier times, live CCM concerts were viewed as generators for album sales which were the primary source of revenues for CCM musicians. Digital music downloads and streaming replaced album sales as the primary income driver. But inadequate compensation rates for digital downloads led to the increasing importance of live concerts as the primary source of revenue in the CMM music industry.

95. As explained in detail in Article V, CCM music concerts are generally classed as either CCM tours or One-Off performances. CCM tours, described in detail *infra,* or the CCM Touring Market, are generally a series of pre-planned, branded, and commonly promoted live Christian music performances presented at multiple pre-selected venues in multiple cities or states, pursuant to a published route or date list. CCM one-time events, on the other hand, also described in detail *infra*, are typically in a single hosted venue and occur on a stand-alone basis.

96. The primary market relevant here is the CCM Touring Market which involves (a) performing artists; (b) promoters; and (c) nonprofit concert sponsors, all of which are explained in detail in Article V.

23

### A. CCM PERFORMING ARTISTS

97. Artists perform live at each live CCM concert at each venue and preparing for and conducting live performances requires a significant expenditure of time, energy, skill, financial resources, and physical exertion from the artist. Artists almost always have an accompanying retinue (instruments and vocals) that perform with them. Behind the scenes at each performance are a coterie of supporting personnel responsible for unique stage lighting and lighting rigs, pyrotechnics, and visual effects as well as stagehands, makeup artists, costume designers, managers, and sound technicians. The quality of these components often distinguishes one artists' performance from others.

98. These cost for these are usually referred to as "production costs," and each performing artist is expected to pay for their own production costs.

### B. CCM PROMOTERS

99. CCM concert promoters are selected by the artists or their representatives. With artists' input, promoters prepare a plan identifying multiple pre-selected venues in multiple cities or states across different markets; a route or performance date list; schedule performances within a defined tour window; generate a tour name for branding; and generate accompanying marketing artwork. Tour planning can occur several months in advance of a tour. The promoter advertises and markets in each anticipated venue to ensure maximum audience attendance.

100. The CCM promoter bears location-specific expenses such as marketing, security costs, stagehand and other labor expenses, local catering costs and similar location-specific expenses. A big cost the promoter bears is the artists' **performance fee** (usually guaranteed) paid for each concert performance which is usually a heavily negotiated item. Artists' production costs are paid from advanced performance fees.

24

101.    Amounts incurred by the promoter, artists' performance fees, are sometimes called "Show Costs" or "Pot Costs."

102.    On the revenue side, promoters contract with a ticketing agency to sell tickets for the performances, the net revenues from which go into the "Pot" as "Show Revenues" or "Pot Revenues," from which promoters are reimbursed their Show Costs first.  The promoter bears the financial risk if Pot Revenues do not equal Show Costs.  While negotiable, Pot Costs and Revenues are sometimes kept on a concert-by-concert basis, meaning revenues from profitable concerts are may not make up for concerts that lose money.

103.    Remaining balances after reimbursement of Show Costs are split (the "***Back End Payment***") typically 85% for the artist and 15% for the promoter, although this is heavily negotiated as well.

104.    Competition among CCM promoters has been intense with promoters competitively bidding against one another for artists and tours.  If one CCM promoter offered unsatisfactory terms, other promoters were waiting to step in.

C.  **SPONSORING NON-PROFIT CHARITIES**

105.    Non-profit charities ("*nonprofits*") have played a crucial and evolving role in the economics of the CCM Touring Market.  Indeed, most agree that without nonprofit participation, there would be no live CCM Touring Market.

106.    A CCM artists' "**Public Platform**" is an important industry term that refers to an intangible feature of "goodwill" that translates into the commercially exploitable ability of a CCM artist to attract, assemble, and engage a live audience.  It encompasses the ability to capture and direct audiences' time, attention, and trust, and then utilize it or allow its use, directly or indirectly, including for promotion, sponsorship, or other monetized engagement.  This Public Platform has

25

historically been referred to as the artist's Public Platform because, as a practical matter, it was created and controlled by the artist irrespective of performance venue or promoter.

107. Nonprofit charities rely on public contributions from donors and artists' Public Platform in a CCM concert is an ideal place to source new donors, who in CCM parlance, are called "***Sponsors.***" Artists, in turn, have allowed their Public Platforms to be used for nonprofit fund raising for a fee tied to Sponsorships generated. Many artists were unaware that their Public Platforms could be so monetized and completely unaware of what an appropriate fee to be charged was for generated sponsors.

108. Practically, Sponsor generation typically involves a spokesperson ("***Spokesperson***") making a presentation on stage about the nonprofit asking the audience to become Sponsors. "***Volunteers***" distribute financial support pledge cards and sit at tables in a foyer with information. It is normally the nonprofit's responsibility to provide a Spokesperson and Volunteers at every concert, which is a particularly onerous task for which most nonprofits were not well suited. Furthermore, even charities interested in participating were unaware of what is a fair and lawful fee that should be to pay for sponsors generated.

109. So, the process of finding, interesting and vetting appropriate charities and determining appropriate charges, and on the other hand, educating artists on the availability of marketing their Public Platforms and the appropriate pricing therefor, is a significant undertaking.

110. The market for the acquisition, sale and use of CCM artists' Public Platforms to generate Sponsors (donors) is herein called the "NPS Market" and will be more fully defined and explained *infra*. This market is characterized by price opacity and resulting information asymmetries, which impede price competition and enable the exercise of market power.

111.     Each state has unique regulations on solicitation of funds from the public.  Artists who are compensated for use of their Public Platforms for fundraising are required to be registered, with the results of each concert filed with the state.

112.     In Tennessee, for example, any person or entity who participates in the solicitation of contributions for a charity is defined by statute as a "professional solicitor." [3] Tenn. Code Ann. §48-101-501 (15).  "Professional solicitors" are required to register with state authorities, file applications and post a bond, among other requirements. Tenn. Code Ann. §48-101-507.  Failure to do so the first time is a Class B misdemeanor [§48-101-515] punishable by imprisonment for no more than six months or a fine of $500 or both.  A second violation is a Class E felony [§48-101-507] punishable by imprisonment for no less than one year nor more than six years and a fine which may not exceed $3000.

113.     Violations can also jeopardize the validity of Sponsorship contributions for which artists were paid.  [§48-101-520].  CCM artists are uniquely unqualified to comply with these laws.

114.     One of the primary reasons states such as Tennessee adopted these kinds of laws was the potential for unfair, deceptive and fraudulent practices in soliciting charitable contribution in a manner where donors did not know who was getting paid what.  Donors thinking their money would be used solely for the charities, needed to know precisely how much the artists were being paid for the solicitations.

115.     Sponsorship fees paid to artists by nonprofits are separate from performance fees paid to artists by promoters and are not typically contributed to the financial "Pot." This deeply

---

[3] Tennessee law does not allow a charities' registration to circumvent the "professional solicitor" registration and monitoring requirements as a charities' compliance only extends to a "salaried officer or permanent employee of a charitable organization

vexed CCM promoters. But given the intense competition among promoters, they had little leverage.

116. Compounding these difficulties was the complexity of a structure, employed by some of compensating artists based on *projected* sponsorships not *actual* sponsorships. When the number of *actual* Sponsorships fell short of *projected* numbers, the nonprofits would still be obligated to pay the artist the agreed upon fee per *projected* Sponsor. And because the expenses the nonprofits incurred for Spokespersons, Volunteers, and other such expenses did not vary with decreased revenue from the event, the net benefit to the nonprofit -- stated as "***Cost Per Dollar Raised***" or "***CPDR***"-- could be badly affected. This in turn, created significant additional legal and business risks for nonprofits.

### D. THRIVING CHILDREN ADVOCATES, LLC

117. Thriving Children Advocates, LLC (previously, "***Thriving Children***" or "***TCA***") was formed to serve as a liaison of sorts, between artists and nonprofits.

118. TCA's basic business plan was to (i) source and match nonprofits and artists; (ii) acquire rights to artists' Public Platforms from the artists; (iii) take the responsibility of securing the Spokespersons and volunteers at each location for each concert; (iv) register in each relevant state as a "professional solicitor"; (v) negotiate a charge to nonprofits only for *actual* Sponsorships not *projected*; and (vi) negotiating with artists a per sponsorship fee they would be paid. The difference between what the nonprofits paid TCA and TCA paid artists, after expenses, was TCA's profit.

119. TCA's business model was unique; no one else did this. So it was highly confidential, so much so that artists and nonprofits were both required to sign confidentiality

28

agreements pledging to maintain the secrecy of TCA's model, particularly what nonprofits paid and what artists received.

E. **WORLD VISION.**

120. One of the first nonprofits with whom TCA worked extensively was defendant World Vision, believed to be the largest and most financially powerful nonprofit organization in the world. Founded as an international Christian humanitarian organization, it operates in nearly 100 countries and reports annual revenues in the billions of dollars across its global network. Its U.S. affiliate alone, World Vision United States, is routinely ranked among the largest charities in America by total contributions, placing it in the top tier of nonprofit fundraising entities nationwide.

121. Starting on June 30, 2017, TCA contracted with World Vision around artists' Public Platform employing TCAs models. That relationship ended acrimoniously, however, at TCA's insistence in October 2019. World Vision claimed it had a right to use the Public Platforms of all artists under contract with TCA while it had also set up its own internal department to directly solicit artists' Platforms, making itself, both a customer and competitor of TCA. This created and conflicts and confusion in the marketplace and was the source of often bitter negotiations. Compounding these problems World Vision chose to disregard state fund raising and reporting requirements and did not disclose the results of sponsorship activities on a concert by concert basis. It relied instead on disclosures of its overall results, so the results of individual concerts was hidden by its otherwise massive contribution numbers.

122. These difficulties resulted in a termination agreement between TCA and World Vision on October 24, 2019, and that termination was not friendly.

123. Concerts and thus promoters suffered horribly under the Pandemic. Many smaller regional promoters were driven out of business. Small to midsize promoters were hanging by a thread. Amid this industry fallout, hedge funds from the Netherlands and Denmark known as Waterland Holdings, Waterland PEI, and Waterland PE (collectively, "Waterland") developed and began implementing a strategy to gain control of the United States CCM Touring Market and the NPS Market. [4]

124. Two of the principals of Waterland relevant to the claims herein asserted are Christian Lund Madsen ("Madsen") and Nicklas Guldberg ("Guldberg"), who on information and belief based on public statements, were the driving force behind the entities and actions that are at the base of the claims asserted herein, particularly the antitrust claims. Emails and correspondence to and from these individuals substantiate their personal involvement.

125. By its own statements, Waterland's self-proclaimed business model for acquisitions, looks for a fragmented market and then seeks to aggregate it. It is Waterland's stated practice to itself find targets; targets don't find them. [5]

126. Waterland's first step in the US was to hire Brian Becker, who had been a principal architect of Live Nation's growth strategy. [6] As the initial CEO with Waterland financing, Becker began by forming a series of US companies. Public records reflect the formation of USLive, LLC, which is believed owns USLive Holding, LLC, which in turn owns USLive Intermediate Hold Co,

---

[4] Waterland is capable of rolling up just about anything. Why did it spend $100M on Cooper Parry?" ROLL UP EUROPE, March 22, 2024.

[5] Interview, Tomas Simons, managing partner, Waterland PEI, May 22, 2024 Faces Online ("Faces).

[6] Live Nation is currently a defendant in several antitrust actions filed by the Justice Department and many different states' Attorneys General. *See, e.g., United States v. Live Nation Ent., Inc.,* 2025 U.S. Dist. LEXIS 47262 (S.D.N.Y 2025).

Inc., which in turn owns USLive OpCo, Inc, which is believed to be the primary US operating entity. Emails and communication substantiate Becker's involvement in the formation of these entities and their subsequent acquisitions. Emails and communication also substantiate Becker's involvement in the dealings of those entities with Plaintiffs.

127. Based on filings with the US Patent and Trademark office, USLiveOpCo, Inc. filed a trademark for the name "LiveCo" which appears to be a "dba" under which it operates:

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

## Trademark/Service Mark Application, Principal Register

**Serial Number: 97776018**
**Filing Date: 02/01/2023**

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 97776018 |
| **MARK INFORMATION** | |
| *MARK | \\TICRS\EXPORT18\IMAGEOUT 18\977\760\97776018\xml1 \ APP0002.JPG |
| **SPECIAL FORM** | YES |
| **USPTO-GENERATED IMAGE** | NO |
| **LITERAL ELEMENT** | LIVE CO |
| **COLOR MARK** | NO |
| *DESCRIPTION OF THE MARK (and Color Location, if applicable) | The mark consists of a circle with the words "Live co" appearing on two lines in the center. The word "Live" is in initial capital letters with the letter "I" consisting of a stylized microphone design. The word "co" appears beneath the letter "e" in lowercase letters, with a slash underlining the word "Live". |
| **PIXEL COUNT ACCEPTABLE** | YES |
| **PIXEL COUNT** | 629 x 489 |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | USLive OpCo, Inc. |
| *MAILING ADDRESS | 4400 Post Oak Parkway, Suite 2140 |
| *CITY | Houston |
| *STATE (Required for U.S. applicants) | Texas |

128. On information and belief based on corporate filings, USLive OpCo, Inc. then acquired CCM promoter Premier Productions, LLC (previously "Premier"), which acquisition was made with financing publicly described as having been provided by Waterland:

31



129.     With the acquisition of Premier, whose partner and CEO was Michael Pugh, Waterland had also acquired Premier's ticket issuing company known as Platform Tickets, LLC.

130.     This group later formed (a) Defendants US Live Rush, LLC which was the entity used to acquire CCM concert promoter Rush Concerts, LLC, owned and operated by Jacob Reiser and (b)  US Live Transparent, LLC, which was the entity used to acquire CCM concert promoter Transparent Productions, LLC, owned by Defendant Tim Taber.

131.     In October 2022, Waterland refinanced its existing acquisition debt and "upsized" its credit facility to fund additional acquisitions, as reflected in its own public announcement:



132.    Other independent promoters were also acquired, including BASE Entertainment, Icon Concerts,[7] and Peachtree Entertainment, as well as other, smaller CCM promoters. By January 2023, the Waterland Defendants had substantially completed a series of acquisitions consolidating a significant portion of the CCM concert promotion market, as reflected in their public announcement of the new entity formed by their acquisitions:

---

[7] Icon Concerts is a comedy promoter.

33



**Indie Promoters Consolidate To Form LiveCo; Brian Becker Leads New Venture (Exclusive)**

DEBBIE SPEER / 7:00 AM, TUESDAY, 01/31/2023 / NEWS, PROMOTERS

LiveCo CEO Brian Becker (Front row, 2nd from R) joins his LiveCo team at a company retreat Jan. 30. L–R: Shane Quick, Premier Productions; Tim Ward, LiveCo; Jacob Reiser, Rush Concerts; Paul Meloche, Icon Concerts; Mark Maluso, BASE Entertainment; Becker; Mark Dinerstein, Live Co; Michael Pugh, Premier Productions; Dale Head, LiveCo and Bradley Jordan, Peachtree Entertainment. *(Photo courtesy of LiveCo)*

133. This announcement, dated January 31, 2023, was made at a LiveCo meeting at which all relevant LiveCo participants attended (the "January 31 LiveCo Meeting").

134. Negotiations for the acquisition of Transparent were substantially complete by then, and the Transparent acquisition would close shortly thereafter. Taber began serving as the de facto, and later formally declared, LiveCo/TPR's "Chief Strategy Officer." He is believed to have been present at and to have participated in the discussions about the TCA acquisition that took place there.

135. Business was begun thereafter under the assumed name of "LiveCo" and its web site advertises itself under that name touting ownership of certain "vertical" companies, one of which is listed as "TPR" which is an acronym of Transparent, Premier and Rush:

34



136. As a result, of its actions, the Waterland Defendants created by acquisition what they themselves call "the world's largest one-stop, full service global faith-based promotion company," which they proclaim was formed "through the merger of Transparent Productions Premier Productions, and Rush Concerts" and which they sometimes refer to as "TPR." Notably, however, the "world's largest one-stop, full-service faith-based promotion company" was created through a deliberate process of acquisitions, not organic growth.

137. Although TPR is referenced as the result of a "merger," on information and belief no true "merger" occurred, but it refers to their union as such colloquially.

138. When these acquisitions were announced, LiveCo CEO Brian Becker stated that the "combination of these brands and talent represents a full complement of live entertainment options," and that LiveCo intended to expand partnerships across the industry. Becker, who his

successor stated "was the driving force for the creation of LiveCo," [8] announced owners of each of these acquired companies were "now partners of LiveCo" backed by Waterland Private Equity which was providing them all capital and that the "partners will continue to operate their predecessor companies under the LiveCo umbrella and utilize their established brands. In 2024, Becker was replaced as CEO with Chuck Steedman, who had been Global Executive Vice President for ASM Global, touted as the world's largest live event company. [9]

### G. LIVECO/TPR PLANS FOR ACQUISITION OF TCA THWARTED FOR ANTI-COMPETITIVE REASONS

139. In its quest to become "the world's largest one-stop full service global faith-based promotion company," LiveCo had one glaring deficiency: lack of control of the nonprofit world, which was crucial to CCM Touring Market and a niche segment of the market which Thriving Children (TCA) essentially occupied alone.

140. TCA was the first organization of its kind in the CCM Touring Market serving as a professional fundraising company connecting CCM artists and live events with nonprofit sponsorship opportunities. TCA had "cracked the code" for access to that nonprofit market by among other things, acquiring a long list of successful CCM artists' Public Platforms, and selling them to nonprofits. TCA was repeatedly told by LiveCo/TPR representatives that their acquisition of TCA would provide them with a portal into the nonprofit world which LiveCo did not have.

141. For example, Defendant Pugh, who started Premier, confirmed TCA's unique and superior market position at a meeting where Pugh told Campbell and Wagner directly that TCA had the best model for capturing the NPS Market. Pugh's confirmation was an unprompted,

---

[8] TPR web site, April 16, 2024.
[9] TPR web site, April 16, 2024.

competitor's admission that TCA's proprietary NPS business model was not merely competent but superior to any available alternative.

142. On a separate but related note, in 2022 TCA/Campbell/Newsboys enjoyed a unique fiduciary relationship with the promoter Rush, with whom TCA/Campbell had an exclusive promotion relationship for the promotion of the music group Newsboys which Campbell owned through a series of holding companies. Given that unique fiduciary relationship and its application to Premier by virtue of the fact that Premier and Rush were now partners in same organization, Premier made the initial acquisition overture to Campbell to buy TCA.

143. Two separate confidentiality agreements were signed, defined in Article VI as Confidentiality and Restricted Use Agreements, and meetings began first with Premier, which included Pugh and Shane Quick, both of whom took an active role. Brian Becker, the CEO of LiveCo, shortly thereafter became involved and then Christian Madsen and Nicklas Guldberg, executives with Waterland Holdings, Waterland PEI, and Waterland PE respectively joined the negotiations.

144. Based upon the Confidentiality and Restricted Use Agreements, TCA disclosed a host of confidential information, detailed in Article VI, that was highly sensitive, and imminently usable by LiveCo/TPR, should it choose to violate its nondisclosure agreements. And as set forth in Article VI hereof, it is alleged that LiveCo/TPR did just that.

145. The Waterland Defendants, via LiveCo, made a very attractive initial acquisition offer to acquire TCA which included an earnout provision on future profits TCA may make from its continued operations. On January 26, 2023 -- just a few days before their January 31 LiveCo Meeting -- the Waterland Defendants unilaterally increased the offer of purchase to approximately $50,000,000. This offer was consistent with Pugh's acknowledgement of TCA's superior methods

37

and models.  It demonstrated the Waterland Defendants' decision to purchase TCA rather than attempt to build its own nonprofit-gathering organization from scratch.  And TCA accepted that offer of purchase on January 31, 2023, as elaborated on in Article VI hereof.  This offer establishes the quantitative economic value of TCA's model as independently confirmed by the Waterland Defendants' own valuation.   Indeed, there was no rational reason for such offer apart from a recognition of TCA's unique market position and value.

146.    However, a few days after the contract was formed whereby TCA would operate as the nonprofit sponsorship arm of the Waterland Defendants' operations and their January 31 LiveCo Meeting, Christian Madsen of the Waterland Defendants called TCA to say closing of the agreed acquisition needed to be delayed to allow the Waterland Defendants time to raise acquisition financing.  It is now known and alleged herein, that this was a prevarication.

**H.  THE WATERLAND DEFENDANTS CONCLUDE THEIR DEAL WITH TRANSPARENT/TABER AND ARE JOINED BY WORLD VISION.**

147.    Madsen's statement about postponing closing because more capital was needed, was not the real reason for the Waterland Defendants about face.  On information and belief, it is alleged herein that there were at least two actual anticompetitive reasons for the Waterland Defendants' reversal.

148.    The first was that Transparent was formally acquired and Transparent's Tim Taber had begun serving as the de facto, and later formally declared, LiveCo/TPR's "Chief Strategy Officer."  In that role with TPR, he was tasked with "driving innovation and strategic growth across the company's portfolio" and "focusing on cross-company, strategic partnerships and revenue-generating opportunities."   On information and belief, it is alleged that one of the very first efforts at "innovation" and strategic growth, was to persuade the newly formed LiveCo, not to purchase

38

TCA but for them to internally replicate what TCA had built and do so using TCA's purloined confidential information.

149. On information and belief, for the reasons hereafter set forth, it is alleged Taber convinced the Waterland Defendants that in monopolizing the CCM concert market, they had actually created their own alternative Platform that they could now market to nonprofits. The prospect of their success was enhanced as LiveCo was now armed with the specific knowledge TCA had provided about what nonprofits were willing to pay coupled with knowledge of which artists TCA had reached agreements with and what those artists were being paid. The Waterland Defendants realized that they were now fully equipped to market their own platforms in competition with TCA and performing artists and now knew the competitive marketplace without having to pay TCA $50,000,000.

150. Second, it is alleged that the Waterland Defendants began expedited negotiations with World Vision for World Vision to become the primary if not exclusive, nonprofit who would pay the Waterland Defendants for their newly formed alternative platform. Thus, no longer would TPR have to bow to the artists and/or TCA to acquire artists' Public Platforms. It could market its own Public Platform independently of the artists and TCA. Furthermore, with its own captive nonprofit LiveCo/TPR would not have to look for and negotiate with individual nonprofits, given their partnership with the world's largest charity who would now control their newly formed alternative Public Platform. There thus would be no more competition with artists, TCA or nonprofits.

151. These facts were revealed to Campbell in a meeting which occurred at his home on or around April 21, 2023, no more than 60 days after Madsen had falsely stated closing the TCA acquisition was delayed to allow the Waterland Defendants to raise capital.

152. At that meeting, in discussions with Jacob Reiser of Rush as to the status of the acquisition that Plaintiffs still then-believed would be closed, Reiser said that at the January 31 LiveCo Meeting the assembled group of the Waterland Defendants discussed that TCA would not be able to re-sign any of the artists TCA currently had under contract once those contracts expired. It is now known and herein alleged that the reason for this was that LiveCo intended to preemptively attempt to contract with TCA's artists, telling them effectively that as a condition of them gaining access to the CCM touring platform that LiveCo now held, artists would have to surrender any sponsorship rights they might have, if they wanted to tour.

153. Reiser also disclosed that LiveCo/TPR now had nonprofit sponsorship money itself in a deal paying LiveCo/TPR approximately $500 per sponsor already raised. Of course, this explained the logic of requiring artists to surrender their own sponsorship rights. Reiser also revealed that nonprofit was World Vision.

### I. THE NEWSBOYS ARE UNLAWFULLY BOYCOTTED.

154. In June 2023 Jared Gibo, who worked with Transparent and would shortly become the new CEO of LiveCo/TPR, advised Dave Wagner that Transparent would no longer promote Newsboys' CCM concerts. Gibo stated that this was due to a "rumor" he claimed to have heard about the Newsboys but about which he refused to share any details.

155. The message delivered was particularly unclear and confusing because in the early part of 2023, Transparent's founder and president Tim Taber had told Steve Campbell, Wes Campbell's brother who was also the road manager for the Newsboys, that he had heard a vague rumor. But when Steve Campbell asked Taber to check it out, Taber texted Steve that it was merely an insignificant rumor with no substance, as the following text exchange between Taber

[comments in gray] and Steve Campbell, road manager for the Newsboys [comments in blue] demonstrates:



156.    It was also odd and confusing because the Newsboys had previously agreed with Jacob Reiser of Rush that Rush would be the exclusive promoter for Newsboys and in fact, Rush was promoting Newsboys CCM Tours at that time.

157.    However, in the fall of 2023, even as Newsboys were playing CCM Touring concerts Rush had "scheduled," it was discovered that Rush had done virtually no marketing of the concerts.  For a promoter to schedule a tour, which involved an outlay of expense but not market it, made no sense.  After determining on their own that Rush was in fact not marketing Newsboys' concerts, Reiser was confronted in December 2023.  At that time, Reiser admitted he

41

had been "instructed" to schedule Newsboys concerts but market them no more than minimally necessary to cover Rush's costs, which made no business or economic sense. It is alleged herein that determined in retrospect, the only plausible explanation was to create a financial drain on the group and its owner, Wes Campbell. Traveling to various venues on a CCM tour was expensive as the group had to pay its own production costs. When the group's share of ticket revenues were disappointing, the group's owner, ultimately Wes Campbell, had to fund those costs himself. Seen in retrospect, it was a "slow bleed," designed to cripple the Plaintiffs.

158. When Rush was confronted and admitted he had been "instructed" not market and thus financially cripple Plaintiffs, he was remorseful and promised to do better. As TCA had disclosed to the Waterland Defendants when they had contracted to buy TCA, TCA had a long roster of music artists that were under contract to deliver their Public Platforms exclusively for TCA's use to generate nonprofit sponsorships. In many of those contracts, TCA had made significant financial advances to these artists, and in return, all artists had agreed to deliver set numbers of sponsors. Given that LiveCo/TPR was the then-predominant promoter of CCM concerts, to fulfill their commitments to deliver sponsorships, TCA's artists were required to work with LiveCo/TPR.

159. Concerns about deception being allayed by Riser, conversations and tour planning began with Dave Wagner and Rush. Wagner for the Plaintiffs, came up with the idea for a tour featuring two of TCA's artists jointly who were under contract and owed TCA significant sponsorships for which they had been paid in advance: Tauren Wells and Danny Gokey. Reiser was enthusiastic and even wanted to include the Newsboys in the tour as well, the Newsboys being another client of TCA. Reiser's desire to include the Newsboys indicated there was no "branding"

42

or perception problem with the Newsboys.  Detailed planning began with Plaintiffs concerning that tour.

160.    However, in 2024 Reiser/Rush went radio silent on the planned tour of Wells and Gokey.  It was only afterwards that the Plaintiffs saw a marketing flyer for the branded "Takeback" tour Wagner and Reiser for Rush had been discussing that LiveCo/TPR was doing on its own:



161.    Notably, neither TCA nor its nonprofit (Children International) are mentioned and neither were involved. Instead, although both Wells and Gokey were under exclusive contract with TCA, a fact Live/Co/TPR knew from TCA's acquisition disclosures and from conversations with

43

Reiser that started the idea in the first place, the idea had been misappropriated and contracts interfered with.

162.    One by one, throughout 2023 and 2024, TCA's contracted artists began to renege on their exclusive contracts they had made with Plaintiffs.  It was not as though they stopped touring, as they continued to do so with LiveCo/TPR.  But they refused to return TCA calls or explain what was happening and refused to work with Plaintiffs.  Plaintiffs' investigation subsequently revealed that with the newly created Public Platform LiveCo/TPR created through their monopoly with World Vision serving as their partner and it is herein alleged, the Waterland Defendants and World Vision were now conditioning CCM artists' access to the CCM Touring Market on surrender of sponsorship arrangements.  If artists would not do so, then LiveCo/TPR would greatly reduce the artists' performance fee the promoter had historically paid the artist (usually guaranteed) from which the artists in turn paid their significant production costs.

163.    Danny Goyke, one of Plaintiffs' artists who was under contract with TCA, for example explained precisely what the Defendants' monopoly was doing, Goyke's representative writing:

> *Promoters Controlling Sponsorships.*  The events between 2019 and early 2022 made performance under the Agreement incredibly difficult.  However, next came a systemic, industry-wide change that eroded the foundation on which the Agreement was built: CCM promoters started entering into their own sponsorship agreements with charities, supplanting the artists' (and by extension, TCA's) ability to secure sponsorships.
>
> Promoters now make offers to artists that include higher guarantees but conditioned on the promoter collecting sponsorships.  If the artist is allowed to retain sponsorship rights, the guarantee is much lower.  For Danny, the difference has been as much as $8,500 per show.  Without this sponsorship revenue to help offset touring expenses, it becomes impossible for Danny to tour as a headlining act without losing money.

44

164. From the above it is clear that LiveCo/TPR had entered into its own sponsorship agreements with charities [yellow], which is something they had not been able to do before their merger as they had no Public Platform to offer until then. Then with LiveCo/TPR contracting with their own nonprofit, World Vision, for sponsorships generated, for artists to receive performance fees from the promoter (green above, referred to as "guarantees") the artist was required to surrender their rights and allow LiveCo/TPR to collect sponsorship payments from World Vision. If the artist refused, then the performance fee the promoter had previously paid was greatly reduced such that it became "impossible" for artists to tour (red). Thus, access to the CCM Touring Market was tied to the artists' and thus Plaintiffs', surrender of sponsorship rights in the NPS Market.

165. This coercive tying clearly leveraged the monopoly control LiveCo/TPR had in the CCM touring market to gain control of the NPS Market.

166. And LiveCo/TPR knew precisely how much to demand from these artists, because TCA had previously disclosed in connection with the Purchase Agreement, the identities of the artists they had under contract and the financial terms, including sponsorship commitments, each artist had made.

167. This tying wasn't limited to Danny Gokey but rather is alleged to have been applied across the board to all of Plaintiffs' contracted clients the identities of whom Plaintiffs had previously disclosed.

**J. THE WATERLAND DEFENDANTS AND WORLD VISION REVEAL THEIR HAND IN THEIR ATTEMPT TO CAPTURE MERCYME.**

168. As TCA had disclosed in its due diligence materials delivered to facilitate the agreement of the Waterland Defendants to purchase TCA, MercyMe had been in contract with TCA for many years, having sold their Public Platform to TCA. In fact, over the years, TCA had

45

paid MercyMe for sponsorship generated almost $16 million. In August 2024, as MercyMe's then-current contract with TCA was coming to a conclusion and new contractual arrangements were being negotiated, MercyMe began secret negotiations with LiveCo/TPR.

169. As relayed to Plaintiffs by MM's manager, Scott Bickell, LiveCo/TPR told MercyMe that LiveCo/TPR already had sponsorship money lined up -- obviously World Vision -- and thus MM could not get its own sponsorship revenue, whether through TCA or otherwise. Given the fame and celebrity status of MM, however, LiveCo/TPR stated that if MM would relinquish the right to sponsorship payments it was receiving from TCA that were coming from another nonprofit (Children International), in favor of LiveCo/TPR so that LiveCo/TPR's partner, World Vision, could obtain the sponsorships, LiveCo/TPR would pay for all MM's production costs. On information and belief, the money for this payment was coming from World Vision.

170. Upon receiving this offer, Bickell then called Plaintiffs with the news MM would not be renewing their contract which they had done annually for many years. After extensive negotiations, Bickell advised TCA, however, that MM would not accept LiveCo/TPR's offer if TCA would pay MM an increased rate for sponsorships that would match the dollar amount of the offer LiveCo/TPR made of paying MM's production expenses. Bickell's estimation was this would require TCA to increase its payment for sponsorships to MM to in excess of $500 per sponsor. TCA then engaged in hurried negotiations with Children International and countered at a sponsorship payment of below $500 per sponsor but coupled with a $1.5 million advance to MM to cover MM's production costs for the number of concerts MM would have to perform with TCA so that TCA could recoup that outlay.

171. To the certain shock and fury of LiveCo/TPR and World Vision, MercyMe accepted TCA's offer and a renewal contract was signed on August 2024. It is herein called the

46

"MM Contract" and a redacted copy is attached as Exhibit 4. TCA had thus bested "the world's largest one-stop, full service global faith-based promotion company," and its partner, the world's largest charity, but at a steep cost.

172. It was an unbelievable turn of events. The Waterland Defendants had misappropriated TCA's plans and trade secrets, created their own competing Public Platform, partnered with the world's largest charity and denied touring rights to TCA artists who would not capitulate, and still that was not enough. The Waterland Defendants decided that Plaintiffs simply had to be destroyed.

**K. THE WATERLAND DEFENDANTS JOINED BY WORLD VISION, WEAPONIZE THE FARGO FABRICATION TO CONVINCE MM TO BREACH THEIR CONTRACT WITH TCA AND ALIGN THEMSELVES WITH THE MONOPOLY CREATED BY THE WATERLAND DEFENDANTS AND WORLD VISION.**

173. In its days prior to joining the Waterland Defendants, Transparent was one of many CCM concert promoters. It had promoted a small band, one of the members of whom had actually later married Nicole. As such, Taber is believed and alleged to have become aware of the Fargo Fabrication; in fact, it is alleged he was one of its propagators. Taber had known Wes Campbell, TCA, and the Newsboys for many, many years, although had grown somewhat antagonistic when Campbell chose that the Newsboys would work first with Premier and later Rush. In fact, Taber threatened that Campbell would regret that decision.

174. But Taber was a particularly close friend with Michael Tait having spent time with Tait at Tait's home, even enjoying evenings with Tait in Tait's hot tub. As indicated above, Taber had told Plaintiffs that "rumors" about the Newsboys and Tait were insignificant and lacked substance.

175. Yet after the humiliation of having been beaten in the marketplace by TCA in August 2024, it is a known fact that by October 2024, Nicole had gone to work for the Waterland Defendants in their "marketing department," a position it is alleged she was unqualified for, having come to LiveCo/TPR from a nonmusical employer for whom she is alleged to have had little relevant responsibilities.

176. Now employed by LiveCo/TPR, Nicole began meeting with the Defamation Defendants while she was an employee of the Waterland Defendants. From all appearances, while Nicole lacked all requisite job qualifications except one: she could supply competitive "dirt" on the Newsboys organization and the owner, Wes Campbell, who also owned indirectly TCA.

177. The Waterland Defendants, on information and belief, thus hired Nicole then took her face-saving, unverified story, inflated and amplified it, and then worked to turn that story into a false but damaging public indictment of Campbell, TCA and the Newsboys.

178. Their having fostered it, they then began to actively circulate the "Fargo Fabrication," which coupled with their restriction of access to the CCM touring market caused artists under contract with TCA to breach their contracts with TCA and contract instead with the Waterland Defendants. It was all part of their anticompetitive scheme to destroy their primary competitor where nonprofit sponsorships was concerned.

179. Predictably, one such targeted artist was again MercyMe. As more fully set forth in Article XI, the contract MercyMe signed with TCA, was airtight. However, it contained an obscure provision called a "key man" provision that said if a TCA employee named Troy Collins, a close friend of MM manager Scott Bickell, ceased to be employed by TCA, then MercyMe had the right to terminate the MM Contract. However, as explained in Article XI hereof, the right to

48

terminate had to have been exercised in good faith and even then was subject to TCA's absolute rights to cure, among other restrictions.

180. Collins had been a TCA employee for many years, but he hardly performed irreplaceable services. Yet on June 2, 2025, Collins abruptly resigned for no offered reason. His resignation was followed in quick succession by (a) the publication of the defamatory Articles, (b) a letter from MM's lawyer that Collins resignation gave MM the right to terminate if not cured within 30 days, and (c) another letter sent shortly thereafter before the expiration of 30 days advising that the MM contract was terminated and no cure was to be allowed, just as Collins replacement was about to be designated under TCA's cure rights.

181. Given the timing of those events and those that followed, it is believed and alleged that LiveCo/TPR urged that neither they nor MercyMe should be publicly associated with TCA/Campbell because of the "Fargo Fabrication." Instead, the Waterland Defendants convinced MM and the Bickell Parties who managed MM, to breach their contract with TCA and allow LiveCo/TPR to continue to promote them. They then helped MM concoct a pretense for MercyMe to breach their contract with TCA, namely the resignation of Collins.

182. The Waterland Defendants' believed direct involvement in and responsibility for the defamatory Fargo Fabrication and its circulation, was purely to establish their monopoly control. The tense negotiations that led up to the execution of the August 2024 MM Contract, were entirely premised on LiveCo/TPR and World Vision, getting sponsorship rights for MercyMe performances. Hence, the MM Defendants were fully aware that their contacts with the Waterland Defendants was all about doing in 2025 what they had failed to do in 2024: get MercyMe and any associated sponsorship revenue generation, away from Plaintiffs.

49

L. **BANDS CONTRACTING WITH TCA.**

183. As stated, at the end of 2022, TCA had profitable contracts with some of the most notable artists in the CCM world to both represent them in negotiating with nonprofits for the use of their artists' Public Platform and utilize TCA's "professional solicitor" registration as de facto agents of the bands. And negotiations were ongoing with other with bands. TCA was so successful as the only competition in the nonprofit sponsorship space, that on January 26, 2023, the Waterland Defendants had offered to purchase TCA for approximately $50,000,000 which offer was accepted on January 31, 2023. The Waterland Defendants even expressed an interest in purchasing Plaintiffs' artist management company for an additional approximately $10,000,000. However, by June 2025 TCA had been rendered worthless.

i. *MercyMe.*

184. One of the bands TCA had worked with for many years that the Waterland Defendants took from Plaintiffs, was mega-band, MercyMe, a group managed by the Bickell Parties. MercyMe is the dominant economic driver of audience demand and monetizable engagement within the CCM Touring Market. By every objective measure that defines market power in a touring-driven industry, including radio airplay, audience reach, commercial sales, and sustained chart dominance, MercyMe stands alone, holding the all-time record for No. 1 songs on Billboard's Christian Airplay charts. MM has generated more than fifty No. 1 hits across Christian radio formats and has accumulated billions of streams and millions of units in sales. Its flagship song, "I Can Only Imagine," is among the most commercially successful and culturally recognizable works in the history of the genre. In the CCM ecosystem, where radio airplay plays a direct role in driving touring demand and in turn nonprofit sponsorship revenue, MercyMe's sustained control over audience attention functions as the equivalent of market share in an antitrust

50

sense, giving it an unparalleled ability to attract, assemble, and monetize large-scale live audiences nationwide.

185. For nearly eight years, TCA represented MercyMe under an exclusive contract where TCA alone controlled and monetized MercyMe's Public Platform. In exchange, during this time, MercyMe was paid approximately $17,306,970 from nonprofit sponsorships generated, $1.5M of which was paid to get them to re-sign the August 2024 MM Contract which the Waterland Defendants procured the termination of in June 2025. In so doing, as alleged more fully hereafter, MercyMe became a knowing participant in the antitrust violations being perpetrated by the Waterland Defendants and World Vision, as they are alleged to have known exactly what the Waterland Defendants and World Vision were doing and planned to do.

ii. *Newsboys.*

186. TCA also had a similar exclusive arrangement with the mega-band known as "Newsboys." Formed in 1986, initially the legendary Peter Furler was both co-founder of Newsboys, Inc., with his partner Wes Campbell, and the lead singer for the group. Upon Furler's retirement, Michael Tait assumed the role of lead singer.

187. Tait joined the Newsboys musical ensemble in 2010. Before joining Newsboys, Tait had a highly successful career with another very popular Christian music group called DC Talk, another member of which was Toby Mac. Tait and Toby Mac had been close friends for years and were college roommates. Toby Mac has for many years had his own talent management company called "True Artist," a key employee of which is Dan Pitts. Faithful to the longstanding friendship of Tait and Toby Mac, True Artist and its employee Dan Pitts also managed Tait.

188. When Campbell was deliberating hiring Tait to sing with the Newsboys, Campbell consulted each of these respected persons and each of them personally assured Campbell of Tait's

good reputation, character and integrity. Those assurances led to Tait's retention by the Newsboys in the first place.

189. But as a result of the actions of the Defendants, the Newsboys have been boycotted from CCM tours and concert performances, denied access to the CCM Touring Market.

    *iii.*     *Tauren Wells and Danny Goyke*.

190. As explained both Wells and Goyke are successful CCM artists. Both have breached their contracts with Plaintiffs due to the anticompetitive machinations of the Defendants, and are touring with LiveCo/TPR and World Vision.

    *iv.*     *Other Artists*.

191. Similar to exclusive contracts of MercyMe, Newsboys, Wells and Gokey, TCA acquired the Public Platforms of many other notable artists, including artists such as Micah Tyler, David Crowder, Cory Asbury, Riley Clemmons, and the Social Club Misfits. Each one of these artists contracted with TCA based on their sale to TCA of the exclusive use of their respective Public Platforms with a view towards TCA's resale of those rights to nonprofits in the NPS Market. TCA paid many of these artists significant advances on their anticipated sponsorship generations, only to have them flagrantly breach their contracts at the behest of the Waterland Defendants as a part of the unfolding antitrust scheme, as herein set forth.

## M. THE COORDINATED SCHEME TO ELIMINATE TCA AS A COMPETITOR.

192. The Causes of Action that follow are all based on the events in the preceding portion of this pleading and each and every fact set forth above, is incorporated by reference in each of the Claims and Causes of Action that follow.

193. The foregoing facts were not isolated or unrelated events. Rather, they were components of a coordinated and intentional course of conduct by the Waterland Defendants and

World Vision to eliminate TCA as a competitor in the CCM Touring Market and the related NPS Market, using the integrated structure created through the acquisitions described above. This course of conduct included, among other things, the roll-up strategy and coordinated acquisitions described above, the misuse of confidential information, and the subsequent actions directed at TCA and its contractual relationships and the Newsboys, a related entity.

194. Upon information and belief, the Waterland Defendants recognized that TCA posed a competitive threat by virtue of its relationships with performing artists, including MercyMe, and its ability to secure and monetize nonprofit sponsorship opportunities through those artists' public platforms.

195. A central component of this strategy was the anticipated publication of a defamatory Articles concerning TCA (the "Articles"), authored and published by the Defamation Defendants. Upon information and belief, the Waterland Defendants and World Vision were aware of the impending publication of the Articles in advance of their release and understood that it would cause significant reputational and commercial harm to the Newsboys and the owner Wes Campbell, and by extension, TCA.

196. Upon information and belief, the Waterland Defendants and World Vision, used the impending publication of the Articles as a strategic lever to disrupt and accelerate the breakdown of TCA's existing contractual and business relationships and to accelerate TCA's removal from the market, informing MM and other musicians to distance themselves from TCA and to terminate their existing contractual relationship with TCA and to reposition themselves within the Waterland-controlled promotional structure.

197. These musicians, particularly the MercyMe Defendants, knew US LiveCo/TPR controlled the CCM Touring Market and knew that World Vision had partnered with them to

53

acquire sponsorship rights on tours they promoted. With that knowledge, and in response to those communications, MercyMe acted in coordination with the Waterland Defendants by terminating its contractual relationship with TCA at or around the time of the false and defamatory Article's publication, as have other artists.

198. Upon information and belief, the MercyMe Defendants in particular understood that the termination of their relations with TCA would materially impair TCA's ability to compete and would advance the efforts of the Waterland Defendants' and World Vision to displace TCA from the market. The MercyMe Defendants nonetheless proceeded with such termination.

199. The timing and coordination of these actions were not coincidental. Rather, they were part of a deliberate and unified course of conduct to (a) inflict reputational harm on TCA through the false and defamatory Article, (b) destabilize TCA's existing contractual relationships, including with MercyMe, and (c) redirect sponsorship opportunities, and related revenues to the Waterland Defendants and World Vision.

200. The conduct described herein, involves overlapping participants, communications, witnesses, and evidence, and forms a continuous sequence of events through which the Waterland Defendants and World Vision, together with others acting in concert with them, collectively effected and implemented the displacement of TCA as a competitive force. These events arise from the same series of transactions and occurrences underlying all claims asserted herein and will involve substantially overlapping evidence and witnesses.

## V. CLAIM FOR RELIEF FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT AND SECTION 7 OF THE CLAYTON ACT (ASSERTED AGAINST THE WATERLAND DEFENDANTS, WORLD VISION, THE MERCYME DEFENDANTS AND THE BICKELL PARTIES).

### A. BACKGROUND.

201. In all claims in this Article V, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV.M above and arises from the same common nucleus of operative fact as Plaintiffs' other claims.

202. This claim is based on the same series of communications, transactions, and events through which the Waterland Defendants, World Vision, the MercyMe Defendants and the Bickell Parties (all of whom are sometimes collectively referred to as the "Antitrust Defendants") restrained competition, impaired Plaintiffs' business relationships, eliminated Plaintiffs as a competitive force in the relevant markets (Art. V), misappropriated Plaintiffs' trade secrets and breached contracts (Art. VI), conspired to defame Plaintiffs (Art. VIII), conspiracy/aiding and abetting defamation (Art. IX), violated the Lanham Act (Art. X), contractual claims (Art. XI), interfered with Plaintiffs' contracts with artists and nonprofits (Art.XII) and violated antisolicitation laws (Art. XV).

### B. SOME OF THE BASES FOR DEFENDANTS' INVOLVEMENT IN ARTICLE V CLAIMS.

203. The claims in this Article V specifically challenge the antitrust conduct of the Waterland Defendants arising from the Waterland Defendants' unlawful acquisition, maintenance, and abuse of monopoly power in the CCM Touring Market (the "CCM Touring Market") and the Nonprofit Sponsorship Market ("NPS Market") (collectively, the "Markets"), coupled with

55

anticompetitive conduct including unlawful mergers and acquisitions; coordinated horizontal restraints; exclusionary conduct; de facto exclusive dealing; foreclosure of essential inputs; and tying and leveraging conduct through which the Waterland Defendants used their control of the CCM Touring Market to obtain and entrench dominance in the NPS Market. These violations are both per se unlawful and unlawful under the rule of reason.

204. World Vision is alleged to have knowingly joined and participated in the Waterland Defendants' anticompetitive scheme by entering into agreements and coordinated arrangements pursuant to which World Vision would serve as the exclusive, or near-exclusive, nonprofit partner for the solicitation of sponsorships through the use of the Markets. These agreements were not the product of independent competition, but were structured to foreclose competing nonprofit intermediaries, including TCA, from access to the commercially essential Performing Platforms controlled by the Waterland Defendants.

205. In furtherance of this scheme, World Vision is alleged to have provided substantial financial support and guaranteed sponsorship flows that enabled the Waterland Defendants to acquire, secure, control and/or negate artists' Performing Platforms, and to make payments and economic commitments to artists conditioned upon limiting or foregoing relationships with competing sponsorship intermediaries and/or foregoing sponsorship participations entirely. Through these coordinated arrangements, World Vision and the Waterland Defendants reinforced each other's market positions, Waterland by consolidating control over touring access, and World Vision by securing dominant control over nonprofit sponsorship opportunities, thereby excluding competition and preserving their shared dominance in the NPS Market as it operates through the CCM Touring Market.

206. Without limitation, in April 2023, Jacob Reiser confirmed that the Waterland Defendants had locked up a nonprofit who had agreed to pay the Waterland Defendants in excess of $500 per sponsorship raised, and thus TCA would not be able to re-sign any of its client artists or client nonprofits. Reiser's comments made clear that World Vision had partnered with the Waterland Defendants to secure control of all non-private sponsorships generated from CCM tours arising by, through or under the Waterland Defendants.

207. TCA's model depended on aggregating the "Public Platforms" of top-tier artists and monetizing those platforms through nonprofit sponsorships. MercyMe is the dominant economic driver of audience demand and monetizable engagement within the CCM Touring Market. MercyMe's sustained control over audience attention functions as the equivalent of market share in an antitrust sense, giving it unparalleled ability to attract, assemble, and monetize large-scale live audiences nationwide. That dominance made MercyMe uniquely indispensable to any firm seeking to control or foreclose competition in the intertwined CCM Touring Market and Nonprofit Sponsorship Market. For a consolidated promoter such as LiveCo/TPR, which sought to internalize and capture sponsorship revenues historically controlled by artists and their agents, separating MercyMe from TCA was economically necessary.

208. So long as MercyMe, as the single most powerful driver of audience aggregation in the CCM Market, remained aligned with TCA, TCA retained both credibility and competitive viability as an obstacle to the vertically integrated structure created by LiveCo/TPR and World Vision. By contrast, it is alleged that removing MercyMe from TCA simultaneously (i) deprived TCA of its most commercially valuable platform asset, (ii) signaled to other artists and nonprofits that TCA could no longer deliver premier access, and (iii) enabled LiveCo/TPR to redirect MercyMe's audience-generated sponsorship value into its own controlled channels. The separation

57

of MercyMe from TCA was a foreclosure mechanism: it weakened a horizontal competitor in the NSP Market while reinforcing the ability of LiveCo/TPR to leverage its dominance in the CCM Touring Market into adjacent revenue streams.

209. In August 2024 on information and belief, it is alleged World Vision had agreed to advance significant funds to the Waterland Defendants so those funds could be offered to MercyMe as an inducement to forgo their sponsorship arrangements with TCA and another non-private (Children International) in exchange for payment by the Waterland Defendants of significant amounts of MercyMe's production costs to be incurred in conducting CCM Touring. These financial commitments were conditioned, expressly or implicitly, on the artists' agreement to restrict or eliminate relationships with competing nonprofit sponsorship intermediaries and to route sponsorship opportunities through the channels controlled by the Waterland Defendants and World Vision.

210. MercyMe manager, Scott Bickell acting individually and through his company Brickhouse Entertainment LLC (together, the "Bickell Parties"), translated the anticipated value of the payment of those production costs to be borne by LiveCo/TPR, into an increased per sponsorship payment MercyMe we would have to receive from TCA to renew its contract with TCA. TCA was able to meet that massive demand for more money.

211. Having lost out to TCA, the Waterland Defendants along with World Vision, propagated and perpetuated the Fargo Fabrication, circulating it to MercyMe in and around 2025 and used that as the means of convincing Mercy Me to breach the very contract with TCA that they entered in August 2024. The use of the Fargo Fabrication in this manner is alleged to have constituted exclusionary conduct designed to disrupt TCA's contractual relationships, raise its

58

costs of competing, and eliminate it as a viable competitor, thereby further entrenching Defendants' control over the relevant markets.

212. As the independent negotiating agent for the Mercy Me Parties, the Bickell Parties are alleged to have acted jointly with them and with full knowledge.

213. The foregoing conduct is alleged to have been undertaken pursuant agreements, combinations, and/or conspiracies among the Waterland Defendants, World Vision, and, later, MercyMe and the Bickell Parties, the object and effect of which was to allocate and control the market for nonprofit sponsorships arising from CCM Touring, to foreclose competing intermediaries from access to commercially essential Performing Platforms, and to channel such sponsorship opportunities exclusively or predominantly through Defendants' coordinated structure. This agreement was manifested through express contractual arrangements, conditioned financial commitments, and coordinated conduct that cannot be explained by independent economic self-interest.

214. The combined effect of Defendants' conduct is alleged to have substantially foreclosed competition in the NPS Market by denying rival intermediaries access to the most commercially significant artists, restricting the ability of nonprofits to compete for sponsorship opportunities, and consolidating control over the primary channels through which such sponsorships are generated. This foreclosure is alleged to be significant in both scope and duration and lacking procompetitive justification.

215. By aligning with the Waterland Defendants and World Vision under these conditions, MercyMe Defendants and the Bickell Parties are alleged to have functioned as a controlled input whose availability to competing sponsorship intermediaries was effectively restricted, thereby amplifying the foreclosure effects of the other Defendants' coordinated conduct.

59

216. The conduct alleged herein is alleged to constitute, inter alia, de facto exclusive dealing arrangements, concerted refusals to deal with competing sponsorship intermediaries, and unlawful tying and leveraging of control over CCM Touring opportunities (the tying product) to obtain control over nonprofit sponsorship revenues (the tied product), resulting in substantial foreclosure of competition in the NPS Market.

217. Given these allegations each of the Waterland Defendants, World Vision, the Mercy Defendants and the Bickell Parties are properly named as defendants in this Article V.

C. **CCM TOURING MARKET.**

218. Except where deletions therefrom are noted herein, all market share and concert performance data referenced herein are derived from Pollstar, a widely used third-party source for nationwide concert and ticketing statistics across all genres, including CCM. It is considered in the industry to be a reliable source of concert information. Importantly, the information in Pollstar is self-reported by promoters, thus the Waterland Defendants themselves provided the data on which Pollstar relies as it pertains to their activities. [10]

219. Faith-based music, musicians (or artists) and their listening audiences, which are almost exclusively Christian, are a unique and distinct market, separate from mainstream music and musicians/artists. In fact, this genre has a name: Contemporary Christian Music or "CCM."

220. The CCM Touring Market, as described below, constitutes a legally distinct relevant market that differs from its secular counterpart. The distinction is not limited to lyrical content or audience demographics. It is a difference in purpose, atmosphere, commercial structure, and the very reason consumers attend.

---

[10] Certain exclusions from Pollstar Data used, include data for (a) international concerts and Puerto Rico; (b) non-CCM artists who belong to what the CCM industry recognizes as non-CCM genres; (c) comedy shows; and (d) gospel music styles other than "Southern" gospel (i.e, "Southern" gospel data is included).

221. Both CCM concerts and secular concerts involve ticketed live performances, amplified music, sophisticated production, and large audiences. The surface similarities, however, mask fundamentally different products offered to fundamentally different consumers for fundamentally different purposes.

222. A CCM performance is, at its core, a communal worship experience. Artists pray openly with audiences, share personal testimony, and generally direct attention toward faith rather than themselves as performers. The audience participates not merely as concertgoers, but as members of a shared faith community.

223. By contrast, a secular concert is centered on entertainment and spectacle. The artist is the focal point, and audiences attend as fans rather than participants in a shared belief system.

224. These differences materially affect demand, consumer expectations, and commercial viability. Consumers do not substitute between CCM and secular concerts in response to price, availability or promotional differences. CCM and secular concerts do not compete for audiences with secular artists or concerts, and no CCM promoter competes for CCM artists with promoters of mainstream secular tours.

225. Because substitution between CCM and secular concerts does not occur, the CCM Touring Market constitutes a distinct relevant product market not interchangeable with secular concerts.

226. The CCM live event industry falls generally into one of two categories: (i) CCM Touring Market (also called CCM Tours) (ii) and One-Off Events. They are not interchangeable.

227. Some of the key identifying factors of the "CCM Touring Market," which is the relevant service market in this case, are concert performances that (a) occur pursuant to a written or published plan developed in advance by one or more concert promoters in consultation with the

61

artists that identifies multiple pre-selected venues in multiple cities or states across different markets (rather than a single metro area or campus of venues), in a published route or date list, (b) involve scheduled performances occurring within a defined tour window, such as a spring or fall leg, rather than intermittently over a year as unrelated bookings, (c) have a common tour name or branding, artwork, sponsor slate, and substantially consistent production including set, crew, and backline, (d) employ centralized or coordinated ticketing, presales, pricing strategies, and sponsorship packages managed at the tour level, and (e) use advance and coordinated marketing such as tour posters, announcements, simultaneous date drops, shared web hubs, and unified public relations or social media.

228. "CCM One-Off Events," on the other hand, unlike CCM Tours, encompass concert performances limited to specific venues where each location serves as a true one-off performance. Typically, CCM One-Off Events are (i) arranged directly between the artist or the artist's representative and the hosting venue, often a church, or local civic facility, (ii) negotiated, advertised, and ticketed on a standalone basis without a pre-committed sequence of future dates in other cities, and (iii) involve no centralized routing, branding, or sponsorship across multiple markets. CCM One-Off Events typically (i) have production models, financial responsibilities, and audience bases that differ from CCM Tours, (ii) serve consumer and promoter needs that differ from those associated with CCM Touring, and (iii) show little to no cross elasticity of demand. They therefore are not interchangeable with the CCM Touring Market and have been excluded for market definition purposes.

229. Applying the above criteria to Pollstar data, concert and promoter data have been excluded from the data presented herein where the Pollstar data reasonably indicates events appeared to be or have been, as judged by the Plaintiffs who have industry expertise to make such

62

assessments (a) a One Off Event; (b) promoted as an "in house promotion," or by an individual venue, such as a specific church or theater (unless Pollstar coupled that venue with a third-party promoter); and/or (c) owned or co-owned platforms in which the promoter holds an equity interest rather than serving only as a promoter for a percentage of the event proceeds, since these are not considered analogous to CCM Tours.

230. The geographic market for the CCM Touring Market is nationwide, as CCM artists, promoters, and nonprofits participate in opportunities and evaluate engagements across the entire United States. The nationwide scope of the geographic market reflects the commercial realities of CCM touring especially given how CCM tours are planned, routed, and marketed on a nationwide basis, as explained *supra*. The nationwide geographic market is further confirmed by the Pollstar data utilized herein, which reflects nationwide concert activity as a single integrated competitive landscape, and by the Waterland Defendants' own characterization of their enterprise as a nationwide, one-stop, full-service promotion company serving artists and nonprofits across the United States.

D. **THE NONPROFIT SPONSORSHIP MARKET.**

231. Another market relevant in this case is the Non-Profit Sponsorship Market (previously, the "Nonprofit Sponsorship Market" or "NPS Market"). The NPS Market consists of charitable fundraising conducted at live CCM concert events by means of which artists' Platforms are monetized by solicitations for charities and the enrollment of audience members as donors, who are referred to as "sponsors," reflecting that they are signing up to support a child or other charitable cause.

232. The artists' Public Platform as previously defined herein, is the foundational economic asset around which both the CCM Touring Market and the NPS Market operate. In the

CCM Touring Market, promoters pay for access to the artists' Public Platform which they monetize through ticket sales which have nothing to do with nonprofits or nonprofit sponsorship services. CCM Touring concerts, however, provide the mechanism through which artists' Public Platforms are deployed at scale nationwide.

233. The NPS Market also relies on artists' Public Platforms. CCM artists and their audiences share a mutual sense of engagement, goodwill, and trust. That, plus the faith-based nature of CCM concerts, reinforces audience receptivity to charitable giving requests. CCM concerts thus present a concentrated, captive audience predisposed to charitable giving access to which by means of artists' Public Platforms.

234. Appeals for sponsors during CCM concerts typically involve video presentations depicting children in need, followed by a live appeal from a speaker encouraging concertgoers to enroll as monthly sponsors. Volunteers pass out sponsorship commitment cards, which are typically collected at the end of a performance. All of this fundraising activity requires compliance with detailed regulations that vary from state to state.

235. Fundraising in the NPS Market is more effective than traditional methods because charities are able to leverage the preexisting trust and goodwill between the performing artist and the audience. This form of solicitation is fundamentally different from other marketing or fundraising channels nonprofits employ, such as online advertising, email campaigns, social media outreach, direct mail, television, setting up tables in front of retail stores, which do not provide reasonably interchangeable substitutes for live-event donor acquisition. These alternatives do not provide access to a captive, in-person audience, do not leverage the trust relationship between artist and audience, and do not achieve similar conversion rates, donor quality, or long-term retention.

64

As a result, nonprofits allocate dedicated budgets to this channel separate from other fundraising methods.

236.     Charitable organizations have conducted detailed analyses demonstrating that first-time donors frequently continue their monthly contributions for many years. As a result, the NPS Market produces higher and more predictable donor retention rates and long-term revenue streams than other fundraising channels.

237.     In the NPS Market, third-party nonprofit charities are willing to pay significant, negotiated compensation for access to artists' Public Platforms.  As artists became aware of the value generated by their Public Platforms and nonprofits' willingness to pay to use it, compensation for access to those Public Platforms became the subject of negotiation and evolution. Artists first had to find and connect with a nonprofit.  Then compensation negotiations began.  Negotiated payments have taken various forms over time, including per-event payments, revenue-sharing arrangements, and, in earlier periods, "ambassador fees" not directly tied to confirmed donors. The payment structure later changed to one centering around sponsorships *projected* to be generated, which left nonprofits exposed both financially and legally if those projections were not achieved -- comparing the incurred costs of payments to artists and providing spokespersons and volunteers at each CCM Concert to the results, meant charities would have spent an outsize portion of others' donations for advertising/marketing.

238.     As will be explained more fully, TCA pioneered the latest evolution of compensation by acquiring artists' Public Platforms and charging nonprofits for its use, but only for sponsorships actually generated, with TCA also bearing costs of providing spokespersons and volunteers at concerts.

239.    The NPS Market and the CCM Touring Market are linked through the common economic input of artists' Public Platforms and are structurally interdependent: without the CCM Touring Market, there is no NPS Market, and without the NPS Market, there is no CCM Touring Market.

240.    At the same time, the two markets are distinct. They involve different buyers (nonprofits rather than ticket purchasers), different pricing structures (payments tied to donor acquisition rather than ticket sales), and different economic outputs (long-term donor revenue streams rather than single-event ticket revenue). This distinction was confirmed by Plaintiff Campbell at a March 21, 2023 meeting attended by Defendant Pugh.  This does not, however, limit TCA's cognizable injury arising from conditions in the CCM Touring Market, given TCA's complete dependence on that market as an essential input to its operations.

241.    Access to CCM touring infrastructure, including venue relationships, national routing, coordinated ticketing, and promotion, is a prerequisite to effective participation in the NPS Market. Without such access, an artist's Platform lacks the scale, audience reach, and repetition necessary to generate meaningful sponsorship revenue.  The geographic market for the NPS Market is nationwide and co-terminus with the CCM Touring Market.

E.  **CCM CONCERT PROMOTERS AND THEIR CONSOLIDATION.**

242.    From 2018 to the present, the leading CCM promoters whose activities are reflected in Pollstar have been Transparent, Premier, and Rush (those three are herein sometimes referred to as the "TPR Group").  The Pollstar data referenced herein is set forth in three separate time periods:

   a.  **Period** 1, which shows CCM concert data from January 1, 2018 through November 15, 2022.  The self-reported Pollstar data for this time period shows operating results for these three promoters operating as separate, competing promoters;

66

b. **Period 2**, which shows CCM concert data from November 16, 2022 through November 16, 2023. The self-reported Pollstar data for this period shows that while related to LiveCo, they reported their operations as separate promoters, (e.g., LiveCo/Transparent or LiveCo/Premier or LiveCo/Rush); and

c. **Period 3,** which shows CCM concert data for the period from November 17, 2023 through December 31, 2025. The self-reported Pollstar data for this period is presented as "LiveCo/TPR," indicating unity.

243. During these same three periods, Pollstar also reflects CCM concert data for Awakening Events (also called simply "Awakening"), a unique CCM concert promoter, not truly similar to Transparent, Premier, and Rush, but still considered a CCM promoter. For example, many of Awakening's concerts were and are solely owned or co-owned by Awakening, rather than promoted solely on behalf of an artist's concert platform. This created unique performance and financial circumstances making its operations not directly comparable to that of the TPR Group. Awakening data is nevertheless included in the analysis of the CCM Touring Market despite these dissimilarities, thus making the antitrust analysis very conservative.[11]

244. Besides Transparent, Premier, Rush and Awakening, there were many promoters generically referred to herein (not in Pollstar) as "Others" or "Other Promoters." Promoters in the "Other" category, have historically been very small operators who promoted events that (i) supported their own local or regional venues, radio stations, churches, or causes; (ii) worked with or for (or even owned) a few music groups whose performances they controlled and thus promoted; and/or (iii) promoted usually a very small number of concerts annually, often only one or two.

245. Many of the events promoted by promoters in the "Other" category were CCM One-Off Events as herein defined, although some were occasionally combined into a short tour when regional routing coincidentally arose. Promoters properly included in this grouping typically had

---

[11] Plaintiffs reserve the right to alter the data presented to exclude Awakening.

short commercial lives and were much more subject to and affected by market conditions, such as COVID. While data on these eclectic promoters is intermixed on Pollstar, Plaintiffs have used their reasonable judgment to identify and remove that data from Pollstar market data used herein and in the market analyses herein contained.

i.    *PERIOD 1 -- FROM JANUARY 1, 2018, UNTIL NOVEMBER 15, 2022.*

246.    As to the four CCM promoters -- Transparent, Premier, Rush and Awakening -- the chart below reflects the resulting CCM Tour Market landscape during the five-year period constituting Period 1, beginning January 1, 2018, through November 15, 2022:

| Period 1 1/1/2018-- 11/15/2022 | | |
| --- | --- | --- |
| COMPANY | NUMBER OF CONCERTS [1] | PERCENTAGE CONCERTS |
| AWAKENING | 538 | 18.39% |
| PREMIER | 1241 | 42.43% |
| TRANSPARENT | 765 | 26.15% |
| RUSH | 320 | 10.94% |
| CO-PROMOTIONS AMONG SOME COMBINATION OF TRANSPARENT, PREMIER, RUSH AND/OR LIVECO | 60 | 1.85% |

TPR Entities Percentage 81.61%

[1] During the COVID-19 period CCM concerts were illegal in some places and greatly discouraged in others. CCM concert events therefore occurred at Drive in Theaters and/or online or in virtual form, all of which were emergency techniques employed almost exclusively during the COVID-19 period. As such, numbers and data concerning such unique and transient emergency performances have been omitted from the Pollstar data shown.

247.    During the First Period, or Period 1, the U.S. faith-based concert promotion market was obviously dominated by Transparent, Premier and Rush who together accounted for approximately 81.61% of CCM tours, while operating as distinct, unrelated promoters that were vigorous competitors, although they would on rare occasions co-promote certain performances

within a CCM Tour. Their market dominance is clear particularly when it is considered Awakening likely is not even comparable. [12]

248. Within the First Period, Waterland, the private equity firm, conceived and began to initiate a plan to monopolize the industry by forming a holding company named LiveCo who conducted the targeted acquisition of Transparent, Premier, and Rush, who in turn controlled almost 82% of the CCM Touring Market.

*ii.*     *PERIOD 2-- FROM NOVEMBER 16, 2022, TO NOVEMBER 16, 2023*

249. The chart below reflects the self-reported data for Period 2, which is from November 16, 2022 through November 16, 2023, which dates correspond to a change in the self-reporting of the TPR Group to Pollstar reflecting both the continued operational independence of Transparent, Premier, and Rush, but also their common association via LiveCo as they reported their tour concerts as "LiveCo/Transparent" or "LiveCo/Premier" or "LiveCo/Rush": [13]

---

[12] During the almost five-year period constituting First Period, 126 promoters have been identified by Plaintiffs and reasonably determined to fall into the "Other" category as defined. Their data has thus been excluded. Demonstrating the de minimis activity of these "Other" promoters making them not comparable to the TPR Group and thus reasonably justifying their exclusion from the market analysis, is the fact that as reasonably determined by Plaintiffs: (a) 80% of them produced on average one (1) or fewer concerts a year for the five-year period; (b) 91% of them produced on average two (2) or fewer concerts a year for the five-year period; and (c) 94% of them produced on average four or fewer concerts a year for the five-year period. Also notable is the fact that 63% of these 126 "Other" promoters did not exist-- or did not promote concerts -- after the end of Period 1. Further, 73% did not promote into Period 3.

[13] Concerts indicated as "co-promoted" are those where the indicated entities essentially jointly promoted and so self-reported.

| Period 2 | | |
| 11/16/2022 -- 11/16/2023 | | |
| COMPANY | NUMBER OF CONCERTS | PERCENTAGE CONCERTS |
| --- | --- | --- |
| AWAKENING | 175 | 18.52% |
| LIVECO/TRANSPARENT | 364 | 38.52% |
| LIVECO/PREMIER | 227 | 24.02% |
| LIVECO/RUSH | 145 | 15.34% |
| LIVECO/TPR | 24 | 2.54% |
| CO-PROMOTIONS AMONG SOME COMBINATION OF TRANSPARENT, PREMIER, RUSH AND/OR LIVECO | 8 | 0.85% |
| TRANSPARENT | 1 | 0.11% |
| RUSH | 1 | 0.11% |

TPR Entities Percentage 81.48%

250.    Notably the TPR Group again collectively accounted for more than 81% of all CCM tours during the Second Period. [14]    That in Period 2 the TPR Group operated in a "related but separate status" is known based on (a) the form of their self-reporting to Pollstar as compared to Period 1;  (b) the fact that their respective acquisition prices paid by the Waterland Defendants included substantial earnout payments tied to their respective individual post-acquisition performances, insuring internal competition among them; (c) Defendant Pugh's confirmation of this operational separation at a March 21, 2023 meeting held with Plaintiffs in connection with the proposed acquisition of TCA; [15] and (d) the ticket pricing indicators discussed *infra*.  Thus, while actually or possibly owned by a common parent, independent decision-making and competition among them existed.

iii.    *Period 3-- From November 17, 2023 to December 31, 2025*

[14] During Period 2, Pollstar reflects of the 55 promoters who were reasonably determined by Plaintiffs to fall into the "Other" category.   Their data has thus been excluded.  Demonstrating the de minimis activity of these "Other" promoters making them not comparable to the TPR Group and thus reasonably justifying their exclusion from the market analysis is the fact that as reasonably determined by Plaintiffs, (a) 70% of them promoted on average one (1) or fewer concerts for that period; (b) 20% of them promoted between two (2) and three (3) concerts; and (c) 9 of them promoted between eleven (11) and nineteen (19) concerts.

[15] Pugh's confirmation is distinct from, and should not be confused with, the separate non-competition understanding among the entities with respect to artist relationships, which is addressed elsewhere in this Complaint.

251.     The chart below reflects the self-reported data for Period 3, which is from November 17, 2023 through December 31, 2025:

| Period 3 11/17/2023 -- 12/31/2025 | | |
| --- | --- | --- |
| COMPANY | NUMBER OF CONCERTS | PERCENTAGE CONCERTS |
| AWAKENING | 333 | 22.71 % |
| LIVECO/TPR | 1127 | 76.88% |
| PREMIER/LIVECO/TPR | 3 | 0.20 % |
| TRANSPARENT | 2 | 0.14 % |
| RUSH | 1 | 0.07% |

TPR Entities Percentage 77.29%

252.     By November 17, 2023, the beginning of Period 3, the TPR Group appears to have begun operating as one unified group, and self-reported their concert activity to Pollstar as such.[16] Their likely operational unity is further corroborated as (a) LiveCo's earn-out periods for acquisition of Transparent, Premier and Rush are believed to have substantially concluded, and (b) although no formal documents of merger appear to have been filed, Transparent, Premier, and Rush began marketing themselves as a unified "TPR," as their current website shows:

---

[16] During Period 3, of the 77 promoters that fall into the "Other" category as defined, (a) 88% of them promoted one (1) to five (5) concerts over the two-year period.

71



253. This further suggests their elimination of independent decision making, although discovery will determine their degrees of separate operation.

254. There can be no question that the Waterland Defendants' agreements and acquisitions gave them monopoly power in the CCM Touring Market. While traditional antitrust doctrine uses market share as a rough proxy for market power, that proxy does not tell the full story here where the other market dynamics including the vertical inputs the Waterland Defendants now control as well as control with World Vision of the nonprofit side, gives them market control greatly beyond the percentages herein stated.

255.     In addition to acquiring a monopoly in the CCM Touring Market by acquiring the three largest CCM market promoters (Transparent, Premier and Rush), the Waterland Defendants expanded their monopoly through a host of other acquisitions.

256.     Among the acquisitions were additional horizontal acquisitions of smaller regional promoters.  The precise number of these acquisitions is unknown but will only further increase the market share data for the Waterland Defendants.

257.     The Waterland Defendants also engaged in many vertical acquisitions which are collectively referred to as "TPR Vertical Acquisitions."  Among the TPR Vertical Acquisitions was iTickets, the dominant ticketing platform for the CCM Touring Market as well as Platform Tickets, LLC.  These acquisitions had multiple, compounding negative effects on competition.

258.     First, they allowed the Waterland Defendants to exert control over ticket access and to condition that access on promoter and artist exclusivity. This foreclosed rival promoters who depend on access to essential ticketing infrastructure to reach consumers.

259.     Furthermore, ticketing platforms generate significant revenues apart from the face amount of tickets, from surcharges, including service fees, facility fees, order processing fees, delivery fees, credit card processing fees, upgraded seating charges and/or "meet and greet opportunities with the artists," all of which are collectively referred to as "Ticketing Surcharges." Ticketing Surcharges can typically add 25% to 50% to the face value of a ticket.  By acquiring these ticket companies, the Waterland Defendants thus captured these substantial Ticketing Surcharges, further harming competition.

260.     Additionally harming competition through vertical acquisitions of these ticket companies, the Waterland Defendants gained access to detailed information about the markets and

73

venues where "other" promoters were drawing audiences not then targeted by the Waterland Defendants, allowing TPR to thereby target and expand into those new geographic markets when expeditious using competitively sensitive data otherwise unavailable to rivals.

261. Another TPR Vertical Acquisition was LiveCo's acquisition of Round Table Management, an artist management firm. By this acquisition, the Waterland Defendants gained management of artists and thus a significant voice in each artists' operational decisions related to their Public Platform. Control of this further constricted competition and ensconced their market control as artist management firms guided artists to promoters in the first place.

262. These TPR Vertical Acquisitions allowed the Waterland Defendants to control critical upstream and downstream channels of ticketing, staffing, and artist representation that competitors needed to promote successful tours in competition with the Waterland Defendants, and the ability to either provide those services (for a fee) or deny competitors the services of these necessary corollary services, thus eliminating viable competitive alternatives. It also gave them the associated revenue streams of money generated by these activities, which increased their competitive advantage particularly in terms giving them additional resources to pay increased amounts to artists for express or understood exclusivity.

263. As an additional TPR Vertical Acquisition, LiveCo also acquired a company called "Loop Events," a third-party vendor who was one of the only companies that could provide Volunteers required at every concert nationwide. Control of one of the only entities that could provide Volunteers at CCM concerts nationwide has given the Waterland Defendants a strangle hold over nonprofits and TCA, forcing them to deal with the Waterland Defendants. Even those competitors who could overcome all of the other insurmountable obstacles, nevertheless found

74

themselves without Volunteers who were critical to the ability to contract with nonprofits, absent dealings with the Waterland Defendants.

264. These upstream and downstream TPR Vertical Acquisitions, often referred to as "vertical squeezes," collectively and individually, squeezed multiple competitive points in the Markets simultaneously.

265. Through control of (a) the CCM Touring Market, (b) many of the essential vertical inputs necessary to compete, and (c) management of many artists and their Public Platforms in connection with CCM tours, the Waterland Defendants acquired the ability to determine whether and how nonprofit sponsorship fundraising activities could even occur during CCM tours as well as the ability to exclude all competition and competitors, such as TCA.

### G. WORLD VISION JOINS THE WATERLAND DEFENDANTS

266. World Vision knowingly joined and participated in the Waterland Defendants' anticompetitive scheme herein set forth by entering into agreements and coordinated arrangements pursuant to which World Vision would serve as the exclusive, or near-exclusive, nonprofit partner for the solicitation of sponsorships through the use of the Markets. While the exact time is unknown, it is believed that World Vision joined the Waterland Defendants at some point in 2023. These agreements were not the product of independent competition, but were structured to foreclose competing nonprofit intermediaries, including TCA, from access to the commercially essential Performing Platforms controlled by the Waterland Defendants. In furtherance of this scheme, World Vision is alleged to have provided substantial financial support and guaranteed sponsorship flows that enabled the Waterland Defendants to acquire, secure, control and/or negate artists' Performing Platforms, and to make payments and economic commitments to artists conditioned upon limiting or foregoing relationships with competing sponsorship intermediaries

75

and/or foregoing sponsorship participations entirely. Through these coordinated arrangements, World Vision and the Waterland Defendants reinforced each other's market positions, Waterland by consolidating control over touring access, and World Vision by securing dominant control over nonprofit sponsorship opportunities, thereby excluding competition and preserving their shared dominance in the NPS Market as it operates through the CCM Touring Market. World Vision is alleged to be jointly and severally liable with the Waterland Defendants for the acts herein set forth. Hereafter, when the term "Waterland Defendants" is used in this Article V, it is deemed to include by reference, World Vision.

## H. MONOPOLY POWER; MARKET POWER IN THE MARKETS.

### i. *Waterland Defendants' Monopoly Power Over CCM Touring Market*

267. The Waterland Defendants were attempting and intending to monopolize both the Markets. As to the CCM Touring Market, they have succeeded. In the alternative, if they have not already, there was/is a dangerous probability that they will/would succeed in monopolizing the CCM Touring Market particularly given the concrete steps they have/had taken to accomplish that objective.

268. To repeat, the chart for Period 3 shows the monopolist market share the Waterland Defendants have in the CCM Touring Market:

| Period 3 11/17/2023 -- 12/31/2025 | | | |
|---|---|---|---|
| COMPANY | NUMBER OF CONCERTS | PERCENTAGE CONCERTS | |
| AWAKENING | 333 | 22.71 % | |
| LIVECO/TPR | 1127 | 76.88% | TPR Entities Percentage 77.29% |
| PREMIER/LIVECO/TPR | 3 | 0.20 % | |
| TRANSPARENT | 2 | 0.14 % | |
| RUSH | 1 | 0.07% | |

76

269.     LiveCo/TPR and thus the Waterland Defendants acquired by acquisition, not organic growth, a dominant market share and monopoly power in the CCM Touring Market, accounting for almost 78% of all CCM tours -- even more if Awakening is excluded and their other horizontal acquisitions of promoters is included.  This alone establishes their acquisition of a monopoly which they have maintained.

270.     The TPR Group's and thus the Waterland Defendants' monopoly power is further demonstrated by its disproportionate capture of ticket revenue and ability to impose higher ticket prices on the market. Although the TPR Group promoted approximately 77% of CCM concerts in Period 3, during that same period they captured approximately 87% of ticket revenue:

| Market Percentage | | | |
|---|---|---|---|
| COMPANY | NUMBER OF CONCERTS | NUMBER OF TICKETS SOLD | TICKETS REVENUE |
| AWAKENING | 22.71% | 16.15% | 13.32% |
| TPR | 77.29% | 83.85% | 86.68% |

271.     The TPR Group's (and thus the Waterland Defendants') outsized revenue share is not accidental; it corresponds with their ability to charge ticket prices that were materially higher than Awakening, its only significant rival.  The above chart also demonstrates that Awakening had lower attendance reflected in a lower number of ticket sales compared to the number of concerts it promoted.

272.     Below is a chart showing average ticket pricing for Transparent, Premier, Rush and Awakening across the three periods:

| Average Ticket Prices | | |
|---|---|---|
| | AWAKENING | ALL TPR |
| PERIOD 1 1/1/18- 11/15/22 | $35.99 | $37.38 |
| PERIOD 2 11/16/22 - 11/16/23 | $41.39 | $39.01 |
| PERIOD 3 11/17/23 - 12/31/25 | $36.67 | $45.98 |

77

273. During Period 1 when Transparent Premier, Rush and Awakening competed in the marketplace, the TPR Group's and thus the Waterland Defendants' combined average ticket prices were only slightly higher than Awakenings. In Period 2 as Transparent Premier, and Rush began their consolidating activity, their ticket pricing was somewhat lower than Awakenings. However, in Period 3 after their combination appears to have been had completed, the average ticket prices for the TPR Group and thus the Waterland Defendants, were dramatically higher than Awakenings.

274. In a competitive market where promoters offer comparable artists, revenue share and concert share would tend to move in tandem because buyers could substitute toward lower-priced alternatives. That did not happen here. Instead, because of its market dominance, the TPR Group and thus the Waterland Defendants extracted materially more ticket revenue per concert and per attendee while still retaining dominant share. A promoter subject to real competitive discipline cannot systematically charge higher prices for similar offerings without losing business. The TPR Group and thus the Waterland Defendants have been able to do so here because concertgoers lack meaningful alternatives. This is direct economic evidence that the TPR Group and thus the Waterland Defendants possess and exercise monopoly power to impose supra-competitive prices.

275. Furthermore, controlling ticket sales and receiving Ticket Surcharge revenue, provided the Waterland Defendants more revenue than the face amount of tickets. Thus, even though the chart above shows elevated ticket prices which itself is indicative of supra-competitive pricing, the predatory effect is significantly greater when these additional monopoly driven revenue components like Ticket Surcharges are taken into account.

276. The Waterland Defendants cannot escape this inference by claiming they promote "better" artists. Even if the Waterland Defendants were able to secure the most commercially

78

valuable artists, that outcome itself reflects its dominance and the structural advantages flowing from its control of both the CCM Touring market, as well as their ability to pay artists more with their increased revenues.

ii. *Waterland Defendants' Have Monopoly Power Over NPS Market As It Is Interlinked With The CCM Touring Market.*

277. The Waterland Defendants have monopoly power over the NPS Market. In the alternative, if they have not already, there was/is a dangerous probability that they will/would succeed in monopolizing the NPS Market, as the NPS Market and the CCM Touring Market are inextricably linked both through the common economic input of artists' Platforms and also structurally interdependent. Thus, monopoly control over the CCM Touring Market has provided the Waterland Defendants with leveraged monopoly power over the NPS Market.

278. The nature of the linkage and structural interdependence arises from the fact that CCM concert promoters have competed for access to artists' Platforms for ticket sales, and nonprofit charities compete for access to those same artists' Platforms to gain sponsors for their charitable endeavors. The two markets are distinct and separate in that their participants, transactions, and competitive dynamics, involve different buyers (nonprofits rather than ticket purchasers), different pricing structures (payments tied to donor acquisition rather than ticket sales), and different economic outputs (long-term donor revenue streams rather than single-event ticket revenue).

279. Nevertheless, the NPS Market cannot exist without the CCM Touring Market within which sponsorships are sought. The CCM Touring Market cannot exist without the NPS Market, as revenues arising solely from ticket sales is not large enough to cover the necessary costs.

79

280. As a result, although distinct, the NPS Market operates in practical conjunction with the CCM Touring Market, operating horizontally alongside, and in functional interdependence with, the CCM Touring Market. In the alternative, and to the extent the broader CCM Touring ecosystem is regarded as the relevant frame of reference, the NPS Market constitutes a cognizable submarket within the broader CCM Touring Market.

281. Control over access to nationwide CCM touring platforms and artist relationships, constitutes control over inputs essential to effective competition in the NPS Market. Because access to the CCM Touring Market is an essential input to competition in the NPS Market, a party that controls the CCM Touring Market possesses the ability to control entry, participation, and competitive dynamics in the NPS Market. Rivals to the Waterland Defendants who do not have access to these inputs that have been artificially acquired by purchase, cannot practically compete.

    iii. *Waterland Defendants' Have Monopoly Power Over NPS Market As They Have Created A Competing Platform To The Artists' Platforms.*

282. Control over the CCM Touring Market has given the Waterland Defendants control over the NPS Market for the additional reason that the Waterland Defendants have created a competing Public Platform to market to nonprofits in competition with the artists and their assigns/intermediaries, like TCA. This competing platform the Waterland Defendants have created has the devastating advantage that it can close its doors to artists and their assigns/intermediaries, like TCA as well as nonprofits who do not capitulate to the demands of the Waterland Defendants.

283. Historically in the CCM industry, promoters functioned as service providers who organized venues, logistics, and ticketing, and derived the overwhelming majority of their revenues from ticket sales, recouping their expended incurred costs from ticket sales, sharing any

80

remaining excess approximately eighty-five percent (85%) to the artist and fifteen percent (15%) to the promoter. The commercially valuable "platform" belonged to the artist who retained all nonprofit sponsorship payments because the nonprofits paid for the artist's ability to attract and engage audiences. Promoters, on the other hand, had no platform of their own to offer, and thus could not approach nonprofits for direct negotiation of sponsorships.

284. Promoters therefore continuously but unsuccessfully attempted to convince artists to share in sponsorship revenues, but because artists had multiple promoter options within the CCM Touring Market, promoters who attempted to demand access to sponsorship rights risked losing access to artists.

285. LiveCo's acquisition of the major promoters created a single, unified enterprise with control over access to large-scale CCM touring opportunities nationwide. In other words, they created an alternative platform they could now directly offer nonprofits independent of any individual artist. LiveCo then entered into direct competition with artists for sponsorship revenue.

286. Leveraging their monopoly power in the CCM Touring Market to gain control over, and ultimately monopolize, the NPS Market, the Waterland Defendants marketed their own platform as giving access to audiences, positioning themselves as an alternative, and superior, sponsorship generating generation channel, particularly powerful as no artist could tour without using LiveCo's newly created "platform" arising from their monopoly control.

287. Instead of recouping costs from ticket sales and sharing net revenues approximately eighty-five percent (85%) to the artist and fifteen percent (15%) to the promoter while the artist retained 100% of its nonprofit sponsorship revenues, the Waterland Defendants positioned themselves to capture both ticketing revenue and all or substantially all of the nonprofit

81

sponsorship revenue, along with the unilateral ability to dictate how much, if any, of either revenue stream the artist will receive.

    *iv.*    *ANTICOMPETITIVE IMPACT ON COMPETITION VIS A VIS IMPACT ON ARTISTS*

288.    As to artists, the Waterland Defendants have required artists to forego or greatly dilute any sponsorship money artists' may receive, on threat of withholding or greatly reducing any historical guaranteed payments the artists would otherwise receive, as explained by the statements of a representative of one artist who advised that the artist could no longer work with TCA and stated precisely why:

> However, next came a systemic, industry-wide change that eroded the foundation on which the Agreement was built: CCM promoters started entering into their own sponsorship agreements with charities, supplanting the artists' (and by extension, TCA's) ability to secure sponsorships. Promoters now make offers to artists that include higher guarantees but conditioned on the promoter collecting sponsorships. If the artist is allowed to retain sponsorship rights, the guarantee is much lower. For [the named artist] the difference has been as much as $8,500 per show. Without this sponsorship revenue to help offset touring expenses, it becomes impossible for [the named artist] to tour as a headlining act without losing money."

289.    Artists already under contract with nonprofits either themselves or via TCA, were thus required to surrender their sponsorship payments, while artists who had not so contracted, incentivized not to deal with either nonprofits or TCA and instead deal directly with the Waterland Defendants

    *v.*    *ANTICOMPETITIVE IMPACT ON COMPETITION VIS A VIS NONPROFITS*

290.    As to nonprofits, the negative impact of the actions of the Waterland Defendants has had a profound impact on them. Particularly during Period Three, a substantial percentage of CCM Touring concerts included nonprofit participation and fundraising presentations. These concerts constitute the primary platform through which nonprofit sponsorship activity occurs.

291. Because the Waterland Defendants control more than 77% of CCM tours and substantially all NPS Market activity occurs in connection with CCM Touring platforms, the Waterland Defendants control incontestable.

292. The Waterland Defendants approached nonprofits directly, soliciting arrangements under which the Waterland Defendants would be the direct beneficiaries of sponsorship revenue generated from CCM concerts which by definition precluded nonprofits contracting with artists or intermediaries, like TCA or at the very minimum served to greatly increase the amounts nonprofits had to pay to even attempt to stay in the game.

293. This competitive pressure was sufficiently significant that TCA and one of its longtime nonprofit partners were required to renegotiate their arrangement, that amendment reciting that the revisions were necessitated, in their own words "due to the escalation of sponsor pricing offered by certain child sponsorship organizations directly to promoters and the resulting market pressures on TCA to retain talent as a consequence thereof." This contemporaneous, arms-length business document constitutes direct evidence that the Waterland Defendants' entry into the NPS Market as a competing Platform caused actual, immediate competitive harm to TCA.

294. The amounts nonprofits were charged for access to those platforms the Waterland Defendants now controlled, effectively precluded participation by smaller but nonetheless worthy charities, who could not match the rates demanded by the Waterland Defendants, from participating in the NPS Market at all. On information and belief, TPR personnel have acknowledged to third parties that TPR's pricing structure was set at levels that smaller nonprofits could not meet.

295. Plaintiff TCA was a significant participant in the NPS Market. TCA's business model fundamentally altered that structure in profound ways. As set forth in Article VI hereof (which is incorporated herein by reference), TCA purchased rights to artist Platforms (which purchase agreements contained strict confidentiality provisions forbidding artists' disclosure of terms) and then resold those rights to charities for amounts centered around per-sponsorship fees for confirmed donors (which agreements also contained strict confidentiality provisions forbidding artists' disclosure of terms). As explained in other portions, here, TCA provided sourcing assistance to artists helping them find and then negotiate contractor arrangements involving nonprofits. TCA helped the nonprofits by bringing suitable artists to them, ranging for volunteers and spokespersons, leaving nonprofit of that burden, most importantly, imposing a structure where nonprofits were not paid on projected sponsorships, but actual sponsorships.

296. TCA was thus a direct participant in the NPS Market and a specific target of Defendants' conduct. Defendants sought to eliminate TCA as a competitive intermediary by

- refusing to deal with TCA and the Newsboys;
- denying TCA and affiliated artists access to TPR-controlled tours or imposed economically prohibitive terms;
- coercing and pressuring artists and nonprofits to cease doing business with TCA.
- preventing nonprofits from partnering with TCA on TPR-controlled tours;
- denying TCA access to spokespersons and volunteers;
- restricting access to essential inputs necessary to compete.

297. The Waterland Defendants' conduct was aimed at eliminating TCA from the NPS Market in order to capture as much as 100% of the sponsorship revenue streams and entrench their monopoly power in both the NPS Market and the CCM Touring Market. While the injury has been to competition, not merely competitors, the harm to TCA has been direct.

298. The Waterland Defendants' leveraging control over essential inputs for artists and their intermediary assigns, like TCA, and nonprofits has had the effect of

    a. increasing the Waterland Defendants' total revenues and profits without a corresponding increase in concert output;

    b. foreclosing competitors, including TCA, from access to nonprofit sponsorship opportunities;

    c. reducing output and resulting in fewer market participants;

    d. forcing artists out of the market or preventing them from touring economically reducing nonprofits' participation; and

    e. raising barriers to entry by requiring any competing firm to replicate both the promotion infrastructure and the sponsorship platform simultaneously in order to compete effectively.

    *vii.*    *Employing Dirty Tricks To Throttle Competition*

299. The Waterland Defendants have also used the "Fargo Fabrication" to alienate artists from TCA and drive away nonprofits and artists and engaging in exclusionary and anticompetitive conduct, including the orchestration and dissemination of knowingly false and defamatory statements designed to eliminate Plaintiffs as a competitive force,

    *viii.*    *Insurmountable Barriers To Entry Have Been Erected*

300. With the consolidation of market power in the Waterland Defendants, competition in both the CCM Touring Market and the NPS Market was dramatically curtailed, if not eliminated and extensive barriers to entry have been erected.

301. The barriers to entry in the CCM Touring Market itself are substantial and have been materially heightened by the Waterland Defendants' acquisitions. A new entrant seeking to promote CCM tours at meaningful scale must independently establish relationships with major CCM artists, secure access to venues in multiple markets simultaneously, develop national routing and logistics infrastructure, obtain access to ticketing platforms capable of serving nationwide

85

audiences, and assemble the marketing relationships necessary to generate sufficient advance ticket sales to sustain a national tour. Prior to the Waterland Defendants' consolidation, these barriers, while significant, were surmountable because multiple promoters competed for artist relationships, providing artists with alternatives and new entrants with the possibility of securing talent. New entrants could co-promote with established promoters. Following consolidation, the dominant position of the TPR Group has made it virtually impossible for a new entrant to assemble a competitive roster of artists, as artists face significant financial penalties, in the form of substantially reduced guarantees, for declining to tour with TPR. The acquisition of iTickets has further foreclosed new entrants from access to the dominant ticketing infrastructure serving the CCM market. These barriers, individually and collectively, render the CCM Touring Market effectively closed to new competition, confirming the durability of Defendants' monopoly power.

302. The barriers to entry into the NPS Market are equally insurmountable. A new entrant into the NPS Market cannot gain access to the alternative platform created by the Waterland Defendants which is literally impossible to recreate.

303. As to artist's platforms, whatever remaining value they have, access to these on a nationwide basis requires access to a nationwide CCM touring infrastructure now controlled by the Waterland Defendants. Even if obtainable, it also requires the expensive capital outlay of registration and compliance as a professional solicitor across numerous states. It requires the operational capacity to field spokespersons and volunteers at every concert venue nationwide. Fundamentally it requires establishing relationships with nonprofits which in most cases is required to be built over years of performance. Each of these barriers is individually significant; collectively they are prohibitive for any new entrant operating independently of the Waterland Defendants. Artists and their assignees such as TCA, who are dependent on CCM promoters to

86

wield their own Platform's economic power, have no alternatives. New promoters seeking to secure artists for nationwide tours now find it virtually impossible to recreate the large volume of venue relationships and market access needed to assemble a nationwide CCM Tour on an economic basis.

304. These barriers to entry have meant that the Waterland Defendants control the Markets, and no rival can reach scale without their permission.

305. By these acts the Waterland Defendants have willfully acquired and maintained monopoly power through exclusionary conduct, eliminating independent competition in the Markets, reducing output, increasing effective pricing to nonprofits, and concentrating control of sponsorship access in the Waterland Defendants.

### I. UNLAWFUL ACQUISITIONS IN VIOLATION OF CLAYTON ACT §7

306. Waterland's formation of Defendants as outlined in Section F *supra* hereof, including its subsequent acquisitions of Transparent, Premier, and Rush, and later merging of those three entities, coupled with their acquisition of other CCM concert promoters, had anticompetitive effects on the CCM Touring Market in the United States, which is the relevant geographic market.

307. Similarly, the Waterland Defendants acquisition of Loop and its other TPR Vertical Acquisitions, has given it control of the CCM Touring Market and had an anticompetitive effect on the NPS Market.

308. As a direct and proximate result of these acts, competition in the CCM Touring Market and in the NPS Market was significantly reduced in the ways set out hereafter. Among other things, these acquisitions facilitated Defendants' ability to control artist access, suppress competition from independent intermediaries such as TCA, and redirect nonprofit sponsorship revenues to Defendants and their co-conspirators, including World Vision.

309. The acquisitions and consolidation described herein, including the roll-up of Transparent, Premier, and Rush into a single unified entity under common ownership and control, have had the effect—and were intended to have the effect—of substantially lessening competition in the CCM Touring Market and related markets, including the Nonprofit Sponsorship Market.

310. Following consolidation, Defendants obtained the ability to coordinate conduct across formerly independent promoters, eliminate competition among them, and leverage their combined control over artist access, tour routing, and venue selection to dominate adjacent markets, including nonprofit sponsorship and fundraising activities associated with CCM tours.

311. This consolidation enabled Defendants to implement the strategy described herein—namely, the internalization and control of sponsorship revenues—on a market-wide basis, something that would not have been possible in a competitive, fragmented promoter market.

312. The effect of these acquisitions has been to increase concentration, raise barriers to entry, foreclose competitors such as TCA, and facilitate the extension of Defendants' market power from the CCM Touring Market into the Nonprofit Sponsorship Market.

313. Defendants' acquisitions therefore violate Section 7 of the Clayton Act because their effect "may be substantially to lessen competition, or to tend to create a monopoly," both in the CCM Touring Market and in the closely related Nonprofit Sponsorship Market.

J.  **MONOPOLIZATION IN VIOLATION OF SHERMAN ACT §2**

314. Monopolization under Section 2 of the Sherman Act requires proof of two elements: (i) the possession of monopoly power in the relevant market, and (ii) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. The Waterland Defendants' monopoly power was not the product of superior performance, innovation, or organic

competitive success. It was the product of a deliberate, externally financed acquisition strategy designed to eliminate competitors, misappropriate a rival's business model, and restructure market economics to exclude independent participation. These acquisitions were undertaken pursuant to a pre-planned strategy modeled on Live Nation's secular monopolization of the mainstream concert market, financed by Waterland Private Equity, and directed from the outset at eliminating competitive alternatives in both the CCM Touring Market and the Nonprofit Sponsorship Market.

315. Defendants' conduct was not limited to competition on the merits but instead involved the use of monopoly power in the CCM Touring Market to restructure market economics, capture nonprofit sponsorship revenues, and exclude independent intermediaries, including TCA, from the Nonprofit Sponsorship Market. Defendants' monopolization of the CCM Touring Market included the deliberate transformation of the economic structure of the market to capture and control a separate and previously independent stream of revenues—namely, nonprofit sponsorship revenues associated with artists' public platforms. Defendants' monopolization and maintenance of monopoly power includes not only their consolidation of promoters, but also their deliberate use of that power to restructure market economics by capturing nonprofit sponsorship revenues and excluding independent intermediaries, including TCA, from that market.

316. The Waterland Defendants' contracting, combining, and/or conspiring to create and maintain these monopolies has produced adverse, anticompetitive effects within the Markets, and the objects of and conduct pursuant to those actions were unlawful. Plaintiffs have been injured as a proximate result of that activity.

K. **VIOLATIONS OF SHERMAN ACT §1 (INCLUDING TYING) AND CLAYTON ACT §14**

317. The actions of the Waterland Defendants constitute violations of Sherman Act §1. It has long been clear that a pattern of acquisitions may itself create a combination illegal under

89

Sherman Act §1 and certainly serves as a predicate for finding Sherman Act §1 violations. [17]The Supreme Court has stated:

> It has long been clear that a pattern of acquisitions may itself create a combination illegal under §1, especially when an original anticompetitive purpose is evident from the affiliated corporations' subsequent conduct. The Yellow Cab passage is most fairly read in light of this settled rule. In Yellow Cab, the affiliation of the defendants was irrelevant because the original acquisitions were themselves illegal. An affiliation "flowing from an illegal conspiracy" would not avert sanctions. Common ownership and control were irrelevant because restraint of trade was "the primary object of the combination," which was created in a "'deliberate, calculated'" manner. Other language in the opinion is to the same effect. [18]

318. Furthermore, agreements the Defendants have extracted from artists and nonprofits, even if they were victims of Defendants' actions, nevertheless constitute agreements falling under and prohibited Sherman Act §1.

319. The actions of the Waterland Defendants constitutes unlawful tying. The CCM Touring Market and the NPS Market are distinct product markets, and access to the former was conditioned on relinquishment of rights in the latter. Although distinct, they are inextricably intertwined.

320. Following these consolidating acquisitions, the Waterland Defendants with monopoly power in the relevant markets, could and did approach nonprofits offering nationwide tours in exchange for sponsorship compensation, thus making nonprofit participation with promoters, instead of artists, not just feasible but demanded. As TPR now had sponsorship money, they could also offer artists competitively higher guaranteed touring payments, albeit without the artist getting sponsorship money (or a greatly reduced amount) creating insurmountable competition with TCA. Correspondingly, artists who did not agree to TPR terms found themselves

---

[17] *Copperweld Corp. v. Independence Tube Corp*., 467 U.S. 752, 761-761 note 5 (1984).

[18] *Copperweld* 467 U.S. at 761-762 .

90

without nonprofit money and/or facing much more difficult touring conditions. These arrangements were not the product of independent economic choice but were compelled by Defendants' control over access to touring opportunities necessary for artists to perform at scale.

321. Given the market power achieved by the acquisitions of the main promoters and the critical specialty businesses that supported the CCM concert industry, the Waterland Defendants embarked on a deliberate scheme to foreclose Plaintiffs and other competitors from the market.

322. Defendants conditioned access to essential CCM touring opportunities, including venue access, tour slots, and promotional support, on artists' agreement to relinquish their rights to nonprofit sponsorship revenues, thereby unlawfully tying CCM touring services to the Nonprofit Sponsorship Market.

323. This scheme included specifically: (1) cutting off nonprofit sponsorship access by negotiating directly with nonprofits and bundling sponsorships with TPR-controlled national tours; (2) inducing artists to deal exclusively with TPR with lucrative offers but witheringly small opportunities if artists refused exclusivity; and (3) offering inflated flat fees to artists funded by captured sponsorship revenues and revenues from ticketing and ancillary services, making competition economically impossible.

324. Upon information and belief, given Defendants' dominant market share in the CCM Touring Market, Defendants conditioned, expressly or implicitly, access to participation in CCM tours and promoter-controlled concert opportunities on artists' and/or nonprofits' agreement to route sponsorship and fundraising activities through Defendant-controlled structures, thereby tying access to the CCM Touring Market (the tying product) to participation in the Nonprofit

91

Sponsorship Market (the tied product), and foreclosing independent intermediaries such as TCA from competing for those sponsorship opportunities.

325. On information and belief, the MercyMe Defendants knowingly joined and furthered the conspiracy by agreeing to forego sponsorship arrangements with TCA in exchange for compensation and benefits funded in whole or in part by the Waterland Defendants and World Vision, thereby advancing the Defendants' scheme to eliminate TCA as a competitor.

L. **MARKET AND CUSTOMER ALLOCATIONS IN VIOLATION OF SHERMAN ACT §1**

326. During the period referred to as the "Second Period, which began on November 16, 2022, and ended on November 16, 2023, each of Transparent, Premier, and Rush were (a) legally separate companies, (b) separately compensated through earnouts tied to their individual performance, and (c) independent actors capable of concerted action.

327. Despite their nominal common ownership under LiveCo, each had its own economic incentives and competed for artists, because the earnout structure rewarded individual performance.

328. Yet, during this period, the three promoters entered into an unlawful horizontal agreement not to compete with one another for artist relationships or promotional services. This is a classic market allocation.

329. Artists were implicitly and explicitly told that whichever of the three entities had previously promoted them "owned" them for earnout purposes, that the other two earnout entities would not compete for the artist's next tour, and that the promoters had an "internal agreement" not to bid against one another as to such "legacy" business.

330. The market allocation understanding alleged in the preceding paragraph is corroborated by a direct admission by Defendant Pugh. At a March 21, 2023 meeting between

92

Pugh and Plaintiff Campbell — a meeting held in the context of active commercial acquisition negotiations, by a senior executive, unprompted, and in the presence of TCA's principals — Pugh stated explicitly: "we're not going to send competing offers . . . [i]t would make no sense for us to compete with each other on an offer submission." This statement is a direct, unambiguous admission of an agreement, whether express or tacit, not to submit competing offers in the Market, and confirms the existence of precisely the internal agreement among Premier, Rush, and Transparent alleged in the preceding paragraph.

331.    Such an agreement constitutes a per se unlawful horizontal market allocation under Section 1 of the Sherman Act, 15 U.S.C. § 1. It requires no showing of anticompetitive effect and admits of no procompetitive justification. The fact that this admission was made in a collegial commercial context does not diminish its legal significance; per se offenses do not require predatory intent, and a statement made by a senior executive in a commercial negotiation, unprompted and in the presence of a counterparty, cannot be characterized as mere informal courtesy. Pugh further confirmed that the non-competition arrangement was tied to the earnout structure governing Transparent, stating the parties would not compete "specifically because Transparent is still in an earn out scenario" — acknowledging that the market allocation had a defined economic rationale that the parties had internalized as a matter of business practice.

M. **GROUP BOYCOTT IN VIOLATION OF SHERMAN ACT §1**

332.    Further particularly during the Third Period, TPR (a) coerced other music groups to not contract with TCA and/or breach contracts with TCA on the threat of being denied access to TPR's promotional networks, thereby depriving TCA of the ability to serve a large segment of market; (b) threatened punitive financial consequences to musicians who were affiliated with

TCA; and (c) compelled musicians, either through threats of punitive measures or through financial incentives, to refuse to work with TCA.

333. Thus, the Waterland Defendants organized a boycott and a concerted refusal to deal with the Newsboys, with TCA itself, and with any musical group associated with TCA, thereby organizing a group boycott of the Newsboys and TCA in violation of the antitrust laws.

334. This boycott included refusing to book the Newsboys on nationwide tours despite their ongoing market appeal, threatening other artists (including MercyMe and others) with exclusion from TPR's national touring network if they continued to work with TCA, communicating that an affiliation with TCA would result in artists being barred from or penalized in future TPR tours, coercing artists to breach contracts with TCA under threat of exclusion, and organizing an industry-wide understanding that working with TCA was professionally "dangerous" because artists would lose access to TPR tours. These actions include coordinated artist pressure, which is also actionable under Section 1.

335. These are not complex vertical restraints. They are horizontal group boycotts undertaken by multiple parties acting in concert, and they are unlawful and properly analyzed as *per se* or, at minimum, quick-look.

336. Further, this conduct constitutes a coordinated effort to remove TCA and entities owned by Wes Campbell, including the Newsboys, from the market. TCA, in particular, provided enhanced measures of compliance for charitable fundraising through its dedicated compliance department. On information and belief, the TPR Tours are not complying with applicable fundraising laws, which deprives the market of a superior product, namely compliant charitable fundraising, that TCA provided.

94

337. The so-called "Fargo Fabrication" was used as a tool and part of the coordinated boycott. It was circulated through the industry, repeated by TPR-affiliated promoters, used to poison artists against TCA, used to cut off nonprofit relationships, and part of a unified refusal to deal. The "Fargo Fabrication" therefore functions as a boycott-enforcement mechanism, and a horizontal signal to artists and nonprofits that dealing with TCA was prohibited.

N. **ANTITRUST INJURY**

338. Plaintiffs have suffered antitrust injury of the type the antitrust laws were intended to prevent and that flows directly from Defendants' unlawful conduct.

339. As a direct and proximate result of this conduct, Plaintiffs have been foreclosed from competing for artist platforms and nonprofit sponsorship opportunities, from meaningful participation in the nonprofit sponsorship market, all of which were previously available to them. Plaintiffs have lost existing and prospective contractual relationships with artists and nonprofit organizations and have suffered substantial loss of revenues and business value. In fact, Defendants had previously offered to purchase TCA for approximately $50,000,000, whereas now its value is zero. This loss of value is antitrust damage. These injuries are the direct result of Defendants' exclusionary control over the channels through which competition in these markets occurs, and not the product of independent business decisions or market forces.

340. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff Newsboys has suffered substantial injury to its business and property. Defendants' exclusionary control over the CCM Touring Market has foreclosed Newsboys Touring from access to commercially viable concert promotion channels, resulting in the loss of touring opportunities, a reduced number of concerts, suppressed ticket revenues, diminished participation in sponsorship revenue tied to live events, and the inability to compete for and secure tour placements on

95

commercially reasonable terms. These injuries include both realized losses and the loss of future touring opportunities that would have occurred in a competitive market absent Defendants' conduct.

341. As a further direct and proximate result of the same anticompetitive conduct, Plaintiff Newsboys has suffered distinct injury to its intellectual property and licensing business. The suppression of touring activity and public exposure caused by Defendants' exclusionary conduct has directly reduced demand for Newsboys' recorded music, streaming, licensing, and related revenue streams, diminished the value of its catalog, impaired brand goodwill, and foreclosed licensing and promotional opportunities that depend upon sustained public visibility through live touring and public performance — the principal channels through which recorded music demand is created and maintained. These injuries are concrete, quantifiable, and flow directly from Defendants' foreclosure of those channels.

342. The injuries suffered by Plaintiffs Newsboys are distinct, direct, and non-duplicative. Newsboys have been injured in live performances, touring business, and in its ownership and exploitation of intellectual property and recorded music assets. Although these injuries arise from the same exclusionary scheme, each Plaintiff suffers harm in a separate line of commerce and through separate revenue streams. These injuries are not the result of internal allocation or corporate structuring, but instead reflect independent economic harm inflicted on each Plaintiff by Defendants' conduct. Recovery by each Plaintiff is therefore based on its own direct injuries and does not constitute double recovery or derivative harm of another entity.

343. Defendants' conduct has also reduced output and competition in the relevant markets by eliminating an independent competitor that developed and operated an alternative

96

sponsorship platform, thereby depriving artists and nonprofit organizations of competitive choices and reducing the availability of independent sponsorship opportunities.

344. The harm to competition is further demonstrated by the effect on artists and nonprofit organizations themselves. Under the prior competitive regime, nonprofits could negotiate with TCA and artists independently, on the basis of actual sponsorships generated and at rates disciplined by competition. Under the Defendants' controlled structure, nonprofits are required to transact through TPR on terms dictated by a monopolist, at prices that smaller and mid-sized charities are unable to meet, as TPR personnel have acknowledged to third parties. This reduction in nonprofit participation constitutes a direct, measurable reduction in output in the Nonprofit Sponsorship Market and distorts the previous competitive pricing structures that previously controlled and disciplined the Markets.

345. In addition, Defendants' conduct has resulted in the extraction of supra-competitive profits by enabling Defendants to capture multiple revenue streams, including sponsorship revenues, without increasing output, and by insulating Defendants from competitive constraints that would otherwise discipline pricing, structure, and participation in both the CCM Touring Market and the Nonprofit Sponsorship Market.

346. Given TCA's stated purpose, it is inextricably connected to the CCM Touring and NPS Markets such that its entire existence depended on the competitive health of the Markets. The injuries suffered by Plaintiffs are thus inextricably intertwined with the injury to competition caused by Defendants' conduct, are the direct and foreseeable result of Defendants' violations of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act and such an integral aspect of the conspiracy alleged, there can be no question but that Plaintiffs' loss was precisely the type of loss that violations of the Sherman and Clayton Acts anticipated were likely to cause.

97

347. Plaintiffs are efficient enforcers of the antitrust laws. TCA was the only independent intermediary operating in the Nonprofit Sponsorship Market and was the direct target of Defendants' exclusionary conduct. TCA's injuries are the precise injuries the antitrust laws were designed to redress, not incidental competitive harm, but the deliberate foreclosure of the firm that created the market Defendants sought to capture. Newsboys Plaintiffs are likewise efficient enforcers, as direct targets of the same exclusionary scheme whose commercial viability depended upon access to the competitive market Defendants destroyed.

## VI. CLAIM FOR RELIEF FOR VIOLATIONS OF TENN. CODE ANN. §§ 47-25-101&102 [TENNESSEE ANTITRUST ACT] (ASSERTED AGAINST THE WATERLAND DEFENDANTS, WORLD VISION, THE MERCYME DEFENDANTS AND THE BICKELL PARTIES).

348. n all claims in this Article VI, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein. Without limiting the foregoing, Plaintiffs assert the same facts as set forth in Article V of this Complaint here, which are incorporated by reference herein as if fully set forth independently.

349. Such acts constitute violations under TENN. CODE ANN. §§ 47-25-101 &1 02.

350. Plaintiffs have been proximately damaged by the acts of the named Defendants for which full relief is herein sought.

## VII. CAUSES OF ACTIONS AND CLAIMS FOR RELIEF ASSERTED AGAINST WATERLAND DEFENDANTS FOR MISAPPROPRIATION OF TRADE SECRETS, BREACHES OF CONTRACTS AND RELATED CLAIMS

351. In all claims in this Article VII, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

352. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV.M above and arises from

the same common nucleus of operative fact as Plaintiffs' other claims. This claim is based on the same series of communications, transactions, and events through which the Waterland Defendants restrained competition, impaired Plaintiffs' business relationships, eliminated Plaintiffs as a competitive force in the relevant markets (Art. V), misappropriated Plaintiffs' trade secrets and breached contracts (Art. VI), conspired to defame Plaintiffs (Art. VIII), conspiracy/aiding and abetting defamation (Art. IX), violated the Lanham Act (Art. X),  contractual claims (Art. XI), interfered with Plaintiffs'  contracts with artists and nonprofits (Art.XII) and violated antisolicitation laws (Art. XV).

### A. BACKGROUND FACTS APPLICABLE TO ALL CLAIMS UNDER THESE CAUSES OF ACTON.

353.    Starting as soon as 2016, Premier had agreed to be the exclusive promoter for the Plaintiff Newsboys, as a result of which Premier, and later the Waterland Defendants because of the merger, undertook fiduciary duties to the Plaintiffs.  Defendant Rush later replaced Premier as Plaintiffs' exclusive promoting agent, but (a) because Defendant Rush was without any background with or detailed knowledge of the NPS Market, (b) Premier had been the first promoter acquisition undertaken by LiveCo, (c) Premier had had  prior dealings with the Plaintiffs and their artists whose sponsorship rights TCA had acquired, and (d) its knowledge in very general terms of the profitable operations of TCA, Premier took the lead in approaching Plaintiffs about the acquisition of Plaintiff TCA.

354.    Premier initiated contact with the Plaintiffs and requested detailed financial, operating information and data from TCA to determine what had made Plaintiffs in general, and TCA in particular so successful -- in fact so successful that LiveCo would approach Plaintiffs about an acquisition and do so almost immediately after LiveCo's formation and initial funding.  There

99

would be no reason to request the information from TCA if it was otherwise known or readily available.

355. Before any disclosures, Plaintiffs insisted on a broad and all-encompassing confidentiality agreement, which forbade LiveCo/Premier and any of its affiliates from using and/or disclosing any information Plaintiffs may present, and an agreement entitled "Nondisclosure and Restrictive Covenant Agreement" was signed by Premier for itself and any and all of its affiliates which included LiveCo (the "First Confidentiality Agreement").

356. Following execution of the First Confidentiality Agreement, Plaintiffs begin to disclose highly sensitive and confidential information about its operations and business and did so for the single and sole purpose of facilitating a sale transaction.

357. After these disclosures, Premier decided it was necessary to involve Waterland as the founding equity owner of LiveCo. After doing so, Waterland requested even more detailed information about TCA and its operations and business.

358. Given the involvement of Waterland and the highly confidential nature of the information being requested, Plaintiffs required an additional agreement of confidentiality be executed to ensure limited access to and use of any information it may disclose. Thus, an additional agreement of confidentiality was signed, this time by USLive OpCo, the entity represented by the Defendants to be the operating holding company who would actually make the acquisition of TCA, although in binding affiliates as well, it bound all Waterland Defendants (the "Second Confidentiality Agreement").

359. The first confidentiality agreement and the second confidentiality agreement or here sometimes referred to collectively as the "Confidentiality and Restricted Use Agreements."

360. The Confidentiality and Restricted Use Agreements having been. signed, TCA provided confidential information to the Waterland Defendants which was not general industry knowledge, but highly specific, non-public, and economically valuable information, including without limitation detailed data and methodologies concerning: (i) nonprofit sponsorship structures; (ii) amounts and ranges of payments made by nonprofits for access to artists' public platforms; (iii) revenue-sharing arrangements among TCA, artists, and nonprofit entities; (iv) performance metrics and conversion rates associated with sponsorship solicitations; and (v) the scalability, predictability, and profitability of sponsorship revenues across multiple tours and markets.

361. Without limitation, the Waterland Defendants were given the amounts nonprofits were paying TCA for sponsorships. This information was embodied in contracts TCA had signed with nonprofits which contained explicit confidentiality restrictions against disclosure. As to nonprofits, armed with this information, a competitor would know maximum amounts nonprofits would pay for sponsorships allowing the Waterland Defendants to compete against TCA by charging more in their dealings with nonprofits to increase the Waterland Defendants' own profits, and also achieve a competitive advantage against TCA when bidding head to head for nonprofits' business.

362. As to artists, the Waterland Defendants were provided with the number of artists TCA then had under contract and each contracts' duration and sponsorship commitments. TCA started first with disclosures of artist listings anonymously, followed later by the name of the contracting artist with detailed information about sponsorship numbers each artist had committed to and the rates they were being paid both individually by artist and in the aggregate as an average for all artists. This information is embodied contracts with artists that also contained explicit

101

confidentiality restrictions against disclosure. Armed with such important competitive information, the Waterland Defendants knew precisely which artists were under contract with TCA (and which were not), the number of sponsorships each artist was committed to raise, and the rates TCA was paying them.

363. Although precluded by the Confidentiality and Restricted Use Agreements, this information would enable TCA competitors (a) to glean knowledge of what sums they could demand the artist contribute to them to the "pot" should the acquisition not proceed, as happened in the case of one artist who was specifically told later his sponsorship revenue would have to be given up in order to receive any guaranteed payments; (b) to know when to target specific artists s to secure future rights; and (c) to know the competitive bidding range which they would need to outbid TCA in dealing with artists in the future.

364. TCA's revenue payments disclosed in the aggregate and on average from nonprofits along with the amounts paid to specific artists individually, and in the aggregate told the Waterland Defendants as competitors, TCA's actual profit structure and provided key insight into just how that structure could be utilized.

365. This information was not known in the marketplace and neither could it be determined. It empowered the Waterland Defendants as a competitor to more effectively bid for nonprofits and artists to undercut TCA. The Waterland Defendants' ability to use TCA's confidential disclosures to compete directly against TCA is illustrated by TCA's dealings with artist Brandon Lake.[19] Through a series of meetings, TCA, by and through Wes Campbell,

---

[19] Brandon Lake is a nationally recognized contemporary Christian music artist with a substantial public following and frequent appearances at large-scale events. His prominence is reflected, for example, by his selection as one of a limited number of well-known artists invited to lead portions of the musical program at a widely attended public memorial service for Charlie Kirk.

educated Lake and his management regarding the structure, availability, and revenue potential of nonprofit sponsorship arrangements, information that was not previously known to them. Following these disclosures, Lake and Campbell reached an agreement in principle for Lake to engage TCA to solicit and manage sponsorships in connection with his upcoming tour, which was to be promoted by LiveCo. Lake indicated that he would advise LiveCo that sponsorship solicitations would be conducted through TCA as part of the upcoming the tour so LiveCo as the event promoter would understand those logistical requirements. After having reached agreement in principle, however, Lake ceased communications and the contemplated relationship did not proceed. Given the significant incremental revenue associated with sponsorships, knowledge of which Lake had only recently acquired through TCA's disclosures, the abrupt termination is explainable only with Defendants' use of TCA's confidential information to internalize or redirect those sponsorship opportunities rather than permit TCA to perform that function. [20]

366. Prior to obtaining TCA's confidential information, the Waterland Defendants had no comparable operational experience, established platform or meaningful access to the NPS Market. Their participation in concert promotion had been limited to the traditional ticket-based model described above. TCA's confidential disclosures provided the Waterland Defendants with an economic roadmap for a market they had not previously navigated and could not have entered at comparable speed or effectiveness without the benefit of TCA's proprietary data and methodology. The Waterland Defendants could not have developed or implemented this competing model within the same time frame, or with the same effectiveness, absent their access to TCA's confidential information obtained under the guise of acquisition negotiations and subject to strict confidentiality obligations.

---

[20] The only other possible explanation is that LiveCo passed on the Fargo Fabrication to him.

103

367. Following this, the Waterland Defendants made a significant offer to purchase the equity interest in TCA starting initially with an offer made on December 19, 2022. Later, on January 26, 2023 the Waterland Defendants increased that offer in total to approximately $50 million for the acquisition of TCA, which offer TCA accepted.

368. As explained herein, the Waterland Defendants decided to breach their contract to purchase TCA in large part, intending to use the confidential information they had acquired from TCA to replicate TCA's business model in direct competition with TCA, rather than paying the agreed acquisition price.

**B. VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ET SEQ.**

369. TCA is the owner of trade secrets as defined under the Defend Trade Secrets Act, 18 U.S.C. § 1839(3) ("DTSA"). These trade secrets are related to services used in, or intended for use in, interstate and foreign commerce, in that TCA's operations span the United States nationwide and involve contractual relationships with artists, charities and promoters across multiple states, and the Waterland Defendants' own operations likewise involve interstate commerce in the same markets.

370. In addition to the trades listed in the background section of this cause of action, TCA's trade secrets include, without limitation, the following categories of information (collectively, the "Trade Secrets"):

  a. TCA's proprietary business model for serving as an exclusive intermediary between performing artists and nonprofit charities, including TCA's methodology for monetizing artist public platforms through live-event charitable sponsorship solicitations and its "turnkey" operational model;

  b. TCA's confidential customer lists identifying the nonprofit charities with whom TCA had established or was developing contractual relationships, including the specific terms, rates, and payment structures negotiated with each nonprofit;

104

c. TCA's confidential artist roster, including the identities of performing artists under contract with TCA, the specific terms of each artist agreement, per-unit CTA rates, initial and recurring advances, option structures, and outstanding sponsorship commitments;

d. TCA's proprietary per-sponsorship pricing model, including its internal cost structure per confirmed sponsor (comprised of artist costs and in overhead, compliance, and campaign-related expenses), and its strategies for increasing per-sponsorship rates charged to nonprofits above the then-current rate;

e. TCA's historical and projected sponsorship volume data, including its pre-pandemic performance of over 40,000 confirmed sponsorships annually and its projections for 2022 through 2024;

f. TCA's proprietary compliance infrastructure, including its registration as a "professional solicitor" in the relevant states, its in-house compliance department, and the details of its operational processes for deploying spokespersons and volunteers at concerts nationwide;

g. TCA's identification of its competitive risks and vulnerabilities, including its reliance on Loop Events as a third-party vendor for volunteer recruitment and its plans to build an in-house department to reduce that exposure;

h. TCA's strategies for expanding its artist roster, increasing per-sponsorship rates, and penetrating additional genres and nonprofit sectors beyond its existing partnerships; and

i. TCA's methods for complying with charitable solicitation registration requirements in states where concerts occur and solicitations for sponsorships were made.

371. TCA took reasonable measures to maintain the secrecy of the Trade Secrets. Among other things, artists and nonprofits contracting with TCA were bound by confidentiality agreements prohibiting disclosure of the terms and nature of their arrangements with TCA. TCA required all parties with whom it shared confidential information to execute nondisclosure agreements before receiving such information. When TCA provided financial and operational information to the Waterland Defendants in connection with the proposed acquisition, TCA did so expressly subject to the terms of the Confidentiality and Restricted Use Agreements described herein, and initially withheld artist names until it was assured that an offer of purchase was about

105

to be forthcoming. TCA further maintained the confidentiality of its business model and operations through internal practices limiting access to sensitive information.

372. The ongoing operative character of TCA's confidentiality measures is further confirmed by Defendant Pugh's own admissions at a March 21, 2023 meeting where Pugh expressly acknowledged that he personally remained still functioning "under the NDA," and the participants collectively confirmed the same. These statements establish that TCA's requirement that all parties execute the Confidentiality and Restricted Use Agreements before receiving confidential information constituted a reasonable protective measure that was understood, acknowledged, and accepted as binding by the recipients at the time of that meeting. A trade secret claimant's reasonable measures are sufficient where, as here, the counterparty expressly acknowledges the operative obligations in real time.

373. The Trade Secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons or entities who could obtain economic value from their acquisition or use. Until the later actions by the Waterland Defendants herein complained of, TCA's proprietary business model, pricing structures, artist and nonprofit relationships, and operational infrastructure gave TCA a unique competitive position as it was the only entity in the NPS Market who bought and sold artist platform rights and solicited charitable sponsorships on behalf of nonprofit charities. This competitive position had quantifiable economic value, the Waterland Defendants' own valuation of TCA and offers to purchase at approximately $50 million alone demonstrate. in fact, there was no other reason why the Waterland Defendants would offer such sums absent such value.

374. The Waterland Defendants misappropriated TCA's Trade Secrets within the meaning of 18 U.S.C. § 1839(5) by the following means, among others:

106

a. Acquiring TCA's Trade Secrets through improper means, in that the Waterland Defendants obtained access to the Trade Secrets ostensibly for the purpose of evaluating and consummating a bona fide acquisition of TCA, while in fact intending, or later deciding, to use the Trade Secrets to replicate TCA's business model without completing the acquisition or paying the agreed consideration, thereby obtaining the Trade Secrets through deception;

b. Disclosing and using TCA's Trade Secrets without consent, in that after abandoning the acquisition, the Waterland Defendants used TCA's Trade Secrets to develop and implement their own competing nonprofit sponsorship platform, to approach nonprofit charities with whom TCA had existing or developing relationships, and to offer artists higher guaranteed payments conditioned on the promoter capturing sponsorship revenues, all directly replicating the business model and competitive strategies TCA had disclosed in confidence; and

c. Disclosing TCA's Trade Secrets to Defendant Timothy Taber, who as the de facto and then formally appointed Chief Strategy Officer of LiveCo/TPR, received access to TCA's confidential information and who on information and belief used that information to persuade the Waterland Defendants not to acquire TCA and instead to replicate its model using TCA's misappropriated operational plan as a blueprint. That Taber did so is the only logical explanation for why the Waterland Defendants would (a) initiate sales dialogue with TCA; (b) request TCA's highly confidential information; and (c) make a significant offer of purchase, which was unilaterally increased, only to in retrospect abandon the acquisition after Taber 's Transparent was acquired. The Waterland Defendants asserted that their excuse for delaying closing was the need to arrange financing, which was later determined to be a canard when Plaintiffs discovered in preparing this lawsuit that in October 2022, the Waterland Defendants' financial advisors had filed a tombstone ad stating that they had assisted the Waterland Defendants in actually already arranging acquisition financing.

375. The Waterland Defendants' misappropriation was willful and malicious, in that the Defendants obtained TCA's Trade Secrets under the false pretense of a bona fide acquisition, shared those Trade Secrets with Taber and others who had competitive interests adverse to TCA, and thereafter deliberately implemented TCA's business model to compete with and ultimately destroy TCA as a market participant, while simultaneously taking steps to damage TCA's reputation and commercial relationships to prevent TCA from mounting effective competition.

107

376. The Waterland Defendants' misappropriation was willful and malicious, in that the Defendants obtained TCA's Trade Secrets under the false pretense of a bona fide acquisition, shared those Trade Secrets with Taber and others who had competitive interests adverse to TCA, and thereafter deliberately implemented TCA's business model to compete with and ultimately destroy TCA as a market participant, while simultaneously taking steps to damage TCA's reputation and commercial relationships to prevent TCA from mounting effective competition. As a direct and proximate result of the Waterland Defendants' misappropriation of TCA's Trade Secrets, Plaintiffs have suffered and continue to suffer damages including, without limitation: lost revenues from the loss of artist contracts and nonprofit partnerships; loss of the consideration promised in connection with the acquisition of TCA; loss of the value of TCA's business and competitive position in the NPS Market; and costs incurred in connection with investigating and responding to the Waterland Defendants' conduct. In fact, Plaintiffs' valuation went from approximately $50 million as established by the Waterland Defendants themselves to zero. The exact amount of these damages will be established at trial.

377. Because the Waterland Defendants' misappropriation was willful and malicious, Plaintiffs are entitled to an award of exemplary damages in an amount not exceeding two times the actual damages awarded, pursuant to 18 U.S.C. § 1836(b)(3)(C).

378. Plaintiffs are also entitled to an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

379. In addition to damages, Plaintiffs are entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to prevent the Waterland Defendants' continued use and disclosure of TCA's Trade Secrets, including without limitation an order requiring the Waterland Defendants to cease operating any nonprofit sponsorship platform developed using TCA's confidential

108

information, to return or destroy all materials containing or derived from TCA's Trade Secrets, and to refrain from further disclosure or use of TCA's Trade Secrets.

### C. VIOLATION OF THE TENNESSEE UNIFORM TRADE SECRETS ACT, TENN. CODE ANN. § 47-25-1701 ET SEQ.

380. Plaintiffs assert the same facts of this Complaint here, which are incorporated by reference herein as if fully set forth independently

381. TCA's Trade Secrets as described above constitute "trade secrets" as defined under the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1702(4), in that they constitute information, including formulas, patterns, compilations, programs, devices, methods, techniques, and/or processes that (a) derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) was/is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

382. The Waterland Defendants misappropriated TCA's Trade Secrets within the meaning of Tenn. Code Ann. § 47-25-1702(2) by acquiring TCA's Trade Secrets through improper means, and by disclosing and using TCA's Trade Secrets without TCA's consent, as more particularly alleged in Article VII.B hereof, which is incorporated herein by reference.

383. The Waterland Defendants' misappropriation was willful and malicious within the meaning of Tenn. Code Ann. § 47-25-1704(b).

384. As a direct and proximate result of the Waterland Defendants' misappropriation, Plaintiffs have suffered damages as alleged hereinabove, for which they are entitled to recover under Tenn. Code Ann. § 47-25-1704(a), including both actual damages and, to the extent actual damages are insufficient to compensate for the unjust enrichment the Waterland Defendants

derived from the misappropriation, unjust enrichment damages. Such damages are at a minimum $50 million, which is the value the Waterland Defendants themselves established through their own offers, and which has since been reduced to zero.

385. Plaintiffs are further entitled to an award of exemplary damages in an amount not exceeding two times the actual damages awarded, pursuant to Tenn. Code Ann. § 47-25-1704(b), on account of the Waterland Defendants' willful and malicious misappropriation.

386. Plaintiffs are also entitled to an award of reasonable attorneys' fees pursuant to Tenn. Code Ann. § 47-25-1705.

387. Plaintiffs are further entitled to injunctive relief pursuant to Tenn. Code Ann. § 47-25-1703 to prevent the Waterland Defendants' actual and threatened continued misappropriation of TCA's Trade Secrets.

### D. BREACH OF CONFIDENTIALITY AND RESTRICTED USE AGREEMENTS.

388. Two written nondisclosure agreements govern the disclosure and use of TCA's confidential information by the Waterland Defendants and their affiliates, both collectively defined previously as the Confidentiality and Restricted Use Agreements.

389. Pursuant to the First Confidentiality Agreement, Premier Productions LLC agreed to hold all Confidential Information in strict confidence and "not use any Confidential Information for any purpose except to carry out discussions and/or negotiations concerning or undertaking any mutually agreed obligation relating to or in furtherance of, the Relationship." The First Confidentiality Agreement expressly provides that these obligations "shall remain in full force and effect in perpetuity, unless the Disclosing Party specifically and in writing agrees to release all or any part of the Confidential Information from the restrictions imposed hereunder." The First Confidentiality Agreement also included a non-solicitation covenant prohibiting the Recipient

110

from causing or attempting to cause any employee, agent, or advisor of TCA to terminate his or her relationship with TCA.

390. Pursuant to the Second Confidentiality Agreement, the Waterland Defendants agreed to treat and hold TCA's Confidential Information in the strictest confidence and "not to use it other than in connection with the Transaction or potential Transaction." The Second Confidentiality Agreement requires the same and further provides that the Receiving Party's obligations to keep Confidential Information confidential survive any termination of the agreement.

391. Because Premier Productions, LLC was subsequently acquired by and merged into LiveCo and ultimately TPR, and because the First Confidentiality Agreement expressly binds the parties' "successors and assigns," TPR and the Waterland Defendants are bound by the obligations of the First Confidentiality Agreement as successors to Premier Productions, LLC.

392. Similarly, because signatory USLive OpCo, Inc. is believed to be an entity operating under the assumed names "TPR" and "LiveCo," TPR and the associated Waterland Defendants are bound by the obligations of the Second Confidentiality Agreement.

393. TCA performed all conditions, covenants, and obligations required of it under the Confidentiality and Restricted Use Agreements, including by providing the Confidential Information and Trade Secrets described herein to the Waterland Defendants in reliance on the confidentiality obligations of the Confidentiality and Restricted Use Agreements.

394. The NDA obligations described herein remained operative beyond the formal period of acquisition negotiations. At a meeting held on March 21, 2023, Defendant Pugh expressly acknowledged his continuing obligations under both the First Confidentiality Agreement and the Second Confidentiality Agreement (previously, the Confidentiality and Restricted Use

111

Agreements) stating that he was "still functioning under [the] NDA." The other participants in that meeting likewise acknowledged their shared understanding, confirming that "[w]e're all under the NDA." These statements confirm that the Confidentiality and Restricted Use Agreements were understood by all parties in attendance to remain in full force and effect as of March 2023, nearly two months after Plaintiffs' acceptance of the acquisition offer, and that the disclosures TCA had made in connection with the acquisition negotiations remained subject to strict confidentiality obligations at the time of that meeting.

395. The Waterland Defendants materially breached the Confidentiality and Restricted Use Agreements by, among other things:

a. Using TCA's Confidential Information for purposes other than evaluation of the proposed acquisition of TCA, specifically by using TCA's business model, pricing structure, customer relationships, artist roster information, and operational methodology to develop and implement their own competing nonprofit sponsorship platform, in direct competition with TCA;

b. Disclosing TCA's Confidential Information to Defendant Timothy Taber and other personnel of the Waterland Defendants who were not party to the original acquisition negotiations and whose interests were adverse to TCA, without TCA's consent;

c. Failing to return or destroy TCA's Confidential Information upon abandonment of the proposed acquisition, as required by both NDAs;

d. Through Defendant Timothy Taber, using TCA's disclosed competitive vulnerabilities, which the Defendants converted into a weapon against TCA's competitive position; and

e. Use by Rush of confidential information and data to preempt Plaintiffs' planned joint tour featuring artists Tauren and Danny Gokey, the details of which are set forth in Article IV.I and XIII.F hereof, which are incorporated by reference.

396. The First Confidentiality Agreement further provides that the non-solicitation covenant prohibits the Waterland Defendants from interfering with TCA's employee relationships. The Waterland Defendants breached this provision by, among other things, counseling and

112

working with MercyMe to terminate/breach their contract and Troy Collins to resign from TCA for the purpose of enabling the termination of the MercyMe contract and facilitating the transfer of the MercyMe and Children International relationship to the Waterland Defendants.

397. As a direct and proximate result of the Waterland Defendants' breaches of the Confidentiality and Restricted Use Agreements, Plaintiffs have suffered damages including, without limitation, loss of their confidential business model and competitive position, loss of artist and nonprofit relationships enabled by the Waterland Defendants' misuse of TCA's confidential information, and loss of the benefit of the bargain of the proposed acquisition. The exact amount of these damages will be established at trial.

398. The Confidentiality and Restricted Use Agreements expressly provide that breach would cause immediate and irreparable harm for which money alone may not fully compensate, and that the Disclosing Party shall be entitled to seek injunctive relief without posting any bond or other security. Plaintiffs are therefore entitled to injunctive relief, in addition to damages, to prevent the Waterland Defendants' continued use and disclosure of TCA's Confidential Information.

399. Pursuant to the Confidentiality and Restricted Use Agreements, the party that substantially prevails in any action to enforce shall recover all costs and attorneys' fees incurred in connection with the action. Plaintiffs are therefore entitled to recover their costs and attorneys' fees upon prevailing on this claim.

**E. BREACH OF CONTRACT TO ACQUIRE TCA**

400. Beginning in or about October 2022, the Waterland Defendants, through their principals Christian Lund Madsen and Nicklas Guldberg of Waterland PEI and Waterland PE respectively, and through Brian Becker of USLive OpCo, entered into discussions and negotiations

113

with Plaintiffs for the acquisition of Plaintiff TCA by the Waterland Defendants through their LiveCo/USLive platform.

401. In furtherance of those negotiations and the proposed acquisition, the Waterland Defendants made a formal written offer to acquire TCA on December 19, 2022 (the "First Offer"). The First Offer proposed a purchase price of USD $15 million at closing, plus a second tranche earn-out payment calculated as five times the difference between TCA's average EBITDA for 2023-2024 and its last twelve months EBITDA at closing, capped at a total consideration of USD $45 million, with reinvestment requirements of 10-40% of the upfront payment and 20-40% of the earn-out into USLive equity, which amounts Plaintiffs were content to allow Defendants to determine, and additional terms including salary continuity, employment agreements, and an earn-out protection covenant.

402. Following further discussions and TCA's disclosure of updated financial information reflecting a projected accrual EBITDA of $3.6 million for 2022 and a trajectory toward $7 million for 2023, the Waterland Defendants increased their formal written offer on January 26, 2023 (the "Second Offer" or "Offer"). The Second Offer increased the upfront payment to USD $17 million while maintaining the same earn-out formula, cap, reinvestment requirements, and other key terms as the First Offer. The Waterland Defendants also stated in the Second Offer that they would initiate drafting of Memoranda of Understanding as soon as they received confirmation of the terms. In the context of these negotiations and as used between these sophisticated commercial parties, the reference to a Memorandum of Understanding reflected the parties' mutual intent to memorialize and be bound by the material terms already agreed upon, rather than to reopen or renegotiate those terms.

114

403. On January 31, 2023, Dave Wagner, as authorized agent and representative of Plaintiffs, transmitted a written acceptance of that offer (the "Acceptance") which all parties understood to be a contractual acceptance. In the Acceptance, Wagner confirmed that TCA's projections could be achieved on a stand-alone basis provided only that TCA's trade secrets were not improperly exploited by others and/or actions used for the sole purpose of reducing the earn-out, which was not a material variation of the Waterland Defendants' offer as otherwise the "offer" would have been in bad faith and illusory. Only confirmatory due diligence verifying the material accuracy of Plaintiffs' prior disclosures remained to be completed, and no material fact existed that any subsequent due diligence would have uncovered that would have changed the fundamentals of Plaintiffs' prior disclosures. Plaintiffs expressed enthusiasm for the partnership and stated that Plaintiffs were "ready to proceed to the MOU phase for TCA," and as stated, by industry standards and custom and usage, a Memorandum of Understanding is a term of art used to describe binding agreements. The Acceptance did not reopen, contest, or qualify any material economic term of the Second Offer, including price, earn-out formula, cap, reinvestment obligations, salary terms, or employment agreement structure.

404. The exchange of written communications constituting the Second Offer and the Acceptance resulted in the formation of a binding contract between Plaintiffs and the Waterland Defendants for the acquisition of TCA (the "Purchase Agreement"). The essential terms of the Purchase Agreement were definite and certain, including: the identity of the parties; the subject matter of the acquisition; the purchase price of $17 million at closing plus an earn-out calculated at 5x the EBITDA improvement over the last twelve months baseline, capped at $45 million total consideration; reinvestment obligations as determined by the Defendants; salary and employment

115

continuity; and an earn-out protection covenant prohibiting the Waterland Defendants from taking actions with the sole purpose of reducing the earn-out.

405. Under Tennessee law, the fact that the parties contemplated the execution of a subsequent written memorandum of understanding and/or definitive agreements does not preclude a finding that a binding contract was formed upon acceptance of the material terms, where the parties have reached agreement on all essential terms and the remaining items are matters of implementation rather than substance. Here, both parties expressly acknowledged that the next step was to "proceed to paper" and to the MOU phase, treating those steps as ministerial formalization of an agreement already reached on the essential terms.

406. The Waterland Defendants breached the Purchase Agreement by repudiating and failing to perform their obligation to close the acquisition of TCA and pay the agreed consideration. Despite having reached agreement on all essential terms, having received TCA's confidential business information, and having committed to proceeding to documentation, the Waterland Defendants abandoned the acquisition without justification, failed to proceed to the MOU phase, refused to close or pay any portion of the agreed consideration, thereby breaching the Purchase Agreement.

407. In fact, the Waterland Defendants never actually announced they were reneging on the Purchase Agreement.

408. Rather, the Waterland Defendants asserted that their excuse for delaying closing was the need to arrange financing, which was later determined to be a canard when Plaintiffs discovered in preparing this lawsuit that in October 2022, the Waterland Defendants' financial advisors had filed a tombstone ad stating that they had assisted the Waterland Defendants in actually arranging acquisition financing.

116

409. The Waterland Defendants' breach of the Purchase Agreement was not the result of any legitimate business justification or change in TCA's representations or performance. Rather, as alleged herein, the Waterland Defendants' abandonment of the acquisition was caused, in part, by the improper intervention of Defendant Timothy Taber, who convinced the other Waterland Defendants to replicate TCA's business model without paying the acquisition price, and who further discouraged the acquisition by circulating the Fargo Fabrication as a pretext for abandonment, thus misappropriating TCA's confidential information.

410. Blaming the delay in closing on the false pretext of their need to obtain more capital encouraged TCA to continue to entertain the TPR management staff to continue working together, pending closing, thereby reinforcing TCA's belief of an impending completed sale.

411. As a direct and proximate result of the Waterland Defendants' breach of the Purchase Agreement, Plaintiffs have suffered damages including, without limitation: loss of the agreed purchase price of approximately $50 million; loss of the employment agreements and salary continuity contemplated by the Purchase Agreement; loss of the USLive equity appreciation that would have accrued to Plaintiffs as reinvestment participants; loss of the earn-out payments that would have been earned through TCA's continued operations as part of the USLive platform; and consequential damages flowing from the Waterland Defendants' subsequent competitive use of TCA's confidential information and destruction of TCA's market position. The exact amount of these damages will be proven at trial.

412. In the alternative, to the extent a court determines that the Purchase Agreement did not constitute a fully binding contract for the acquisition of TCA, Plaintiffs assert a claim for promissory estoppel and/or detrimental reliance, in that the Waterland Defendants made clear and definite promises to acquire TCA on the agreed terms, Plaintiffs reasonably and foreseeably relied

117

on those promises by disclosing their confidential information, foregoing alternative business opportunities, and investing time and resources in the anticipated transaction, and Plaintiffs suffered substantial detriment as a result of that reliance, such that injustice can be avoided only by enforcement of those promises.

413. In the further alternative, to the extent a court determines that neither a binding contract nor promissory estoppel applies, Plaintiffs assert a claim for unjust enrichment, in that the Waterland Defendants received and retained substantial benefits from TCA, including TCA's proprietary business model, operational plans, artist roster data, nonprofit relationship information, and competitive strategy, without paying the agreed consideration or any compensation therefor, and it would be unjust and inequitable to permit the Waterland Defendants to retain those benefits without compensation to Plaintiffs.

## VIII. CAUSE OF ACTION AND CLAIM FOR RELIEF FOR DEFAMATION, FALSE LIGHT, ETC. ASSERTED AGAINST THE DEFAMATION DEFENDANTS.

414. In all claims in this Article VIII, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

415. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV.M above and arises from the same common nucleus of operative fact as Plaintiffs' other claims. This claim is based on the same series of communications, transactions, and events through which the Waterland Defendants restrained competition, impaired Plaintiffs' business relationships, eliminated Plaintiffs as a competitive force in the relevant markets (Art. V), misappropriated Plaintiffs' trade secrets and breached contracts (Art. VI), conspired to defame Plaintiffs (Art. VIII), conspiracy/aiding and

118

abetting defamation (Art. IX), violated the Lanham Act (Art. X), contractual claims (Art. XI), interfered with Plaintiffs' contracts with artists and nonprofits (Art.XII) and violated antisolicitation laws (Art. XV). Without limiting the generality of the foregoing, this claim is based on the same series of communications, publications, and events through which Defendants published and amplified false statements concerning Plaintiffs, causing reputational harm and contributing to the disruption of Plaintiffs' business relationships and competitive position.

416. Plaintiffs allege that the Defamation Defendants published statements that were false and defamatory as to the Plaintiffs and presented Plaintiffs in a false light. As to the Defamation Defendants' culpability, as none of the Plaintiffs is a public figure, it is alleged that the Defamation Defendants were negligent in failing to ascertain the truth of the statements.

417. In the alternative, if it is determined any of the Plaintiffs is a public figure or limited purpose public figure, it is alleged the Defamation Defendants published the defamatory statements with knowledge that the statements were false or with reckless disregard for the truth of the statements. While there are many facts that demonstrate the Defamation Defendants' reckless disregard, the most conspicuous one is the fact that the police report specifically stated that Nicole called her liaison "consensual" and the Defamation Defendants consciously chose to omit not just that that phrase was in the police report, but that it was attributed to Nicole herself.

### A. THE ARTICLE FALSELY ASSERTS NICOLE WAS RAPED BY NEWSBOYS' EMPLOYEE WHEN NICOLE TOLD THE POLICE AND OTHERS HER ENCOUNTER WAS CONSENSUAL - - A FACT THE ARTICLE KNOWINGLY OMITTED

418. The Article repeatedly states that Nicole was raped, not by Michael Tait but by a man named Matt Brewer, who was an independent contractor who worked with numerous artists (not an employee of Plaintiffs) making such assertions as (a) "Woman Accuses Michael Tait of Drugging Her and Watching While She Was Raped" (Article Title, Ex. 1, p.1); (b) "... a woman

119

who worked with the band [the Newsboys] says she was raped while Tait watched." (Ex. 1, p.1); and (c) "In my head I'm thinking, did he help feed the (rape)? (Ex. 1, p. 11). [21] These are clearly per se defamatory and they are false.

419. The Article's implication of criminal conduct by Tait is further undermined by the Article's own account. The Article does not allege, and no evidence supports, any physical interaction between Tait and Nicole. Tait's alleged involvement was limited to observing two adults who were, as the Fargo Police confirmed, engaged in consensual sexual relations. That alleged conduct, even as described by the Article itself, is not a crime. By saturating the Article with the words "rape" eighteen times, "raped" seven times, "sexually assaulted" nine times, "assault" thirty-eight times, "assaulted" thirteen times, and "victim" nine times, the Article creates a false and defamatory impression that Tait engaged in or facilitated criminal conduct when even the Article's own narrative alleges no such thing.

i. *The Article Did Not Disclose Nicole's Statements To Police Of Consensual Sex.*

420. The Article states that a few weeks after December 18, Nicole filed a police report with the Fargo Police, but that is blatantly false as Nicole spoke to the Fargo Police three days later (December 19) and her statement to them contradicts these assertions.

421. The Article states that Nicole continued on the concert tour from Fargo, a fact discussed infra, but her continued travel with a man she later accused of rape contradicts that assertion. The Article further states that two days later, on December 18, she was terminated from her employment, which also conflicts with the narrative of an immediate and reported assault. The Article then states that she returned to her home in Minnesota, where a friend took her to St. John's Hospital, and that she was "diagnosed with sexual assault." (Ex. 1, p. 13) A diagnosis of sexual

---

[21] The word "rape" has been supplied in parentheticals indicating the victim did not use that term and it was intentionally inserted by the Defamation Defendants.

assault, if accurate, does not mean there were objective findings confirming rape or assault, but only that the patient reported such an incident and that there were no clinical findings that contradicted herself report.

422.     In Minnesota, with even the possibility of rape having been suggested, a health care professional was required by law to notify the Minnesota police, who in turn contacted the Fargo Police. The Fargo Police then contacted Nicole and Matt Best, all of which occurred three days after the events in question.  The Fargo Police documented these contacts, yet the Article omits these facts.  The police investigative report made on December 19, along with another report prepared shortly thereafter, both of which were in the Defamation Defendants' possession, clearly state that Nicole told the Police her interactions with Brewer were consensual. These facts were omitted from the Article in a manner that demonstrates culpability beyond negligence and rises to the level of culpable malice.  The Fargo Police recorded these statements, but the Article did not disclose them.

- "'Nicole' said she remembered 'Matt' trying to have sex with her and giving 'Matt' oral sex"; (Ex. 2, p. 3)

- "She ['Nicole'] does, agree, though that any interaction that she would have had with Matt would have been consensual...."; and (Ex. 2, p. 5)

- "Matthew Best is not the same person as who 'Nicole' was having consensual relations with..." (Ex. 2, p. 6)

423.     The Police Reports contain statements Nicole made to the Police that her sexual acts with Brewer were consensual, and the Article does not mention these admissions Nicole made to the Fargo Police.   Instead, the Article misstates that the Fargo Police "concluded that -- despite 'Nicole's' testimony to the contrary, her interactions with Brewer had been consensual." (Ex. 1, p. 13)

424. Further demonstrating culpability beyond negligence, rising to the level of culpable malice, are the following facts. The Article's use of the term "testimony" connotes that Nicole told the police under oath she had been raped, but that was not true; Nicole never told the police that. In stating that: "*The detective... concluded that - despite 'Nicole's' testimony to the contrary - her interactions with Brewer had been consensual*," (Ex. 1, p. 13) the Article conveys that the conclusion of consensual sex was the officers' subjective conclusion reached in the opposition to "Nicole's" assertions but omits to disclose that the determination of consensual sex was based on "Nicole's" own statements to the police as reported by the police in their official report after interviewing Nicole. Thus, what the police recorded were statements Nicole made to them, not the officer's conclusions or opinions as falsely reported. Further indicating culpable knowledge, the Defamation Defendants never questioned the Police, even though she had their contact information clearly stated in the Police Reports, thus evidencing conscious avoidance of the true facts, evidencing legal malice. Additional evidence of legal malice is the failure of the Defamation Defendants to confronted Nicole with her own statements.

425. Compounding these failures, the Defamation Defendants also failed to make any meaningful pre-publication attempt to contact Wesley Campbell and afford him an adequate opportunity to respond to the specific accusations being directed at him personally. Despite repeatedly naming Campbell, publishing his photograph, identifying him as Newsboys owner, and attributing responsibility for the events in Fargo to him, the Defamation Defendants made no good-faith effort to present those accusations to Campbell before publication and obtain his response. This failure is an additional indicia of culpable malice.

122

426.    Not only did Nicole tell the police her involvement with Brewer was consensual, the morning of the incident, she claimed to her friends that she could only remember giving Brewer fellatio ("I woke up giving Matt Brewer a blow job...") (Ex. 1, p. 9), and also over breakfast that morning, claimed she was trying to figure out what happened.  She did not tell her friends she had been raped.

427.    Thus, Nicole told the police three days after the incident that her interaction with Brewer had been consensual, and she told friends the next morning she "woke up giving Matt Brewer a blow job."  Eleven years later, however, she told the Defamation Defendants:

> *"The next thing that I remember is being on a bathroom floor and feeling like a 1,000 pounds were on me. My body was so heavy I could hardly move. I hear Matt Brewer's voice, and I remember (Tait) being in there." "I remember the feeling of my head being pushed down between someone's legs. I . . . guess oral sex, or an attempt, but I don't fully remember."* (Ex. 2, p. 8)

These stories stand in stark contrast to one another yet the Defamation Defendants neither pressed nor qualified the tabloid story of rape.

428.    Further contradicting the allegation of a rape and supporting the notion that the Defamation Defendants pushed to fabricate a story eleven years afterwards, later on the morning of the incident when Nicole claimed she could not remember what happened, her employer took her to a Fargo hospital where Nicole declined any medical tests that would have confirmed whether she had been drugged and raped,  -- itself deeply suggesting fabrication -- but she explained her declining of tests stating:  "I did not want to say that I was raped or even believe it, because it's horrific **if it's true**."  (emphasis added) (Ex. 1, p. 10).  The Defamation Defendants seeing and hearing the "if it's true" demonstrates that at the very best, Nicole did not know or believe she had been raped.

429. The Fargo Hospital itself reported that "Nicole's" sexual encounters were consensual, the hospital writing:

*"[Nicole] was out drinking with co-workers... Thinks she had sex with at least one other male. Unsure if it was more than one person. States there was at least a third person that walked into the room during the sexual encounter. [Nicole was] concerned that there was a tampon inserted during the entire sexual encounter last night."* (Ex. 1, p. 10)

430. Nothing suggesting rape was stated by Nicole to the Fargo hospital, who would have had a duty to report any possible rape had Nicole said so. In fact, the Article states the hospital records from the Fargo hospital "does not say if she was drugged and raped in the Ramada." (Ex. 1, p. 10).

431. Other inconsistencies in Nicole's story strongly implicate a fabrication between Nicole and the Defamation Defendants. One of the reasons Nicole felt she may have been "raped" has to do with the location of a tampon she claimed had been inserted at the time of the incident. She told the Defamation Defendants that "she was -- or had been -- a virgin..." (Ex. 1, p. 9) and later, on the morning of the incident, "woke up and discovered that a tampon she had been wearing was shoved up her vagina as if by force." (Ex. 1, p. 9) But in her statement to the Fargo Police, she told them the opposite, the police writing:

*"She also said that her tampon was shoved deep up into her vagina, which she would not do under normal circumstances if she was preparing or planning on having vaginal intercourse. She would have removed the tampon prior to this ...."* (Ex. 2, p. 4)

432. The Article states that Nicole worked for a small concert promoter named Pulse Evangelism, that her boss was a man named Matt Best, and that Best was promoting a multicity tour for an evangelist named Nick Hall at which the Newsboys were performing before Hall preached. After playing in Fargo, North Dakota on December 15, the tour had December 16 off and was scheduled to perform in Williston, North Dakota on December 17, St. Paul, Minnesota on

124

December 18, Eau Claire, Wisconsin on December 19, and Paducah, Kentucky on December 20. When "Nicole's" immediate supervisor, Matt Best, and the tour sponsor, Nick Hall, learned of the incident, they conducted an internal inquiry, terminated her employment, and sent her home. The Article attempts to minimize this as a "mutual decision," but that characterization reflects the Defamation Defendants' bias, as the action was a termination based on conduct the tour deemed inconsistent with a Christian music tour, not a punishment of a rape victim. The tour then continued with the Newsboys and with Brewer fully participating and interacting with the touring personnel.

433. These facts, all known to the Defamation Defendants, demonstrate culpability beyond negligence, rising to the level of culpable malice.

B. **THE ARTICLE CLAIMS NICOLE MUST HAVE BEEN DRUGGED BASED ON NOTHING OTHER THAN NICOLE'S SELECTIVE, SELF-PROCLAIMED PARTIAL AMNESIA.**

434. The Article claimed Nicole was drugged by Newsboy's singer Michael Tait. Yet the Article cites no evidence of a drugging and certainly none by the Newsboys singer. The Defamation Defendants did not contact health care experts to determine the likelihood of a "date rape" drug having been used, which constitutes conscious disregard. Had the Defamation Defendants contacted a health care expert, she would have been told it was somewhere between extremely unlikely and impossible.

435. The Article asserts that Nicole must have been drugged and, because it presents no other explanation, implies that the substance must have been administered by Newsboys member Michael Tait. Moments before, while at the hotel bar, Tait ordered three tequila shots, one for himself, one for John Burch, and one for Nicole. The Article claims that Tait put some kind of date rape drug into one of the three shots, despite offering no evidence or support for that claim other than Nicole's self-reported amnesia. In fact, John Burch was standing immediately beside Tait when the three shots were poured by the bartender and affirmatively states that nothing was put

125

into the shot glasses other than the tequila poured by the bartender. Neither Burch nor the bartender saw anything added by anyone. The defamatory Article discloses none of these facts, and the Defamation Defendants did not contact either Burch or the bartender even though the Defamation Defendants knew their full names and had their contact information.

436. The Articles also sought to enhance the drugging narrative by minimizing Nicole's acknowledged alcohol consumption, stating that Nicole remained "well within legal drinking limits" that evening. That characterization is false and presents the events in a false light. There are no applicable "drinking limits" for a hotel guest. More importantly, the Fargo Police Report—in the Defamation Defendants' possession, documents that Nicole told the Fargo Police she "had quite a bit to drink" (Ex. 2, p. 3) that evening. The Defamation Defendants knowingly substituted a minimizing characterization of Nicole's alcohol consumption for her own contrary admission to law enforcement, further inflating an already speculative drugging claim.

437. And the Fargo Police concluded Nicole had not been given any "date rape" drug, based in part on their own investigation, including their viewing of the hotel video footage, the Fargo Police writing in their report repeatedly

> "*there is no indication of her being drugged in any way for this to have happened";*
> (Ex. 2, p. 5)
>
> *\*\*\**
> *"[there was no] indication that she had been given a date rape drug which would have incapacitated her*." (Ex. 2, p. 6)

Although the Defamation Defendants knew this, she did not disclosure it in her article, because she did not want to include anything that negated or contradicted the story line.

438. To further ensure readers would discount the Fargo Police's conclusions, the Article falsely portrayed the Fargo Police as appearing "unwilling to pursue any leads", a characterization designed to present the police investigation in a false light. That characterization was false and

126

defamatory. The Fargo Police conducted a thorough, multi-faceted investigation that included: (a) traveling to the Ramada Inn and viewing hotel video footage of all relevant areas in coordination with hotel management; (b) interviewing the bartender at the hotel bar where the Article alleges Tait administered a drug to Nicole; (c) retrieving the billing records of all relevant parties; (d) interviewing Nicole's employer, Matt Best, and recording his statement; (e) interviewing other witnesses; and (f) attempting to interview additional out-of-state witnesses. The Article's false portrayal of the Fargo Police as disinterested investigators was a deliberate device to cause readers to dismiss the very findings—that Nicole had not been drugged and that her encounter was consensual, that directly defeated the defamatory narrative.

439. Perversely, the Article claims one of the "indicators" that Nicole had been "drugged" by someone comes from the hotel security video of the corridor outside Brewer's hotel room. The Article does not show the video or any clips; rather it verbally describes Nicole and Matt both coming out of Matt's room whereupon she leaped up on him and wrapped her legs around him, at which point they re-entered the room for consensual sex.

440. The Police Report particularly noted this, writing:

> *".. all three of them are standing outside of the hotel room and it's about that time that [Nicole] jumps up on Matt and straddles him and they walk into the hotel room."* (Ex. 2, p. 5)

The Article notes this, but without showing the video or any shots records Nicole as saying 11 years later, that "she did not remember this moment, the Article stating:

> "*While viewing the footage, Nicole told TRR that she did not remember this moment but said she unequivocally would not have wanted to be taken back into the room. She believes a date rape drug, like Rohypnol, GHB, or Ketamine, mixed with alcohol, lowered her inhibitions.*" (Ex. 1, p. 6)

441. While leaping into Brewer's arms exhibits motor skills that are not consistent with any incapacitating date rape drug. Even more importantly, a video of an affectionate embrace --

127

fully consistent with consensual sex -- has now become evidence of being drugged, because, the Article states, Nicole "said she unequivocally would not have wanted to be taken back into the room [and therefore]...believes a date rape drug, like Rohypnol, GHB, or Ketamine, mixed with alcohol, lowered her inhibitions."  In other words, she claims she would have never done this unless she was drugged and therefore must have been.

442.    The published accusation of "drugging" did not rest on toxicology, medical evidence, eyewitness testimony, or contemporaneous complaint. It rested solely on the accuser's retrospective assertion that she would not have gone to Plaintiff's hotel room "in her right mind." That is not evidence of drugging; it is an inference drawn from conduct she later regretted.  The Defamation Defendants knew this. The Defamation Defendants also knew the allegation was unsupported by any objective indicia of intoxication by surreptitious drugs. Yet Defendant presented the claim as a factual occurrence rather than a speculative belief. Publishing a serious criminal accusation while aware that it rests only on such ipse dixit constitutes reckless disregard for the truth.

443.    Further revealing this as a preposterous claim comes from even a cursory viewing of the video taken by the hotel's security cameras, which the Defamation Defendants had.  This footage showed Nicole arriving at Brewer's room texting on her phone:



**Cell Phone**




444.    Then hotel video footage shows Nicole walking out of Brewer's room in the middle of her time there, leaping into Brewer's arms.

129









130

Case 3:26-cv-00484    Document 1    Filed 04/17/26    Page 139 of 204 PageID #: 139

**5**  **6**

**7**  **8**

131

445.    Not only were Nicole's motor skills inconsistent with a claim of having been drugged, but her entire demeanor was also nothing remotely resembling a drugged victim.  To the contrary, she seemed alert, texting, talking, leaping and on leaving Brewer's room turns to speak to him as she has left the room.

446.    Also inconsistent with a claim of having been drugged was Nicole's suspiciously selective recall. Unlike a person who had been administered a date rape drug and has no memory at all, Nicole had precise, albeit selective, recall of events.  For example, Nicole claimed to know the precise time Tait offered tequila shots was 1:17 AM:  "...Tait saw her stand up at 1:17 a.m., he yelled for her across the bar...." (Ex. 1, p. 4) No one drugged would have that precise a memory of time.  Similarly suspicious, Nicole knew the precise time she had "blacked out" and what she remembered seeing when she "woke up," the Police writing:

> *Nicole [22] said she "blacked out" around 0200 hours [i.e., 2 AM].  Nicole said the next thing she remembers is being in a hotel room bathroom with a male named "Matt."  Nicole said "Matt" was a white male, 6'5", very large, and had brown curly hair pulled back into a "bun."  Nicole said she also remembers a black male entering the hotel room at some point (unknown description) Nicole said she remembers "Matt" trying to have sex with her and giving "Matt" oral sex.  Nicole is concerned there were sexual acts completed by one or more males* (Ex. 2, p. 3)

Even a normal person let alone a true victim of a date rape drug, will not be able to recall the precise time they "blacked out" -- here Nicole recalled it being 2 AM.  As to what Nicole said about what she "remembered" when she "woke up," Nicole described to the Fargo Police with incredible detail her now-alleged assailant, Matt and what they were doing:

> *"the next thing she remembers is being in a hotel room bathroom with a male named 'Matt.'  Nicole said 'Matt' was a white male, 6'5", very large, and had brown curly hair pulled back into a "bun."  Nicole said she also remembers a black male entering the hotel room at some point (unknown description) Nicole said she*

---

[22] In the copy of the Police Report attached hereto as Exhibit 2 the victim's name has been redacted.  The pseudonym Nicole has replaced "[REDACTED]" as it actually appears in the Police Report.

132

*remembers 'Matt' trying to have sex with her and giving 'Matt' oral sex."* (Ex. 2, p. 3)

447. Medically, the recall of (a) the precise time of "blacking out," (b) the minute details of her surroundings; (c) her paramour's size and hair style; and (d) what was being done sexually, are not consistent with any kind of incapacitating date rape drug.

448. And her account to the Fargo Police, stated immediately above, and what she told the Defamation Defendants 11 years later are different, the Defamation Defendants stating:

*"Nicole told TRR that after taking the Tequila from Tait, 'The next thing that I remember is being on a bathroom floor and feeling like a 1,000 pounds were on me. My body was so heavy I could hardly move. I hear Matt Brewer's voice, and I remember (Tait) being in there.' 'I remember the feeling of my head being pushed down between someone's legs. I . . . guess oral sex, or an attempt, but I don't fully remember."* (Ex. 1, p. 8)

449. Also contradicting claims of rape versus consensual sex are the references to oral sex, with

| a. | Nicole telling the police according to the official police report: | "...she remembers 'Matt' trying to have sex with her and giving 'Matt' oral sex" (Ex. 2, p.3) |
|---|---|---|
| b. | Nicole telling her friend Elizabeth Chan: | "I woke up to giving Matt Brewer a blow job'" (Ex. 1, p. 9) |
| c. | Nicole telling the Defamation Defendants 11 years later: | "I remember the feeling of my head being pushed down between someone's legs. I . . . guess oral sex, or an attempt, but I don't fully remember." (Ex. 1, p. 8) |

450. These accounts of memory recall are not only inconsistent with a date rape drugging but internally inconsistent with one another, creating the immediate sense of fabrication. Nicole's discussions with her friend in 2014 clearly state she was "giving" fellatio to Matt Brewer while her

133

statements 11 years later to the Defamation Defendants was of her "head being pushed down between someone's legs...:" (Ex. 1, p. 8). This starkly inconsistent rendition of events creates the immediate sense of fabrication.

451. Also, dramatically inconsistent with claims of nonconsensual rape from a drugging, are the facts that when she "woke up,"

      a. Nicole did not cry for help, as the entire reason they were in the bathroom was someone was asleep in the bedroom next to the bathroom and

      b. Nicole did not immediately leave the room when she woke up if her encounters had not been voluntary;

Indeed, the hotel video footage captures Nicole's leaving Brewer's room which show her calm and in control and even turning to chat with Brewer after she exited his room:

  

134

452.     Directly contradicting Nicole's account to the Defamation Defendants that she was on a "bathroom floor" is the eyewitness account referenced in the Article itself. The Article states that video footage shows Jack Campbell following Tait to Brewer's hotel room, opening the door, and—after only six seconds—fleeing. (Ex. 1, p. 6) That six-second observation nonetheless afforded Jack Campbell a direct view into the room. As reflected in the Article, Jack Campbell observed Nicole and Brewer engaged in consensual sexual activity on a couch in the living room area of the hotel room, with Tait watching. That is irreconcilable with Nicole's claim, made eleven years later, that she was on a bathroom floor with Brewer on top of her. The Article neither acknowledges this contradiction nor attempted to reconcile Nicole's account with the eyewitness evidence the Article itself recites. Furthermore, the Article's own timeline renders the bathroom floor account physically implausible. The Article places Jack Campbell's observation of Nicole and Brewer in the living room at approximately 2:00 AM and records Nicole exiting the room fully dressed at 2:21 AM, approximately twenty minutes elapsed. It is implausible that Nicole and Brewer relocated from the living room couch to the bathroom, engaged in the acts Nicole described, and fully redressed and exited within that window

453.     The entire story of drugging was fabricated based entirely on Nicole's self-reported amnesia, and unverified preposterous assertions in other publications that few young men reported doing things they would not otherwise have done, so they "must" have been drugged.

**C. THE ARTICLES FALSELY CHARACTERIZED TAIT'S JUNE 10, 2025 STATEMENT AS AN "ADMISSION OF GUILT" AND KNOWINGLY MISREPRESENT ITS CONTENTS.**

454.     The Article contains a bolded sub-headline reading "Tait's alleged admission of guilt" and states that Tait's "admission of guilt came only after The Roys Report (TRR) published the stories." These statements are false and defamatory. Tait never admitted to having drugged

135

Nicole, never admitted to watching while Nicole was raped, and never admitted to any participation in concealing such events. The characterization of Tait's post-publication statement as an "admission of guilt" for the specific acts alleged in the Article has no factual support and constitutes defamation per se.

455. The Article further falsely states that in his June 10, 2025 statement Tait "admitted he has preyed sexually on other men." Tait's actual statement was that he had "at times touched men in an unwanted sensual way." The Article's substitution of "preyed sexually" with its connotation of predatory, criminal conduct for Tait's own words is a knowing misrepresentation of the source the Article purports to quote, and constitutes actual malice

**D. THE ARTICLES' CLAIMS THE NEWSBOYS "COVERED UP" NICOLE'S RAPE AND DRUGGING WAS A LITERAL IMPOSSIBILITY SINCE EVERYONE KNEW EVERYTHING**

456. The Article falsely and defamatorily proclaims that the Plaintiffs then perpetrated a "cover up" of these events, a preposterous and particularly damaging false accusation. But a "cover up" was legally and factually impossible. There was no cover up and the Defamation Defendants knew it.

457. First, a cover up was impossible because Plaintiffs controlled no one and were in no position to cover anything up had they wanted to. The Article claims that two of Nicole's friends were concerned in the early morning hours of December 16, the Article writing about Nicole's two friends, Jesi Jones and Elizabeth Chan:

> *By the time [Elizabeth] Chan and [Jesi] Jones arrived back on the floor two minutes later, they found Nicole crumpled on the floor by her door. Chan and Jones told TRR that she had blacked out and her pants were unzipped. 'Even if you're black-out drunk,' said Chan, 'I've never seen anyone to that point of having no motion.' At that moment, Brewer left his hotel room. Chan pulled Nicole into their room, while Jones doubled back to ask Brewer what happened. She told TRR, 'He was wasted.' A video feed shows Brewer fully dressed and talking on his phone with Nicole's crumpled body still visible in the hallway. To this day, Chan and Jones say they wish they had called an ambulance. 'I wasn't very familiar with*

136

*what roofying looked like versus just being fully intoxicated,' said Chan, who was 22 at the time. 'I checked and knew that she was breathing. I brought her into the suite area of the hotel (room), and I put her on the couch. 'I couldn't get her to talk or really be coherent at all. But I knew she had a pulse, was breathing normally, and perhaps had too much to drink. So, Jesi and I decided we would just let her sleep it off, hoping maybe the next morning, she'll be able to tell us what really happened."* (Ex. 1, Pgs. 8-9)

458. This, plus the fact that later that morning Nicole told Elizabeth Chan and Jesi Jones that she "woke up to giving Matt Brewer a blow job..." (Ex. 1, p. 9) clearly show that there was nothing to "cover up": Nicole told her friends and would within a short time span tell her boss, the evangelist for whom they worked, a hospital, and the Fargo Police. But the account of Jones and Chan is false and misleading with the hotel video footage showing a different story.

459. The hotel video shows Nicole walking straight down the corridor to her room and when she cannot get in, sitting down by the door waiting for someone to let her in. Elizabeth and Jesi arrive in moments and let her in, then Jesi walks down the hall towards Brewer who is now waiting for the elevator and John Burch who has just gotten off the elevator, whom she approaches smiling and hands Burch Tait's glasses:



460. Jones then engages in playful banter, smiling and chatting:

 



461. Chan arrives moments later similarly smiling and laughing:



These images, not shown by the Defamation Defendants, clearly contradict assertions of worried friends who thought Nicole should be hospitalized.

462.    The Article reports that later that morning, "As soon as [boss Matt Best] found out about Nicole's memory of Brewer and Tait in the bathroom, he leaped into action. He drove Nicole to the emergency room at Essential Health West in Fargo..." (Ex. 1, p. 10) So, her boss knew what had transpired and allegedly drove her to the hospital. Then Best and Steve Campbell had a series of meetings, starting that evening when Best texted Steve Campbell wanting to meet and talk before they left:



463.    Not only did Best meet with Steve Campbell on the evening of December 16, on the 17th they met again. Tait was to be included, and Best wanted to meet without involving Hall, and Tait disagreed wanting everyone there:



464.    On the evening of December 17, Steve Campbell, Best and Tait met with evangelist

Hall and wanted Nicole's friend Jesi Jones to be there:



465.    And shortly thereafter Matt Best again texted Steve Campbell that he, Tait and

evangelist Hall were all together:



466. Then on December 18, they met again:



467. Following this, Nicole met with Best and likely Hall, where they discussed the incident and Nicole was dismissed, certainly not because she was raped.

468. Thus, if the incident occurred around 2:00 AM on December 16, within three days, Nicole had (a) freely talked to her friends, (b) freely talked to her employer, (c) talked to evangelist Nick Hall who was the tour owner, (d) been to two different hospitals where she had spoken with doctors and nurses in both, and (e) importantly talked extensively to the Fargo Police. The Plaintiffs not only had done nothing to "cover up" Nicole's encounter, but there was nothing to

142

"cover up" as everyone relevant was involved and fully informed.  The only actual "cover-up" was done by the Defamation Defendants who "covered up" the relevant facts.

E. **THE FEBRUARY 12, 2026, ARTICLE RESTATED THE ORIGINAL ARTICLE WITH MATERIALLY ALTERED AND EXPANDED DEFAMATIONS ABOUT THE ALLEGED "COVER UP" ALLEGATION IMPLICATING WES CAMPBELL PERSONALLY IN THE MATTERS COVERED BY THE ORIGINAL ARTICLE**

469.    In a new article dated February 12, 2026 entitled "Michael Tait Flees Nashville Amid Investigation, Newsboys Left in Limbo," (the "New Article"; Ex. 3, p. 1) the most recent of at least fifteen articles published by The Roys Report since June 19, 2025, the Defamation Defendants both restates and republishes the defamatory allegations found in the original Article, adding materially expanded accusations targeting Wes Campbell and the Newsboys.

470.    The New Article repeats the defamations in the original Article and adds broadly that "a woman and four witnesses told TRR that Newsboys management covered up the incident." (Ex. 3, p. 3).  The new Article also identifies Wes Campbell as the owner of the Newsboys and repeatedly discusses him in connection with the band's leadership, management, finances, business operations, litigation, and industry consequences. In fact, he is the only "Campbell" named or discussed in the New Article. In that context, the phrase "Newsboys management" is understood to refer to Wes Campbell personally.

471.    Through this reframing, the Defamation Defendants has conveyed to readers that Wes Campbell personally participated in, directed, authorized, ratified, or was responsible for a criminal cover-up of alleged sexual assault. That implication is false.

472.    Wes Campbell did not engage in, authorize, direct, ratify, or participate in any concealment of alleged criminal conduct. He did not obstruct any investigation, interfere with law enforcement, suppress evidence, or otherwise engage in criminal wrongdoing.

473.     By publishing and republishing this accusation in this expanded form, the Defamation Defendants falsely imputed obstruction of justice and complicity in criminal conduct to Wes Campbell. Such accusations constitute defamation per se. This has caused substantial and ongoing damage to Wes Campbell's personal and professional reputation and business interests.

474.     The Articles additionally reference Wes Campbell's sale of a home to Tait, a private real estate transaction bearing no connection to the events in Fargo, for no apparent purpose other than to insinuate, without any factual basis, that the sale price was below market value and thus constituted a form of hush money. The Articles offer no evidence that the transaction was at below-market value and offer no evidence connecting the transaction to the events described in the Articles. The insinuation is fabricated from the juxtaposition of unrelated facts and constitutes a false and defamatory implication presenting Wes Campbell in a false light.

475.     The Articles also falsely assert or imply that the Brentwood Police Department or other Tennessee law enforcement authorities were investigating Tait in connection with the allegations described in the Articles. That assertion is false and defamatory. No Tennessee law enforcement agency conducted any investigation of the allegations made by Nicole as described in the Articles. The Defamation Defendants either knew this to be false at the time of publication or acted with reckless disregard for the truth in asserting or implying the existence of such an investigation.

F. **DEFAMATION DEFENDANTS ARE RESPONSIBLE FOR EACH SUBSEQUENT REPUBLICATION.**

476.     The Defamation Defendants are liable for the defamations herein set forth and those that shall be adduced at trial.  The Defamation Defendants are also liable for each and every republication of these defamations, as they were published knowing republication would occur.

144

477. The February 12, 2026 article republished multiple prior sexual assault allegations previously disseminated by the Defamation Defendants and again referenced allegations from multiple accusers and witnesses, including the alleged 2014 tour incident involving "four witnesses." By republishing and reframing these accusations in connection with "Newsboys management," the Defamation Defendants further entrenched and expanded the defamatory narrative directed at Wes Campbell. The Defamation Defendants are liable for this republication and for each subsequent repetition of these false and defamatory statements.

478. Additionally, the February Article republishes and references alleged prior conduct by Tait involving other individuals and other circumstances. All such alleged conduct, even if accurate, occurred years before Tait joined the Newsboys in 2010. The Articles attribute responsibility for that prior conduct to Wes Campbell and the Newsboys without disclosing—and apparently with the purpose of concealing—that all such alleged events predated Tait's affiliation with the Newsboys entirely. Campbell had no knowledge of, and no legal or factual responsibility for, any conduct of Tait's that preceded Tait's 2010 engagement by the Newsboys. The Articles' attribution of responsibility to the Campbell Parties for conduct predating Tait's Newsboys tenure presents the Campbell Parties in a false and defamatory light.

G. **PLAINTIFFS HAVE BEEN DAMAGED BY THESE DEFAMATIONS.**

479. Plaintiffs have suffered substantial damages as a direct and proximate result of Defendants' defamatory statements, including but not limited to the loss of existing and prospective contractual relationships with performing artists and nonprofit organizations, the destruction of goodwill and reputation in the CCM Touring and NPS Markets, and the impairment and ultimate destruction of Plaintiffs' business operations. These injuries were caused both by the immediate reputational harm inflicted by Defendants' false statements and by the foreseeable

145

commercial consequences of those statements, including the withdrawal, termination, or refusal of business relationships by market participants who relied upon or were influenced by Defendants' defamatory communications.

480. To the extent the same course of conduct by Defendants also constitutes anticompetitive conduct giving rise to Plaintiffs' antitrust claims, Plaintiffs do not seek duplicative recovery for the same injury but rather seek recovery under all applicable legal theories for the full measure of harm caused by Defendants' wrongful conduct. The defamatory statements and the anticompetitive scheme operated in tandem, each reinforcing the other, such that Defendants' defamation both independently caused injury to Plaintiffs' business and reputation and served as a mechanism through which Defendants achieved and maintained their anticompetitive objectives. Plaintiffs therefore seek all damages permitted by law, with any necessary adjustments to prevent double recovery to be addressed at the appropriate stage of the proceedings.

## IX. CLAIM FOR RELIEF FOR CONSPIRACY AND AIDING AND ABETTING DEFAMATION AGAINST WATERLAND DEFENDANTS

481. In all claims in this Article IX, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

482. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV.M above and arises from the same common nucleus of operative fact as Plaintiffs' other claims. This claim is based on the same series of communications, transactions, and events through which the Waterland Defendants restrained competition, impaired Plaintiffs' business relationships, eliminated Plaintiffs as a competitive force in the relevant markets (Art. V), misappropriated Plaintiffs' trade secrets and

breached contracts (Art. VI), conspired to defame Plaintiffs (Art. VIII), violated the Lanham Act (Art. IX), interfered with Plaintiffs' contracts with artists and nonprofits (Art. XI) and violated antisolicitation laws (Art. XIII). Without limiting the generality of the foregoing, this claim is based on the same series of communications, coordination, and actions through which Defendants, acting in concert, facilitated and amplified the publication of defamatory statements and the resulting harm to Plaintiffs' business and reputation.

483. Transparent and Tim Taber and later because of the merger, the Waterland Defendants, are jointly and severally liable for fomenting, encouraging, aiding and abetting the scandalously false defamations set forth in the previous cause of action.

484. Transparent/Taber were also keen to separate themselves from the Fargo Fabrication because Taber had been in hot tub with Tait and knew if he and thus Transparent and then by extension, other musical groups with which they were associated, were publicly associated in ongoing business with Tait, Transparent/Taber would be hurt, and thus spread the defamatory Fargo Fabrication to others to justify their separation.

485. Transparent/Taber republished the defamatory Fargo Fabrication to musicians and others that were doing business with Plaintiffs and those that were thinking about doing business with the Plaintiffs, including without limitation, MercyMe, Brandon Lake, and others to induce them to cease doing business with Plaintiffs, telling them, among other things, that their brands would be tarnished on publication of the Fargo Fabrication, endeavoring to use this as a means of contracting themselves with such bands.

486. While Plaintiffs were negotiating for the sale of TCA, Transparent and Taber and later because of the merger, the Waterland Defendants, told the defamatory Fargo Fabrication to Premier and Rush and induced them to halt acquisition conversations, as the Fargo Fabrication,

147

which they were assiduously circulating, would mean Plaintiffs would suffer economically in the future, making an acquisition less attractive.

487. The Waterland Defendants told the defamatory Fargo Fabrication to Premier and Rush, encouraging them to breach their contracts and duties to Plaintiffs, such that they ceased marketing the Newsboys and other groups under contract with TCA, telling them that the Fargo Fabrication would mean far smaller audiences and thus marketing money spent would be wasted.

488. The Waterland Defendants hired Nicole and while on TPR's payroll, authorized, assisted, facilitated and encouraged Nicole to meet with the Defamation Defendants to further the Fargo Fabrication and encourage and abet the creation and dissemination of the Article, also assisting, facilitating and encouraging other individuals witnesses in the Article to meet with the Defamation Defendants.

489. In addition to aiding and abetting the defamation, under respondeat superior, they are responsible for the resulting defamatory Articles, which were the intended result of such conduct.

## X. CLAIM FOR RELIEF FOR VIOLATIONS OF LANHAM ACT ASSERTED AGAINST THE WATERLAND DEFENDANTS AND WORLD VISION

490. In all claims in this Article X, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

491. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV.M above and arises from the same common nucleus of operative fact as Plaintiffs' other claims. This claim is based on the same series of communications, transactions, and events through which the Waterland Defendants restrained competition, impaired Plaintiffs' business relationships, eliminated Plaintiffs as a

148

competitive force in the relevant markets (Art. V), misappropriated Plaintiffs' trade secrets and breached contracts (Art. VI), conspired to defame Plaintiffs (Art. VIII), conspiracy/aiding and abetting defamation (Art. IX), violated the Lanham Act (Art. X), contractual claims (Art. XI), interfered with Plaintiffs' contracts with artists and nonprofits (Art.XII) and violated antisolicitation laws (Art. XV). Without limiting the generality of the foregoing, this claim arises under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which prohibits any person from using in commerce any false or misleading representation of fact that is likely to cause confusion, mistake, or deception as to the nature, characteristics, or qualities of another person's goods, services, or commercial activities, and which further prohibits false or misleading statements that misrepresent the nature, characteristics, or qualities of a person's own or another person's goods, services, or commercial activities. The purpose of Section 43(a) is to protect persons engaged in commerce within the control of Congress against unfair competition. 15 U.S.C. §1127. The Waterland Defendants and World Vision are direct competitors of Plaintiffs in the CCM Touring Market and the NPS Market as defined and described herein, and their false and misleading statements were made in the context of that competitive relationship for the purpose of obtaining competitive advantage. Plaintiffs fall within the zone of interests protected by the Lanham Act, and their injuries were proximately caused by Defendants' violations. Defendants' conduct constitutes unfair competition in its classic form—competition by falsehood rather than by merit.

492. Because of the partnership/joint venture arrangements which had been entered between the Waterland Defendants and World Vision, World Vision is responsible for each, and every statement and act undertaken by the Waterland Defendants, as they were taken in furtherance of their partnership.

149

493.     The Defendants made false and misleading statements of fact in commerce concerning Plaintiffs and Plaintiffs' commercial activities, widely disseminated to performing artists, nonprofit organizations, and others operating in the CCM Touring Market and the NPS Market.

494.     The conduct of the Defendants is not merely defamatory speech but constitutes commercial advertising and promotion within the meaning of Section 43(a), because Defendants carried out a deliberate market-facing campaign of false factual representations, disseminated to Plaintiffs' customers, prospective customers, and purchasing decision-makers, for the purpose and with the effect of altering purchasing decisions and diverting business; accordingly, this case arises under the Lanham Act's prohibition on unfair competition through false advertising, not merely under principles of defamation, including, without limitation, the following categories of conduct:

   a. *The Fargo Fabrication as Commercial Disparagement*. The false narrative described herein as the "Fargo Fabrication," namely, the fabricated account of drugging, rape, and coverup involving Plaintiffs, was repeatedly and deliberately disseminated to performing artists, nonprofit organizations, and other commercial counterparties, while knowing that narrative to be false. These statements were not mere expressions of opinion but false statements of purported fact, made in a commercial context, in interstate communications directed to current and prospective customers, for the express purpose of inducing artists and nonprofits to terminate or decline business relationships with Plaintiffs and to redirect those relationships to the Defendants. As alleged herein, the Waterland Defendants were a participating and motivating cause of the fabrication and dissemination of the Fargo Fabrication, rendering their subsequent circulation of it as a purportedly independent fact particularly egregious, acts joined in by World Vision. By presenting the Fargo Fabrication to commercial counterparties as factual information bearing on Plaintiffs' fitness as business partners, the Defendants made false and misleading representations of fact concerning the nature and character of Plaintiffs' commercial activities within the meaning of 15 U.S.C. § 1125(a)(1)(B).

   b. *False Statements Concerning Impending Reputational Harm*. The Defendants told performing artists and nonprofit organizations that a devastating published article was imminent concerning Plaintiffs, and that continued association with Plaintiffs would tarnish those artists' and nonprofits' own brands and reputations, causing their careers and charitable missions to suffer. These statements were false and misleading in that the Defendants knew the article being anticipated was based on

150

fabricated allegations that they themselves had helped construct and promote, and thus were representing to third parties as an independent, adverse factual development something that was in fact the product of their own wrongful conduct. These statements were further misleading in that they presented the anticipated reputational harm to Plaintiffs as an objective market condition rather than a manufactured outcome orchestrated by the very parties making the representation.

c. *False Statements Concerning Plaintiffs' Business Viability*. The Defendants told performing artists and nonprofit organizations that Plaintiffs' business would be destroyed upon publication of the anticipated article, that audiences would diminish, that marketing dollars spent on Plaintiffs' concerts would be wasted, and that Plaintiffs would become pariahs in the Christian concert market. These statements were specific, verifiable statements of fact and false predictions presented as existing market realities concerning the nature and future character of Plaintiffs' commercial activities, made without basis other than the plan of the Defendants to destroy Plaintiffs, and were designed to induce commercial counterparties to act on those false statements to Plaintiffs' detriment and the benefit of the Defendants.

d. *False Statements Concerning Nonprofit Sponsorship Relationships*. The Defendants told nonprofit organizations with whom Plaintiffs had existing or prospective contractual relationships that money spent on sponsorships through Plaintiffs would not be recouped, and that continued association with Plaintiffs would jeopardize those nonprofits' relationships with donors and the public. These statements were false statements of fact concerning the nature and quality of Plaintiffs' commercial services, made for the purpose of diverting those nonprofit relationships to the Defendants.

e. *False Statements Concerning the Character of Plaintiffs' Commercial Activities*. By disseminating the Fargo Fabrication and related false statements in a commercial context, the Defendants made false and misleading representations that Plaintiffs' commercial activities were tainted by criminal conduct, moral turpitude, and institutional coverup — representations that were false, that the Defendants knew to be false, and that directly concerned the nature and character of Plaintiffs' commercial activities within the meaning of Section 43(a).

f. *Statements Constituting Commercial Advertising or Promotion*. The foregoing statements were part of an organized and systematic campaign to penetrate the relevant market, directed to a substantial portion of Plaintiffs' actual and potential customers, and therefore constitute "commercial advertising or promotion" within the meaning of Section 43(a).

495. These foregoing statements were not subjective opinions or non-actionable predictions but were presented as statements of existing fact or inevitable market outcomes and were understood as such by their recipients.

496. The false and misleading statements were made in the context of commercial competition. As alleged herein, the Defendants were direct competitors of Plaintiffs in both the CCM Touring Market and the NPS Market. Their false statements were made for the express purpose of obtaining competitive advantage by diverting artists and nonprofits from Plaintiffs to the Defendants. The commercial motivation underlying these statements, and the competitive relationship between the parties, satisfies the commercial nexus required under Section 43(a). Defendants' statements were not merely incidental speech but were integral to a broader scheme of market displacement. Defendants' false and misleading statements were thus a central mechanism by which Defendants executed and maintained their exclusionary scheme in the relevant markets.

497. This campaign was sufficiently disseminated to the relevant purchasing public to constitute commercial advertising or promotion and was made in commerce. The CCM Touring Market and the NPS Market operate on a nationwide basis, as alleged herein, and the Defendants' communications were directed to artists, nonprofits, and commercial counterparties across the United States. These statements therefore occurred in interstate commerce within the meaning of the Lanham Act.

498. The Defendants' false and misleading statements actually deceived, and in any event had the tendency and capacity to deceive, a substantial segment of their intended audience. As alleged herein, performing artists including MercyMe terminated or declined contractual relationships with Plaintiffs in direct response to the Defendants' false statements. Nonprofit

152

organizations similarly declined to enter into or renew contracts with Plaintiffs as a direct result of these statements. These outcomes demonstrate both the materiality of the false statements and their actual deceptive effect on commercial decision-making.

499. The deception caused by the Defendants' false statements was material in that it was likely to, and did, influence the purchasing and contracting decisions of performing artists, nonprofit organizations, and other commercial counterparties who were the intended audience of those statements. Such influence on purchasing decisions necessarily and foreseeably caused injury to Plaintiffs' commercial interests. Artists who would otherwise have contracted with Plaintiffs declined to do so or breached existing contracts. Nonprofits who would otherwise have renewed or extended their arrangements with Plaintiffs declined to do so. These were precisely the commercial outcomes the Defendants intended their false statements to produce.

500. The Defendants' false and misleading statements injured Plaintiffs in their commercial activities. As a direct and proximate result of those statements, Plaintiffs suffered, without limitation: loss of performing artists under contract, including MercyMe and others; loss of nonprofit sponsorship relationships; loss of prospective contractual relationships with artists including Brandon Lake and others; loss of revenues from sponsorship arrangements that were diverted to the Waterland Defendants; damage to Plaintiffs' commercial reputation in the CCM Touring Market and the NPS Market; and the destruction of Plaintiffs' business and competitive position, the value of which had been independently established at approximately $50 million by the Waterland Defendants' own acquisition offer. Plaintiffs have suffered injuries to their business reputation and to their present and future sales and commercial relationships within the meaning of Section 43(a). These injuries were a direct and foreseeable result of Defendants' false

advertising and competitive misconduct, including the diversion of sales and business opportunities from Plaintiffs to the Waterland Defendants.

501. The Defendants' violations of Section 43(a) were willful. As alleged herein, the Defendants knowingly fabricated or participated in the fabrication of the false statements they disseminated, understood those statements to be false at the time they made them, and made them for the express commercial purpose of destroying Plaintiffs as competitors and capturing their business relationships and revenue streams. This willfulness entitles Plaintiffs to enhanced damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

502. As a direct and proximate result of the Defendants' violations of Section 43(a) of the Lanham Act, Plaintiffs have suffered damages in an amount to be proven at trial, but in no event less than the value of the business and commercial relationships destroyed by Defendants' conduct, which the Waterland Defendants themselves valued at approximately $50 million. Plaintiffs are further entitled to disgorgement of the Defendants' profits attributable to their wrongful conduct, enhanced damages for willful violation, and an award of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

503. In addition to damages, Plaintiffs are entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116 enjoining the Defendants from continuing to make false or misleading statements of fact concerning Plaintiffs or their commercial activities, from continuing to disseminate the Fargo Fabrication or any variation thereof in a commercial context, and from continuing to use false or misleading representations to divert artists, nonprofits, or other commercial counterparties from Plaintiffs. Plaintiffs further seek corrective advertising and such other equitable relief as the Court deems just and proper. Plaintiffs have suffered and will continue

to suffer irreparable harm for which there is no adequate remedy at law absent such injunctive relief.

## XI. CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST MERCYME DEFENDANTS.

504. In all claims in this Article XI, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

505. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV.M above and arises from the same common nucleus of operative fact as Plaintiffs' other claims. This claim is based on the same series of communications, transactions, and events through which the Waterland Defendants restrained competition, impaired Plaintiffs' business relationships, eliminated Plaintiffs as a competitive force in the relevant markets (Art. V), misappropriated Plaintiffs' trade secrets and breached contracts (Art. VI), conspired to defame Plaintiffs (Art. VIII), conspiracy/aiding and abetting defamation (Art. IX), violated the Lanham Act (Art. X), contractual claims (Art. XI), interfered with Plaintiffs' contracts with artists and nonprofits (Art.XII) and violated antisolicitation laws (Art. XV). Without limiting the generality of the foregoing, this claim is based on the same series of communications, transactions, and events through which the MercyMe Defendants, with knowledge of material facts concerning the impending publication of the Article and its expected impact, acted in coordination with the Waterland Defendants to terminate their contractual relationship with Plaintiffs, thereby impairing Plaintiffs' business and competitive position.

155

A. **Background Facts Relevant to the Causes of Action and Claims hereunder.**

506. On or around August 2024, Plaintiff TCA and the music group MercyMe ("MM") and the group's four members, namely Bart Millard, Robby Shaffer, Nathan Cochran, and Mike Scheuchzer (collectively, the "MercyMe Defendants") signed a contract (that contract is herein called the "MM Contract"). A true and correct copy of the MM Contract is attached hereto as Exhibit 4. The background of that contract has been set forth *supra*, and it is incorporated herein by reference.

507. By virtue of its prior dealings with the Waterland Defendants in or around August 2024 in connection with the Waterland Defendants' efforts to at that time to acquire MM's Public Platform and obtain a relinquishment of MM's rights to generate sponsorship revenues in favor of LiveCo/TPR and World Vision, MercyMe had knowledge of the structure and purpose of the scheme, including that World Vision was the vertical funding source enabling the Waterland Defendants' consolidation strategy. By its acts herein complained of, the MM Defendants joined that conspiracy by agreeing to unlawfully terminate the MM Contract and did so knowing such acts would aid and abet the Waterland Defendants and World Vision.

508. The MM Contract was signed not only by MercyMe, Inc. as an entity, but personally and individually by each of Bart Millard, Robby Shaffer, Nathan Cochran, and Mike Scheuchzer. The signature page of the MM Contract (Ex. 4, p. 15) expressly reflects their individual execution "personally and individually," separate from and in addition to MercyMe, Inc.'s execution. Each of these individuals therefore undertook personal contractual obligations to TCA co-extensive with those of MercyMe, Inc. Their individual liability for the breaches alleged herein arises directly from their personal execution of the Agreement and is not derivative of

156

MercyMe, Inc.'s liability. Each of these individuals is therefore jointly and severally liable with MercyMe, Inc. for all damages and equitable relief sought herein.

509. Furthermore, in numerous places in the MM Contract, the MM Defendants agreed to provide its Public Platform only to TCA. For example, MercyMe agreed:

a. in (Ex. 4, p.1, ¶1(a)), "to furnish, exclusively to TCA, MercyMe's Public Platform....";

b. in (Ex. 4, p. 1, ¶1(b)) that MM's concerts, conferences, or similar events would only be used, associated with, or otherwise made available for promoting, educating, making appeals, or otherwise securing child sponsorships for TCA;

c. in (Ex. 4, p. 1, ¶1(b)) MM would not make its concerts, conferences, or similar events available to promote and assist any party other than TCA in connection with securing child, family, community, victim, or similar charitable sponsors for nonprofits; and

d. in (Ex. 4, p. 2, ¶1(c)) the charitable sponsor(s) named by and contracted with TCA, would be the exclusive charitable sponsor at, on, or in connection with MercyMe's concerts, conferences, or similar events.

510. TCA advised the MM Defendants on numerous occasions that the nonprofit TCA had contracted with was "Children International," and thus this fact was known by them,

511. MM gave TCA the right to use the MM name (Ex. 4, p.2, ¶1(d)) and all information and materials "developed, obtained or generated in connection with" the agreement (Ex. 4, p.2, ¶1(e)) and no other person or entity other than TCA and the nonprofit(s) TCA designates, has or will have the right to use MercyMe's name in connection with child, family, community, victim, or similar charitable sponsorship (Ex. 4, p.2, ¶1(d)).

512. The MM Contract further precluded MM from creating or using any materials except that which TCA approved. (Ex. 4, p.2, ¶1(f)). And MM agreed to be available for all marketing activities and even agreed to travel to other locations for such marketing. (Ex. 4, p. 9, ¶8).

513. MM promised they would conduct a minimum 48 concerts for TCA, the associated expenses for these MM was to pay itself. The 48 concerts was a minimum number, and MM undertook a duty to do even more if at all possible. (Ex. 4, p. 1, ¶1(b)). A $1.5M payment was made to MM "intended to assist MM with the tour production and related expenses" they were going to incur in conducting the concerts MM was required to conduct. (Ex. 4, p. 6, ¶5). MM agreed to use its "best efforts" to generate at least 8,000 sponsorships during 2025. (Ex. 4, p. 6, ¶4(c)). This was a minimum number and the parties' reasonable expectations were that far more than 8000 sponsorships would be generated.

514. The MM Defendants knew full well these commitments were in turn made by TCA to Children International as the MM Agreement specifically so states. See (Ex. 4, p. 1, ¶1(a)). At almost the end of the MM Contract there is a provision called the "key man" provision (the "Key Man Proviso") that reads:

> 14A. Key Man**. Subject to the cure provisions described in Paragraph 14(a) of this Agreement**, Professional [i.e. MM] shall have the right to terminate this Agreement and to retain all monies theretofore paid to Professional [i.e. MM] by Client [i.e., TCA], if Troy Collins shall at any time during the Term cease to be actively involved in Client 's [i.e., TCA], operations other than for reasons of death, disability, or moral turpitude." (emphasis added)

515. The opening sentence of the above states that the Key Man Proviso clearly references that it is "subject to" the cure provisions set forth in (Ex. 4, p. 12, ¶14(a)) which immediately precedes (Ex. 4, p. 13, ¶14A). The cure provisions of (Ex. 4, p. 12, ¶14(a)) read as follows:

> 14(a) ... the failure by either Client (TCA) or Professional (MM) to perform any of their respective obligations hereunder shall not be deemed a breach of this Agreement unless the party claiming breach gives the other party written notice of such failure to perform and such failure is not corrected within thirty (30) days ... from and after the receipt of such notice, or, if such breach is not reasonably capable of being cured within such thirty (30) day ..., the party receiving notice does not commence to cure such breach within such thirty

158

(30) day ... period and proceed with reasonable diligence to complete the curing of such breach thereafter.

516. On June 2, 2025, Troy Collins, whom the MM Contract designated as the "Key Man," voluntarily and for no reason resigned.

517. Acknowledging that TCA had at least a contractual thirty day right to cure,[23] on July 1, 2025, MM sent a letter to TCA advising of Collins' voluntary resignation and alerting TCA to its 30-day right to cure. Nevertheless, on July 18, 2025, well before the cure period expired, the MM Defendants repudiated and thus breached the MM Contract by purportedly immediately terminating the MM Contract stating:

"The Contract's Term expired on July 1, 2025. Each of MercyMe's obligations to TCA pursuant to the Contract terminated that same day. MercyMe encourages TCA to accept that the Contract is terminated and that MercyMe has no continuing obligations to TCA." 518.

B. **BREACH OF CONTRACT CLAIM AND RELATED CLAIMS AGAINST THE MM DEFENDANTS.**

519. Plaintiffs allege that these acts constitute a repudiation and breach of contract.

i. *Collins' Resignation Involved An Act Of Moral Turpitude Triggering No Termination Right*

520. On information and belief, Plaintiffs allege Collins' departure involved an act of moral turpitude which meant his resignation did not trigger a right to terminate. Collins resigned to facilitate the setting up separate contractual relations with the nonprofit that was under contract with TCA and do so for MercyMe, LiveCo/TPR and himself, which he has done as MercyMe began touring with Children International with the continued involvement of Children International as the pertinent charity and Collins is known to be a participant in that arrangement. Particularly given his fiduciary and other duties to his employer, his departure for these nefarious

---

[23] The cure provisions of (Ex. 4, p. 12, ¶14(a)) could actually be longer than 30 days if TCA needed more time to effect a cure.

reasons was a deceptive and dishonest act of moral turpitude. Therefore, it did not give MM a right of termination.

### ii. Collins' Resignation For No Reason Did Not Trigger Right To Terminate

521. In the alternative, apart from the issue of moral turpitude, Plaintiffs assert that the resignation of Collins, particularly for no reason, was not a proper ground for terminating the MM Contract. Plaintiffs assert that the voluntary resignation of Troy Collins was never intended to be a basis for MM to terminate a multimillion-dollar contract where significant amounts of money had been advanced and may be effectively deemed forfeited. That the trigger of a massive forfeiture cannot have meant to be precipitated by Collins' whim to quite is clear. It is unreasonable and not in keeping with the "spirit" of either the Key Man provision or the MM Contract as a whole to say Collins could trigger a forfeiture simply because Collins wanted to retire, or as here, to accomplish a means for the MM Defendants to garner a release from their contract so they could contract directly with Children International. This is particularly so, since under Tennessee law contract interpretations that effect a forfeiture are strictly construed. Because Collins voluntarily resigned and was not removed by TCA, the actions of the MM Defendants terminating the MM Contract, particularly prior to the end of the cure period, were invalid, a repudiation of the MM Contract and a material breach of contract. In summary, the voluntary resignation of Collins did not trigger the Key Man Provision in (Ex. 4, p. 13,¶14A).

### iii. MM Parties Did Not Exercise Termination Right In Good Faith

522. In the alternative, TCA asserts that the Key Man provision does not state that the agreement automatically terminated, but that upon Collins' ceasing to be involved MM had the *right* to terminate. But in exercising that right, MM was required to act reasonably and in good faith. Thus, MM had to have had a good faith reason why Collins' resignation should reasonably

160

trigger a termination and TCA alleges that there was no good faith reason, thus rendering any purported termination of the MM Contract invalid, a repudiation of the MM Contract and a material breach of contract. Interpreting the "Key Man Provision" in the context of the entire agreement, Collins' role and functions for TCA was not so important to the entire agreement that his departure would justify a termination and ensuing forfeiture of a very large sum of money. Collins' voluntary departure in no way interfered with or made performance of the MM Contract more problematic for either TCA or MM. For example, if Collins ceased to be actively involved because he died, or became disabled, or was guilty of some heinous act of "moral turpitude," there was no trigger and therefore he cannot have been somehow "irreplaceable," by the agreement's own words to either party. Because Collins voluntary departure had no material impact on the MM Contract or performance of its terms, there was no good faith reason for the MM Defendants to exercise a right of termination, and thus the actions of the MM Defendants terminating the MM Contract, constitute a further breach of contract.

iv. *Plaintiffs Were Denied Contractual Cure Rights*

523. In the alternative, Plaintiffs assert that the MM Defendants repudiated and breached the MM Contract in terminating it without allowing Plaintiffs to cure, which Plaintiffs had a right to do under paragraph 14A, which Plaintiffs were ready, willing and able to do and would have done, but for the repudiation and breach by the MM Defendants. This is particularly true given that "cure" had nothing to do with trying to convince Collins to change his mind. For that matter, it had nothing to do with Collins at all, as if it did it would make cure rights illusory. Instead, TCA's cure right simply meant at most that TCA had the right to designate a qualified person who could perform Collins' functions. Moreover, the MM Defendants even acknowledged on July 1,

161

2025 in writing that TCA had <u>*at least*</u> a contractual thirty day right to cure,[24] and in fact the cure provisions of (Ex. 4, p. 12, ¶14(a)) could actually be longer than 30 days if TCA needed more time to effect a cure.  Nevertheless, on July 18, 2025, well before the cure period expired, the MM Defendants repudiated and thus breached the MM Contract by purportedly immediately terminating the MM Contract.

> v.  *MM Defendants Breached (Ex. 4, p. 10, ¶9(c) of MM Contract*

524.    MercyMe further breached the MM Contract by its independent violation of (Ex. 4, p. 10, ¶9(c)), which provides that "during the Term hereof, Professional shall not enter into any agreement that would interfere with the full and prompt performance of Professional's obligations hereunder, and Professional shall not make Professional's Public Platform available to promote and assist any party other than Client in connection with securing child, family, community, victim, or similar charitable sponsors for Nonprofits."

525.    Plaintiffs allege on information and belief that MercyMe entered into arrangements with Children International and/or TPR during or immediately following the purported cure period, in violation of (Ex. 4, p. 10, ¶9(c)), and that such arrangements were planned and coordinated prior to MercyMe's purported notice of termination. These actions constitute an independent material breach of the MM Contract.

526.    The provisions of (Ex. 4, p. 10, ¶9(c)) are absolute and contain no exceptions or qualifications and certainly none tied to the Key Man provision or any termination right. Even to the extent the MM Contract remained in effect during the cure period, MercyMe's concurrent negotiations with and arrangements for Children International and/or LiveCo/TPR during that period constitutes an independent violation of (Ex. 4, p. 10, ¶9(c)), separate from and in addition

---

[24] The cure provisions of (Ex. 4, p. 12, ¶14(a)) could actually be longer than 30 days if TCA needed more time to effect a cure.

162

to the wrongful termination itself. MercyMe could not simultaneously purport to exercise a right of termination while also entering into arrangements that violated its continuing exclusivity obligations under a contract it had not yet validly terminated.

### vi. MM Defendants Breached MM Contract By Denying Matching Rights

527. The MM Contract contains a provision called the "Matching Right" that reads as follows:

> 3A. Matching Right.  If at any time Professional (MM) receives an offer to make Professional's Public Platform available **after the Term** to a third party ... in order to promote, educate, make an appeal for, or otherwise assist in the securing of child, family, community, victim, or similar charitable sponsors ..., or in the event Professional on its own behalf seeks or desires **after the Term** to promote, educate, make an appeal for, or otherwise assist in the securing of child, family, community, victim, or similar charitable sponsors ..., Professional will not accept any such Sponsorship Offer unless and until the terms and conditions of this paragraph have been fulfilled and Client's exclusive rights under this Agreement have been addressed to its satisfaction.  (emphasis added)

528. The MM Contract contains a Matching Right provision at (Ex. 4, p. 4, ¶3A) that survives the termination or expiration of the Agreement and operates independently of any termination dispute. The scope of (Ex. 4, p. 4, ¶3A) is deliberately and expressly broad. It covers offers from any third party "whether a non-profit organization or a for-profit promoter, artist, marketing firm, manager, music and/or entertainment company of any nature, or any other third party." It covers any arrangement "whether or not such offer is in the form of a direct sponsorship relationship, a 'package deal,' 'buy-out,' or other mechanism wherein the acquisition and accumulation of sponsorships are addressed." And it covers MercyMe acting entirely on its own initiative to secure sponsorships, without any third-party offer at all.

529. The MM-CI direct arrangement constitutes a "Sponsorship Offer" within the meaning of (Ex. 4, p. 4, ¶3A) on multiple independent grounds. First, it involves MercyMe making its Public Platform available to Children International, a non-profit organization, for the purpose of securing charitable sponsors, precisely the relationship (Ex. 4, p. 4, ¶3A) was designed to

<div align="center">163</div>

address. Second, to the extent TPR is involved in the arrangement, as TCA alleges, that involvement constitutes an arrangement with a "for-profit promoter" and "any other third party" within the express language of (Ex. 4, p. 4, ¶3A). Third, even if MercyMe characterizes the arrangement as self-initiated rather than offer-based, (Ex. 4, p. 4, ¶3A) expressly captures the situation where "Professional on its own behalf seeks or desires after the Term to promote, educate, make an appeal for, or otherwise assist in the securing of... similar charitable sponsors."

530. Before accepting or entering into any such Sponsorship Offer or arrangement, MercyMe was contractually required to: (a) provide TCA with a copy of any bona fide third-party Sponsorship Offer, presented in a manner allowing TCA to identify all financial terms and conditions; and (b) afford TCA thirty (30) days from receipt to match the Sponsorship Offer. MercyMe provided no such notice and afforded TCA no such opportunity. Instead, MercyMe proceeded directly to contract with Children International, and, on information and belief, with TPR, in plain violation of (Ex. 4, p. 4, ¶3A).

531. MercyMe's failure to provide notice and matching opportunity is an independent, freestanding breach of the MM Contract, separate from and in addition to MercyMe's wrongful termination of the Agreement. It is not merely an alternative theory; it is a distinct contractual violation with its own damages. By denying TCA its matching right, MercyMe deprived TCA of the contractual right to continue, or to reinstate, the exclusive economic relationship TCA had built, funded, and was entitled to protect.

532. TCA's damages from MercyMe's breach of the Matching Right include, without limitation, the value of the sponsorship arrangement TCA was denied the opportunity to match, including all revenues generated by MercyMe and Children International from the post-

164

termination sponsorship arrangement that TCA would have obtained had the matching right been honored

533. Plaintiffs further allege that the breach of the MercyMe Agreement did not merely deprive TCA of discrete per-sponsorship payments but instead enabled MercyMe to appropriate and internalize the entirety of the sponsorship platform, revenue stream, and economic model that TCA had created, funded, and contractually secured. This included, without limitation, the benefit of TCA's upfront Production Fee of $1,500,000, the Minimum Event Commitment of forty-eight (48) events, and the structured conversion of attendees into Confirmed Sponsors, all of which were integral components of TCA's proprietary business model.

*vii.* *MM Defendants Breach Of Duty Of Good Faith*

534. The MM Contract contains an implied covenant of good faith and fair dealing both in the performance and in the interpretation of the contract that protects the parties' reasonable expectations and their right to benefit from their agreement. Furthermore, the duty of good faith requires a contracting party to do nothing that will have the effect of impairing or destroying the rights of the other party to receive the benefits of the contract. The MM Defendants have breached the duty of good faith.

535. Without limitation, the MM Defendants induced and persuaded Collins to resign from his employ with TCA and did so for the express purpose of attempting to enable the MM Defendants to terminate the MM Contract. These actions were specifically intended to deprive TCA of its benefits under the MM Contract, which was especially in bad faith given the huge advances of money TCA had made to MM based on anticipated expenses of a minimum of 48 concerts, which at the time of purported termination, MM was not close to achieving. These actions violated the duty of good faith.

165

536. TCA asserts a claim for conversion against the MM Defendants based on their continued use and exploitation of materials, data, and information that are the express property of TCA under the MM Contract.

537. Paragraph 1(e) (Ex. 4, p. 2) of the MM Contract unambiguously provides that "as between Professional and Client, Client shall own all right, title, and interest in and to all information and other materials developed, obtained or generated in connection with this Agreement and the Sponsorship." The materials so owned by TCA include, without limitation, all sponsor information, donor data, personally identifiable information of Confirmed Sponsors and pledging donors, campaign structures, event execution materials, and any other materials or information generated in connection with MercyMe's approximately thirty-two (32) performances under the MM Contract. Paragraph 1(e) (Ex. 4, p. 2) further provides that its ownership provisions "shall survive expiration or termination of this Agreement."

538. TCA therefore owns these Materials as a matter of express contract, and that ownership is unaffected by any purported termination of the MM Contract.

539. Following purported termination, the MM Defendants have continued to use, exploit, and derive economic benefit from TCA's Materials including without limitation the donor pipeline, sponsor conversion data, and event execution systems developed during the term, in connection with their ongoing sponsorship arrangement with Children International. The MM Defendants have done so without TCA's authorization, without compensation to TCA, and in direct violation of TCA's ownership rights under (Ex. 4, p. 2, ¶1(e)).

540. The MM Defendants' unauthorized use and retention of TCA's property, including their transfer or use of that property in connection with their arrangement with Children

166

International, constitutes conversion of TCA's personal property under Tennessee law. TCA is entitled to recover the full value of the converted property, including the economic value of the donor data, sponsor pipeline, and campaign materials misappropriated by the MM Defendants, as well as all revenues derived from the exploitation of those converted assets

## C. VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ET SEQ.

541. The Agreement expressly provides that all materials, information, and data developed, obtained, or generated in connection with the Sponsorship, including, without limitation, sponsor information, donor data, campaign structures, and related materials, are the property of TCA and constitute its proprietary and confidential information. (Ex. 4, p. 2, ¶1(e)).

542. Even if the MM Contract was terminated, such termination did not extinguish TCA's ownership rights in the materials, data, and sponsorship infrastructure created pursuant to the Agreement, nor did it permit MercyMe to appropriate and continue to exploit that platform for its own benefit.

543. Following termination, MercyMe continued to utilize the same sponsorship model, donor pipeline, and event-based conversion system that had been created and implemented by TCA, including in connection with its ongoing relationship with Children International

## D. DAMAGES.

544. The damages arising from MercyMe's breach are not limited to lost per-sponsorship payments at the New Sponsor Rate of $337.50 per Confirmed Sponsor. Plaintiffs' damages include, without limitation, each of the following independent components:

   a. Lost Minimum Event Revenue. MercyMe committed to a minimum of forty-eight (48) separate events during 2025, with a corresponding commitment to use its best efforts to generate no fewer than eight thousand (8,000) Confirmed Sponsors. Based on the parties' contractual economics and reasonable performance expectations derived from historical results, TCA's lost revenue from MercyMe's

failure to perform the Minimum Event Commitment, including both per-sponsor payments and the economic value of the sponsorship pipeline those events would have generated, constitutes a separately recoverable component of damages, the precise amount of which will be established at trial.

b. Post-Event Pledge Conversions. The MM Contract expressly provides at (Ex. 4, p. 5, ¶4(b)) that pledges obtained during events, defined as situations where a potential donor expresses sincere interest in sponsoring a child but cannot or will not make payment at that moment, "shall be counted for all purposes of this Agreement, even if converted following the termination or expiration of this Agreement." Pledges collected during the approximately thirty-two (32) events MercyMe performed in connection with the MM Contract that have converted, or will convert, to Confirmed Sponsors following MercyMe's purported termination remain contractually owed to TCA as Confirmed Sponsors. MercyMe's failure to account for and pay these post-event conversions constitutes an independent breach of (Ex. 4, p. 5, ¶4(b)) and a separately recoverable component of damages.

c. Loss of Recoupment and Advance Pipeline. The MM Contract's payment structure was designed to recoup prior advances through ongoing sponsor generation. MercyMe's premature termination of the Agreement before the Minimum Event Commitment was fulfilled deprived TCA of the recoupment mechanism built into the contractual economics, including TCA's right to apply New Sponsor Rate payments toward the outstanding balance of Prior Advances, causing TCA additional economic harm beyond lost forward revenue.

d. Platform and Enterprise Value. MercyMe's breach did not merely deprive TCA of a revenue stream; it enabled MercyMe and Children International to capture and internalize the entirety of the sponsorship platform, operational model, and ongoing economic relationship that TCA had created, funded, and contractually secured through its $1,500,000 Production Fee payment and years of prior performance. The loss of this platform, including its long-tail donor retention value, its replicable conversion model, and its enterprise worth as an ongoing revenue-generating system, constitutes a separately cognizable and recoverable component of TCA's damages.

e. Disgorgement. To the extent MercyMe and Children International have realized revenues, profits, or economic benefits from the continued exploitation of the sponsorship platform, donor pipeline, and operational model that TCA created and funded, TCA is entitled to disgorgement of those ill-gotten gains as an alternative or additional measure of damages.

545. The exact amount of each foregoing component of TCA's damages will be proven at trial. Plaintiffs expressly reserve the right to present expert testimony and financial modeling on each component.

546. Because the MM Contract has not been terminated, the MM Defendants still have continuing duties to TCA which they are not fulfilling or performing, and TCA has continuing rights, including providing TCA with the exclusive right to their Public Platform and MM is required to refrain from providing their Public Platform to others or otherwise work with others including nonprofits, which requirements the MM Defendants have violated. Their actions and inactions constitute a continuing breach of the MM Contract

### E. UNJUST ENRICHMENT AND IMPOSITION OF CONSTRUCTIVE TRUST AGAINST THE MM DEFENDANTS

547. TCA asserts a claim for unjust enrichment against the MM Defendants, in the alternative and without limitation to TCA's contract-based claims, and independently of whether the MM Contract was validly terminated.

548. TCA created, developed, funded, and operationalized the sponsorship relationship between MercyMe and Children International. Through its $1,500,000 Production Fee payment, its years of prior investment in the MM-CI relationship, its proprietary sponsorship model, its compliance infrastructure, its donor pipeline, and its event-execution systems, TCA generated the economic platform through which MercyMe's Public Platform was monetized for charitable sponsorship purposes.

549. Following MercyMe's purported termination of the MM Contract, MercyMe and Children International directly assumed and continued the sponsorship relationship that TCA had built, utilizing the same structural model, the same event-based conversion system, and the same donor pipeline that TCA had created and funded. MercyMe and Children International have thereby received and retained substantial economic benefits — including ongoing sponsorship revenues, donor relationships, and the operational platform TCA developed — without compensating TCA for those benefits.

169

550. It would be unjust and inequitable to permit MercyMe and Children International to retain these benefits without compensation to TCA. MercyMe and Children International knowingly accepted these benefits with full awareness that they were derived from TCA's investment, performance, and proprietary model. The retention of those benefits at TCA's expense constitutes unjust enrichment under Tennessee law.

551. TCA is further entitled to the imposition of a constructive trust over all revenues, sponsorship payments, and economic benefits that MercyMe and Children International have derived, and continue to derive, from the sponsorship platform, donor pipeline, and operational model created by TCA. Where a party has been unjustly enriched through the appropriation of another's work, investment, and proprietary systems, equity recognizes the imposition of a constructive trust as an appropriate remedy to prevent the unjust retention of those benefits. *See Intersparex Leddin KG v. Al-Haddad*, 852 S.W.2d 245, 249 (Tenn. Ct. App. 1992). Because MercyMe and Children International are currently receiving ongoing revenues from the platform TCA built, revenues that flow directly and traceable from TCA's prior investment and performance , a constructive trust is warranted over those revenue streams pending adjudication of TCA's rights.

552. The damages and equitable relief sought under this count include: (a) the reasonable value of the benefits conferred by TCA upon MercyMe and Children International, including without limitation the value of TCA's $1,500,000 production investment, the value of the sponsorship platform and donor pipeline TCA created, and the value of the operational model TCA provided; (b) disgorgement of all revenues and profits MercyMe and Children International have realized from the continued exploitation of that platform; and (c) imposition of a constructive trust over those revenues pending the Court's determination of TCA's rights.

170

F. **CLAIM FOR INDEMNITY**.

553.     TCA asserts a claim for indemnity against the MM Defendants, for all claims, damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorneys' fees) arising to third parties, that TCA incurs, arising out of or connected with the failure of the MM Defendants to perform under the MM Contract.  Without limitation, this includes any and all claims asserted against TCA by Children International who the MM Defendants knew to be the beneficiaries of the promises MM made to TCA and on which TCA relied in contracting with both the MM Defendants and Children International.

G. **TORTIOUS INTERFERENCE WITH TCA'S CONTRACT AND BUSINESS RELATIONS WITH CHILDREN INTERNATIONAL**

554.     TCA had a longstanding relationship with Children International, having contracted with them repeatedly over the years.  TCA's current contract with Children International terminated by its terms on September 30, 2025, but as with every other time in the past, TCA had a very reasonable expectation that to a high degree of probability that contract would be extended or renewed.  However, the MM Defendants wanted to remove and replace TCA in its relations with Children International and thus orchestrated Collins voluntary resignation to enable themselves to do just that, which the MM Defendants have done, the following being but one example of many:

171



555.     Through the actions of the MM Defendants, they have tortiously interfered with TCA's contract with Children International, violating Tenn. Code Ann. § 47-50-109 and constituting common law tortious interference.

556.     Additionally, the actions of the MM Defendants constitutes tortious interference with business relationships as (1) TCA had an existing business relationship with Children International as well as a prospective relationship with Children International into the future; (2) the MM Defendants had specific knowledge of these relations; (3) the MM Defendants intended to cause the breach and termination of the business relationship; (4) the MM Defendants' improper motive was to illicitly take those rights and opportunities for themselves and also did so by improper means, including inducing Collins to voluntarily resign and then re-engaging Collins themselves for assistance in themselves getting the relationship with Children International; and (5) TCA has suffered extensive damages resulting from these tortious actions.

172

### H.  TORTIOUS INTERFERENCE WITH COLLINS' CONTRACT.

557.  Collins was an employee of TCA having started with a contract in 2017, which expired by its terms, but which TCA and Collins had nevertheless been operating under by extension.  Collins' contract carried with it a duty of good faith and fair dealing. For Collins to quit for the sole reason of allowing MM a right to terminate the MM Contract and to enable himself to step into the shoes of TCA with relations to MercyMe and Children International, is a violation of the duty of good faith in fair dealing in that contract.  MercyMe conspired with Collins with a view towards interference with TCA's contract with Collins and to assist in their interference with TCA's contract with Children International.

### I.  CLAIM FOR RELIEF FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF ASSERTED AGAINST MERCYME.

558.  In (Ex. 4, p. 12, ¶13) of the MM Contract, the MM Defendants explicitly covenant and agree that their breach as has happened, will cause TCA irreparable injury which it has.  In that provision of the MM Contract, the MM Defendants also explicitly covenant and agree that TCA is entitled to be granted injunctive relief, in addition to damages.  Plaintiffs therefore request that this Court issue a preliminary and permanent injunctions against the MM Defendants, precluding them from conducting concerts with either Children International and/or TPR, in violation of the MM Contract.

### J.  SUMMARY OF CLAIMS AGAINST THE MM DEFENDANTS

559.  Without limiting the generality of the foregoing, by way of summary, for the reasons set forth above, Plaintiff TCA requests declarations from this Court as follows:

a. Collins' purported resignation was an act of moral turpitude which meant the Key Man provisions of ¶14A of the MM Contract was not triggered;

173

b. the voluntary termination of Troy Collins was never intended to be a basis for MM to terminate a multimillion-dollar contract, particularly where significant amounts of money had been advanced and may be effectively deemed forfeited;

c. the Key Man provisions of (Ex. 4, p. 13, ¶14A) of the MM Contract were not triggered by Collins' resignation but only gave rise to a right of termination which the MM Defendants had a duty to exercise reasonably and in good faith and for just cause;

d. the voluntary resignation of Collins did not interfere with or make performance of the MM Contract more problematic for either TCA or MM;

e. the MM Defendants had a covenant of good faith and fair dealing in the performance and interpretation of the MM Contract and inducing and/or persuading Collins to resign from his employ with TCA to enable the MM Defendants to terminate the MM Contract was a violation of that duty;

f. if Collins' resignation was effective, TCA had a 30-day (or more) cure right; and

g. the MM Defendants anticipatorily breached the MM Contract by not affording TCA its cure rights.

560. Without limiting the generality of the foregoing, by way of summary, for the reasons set forth above, Plaintiff TCA alleges the MM Defendants have breached the MM Contract by (a) terminating the MM Contract and doing so without affording TCA its rights to cure; and (b) denying TCA its Matching Rights post termination.

561. Without limiting the generality of the foregoing, by way of summary, for the reasons set forth above, Plaintiff TCA requests the MM Defendants be determined to be liable for tortious interference in TCA's relations with Children International and/or Troy Collins

562. Without limiting the generality of the foregoing, by way of summary, for the reasons set forth above, Plaintiff TCA requests this Court grant injunctive relief as herein requested.

563. Without limiting the generality of the foregoing, by way of summary, for the reasons set forth above, Plaintiff TCA requests that injunctive relief be granted them.

174

## XII. CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST WATERLAND DEFENDANTS RELATED TO THE MM CONTRACT AND OTHER TORTIOUS ACTS.

### A. GENERAL ALLEGATIONS APPLICABLE TO THESE CLAIMS.

564. In all claims in this Article XII, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

565. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV.M above and arises from the same common nucleus of operative fact as Plaintiffs' other claims.

566. Plaintiffs allege that the Waterland Defendants had full knowledge of the MM Contract. Among other things, the MM Parties and TCA have been engaged in a business relationship since at least 2017. On December 8, 2022, TCA sent a letter to Rush Concerts and Jacob Reiser, who are now officers of TPR, giving notice of the contractual relationship between MM and TCA after discovering that MercyMe's manager, Scott Bickell, had engaged in business negotiations with Rush Concerts and Jacob Reiser for a potential tour that would violate the exclusivity provisions of the Agreement ("Notice of Exclusive Relationship"). Because Rush was owned by LiveCo and merged into TPR, and because Reiser is an executive officer, this knowledge is imputed to TPR.

567. Prior to the execution of the MM Contract in August 2024, the MM Parties were in negotiations with TPR for a new contract. During those negotiations, TPR was informed that the MM Parties would not contract with TPR because they had entered into the MM Contract with TCA.

568. After August 2024, MercyMe conducted approximately 32 performances with TCA pursuant to the MercyMe Contract, each one of which performances were promoted by TPR. As such, TPR had actual knowledge that TCA and the MercyMe Parties were in a contractual relationship, and certainly constructive notice and in the alternative, inquiry notice.

569. Furthermore, as a part of the proposed acquisition of Plaintiff TCA, agreements of confidentiality were entered both in writing and verbally. These agreements created duties of good faith and fair dealing and corresponding duties of disclosure which were fiduciary in nature.

B. **CONSPIRACY TO BREACH MM CONTRACT**.

570. The Waterland Defendants conspired with the MM Parties to breach the MM Contract. They did so without justification. With full knowledge of the MM Contract, TCA alleges on information and belief that TPR counseled and worked with both MM and Collins to achieve the termination of the MM Contract through the voluntary resignation of Collins. This allegation is supported by the fact that MM and Collins have continued to work with Children International and are doing so in coordination with TPR, which is continuing to promote MM performances at which Children International is seeking sponsorships.

C. **TORTIOUS INTERFERENCE WITH MM CONTRACT**

571. These same facts give rise to claims that the Waterland Defendants have tortiously interfered with TCA's contract with MercyMe, in violation of Tenn. Code Ann. § 47-50-109 and under common law tortious interference principles. Specifically, if the MM Contract was not validly terminated as alleged herein, then the Waterland Defendants tortiously interfered by contracting with MercyMe for concerts in violation of the contract's exclusivity provisions. If the contract was terminated, then the Waterland Defendants induced and participated in that termination.

### D. TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL AND BUSINESS RELATIONS WITH MM.

572. As concerts take weeks or months to plan in advance, Plaintiffs allege on information and belief, that TPR was telling/advising the MM Parties (i) about the Fargo Fabrication that their employees (including Nicole) were meeting with the Defamation Defendants, (ii) about the impending Article that once published would severely defame Plaintiffs, (iii) that MercyMe would be tarnished in the world of Christian concerts if they were publicly associated with Plaintiffs, and (iv) that the MercyMe Parties needed to exit their contract with TCA as soon as possible. Knowing that concerts require nonprofit involvement, and that the fall tour was imminent, as a matter of commercial necessity, MM and TPR must have worked through all facets of MM's termination and post-termination issues and resolved them prior to their exit.

### E. TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL AND BUSINESS RELATIONS WITH BRANDON LAKE AND OTHERS.

573. Defendants' interference with TCA's prospective business relationships is further demonstrated by TCA's dealings with Brandon Lake. As alleged, TCA, through Wes Campbell, engaged in multiple discussions with Lake and his management, during which Campbell introduced and explained the availability and revenue potential of nonprofit sponsorship arrangements—an opportunity of which they were previously unaware. Lake and Campbell thereafter reached an agreement in principle for Lake to become a TCA client for purposes of sponsorship solicitation and management in connection with his upcoming LiveCo-promoted tour. Lake stated that he would inform LiveCo that sponsorship activities would be conducted through TCA as part of the tour structure. Shortly thereafter, however, all communications ceased, and the relationship was abandoned. Given the substantial revenue opportunity at issue, it would have been economically irrational for Lake to forgo the arrangement absent outside influence. On information

177

and belief, Defendants, including LiveCo, intervened to prevent Lake from proceeding with TCA, including by exerting pressure or otherwise discouraging any association with Campbell or TCA, thereby disrupting a concrete and imminent business expectancy.

## F. BREACH OF FIDUCIARY DUTY

574. At all relevant times, a fiduciary relationship existed between the plaintiffs on the one hand and promoter Rush on the other. Because of Rush's relationship to and part of the Waterland/LiveCo organization, that fiduciary duty extended to the Waterland Defendants.

### i. *Breach of Fiduciary Duty Regarding Concert Jointly Featuring Artists Tauren Wells and Danny Gokey Who Were Under Contract With TCA*

575. In or around February 2024, with this fiduciary relationship in place, as well as the protective and restrictive provisions of the Confidentiality and Restricted Use Agreements were still enforced, Plaintiffs had detailed discussions with Jacob Reiser about a tour featuring two headline acts both of whom the Waterland Defendants knew were under contract with TCA: Tauren Wells and Danny Gokey ("Wells/Gokey Tour").

576. In the exchanges that occurred with Reiser concerning this project, Plaintiff, disclosed confidential and sensitive information, including among other things, information an d data about sponsorships available, and the amount of sponsorships Wells and Gokey owed from their contracts with Plaintiffs and how these tours could assist both the Waterland Defendants, Plaintiffs, and also the performing artists.

577. Notwithstanding the fiduciary relationships and agreements of confidentiality the Waterland Defendants proceeded to take that information and conduct their own Wells/Gokey touring concert featuring Wells and Gokey jointly, thus co-opting the ideas a date that have been shared in confidence and causing Wells and Gokey to violate their contracts with Plaintiffs.

178

578.	Given this relationship of trust and confidence and connection with the negotiation of the Purchase Agreement, the Waterland Defendants undertook duties of candor, which included the obligation to fully disclose all material issues and risks in connection with the negotiation and agreement of the Purchase Agreement. This duty of candid disclosure was further compounded as the Purchase Agreement contemplated the purchase the membership interests of TCA as well as the sale of LiveCo equity to the plaintiffs, both of which are securities transactions, which created its own set of disclosure obligations imposed by law.

579.	Among other things, the Waterland Defendants breached these duties of full disclosure by failing to advise the Plaintiffs of their plans concerning the acquisition of TCA, as those plans changed overtime. Without limitation, the duty of disclosure obligated the Waterland Defendants to advise the Plaintiffs of any concerns and/or risks they believed existed, including truthful and faithful disclosure of all events associated with their announced decision to delay closing. Instead, the Waterland Defendants misrepresented the issues precipitating delay as needing to require additional capital, which was false when they had already done so as the tombstone advertisement placed by their financial advisors discovered in preparing this lawsuit, so stated.

580.	Furthermore, the duty of disclosure obligated the Waterland Defendants to fully and completely advise the Plaintiffs with all the information they had regarding the Fargo Fabrication to extent that it could or would have an impact on their negotiations. Instead, defendant Taber who would short thereafter become the chief strategy officer for the Waterland Defendants specifically represented to the Plaintiffs that the Fargo Fabrication was "merely a rumor," while at

the same time advising other people that it was a serious and potentially damaging truthful publication.

### G. TORTIOUS INTERFERENCE WITH WELLS AND GOKEY CONTRACTS

581. The Waterland Defendants had full knowledge that Tauren Wells and Danny Gokey were bound by contract to deliver sponsorships to TCA and also to not allow their Public Platforms to be used for solicitation of sponsorships for any other nonprofits. Yet notwithstanding this knowledge they were contractually bound, the Waterland Defendants conducted their own Wells/Gokey touring concert featuring Wells and Gokey jointly, thus causing Wells and Gokey to violate their respective contracts with Plaintiffs.

582. Plaintiffs have been damaged by this conduct

### XIII. CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST WORLD VISION RELATED TO THE TCA PURCHASE AGREEMENT AND OTHER TORTIOUS ACTS.

583. In all claims in this Article XIII, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs in this Complaint as if fully set forth herein

584. Plaintiffs allege that World Vision had full knowledge of the Purchase Agreement that Plaintiffs had reached with the Waterland Defendants and the prospects and opportunities represented by the Purchase Agreement for the Plaintiffs.

585. World Vision conspired with the Waterland Defendants to effect a breach of the Purchase Agreement. They did so without justification and with full knowledge of the fact that the Purchase Agreement had been in negotiation, material terms had been agreed to, and execution of a definitive writing was imminent. Plaintiffs allege on information and belief that World Vision

convinced the Waterland Defendants not to execute such formal written contract embodying what had been agreed to and not to proceed any further with any discussions or negotiations with the Plaintiffs involving their purchase of TCA or even to transact business with Plaintiffs.

586. On information and belief, Plaintiffs allege that World Vision represented, advised and counseled the Waterland Defendants that if they proceeded to purchase TCA and/or document the agreement reached regarding TCA's purchase, then the antitrust plans and goals they had reached could not be accomplished. Among other things, on information and belief, World Vision also falsely and maliciously defamed Plaintiffs and misrepresented World Vision's prior dealings with Plaintiffs.

587. On information and belief, World Vision advised the Waterland Defendants that TCA would resist the Waterland Defendants setting up their own internal competing recruitment programs to sell their own platform to nonprofits which would compete with the proper and lawful acquisition of artist platforms. As such, the Waterland Defendants would therefore not be able to enter into agreements with World Vision involving World Vision paying the Waterland Defendants for sponsorship arrangements while TCA was a functioning affiliate.

588. World Vision is alleged to have presented to and entered into agreements and coordinated arrangements with the Waterland Defendants pursuant to which World Vision would serve as the exclusive, or near-exclusive, nonprofit partner for the solicitation of sponsorships in violation of state and federal antitrust laws, through the use of the Markets, structured to foreclose competing nonprofit intermediaries, including TCA, from access to the commercially essential Performing Platforms controlled by the Waterland Defendants.

589. World Vision is alleged to have provided substantial financial support and guaranteed sponsorship flows that enabled the Waterland Defendants to acquire and secure, control

181

contracts with artists negating or forfeiting those artists' Performing Platforms, and to make payments and economic commitments, directly or indirectly, to artists conditioned upon limiting or forfeiting relationships with competing sponsorship intermediaries and/or foregoing sponsorship participations entirely. Through these coordinated arrangements, World Vision and the Waterland Defendants reinforced each other's market positions, Waterland by consolidating control over touring access, and World Vision by securing dominant control over nonprofit sponsorship opportunities, thereby excluding competition and preserving their shared dominance in the NPS Market as it operates through the CCM Touring Market.

590. These same facts give rise to claims that World Vision has tortiously interfered with TCA's contract with the Waterland Defendants in violation of Tenn. Code Ann. § 47-50-109 and under common law tortious interference principles.

591. In the alternative, if a valid purchase agreement had not been reached regarding the purchase and sale of TCA to the Waterland Defendants, then World Vision tortiously interfered with the prospective contractual and business relations between Plaintiffs and the Waterland Defendants.

592. Plaintiffs and the Waterland Defendants had proceeded in their negotiations to the point that all material terms had been agreed to between them regarding future business and operations, such that all that was left to do was sign the paperwork evidencing what the parties had verbally already agreed to regarding TCA providing the Waterland Defendants access and services with respect to the nonprofit sponsorship market, that they did not possess.

593. On information and belief, when World Vision found out about what was transpiring and/or the state of the negotiations, they intervened to prevent the Waterland Defendants from proceeding with TCA, including by offering to make payments on behalf of the

182

Waterland Defendants, discouraging any association with Campbell or TCA, and defaming Campbell and/or TCA, thereby disrupting their relations causing a concrete and imminent business expectancy to be lost.

594. Plaintiffs have been damaged by this conduct, including the loss of the purchase agreement with the contract price at $50 million as well as the loss of other valuable rights and opportunities, which losses would not have occurred, but for the tortious conduct of World Vision.

## XIV. CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST MICHAH TYLER FOR BREACH OF CONTRACT.

595. In all claims in this Article XIV, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs in this Complaint as if fully set forth herein.

596. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV.M above and arises from the same common nucleus of operative fact as Plaintiffs' other claims.

### A. Background Facts Relevant to the Claims Against Micah Tyler.

597. On January 1, 2022, Plaintiff TCA and Micah Begnaud, professionally known as "Micah Tyler" ("Tyler"), entered into a written Exclusive Platform Agreement (the "Tyler Contract"). The Tyler Contract was managed on Tyler's behalf by Scott Bickell, who served as Tyler's manager and who is also the manager of the MercyMe Parties and a named defendant herein.

598. Pursuant to the Tyler Contract, Tyler agreed to furnish, exclusively to TCA, his Public Platform — defined as all musical concerts, conferences, or similar events featuring or headlined by or under Tyler's control — for the purpose of generating charitable sponsorships for

183

Children International or such other nonprofit designated by TCA. [Ex¶1(a)-(b)]. Tyler expressly agreed that the nonprofit designated by TCA would be the exclusive charitable sponsor in connection with his Public Platform during the Term. [¶1(c)].

599. Tyler further agreed that during the Term he would not enter into any agreement interfering with the full and prompt performance of his obligations to TCA and would not make his Public Platform available to promote or assist any party other than TCA in connection with securing charitable sponsors for nonprofits. [¶10(c)].

600. The Tyler Contract further expressly warranted and required Tyler to diligently, competently, and to the best of his ability pursue on a full-time basis his recording and live musical performing career, it being expressly acknowledged that Tyler's full-time commitment was the essence of the Agreement. [¶10(a)].

601. In consideration of Tyler's obligations under the Tyler Contract, TCA agreed to pay Tyler a non-recoupable signing bonus of Twenty-Five Thousand Dollars ($25,000.00) and recoupable advances totaling Eighty Thousand Dollars ($80,000.00) — specifically, $40,000.00 upon execution and $40,000.00 upon Tyler's request — with additional per-batch advances of $80,000.00 payable as each increment of 500 Confirmed Sponsors was credited to TCA's account. [¶¶5, 5A]. TCA paid the signing bonus and the initial advances as required.

### B. Breach of Contract by Micah Tyler.

602. Following TCA's payment of the signing bonus and initial advances under the Tyler Contract, Tyler ceased performing under the Agreement. Tyler failed to conduct sufficient concert performances to generate the Confirmed Sponsors required under the Tyler Contract and to allow TCA a reasonable opportunity to recoup the advances it had paid. Despite having received TCA's advances and signing bonus, Tyler did not fulfill his contractual obligation to pursue his live

184

touring career on a full-time basis as expressly required by ¶10(a) of the Tyler Contract, and did not make his Public Platform available to TCA in the manner and to the extent the Tyler Contract required.

603. Tyler's failure to perform constitutes a material breach of the Tyler Contract, including without limitation his breach of: (a) his obligation to furnish his Public Platform exclusively to TCA for sponsorship purposes [¶1(a)]; (b) his obligation to diligently pursue his live touring career on a full-time basis [¶10(a)]; and (c) his obligation not to enter into agreements that would interfere with his performance obligations to TCA [¶10(c)].

604. As a direct and proximate result of Tyler's breach, TCA has suffered damages including without limitation: (a) the full amount of all unrecouped advances paid to Tyler, which Tyler is contractually obligated to repay pursuant to ¶10(a) and ¶10(d)(ii) of the Tyler Contract upon his failure to perform; (b) the value of the sponsorships TCA would have generated had Tyler performed as required; and (c) the loss of the economic value of Tyler's Public Platform for the duration of the Term, including the Initial Period and any Option Periods TCA would have exercised. The exact amount of TCA's damages will be proven at trial.

605. TCA further asserts that, pursuant to ¶14 of the Tyler Contract, Tyler's breach has caused and will continue to cause TCA irreparable injury for which monetary damages alone may not fully compensate, and TCA is therefore entitled to seek injunctive relief in addition to damages.

### C. Claim for Indemnity Against Micah Tyler.

606. TCA asserts a claim for indemnity against Tyler for all claims, damages, liabilities, costs, losses, and expenses (including legal costs and reasonable attorneys' fees) arising to third parties that TCA incurs arising out of or connected with Tyler's failure to perform under the Tyler

185

Contract, including without limitation any claims asserted against TCA by Children International or any other nonprofit that relied on Tyler's performance commitments.

### D. Summary of Relief Sought Against Micah Tyler.

607. Without limiting the generality of the foregoing, TCA requests:

    a. judgment against Tyler for breach of the Tyler Contract and an award of all damages caused thereby, including recovery of all unrecouped advances, lost sponsorship revenues, and consequential damages in an amount to be proven at trial;

    b. judgment requiring Tyler to repay all unrecouped advances paid by TCA pursuant to the Tyler Contract;

    c. injunctive relief as warranted pursuant to ¶14 of the Tyler Contract; and

    d. an award of attorneys' fees and costs pursuant to ¶18 of the Tyler Contract, which provides that the prevailing party shall recover its reasonable attorneys' fees.

## XV. CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST THE BICKELL PARTIES RELATED TO THE MM CONTRACT AND TYLER CONTRACT.

608. In all claims in this Article XV, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

609. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV.M above and arises from the same common nucleus of operative fact as Plaintiffs' other claims. This claim is based on the same series of communications, transactions, and events through which the Waterland Defendants restrained competition, impaired Plaintiffs' business relationships, eliminated Plaintiffs as a competitive force in the relevant markets (Art. V), misappropriated Plaintiffs' trade secrets and breached contracts (Art. VI), conspired to defame Plaintiffs (Art. VIII), violated the Lanham Act

(Art. IX), interfered with Plaintiffs' contracts with artists and nonprofits (Art. XI) and violated antisolicitation laws (Art. XIII). Without limiting the generality of the foregoing, this claim is based on the same series of communications and actions through which Defendants participated in and furthered the disruption of Plaintiffs' contractual relationships and business operations.

610. Collins was an employee of TCA having started with a contract in 2017, which expired by its terms, but which TCA and Collins had nevertheless been operating under by extension. Collins' contract carried with it a duty of good faith and fair dealing. For Collins to quit for the sole reason of allowing MM a right to terminate the MM Contract and to enable himself to step into the shoes of TCA with relations to MercyMe and Children International, is a violation of the duty of good faith in fair dealing in that contract.

611. Scott Bickell himself and through his company, Brickhouse Entertainment, LLC. (together the " Bickell Parties") was lifelong friends with Collins who had secured Collins his employment with TCA. The Bickell Parties were also associated with as a manager, the group MercyMe. On information and belief Collins and the Bickell Parties at all times work together to accomplish the goals of the tortious conduct herein alleged and are jointly and severally liable as such.

612. Through the actions of the Bickell Parties, they have tortiously interfered with TCA's contract with Children International, violating Tenn. Code Ann. § 47-50-109 and constituting common law tortious interference.

613. Additionally, the actions of the Bickell Parties constitutes tortious interference with business relationships as (1) TCA had an existing business relationship with Children International as well as a prospective relationship with Children International into the future; (2) the Bickell Parties had specific knowledge of these relations the Bickell Parties were part of TCA's interface

187

with CI in fulfilling his duties and reported regularly about such; (3) the Bickell Parties intended to cause the breach and termination of the business relationship; (4) the improper motive of the Bickell Parties was to illicitly take those rights and opportunities for themselves and also do so by improper means, including inducing MM to attempt to terminate their contract and then re-engaging with MM to usurp the relationship with Children International; and (5) TCA has suffered extensive damages resulting from these tortious actions.

### A. CONSPIRACY TO BREACH MM CONTRACT.

614. The Bickell Parties conspired with the MM Parties to breach the MM Contract. They did so without justification. With full knowledge of the MM Contract, the Bickell Parties counseled and worked with MM to achieve the termination of the MM Contract through Collins' voluntary resignation. This allegation is supported by the fact that MM, Collins and the Bickell Parties have continued to work together even after Collins' "resignation" and are doing so in coordination with LiveCo/TPR and CI.

### B. TORTIOUS INTERFERENCE WITH MM CONTRACT.

615. These same facts give rise to claims that the Bickell Parties have tortiously interfered with TCA's contract with MercyMe, in violation of Tenn. Code Ann. § 47-50-109 and under common law tortious interference principles. Specifically, if the MM Contract was not validly terminated as alleged herein, then the Bickell Parties tortiously interfered by causing MercyMe to contract with others for concerts in violation of the contract's exclusivity provisions. If the contract was terminated, then the Bickell Parties induced and participated in that termination.

### C. TORTIOUS INTERFERENCE WITH THE TYLER CONTRACT.

188

616. The Bickell Parties served as Tyler's manager and, on information and belief, was the primary point of contact through whom Tyler's contractual relationship with TCA was established and through whom Tyler's departure from his performance obligations was managed. As alleged in this Complaint in connection with the MercyMe claims, the Bickell Parties were simultaneously managing MercyMe's relationship with TCA and coordinating the termination of the MM Contract. TCA alleges on information and belief that the Bickell Parties' management of both Tyler and MercyMe, combined with his role in the Waterland Defendants' coordinated strategy to displace TCA, was not coincidental — and that the Bickell Parties advised, directed, or facilitated Tyler's cessation of performance under the Tyler Contract in furtherance of the same scheme. To the extent the Bickell Parties tortiously interfered with or aided and abetted Tyler's breach of the Tyler Contract, the Bickell Parties are individually liable for TCA's resulting damages on the same theories alleged in Article XI with respect to his conduct in connection with the MM Contract

## XVI. DAMAGES FOR VIOLATIONS OF TENN. CODE ANN. § 48-101-520 IN CONNECTION WITH THE SOLICITATION OF CHARITABLE FUNDS.

617. In all claims in this Article XVI Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs in this Complaint as if fully set forth herein

618. Tenn. Code Ann. § 48-101-520 provides a private right of action to any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair, false, misleading or deceptive act or practice declared to be unlawful by this part or any other violation of rules and regulations on the solicitation of charitable funds.

619. Plaintiffs have been so damaged.

620. On information and belief, the Defendants have engaged in a practice and pattern of engaging in professional solicitation as defined in Tenn. Code Ann. § 48-101-501 (15) through which they have engaged in solicitations for contributions as defined in Tenn. Code Ann. § 48-101-501 (17).

621. On information and belief, among other things, the Defendants have not properly registered as professional solicitors, completed the necessary applications, paid the filing fees nor posted a bond.

622. Plaintiffs had gone through the entire process entitling them to engage as professional solicitors under the statute, and have had their business destroyed by the Defendants' unlawful actions in violation of Tenn. Code Ann. § 48-101-501, et seq.

## XVII.    CONSPIRACY (ALL DEFENDANTS)

623. In all claims in this Article XVII, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

624. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV.M above and arises from the same common nucleus of operative fact as Plaintiffs' other claims. This claim is based on the same series of communications, transactions, and events through which the Waterland Defendants restrained competition, impaired Plaintiffs' business relationships, eliminated Plaintiffs as a competitive force in the relevant markets (Art. V), misappropriated Plaintiffs' trade secrets and breached contracts (Art. VI), conspired to defame Plaintiffs (Art. VIII), conspiracy/aiding and abetting defamation (Art. IX), violated the Lanham Act (Art. X),  contractual claims (Art. XI), interfered with Plaintiffs' contracts with artists and nonprofits (Art. XII) and violated

190

antisolicitation laws (Art. XV).   Without limiting the generality of the foregoing, this claim is based on the same series of communications and actions through which Defendants participated in and furthered the disruption of Plaintiffs' contractual relationships and business operations.

625.     Defendants' conduct described herein constitutes a civil conspiracy and aiding and abetting each other to accomplish the causes and claims made in this Complaint, including without limitation, to violate the Sherman and Clayton Acts, breach and conspire to breach contracts, and tortiously interfere with the contracts and opportunities (current and prospective).

626.     In furtherance of their conspiracy, Defendants have undertaken efforts to eliminate competition and output in the CCM Touring Market and the NPS Market, by eliminating the Newsboys and TCA from those Markets, forcing their exit from those markets.

627.     As a direct result of the overt acts taken in furtherance of Defendants' conspiracy, Plaintiffs have suffered considerable injury to their businesses and their ability to compete in the Markets.

628.     Defendants are all jointly and severally liable for the actions taken in furtherance of their joint conduct.

629.     Defendants are all jointly and severally liable for the actions taken in furtherance of their joint conduct.

## XVIII.    CONDITIONS PRECEDENT

630.     All conditions precedent have been performed, have occurred, or have been excused.

## XIX.    ATTORNEYS FEES.

191

631.    Plaintiffs pray for the recovery of all attorney's fees and expenses to which they show themselves justly entitled.

<p align="center">**<u>JURY TRIAL DEMANDED</u>**</p>

632.    Plaintiffs demand a jury trial.

<p align="center">**<u>PRAYER FOR RELIEF</u>**</p>

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and grant the following relief:

a.  For judgment on all Counts in favor of Plaintiffs and against Defendants;

b.  For an award of compensatory damages in an amount to be determined at trial sufficient to compensate Plaintiffs for all injuries suffered, including but not limited to reputational harm, loss of business, lost profits, loss of goodwill, loss of the agreed acquisition price of approximately $50 million, and other economic damages;

c.  For an award of damages under the antitrust laws, including treble damages pursuant to 15 U.S.C. § 15, together with all recoverable costs;

d.  For an award of damages for misappropriation of trade secrets, including actual damages, unjust enrichment, and, to the extent permitted by law, exemplary damages equal to exceed two times the actual damages awarded, pursuant to 18 U.S.C. § 1836(b)(3)(C) and Tenn. Code Ann. §47-25-1704(b) or such greater amounts as allowed by law;

e.  For an award of damages for breach of contract and tortious interference, including all direct, consequential, and expectancy damages recoverable under applicable law, including without limitation, damages for breach of the Confidentiality and Restricted Use Agreements, breach of the Purchase Agreement, breach of the MM Contract, and

<p align="center">192</p>

tortious interference with TCA's contracts and business relations with Children

International and others;

f. For an award of damages under the Lanham Act, including Defendants' profits, any

damages sustained by Plaintiffs, and trebling of such damages as permitted by law

g. For an award of a reasonable royalty should such be appropriate;

h. For an award of punitive or exemplary damages to the fullest extent permitted by law

based on Defendants' willful, malicious, and intentional conduct;

i. For preliminary and permanent injunctive relief prohibiting Defendants from continuing

their unlawful conduct, including but not limited to:

i. Continuing to publish or republish defamatory statements about Plaintiffs;

ii. Using or disclosing Plaintiffs' confidential and proprietary information and

requiring Defendants to return or destroy all materials containing or derived from

TCA's Trade Secrets;

iii. Engaging in anticompetitive conduct in violation of the antitrust laws;

iv. interfering with Plaintiffs' contractual and business relationships;

v. Conducting any nonprofit sponsorship platform developed using TCA's confidential

information or Trade Secrets; and

vi. MercyMe conducting concerts with Children International and/or LiveCo/TPR in

violation of the MM Contract, as more particularly set forth in this Complaint;

j. For an order requiring Defendants to retract the defamatory statements and to publish

corrective statements in a manner reasonably calculated to reach the same audience as the

original publications;

193

k. For a declaration of Plaintiffs' rights as requested herein, including rights under the MM Contract, including but not limited to a declaration that (i) the voluntary resignation of Troy Collins did not validly trigger the Key Man provision of the MM Contract so as to permit termination, and/or (ii) TCA's right to cure was not extinguished by MercyMe's premature repudiation, and/or (iii) MercyMe's Matching Right obligations survive any purported termination of the MM Contract;

l. For an award of attorneys' fees, costs, and expenses to the fullest extent permitted by law, including but not limited to those recoverable under the antitrust laws, the Defend Trade Secrets Act (18 U.S.C. §1836(b)(3)(D)), the Tennessee Uniform Trade Secrets Act (Tenn. Code Ann. § 47-25-1705), the Lanham Act (15 U.S.C. § 1117(a)), and the Confidentiality and Restricted Use Agreements;

m. For an award of damages pursuant to Tenn. Code Ann. § 48-101-520 arising from Defendants' unlawful solicitation of charitable funds in violation of Tenn. Code Ann. §48-101-501 et seq.;

n. For pre-judgment and post-judgment interest as permitted by law; and

o. For such other and further relief, at law or in equity, as the Court deems just and proper.

Respectfully submitted,

_//s/ G. Kline Preston, IV_
/s/ G. Kline Preston IV, Esq.
G. Kline Preston, IV, Esq. (#017141)
Belle Meade Office Park
4515 Harding Pike, Suite 107
Nashville, TN 37027
Tel: 615-649-8680
Fax: 866-610-9565
kpreston@klineprestonlaw.com

194

<u>*/s/ Ben Broocks*</u>
/s/ Ben Broocks
Ben Broocks (pro hac pending)
248 Addie Roy Road, Suite B-301
Austin, Texas
Tel: 512-201-2002
Fax: 512 201-2386
Attorney for Wesley Eugene Campbell

195