EXHIBIT 4

THRIVING CHILDREN ADVOCATES, LLC
7106 Crossroads Blvd, Suite 215
Brentwood, TN  37027

As of August 1, 2024

Messrs. Bart Millard, Robby Shaffer, Nathan Cochran,
and Mike Scheuchzer
p/k/a "MercyMe"
106 Mission Court
Suite 1202
Franklin, TN  37067

Re:     Exclusive Platform Agreement

Gentlemen:

This agreement (the "Agreement"), when signed by Bart Millard, Robby Shaffer, Nathan Cochran, and Mike Scheuchzer, individually, and by an authorized representative of MercyMe, Inc., (individually and collectively deemed the "Professional") and Thriving Children Advocates, LLC ("Client"), shall represent a binding contract between Professional and Client according to the terms and conditions set forth herein.

1.     Exclusive Services and Sponsorship Rights

(a)     Professional hereby agrees to furnish, exclusively to Client, Professional's Public Platform (as defined below) in order to promote and assist Client's efforts to secure child, family, community, victim, or similar charitable sponsors for Children International (the "Nonprofit") in accordance with the terms and conditions set forth in this Agreement (including, without limitation, those terms and conditions set forth in Schedule A attached hereto and incorporated herein by this reference).

(b)     "Professional's Public Platform" shall mean all concerts, conferences, or similar events featuring or headlined by Professional during the Term of this Agreement. Professional warrants and represents that [in addition to those concerts, conferences, or similar events featuring or headlined by Professional during 2024] Professional's Public Platform shall consist of no less than forty-eight (48) separate events between January 1, 2025, and December 31, 2025 (the "Minimum Event Commitment"). Professional's Public Platform shall not be used, associated with, or otherwise made available during the Term for promoting, educating, making appeals, or otherwise securing child, family, community, victim, or similar charitable sponsors for any party other than Client. Notwithstanding the foregoing, Client understands that from time to time during the Term Professional may be featured at or headline an event where Professional is unable to control the environment or presentation in order to make an appeal on behalf of the Nonprofit, in which case Professional shall not be obligated to furnish Professional's Public Platform for Client on behalf of the Nonprofit, provided that Professional shall not at such events or in such

MercyMe /TCA/EPA/8-1-24           1

EXHIBIT 4

circumstances represent, endorse, or otherwise support the mission of an organization other than Nonprofit.

(c)     The exclusive relationships between and among Professional, Client, and Nonprofit may sometimes for convenience be referred to herein as the "Sponsorship." It is expressly understood and agreed that the Nonprofit shall be the exclusive charitable sponsor at, on, or in connection with Professional's Public Platform during the Term.

(d)     Professional is authorized and does hereby grant to Client and Client's designees the non-exclusive worldwide right to use and permit others to use, at no cost, the approved names (including, without limitation, the name "*MercyMe*" and any other legal, fictitious or professional names used by Professional and its members), the approved likenesses, approved photographs, and approved biographical rights of Professional for purposes of trade and otherwise without restriction in connection with Client's and Nonprofit's mission, fulfillment of the objects of this Agreement, and in the marketing and advertising in connection therewith. Professional hereby warrants that Professional is the sole owner of any legal, fictitious, or professional name used by Professional, and that no other person or entity has or will have the right to use Professional's name in connection with child, family, community, victim, or similar charitable sponsorship during the Term.  For the avoidance of doubt, the usage of the names, likeness photographs, and biographical information of the members of Professional shall only be granted to Client and Nonprofit in the context of the Professional as a whole, and nothing herein shall be deemed to grant any rights to Client or Nonprofit to use the names, likenesses, photographs, or biographical information of any individual members of Professional apart from their membership in or of Professional.

(e)     Professional agrees that, as between Professional and Client, Client shall own all right, title, and interest in and to all information and other materials developed, obtained or generated in connection with this Agreement and the Sponsorship (the "Materials").  For the avoidance of doubt, the Materials expressly include, without limitation, all materials and other information (i) provided by Client, including any of its representatives or third party providers, to Professional and (ii) provided by any Confirmed Sponsor or potential sponsor or donor of Client obtained during the Term. All information or data pertaining to Sponsorships shall be considered the proprietary and confidential information of Client and shall be subject to the confidentiality provisions set forth in this Agreement. This Paragraph 1(e) shall survive expiration or termination of this Agreement. Notwithstanding the foregoing,

(f)     Professional shall not have any right to create (and Professional hereby agrees to refrain from using) any materials for the Sponsorship other than the Materials provided by or at the direction of Client in connection with this Agreement. All Materials that include or incorporate Client's name, logo, service mark, or similar information, in whatever media, including but not limited to custom Client sponsorship landing webpages, shall be deemed licensed to Professional at no cost to Professional and otherwise in accordance with the terms and conditions of this Agreement. Professional shall be solely responsible for obtaining (and shall indemnify and hold Client harmless from any costs associated with) all applicable licenses, consents, and permissions for the use of any materials other than the Materials.

MercyMe /TCA/EPA/8-1-24                                     2

EXHIBIT 4

1A.  Prior Agreement

1A.01  (a)      Professional and Client are parties to an agreement dated as of June 13, 2019 (the "Prior Agreement"). Professional and Client hereby acknowledge and agree that the Term of the Prior Agreement shall (notwithstanding its terms) shall expire and be deemed terminated, by mutual consent, subject to the terms and conditions set forth in this Agreement.

(b)      Upon the full execution hereof, Professional and Client shall have entered into a new professional services and exclusive public platform agreement. This Agreement is sometimes referred to herein as the "New Agreement" or the "Agreement."  The New Agreement and the terms hereof are intended to and shall constitute an agreement that is separate and apart from the Prior Agreement.

1A.02  (a)      *Except for the foregoing, and except for any confidentiality provisions under the Prior Agreement (which Client and Professional hereby expressly agree shall survive the termination of the Prior Agreement),* Professional and Client hereby forever mutually release, remise, and discharge each other from any and all claims, demands, debts, damages, liabilities, actions, causes of action, suits, sums of money, accounts, covenants, agreements, contracts and promises in law or in equity which Professional or Client (or Professional and Client's respective successors and assigns) now have, have had or at any time may have against the other relating to the Prior Agreement, whether or not they have been subject to dispute and whether or not known or unknown or suspected or unsuspected, all relating to the Prior Agreement, its inducement, inception, execution and/or performance(s).

(b)      Professional and Client intend that this paragraph 1A.02 shall be effective as a full and final accord and satisfaction and release of each and every matter hereinabove referred to.

(c)      Professional and Client represent and acknowledge to each other that neither party has heretofore assigned, or transferred or purported to assign or transfer to any person any matter hereinabove released or any part or portion thereof, and each party mutually agrees to indemnify each other from and against any claim, demand, damage, debt, liability, cost, expense, action or cause of action (including the payment of reasonable attorneys' fees and costs actually incurred whether or not litigation is commenced) based on, in connection with or arising out of any such assignment or transfer or purported or claimed assignment or transfer which such claim is reduced to final judgment or settled with the other party's consent.  Professional further agrees to indemnify Client from and against any and all claims, demands, damages, debts, liabilities, costs, expenses, actions or causes of action.

(d)      Each party mutually acknowledges to the other that neither, nor any agent or attorney of either, has made any promise, representation or warranty whatever, express, implied or statutory, not contained herein concerning the subject matter hereof to induce the other to execute this Agreement, and Professional and Client acknowledge that neither has executed this Agreement in reliance on any such promise, representation or warranty not contained herein.

MercyMe /TCA/EPA/8-1-24                                3

EXHIBIT 4

2.    Spokespersons, Table Representatives, and Volunteers

Client shall provide (at Client's sole cost and expense) all spokespersons, table representatives, and volunteers deemed necessary by Client to acquire charitable sponsors and otherwise to fulfill Client's obligations to the Nonprofit at Professional's Public Platform during the Term.

3.    Term

The term of this Agreement shall commence as of the date of the complete execution of this Agreement by Client and Professional and shall continue (subject to the other terms and conditions of this Agreement) until close of business on December 31, 2025 (the "Term").

3A.    Matching Right

If at any time Professional receives an offer to make Professional's Public Platform available after the Term to a third party (*whether a non-profit organization or a for-profit promoter, artist, marketing firm, manager, music and/or entertainment company of any nature, or any other third party*) in order to promote, educate, make an appeal for, or otherwise assist in the securing of child, family, community, victim, or similar charitable sponsors (*and whether or not such offer is in the form of a direct sponsorship relationship, a "package deal," "buy-out," or other mechanism wherein the acquisition and accumulation of sponsorships are addressed*), *or* in the event Professional *on its own behalf* seeks or desires after the Term to promote, educate, make an appeal for, or otherwise assist in the securing of child, family, community, victim, or similar charitable sponsors (all of the above being individually and collectively deemed a "Sponsorship Offer"), Professional will not accept any such Sponsorship Offer unless and until the terms and conditions of this paragraph have been fulfilled and Client's exclusive rights under this Agreement have been addressed to its satisfaction.

(a)    Professional will provide to Client a copy of any bona fide third-party Sponsorship Offer that Professional desires to accept, which Sponsorship Offer will be presented to Client in such a manner as to allow Client to identify all financial terms and conditions of the Sponsorship Offer, and Client will have thirty (30) days from receipt of the Sponsorship Offer to match the Sponsorship Offer.  If Client so notifies Professional of Client's intent to match the Sponsorship Offer, then as of the date of receipt of such notice from Client, Client's rights shall automatically vest, and Professional and Client will enter into a written agreement with respect thereto, subject to Paragraph 3(b), below.  If Client fails to so notify Professional, Professional can only accept the Sponsorship Offer on terms equal to or more favorable to Professional than those contained in the Sponsorship Offer and only from the original offeree. The foregoing procedures shall again apply to any subsequent Sponsorship Offers that Professional desires to accept, including without limitation, any Sponsorship Offers containing the identical terms and conditions previously rejected by Client.

(b)    For the avoidance of doubt,  Client shall not be required to match any Sponsorship Offers (or parts of any Sponsorship Offers) that include or would otherwise require Client to renegotiate or "pay again" for any rights Client has already acquired pursuant to this Agreement, it being understood and agreed that Client's obligation to "match" (and Professional's right to

MercyMe /TCA/EPA/8-1-24                              4

EXHIBIT 4

proceed) with any Sponsorship Offer shall only pertain to prospective rights, that is, rights that Client does not already control under this Agreement (i.e., future rights following the Term).

4. Confirmed Sponsor Rate

(a) In consideration of Professional's warranties, representations, covenants, and agreements under this Agreement, Client agrees to pay to Professional the sum of:

(i)  ) for each Confirmed Sponsor acquired at Professional's Public Platform between the date of this Agreement and November 30, 2024, or such later date at which Professional has concluded its touring for the calendar year 2024 (hereinafter the "Initial Sponsor Rate"), it being understood and agreed that the Initial Sponsor Rate shall first be credited toward and applied in reduction of all outstanding advances paid to Professional during the Term of the Prior Agreement (the "Prior Advances"), the balance of which such Prior Advances are, as of the date of this Agreement, , representing ) yet-to-be-delivered Confirmed Sponsors; and

(ii) ) for each Confirmed Sponsor acquired between January 1, 2025, and December 31, 2025 (hereinafter the "New Sponsor Rate"), it being understood and agreed that the New Sponsor Rate shall first be credited toward and applied in reduction of the balance (if any) of Prior Advances still unrecouped by the end of 2024.

(iii) The Initial Sponsor Rate and the New Sponsor Rate shall each be deemed a "Confirmed Sponsor Rate" and collectively "Confirmed Sponsor Rates."

(b) "Confirmed Sponsor" shall be defined according to the relevant Nonprofit's requirements and may be subject to change from time to time to account for attrition (among other things), but shall mean, at a minimum: a donor completing the Nonprofit's child sign-up packet supplied by Client's agents during an event, and who gives his/her first gift donation in the amount determined by and in accordance with the then-current standards of the applicable Nonprofit by cash, check, or credit card and which first donation is cleared by the Nonprofit's payment processing. For the avoidance of doubt, a "pledge" is defined as any situation in which a potential donor expresses a sincere and heartfelt interest in sponsoring a child, but for a variety of reasons cannot or will not make payment at that moment. Any envelope containing complete sponsor contact information *without* payment information will be treated as a pledge (a "Pledge"). Pledges that are subsequently paid within the parameters of the "Confirmed Sponsor" definition above shall be treated as Confirmed Sponsors for purposes of this Agreement, and Pledges that convert to a Confirmed Sponsor shall be counted for all purposes of this Agreement, even if converted following the termination or expiration of this Agreement. Professional understands and agrees that the verification and crediting of Confirmed Sponsors is at the discretion of the applicable Nonprofit, may change from time to time during the Term, and is not under or otherwise subject to the control or influence of Client. However, because the term "Confirmed Sponsor" serves as the basis for payments to both Client and Professional, changes to the definition of "Confirmed Sponsor" will impact Client and Professional similarly. Accordingly, Professional understands that Client will

MercyMe /TCA/EPA/8-1-24                                5

EXHIBIT 4

remain motivated during the Term of this Agreement to encourage the Nonprofit to continue to define "Confirmed Sponsor" as that term has been historically defined and understood by charitable child sponsorship organizations.

(c)     In addition to Confirmed Sponsors acquired during 2024, Professional agrees to use its best efforts to facilitate Client's acquisition of at least Eight Thousand (8,000) additional Confirmed Sponsors between January 1, 2025, and December 31, 2025.

(d)     Unless provided to Professional more frequently as a matter of course from time to time during the Term, Client agrees to provide (at a minimum) an annual report to Professional no later than March 31, 2026, for Confirmed Sponsors achieved during the Term, provided that the inadvertent failure of Client to do so shall not be deemed a breach of this Agreement. Client shall also provide notice to Professional when Professional has attained sufficient Confirmed Sponsors to have recouped the Prior Advances.

5.     Production Expenses

In addition to the Confirmed Sponsor Rates, Client agrees to pay to Professional on January 10, 2025 (the "Due Date"), the sum of One Million Five Hundred Thousand Dollars ($1,500,000.00), which sum is intended to assist Professional with the tour production and related expenses required to cover the Minimum Event Commitment (the "Production Fee").

6.     Confidentiality

(a)     Professional and Client each hereby agrees to keep the terms and conditions of this Agreement [and, except with respect to Client's compliance disclosures described in Paragraph 6(b)(iv), below, the very existence of this Agreement] strictly confidential.

(b)     In addition to the foregoing, Professional understands and agrees:

(i)     The following terms shall have the meanings provided:

(A)     "Client Data" means (i) all data and information generated, provided or submitted by or caused to be generated, provided or submitted by, Client and/or Professional in connection with this Agreement and the Sponsorship; (ii) all data and information regarding the business, donors, sponsors, and potential donors, sponsors or of Client or the Nonprofit(s) collected, generated or submitted by, or caused to be generated, provided or submitted by, Professional (if any); and (iii) Personally Identifiable Information.

(B)     "Confidential Information" includes this Agreement and all of its terms and conditions and, with respect to a party, any and all proprietary information of the disclosing party (whether Client's, Professional's or the applicable Nonprofit's) and/or of third parties in the possession of the disclosing party, treated as secret or confidential by the disclosing party that does not constitute a trade secret.  For avoidance of doubt, Confidential Information also includes (a) information which has been disclosed to such party by a third

MercyMe /TCA/EPA/8-1-24                                      6

EXHIBIT 4

party which party is obligated to treat as confidential or secret; and, (b) with respect to Client, the Client Data and any other proprietary materials.

(C) "Personally Identifiable Information" means personally identifiable information of individuals and any information that may be used to identify such individuals that is generated by or disclosed to Professional in connection with the Services.

(ii) In connection with this Agreement, each Party understands and agrees that it may be furnished with Confidential Information. Client Data shall be considered the Confidential Information of Client. The Party disclosing Confidential Information is referred to herein as the "Discloser" and the Party receiving Confidential Information is referred to herein as the "Recipient." Notwithstanding the foregoing, Confidential Information shall not include information which: (a) is or becomes part of the public domain through a source other than Recipient; (b) was rightfully known to Recipient at the time of disclosure with no confidentiality obligations to a third party; (c) is independently developed by Recipient without breach of the Agreement; or (d) is subsequently learned from a third party not under a confidentiality obligation to Discloser. For purposes of the foregoing exclusions only, "Confidential Information" does not include Personal Information.

(iii) Recipient agrees (A) to use the Confidential Information only for the purpose of performing or enforcing its obligations under the Agreement, and (B) to secure, protect and maintain the confidentiality of the Confidential Information of Discloser, using at least as great a degree of care as it uses to maintain the confidentiality of its own information of a similar nature or importance, but in no event less than reasonable care. Recipient will not reproduce Confidential Information except as necessary in furtherance of the purpose of this Agreement. Recipient will not sell, transfer, publish, disclose, or otherwise use or make available any portion of Discloser's Confidential Information to third parties, except to those of its directors, officers, employees, subcontractors, or attorneys who have a need-to-know the same in furtherance of the purposes of the Agreement. Recipient shall be responsible for the compliance of such third parties with the terms and conditions of the Agreement.

(iv) Recipient will not be entitled to release Confidential Information required to be disclosed by law, pursuant to a duly authorized subpoena, court order or government authority unless and until Recipient has provided to Discloser advance notice thereof and, unless prohibited by law, to permit Discloser to seek a protective order or other appropriate remedy protecting the Discloser's Confidential Information from disclosure, and Recipient limits the release of the Confidential Information to the greatest extent possible under the circumstances. Notwithstanding the foregoing or anything to the contrary contained herein, Client shall have the right to disclose this Agreement as required in order to remain in compliance with various state rules and regulations pertaining to charitable solicitations and professional fundraising.

(v) The Parties' confidentiality obligations under this Section will survive for three (3) years following any termination or expiration of this Agreement, provided however that confidentiality obligations with respect to Confidential Information constituting trade secrets will continue for as long as such Confidential Information is eligible for trade secret protection and

EXHIBIT 4

confidentiality obligations with respect to Personally Identifiable Information will continue in perpetuity.

7.      Compliance with Applicable State Requirements

(a)     Professional understands and agrees that Client is a professional fundraiser, and that Client's activities are or may be governed by, performed, applied, interpreted, and/or enforced from time to time by, within, or subject to the laws, statutes, and regulations of or under the jurisdictions of individual states' professional fundraising or similar regulations ("State Rules"). Accordingly, this Agreement shall be interpreted at all times to be in compliance with these State Rules and, where necessary, shall be tailored (and subject) to the respective State Rules. In furtherance thereof, Client shall have the right to amend this Agreement from time to time as necessary to bring the Agreement into compliance with all jurisdictions where Client solicits contributions on behalf of the Non-Profit (a "Compliance Amendment"), and Professional agrees to review and promptly execute such Compliance Amendments upon Client's request.

(b)     Professional warrants and represents that Professional is not a professional fundraiser. Accordingly, Professional hereby agrees to refrain from (and agrees to indemnify Client and hold Client and the Nonprofit harmless from any liability arising from or relating to Professional's taking any action that could be interpreted (or misinterpreted) as those of a professional fundraiser or which would otherwise subject Professional directly (as opposed to indirectly through Client) to the State Rules.

(c)     In order to remain compliant with State Rules, Professional understands that Client and the Nonprofit must, among other things:

        (i)      Disclose and submit to the applicable states full details regarding the dates, locations, and venues constituting Professional's Public Platform during the Term;

        (ii)     Disclose and submit to the applicable states full details regarding speakers, presenters, and table or tour representatives appearing on behalf of Professional and the Nonprofit (hereinafter deemed the "Personnel") at Professional's Public Platform during the Term; and

        (iii)    Conduct a background check of all such Personnel prior to submission and disclosure to the states as aforesaid.

(d)     Accordingly, Professional agrees not to engage any Personnel in connection with the performance of Professional's obligations hereunder or assisting Professional in any way in the accomplishment or execution of Professional's duties (whether as a speaker, presenter, table representative, tour representative, or otherwise) without first submitting the name of the proposed Personnel and all requisite data required by Client and/or Nonprofit in order that Client may run the required background checks and (provided the proposed Personnel clears the background check) contract the proposed Personnel directly. Professional understands that for these reasons, Client shall have the right to approve all such Personnel.

(e)     Professional further agrees to send to Client all details pertaining to the dates, locations, and venues of Professional Public Platform during the Term (the "Event Details") as soon as

MercyMe /TCA/EPA/8-1-24                                    8

EXHIBIT 4

those Event details become available from time to time during the Term so that Professional and Nonprofit may remain compliant under State Rules. The Event Details known as of the date hereof and all other events comprising Professional's Public Platform during the Term of the Agreement (whether or not added to the Itinerary) shall be deemed, collectively, the "Tour."

(f)     Notwithstanding anything to the contrary contained in this Agreement, if it is determined that Client must deem Professional an "employee" of Client in order for Client and Professional to be in compliance with the State Rules, Professional hereby accepts such designation for (*and only for*) the purpose of compliance with the State Rules. In connection therewith, Professional understands that (among other things) Client may be required to withhold taxes from all amounts payable to Professional under or pursuant to this Agreement, and Professional hereby consents to such withholding of taxes in such case. Professional further agrees to take any other action deemed necessary by Client to verify Professional's status as an "employee" for the purpose of complying with State Rules *only*. Any change of Professional's status to an "employee" for compliance with the State Rules shall not otherwise affect the nature of the relationship between Client and Professional which, in all other respects, shall remain that of independent contractors with respect to each other. Accordingly, Client shall not be liable for the acts or omissions of Professional in any manner whatsoever. For the avoidance of doubt, Client agrees to notify Professional wherever and whenever such "employee" designation (if ever) is required, and Client shall advise Professional in advance of any withholdings required by this Paragraph 7(f) so that Professional and its accountants shall have the opportunity to prepare and plan accordingly.

(g)     Professional's compliance with all of the terms and conditions of this Paragraph 7 is a material condition of this Agreement.

8.     Marketing

Professional agrees to be available for (and to approve and consent to) appropriate video and/or photo shoots (if requested by the Nonprofits) to be incorporated into Nonprofit's marketing materials and otherwise for the purpose of facilitating sponsorships and the mission of the Nonprofit. If deemed necessary by the Nonprofits, Professional also agrees to be available to travel (at Nonprofit's expense) to a location selected by the Nonprofit and subject to Professional's reasonable approval (not be unreasonably withheld), for a minimum of two (2) days on-site in order to become more familiar with the Nonprofit's mission, and to permit the filming, recording and/or other capturing of Professional's participation in connection therewith for *gratis* use in the Nonprofit's marketing materials and otherwise for the purpose of facilitating sponsorships and the mission of the Nonprofit.

9.     Warranties; Suspension; Termination

(a)     Professional warrants, represents, covenants, and agrees that Professional has the right and power to enter into this Agreement, to grant the rights herein granted by Professional, to perform the services agreed to be performed by Professional hereunder, and to be available as described herein. Professional further warrants, represents, covenants, and agrees, during the Term, to fulfill its obligations diligently, competently, and to the best of Professional's ability. Client warrants,

MercyMe /TCA/EPA/8-1-24                    9

EXHIBIT 4

represents, covenants, and agrees that Client has the right and power to enter into this Agreement, to grant the rights herein granted by Client, to perform the services agreed to be performed by Client hereunder. Client further warrants, represents, covenants, and agrees, during the Term, to fulfill its obligations diligently, competently, and to the best of Client's ability.

(b)     [intentionally deleted without implication]

(c)     During the Term hereof, Professional shall not enter into any agreement that would interfere with the full and prompt performance of Professional's obligations hereunder, and Professional shall not make Professional's Public Platform available to promote and assist any party other than Client in connection with securing child, family, community, victim, or similar charitable sponsors for Nonprofits.

(d)     If at any time during the Term Professional shall commit any act or become involved in any situation or occurrence which brings Professional, the Nonprofit, and/or Client into public disrepute, contempt, scandal or ridicule or which tends to shock, insult or offend the community at large or any substantial group or class thereof, or which reflects unfavorably on Client's or the Nonprofit's reputation, then Client shall have the right (without limiting Client's other rights and remedies) to:

        (i)     Terminate this Agreement without further obligation to Professional except for Confirmed Sponsors attributable to Professional's Public Platform and credited to Client's account prior to such commission or involvement of Professional; and

        (ii)     Be reimbursed by Professional for any and all Advances paid to Professional that have not been recouped by Client from revenues derived from Professional's Public Platform prior to such commission or involvement of Professional.

(e)     If because of an act of God, inevitable accident, fire, lockout, strike, or other labor dispute, riot or civil commotion, terrorism or act of public enemy, enactment, rule, order or act of any government or government instrumentality (whether federal, state, local or foreign), failure of technical facilities, illness or incapacity of Professional (or any member thereof), or other cause of a similar or different nature not reasonably within Client's control Client determines that it is unlikely that Professional will deliver the Minimum Event Commitment hereunder in the ordinary course of business or that Client's normal business operations become otherwise commercially impractical, then without limiting Client's rights, Client shall have the option, by giving Professional notice, to suspend the Term of this Agreement for the duration of any such contingency plus such additional time as is necessary so that Client shall have no less than thirty (30) days after the cessation of such contingency in which to determine whether Client shall continue this Agreement. During any such suspension, Professional shall not make Professional's Public Platform available to promote and assist any party other than Client in connection with securing child, family, community, victim, or similar charitable sponsors for Nonprofits. In the event of a suspension owing to a "force majeure" (as opposed to a suspension specifically related to Professional), which suspension exceeds twelve (12) consecutive months, Professional may terminate this Agreement upon thirty (30) days written notice to Client, but only if such "force majeure" is not lifted within ten (10) days of Client's receipt of the written notice.

MercyMe /TCA/EPA/8-1-24                    10

EXHIBIT 4

10.     Indemnification

Professional and Client each agree to indemnify the other and save and hold the other harmless from any and all claims, damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorneys' fees) arising out of or connected with any claim, demand or action which is inconsistent with any of the warranties, representations, covenants or agreements which either party has each made in this Agreement, and professional and Client agree to reimburse each other on demand for any payment made or incurred by either of them with respect to the foregoing, provided the claim concerned has been settled (with the indemnitor's consent) or has resulted in a final non-appealable judgment against the other or its licensees.  Pending the determination and settlement of any such claim, demand or action, or if Professional shall otherwise fail to faithfully perform all of the material terms and conditions hereof, Client shall have the right at Client's election, to withhold in an interest bearing account payment to Professional of any monies (including the Confirmed Sponsor Rate and the World Vision Sponsor Rate) otherwise payable to Professional under this Agreement in an amount reasonably related to that claim, demand or action and Client's estimated costs and expenses (including legal costs and reasonable attorneys' fees) in connection therewith [or, if such withholding by Client is a result of Professional's failure to faithfully perform all of the material terms and conditions hereof, Client may withhold all amounts otherwise due and owing to Professional hereunder], unless Professional has made bonding arrangements satisfactory to Client that assure Client of reimbursement for all damages, liabilities, costs and expenses (including legal costs and reasonable attorneys' fees) which Client may incur as a result of that claim or Professional's failure of performance.  Client agrees to release any monies withheld if for one (1) full year following such withholding no action is commenced on any claim concerned or no settlement discussions have taken place and no further demand has been made on said claim.  Client shall promptly notify Professional of any action commenced on such a claim, and Professional may participate in the defense of any such claim through counsel of Professional's sole choosing and at Professional's sole expense, subject to Client's right to control the defense of such claim.

11.     Notices

The respective addresses of Client and Professional for all purposes hereunder are set forth on the first page of this Agreement, unless and until notice of a different address is received by the party notified of that different address.  All notices shall be in writing and shall either be served by personal delivery (to an officer of Client if to Client), by certified or registered mail (return receipt requested), by telegraph or by overnight or local courier, in each case with all charges prepaid. Notices shall be deemed effective when personally delivered, mailed or delivered to a telegraph office, all charges prepaid, except for notices of change of address, which shall be effective only when received by the party notified.  A copy of each notice to us shall be simultaneously sent to The Law Office of Kevin S. Kookogey, ATTN: Kevin S. Kookogey, 7106 Crossroads Blvd., Suite 215, Brentwood, TN  37027. A copy of each notice to Professional shall be simultaneously sent to Mr. Scott Brickell, Brickhouse Entertainment, 106 Mission Court, Suite 1202, Franklin, TN 37067. The failure to send courtesy copies shall not be deemed a breach of this Agreement.

EXHIBIT 4

12. <u>Assignment</u>

Client may, at Client's election, assign this Agreement or any of Client's rights hereunder or delegate any of Client's obligations hereunder, in whole or in part, for any reason, including, without limitation, to any person, firm or corporation owning or acquiring all or a substantial portion of Client's stock or assets, to any person, firm or corporation that is related to Client as an affiliate, subsidiary or otherwise, or to any person, firm or corporation into which or with which Client might merge or consolidate. Professional may not delegate any of Professional's obligations or assign any of Professional's rights hereunder, except that Professional shall have the right, at Professional's election, to assign Professional's right to receive payment of Advances and Confirmed Sponsor Rates hereunder to no more than one (1) then-current assignee thereof which is identified to Client in an appropriate letter of direction signed by Professional. Any assignee of amounts otherwise payable directly to Professional hereunder shall not be a third-party beneficiary of this Agreement and shall have no right under this Agreement or otherwise to commence or prosecute any claim, demand or action against us as a result of Client's payment or failure to pay any amounts to that assignee.

13. <u>Unique Services</u>

Professional expressly acknowledges that Professional's services hereunder, as well as the rights and privileges granted to Client hereunder, are of special, unique, and intellectual character which gives them peculiar value, and that in the event of a breach by Professional of any term, condition, or covenant hereof, Client will be caused irreparable injury. Professional expressly agrees that in the event Professional shall breach any provision of this Agreement, Client shall be entitled to seek injunctive relief and/or damages, as Client may deem appropriate, in addition to any other rights or remedies available to Client, and Client shall have the right to recoup any such damages resulting from any such breach from any monies which may be payable to Professional under this Agreement.

14. <u>Failure of Performance</u>

(a) Except with respect to the exclusivity provisions hereof or any judicially established fraud (for which there shall be no cure period), the failure by either Client or Professional to perform any of their respective obligations hereunder shall not be deemed a breach of this Agreement unless the party claiming breach gives the other party written notice of such failure to perform and such failure is not corrected within thirty (30) days [or, with respect to payment defaults, ten (10) days] from and after the receipt of such notice, or, if such breach is not reasonably capable of being cured within such thirty (30) day [or, with respect to payment defaults, ten (10) day] period, the party receiving notice does not commence to cure such breach within such thirty (30) day [or, with respect to payment defaults, ten (10) day] period and proceed with reasonable diligence to complete the curing of such breach thereafter.

(b) Notwithstanding the foregoing, each of the following shall constitute an event of default which shall (without limiting Client's other rights and remedies) entitle Client to terminate the term of this Agreement immediately following (and without giving Professional an opportunity to cure) the occurrence of any such event:

MercyMe /TCA/EPA/8-1-24       12

EXHIBIT 4

(i)     If Professional commences a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or if Professional consents to the entry of any order for relief in any involuntary case under such law, or if Professional consents to the appointment of or taking possession by a receiver, liquidator, assignee, trustee or sequestrator (or similar appointee) of Professional or any substantial part of Professional's property, or if Professional makes an assignment for the benefit of creditors or takes any act (whether corporate or otherwise) in furtherance of any of the foregoing;

(ii)    If a court having jurisdiction over Professional's affairs or property enters a decree or order for relief with respect to Professional or any of Professional's property in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or if such a court appoints a receiver, liquidator, assignee, custodian, trustee or sequestrator (or similar appointee) of Professional or for any substantial part of Professional's property or orders the winding up or liquidation of Professional's affairs and such decree or order remains unstayed and in effect for a period of sixty (60) consecutive days.

14A.   Key Man

Subject to the cure provisions described in Paragraph 14(a) of this Agreement, Professional shall have the right to terminate this Agreement and to retain all monies theretofore paid to Professional by Client, if Troy Collins shall at any time during the Term cease to be actively involved in Client's operations other than for reasons of death, disability, or moral turpitude.

15.    Insurance; Indemnification

Professional and Client shall each be responsible for (and each hereby agrees to indemnify and hold the other harmless from and against) any and all claims, damages, and liability arising from its own negligent or intentional acts or omissions relating to this Agreement and/or the Sponsorship. Professional and Client shall each maintain appropriate and adequate insurance coverage for their respective exposures arising from and pertaining to this Agreement and the Sponsorship, with each party naming the other (and the Nonprofit) as additional insureds on all such insurance policies. Upon request, Professional and Client shall promptly provide each other with copies of all applicable Certificates of Insurance detailing the coverages described above.

16.    Independent Contractors

Professional and Client are independent contractors with respect to each other, and neither Professional, Client, nor any of their respective employees or subcontractors are or shall be deemed employees, agents, representatives, partners, or joint ventures of the other. Professional further agrees and represents that this Agreement does not create a partnership between the parties hereto, and that Professional is solely responsible for paying its own taxes of any nature whatsoever arising from or relating to this Agreement and the Sponsorship.

EXHIBIT 4

17.     Miscellaneous

This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and cannot be changed or terminated except by an instrument signed by the party to be bound. A waiver by either party of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations, and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party. If any part of this Agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, the remainder of this Agreement shall remain in full force and effect. This Agreement has been entered into in the State of Tennessee and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of Tennessee applicable to contracts entered into and performed entirely within the State of Tennessee.  The venue for any controversy or claim arising out of or relating to this Agreement or breach thereof, shall be the appropriate state and federal courts located in Davidson or Williamson County, Tennessee. Accordingly, Client and Professional each submit to the jurisdiction of such courts.  Any process in any action or proceeding arising out of or relating to any such claim, dispute or disagreement may, among other methods, be served upon Client or Professional by delivering or by mailing the same via registered or certified mail to the addresses contained herein. The prevailing party in any such dispute arising hereunder shall be entitled to recover from the other party its reasonable attorneys' fees in connection therewith in addition to the costs thereof. Professional has been represented by independent legal counsel or has had the unrestricted opportunity to be represented by independent legal counsel of its choice for purposes of advising Professional in connection with the execution of this Agreement.  If Professional has not been represented by independent legal counsel of Professional's choice in connection with this Agreement, Professional acknowledges and agrees that its failure to be represented by independent legal counsel in connection with this Agreement was determined solely by Professional. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original (including facsimile signatures), but all of which together shall constitute but one and the same instrument.

18.     Side Letters for Compliance Filings

Upon Client's request from time to time during the Term, Professional agrees to execute side letters and/or similar short form agreements prepared by Client and summarizing the financial terms of this Agreement (the "Side Letters") so that Client may submit to the applicable jurisdictions such Side Letters in lieu of this Agreement in order to evidence the engagement of Professional for the purposes and consideration set forth herein without disclosing other confidential information.

[signatures next page]

EXHIBIT 4

Sincerely,
Thriving Children Advocates, LLC

By:_____
   An authorized signatory

ACCEPTED AND AGREED:
MercyMe, Inc.

By:_____
   An authorized signatory

And personally and individually:

_____
Bart Millard

_____
Robby Shaffer

_____
Nathan Cochran

_____
Mike Scheuchzer

MercyMe /TCA/EPA/8-1-24                    15

EXHIBIT 4

Schedule A

In furtherance of that Professional Services Agreement between Thriving Children Advocates, LLC ("Client") *and* Bart Millard, Robby Shaffer, Nathan Cochran, and Mike Scheuchzer, individually, and by an authorized representative of MercyMe, Inc., ("Professional") dated as of August 1, 2024, and to which this *Schedule A* is attached (the "Agreement"), Professional hereby agrees:

(a)     Professional shall allow for a "main" appeal for up to fifteen (15) minutes, followed immediately by a five (5) minute uninterrupted "packet pass" at **each** event comprising Professional's Public Platform.  During this appeal, house lights MUST be down. This slot shall include an intermission following the conclusion of the appeal.

(b)     No work shall take place on stage during the appeal, unless a curtain of some kind is used to conceal the work.  In the event a curtain is used, all best efforts shall be made to minimize any noise that may occur backstage.

(c)     During the main appeal, if the location has video equipment, video messaging will be used, at the direction of the Client and subject to Professional's reasonable creative approval.

(d)     Professional shall meet or provide Client's requirements for exhibit space o/b/o the Nonprofit, including, (without limitation, and at no charge), well-lighted space for presentation tables, chairs for staff, and electrical service.

(e)     Professional shall supply credentials for Client's representatives and staff

(f)     Professional shall assure entrance and access to the venue prior to show-time for all volunteers provided by Client and/or Nonprofit so that these volunteers may receive the requisite training for the event.

(g)     N/A

(h)     Professional shall make available catering and a shared crew dressing room with showers (or an equivalent hotel room if same is provided for Professional's crew) at all events for Client's staff. When available, a dedicated private room for the designated speaker in order to allow sufficient opportunity for the speaker to prepare for the appeal.

(i)     Professional shall make available ground transportation and dedicated tour bus bunk space for two (2) Client personnel (speaker + table representative) whenever Professional is employing ground transportation, it being understood and agreed that airfares for Client personnel, where required, shall be the responsibility of Client.

(j)     Entrance and access to the venue two (2) hours prior to show-time for all volunteers provided by Client and/or Nonprofit so that these volunteers may receive the requisite training for the event.

MercyMe /TCA/EPA/8-1-24                    16