## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

THRIVING CHILDREN ADVOCATES,
LLC, et al.,

        Plaintiffs,

        v.

WATERLAND PRIVATE EQUITY
INVESTMENTS, B.V., et al.,

        Defendants.

Case No. 3:26-cv-00484

District Judge Crenshaw

Magistrate Judge Frensley

## MEMORANDUM IN SUPPORT OF DEFENDANT WORLD VISION'S
## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

**TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 2

LEGAL STANDARD................................................................................................. 5

ARGUMENT............................................................................................................... 6

I. Plaintiffs fail to plead with specificity. ........................................................ 6

II. Plaintiffs fail to plausibly allege multiple elements of their antitrust claims. ................... 7

    A. Plaintiffs have not adequately pleaded injury to competition or injury in fact................................................................................................. 8

    B. Plaintiffs fail to adequately plead a relevant market........................... 11

III. Each of Plaintiffs' antitrust claims fail for additional, independent reasons. .................. 12

    A. Plaintiffs' inferences of conspiracies involving World Vision under Section 1 of the Sherman Act are facially implausible............................... 12

        1. World Vision would be a victim of the alleged market allocation conspiracy. ....................................................................... 13

        2. Financing LiveCo does not make World Vision a co-conspirator........... 14

        3. The vertical agreement is facially implausible or foreclosed no one....... 14

        4. The Complaint does not state a claim for tying. ..................... 15

    B. Plaintiffs' monopolization claims fail as a matter of law. .................. 16

    C. Plaintiffs fail to state a claim as to World Vision under Clayton Act Section 7. ........................................................................................... 17

    D. All of Plaintiffs' state-law antitrust claims fail as a matter of law. ..................... 18

IV. Plaintiffs fail to state a claim for false advertising against World Vision. ..................... 18

    A. No well-pleaded factual allegations plausibly support World Vision's involvement................................................................................. 19

    B. The Complaint fails to plausibly plead proximate cause. ................... 20

    C. False advertising liability due to news articles does not extend to sources......... 21

V. Plaintiffs fail to state a tortious interference claim against World Vision....................... 21

    A. Without a valid contract, no claim lies for tortious interference with contract. ...................................................................................... 22

    B. Plaintiffs cannot allege improper motive or means as to World Vision. ............. 22

VI. Plaintiffs' state-law solicitation claims fail as a matter of law. ..................... 23

CONCLUSION.......................................................................................................... 24

i

## INTRODUCTION

This lawsuit is a meritless attack on ordinary competitive conduct dressed up in antitrust clothing. Plaintiffs—a broker that allegedly lost business to a better rival and a band whose reputation suffered from a rape allegation—ask this Court to punish World Vision, Inc. ("World Vision"), a California nonprofit charity dedicated to helping children in need, for the sin of succeeding in the marketplace after Plaintiffs walked away from their business relationship.

In 2019, Plaintiff Thriving Children Advocates, LLC ("TCA") terminated its relationship with World Vision "acrimoniously" because TCA feared World Vision had become a competitor. World Vision then did what any rational actor would: it found other parties to support its charitable mission, by securing sponsorships at Christian Contemporary Music concerts. That is competition, not conspiracy.

Having lost business to a more efficient model, Plaintiffs now fabricate an elaborate antitrust scheme spanning four broad categories of claims and thirty-three defendants. But their 632-paragraph Complaint crumbles under the weight of its own implausibility. Plaintiffs allege no facts showing market power, no facts demonstrating anticompetitive foreclosure, and no facts establishing that World Vision participated as a competitor in the very market Plaintiffs claim was monopolized. Any arrangement between World Vision and concert promoters is a *vertical* relationship governed by the rule of reason, not a per se antitrust violation. And the rule of reason torpedoes Plaintiffs' antitrust claims against World Vision.

Plaintiffs' remaining claims fare no better. Their Lanham Act false-advertising claim rests entirely on "information and belief" that World Vision somehow "circulated" a news article reporting a rape allegation. But the article was written by independent journalists, and no facts allege World Vision provided sourcing for the article, was in touch with the alleged primary source, knew the content of the article was false, or was even aware of the content of the article. Plaintiffs' state-

1

law tortious interference claims collapse because Plaintiffs cannot establish the tort's defining element of improper means or motive. Finally, Plaintiffs lack standing to bring a claim under the Tennessee Charitable Solicitations Act because they allege no qualifying solicitations or that any Plaintiffs suffered a loss of money or property attributable to the alleged violation.

For these reasons, discussed more fully below, all claims against World Vision should be dismissed with prejudice.

## BACKGROUND[1]

Plaintiffs are participants in the Contemporary Christian Music ("CCM") industry. TCA negotiates deals between CCM artists and charities seeking opportunities to solicit CCM concert attendees to sponsor the charity's nonprofit work. Wesley Campbell is the founder of both TCA and CCM band the Newsboys, a co-Plaintiff.

Defendants fall into four categories. The first are TCA's competitors. These CCM promoters began pursuing the deals TCA says it pioneered. These Defendants include LiveCo and related entities (the "LiveCo Defendants"[2]). The second group consists of MercyMe and Micah Tyler, two CCM acts that rival the Newsboys, and related entities. The third are two journalists and their news publication (the "Journalist Defendants"). Finally, the Complaint names World Vision, a nonprofit charity that provides emergency relief, economic support, and healthcare in the developing world.

---

[1] World Vision accepts, as it must, the allegations in the Complaint as true for purposes of this motion to dismiss. World Vision does not concede or admit that the allegations in the Complaint have any factual or legal merit.

[2] Defendants that comprise this group are Waterland Private Equity Investments, B.V., Waterland Private Equity Aps, Waterland Holdings LLC, Christian Lund Madsen, Nichlas Guldberg, US Live OpCo, Inc., USLive, LLC, USLive Holding, LLC, Brian Becker, TPR Entertainment, LLC, Premeir Productions Holdings, LLC, Michael Pugh, Shane Quick, USLive Rush, LLC, Rush Concerts, Ltd., Jacob Reiser, USLive Transparent, LLC, Transparent Productions, LLC, Transparent Productions LLC, and Timothy Taber.

2

World Vision's connection to the claims stem from its solicitations of attendees at some CCM concerts for sponsorships of children in the developing world.

World Vision and TCA had a prior business relationship. Compl. ¶ 120. Starting in 2017, TCA says it contracted with World Vision to purchase the rights to solicit sponsors at certain CCM concerts. *Id.* ¶ 121. TCA terminated the relationship in 2019, which the Complaint characterizes as a "termination that was not friendly" and having marked an "acrimonious[ ]" end to any relationship between the organizations. *Id.* ¶¶ 121–22. TCA alleges it insisted on the breakup because World Vision "had also set up its own internal department to directly solicit artists' [audiences at concerts], making itself, [sic] both a customer and competitor of TCA." *Id.* ¶ 121.

The cruxes of Plaintiffs' allegations are consolidation in the promotion market and an alleged conspiracy to destroy the Newsboys. The only factual allegations involving World Vision are listed in the chart below. All but the most innocuous rest entirely on speculation or information and belief.

| Allegation | Purported Source |
|---|---|
| TCA contracted with World Vision on June 30, 2017, employing TCA's models. *See* Compl. ¶ 121. | Knowledge |
| World Vision set up an internal department to solicit artists' Platforms, competing with TCA. *See id.* | Knowledge (no identifiable source) |
| TCA ended its relationship with World Vision acrimoniously on October 24, 2019. *Id.* ¶¶ 121–22. | Knowledge |
| World Vision entered into an exclusive or partially exclusive agreement with the LiveCo Defendants around 2023. *Id.* ¶ 266. | Knowledge (no identifiable source) |
| Defendant Jacob Reiser, the owner of one of LiveCo's predecessor companies, stated in April 2023 that World Vision paid the LiveCo Defendants more than $500 per sponsorship raised. *Id.* ¶¶ 153, 206. | Knowledge |
| At some point during 2024, CCM artists Tauren Wells and Danny Goken breached their contracts with TCA and began touring under LiveCo, with World Vision sponsoring those concerts. *Id.* ¶¶ 160–161, 190–91. | Knowledge |

| Allegation | Purported Source |
|---|---|
| World Vision agreed in August 2024 to advance funds to the LiveCo Defendants to be used as a guaranteed payment to MercyMe should it decide to forgo TCA-arranged nonprofit solicitations. *id*. ¶¶ 20, 209. | Information and belief |
| To remove Plaintiffs from the product markets alleged, World Vision and the LiveCo Defendants began to search for facts that could harm Mr. Campbell's reputation, finding Nicole, a pseudonymous former Newsboys employee. *Id*. ¶¶ 4 n.1, 23, 27, 29. | Knowledge (no identifiable source) |
| World Vision communicated with the LiveCo Defendants, who were then exploring an acquisition of TCA, resulting in the LiveCo Defendants deciding not to execute the Purchase Agreement with TCA and not to transact any business with TCA. *Id*. ¶¶ 584–86. | Information and belief |
| World Vision advised the LiveCo Defendants that if the deal were consummated, TCA would prohibit the LiveCo Defendants from selling the rights for charities to solicit sponsors at concerts LiveCo promoted. *Id*. ¶ 587. | Information and belief |
| World Vision and the LiveCo Defendants used an allegedly defamatory article as a lever to remove TCA from the alleged product markets. *Id*. ¶ 196. | Information and belief |
| World Vision and the LiveCo Defendants propagated and circulated the allegedly defamatory article or its contents to MercyMe to convince the band to breach its August 2024 contract with TCA. *Id*. ¶ 211. The article resulted in the LiveCo Defendants no longer promoting the Newsboys. *Id*. ¶ 154. | Knowledge (no identifiable source) |

In sum, Plaintiffs allege that World Vision, after being spurned by TCA (Compl. ¶ 121), purchased the right to solicit audiences at certain LiveCo-promoted shows (*id*. ¶¶ 121, 554), financed LiveCo's acquisition of promotion rights to MercyMe (*id.* ¶¶ 20, 209), and shared insight into TCA with LiveCo while LiveCo and TCA discussed a merger (*id*. ¶ 587). Based on these allegations, Plaintiffs bring claims against World Vision for (1) market and customer allocations in violation of Sherman Act Section 1 and the Tennessee Antitrust Act (*id*. §§ V.L, VI); (2) a group boycott of the Newsboys, TCA, and TCA-affiliated groups in violation of the same (*id*. §§ V.M, VI); (3) monopolization of both alleged markets in violation of Section 7 of the Clayton Act and the Tennessee Antitrust Act (*id*. § V.I, V.J); (4) false commercial advertising and promotion in

4

violation of the Lanham Act (*id*. § X); (5) tortious interference with TCA's contract (*id*. § XIII); (6) tortious interference with prospective contractual and business relations (*id*.); and (7) violations of Tennessee's statute regulating soliciting charitable funds (*id*. XVI).

Plaintiffs allege two "distinct" (*id*. ¶ 24) product markets: the CCM Touring market (*id*. ¶¶ 220–30), and the Nonprofit Sponsorship ("NPS") market (*id*. ¶¶ 231–41). Plaintiffs define the CCM Touring market as live, in-person CCM performances in multi-city tours. *Id*. ¶¶ 221, 226–228. Participants include CCM artists, who sell the right to promote their tours (*id*. ¶¶ 219, 232), and promoters such as LiveCo, who purchase the right to organize the tours and profit or bear losses based on those tours' earnings (*id*. ¶¶ 100–03). World Vision does not participate in this market. The alleged NPS market is where CCM artists, their promoters, or brokers such as TCA sell to charities the right to solicit concertgoers for sponsorships. *Id*. ¶ 238. The Complaint asserts these markets are coextensive, such that live, touring CCM shows constitute a discrete advertising platform for charities distinct from other platforms. *Id*. ¶ 239.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests whether a complaint adequately states a claim entitling the plaintiff to relief. *See, e.g.*, *Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001). A complaint will be dismissed when the facts alleged are legally insufficient to support the relief sought. *See e.g.*, *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805–10 (6th Cir. 1988); *Sharp v. Rainey*, 910 F. Supp. 394, 395–96 (E.D. Tenn. 1996). Although, for purposes of this motion, the Court accepts the truth of the Complaint's well-pleaded factual allegations, the Court does *not* accept as true legal conclusions or unwarranted, unreasonable, or implausible factual inferences and allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *Gean v. Hattaway*, 330 F.3d 758, 765 (6th Cir. 2003). Courts are particularly "wary of accepting uncritically the plaintiffs' theories of how federal law applies to the asserted facts." *Gean*, 330

5

F.3d 765; *see Kensu v. Corizon, Inc.*, 5 F.4th 646, 649, 651, 653 (6th Cir. 2021). Indeed, given the costs and burdens of discovery inherent in antitrust actions, courts are especially rigorous in ensuring antitrust plaintiffs have offered "the price of entry"—that is, "alleg[ing] a factual predicate concrete enough to warrant further proceedings." *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 530 (6th Cir. 2001) (citation omitted).

**ARGUMENT**

**I.      Plaintiffs fail to plead with specificity.**

Factual allegations must be plausible and the Court "need not accept as true legal conclusions or unwarranted factual inferences." *Gean*, 330 F.3d at 765 (citation omitted). In addition, allegations that fail to reasonably identify the defendant they apply to must be disregarded. *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 596–97 (6th Cir. 2012). The same is true for allegations that fail to connect specific facts to the specific cause of action they concern. *See Arnold v. CooperSurgical, Inc.*, 681 F. Supp. 3d 803, 824 (S.D. Ohio 2023). Because "proceeding to antitrust discovery can be expensive," the Supreme Court has cautioned that "a district court must retain the power to insist on some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (citation omitted); *see also Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 458 F. Supp. 2d 474, 485 (E.D. Mich. 2006), *aff'd*, 524 F.3d 726 (6th Cir. 2008).

The Complaint spans 632 paragraphs, nearly 300 pages, and 33 defendants. On 13 occasions, it purports to incorporate not only the preceding paragraphs but also all of the following paragraphs, adding to the confusion over which of the sprawling, often contradictory allegations are connected to which Defendant or to the more than a dozen legal claims asserted. Such a complaint typifies the kind of harm that motivates the rule against pleading allegations generally across multiple defendants. *See Marcilis*, 693 F.3d at 596–97; *Mich. Cemetery Ass'n*, 458 F. Supp. at 485.

6

**II.    Plaintiffs fail to plausibly allege multiple elements of their antitrust claims.**

World Vision does not compete with LiveCo or any other Defendant in any relevant market. *See* Compl. ¶ 5 (defining World Vision as a "charity" that, among other things, purchases the right to solicit concertgoers for sponsorships); *id.* ¶ 68; *see id.* ¶¶ 47–68 (defining the LiveCo Defendants as "faith-based concert promot[ers]" and related personnel). Any agreements World Vision allegedly entered into are thus vertical. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.4 (1988) (non-competitors' restraints are vertical regardless of whether any alleged anticompetitive effects are horizontal), *modified on other grounds by Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007). Antitrust laws impose no prohibition per se on such agreements. In other words, "[o]nly a group boycott through horizontal agreement can constitute a per se violation." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 (6th Cir. 2008).

The legality of vertical restraints is evaluated using the rule of reason. *See Leegin*, 551 U.S. at 898; *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 272 (6th Cir. 2014). To state a *prima facie* case for an antitrust violation under the rule of reason, a plaintiff must allege "(1) that the defendants contracted, combined, or conspired; (2) that the scheme produced anticompetitive effects; (3) that the restraint affected relevant product and geographic markets; (4) that the object of the scheme and the conduct resulting from it was illegal; and (5) that the scheme was a proximate cause of the plaintiff's antitrust injury." *Expert Masonry, Inc. v. Boone Cty.*, 440 F.3d 336, 343 (6th Cir. 2006); *see also Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 969 (W.D. Tenn. 2004) ("A plaintiff must first define the relevant market in order to state a claim under the antitrust statutes[.]"); *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) (requiring market definition); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) (requiring substantial foreclosure).

7

**A.      Plaintiffs have not adequately pleaded injury to competition or injury in fact.**

"An antitrust claimant must show more than merely an 'injury causally linked' to a competitive practice; it 'must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). In other words, to state a claim under any antitrust law, a plaintiff must plead the violation did not merely harm a competitor, but harmed competition itself. *See Expert Masonry*, 440 F.3d at 348. A plaintiff cannot base antitrust standing upon an injury that, "although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation." *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 616 (6th Cir. 2001) (citation omitted).

Plaintiffs assert, albeit in a threadbare and speculative manner, four claims implicating World Vision: (1) World Vision was a partner in the LiveCo Defendants' search for and distribution of information regarding the rape allegation (Compl. ¶¶ 4 n.1, 23, 27, 29); (2) World Vision persuaded the LiveCo Defendants not to acquire TCA (*id.* ¶¶ 584–86); (3) World Vision withheld its business in a group boycott enforced by the rape accusation (*id.* ¶¶ 337); and (4) pursuant to an alleged agreement between it and LiveCo (the "Vertical Agreement"), World Vision withheld business from TCA (*id.* ¶ 15). Three of these alleged injuries do not give rise to the requisite injury to *competition*. The fourth doesn't plead an injury to Plaintiffs.

First, even if World Vision's purported involvement in the search for harmful information about Plaintiffs were true, the Complaint pleads no resulting injury to competition in a relevant market. The only injury alleged is to Plaintiffs and "flows directly from conduct"—alleged defamation—"that is not itself an antitrust violation." *Watkins*, 254 F.3d at 616 (citation omitted).

Second, consider the allegation that World Vision persuaded the LiveCo Defendants not to acquire TCA, apparently using facts the charity intuited about how TCA would operate post-merger. Compl. ¶¶ 584–87. The Complaint does not allege that World Vision conditioned anything on its counsel regarding the proposed acquisition, nor any well-pleaded facts that could elevate World Vision's mere communications to a restraint of trade. Accordingly, antitrust laws do not prohibit the complained-of conduct.

Third is the alleged boycott of Plaintiffs. Nothing in the Complaint states that Plaintiffs either sought or desired business from World Vision during the alleged boycott period, making it impossible for World Vision to boycott them in any meaningful way. Indeed, the allegation is baseless given the assertion that TCA (the sister and parent company of its co-Plaintiffs) effectively boycotted World Vision first, forcing the charity to look for others to provide advertising platforms. Thus, World Vision purchasing solicitation rights from Plaintiffs' competitors cannot give rise to a cognizable harm to Plaintiffs, let alone to *competition*.

Finally, consider the Vertical Agreement, which Plaintiffs characterize as conferring either exclusive or partially exclusive rights between World Vision and the LiveCo Defendants. *See* Compl. ¶ 15. To plead actual injury due to exclusive dealing, a claimant must plausibly allege it was foreclosed from the market. *In re EpiPen Antitrust Litig.*, 44 F.4th 959, 986 (10th Cir. 2022); *Untracht v. Fikri*, 454 F. Supp. 2d 289, 309 (W.D. Pa. 2006) (plaintiff who "was not, in fact, shut out from competing in the market" lacks antitrust standing), *aff'd*, 249 F. App'x 268 (3d Cir. 2007). With respect to World Vision, the relevant market is the alleged NPS market. Plaintiffs do not clarify which side of the market was exclusive or partially exclusive. According to their vague allegation, either World Vision could have been prohibited from acquiring the right to solicit audiences at concerts not promoted by LiveCo, or LiveCo could have been prohibited from selling

solicitation rights at its concerts to anyone but World Vision. Either way, the Vertical Agreement cannot give rise to an injury to *Plaintiffs*. If the Vertical Agreement prohibited World Vision from acquiring solicitation rights for non-LiveCo concerts, such a prohibition would not harm Plaintiffs who had previously decided they would not sell to World Vision. If the exclusivity went the other way, charities other than World Vision who wanted to purchase rights might have been foreclosed due to new "barriers to entry into the NPS Market" impeding entrants from "gain[ing] access" to audiences at LiveCo's CCM shows. Compl. ¶ 302. But no Plaintiff is a charity and, therefore, no Plaintiff could have been injured by such a foreclosure.

Even if Plaintiffs were somehow able to cure these deficiencies, their claims of injury due to the Vertical Agreement would still fail on two independent bases. First, Plaintiffs fail to allege that the Vertical Agreement foreclosed any particular share of the NPS market—much less the requisite "substantial share." *Nashville Coal*, 365 U.S. at 327–28 (1961); *see Barr Labs., Inc.*, 978 F. 2d at 110–11. And second, as detailed *infra* in Section III.A.3, Plaintiffs' bare and self-serving allegation that the Vertical Agreement was exclusive is entirely implausible.

To the contrary, the allegations demonstrate that World Vision's actions are procompetitive. World Vision's only role in either of the markets alleged is as a buyer in the purported NPS market. Specifically, the Complaint alleges that World Vision agreed with the LiveCo Defendants to serve as an exclusive or partially exclusive nonprofit buyer for the solicitation of sponsorships in that market. Compl. ¶¶ 15, 169–70, 554.

Far from suppressing competition, the Vertical Agreement injected competition into a market that Plaintiffs assert lacked it. Consider Plaintiffs' characterization of the NPS market *prior to* versus *after* the Vertical Agreement: historically, charities directly paid CCM artists for the rights to solicit concertgoers. Compl. ¶ 8. Then, TCA says it "pioneered" the practice of acquiring those

rights and reselling them to nonprofits." *Id.* ¶ 238; *see id.* ¶ 9. Because "promoters did not participate," the only sellers competing with TCA were individual CCM artists who dealt with nonprofits directly. *Id.* ¶ 10. Without any significant competitor, TCA was a monopolistic buyer.

Following the Vertical Agreement, LiveCo became TCA's first major competitor. Immediately, the alleged price CCM artists could secure from nonprofits rose, with Plaintiffs alleging that World Vision agreed to pay "an *astounding* $500 (or more) for each sponsorships generated." *Id.* ¶ 15 (emphasis added); *see id.* ¶ 170 (stating that for TCA to match World Vision's offer to MercyMe would require "in excess of $500 per sponsor").

The plausible inference to draw from the NPS market's transformation is clear. By unleashing a buyer of solicitation rights that could rival TCA, the Vertical Agreement spurred competition on the purchasing side of the NPS market. Thus, there is no injury to competition.[3]

### B. Plaintiffs fail to adequately plead a relevant market.

The NPS market—the market relevant to World Vision—is not economically viable. *See Cupp*, 310 F. Supp. 2d at 969. It fails to account, as any market definition must, for reasonably interchangeable products. *See Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 961 (6th Cir. 2004). Reasonable interchangeability is "gauged by (1) the product uses, *i.e.,* whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity)." *Id*. Here, the only relevant market in which World Vision could plausibly restrain trade is the alleged NPS market, defined as charity solicitation rights only for (1) live and in-person audiences of (2) CCM artists at (3) concerts within tours. To be

---

[3] An alternate explanation is that LiveCo was a monopolistic seller in the alleged NPS market able to charge supracompetitive prices to charity sponsors such as World Vision. *See* Compl. ¶ 17. In this case, World Vision, the purchaser paying supracompetitive prices, would have been the party injured by the antitrust conspiracy, as further discussed *infra* in Section III.A.1.

economically plausible, the relevant market must be the market for charities to advertise to potential sponsors, and it must include similar marketing avenues that charities could reasonably pursue to reach similar demographics of potential donors.

Reasonable substitutes include CCM concerts outside the context of multi-city tours, churches and their congregants, TV and radio commercials (including during Christian programming), paid posts on Christian influencers' (including CCM artists') social media accounts, social media and internet-based advertising, and advertising on buses, in subways, and on billboards. Although the Complaint offers perfunctory assertions that touring CCM concerts offer a unique marketing opportunity because other avenues are "less effective," those allegations fail. Crucially, they misunderstand the standard for interchangeability, which by no means requires fungibility. *Id*. ("The Supreme Court has repeatedly held that it is improper to require products be fungible to be considered in the relevant market."). Second, the self-serving allegations are entirely bare and conclusory and as such must be disregarded. *Crane & Shovel*, 854 F.2d at 805 ("The essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal . . . ."). Without reasonable substitutes meaningfully accounted for in the relevant market, no antitrust claim can lie against World Vision.

## III. Each of Plaintiffs' antitrust claims fail for additional, independent reasons.

The Court need go no further than this to dismiss all of Plaintiffs' antitrust claims against World Vision. However, these claims also fail for other reasons.

### A. Plaintiffs' inferences of conspiracies involving World Vision under Section 1 of the Sherman Act are facially implausible.

The Sixth Circuit recognizes that the plausibility of antitrust conspiracies hinges, in large part, on whether the "inferences of conspiracy from th[e] evidence are plausible as a matter of economic theory." *Superior Prod. P'ship* v. *Gordon Auto Body Parts Co*., 784 F.3d 311, 319 (6th

Cir. 2015). Further, "[m]ore evidence is required the less plausible the charge of collusive conduct." *Id.* at 320 (citation omitted). Following *Twombly*, courts dismiss antitrust claims that allege conduct, particularly via inferences, inconsistent with sound economic logic. *See In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 725 (N.D. Ohio 2025). With respect to each of Plaintiffs' claims under Section 1 of the Sherman Act (market and customer allocations, group boycott, and product tying), Plaintiffs' characterization of World Vision as an antitrust conspirator quickly runs into incurable plausibility problems.

### 1. World Vision would be a *victim* of the alleged market allocation conspiracy.

World Vision is an ordinary purchaser in the NPS market—not a purchaser that the Complaint alleges has market power or even any particular market share. The Complaint alleges that under the Vertical Agreement, World Vision agreed to pay the LiveCo Defendants more than twice the going rate for soliciting sponsors at CCM concerts. Compl. ¶¶ 8, 15, 121. Thus, to the extent that the Vertical Agreement was not procompetitive (*see supra* Section II.A), the Complaint requires the Court to infer that the Vertical Agreement compelled World Vision to pay supracompetitive prices. The allegation World Vision would have willingly entered such an agreement is economically implausible. And it cannot be explained away by the Complaint's self-serving insinuations that World Vision desired to retaliate against TCA for the latter's decision to split with the charity. *See Lifeline, Ltd. No. II v. Conn. Gen. Life Ins. Co.*, 821 F. Supp. 1201, 1205 (E.D. Mich. 1993) (an "emotional motivation" to retaliate is not relevant to plaintiff's antitrust claim). To the extent that this anticompetitive view of the restraint is accurate, it would demonstrate that World Vision was not a willing conspirator and therefore lacks the "inten[t] to combine or conspire in restraint of trade" necessary for liability. *Mich. State Podiatry Ass'n v. Blue Cross & Blue Shield of Mich.*, 671 F. Supp. 1139, 1147 (E.D. Mich. 1987).

Ultimately, this implausibility or complete negation of the "intent" element must lead the Court to disregard the Complaint's bare and conclusory factual inferences that World Vision was a "partner" or knowing collaborator with the LiveCo Defendants in the latter's consolidation of the CCM promotion industry (Compl. ¶¶ 169, 209). *See Gordon Auto Body*, 784 F.3d at 320.

### 2. Financing LiveCo does not make World Vision a co-conspirator.

After stripping away the implausible and bare factual inferences that World Vision was a collaborator in any potentially anticompetitive conduct, the substance of the Complaint against World Vision is clear: the charity allegedly provided financing that facilitated the LiveCo Defendants' growth. Compl. ¶ 266; *see id*. ¶¶ 22, 153, 206, 209. This conduct is insufficient as a matter of law to make World Vision a co-conspirator. *Gulf States Reorganization Grp., Inc. v. Nucor Corp*., No. 1:02-CV-2600-RDP, 2009 WL 10687799, at *6 (N.D. Ala. Jan. 5, 2009) (financier that does not independently violate antitrust laws cannot be an antitrust co-conspirator); P. Areeda & H. Hovenkamp, *Antitrust Law* (2007 ed.), ¶ 1474(d)).

### 3. The vertical agreement is facially implausible or foreclosed no one.

The Complaint's vague, conclusory assertion that the Vertical Agreement was exclusive or partially exclusive (Compl. ¶ 15) allows three interpretations: (1) the agreement made World Vision the only solicitor permitted for LiveCo's shows; (2) it made LiveCo shows the only ones where World Vision could solicit sponsors; or (3) some partnership existed between LiveCo and World Vision regarding solicitations that did not exclude other charities in the NPS market. The first interpretation is put to lie by the Complaint including a marketing flyer showing a LiveCo-promoted tour during the period of the Vertical Agreement in which the soliciting charity was Children International, making it facially implausible that World Vision was LiveCo's only solicitor. *Id*. ¶ 554; *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986) (mere conclusions of unlawful conduct must give way to well-pleaded facts). The second interpretation lacks any

factual support in the Complaint. The third interpretation cannot state an antitrust claim because, by definition, a *non-exclusive* vertical agreement does not plausibly foreclose anyone. *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 387 (M.D.N.C. 2002) ("[S]ubstantial foreclosure is required in all exclusive dealing cases."), *aff'd*, 67 F. App'x 810 (4th Cir. 2003).

### 4. The Complaint does not state a claim for tying.

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992) (cleaned up). Plaintiffs bring tying claims against World Vision under Sherman Act Section 1 and Clayton Act Section 3, alleging that the LiveCo Defendants tied "access to the CCM Touring Market . . . to the artists' and thus Plaintiffs', [sic] surrender of sponsorship rights in the NPS Market." Compl. ¶ 164. Under the Sherman Act, a tying claim requires the plaintiff to plausibly allege (1) two separate products or services; (2) sufficient economic power as a seller in the tying product market; and (3) a substantial sales volume in the tied product market. *Eastman Kodak*, 504 U.S. at 462; *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1330 (6th Cir. 1983). Tying claims under the Clayton Act require the same elements except with the additional requirement that both the tied and tying products are physical "goods, wares, merchandise, or other commodities." *Bouldis*, 711 F.2d 1330; *see* 15 U.S.C. § 14.

As to World Vision, the tying claims plainly fail. Neither the tying product (access to the CCM touring market) nor the tied product (solicitation rights in the NPS market) are physical goods for which the Clayton Act imposes liability. Compl. ¶ 319. That leaves the Sherman Act. But even there, the Complaint is entirely devoid of allegations that could establish either of two necessary elements to state a tying claim: that World Vision possessed market power as a *seller* in either of the tied or tying products' relevant markets. World Vision—which neither buys nor sells

anything in the CCM market—cannot have market power in the tying product. Similarly, no allegations could support that World Vision, a *purchaser* in the NPS market, has the seller-side power required to state a tying claim. *Eastman Kodak*, 504 U.S. at 452 (for purposes of determining appreciable economic power in the tying market, "market power" is "the power to force a *purchaser* to do something that he would not do in a competitive market") (cleaned up and emphasis added); *see Beard v. Parkview Hosp*., 912 F.2d 138, 140 (6th Cir. 1990).

### B. Plaintiffs' monopolization claims fail as a matter of law.

Plaintiffs bring monopolization and attempted monopolization claims ("Monopolization Claims") against World Vision. These claims relate to the charity allegedly "financ[ing]" the LiveCo Defendants' consolidation of CCM promoters (Compl. ¶¶ 205, 314), its alleged purchase of solicitation rights for MercyMe's concerts (*id.* ¶ 209), its alleged participation in the Vertical Agreement (*id.* ¶ 204), and its alleged partnership with the LiveCo Defendants to identify and circulate the rape accusation (*id.* ¶ 211). For the reasons detailed above and briefly highlighted here, none of these theories states a plausible claim.

First, financing another party that engages in antitrust violations does not render the funder liable unless it has independently violated antitrust laws. *See supra* Section III.A.2.

Second, Plaintiffs have not alleged a plausible product market. *Supra* Section II.B. "Section 2 claims . . . must plausibly allege the existence of geographic and product markets in which the accomplished monopolist maintains monopoly power, or in which Plaintiff competes with the aspiring monopolist." *U.S. Ring Binder L.P. v. World Wide Stationery Mfg. Co*., 804 F. Supp. 2d 588, 593 (N.D. Oh. 2011). Plaintiffs have done neither. *Id*.

Third, the Complaint fails to plausibly allege that World Vision specifically intended to create a monopoly. A viable monopolization claim "require[s] that a defendant be shown to have acted with the specific intent to monopolize." *In re Microsoft Corp. Antitrust Litig*., 127 F. Supp.

16

2d 728, 730 (D. Md. 2001), *aff'd sub nom. Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002). Specific intent "signifies something more than willing, voluntary, and knowing participation in the illegal course of conduct." *Id.* at 731. In fact, a co-conspirator merely "acced[ing] to th[e] demands [of a monopolist] in order to gain advantage over their rivals in the markets in which they competed" is insufficient to state a claim. *Id.* With respect to the Monopolization Claims against World Vision, the Complaint fails to plead anything more than the conclusory allegation that the charity facilitated the LiveCo Defendants monopolizing the alleged NPS market. On its face, this allegation does not establish World Vision's intent. Further, it is implausible because it is directly against World Vision's interest as a purchaser in the NPS market to create or further entrench a monopolist seller in said market. *Supra* Section III.A.1. That Plaintiffs have failed to allege the duration of the Vertical Restraint, meaning it could expire at any time and force World Vision to renegotiate solicitation rates, further underlies the implausibility that World Vision could have the necessary intent to conspire.

>     **C.**      **Plaintiffs fail to state a claim as to World Vision under Clayton Act Section 7.**

Section 7 of the Clayton Act prohibits acquisitions that are substantially likely to lessen competition or tend to create a monopoly. 15 U.S.C. § 18. The statute's plain language limits violations to entities that "acquire" another, and the Sixth Circuit has directly confirmed liability exists only for parties that acquire part or all of another. *United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 856, 860 (6th Cir. 2005) (agreeing with lower court "that Section 7 of the Clayton Act is directed solely against the *acquirer* in a transaction" but reversing lower court's ruling for the defendant because the defendant acquired a part ownership interest in the other entity at issue). This accords with the jurisprudence in other federal courts confirming that Section 7 claims are viable only against an *acquirer*. *See, e.g.*, *Dailey v. Quality Sch. Plan, Inc.*, 380 F.2d 484, 488 (5th

Cir. 1967) (holding that "§ 7 by its terms proscribes only the acquiring corporation" and dismissing claim against acquired corporation).

The Complaint nowhere alleges that World Vision acquired any of the LiveCo Defendants or any interest therein.

### D. All of Plaintiffs' state-law antitrust claims fail as a matter of law.

The Tennessee Antitrust Act lies within the Tennessee Trade Practices Act ("TTPA"). Even if this statute could apply to any of Plaintiffs' antitrust claims, they should be dismissed as to World Vision based on the same arguments detailed above. However, the Tennessee Antitrust Act does not allow Plaintiffs to recover for an additional, independent reason. "The law is well settled that the TTPA applies only to tangible goods, not intangible services." *Bennett v. Visa U.S.A., Inc.*, 198 S.W.3d 747, 751 (Tenn. Ct. App. 2006); *see id.* at 753 ("The TTPA cannot be asserted every time product prices are influenced by anti-competitive conduct in the service industries without effectively expanding the TTPA's scope to include those service industries. Such an implicit expansion of the TTPA's scope would be in contravention of the Tennessee Supreme Court's interpretation of § 47–25–101[.]"). World Vision, as confirmed by the Complaint, is a purchaser of *services*. Indeed, neither of the alleged markets involves goods. Accordingly, the TTPA counts should be dismissed with prejudice.

### IV. Plaintiffs fail to state a claim for false advertising against World Vision.

Plaintiffs assert that a rape allegation constitutes false commercial advertising in violation of the Lanham Act. Compl. ¶ 494. To state a false advertising claim against World Vision, the Complaint must plausibly plead that (1) World Vision made a false or misleading statement of fact concerning another's product; (2) the statement actually or tends to deceive a substantial portion of the intended audience; (3) the statement is material to deceived consumer's purchasing decisions; and (4) the statement directly and proximately caused harm to Plaintiffs. *Louisiana-Pac.*

*Corp. v. James Hardie Bldg. Prods., Inc.*, 335 F. Supp. 3d 1002, 1011–15, 1018 (M.D. Tenn. 2018), *aff'd*, 928 F.3d 514 (6th Cir. 2019); *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 411–12 (6th Cir. 2024).

> **A.** **No well-pleaded factual allegations plausibly support World Vision's involvement.**

With the exception of allegations identifying the conduct of Nicole, the alleged rape victim and accuser (*see, e.g.*, Compl. ¶¶ 426–28), the conduct of the journalists who wrote about the alleged rape, and the conduct of a group of so-called "Defamation Defendants" from which World Vision is expressly excluded (*id.* ¶ 2), Plaintiffs plead each of their false advertising-related claims generally across all 33 Defendants. *See, e.g.*, *id.* ¶¶ 493–94, 596–503. This imprecision leaves World Vision without fair notice and requires the Court to disregard the general allegations. *See supra* Section I.

Doing so leaves no plausible, well-pleaded factual allegations implicating World Vision. Indeed, no allegations indicate that World Vision tracked down Nicole, ever communicated with her, ever communicated with the journalists who reported her rape accusation, or had reason to believe that any statements in the article were false. Rather, the only allegations that World Vision played any role in the dissemination of the rape accusation are the following:

- Upon information and belief, World Vision, in connection with the LiveCo Defendants, used an allegedly defamatory article as a lever to remove TCA from the alleged product markets. Compl. ¶ 196.

- World Vision, in connection with the LiveCo Defendants, propagated and "around 2025" circulated the allegedly defamatory article or its contents to MercyMe to convince the band to breach its August 2024 contract with TCA. *Id.* ¶ 211.

- "Because of the partnership/joint venture arrangements which had been entered between the [LiveCo] Defendants and World Vision, World Vision is responsible for each, and every statement and act undertaken by the [LiveCo] Defendants, as they were taken in furtherance of their partnership." *Id.* ¶ 492.

The first two allegations are speculative, bare, and conclusory. Both allegations fail to inform the reader as to how World Vision "used" the article to remove TCA from the alleged NPS market, or how World Vision "propagated and . . . circulat[ed]" the article. Thus, they should be disregarded. And the third allegation, an unsupported legal conclusion that purports to sweep across the entire vast Complaint, confirms what Plaintiffs meant when they named World Vision: World Vision's inclusion simply reflects Plaintiffs' implausible speculation that any allegation describing the LiveCo Defendants somehow also implicates World Vision.

None of these allegations come close to meeting the plausibility standard. *See Twombly*, 550 U.S. at 558; *Gordon Auto Body*, 784 F.3d at 320.

**B.     The Complaint fails to plausibly plead proximate cause.**

To state a viable false advertising claim against World Vision, Plaintiffs must plausibly allege the charity proximately caused harm to them. *Campfield*, 91 F.4th at 411–12. Two intervening causes break any chain of causation Plaintiffs might attempt to construct. Nicole's conduct is one. Nicole was the alleged source of the rape accusation and all details related to it, which she shared with the Journalist Defendants; and no allegations indicate World Vision was in any contact with her such that it could coach her. The Journalist Defendants are the other intervening cause. They worked for a noted publication completely unaffiliated with World Vision or any other Defendant. As journalists, they had ethical duties to investigate the claims Nicole shared with them prior to publishing the articles about the rape.

Even if Plaintiffs were able to prove the rape accusation to be false or misleading, Nicole's tortious conduct in telling a defamatory lie and the journalists' negligence or libel would each constitute an intervening cause, severing the chain of causation twice over.

20

### C. False advertising liability due to news articles does not extend to sources.

Courts in the Sixth Circuit have clarified that false advertising cannot be established through means "contribut[ing]" to a deception. *E.g.*, *Acad. of Drs. of Audiology v. Int'l Hearing Soc'y*, 237 F. Supp. 3d 644, 666 (E.D. Mich. 2017); *see also Telebrands Corp. v. My Pillow, Inc.*, No. 18-CV-06318, 2019 WL 1923410, at *3 (N.D. Ill. Apr. 30, 2019) ("This novel contributory false advertising claim under the Lanham Act has not been adopted by either the Seventh Circuit or any other circuit."). This accords with precedent requiring the deception to be "direct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014); *Campfield*, 91 F.4th at 412. Here, where World Vision's alleged involvement in the false advertising is unclear and speculative, the bar on contributory false advertising applies.

## V. Plaintiffs fail to state a tortious interference claim against World Vision.

Plaintiffs allege two kinds of tortious interference against World Vision: interference with TCA's contract pursuant to Tenn. Code Ann. § 47-50-109 and the common law, and tortious interference with prospective contractual and business relations. Other than the element of an existence of a contract versus prospective contractual relations not yet reduced to contract, "the elements of these claims are identical." *BCG Masonic Cleveland, LLC v. Live Nation Ent., Inc.*, 570 F. Supp. 3d 552, 557–58 (N.D. Ohio 2021). To state a claim under either cause of action, Plaintiffs must plead: (1) there was a (legal contract)/(non-contractual business relationship); (2) World Vision knew of the (contract)/(non-contractual business relationship); (3); World Vision intended to cause a (breach or termination of the contract)/(termination of the non-contractual business relationship); (4) World Vision used improper motive or means; (5) the (contract was actually breached)/(relationship was actually terminated); (6) World Vision was the proximate cause of the (breach)/(termination); (7) Plaintiffs suffered damages as a result. *See Vanderbilt Univ. v. Scholastic, Inc.*, 382 F. Supp. 3d 734, 759 (M.D. Tenn. 2019) (contract); *BNA Assocs. LLC v. Goldman*

21

*Sachs Specialty Lending Grp., L.P*., 63 F.4th 1061, 1063 (6th Cir. 2023) (business relationship). Pleading tortious interference requires "more than simply parrot[ing] the legal elements." *Scholastic*, 382 F. Supp. 3d at 759 (citation omitted). A plaintiff "must also allege specific facts that, if true, would support each of the seven elements of the tort." *Id.* at 759–60 (citation omitted).

Plaintiffs allege that World Vision interfered with the agreement in which the LiveCo Defendants were to buy TCA. Compl. ¶¶ 583–90. Alternatively, if the unexecuted purchase agreement was not a binding contract, Plaintiffs assert that the same conduct constituted interference with prospective business relations. Beyond the conclusory recitation of the legal elements, the Complaint pleads scant factual allegations in support of these counts. It alleges only that, "[o]n information and belief," World Vision had an improper motive in terms of unexplained "antitrust plans and goals" (Compl. ¶ 586), and that World Vision used improper means by (1) telling the LiveCo Defendants that TCA would prevent them from selling solicitation rights for the concerts they promoted (*id.* ¶ 587), and (2) entering into the aforementioned exclusive or partially exclusive contract with the LiveCo Defendants (*id.* ¶ 588), which (3) involved paying the LiveCo Defendants for World Vision's solicitation rights (*id.* ¶ 589).

### A.      Without a valid contract, no claim lies for tortious interference with contract.

To the extent that the relationship interfered with was reduced to a contract, Tennessee bars intentional interference with business relations claims. *BNA Assocs.*, 63 F.4th at 1064. In the instant dispute, Plaintiffs point to a $50 million purchase agreement that they admit had yet to be reduced to writing. Compl. ¶¶ 585, 594. This non-final agreement is plainly not a valid contract.

### B.      Plaintiffs cannot allege improper motive or means as to World Vision.

Plaintiffs' bare allegation that World Vision had an unexplained, generic goal to violate antitrust laws must be disregarded. The only operative allegation is that World Vision told the LiveCo Defendants that TCA would not allow LiveCo to compete with TCA in the NPS market.

22

Compl. ¶ 587. But merely sharing a fact with a party is neither a "threat" nor any indication of "improper motive"—particularly where the fact is true, which Plaintiffs have not disputed. *See United Mag. Co. v. Prudential Ins. Co.*, 877 F. Supp. 1076, 1086 (S.D. Ohio 1995) ("[A]ccurate communication . . . does not generally constitute improper conduct."). This truism is even stronger in a situation like this one, where any noncompetition conditions between the future business units would be no surprise to those actually negotiating the deal. Any noncompetition conditions would be in the eventual purchase agreement almost by necessity.

Accordingly, the facts simply do not support a plausible tortious interference claim against World Vision.

## VI. Plaintiffs' state-law solicitation claims fail as a matter of law.

Plaintiffs allege that World Vision violated the Tennessee Charitable Solicitations Act ("TCSA"), Tenn. Code Ann. § 48-101-501 *et seq.*, and seek damages under the statute's private right of action, Tenn. Code Ann. § 48-101-520. Both the statute's plain language and court precedent confirm Plaintiffs lack standing to bring this claim.

The TCSA confers a private right of action to "[a]ny solicitee or person who suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair, false, misleading, or deceptive act or practice" prohibited by the TCSA. Tenn. Code Ann. § 48-101-520. The statute applies to only solicitees residing in Tennessee or solicitations occurring in the state. *See* Tenn. Code Ann. § 48-101-516(a) (limiting the TCSA's applicability, with respect to non-Tennessee-based charities, to those that "solicit[ ] contributions from people in this state"). The Complaint alleges no qualifying solicitations or that any Plaintiff suffered a loss of money or property attributable to the alleged violation.

Plaintiffs were never solicited to donate to World Vision. *See* Tenn. Code Ann. § 48-101-520. Private plaintiffs have standing for statutory claims only when "their claim falls within the

zone of interests protected or regulated by the statute in question." *Metro. Gov't of Nashville v. Bd. of Zoning Appeals of Nashville*, 477 S.W.3d 750, 755 (Tenn. 2015). Here, the law is trained on protecting donors solicited in Tennessee from deceptive practices. The Complaint does not allege that any Plaintiff ever donated to World Vision, that any Tennessee-based donors were ever solicited, or that World Vision ever engaged in any solicitations in Tennessee. Further, the Complaint does not assert that World Vision ever engaged in an applicable deceptive practice related to its solicitations. The only violation alleged asserts a mere failure to *register*. *See* Compl. ¶ 112. This is at most an administrative error that could require World Vision to pay allegedly unpaid registration fees and a number of $25 fines (*see* Tenn. Code Ann. § 48-101-507(a)(4)), and not an error the Complaint even alleges could have deceived donors. Accordingly, the Complaint alleges no facts supporting a plausible violation of the TCSA.

## CONCLUSION

The Complaint asserts a wide range of ultimately self-defeating allegations. It defines a product market narrowly without identifying the facts necessary to support it. Its characterization of their injuries confirm that Plaintiffs misidentify their own injuries caused by legitimate competition as alleged antitrust law violations. With respect to World Vision, Plaintiffs harbor nothing more than vague, entirely speculative conspiracies in which all of the wrongful conduct was committed by other Defendants in a market in which World Vision does not operate. For these and the foregoing reasons, all of Plaintiffs' claims against World Vision should be dismissed with prejudice.

24

Date: July 1, 2026

Respectfully submitted,

*/s/ Benjamin S. Morrell*
Benjamin S. Morrell (TBPR No. 035480)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel.: (312) 527-4000
Fax: (312) 527-4011
bmorrell@taftlaw.com

Daniel R. Warncke (*pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
301 E. Fourth Street, Suite 2800
Cincinnati, OH 45202
Tel.: (513) 381-2838
Fax: (513) 381-0205
warncke@taftlaw.com

David E. Lamb (*pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel.: (612) 977-8400
Fax: (612) 977-8650
dlamb@taftlaw.com

*Counsel for Defendant World Vision, Inc.*

25

**CERTIFICATE OF SERVICE**

I hereby certify that on the date listed below, I filed the foregoing document using the Court's CM/ECF system, which will send electronic notice to all counsel of record.


Dated: July 1, 2026

*/s/ Benjamin S. Morrell*

26