IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| THRIVING CHILDREN ADVOCATES, LLC, Et al. | § § § | |
| Plaintiffs | § | Civil Action No. 3:26-cv 00484 District Judge: Hon. Waverly D. Crenshaw, Jr. |
| v. | § | Magistrate Judge: Hon. Jeffrey S. Frensley |
| WATERLAND PRIVATE EQUITY INVESTMENTS, B.V.; Et al. | § § § | Jury Trial Demanded |
| Defendants. | § | |

**PLAINTIFFS' MOTION TO ALLOW ALTERNATIVE SERVICE UNDER FRCP 4(f)(3) AND <u>UNOPPOSED</u> REQUEST TO RESCHEDULE INITIAL CASE MANAGEMENT CONFERENCE**

Plaintiffs request leave of court under FRCP 4(f)(3) to serve the Summons and Complaint [Dkt. No. 1] in this case on two Danish and Netherlands entities and two of their Danish controlling executives: Waterland Private Equity Investments, B.V, ("*Waterland PEI*"), Waterland Private Equity ApS ("*Waterland PE*"), Nicklas Guldberg ("*Guldberg*") and Christian Madsen ("*Madsen*") (collectively, the "*Waterland Service Parties*."). All Defendants other than the four Waterland Service Parties have been served and/or their counsel have agreed to accept service.

At explained briefly below, this is an antitrust case involving the intentional creation of a monopoly, the creating sponsor of which is a Denmark hedge fund known as "Waterland Private Equity" accomplished through the Waterland Service Parties. Under the guiding hand of US lawyer Jared Manes ("Manes"), they formed a host of US entities that in turn purchased the three leading Christian concert promoters and other ancillary businesses, effectively accomplishing their preconceived plan to create and operate a monopoly destroying Plaintiffs in the process.

1

Although attorney Manes (a) was counsel for the Waterland Service Parties when the very acts occurred that this suit complains of, (b) formed for the Waterland Service Parties many of the entities they used to accomplish the antitrust monopoly herein complained of including serving personally as the "incorporator" of those entities, and (c) has confirmed that he will personally represent the Waterland Service Parties once they have been served, he has stated he will not accept service for the Waterland Service Parties with whom he has had an ongoing relationship. Instead, the Waterland Service Parties insist on attempting to put Plaintiffs through the expense and delay of securing service of process through the Hague Convention which will cost almost $60,000 and result in an inordinate delay in these proceedings of approximately five (5) months, perhaps more.

But that expense and delay is unnecessary given FRCP 4(f) and (h) which govern service of foreign individuals and entities such as the Waterland Service Parties. For the reasons hereafter set forth, Plaintiffs request the following by this Motion:

**First**, Plaintiffs request leave of court to serve the Waterland Service Parties in any or all of the following ways: (1) to serve all four of the Waterland Service Parties by serving Manes as their counsel and agent, by email and/or, (2) to serve Waterland PEI, Waterland PE, and Guldberg himself by serving Guldberg by email as Guldberg is an active Principal of Waterland; and (3) to serve Madsen by email. Plaintiffs further request that they not be required to translate the Complaint into Danish (Denmark) or Dutch (the Netherlands) as all Waterland Service Parties are fluent in spoken and written English.

**Second**, Plaintiffs request the Initial Case Management Conference (CMC) currently set for July 23, 2026, be rescheduled for thirty days to allow for service on all parties. **<u>As explained below, all other defendants are represented by counsel who have advised they do not object</u>**

**to this rescheduling of the CMC.**  Plaintiffs' counsel also requests permission to attend that CMC in person such that all counsel have the option of appearing live or by telephone.

**Third**, while Plaintiffs do not believe that Rule 4(m) applies to service of process on the Waterland Service Parties in light of the final sentence of FRCP 4(m), out of an abundance of caution, Plaintiffs request an extension of the 90-day time set in FRCP 4(m), to the extent applicable, for an additional 30 days to allow the above service of process to be accomplished, and in the alternative an additional 90 days, if the Court declines to allow alternative service and instead requires compliance with the serve requirement of the Hague Convention.

This Motion is supported by the Declarations of (a) Ben Broocks, lead counsel for Plaintiffs [Exhibit A]; (b) Wes Campbell, one of the Plaintiffs and the control person for the entity Plaintiffs [Exhibit B]; and (c) Celeste Ingalls, Director of Operations for Crowe Foreign Services, [Exhibit C] who will arrange Hague Convention service if the Court denies Plaintiffs requests for alternative service.

## I.  BRIEF FACTUAL BACKGROUND

This action has been brought against 33 Defendants who the Complaint groups relationally as follows:

  i.   Twenty-one (21) defendants the Complaint calls "**Waterland Defendants**," consisting of the 4 Waterland Service Parties and 17 entities the Waterland Service Parties formed and/or acquired and their control persons. [Dkt No. 1, pp. 14-18; ¶¶47-68] [1]

  ii.  Three (3) defendants the Complaint calls "**Defamation Defendants**, consisting of a print publication, its editor and an Australian reporter. [Dkt No. 1, p. 81; ¶¶68-72]

  iii. Five (5) defendants the Complaint calls "**MercyMe Defendants**," consisting of a music group and four of its members. [Dkt No. 1, p. 19; ¶¶73-77]

---

[1] Although defendants "Waterland Holdings, LLC" and Transparent Processing may have been misnamed and thus may be dropped, to avoid confusion, Plaintiffs will continue to refer to there being 21 Waterland Defendants.

    iv.    Four (4) defendants the Complaint calls "**Other Defendants**," consisting of (i) World Vision, (ii) the entity that managed MercyMe and its owner, and (iii) another musician. [Dkt No. 1, p. 19-20; ¶¶78-81]

This case arises from a coordinated scheme to monopolize the Contemporary Christian Music ("CCM") touring and associated nonprofit sponsorship ("NPS") markets, and to eliminate Plaintiffs in those markets.

As alleged in the Complaint, musical groups perform in concerts that tour across the country. Promoters are responsible for the lion's share of the work and expense in a CCM Tour including: (a) selecting the geographic locations for tours, the order in which they will occur and specific venues within each geographic location; (c) securing the main performing music artist and paying their performance fees; (d) arranging for and shipping lighting and equipment from one location to the others; (e) marketing performances; and (f) selling tickets. Promoters typically pay expenses irrespective of audience attendance and that number is put in the "pot" along with other expenses, on a concert-by-concert basis. Revenue from ticket sales also go into the "pot" and after netting -- and hopefully exceeding-- "pot" expenses, Promoters and artists have traditionally split the excess in the pot, 15% for the Promoter and 85% for the artist.

Secular concerts often associate with "sponsors," like beer companies, who pay to have their names and products advertised at concerts. Faith-based concerts, however, are restricted as a practical matter in securing traditional concert sponsors. Nonprofit charities have stepped in to fill this financial gap creating the Nonprofit Sponsorship Market (or "NPS").

CCM concerts and artists draw certain types of audiences and an artist's ability to draw an audience is referred to in the industry as their "Platform." Unlike artists, concert Promoters have not had a "Platform" to sell to Nonprofits.

Nonprofits have recognized that given the nature of attendees at faith-based concert tours, they can use artists' "Platforms" to generate donors, with artists allowing fundraising appeals in the middle of their concert, asking the audience members to become donors.

Nonprofits have paid artists for new monthly donors generated at a concert irrespective of donation size, based on their statistical analysis that once begun, donations will continue for years.

Promoters have tried to convince artists to contribute their Nonprofit payments to the "pot," but such has been generally unsuccessful, as in the face of demands by one Promoter for sharing Nonprofit payments, artists would simply find another Promoter.

Taking a page from the playbook of now-adjudicated antitrust cartel Live Nation, including retaining some of its founding members, [2] a private equity hedge fund from Denmark, generally referred to as "Waterland," recognized the profitability of removing competition by market consolidation and control.

Specifically, "Waterland," steered by two Waterland executives, Nicklas Guldberg and Christian Lund Madsen, caused at least two of its funds -- Waterland Private Equity Investments, B.V and Waterland Private Equity ApS -- to organize and execute a plan for consolidation of Promoters in the faith-based CCM Touring Market involving the acquisition of the three most prolific, independent faith-based concert promoters: Transparent Productions ("Transparent"), Premier Productions ("Premier") and Rush Concerts ("Rush") as well as acquisition of the primary ticketing company for faith-based concerts, iTickets, among other acquisitions. [3]

This consolidation was guided by their legal counsel, Jared Manes, whose current web site touts his historic representation of Waterland [Dec. Broocks, ¶ 11]:

---

[2] *See, e.g., United States v. Live Nation Ent., Inc.,* 2025 U.S. Dist. LEXIS 47262 (S.D.N.Y 2025).

[3] When the identities of any other Waterland entities and/or executives who participated in the acts complained of are determined they will be added.



Public records show that Manes was the incorporator for several Delaware companies for the Waterland Service Parties, including USLive, LLC., USLive Holding, LLC, USLiveOpCo, Inc., and USLive Intermediate Holdco, Inc., all antitrust defendants:



Dec. Broocks, ¶ 12. As seen above, all of these defendant entities were formed by Manes on August 31, 2021. On November 21, 2021 it was announced that a company called "East Wind" had acted as the exclusive financial advisor to Waterland in securing financing from FLC Credit Partners to support Waterland's acquisition of Premier, the first of the 3 main Promoters acquired, "forming the initial platform for LiveCo...." as the following tombstone announcement proclaimed [Dec. Broocks, ¶ 14]:



Following its acquisition of Premier, in May 2022, the group acquired iTickets, a primary ticketing company issuing concert tickets for primarily faith-based touring concerts. Having acquired Premier, attorney Manes then formed USLive Rush, LLC for the acquisition of Rush Concerts and USLive Transparent for the acquisition of Transparent [Dec. Broocks, ¶ 12]:



In October 2022, Waterland again used financial advisor East Wind to negotiate a refinance of its previously incurred acquisition debt and increase its acquisition financing borrowing capital as yet another tombstone advertisement proclaimed [Dec. Broocks, ¶ 14]:



With the acquisitions of Transparent, Premier and Rush in place -- or "TPR" as they came to call themselves -- Waterland completed its control of the CCM Touring Market operating under the general corporate umbrella name of "LiveCo" and so announced to the world [Dec. Campbell, ¶1] :

Following these acquisitions, USLive OpCo, Inc. took protective steps to secure the "Live Co" trademark in its filing with the PTO using Attorney Manes' new firm to do so [Dec. Broocks, ¶ 13]:

**Trademark/Service Mark Application, Principal Register**

Serial Number: 97776018
Filing Date: 02/01/2023

The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 97776018 |
| **MARK INFORMATION** | |
| *MARK | \TICRS\EXPORT18\IMAGEOUT 18\977\760\97776018.xml1 \ APP0002.JPG |
| SPECIAL FORM | YES |
| USPTO-GENERATED IMAGE | NO |
| LITERAL ELEMENT | LIVE CO |

\*\*\*\*\*\*\*

| APPLICANT INFORMATION | |
|---|---|
| *OWNER OF MARK | USLive OpCo, Inc. |
| *MAILING ADDRESS | 4400 Post Oak Parkway, Suite 2140 |
| *CITY | Houston |
| *STATE (Required for U.S. applicants) | Texas |

Having completed its acquisition of the three primary US faith-based concert promoters -- Transparent, Premier and Rush, and the ticketing agency for faith-based concerts -- Waterland then began operating in 2024 under what is believed to be the assumed name/acronym "TPR"[4] holding itself out as the "world's largest one-stop service global faith-based promotion company [Dec. Campbell, ¶1]:

---

[4] The period after TPR. was intentional and part of their assumed name.



And the "world's largest one-stop, full service global faith-based promotion company" was the result of the "merger" of Transparent, Premier, and Rush. Further, the market share numbers would prove that boast to be fact, as Waterland through LiveCo/TPR itself reported its concert numbers to the industry publication Pollstar. Among other things, the Complaint sets forth the number of Christian Concert performances reported to Pollstar by Waterland/LiveCo/TPR through Transparent, Premier and Rush for three periods,

- the first period being from 2018 through 2022 when Transparent, Premier and Rush were independent operators; [Dkt. No. 1, p. 68, ¶246]

- the second period was from November 2022 to November 2023 when they themselves reported their concert data to Pollstar as LiveCo/Transparent, LiveCo/Premier, and LiveCo/Rush showing an 81.48% market share; Dkt. No. 1, p. 70, ¶249] and

- the third period being from November 2023 through December 2025 where the overwhelming number of concerts were self-reported as LiveCo/TPR: [Dkt. No. 1, p. 71, ¶251]

The concert results for those three periods, as set forth in the Complaint are as follows [Dec. Campbell, ¶2]:

| Period 1 1/1/2018 -- 11/15/2022 | | | |
|---|---|---|---|
| COMPANY | NUMBER OF CONCERTS[1] | PERCENTAGE CONCERTS | |
| AWAKENING | 538 | 18.39% | |
| PREMIER | 1241 | 42.43% | TPR Entities Percentage 81.61% |
| TRANSPARENT | 765 | 26.15% | |
| RUSH | 320 | 10.94% | |
| CO-PROMOTIONS AMONG SOME COMBINATION OF TRANSPARENT, PREMIER, RUSH AND/OR LIVECO | 60 | 1.85% | |

| Period 2 11/16/2022 -- 11/16/2023 | | | |
|---|---|---|---|
| COMPANY | NUMBER OF CONCERTS | PERCENTAGE CONCERTS | |
| AWAKENING | 175 | 18.52% | |
| LIVECO/TRANSPARENT | 364 | 38.52% | TPR Entities Percentage 81.48% |
| LIVECO/PREMIER | 227 | 24.02% | |
| LIVECO/RUSH | 145 | 15.34% | |
| LIVECO/TPR | 24 | 2.54% | |
| CO-PROMOTIONS AMONG SOME COMBINATION OF TRANSPARENT, PREMIER, RUSH AND/OR LIVECO | 8 | 0.85% | |
| TRANSPARENT | 1 | 0.11% | |
| RUSH | 1 | 0.11% | |

| Period 3 11/17/2023 -- 12/31/2025 | | | |
|---|---|---|---|
| COMPANY | NUMBER OF CONCERTS | PERCENTAGE CONCERTS | |
| AWAKENING | 333 | 22.71% | |
| LIVECO/TPR | 1127 | 76.88% | TPR Entities Percentage 77.29% |
| PREMIER/LIVECO/TPR | 3 | 0.20% | |
| TRANSPARENT | 2 | 0.14% | |
| RUSH | 1 | 0.07% | |

As a consolidated monopoly, Waterland/LiveCo/TPR still competed for Nonprofit sponsorship money in the NPS Market, which money the Nonprofits generally directed to artists for their Platform, although Waterland/LiveCo/TPR now competed from a position of monopoly power, threatening artists with boycott if Nonprofit payments were not relinquished.

Plaintiffs also competed for Nonprofit sponsorship dollars, having established a profitable track record of acquiring artists' Public Platforms and effectively marketing them to Nonprofits. Plaintiffs did so, however, by registering in the numerous states as "Professional Solicitors" (in Tennessee defined generally as those engaged in fund raising who were not full-time employees

13

of the charities for whom money was raised) filing detailed financial reports of amounts raised and obtaining a bond -- again as required by law -- to ensure compliance with applicable law. Solicitation of Charitable Funds Act (Act), Tenn. Code Ann. § 48-101-501, et. seq.  No one else -- not even nonprofits themselves, not artists and not Waterland/LiveCo/TPR -- has ever undertaken such arduous and extensive steps to ensure not only compliance with the law, but to ensure the public was not deceived.

Even after the formation of their monopoly, Waterland/LiveCo/TPR still had difficulties capturing the NPS Market.  Waterland/LiveCo/TPR realized that if they acquired Plaintiffs, given Plaintiffs' contracts with both artists and Nonprofits, with TCA operating as a part of Waterland/LiveCo/TPR, the promoters would finally be able to participate to some degree in Nonprofit payments.  Therefore Waterland/LiveCo/TPR acting through the Waterland Service Parties, approached Plaintiffs proposing an acquisition such that Plaintiffs would become the "nonprofit" sponsorship arm of Waterland/LiveCo/TPR.

After signing comprehensive confidentiality agreements, Plaintiffs disclosed their confidential information as to (i) artists they had contracted with, (ii) what those artists were being paid for use of their Platform to generate donors, (iii) the term of expiration of Plaintiffs' agreements, (iv) the revenues Plaintiffs made for services to Nonprofits in connection with sponsorship generation, and (v) the candid competitive challenges Plaintiffs saw in the market place, all of which was disclosed by Plaintiffs in the strictest confidence. [Dec. Campbell, ¶3]

Realizing Plaintiffs' value and the potential for the now-combined promoters to receive some benefit from Nonprofit sponsorship payments, the Waterland Service Parties on behalf of Waterland/LiveCo/TPR offered approxiately $50,000,000 for the purchase of Plaintiffs as well as the ability to acquire USLive/TPR stock which was explained would have very significant value

when their planned IPO occurred.  The Complaint alleges this offer was accepted.  See, e.g., Dkt. No. 1, ¶¶ 13, 145, 367.  The exchanges between Plaintiffs and the Waterland Service Parties, written in perfect English, demonstrates no "translation" requirements [Dec. Campbell, ¶4:



But having (a) obtained Plaintiffs' highly confidential business plans and models, (b) recognized that their monopoly also created their own competing "Platform" that Nonprofits could acquire rights to instead of acquiring Artist's Platforms, and (c) recognized that they could leverage their monopoly power to force their will on both artists and Nonprofits, the Complaint alleges that World Vision as a Nonprofit reached agreement with Waterland/USLiveCo/TPR the monopolist and the Waterland Service Parties, the effect of which was a practical joint venture where World Vison would pay Waterland/USLiveCo/TPR, the monopolist, for rights to its newly created Platform conditioned on some form of full or partial exclusivity in the NPS Market.  Control over

15

the CCM Touring Market thus gave Waterland/USLiveCo/TPR and the Waterland Service Parties specifically, control over the NPS Market, closing its doors to artists and their assigns/intermediaries, like Plaintiffs, as well as nonprofits besides World Vision, who do not capitulate to the demands of the Defendants. See, e.g., Dkt. No. 1, ¶¶ 14-22; 147-159. Competition greatly suffered as a result.

The MercyMe Defendants occupy a strategically significant role in the alleged conspiracy. Plaintiffs have pleaded that MercyMe represented one of Plaintiffs' most valuable artist relationships and that relationship became a principal battleground over whether the existing artist-centered sponsorship model or the new promoter-controlled model would prevail. The Complaint alleges that after Waterland/USLiveCo/TPR and the Waterland Service Parties specifically failed to induce MercyMe to abandon Plaintiffs' sponsorship contract arrangement through financial incentives, in August 2024, Waterland/USLiveCo/TPR and the Waterland Service Parties conspired with the Defamation Defendants to concoct a false and defamatory story of "rape" that allegedly occurred ten years prior, and went on to falsely claim Plaintiffs had covered it up -- Waterland/USLiveCo/TPR and the Waterland Service Parties even going to the point of actually hiring the alleged "rape" victim and then facilitating her meeting with the Defamation Defendants.

The Complaint alleges that these acts culminated in a defamatory article of "rape and "cover up" contradicted by the statements the "victim" herself gave to the police. Waterland/USLiveCo/TPR and the Waterland Service Parties are alleged to have then worked with the MercyMe Defendants to terminate their contractual relationship with Plaintiffs and instead align themselves with Waterland/USLiveCo/TPR and the Waterland Service Parties.

Viewed as a whole, the Complaint alleges a single integrated course of conduct rather than a collection of unrelated claims. The Complaint alleges Waterland/USLiveCo/TPR and the

16

Waterland Service Parties conceived and directed the strategy and implemented it operationally, World Vision provided the financial incentive that made it profitable, the MercyMe Defendants became the critical competitive objective demonstrating how artists would be shifted from Plaintiffs' business model to Defendants' model, and the Defamation Defendants allegedly supplied the reputational weapon that ultimately enabled Defendants to eliminate Plaintiffs as an effective competitor. The Waterland Service Parties are primary culprits in these acts.

## II. SERVICE VIA TRADITIONAL HAGUE CONVENTION METHODS ARE UNNECESSARILY EXPENSIVE AND TIME CONSUMING; EFFORTS TO ACHIEVE SERVICE BY COOPERATION HAVE BEEN UNSUCCESSFUL

A.     SERVICE BY MEANS OF HAGUE IS UNNECESSARILY EXPENSIVE AND TIME Consuming

Plaintiffs have diligently investigated achieving service of process by means of the Hague Convention and have tentatively lined up a service to assist in that process, should this Court deny Plaintiffs' motion for alternative service, however, such is extraordinarily expensive and will occasion unnecessary delay. Attached hereto as **Exhibit C** is the declaration of Celeste Ingalls, the Director of Operations of Alan H. Crowe & Associates, Inc., d/b/a Crowe Foreign Services (the "*Hague Service*"), who specialize in assisting service by the Hague Convention, which states the total estimated cost for translating the Complaint into Danish and Dutch is estimated to be $56,484.00 and that the time it will take to translate the Complaint into Danish and Dutch is between 7 to 8 weeks. Once translated, it will then be transferred to the appropriate governmental authorities in those nations for distribution. The Hague Service estimates it will take an additional 3 months after translation to serve the Waterland Service Parties. And expense of approximately $60,000 for translation -- particularly unnecessary as the Waterland Service Parties are fluent in spoken and written English -- and an approximate 5-month delay before service is too long and unnecessary.

B. **ALL DEFENDANTS HAVE BEEN SERVED OR THEIR COUNSEL HAVE AGREED TO ACCEPT SERVICE -- THE WATERLAND SERVICE PARTIES ARE THE ONLY HOLDOUTS.**

In this lawsuit, the Complaint lists four "sets" of Defendants [Dkt. No. 1, p. 14- 20]. As previously stated, all defendants except the Waterland Service Parties have been served or their counsel has agreed to accept service.

C. **EXTENSIVE EFFORTS FOR SERVICE OF FOREIGN WATERLAND SERVICE PARTIES HAVE BEEN UNSUCCESSFUL VIA COMMUNICATIONS WITH THE US COUNSEL FOR THE DOMESTIC WATERLAND DEFENDANTS**

Given that all twenty-one (21) of the Waterland Defendants -- which includes the Waterland Service Parties -- were part of an integrated operating group with the Waterland Service Parties at the top -- Plaintiffs reasonably believed all of the Waterland Defendants would be commonly represented. After some were served, Plaintiffs' counsel spoke with attorney Keith Carroll who advised that he and his firm would represent the domestic US portion of the Waterland Defendants.

He also advised that he was uncertain whether he would represent the Waterland Service Parties and would "connect with the Waterland entities and their counsel next week and circle back with you." Dec. Broocks, ¶2, App. A.3, p. 3. Carrol later confirmed, based on his personal knowledge, that he and his firm would not be representing the Waterland Service Parties, but that Attorney Manes would be. Dec. Broocks, ¶2, App. A-3, p.3; A-6, p.5; A-7, p. 6; A-8, p.6; A-9, p. 6; A-10, p. 7; A-11, p. 7.

D. **MANES AS HISTORIC COUNSEL FOR WATERLAND INITIALLY ACKNOWLEDGED (1) HE WOULD REPRESENT THREE OF THE WATERLAND SERVICE PARTIES ONCE SERVED, (2) HE WOULD NOT ACCEPT SERVICE FOR THEM, (3) HE WOULD NOT REPRESENT CHRISTIAN MADSEN AND (4) HE HAD NO CONTACT INFORMATION FOR MADSEN**

Having identified Jared Manes as counsel for the Waterland Service Parties, Plaintiffs' counsel initiated contact with attorney Manes both on the phone and by email, and Manes initially

confirmed his intended representation of Waterland PEI, Waterland PE, and Guldberg in this litigation. Manes, however, refused to accept service for them. Dec. Broocks, ¶2-3 & **Appendix B.** These communications were obviously successful in advising those parties of the litigation.

As to former Waterland executive Christian Madsen, Manes said he would not be representing Madsen in this litigation and when asked, stated he did not have any contact information for Madsen. Dec. Broocks, ¶2, App. B-5, p. 3. This refusal then led Plaintiffs on an extended journey of trying to locate Christian Madsen and ,in particular, his address as his personal address is important because: (a) the Hague may not apply if Madsen does not actually live in Denmark and (b) the Hague Service provider requires it. "Madsen," however, happens to be a fairly common name in Denmark. Locating a "Linked In" page and another locating resource, Plaintiffs were able to determine that Madsen worked for what seemed to be a small, family-owned business called "Stenseminde Holding, ApS." Telephone calls to what appeared to be the corporate office of Stenseminde resulted in a recording in presumably Danish. Dec. Broocks, ¶5.

Plaintiffs then sent an inquiring email to the five (5) possible email addresses for Madsen at Stenseminde, (i) alerting him that he had been sued, (ii) transmitting a copy of the Complaint and Summons, (iii) notifying him that Manes was not representing him, (iv) sending him a copy of the filed-complaint and summons, and (v) offering to meet with him. Delivery Failure Notices were received from four (4) of those email addresses. Dec. Broocks ¶¶6-7. However no default notice was received for the email sent to the email: "clm@stenseminde.dk." Dec. Broocks ¶7. In fact, using a special service that determines if an email has been opened, Plaintiffs were able to determine that Madsen received and opened the email with the complaint attached almost immediately on receipt and within less than 24 hours after he received notice of the lawsuit opened the notifying email eleven times. Dec. Broocks Dec. ¶8. So, there is no question but that the email

address "clm@stenseminde.dk" is valid and Madsen receives communications by that email address.

**E.     UPON SENDING MADSEN THE EMAIL NOTICE OF THE LAWSUIT, MANES THEN AGREED TO REPRESENT MADSEN IN THE LAWSUIT, BUT (A) WILL NOT ACCEPT SERVICE FOR MADSEN AND (B) REFUSES TO ALLOW PLAINTIFFS TO CONTACT MADSEN**

Within twenty four hours of sending Madsen the email notice of the lawsuit, Attorney Manes advised Plaintiffs that Madsen had now become his client, he would represent Madsen in the litigation when Madsen was served, refused to accept service for Madsen, and forbade any further contact with Madsen. Dec. Broocks Dec. ¶9. Madsen was sent the Complaint, and he and Manes have clearly has spoken about it given the timing of Manes abrupt about face shortly after Madsen received the Complaint from Plaintiffs conclusively demonstrating they have discussed the suit as Madsen has now apparently retained Manes. And Manes's statement he will represent all Waterland Service Parties after service indicates Manes and the Defendants have all received copies of the complaint and spoken of it, as without that, Manes would not have been empowered to announce his representation of them. Furthermore, Manes insisting that Plaintiffs have no communication with Madsen, attempts to put Plaintiffs in the place where they cannot even find Madsen's residential address which, as stated is required even if service via the Hague Convention will be made.

**III.     ARGUMENT WHY SERVICE BY ALTERNATE MEANS SHOULD BE APPROVED**

As stated, Plaintiffs request leave of court to serve the Waterland Service Parties in any or all of the following ways: (1) to serve all four of the Waterland Service Parties by serving Manes as their counsel and agent, by email; or (2) alternatively, to serve Waterland PEI, Waterland PE, and Guldberg, by serving Defendant Guldberg by email at Guldberg@waterland.dk, as Guldberg

is an active Principal of Waterland; and (ii) to serve Madsen by email at "clm@stenseminde.dk. Plaintiffs further request that they not be required to translate the Complaint into Danish (Denmark) or Dutch (the Netherlands) as all Waterland Service Parties are fluent in spoken and written English.

## A.   APPROVED METHODS OF SERVICE APART FROM THE HAGUE CONVENTION

FRCP 4 dictates how Plaintiffs should serve process on the Waterland Service Parties. Rule 4(f)(1) provides that service may be accomplished on any person not within the judicial district of the United States "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention . . . .".  The United States, Denmark and the Netherlands are signatories to the Hague Convention.  Rule 4(f) does not, however, create a hierarchy of preferred methods of service, and parties are not required to comply with Rule 4(f)(1) or (2) before seeking service under Rule 4(f)(3).  R*io Props., Inc. v. Rio Intern. Interlink,* 284 F. 3d 1007, 1015 (9th Cir. 2002) (hereafter, "*Rio*").  Furthermore, the advisory committee notes to Rule 4 suggest that courts may allow a "special method of service" under Rule 4(f)(3), even if service is also possible through the Hague Convention.

As have many district courts in the circuit and throughout the country, this Court has found the Ninth Circuit's analysis in *Rio* persuasive and that plaintiffs "...need not attempt service under Hague Convention." *Cabinets to Go, LLC. v. Qingdao Haiyan Real Est. Grp. Co., Ltd.*, 2022 U.S. Dist. LEXIS 257672, *5 (M.D. Tenn. 2022) (J. Frensley) (hereafter, "*Cabinets to Go*")

Based upon the plain language of Rule 4(f)(3), the only two requirements for service under that Rule are that it must be "'(1) directed by the court, and (2) not prohibited by international agreement.' And ...Plaintiffs need not attempt service under the Hague Convention here." *Cisco Sys., Inc. v. Lamination Serv., Inc., 2021 LEXIS 263503, *2 (W.D. Tenn. 2021).*  Also, the method

21

has to be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*339 U.S. 314 (1950).

**B.      NEITHER DENMARK NOR NETHERLANDS FORBID SERVICE BY EMAIL THUS SERVICE BY EMAIL IS AN APPROPRIATE AND ACCEPTED METHOD OF SERVICE**

With this Court's approval, the only remaining question is whether the receiving countries -- Denmark and the Netherlands -- have forbidden service by any of the methods requested. *See e. g. Slay, supra; Cisco Systems, Inc. v. Lamination Service, Inc*., 2021 WL 2043980 (W. D. Tenn. 2021).   And they have not.

This Court has held "...that service by email satisfies the requirements of Fed. R. Civ. P. 4(f)(3) in that it is 'reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Cabinets to Go,* at 7.   And most courts that have considered the issue have approved service by email.  *See, e.g., Sportspower Ltd. v. Zhejiang Hongcheng Info. Tech. Co.,* 2024 LEXIS 254636, *4 (W.D. Tex. 2024) (gathering cases).   Furthermore, service by email is imminently reasonable as the Waterland Service Parties regularly communicated with Plaintiffs by email as the primary method of doing business between the parties prelitigation, although they also had personal meetings.   Dec. Campbell, ¶4.   And all the Waterland Service Parties have continued to discuss the lawsuit via email with Manes.

**C.      SERVICE ON COUNSEL FOR THE WATERLAND SERVICE PARTIES**

Given this Court's approval of service of foreign defendants by email, it is also reasonable to allow that service to be made by serving their US counsel, Manes, by email.  The Plaintiffs have demonstrated that Attorney Jared Manes has represented the Waterland Service Parties both in the underlying transactions, is representing the Waterland Service Parties now and will represent them

once the Waterland Service Parties are served. The Court should authorize service through counsel as he is a known agent for each of the companies.

As explained in *Popular Enters., LLC v. Webcom Media Group, Inc*., 225 F.R.D. 560, 561 (E.D.Tenn. 2004), "trial courts have authorized a wide variety of alternative methods of service including publication, ordinary mail, mail to the defendant's last known address, **delivery to the defendant's attorney**, telex, and most recently, e-mail."

And as was held in *Bunce v. Glock, Inc.*, 2024 U.S. Dist. LEXIS 107906, *7-8 (D. Vermont 2024) "Service on an agent or a law firm within the United States does not violate the Hague Convention." *(collecting cases))*.  *In re Realtek Semiconductor Corp.*, 2023 U.S. App. LEXIS 21382, *6 (Fed. Cir. 2023) (holding courts "have sanctioned service on United States counsel as an alternative means of service under Rule 4(f)(3) without requiring any specific authorization by the defendant for the recipient to accept service on its behalf.")

In fact, courts routinely direct service on an international defendant's counsel under Rule 4(f)(3).  *Cleer LLC v. Stranger*, 2024 U.S. Dist. LEXIS 212897, *5-6 (D. Conn 2024).  *See also Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*, 766 F.3d 74, 83 (D.C. Cir. 2014).  This is particularly appropriate here as Manes has identified himself as litigation counsel. Manes advised Keith Carroll, counsel for the other Waterland Defendants, that he (Manes) was litigation counsel for Waterland PEI, Waterland PE, and Guldberg.  [See Broocks Dec. ¶2, App. A-3, p.3; A-6, p.5; A-7, p. 6; A-8, p.6; A-9, p. 6; A-10, p. 7; A-11, p. 7.

Also, Manes confirmed his role as litigation counsel of Waterland PEI, Waterland PE, and Guldberg  to Plaintiffs' counsel, who spoke with attorney Manes both on the phone and by email. Broocks Dec. ¶3-4.  In those communications Manes confirmed his intended role as litigation counsel of Waterland PEI, Waterland PE, and Guldberg, initially, and later included Manes when

Plaintiffs located him.  But even after so confirming, he refused to accept service for them. *See LDK Solar Sec. Litig.*, 2008 U.S. Dist. LEXIS 90702 (N.D. Cal. 2008) (authorizing 4(f)(3) service in part because local defense counsel had refused to accept service on behalf of the foreign defendants).

Even if Attorney Means has not been authorized to accept service for the Waterland Service Parties, that is not relevant.   In *Bunce v. Glock, Inc*., 2024 U.S. Dist. LEXIS 107906, *8 & n. 5 (D. Vermont 2024) the court there addressed this very issue stating: "Courts have approved of serving a foreign defendant pursuant to Rule 4(f)(3) through service of process on a defendant's U.S. counsel, even where U.S. counsel has not been expressly authorized to accept service on the foreign defendant's behalf." (collecting cases))." Given that Plaintiffs have had multiple communications with Mr. Manes at the email address that it now seeks to use for service of process, there is no doubt that serving Waterland Service Parties through Mr. Manes will be apprised of this action in accord with due process.  Substitute service is warranted and should be permitted by serving Mr. Manes via email at his office under FRCP 4(f)(3).

### D. IN THE ALTERNATIVE, PLAINTIFFS REQUEST LEAVE TO SERVE WATERLAND PEI, WATERLAND PE, AND GULDBERG, BY SERVING DEFENDANT GULDBERG BY EMAIL AS GULDBERG IS AN ACTIVE PRINCIPAL OF WATERLAND

In the alternative, if the Court will not allow Plaintiffs' requested leave to serve all Waterland Service Parties via Manes, leave is requested to serve Waterland PEI, Waterland PE, and Guldberg by serving Guldberg by email.   The Website for Waterland shows Guldberg to be a Waterland principal and as such is a managing agent." Dec. Broocks ¶10.  Alternatively, Plaintiffs request leave to serve any other managing agent identified in Waterland's web site, via email.

### E.    SERVICE BY EMAIL FOR MADSEN

In the alternative, if the Court will not permit all Waterland Service Parties to be served via Manes, then Plaintiffs request leave to serve Madsen by his email address of "clm@stenseminde.dk" which Plaintiffs have demonstrated is an email address that he receives communications from.

**F.      NO TRANSLATIONS SHOULD BE REQUIRED**

Given the fact that all relevant Waterland Service Parties are fluent in written and spoken English and all their pre-litigation communications have been in English [Dec. Campbell ¶4], Plaintiffs request they not be required to incur the expense of translating the Complaint into Danish or Dutch.

**IV.      THE CURRENTLY SCHEDLED CMC SHOULD BE POSTPONED FOR 30 DAYS**

Plaintiffs request the Initial Case Management Conference (CMC) currently set for July 23, 2026, be rescheduled for thirty days to allow for service on all parties so all parties' counsel can be in attendance.  As explained herein, all other defendants are represented by counsel who have advised they do not object to this rescheduling of the CMC.   Plaintiffs' counsel also requests permission to attend that CMC in person such that all counsel have the option of appearing live or by telephone.

**V.      REQUESTS FOR EXTENSIONS OF TIME TO EFFECT SERVICE**

While Plaintiffs do not believe that Rule 4(m) applies to service of process on the Waterland Service Parties in light of the final sentence of FRCP 4(m), out of an abundance of caution, Plaintiffs request an extension of the 90-day time set in FRCP 4(m), to the extent applicable, for an additional 30 days to allow the above service of process to be accomplished, and in the alternative an additional 90 days, if the Court declines to allow alternative service and instead requires compliance with the serve requirement of the Hague Convention.

Date: July 20, 2026

Respectfully submitted,

Ben Broocks
Ben Broocks (pro hac)
248 Addie Roy Road, Suite B-301
Austin, Texas
Tel: 512-201-2002
Fax: 512 201-2386

G. Kline Preston IV, Esq.
G. Kline Preston, IV, Esq. (#017141)
Belle Meade Office Park
4515 Harding Pike, Suite 107
Nashville, TN 37027
Tel: 615-649-8680
Fax: 866-610-9565
kpreston@klineprestonlaw.com
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on the date listed below, the undersigned filed the foregoing document using the Court's CM/ECF system, which will send electronic notice to all counsel of record. The undersigned also sent this filing by email to Jared Manes.

Dated: July 20, 2026

Ben Broocks

26