# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| THRIVING CHILDREN ADVOCATES, LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MERCYME, INC.; BART MILLARD; ROBIN "ROBBY" SHAFFER; NATHAN COCHRAN; MIKE SCHEUCHZER; SCOTT BICKELL; BRICKHOUSE ENTERTAINMENT, LLC; MICAH BEGNAUD AKA MICAH TYLER, et al., <br><br> Defendants. | Case No. 3:26-cv-00484 <br><br> Judge Waverly D. Crenshaw, Jr. <br><br> Magistrate Judge Jeffery S. Frensley |

## MEMORANDUM OF LAW IN SUPPORT OF MERCYME DEFENDANTS', BRICKELL PARTIES', AND MICAH TYLER'S MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iv

INTRODUCTION ..........................................................................................................1

STATEMENT OF FACTS ...............................................................................................3

    I.    The parties operate in the Christian Contemporary Music market. ..............................3

    II.   The MercyMe Defendants and the Brickell Parties contracted with Waterland Defendants' competitor, increasing competition in the Christian Contemporary Music market. ......................................................................................................5

    III.  Micah Tyler's alleged conduct....................................................................................8

STANDARD OF REVIEW ..............................................................................................8

ARGUMENT.................................................................................................................9

    I.    The federal antitrust claims against the MercyMe Defendants and Brickell Parties (Count V, Sections H–N) fail as a matter of law because the MercyMe Defendants' and Brickell Parties' alleged conduct increased competition in the market. .................9

        A.  Plaintiffs lack standing to bring their antitrust claims against the MercyMe Defendants and Brickell Parties (Count V, Sections H–N) because Plaintiffs have not suffered antitrust injury..........................................................................9

        B.  The federal antitrust claims against the MercyMe Defendants and Brickell Parties (Count V, Sections H–N) require a conspiracy, but the Complaint fails to allege a conspiracy. ..........................................................................................11

C. The intra-corporate conspiracy federal antitrust claims against the individual MercyMe Defendants (Count V, Sections H–N) fail because precedent prohibits intra-corporate conspiracy claims. ........................................................13

D. The Sherman Act Section 1 claim against the MercyMe Defendants and Brickell Parties (Count V, Sections H, K–M) fails because their alleged conduct was not an unreasonable restraint of trade.................................................13

E. The Sherman Act Section 1 and Clayton Act Section 14 claims against the MercyMe Defendants and Brickell Parties (Count V, Section K) fail because their alleged conduct was not an improper "tying" and regarded only the Waterland Defendants. .........................................................................................18

F. The Sherman Act Section 2 claim against the MercyMe Defendants and Brickell Parties (Count V, Section J) fails because they are not alleged to possess monopoly power and did not maintain Waterland Defendants' monopoly power.....................................................................................................20

G. The Complaint fails to allege that the MercyMe Defendants and the Brickell Parties violated Clayton Act Section 7 (Count V, Section I). ...............................21

H. The Tennessee antitrust claims against the MercyMe Defendants and Brickell Parties (Count VI) fail for the same reasons the federal antitrust claims against these Defendants fail. ..................................................................22

I. Because the federal antitrust claims against the MercyMe Defendants and the Brickell Parties fail, the Court lacks subject matter jurisdiction over the claims against Micah Tyler (Count XIV, Sections B–D and Count XVII)..........23

II. The Conversion claim against the MercyMe Defendants (Count XI, Section B(viii)) fails as a matter of law because they did not convert tangible property. ........24

III. The Tennessee Solicitation of Charitable Funds claim against the MercyMe Defendants and Brickell Parties (Count XVI) fails as a matter of law because TCA is not a solicitee and lacks standing to bring this claim. ...........................................25

IV. The tortious interference claim against the MercyMe Defendants regarding TCA's alleged contract and business relations with Children International (Count XI, Section G) fails as a matter of law because the MercyMe Defendants' alleged conduct was just business competition.......................................................................25

V. The unjust enrichment and constructive trust claims against the MercyMe Defendants (Count XI, Section E) fail as a matter of law because these claims are governed by an enforceable contract. .........................................................................28

VI. The breach of contract claims against the MercyMe Defendants (Count XI, Section B) fail as a matter of law pursuant to the terms of the MM Contract. ............29

A. Troy Collins' voluntary resignation from TCA triggered MercyMe Defendants' right to terminate the contract and was not an act of moral turpitude (Count XI, Section B(i) & B(ii)). ........................................................29

B. The MM Contract's cure period is inapplicable because Plaintiffs were incapable of curing the resignation of Troy Collins (Count XI, Section B(iv))...30

C. The MercyMe Defendants could not have breached Section 9(c) of the MM Contract because the MM Contract had already been terminated (Count XI, Section B(v)). ......................................................................................................30

ii

     D.    TCA had no matching rights after the MM Contract was terminated (Count XI, Section B(vi)). ..................................................................................................31

     E.    The indemnity claim fails because the MercyMe Defendants did not breach the MM Contract (Count XI, Section F). ...............................................................32

VII.  The Defend Trade Secrets Act against the MercyMe Defendants (Count XI, Section C) fails as a matter of law because they are a performing artist that does not use TCA's proprietary information. ....................................................................32

VIII. The Court lacks subject matter jurisdiction over the MercyMe Defendants and Brickell Parties because the federal claims against them fail as a matter of law.........33

IX.    The tortious interference claim against the MercyMe Defendants regarding Troy Collins' TCA contract (Count XI, Section H) fails as a matter of law because Troy Collins did not breach that contract. ...........................................................................33

X.     The Brickell Parties could not have conspired to breach the MM Contract (Count XV, Section A) because the MM Contract was not breached. ...................................34

XI.    The tortious interference claim against the Brickell Parties regarding the MM Contract (Count XV, Section B) fails as a matter of law because the MM Contract was not breached.....................................................................................................34

XII.   The Court lacks subject matter jurisdiction over the tortious interference claim against the Brickell Parties regarding the Tyler contract (Count XV, Section C)........34

CONCLUSION....................................................................................................................35

**TABLE OF AUTHORITIES**

**CASES**

*Ace Beer Distributors, Inc. v. Kohn, Inc.*,
318 F.2d 283 (6th Cir. 1963)................................................................................17

*AmeriGas Propane v. Crook*,
844 F. Supp. 379 (M.D. Tenn. 1993)...........................................................33, 34

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990).............................................................................................15

*Baird v. Smith*,
161 S.W. 492 (Tenn. 1913)..................................................................................22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).........................................................................................9, 11

*Bender v. Southland Corp.*,
749 F.2d 1205 (6th Cir. 1984).............................................................................18

*Bouldis v. U.S. Suzuki Motor Corp.*,
711 F.2d 1319 (6th Cir. 1983).......................................................................18, 19

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*,
No. 3:97-1249, 2008 U.S. Dist. LEXIS 55312 (M.D. Tenn. July 18, 2008) ........................10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)...............................................................................................9

*Care Heating & Cooling, Inc. v. Am. Std., Inc.*,
427 F.3d 1008 (6th Cir. 2005)......................................................................14, 15

*CoreCivic of Tenn., LLC v. Universal Strategic Advisors, LLC*,
No. 3:25-cv-00514, 2026 LX 20529 (M.D. Tenn. Feb. 27, 2026).......................27

*CPB Mgmt., Inc. v. Everly*,
939 S.W.2d 78 (Tenn. Ct. App. 1996) .................................................................28

*Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*,
854 F.2d 802 (6th Cir. 1988)...............................................................................17

*Doe v. Baum*,
903 F.3d 575 (6th Cir. 2018).................................................................................9

*Doherty v. American Motors Corp.*,
728 F.2d 334 (6th Cir. 1984)...............................................................................13

Case 3:26-cv-00484    Document 64    Filed 07/23/26    Page 4 of 42 PageID #: 808

*Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*,
  691 F.2d 241 (6th Cir. 1982)..................................................................................15, 17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ...............................................................................................20

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*,
  243 F.3d 980 (6th Cir. 2001)..................................................................................14

*Fam. Trust Servs. LLC v. Green Wise Homes LLC*,
  693 S.W.3d 284 (Tenn. 2024)................................................................................24

*Food Lion, LLC v. Dean Foods Co.*,
  730 F. Supp. 2d 804 (E.D. Tenn. 2010) .................................................................13

*Fortner Enterprises, Inc. v. United States Steel Corp.*,
  394 U.S. 495 (1969) ...............................................................................................18

*Fray Chevrolet Sales, Inc. v. General Motors Corp.*,
  536 F.2d 683 (6th Cir. 1976)..................................................................................17

*Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*,
  926 F.2d 505 (6th Cir. 1991)..................................................................................13

*Int'l Logistics Group, Ltd. v. Chrysler Corp.*,
  884 F.2d 904 (6th Cir. 1989)..................................................................................15

*J.A. v. Williamson Cty. Bd. of Educ.*,
  731 F. Supp. 3d 938 (M.D. Tenn. 2024) ..................................................................8

*Jet Packaging Grp., LLC v. Votaw*,
  No. 3:24-cv-00787, 2024 U.S. Dist. LEXIS 233329 (M.D. Tenn. Dec. 27, 2024)...............26

*Marshall v. ESPN Inc.*,
  111 F. Supp. 3d 815 (M.D. Tenn. 2015) ..................................................................9

*Milk Antitrust Litig.*,
  739 F.3d 262 (6th Cir. 2014)..................................................................................13

*Miller v. Insituform, Inc. of N. Am., Inc.*,
  605 F. Supp. 1125 (M.D. Tenn. 1985) ...................................................................13

*Ness v. Tenn. Bd. of Funeral Dirs. & Embalmers*,
  793 F. Supp. 3d 911 (M.D. Tenn. 2025) ..................................................................9

*Old Hickory Coaches, LLC v. Star Coach Rentals, Inc.*,
  652 S.W.3d 802 (Tenn. Ct. App. 2021) ..................................................................28

v

*Omar v. United States*,
552 F. Supp. 2d 713 (M.D. Tenn. 2008) ...............................................................................8

*Ralph v. Pipkin*,
183 S.W.3d 362 (Tenn. Ct. App. 2005) ..............................................................................24

*Riddle v. Lowe's Home Ctrs., Inc.*,
802 F. Supp. 2d 900 (M.D. Tenn. 2011) .............................................................................23

*Ryan v. Blackwell*,
979 F.3d 519 (6th Cir. 2020)................................................................................................9

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ..............................................................................................................9

*Theatre Enters. v. Paramount Film Distrib. Corp.*,
346 U.S. 537 (1954) ............................................................................................................11

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*,
71 S.W.3d 691 (Tenn. 2002) ..............................................................................................26

*United States v. Topco Assocs.*,
405 U.S. 596 (1972) ............................................................................................................14

*Valley Prods. Co. v. Landmark*,
128 F.3d 398 (6th Cir. 1997).................................................................................................9

*Wachter, Inc. v. Cabling Innovations*, LLC,
387 F. Supp. 3d 830 (M.D. Tenn. 2019) ............................................................................24

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus.*,
648 F.3d 452 (6th Cir. 2011)..............................................................................................11

*Wells v. Chattanooga Bakery, Inc.*,
448 S.W.3d 381 (Tenn. Ct. App. 2014) .........................................................................23, 24

*Zeigler v. NCAA*,
No. 3:25-cv-226-KAC-JEM, 2025 LX 126822 (E.D. Tenn. June 12, 2025)........................22

**STATUTES**

15 U.S.C. § 1...................................................................................................................11, 13

15 U.S.C. § 14........................................................................................................................19

15 U.S.C. § 18........................................................................................................................21

15 U.S.C. § 2........................................................................................................................20

18 U.S.C. § 1836(b)(1) ...............................................................................................32

28 U.S.C. § 1331 ........................................................................................................33

Tenn. Code Ann. § 47-25-101 ...............................................................................21, 22

Tenn. Code Ann. § 48-101-501 ...................................................................................25

Tenn. Code Ann. § 48-101-520(a)(1) ..........................................................................25

Tenn. Code Ann. §§ 47-25-102 ...................................................................................22

**RULES**

Fed. R. Civ. P. 12(b)(1)..................................................................................................8

Fed. R. Civ. P. 12(b)(6)..........................................................................................8, 9, 17

Fed. R. Civ. P. 12(h)(3)..................................................................................................9

**INTRODUCTION**

For several reasons, the Court should dismiss with prejudice each of the 15 claims asserted against the "MercyMe Defendants" (MercyMe, Inc., Bart Millard, Robin Shaffer, Nathan Cochran, and Mike Scheuchzer), the "Brickell Parties" (Scott Brickell and BrickHouse Entertainment), and Micah Tyler (collectively, the "Motion Defendants") because Plaintiffs lack standing to bring them, because they fail as a matter of law, or because they fail to state a claim upon which relief can be granted.[1]

<u>The Antitrust Claims</u>

The allegations that the MercyMe Defendants and Brickell Parties violated the federal and Tennessee antitrust acts are self-defeating. While antitrust claims require Plaintiffs to allege that the MercyMe Defendants and Brickell Parties reduced competition in the market, Plaintiffs' allegations demonstrate that these Defendants only increased competition in the market. After the MercyMe Defendants terminated their contract with TCA (the "MM Contract"), they entered into an agreement with an independent third party, Monroe-Collins, LLC, which was a new entity in the relevant market and is a competitor of the Waterland Defendants (as that term is defined in the Complaint).

The MercyMe Defendants' and Brickell Parties' pro-competition conduct forms the improper basis of Plaintiffs' antitrust claims against these Defendants. Plaintiffs allege injury from the MercyMe Defendants' alleged breach of the MercyMe/TCA contract (the "MM Contract") but fail to allege injury to market-wide competition. Accordingly, Plaintiffs lack "antitrust standing" to bring these claims, depriving this Court of subject matter jurisdiction.

Nor could the MercyMe Defendants and Brickell Parties have conspired with Waterland Defendants through their controlled subsidiaries, LiveCo/TPR and World Vision, to increase Waterland Defendants' market power because MercyMe Defendants' and Brickell

---

[1] Pursuant to the Court's July 22, 2026 Order (Dkt. 62), the Motion Defendants submit this Memorandum of Law of 35 pages.

1

Parties' actions, if anything, reduced Waterland Defendants' market power. Therefore, Plaintiffs fail to state an antitrust claim against the MercyMe Defendants and the Brickell Parties.

The Other Claims

The antitrust causes of action are not the only causes of action that must be dismissed. The other causes of action brought against Motion Defendants also fail as a matter of law: (1) The conversion cause of action fails because the allegedly converted property is intangible property that cannot, as a matter of law, support a conversion claim. (2) The unjust enrichment claim fails because Plaintiffs admit that an enforceable contract governs the subject matter of their unjust enrichment claim. (3) The Tennessee Solicitation of Charitable Funds statute cause of action fails because Plaintiffs are not "solicitees" under the statute, and Plaintiffs therefore lack standing to bring the claim. (4) The tortious interference with TCA and Children International's business relations fails because Plaintiffs fail to plead that MercyMe Defendants used improper means or had an improper motive in their engagement of Children International. (5) The breach of contract claims fail because the MercyMe Defendants' alleged conduct does not give rise to the inference of any breach. (6) The claim for indemnity fails because MercyMe Defendants did not breach their contract with TCA. (7) The Defend Trade Secrets Act claim fails because the MercyMe Defendants are a performing artist that could not have misappropriated TCA's alleged trade secrets, which could only be used by a market participant like TCA. (8) The claim that MercyMe Defendants tortiously interfered with Collins' contract fails because Collins' departure was not a breach of contract. (9) The claim that Brickell Parties conspired to breach the MM Contract fails because there was no breach of the MM Contract. (10) The claim that Brickell Parties tortiously interfered with the MM Contract fails because there was no breach of the MM Contract. (11) Lastly, the claim that Brickell Parties tortiously

2

interfered with the Tyler Contract fails because the court lacks subject matter jurisdiction over the claim.

**STATEMENT OF FACTS**

**I.   The parties operate in the Christian Contemporary Music market.**

The parties in this lawsuit all operate in the Christian Contemporary Music concert promotion and touring market (the "CCM Touring Market"), which is the alleged relevant market here. Compl. ¶¶ 93–104. This market involves three entities: "(a) performing artists; (b) promoters; and (c) nonprofit concert sponsors." *Id.* ¶ 96. TCA falls in the promoter category. *See id.* ¶ 117 (TCA "serve[s] as a liaison of sorts, between artists and nonprofits."). TCA uses the CCM concert platforms to generate donors, known in the market as "Sponsors," for nonprofit charities. *Id.* ¶ 107. The market for acquiring and using a CCM artists' "Public Platforms" (i.e., the artists' stage presence, verbal announcements, and concert ticket packages) to generate Sponsors is called the "NPS Market." *Id.* ¶ 110.

Performing artists like MercyMe perform live at CCM concerts. *Id.* ¶ 97. Promoters contract with the performing artists to plan and coordinate the artist's concerts and tours. *Id.* ¶¶ 99–104. Nonprofit sponsors contract with a performing artist to use the artist's Public Platform during their concerts to solicit donations from the concertgoers. *Id.* ¶¶ 105–08.

TCA operates as a concert promoter under the relevant market structure to generate nonprofit sponsorships. Compl. ¶¶ 10–11. It is a "nonprofit sponsorship intermediary" that contracts with performing artists to use their Public Platforms to generate charitable sponsors and donors at concerts. *Id.* ¶¶ 117–19. TCA is, by the Complaint's own description, a downstream user of artists' Public Platforms and is dependent on artists choosing to work with it. *Id.* ¶¶ 207–08; *see also id.* ¶ 117 (identifying TCA as a "liaison of sorts . . . between artists and nonprofits"). When an artist stops working with TCA, TCA loses that revenue stream. *Id.* ¶ 339. Loss of revenue streams from artists' choosing to not work with it is the core injury TCA

3

alleges in this lawsuit. *Id.* ("Plaintiffs have lost existing and prospective contractual relationships with artists and nonprofit organizations and have suffered substantial loss of revenues and business value."). TCA's loss of revenue from its lost contractual relationships, however, is by definition not an indicator of market-wide anticompetition effects.

Children International is a nonprofit concert sponsor in the relevant market structure. *Id.* ¶ 169. TCA had engaged with Children International for multiple years, soliciting charitable donations from MercyMe, Inc. concertgoers. *Id.* ¶ 170. After Children International's contract with TCA terminated by its terms on September 30, 2025, it contracted with MercyMe, with the help of Monroe-Collins. *Id.* ¶¶ 554, 556.

MercyMe is a performing artist in the relevant market. *Id.* ¶¶ 96, 179. MercyMe's business is making music and performing concerts, and it contracts with promoters. *See, e.g.*, *id.* ¶ 182.

The MercyMe Defendants contractually engaged with TCA as its nonprofit sponsorship intermediary, and the Complaint alleges that the agreement was signed by MercyMe and each individual band member. *Id.* ¶ 508. There is no allegation that any of these individuals operated independently of MercyMe in any of the conduct at issue, and therefore they acted as agents of MercyMe.

Scott Brickell operates BrickHouse Entertainment, LLC, which serves as the artist manager for MercyMe. *Id.* ¶ 210.

In 2024, World Vision and the Waterland Defendants worked together to attempt to contract with the MercyMe Defendants, which would have deprived TCA of the opportunity to renew the MM Contract. *Id.* ¶ 209. The Brickell Parties were central in the negotiations that led the MercyMe Defendants to re-sign with TCA. *Id.*

The Complaint does not allege that the Brickell Parties are concert promoters. In fact, the allegations regarding the Brickell Parties' role in contract negotiations demonstrate that the

4

Brickell Parties do not compete with TCA. Neither the MercyMe Defendants nor the Brickell Parties possess market power over any relevant market. The only alleged market monopoly is the Waterland Defendants and their controlled subsidiaries LiveCo/TPR and World Vision. *See id.* ¶¶ 18–19, 270. The Brickell Parties manage an artist—MercyMe—and by extension manage MercyMe's dealings with promoters, nonprofit partners, and others.

The Complaint's antitrust narrative is built around the alleged monopoly power of Waterland Private Equity and its subsidiaries. *Id.* ¶¶ 123–38, 246–54. Through LiveCo and TPR, Waterland allegedly acquired dominant control over 77 percent of CCM concert promotion. *Id.* ¶¶ 268–76, 291. With that alleged market dominance, Waterland and TPR are accused of leveraging control over CCM concert promotion to force CCM artists to abandon their nonprofit sponsorship arrangements with TCA in favor of a competing arrangement with LiveCo/TPR, aligning with World Vision and Waterland Defendants' monopolistic scheme. *Id.* ¶¶ 162–65, 319–25.

Micah Begnaud, who performs professionally as Micah Tyler, is a CCM performing artist. *Id.* ¶¶ 597–98. Like the MercyMe Defendants, Micah Tyler is a musical artist and is not alleged to be a concert promoter or a market participant with any capacity to control access to CCM touring. *Id.* ¶¶ 597–98. The Brickell Parties also manage Micah Tyler. *Id.* ¶ 597.

## II. The MercyMe Defendants and the Brickell Parties contracted with Waterland Defendants' competitor, increasing competition in the Christian Contemporary Music market.

In 2024, MercyMe and TCA entered into the most recent version of the MM Contract, Compl. ¶ 508, pursuant to which MercyMe agreed to use its public platform to promote TCA's charitable sponsorship, Children International, at MercyMe concerts, *id.* ¶¶ 509–10.

In 2024, Waterland and its affiliated entity, World Vision, allegedly approached and pressured MercyMe to terminate the MM Contract. *Id.* ¶¶ 168–70. Despite this pressure, MercyMe refused to sign with World Vision and Waterland Defendants, instead choosing to

re-sign with TCA. *Id.* ¶ 171. This should have been the first indication to Plaintiffs that MercyMe Defendants were not co-conspirators with the Waterland Defendants' monopolistic schemes.

The MM Contract contained a Troy Collins "key man" provision that permitted MercyMe to terminate the agreement once Troy Collins ceased to be employed by TCA. *Id.* ¶ 179. On June 2, 2025, Troy Collins resigned from TCA. *Id.* ¶ 180. Following Mr. Collins's resignation, the MercyMe Defendants exercised their contractual right to terminate the MM Contract. *Id.* Plaintiffs highlight that the Troy Collins key man provision is subject to a 30-day cure provision: "[T]he failure by . . . (TCA) . . . to perform any of their respective obligations hereunder shall not be deemed a breach of this Agreement unless the party claiming breach gives the other party written notice . . . and such failure is not corrected within thirty (30) days." *Id.* ¶¶ 514–15. Plaintiffs interpret the Troy Collins key man provision to permit them to designate a "qualified person" to replace Collins. *Id.* ¶ 523. The cure provision does not permit Plaintiffs to replace Troy Collins with anyone else. And such a unilateral cure would render the Troy Collins key man provision futile by allowing TCA to prevent termination of the contract whenever it needed to. Further, Troy Collins is the only person qualified to satisfy the Troy Collins key man provision. The MercyMe Defendants and Brickell Parties specifically negotiated the Troy Collins key man provision into the contract because Troy Collins is "lifelong friends" with Scott Brickell. *Id.* ¶ 611. TCA could never cure the Troy Collins key man provision with anyone other than Troy Collins.

After terminating the MM Contract, MercyMe engaged Troy Collins' new company, Monroe-Collins, to be MercyMe's promoter. *Id.* ¶ 556. Monroe-Collins has no relation to and is a competitor of the Waterland Defendants. *See id.* ¶ 556. The Complaint concludes without factual support that MercyMe's termination of the MM Contract was a part of a larger conspiracy to monopolize the market organized by TPR, World Vision, and the Waterland

6

Defendants: "[T]he MercyMe Defendants knowingly joined and furthered the conspiracy by agreeing to forego sponsorship arrangements with TCA in exchange for compensation and benefits funded in whole or in part by the Waterland Defendants and World Vision, thereby advancing the Defendants' scheme to eliminate TCA as a competitor." *Id.* ¶ 325. Plaintiffs do not allege what those benefits were. Further, Plaintiffs admit that after the MM Contract concluded, MercyMe did not contract with any of the other Defendants but rather used a third-party promoter to engage with Children International. *Id.* ¶ 556. That the MercyMe Defendants and Brickell Parties did not contract with the Waterland Defendants demonstrates the pro-competition nature of their conduct.

Plaintiffs make no factual allegations as to how the MercyMe Defendants and the Brickell Parties' termination of the MM Contract had an anticompetition effect on the market. The only non-conclusory allegations regarding injury pertain to TCA's individual injury, which is not an injury to the market. *See, e.g.*, *id.* ¶¶ 208, 339.

Monroe-Collins contracted with Children International to be its charitable sponsor. TCA had previously worked with Children International and allegedly hoped to continue working with Children International. The Complaint concludes without factual support that the MercyMe Defendants used improper means and motive to have Children International contract with Monroe-Collins and not TCA. *Id.* ¶ 554.

Plaintiffs also claim that MercyMe Defendants improperly converted TCA's proprietary information regarding sponsorship arrangements after MercyMe terminated the MM Contract. *Id.* ¶¶ 536–40. The ownership of these materials was explicitly governed by a provision of the MM Contract. *Id.* ¶ 539. Despite this explicit contractual provision, Plaintiffs bring an unjust enrichment claim.

Plaintiffs allege that MercyMe's use of Children International as a charitable sponsor violates the Tennessee Solicitation of Charitable Funds statute, because the MercyMe

7

Defendants allegedly never registered to be a "professional solicitor," as is required under the statute. *Id.* ¶ 621. But Plaintiffs lack standing to bring this claim because they are not a "solicitee," as they were not solicited for charitable funds or misled to donate funds to Children International. Under the Tennessee Solicitation of Charitable Funds statute, only solicitees have standing to bring a private cause of action, as Plaintiffs do here.

### III. Micah Tyler's alleged conduct

Micah Tyler is a CCM performing artist managed by Scott Brickell and Brickhouse Entertainment. Compl. ¶¶ 597–98. He had a contractual arrangement with TCA under which he used his concerts to support TCA's charitable sponsorship activities. *Id.* ¶¶ 602–04. At some point, Micah Tyler stopped performing concerts required by the contract. *Id.*

Because the Brickell Parties were the managers of Micah Tyler at the time of the alleged breach, Plaintiffs presume that it was the Brickell Parties that encouraged the breach. *Id.* ¶ 616. This same conduct was presumed by the Complaint to be a part of a market-wide monopoly conspiracy when it happened with MercyMe Defendants. *Id.* ¶ 325. It logically follows then that the breach of the Micah Tyler contract comes within the purview of Plaintiffs' federal antitrust conspiracy allegations.

### STANDARD OF REVIEW

The Motion Defendants move under both Rule 12(b)(1) for lack of standing to bring federal antitrust claims and Rule 12(b)(6) for failure to state a claim upon which relief may be granted. A motion to dismiss "for lack of standing is properly characterized as a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *J.A. v. Williamson Cty. Bd. of Educ.*, 731 F. Supp. 3d 938, 945–46 (M.D. Tenn. 2024). When moving under Rule 12(b)(1), "the plaintiff bears the burden of establishing that the Court has subject-matter jurisdiction over his claim." *Omar v. United States*, 552 F. Supp. 2d 713, 716 (M.D. Tenn. 2008). To survive this motion, Plaintiffs must establish that they "(1) suffered an

injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). This Court "must dismiss the action" if it "determines at any time that it lacks subject-matter jurisdiction." Fed. R. Civ. P. 12(h)(3).

To survive a motion to dismiss under Rule 12(b)(6), the complaint must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020). The Court must accept the complaint's factual allegations as true and must "take all of those facts and inferences [to] determine whether they plausibly give rise to an entitlement to relief." *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018). Antitrust is an area in which the Rule 12(b)(6) pleading standard carries particular weight because of the inordinate expensiveness of antitrust litigation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558–59 (2007).

## ARGUMENT

**I.  The federal antitrust claims against the MercyMe Defendants and Brickell Parties (Count V, Sections H–N) fail as a matter of law because the MercyMe Defendants' and Brickell Parties' alleged conduct increased competition in the market.**

> **A. Plaintiffs lack standing to bring their antitrust claims against the MercyMe Defendants and Brickell Parties (Count V, Sections H–N) because Plaintiffs have not suffered antitrust injury.**

To have standing, a plaintiff must suffer an injury in fact caused by the defendant. *See Ness v. Tenn. Bd. of Funeral Dirs. & Embalmers*, 793 F. Supp. 3d 911, 922 (M.D. Tenn. 2025). A "private antitrust plaintiff, in addition to having to show injury-in-fact . . . , must allege, and eventually prove, 'antitrust injury.'" *Marshall v. ESPN Inc.*, 111 F. Supp. 3d 815, 835 (M.D. Tenn. 2015) (citations omitted). "Without antitrust injury, no private antitrust action will lie at law or in equity." *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 402 (6th Cir. 1997).

Antitrust injury is an "injury of the type the antitrust laws were intended to prevent" and is one "that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v.*

9

*Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Plaintiffs "must allege not only an injury to itself, but an injury to the market as well" because the "purpose of antitrust laws is the protection of *competition*, not *competitors*," *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, No. 3:97-1249, 2008 U.S. Dist. LEXIS 55312, at *15 (M.D. Tenn. July 18, 2008) (emphasis in original)).

The Complaint fails to plead an antitrust injury caused by the MercyMe Defendants or the Brickell Parties, alleging instead that the Waterland Defendants "foreclosed [TCA] from competing for artist platforms and nonprofit sponsorship opportunities," "suppressed . . . touring activity" of the Newsboys, and "eliminated an independent competitor" in the market. Compl. ¶¶ 339, 341, 343; *see also* Compl. at ¶¶ 338–47 (using the collective "Defendants").

Unlike the actions attributed to the Waterland Defendants, the MercyMe Defendants and Brickell Parties are alleged only to have breached the MM Contract, Compl. ¶ 180, engaged former TCA employee Troy Collins as a new nonprofit sponsorship intermediary, Compl. ¶ 556, and contracted with Children International. Compl. ¶ 554. This conduct could only increase, not injure, market competition. Paragraph 208 demonstrates this point by alleging that the MercyMe Defendants and Brickell Parties "(i) deprived TCA of its most commercially valuable platform asset, (ii) signaled to other artists and nonprofits that TCA could no longer deliver premier access, and (iii) enabled LiveCo/TPR to redirect MercyMe's audience-generated sponsorship value into its own controlled channels." *Id.* ¶ 208. TCA also allegedly lost the revenue it would have generated from MercyMe's concerts. *Id.* ¶ 339.

While these allegations may demonstrate that the MercyMe Defendants' and Brickell Parties' actions injured Plaintiffs, these allegations do not establish that these Defendants injured competition in the market. Upon terminating the MM Contract, the MercyMe Defendants and Brickell Parties did not contract with any of the Waterland Defendants or World Vision. They instead contracted with Monroe-Collins, which competes with TCA and

10

the Waterland Defendants. *See id.* ¶ 556. The MercyMe Defendants and Brickell Parties increased rather than decreased overall competition in the market. Further, their use of Collins' company to contract with Children International is common business competition, especially in a market where it is "a significant undertaking" to "find[], interest[], and vet[] appropriate charities." *Id.* ¶ 109.

Therefore, Plaintiffs lack antitrust standing, and this Court lacks subject matter jurisdiction over the antitrust claims against the MercyMe Defendants and Brickell Parties.

## B. The federal antitrust claims against the MercyMe Defendants and Brickell Parties (Count V, Sections H–N) require a conspiracy, but the Complaint fails to allege a conspiracy.

Section 1 of the Sherman Act requires proof of a contract, combination, or conspiracy in restraint of trade. 15 U.S.C. § 1. Each of the federal antitrust claims requires a conspiracy between the Defendants to violate the federal antitrust claims. The "crucial question" then is whether the challenged conduct "stem[s] from independent decision or from an agreement, tacit or express." *Theatre Enters. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954). A showing of parallel "business behavior" falls short of "conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." *Id.*; *see also Twombly*, 550 U.S. at 554 (providing additional safeguards against the risk of "false inferences from identical behavior"). Instead, "[t]here must be evidence that tends to exclude the possibility that the [parties] were acting independently." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus.*, 648 F.3d 452, 457 (6th Cir. 2011).

The Complaint fails to allege evidence that excludes the possibility that the MercyMe Defendants and the Brickell Parties were acting independently of the Waterland Defendants. Plaintiffs provide conclusory allegations of a conspiracy, *see* Compl. ¶¶ 325, 507, but provide none of the evidence required to sustain a conspiracy claim. The Complaint also cites to MercyMe Defendants' "prior dealing with the Waterland Defendants in or around August

11

2024." *Id.* ¶ 507. This allegation involves the Waterland Defendants' attempts to contract MercyMe Defendants away from TCA. As the Complaint points out, however, the Waterland Defendants' attempts were unsuccessful, and MercyMe re-signed with TCA. This act alone defeats any inference of a conspiracy between Defendants. *Id.*

Plaintiffs also claim that MercyMe Defendants terminated the MM Contract for "compensation and benefits funded in whole or in part by Waterland Defendants." *Id.* ¶ 325. The Complaint fails to allege any evidence as to what these compensations and benefits may be, when such an agreement was made, or when these benefits were given to MercyMe Defendants. Without more, this allegation is entirely conclusory and need not be taken as true.

That the MercyMe Defendants did not contract with any of the Waterland Defendants further demonstrates that there was no conspiracy. Instead, the MercyMe Defendants contracted with Monroe-Collins, a nonprofit sponsorship intermediary that competes with TCA and Waterland Defendants in the relevant markets. The only inference to be drawn from the Complaint is that the MercyMe Defendants acted independently.

In fact, MercyMe Defendants' and Waterland Defendants' actions are not even parallel. MercyMe Defendants' termination of the TCA contract may have injured TCA, but it did not increase Waterland Defendants' market power or advance their monopoly in any way. Because the MercyMe Defendants terminated the TCA contract on and around the time that Waterland Defendants were performing allegedly monopolistic conduct, Plaintiffs just presume that the two events were related. The Complaint does not sufficiently allege that they were connected. Therefore, the Complaint does not sufficiently plead antitrust conspiracy between the Motion Defendants and the Waterland Defendants. As such, each of the federal antitrust claim against Motion Defendants, including Sherman Act Sections 1 and 2 and Clayton Act Section 14, should be dismissed.

**C. The intra-corporate conspiracy federal antitrust claims against the individual MercyMe Defendants (Count V, Sections H–N) fail because precedent prohibits intra-corporate conspiracy claims.**

Plaintiffs allege a conspiracy between MercyMe, Inc. (the band), its individual band members, and the Waterland Defendants. This claim as it is alleged against the individual band members fails as a matter of law under the "intra-corporate conspiracy theory," *Doherty v. American Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984), under which a corporation cannot conspire with its own agents and employees, *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991); *see also Miller v. Insituform, Inc. of N. Am., Inc.*, 605 F. Supp. 1125, 1135 (M.D. Tenn. 1985) ("Well established precedent in the federal courts holds that collaborative efforts between a corporation and its employees is not sufficient to satisfy . . . a conspiracy within the meaning of 15 U.S.C. § 1.").

Each of the individual members of MercyMe—Bart Millard, Robin Shaffer, Nathan Cochran, and Mike Scheuchzer—are employees and agents of MercyMe Each of their actions as agents of MercyMe are attributed to the corporation. As a corporation, MercyMe cannot conspire with its own employees and agents. The federal antitrust claims against Bart Millard, Robin Shaffer, Nathan Cochran, and Mike Scheuchzer should be dismissed.

**D. The Sherman Act Section 1 claim against the MercyMe Defendants and Brickell Parties (Count V, Sections H, K–M) fails because their alleged conduct was not an unreasonable restraint of trade.**

Under the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. Courts construe "restraint of trade" to mean "an *unreasonable restraint of trade which caused the plaintiff to experience an antitrust injury.*" *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014) (emphasis added).

13

Unreasonable restraint of trade is analyzed either under "per se" circumstances or under the "rule of reason." *Food Lion, LLC v. Dean Foods Co.*, 730 F. Supp. 2d 804, 815 (E.D. Tenn. 2010). Per se violations require there to be a "horizontal restraint" or "agreement between competitors at the same level of the market structure" that "minimize[s] competition." *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972). A party is at the same level of the market structure as the plaintiff if they are a direct competitor in that market. *Id.* A common example is among manufacturers and distributors. Contracts between competing manufacturers are horizontal restraints, but a contract between a manufacturer and distributor would not be horizontal restraints because the two are on different levels of the market structure. *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 986 (6th Cir. 2001).

"Vertical restraints," on the other hand, require "combinations of persons at different levels of the market structure, *e.g.*, manufacturers and distributors . . . ." *Topco Assocs.*, 405 U.S. at 608. Any alleged "vertical . . . restraints are to be tested under the rule of reason" analysis. *Care Heating & Cooling, Inc. v. Am. Std., Inc.*, 427 F.3d 1008, 1013 (6th Cir. 2005).

Any alleged unreasonable restraint of trade here can only be a vertical restraint because the MercyMe Defendants and Brickell Parties are not at the same level of the market structure as the Waterland Defendants. As the Complaint makes clear, Waterland Defendants, through LiveCo/TPR compete as a "promoter" in the CCM Touring Market and NPS Markets. Compl. ¶¶ 284–86. The MercyMe Defendants are not promoters; they are a performing artist. *Id.* ¶ 194. The Brickell Parties are MercyMe Defendants' agents. *Id.* ¶ 212. Because neither MercyMe Defendants nor Brickell Parties are promoters, they are not same-level market competitors of Waterland Defendants, and any contracts or

14

conspiracy between MercyMe Defendants/Brickell Parties with the Waterland Defendants would constitute a vertical restraint. The rule of reason therefore applies.

The rule of reason requires a plaintiff to allege (1) that the defendants contracted, combined, or conspired; (2) that such contract produced adverse anticompetition effects; (3) within relevant product and geographic markets; (4) that the objects of and conduct resulting from the contract were illegal; and (5) that the contract was a proximate cause of plaintiff's injury. *Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989).

The Section 1 claim fails as a matter of law because it fails to satisfy the second prong of the rule of reason analysis for anticompetition effects. The Sherman Act was "intended to protect competition and the market as a whole, not individual competitors." *Care Heating & Cooling*, 427 F.3d at 1014 (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990)). Thus, anticompetitive effect for purposes of this analysis is any "alleged adverse effect on the market" as a whole—"[i]ndividual injury, without accompanying market-wide injury, does not fall within the protections of the Sherman Act." *Id.*; *see also Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 243 (6th Cir. 1982) (holding that a complaint failing to allege facts establishing that defendant's conduct had significant anticompetition effect on the market fails to state an antitrust claim).

The Section 1 allegations as to MercyMe can be reduced to the following: MercyMe terminated its arrangement with TCA at the alleged orchestration of the Waterland Defendants, engaged Troy Collins' company, and contracted with Children International as its charitable partner. Compl. ¶¶ 180, 307, 556. As a result, Plaintiffs allege that TCA lost the revenue it would have generated from MercyMe's concerts and lost "existing and prospective contractual relationships with artists and nonprofit organizations." *Id.* ¶ 339. This is individual injury to

15

TCA. It is not market-wide anticompetition effects. As to the market as a whole, Plaintiffs allege, in conclusory fashion, that Defendants' actions "reduced output and competition in the relevant markets by eliminating an independent competitor," *id.* ¶ 343, and harmed "artists and nonprofit organizations" who can no longer "negotiate with TCA and artists independently" because of "Defendants' controlled structure," *id.* ¶ 344.

There can be no market-wide anticompetition effect from the MercyMe Defendants' or the Brickell Parties' alleged conduct. The MercyMe Defendants actually increased, rather than "reduced," competition in the relevant market. After its contract with TCA was terminated, MercyMe Defendants contracted with Troy Collins' company as its nonprofit sponsorship intermediary—a direct competitor of TCA and, as a result, with the Waterland Defendants' competing Public Platform. *See* Compl. ¶ 282. A CCM force as influential as the MercyMe Defendants signing with a nonprofit sponsorship intermediary in this market certainly increases competition and, as Plaintiffs admit, is a significant obstacle to Waterland Defendants' monopoly power. *See id.* ¶ 208 ("So long as MercyMe, as the single most powerful driver of audience aggregation in the CCM Touring Market, remained aligned with TCA, TCA retained both credibility and competitive viability as an obstacle to the vertically integrated structure created by LiveCo/TPR and World Vision."). TCA has mistakenly conflated its individual injury from pure business competition to be a market-wide injury. It is not—injury to a competitor is not injury to competition. MercyMe Defendants have added another competitor to this market and just because that damages TCA's business, it does not mean that MercyMe Defendants had an anticompetition effect on the market as a whole.

Plaintiffs' allegation that MercyMe Defendants and Brickell Parties harmed "artists and nonprofit organizations" who can no longer "negotiate with TCA and artists independently" because of "Defendants' controlled structure" is also unfounded. *Id.* ¶ 344. MercyMe, an artist, engaged with Troy Collins' company as a nonprofit sponsorship intermediary and Children

16

International as its charitable sponsor—noticeably independent of Waterland Defendants' control over the NPS Market. An artist or charity not contracting with TCA does not mean that competition in CCM Touring Market or NPS Market is destroyed. TCA cannot summarily champion itself as the savior of competition in these markets—Children International's engagement with MercyMe, Inc. and an independent competitor outside the monopolistic control of Waterland Defendants is proof of that.

TCA's attempt to convert individual injury to market-wide injury closely mirrors distributor/manufacturer disputes in which a distributor improperly conflates an individual injury from pure business competition to be a market-wide injury. In *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683 (6th Cir. 1976), for instance, a distributor brought an antitrust claim against a manufacturer after it decided to use a different distributor for the distribution of its goods. The Sixth Circuit has made clear that "the substitution of one distributor . . . for another . . . does not eliminate or materially diminish the existing competition . . . and, in our opinion, is not an unreasonable restraint of trade." *Id*. at 686; *see also Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283, 287 (6th Cir. 1963); *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 807 (6th Cir. 1988) (ruling that a complaint charging restraint of trade based on a manufacturer's substitution of one distributorship for another must allege anticompetition effects at the Interbrand level to survive a Rule 12(b)(6) motion). The courts have noted that if they were to rule otherwise and "follow the Plaintiff's reasoning on this point to its logical conclusion, every time an individual consumer chose the services of a particular company, a monopoly would be established." *Dunn & Mavis*, 691 F.2d at 243.

Plaintiffs' allegations against the MercyMe Defendants and the Brickell Parties are analogous. The MercyMe Defendants and Brickell Parties are like the manufacturer, producing music and performing concerts. Their nonprofit sponsorship intermediary, formerly TCA, is like the distributor, aligning and coordinating everything for MercyMe Defendants to contract

17

with certain charitable organizations. When the MercyMe Defendants terminated their contract with TCA and chose to use Troy Collins' company, it was akin to a manufacturer choosing to use a different distributor. There was no harm done to Interbrand competition because a new competitor was added to the market. Just because that decision harmed TCA's business does not mean that those actions amounted to a violation of federal antitrust law. To hold otherwise would be to conjure a monopoly every time a company chose the services of another.

Because Plaintiffs fail to sufficiently plead that MercyMe Defendants' and Brickell Parties' actions created market-wide anticompetition effects, the Complaint fails the rule of reason analysis. Therefore, Plaintiffs fail to state a claim for a violation of the Sherman Act Section 1 and this Court should dismiss this claim against MercyMe Defendants and Brickell Parties.

**E. The Sherman Act Section 1 and Clayton Act Section 14 claims against the MercyMe Defendants and Brickell Parties (Count V, Section K) fail because their alleged conduct was not an improper "tying" and regarded only the Waterland Defendants.**

In its cause of action for a violation of the Sherman Act Section 1 and Clayton Act Section 14, Plaintiffs suggest that the MercyMe Defendants' and Brickell Parties' actions constitute impermissible "tying" of products or services. A "tying arrangement exists where a seller will sell one product (the tying product) only if the buyer will purchase a second product (the tied product)." *Bender v. Southland Corp.*, 749 F.2d 1205, 1215 (6th Cir. 1984). This arrangement can also involve services and is per se unlawful under Section 1 of the Sherman Act. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 507 (1969). For the tying of services, the seller must have "sufficient economic power with respect to the tying [service] to appreciably restrain free competition in the market for the tied product and a 'non insubstantial' amount of interstate commerce is affected." *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1324 (6th Cir. 1983).

18

A Clayton Act Section 14 claim is often brought alongside a Sherman Act Section 1 claim for illegal tying arrangements. The relevant statute makes it unlawful "for any person engaged in commerce . . . to lease or make a sale or contract for sale of goods . . . or other commodities . . . on the condition . . . that the lessee or purchaser . . . shall not use or deal in . . . other commodities of a competitor . . . where the effect of such . . . condition . . . may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14. The analysis for a Clayton Act Section 14 claim is therefore the same as the Sherman Act tying arrangement analysis.

Plaintiffs allege that Defendants used "unlawful tying and leveraging of control over Christian Contemporary Music Touring opportunities (the tying product) to obtain control over nonprofit sponsorship revenues (the tied product), resulting in substantial foreclosure of competition in the NPS Market." Compl. ¶ 216. Even if this alleged arrangement constitutes illegal tying, it does not apply to MercyMe Defendants or Brickell Parties. Plaintiffs attempt to lump the MercyMe Defendants and Brickell Parties in with this alleged tying arrangement by claiming that they "align[ed] with the Waterland Defendants and World Vision under these conditions . . . ." *Id.* ¶ 215. However, Plaintiffs never allege that MercyMe Defendants (one of thousands of artists who perform in the CCM Market) or Brickell Parties (one of thousands of artist managers who manage CCM artists) have any kind of monopoly power in this market. Therefore, MercyMe Defendants and Brickell Parties cannot have "sufficient economic power with respect" to the tying arrangement "to appreciably restrain free competition in the market." *Bouldis*, 711 F.2d at 1324. Nor does either party have enough "control over Christian Contemporary Music Touring opportunities" to leverage control over it. Compl. ¶ 216. It is clear that this claim for tying applies exclusively to Waterland Defendants and their control over the market.

19

Further, even if the alleged tying arrangement exists, MercyMe Defendants is a performing artist and is therefore a market participant that would be most negatively affected by such an arrangement. The statute asserts liability onto the party that ties products or services together, not the parties that are impacted by the tying arrangement. To argue otherwise would be akin to placing liability onto wrongdoers and their victims.

Plaintiffs fail to allege any evidence suggesting that MercyMe Defendants and Brickell Parties leveraged control over the market into a tying arrangement for products or services. Rather, the allegations of tying pertain only to Waterland Defendants. Therefore, Plaintiffs fail to state a claim for a Sherman Act Section 1 claim for tying or a Clayton Act Section 14 claims and therefore these two causes of actions should be dismissed.

**F.  The Sherman Act Section 2 claim against the MercyMe Defendants and Brickell Parties (Count V, Section J) fails because they are not alleged to possess monopoly power and did not maintain Waterland Defendants' monopoly power.**

Section 2 of the Sherman Act, 15 U.S.C. § 2, provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states . . . shall be deemed guilty of a felony . . . ." To plead this cause of action, Plaintiffs must allege "(1) possession of monopoly power in the relevant market; and (2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992).

While Plaintiffs generally allege a cause of action for a Sherman Act § 2 violation against "Waterland Defendants, World Vision, the MercyMe Defendants and B[r]ickell Parties," this claim cannot be made against the MercyMe Defendants and Brickell Parties. The Complaint does not allege that either the MercyMe Defendants or the Brickell Parties possess

20

any monopoly power. Further, because neither party possesses monopoly power, it is impossible for them to have made an acquisition or action to maintain their monopoly power.

Even if this cause of action applied to the MercyMe Defendants or the Brickell Parties, Plaintiffs cannot plausibly state that any of their actions maintained the Waterland Defendants' monopoly power. The Motion Defendants did not increase the Waterland Defendants' market share. Instead, by contracting with Monroe-Collins, a competitor of Waterland Defendants, they added another competitor to the market. Plaintiffs conceded that a competitor engaged with such an influential artist as MercyMe would prove an "obstacle" to the monopoly. Compl. ¶ 208. This cause of action therefore fails as a matter of law as against the MercyMe Defendants and the Brickell Parties and should be dismissed.

**G. The Complaint fails to allege that the MercyMe Defendants and the Brickell Parties violated Clayton Act Section 7 (Count V, Section I).**

The Complaint generally alleges a Clayton Act Section 7 violation in the same way it alleges a Sherman Act Section 2 violation, making allegations against Waterland Defendants, World Vision, MercyMe Defendants, and the Brickell Parties. The Complaint, again, provides no factual support for how the MercyMe Defendants or the Brickell Parties violated Section 7 of the Clayton Act. *See* Compl. ¶¶ 306–13. Nor could it, because Section 7 of the Clayton Act prohibits a party from "acquir[ing], directly or indirectly, the whole or any part of the stock or other share capital . . . of another person engaged also in commerce or in any activity affecting commerce, where . . . the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

But the MercyMe Defendants and the Brickell Parties are not alleged to have made any anti-competition acquisitions or to have possessed monopoly power. Therefore, this cause of action for a violation of the Clayton Act Section 7 against MercyMe Defendants and Brickell Parties fails as a matter of law and should be dismissed.

21

**H. The Tennessee antitrust claims against the MercyMe Defendants and Brickell Parties (Count VI) fail for the same reasons the federal antitrust claims against these Defendants fail.**

Plaintiffs briefly allege that the MercyMe Defendants' and the Brickell Parties' actions constituted a violation of Sections 47-25-101 and 102 of the Tennessee Code. Compl. ¶¶ 348–50. Plaintiffs incorporate their allegations from their federal antitrust claims for support that the MercyMe Defendants and the Brickell Parties violated the Tennessee antitrust law. *Id.*

Tenn. Code Ann. § 47-25-101 prohibits any agreement that "lessen[s] . . . full and free competition in trade or commerce . . . ." Under this section, courts must examine whether the alleged restraint in trade "tends to . . . work an undue or unreasonable restraint upon full and free competition." *Baird v. Smith*, 161 S.W. 492, 493 (Tenn. 1913). The unreasonable restraint "inquiry mirror[s] . . . the Rule of Reason." *Zeigler v. NCAA*, No. 3:25-cv-226-KAC-JEM, 2025 LX 126822, at *12 (E.D. Tenn. June 12, 2025). Because the analysis above shows that MercyMe Defendants' and Brickell Parties' actions did not constitute an unreasonable restraint of trade under Section 1 of the Sherman Act, the mirroring Tennessee state antitrust law fails as well.

Tenn. Code Ann. § 47-25-102 provides that it is "unlawful for any corporation or person to monopolize, attempt to monopolize, conspire to monopolize, or maintain a monopoly over any part of trade or commerce affecting this state." Again, this statute nearly mirrors Section 2 of the Sherman Act. However, as explained prior, MercyMe Defendants and Brickell Parties held no monopoly power and never attempted to gain monopoly power. Further, even if this statute could apply to them, they did nothing to maintain the Waterland Defendants' monopoly power. They did not increase the Waterland Defendants' market share or power whatsoever. In fact, they created an additional market obstacle to the Waterland Defendants' monopoly by creating another independent competitor in the market. Therefore, because the Sherman Act

22

Section 2 claim fails as a matter of law, Plaintiffs' claim for a violation of Tenn. Code Ann. § 47-25-102 also fails.

Because Plaintiffs fail to state a claim for relief for any of the federal antitrust causes of action against MercyMe Defendants and Brickell Parties, their Tennessee antitrust claims fail as a matter of law. Therefore, Plaintiffs' claim for violations of Tennessee's antitrust statutes should be dismissed.

**I. Because the federal antitrust claims against the MercyMe Defendants and the Brickell Parties fail, the Court lacks subject matter jurisdiction over the claims against Micah Tyler (Count XIV, Sections B–D and Count XVII).**

Plaintiffs allege that this Court has subject matter jurisdiction over their claims against Micah Tyler "because the *claims* asserted against [him] by Plaintiffs are *claims* arising between citizens of different states . . . and the amount in controversy exceeds $75,000 . . . ." Compl. ¶ 85 (emphasis added). In other words, Plaintiffs allege that diversity jurisdiction exists for the claims against Micah Tyler. But diversity requires that "no defendant may be a citizen of the same state as any plaintiff." *Riddle v. Lowe's Home Ctrs., Inc.*, 802 F. Supp. 2d 900, 903 (M.D. Tenn. 2011). Diversity does not exist here because the Plaintiffs and several of the Defendants (Bart Millard, Nathan Cochran, and Mike Scheuchzer) are citizens of Tennessee. Compl. ¶¶ 42–46, 74, 76, 77, 79, 80. Accordingly, this Court lacks diversity jurisdiction.

Plaintiffs cannot sequester claims within a lawsuit so that diversity jurisdiction exists over a singular Defendant. Holding otherwise would allow any Plaintiff to easily circumvent the complete diversity requirement of diversity jurisdiction. Because there is no complete diversity in this action, this Court does not have subject matter jurisdiction over Micah Tyler through diversity jurisdiction.

Should this Court dismiss Plaintiffs' federal claims, it would lose the accompanying supplemental jurisdiction over Micah Tyler, depriving the Court of subject matter jurisdiction over him. Accordingly, the Court should dismiss all causes of action against Micah Tyler.

23

**II.** **The Conversion claim against the MercyMe Defendants (Count XI, Section B(viii)) fails as a matter of law because they did not convert tangible property.**

Conversion "is the wrongful appropriation of another's tangible property." *Wells v. Chattanooga Bakery, Inc.*, 448 S.W.3d 381, 392 (Tenn. Ct. App. 2014). The wrongfully appropriated property must be *tangible* in order to sustain a conversion claim in Tennessee— "an action for the conversion of intangible . . . property is not recognized in Tennessee." *Id.*; *Fam. Trust Servs. LLC v. Green Wise Homes LLC*, 693 S.W.3d 284, 306 (Tenn. 2024) ("[O]ur courts have consistently declined to recognize causes of action for . . . conversion of intangible property rights."); *see also Wachter, Inc. v. Cabling Innovations*, LLC, 387 F. Supp. 3d 830, 848 (M.D. Tenn. 2019) ("Plaintiff's conversion claims fails as a matter of law because Tennessee law does not recognize an action for the conversion of . . . intangible property.").

Property is tangible if it can be "seen, felt, weighed and measured." *Wells*, 448 S.W.3d at 392. Therefore, because intellectual property cannot be "seen, felt, weighed and measured," it is a "species of intangible . . . property" that cannot support a claim for conversion. *Ralph v. Pipkin*, 183 S.W.3d 362, 368 (Tenn. Ct. App. 2005) (citation omitted).

All of the property that Plaintiffs allege was converted by MercyMe Defendants is intangible property and cannot sustain a conversion claim as a matter of law. Plaintiffs claim that MercyMe Defendants converted property such as "sponsor information, donor data, personally identifiable information of Confirmed Sponsors and pledging donors, campaign structures, [and] event execution materials." Compl. ¶ 537. None of this property is tangible. None of it can be seen, felt, weighed and measured.

The allegedly converted property is undoubtedly intellectual property. TCA is alleging that MercyMe Defendants converted TCA's intellectual property—that TCA used to generate revenue—in order to generate its own revenue in the market. Because such misappropriation of "data" and "information" cannot sustain a cause of action for conversion in Tennessee,

24

Plaintiffs' claim for conversion against MercyMe Defendants fails as a matter of law. Therefore, this claim should be dismissed.

**III.** **The Tennessee Solicitation of Charitable Funds claim against the MercyMe Defendants and Brickell Parties (Count XVI) fails as a matter of law because TCA is not a solicitee and lacks standing to bring this claim.**

Tennessee's Solicitation of Charitable Funds statute provides that "[a]ny solicitee or person who suffers an ascertainable loss of money or property . . .  or thing of value . . . as a result of the use or employment by another person of an unfair, false misleading or deceptive act or practice . . . may bring an action individually to recover actual damages." Tenn. Code Ann. § 48-101-520(a)(1). The plain text of the statute makes clear its intention to provide relief to solicitees who were fraudulently or deceptively solicited to. A "solicitee" for purposes of the statute means "any person from whom a charitable contribution or donation is solicited …" *Id.* § 48-101-501.

Plaintiffs lack standing to bring this claim because they were not solicitees, as that term is defined in the statute. Plaintiffs allege that MercyMe Defendants and Brickell Parties solicited funds from their crowds without registering as a "professional solicitor." Compl. ¶¶ 620–21. They then claim that because Defendants failed to register as professional solicitors, Plaintiffs "had their business destroyed . . . ." *Id.* ¶ 622. Plaintiffs were not the individuals who were solicited for charitable funds. Only those concertgoers who donated or were asked to donate charitable funds would have suffered the necessary injury to bring this claim. As a result, this Court lacks subject matter jurisdiction over this claim and this cause of action should therefore be dismissed.

**IV.** **The tortious interference claim against the MercyMe Defendants regarding TCA's alleged contract and business relations with Children International (Count XI, Section G) fails as a matter of law because the MercyMe Defendants' alleged conduct was just business competition.**

Despite the cause of action stating that MercyMe Defendants tortiously interfered with TCA's "contract" with Children International, the claim is entirely one for tortious interference

25

with a business relation. TCA's contract with Children International "terminated by its terms on September 30, 2025." Compl. ¶ 554. TCA simply had an "expectation" that the contract "would be . . . renewed." *Id.* Therefore, there was no contract to interfere with, only a business relation.

To sufficiently allege an intentional interference with a business relation in Tennessee, a plaintiff must show "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means* . . . ; and finally, (5) damages resulting from the tortious interference." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (emphasis in original).

Plaintiffs fail to plausibly plead the fourth element for improper motive or means. "Improper means" are "means that are illegal, independently tortious or that violate an established standard of trade or profession." *Jet Packaging Grp., LLC v. Votaw*, No. 3:24-cv-00787, 2024 U.S. Dist. LEXIS 233329, at * 22–23 (M.D. Tenn. Dec. 27, 2024). The improper means must have the end of interfering with the business relation. Common examples include "ma[king] disparaging remarks to, and shar[ing] confidential information with . . ." the plaintiff's business clients to interfere with those relations. *Id.* at *23.

Plaintiffs do not sufficiently plead that MercyMe Defendants used improper means to interfere with TCA's business relation with Children International. Plaintiffs allege that Defendants arranged for Troy Collins to leave TCA, giving MercyMe Defendants an avenue to prematurely terminate their contract with TCA in July 2025 and to engage Children International the following year. Compl. ¶¶ 554–56. Even assuming MercyMe Defendants and Brickell Parties prematurely terminated their contract with TCA via improper means, that does

26

not mean that they used improper means to somehow steal Children International away from TCA. Defendants did not disparage TCA to Children International or deceive Children International to lead them away from TCA. Defendants simply used their new nonprofit sponsorship intermediary—Troy Collins' company—to submit a competing offer to Children International upon its termination of its contract with TCA which it accepted. This is plain business competition. Further, Children International is free to choose whichever offer they want.

To interpret Defendants' alleged improper means in terminating its contract with TCA to mean that it used improper means in contracting with Children International would be beyond the intended scope of this tort. This tort "should not be interpreted in such a way as to prohibit or undermine the ability to contract freely and engage in competition." *CoreCivic of Tenn., LLC v. Universal Strategic Advisors, LLC*, No. 3:25-cv-00514, 2026 LX 20529, at *19-20 (M.D. Tenn. Feb. 27, 2026). MercyMe Defendants and Brickell Parties, through their third-party nonprofit sponsorship intermediary, competed with TCA for Children International's business and won. There were no improper means used in this engagement.

Nor do Plaintiffs sufficiently plead improper motive on the part of Defendants. With "regard to improper motive, [Tennessee Courts] require that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff." *Id.* Plaintiffs cannot plausibly state that MercyMe Defendants' and Brickell Parties' engagement with Children International had the predominant purpose of injuring TCA. The predominant purpose of Defendants' engagement of Children International was business. The NPS market is challenging, and viable charities are difficult to find. Plaintiffs even admit so when they explain that "the process of finding, interesting and vetting appropriate charities and determining appropriate charges . . . is a significant undertaking." Compl. ¶ 109. With such a competitive market, it makes sense that MercyMe Defendants and Brickell Parties simply had business aspirations with a charity

27

that it had a relationship with in the past. Children International might have had the same aspirations.

Because Plaintiffs do not sufficiently allege that Defendants used improper means or had improper motive in its contracting with Children International, Plaintiffs fail to state a claim for tortious interference with a business relation and this claim should be dismissed.

**V.     The unjust enrichment and constructive trust claims against the MercyMe Defendants (Count XI, Section E) fail as a matter of law because these claims are governed by an enforceable contract.**

Courts "cannot find that . . . quasi-contractual damages" such as "unjust enrichment" should "be awarded when there has been a finding of an enforceable contract," *Old Hickory Coaches, LLC v. Star Coach Rentals, Inc.*, 652 S.W.3d 802, 821 (Tenn. Ct. App. 2021), i.e., "there must be no existing, enforceable contract between the parties covering the same subject matter." *CPB Mgmt., Inc. v. Everly*, 939 S.W.2d 78, 81 (Tenn. Ct. App. 1996).

Plaintiffs allege that the MercyMe Defendants were unjustly enriched and ask the court to put a constructive trust over Defendants' revenues for their use of "sponsorship payments, and economic benefits that MercyMe and Children International have derived, and continue to derive, from the sponsorship platform, donor pipeline, and operational model created by TCA." Compl. ¶ 551. However, Plaintiffs also allege that TCA's contract with MercyMe Defendants governed the use of that same information. *Id.* ¶ 537 ("Paragraph 1(e) [of the Contract] . . . provides that its ownership provisions 'shall survive expiration or termination of this [Contract].'").

Because the disputed contract provision expressly survives termination of the contract, the subject matter of the unjust enrichment and constructive trust claims are governed by an enforceable contract. These claims should be dismissed.

28

## VI. The breach of contract claims against the MercyMe Defendants (Count XI, Section B) fail as a matter of law pursuant to the terms of the MM Contract.

### A. Troy Collins' voluntary resignation from TCA triggered MercyMe Defendants' right to terminate the contract and was not an act of moral turpitude (Count XI, Section B(i) & B(ii)).

Plaintiffs allege that Collins resigned "for no reason" and conclude incorrectly that his resignation did not trigger the Troy Collins key man provision. *Id.* ¶ 521. The language of the Troy Collins key man provision is unambiguous: "Professional [i.e. MM] shall have the right to terminate this Agreement . . . if Troy Collins shall at any time during the Term cease to be actively involved in Client's [i.e., TCA], operations . . . ." *Id.* ¶ 514. Collins resigned from TCA, and as a result he ceased to be actively involved in TCA's operations. This triggered the Troy Collins key man provision. Plaintiffs claim that Collins' resignation was "never intended to be a basis for MM to terminate a multimillion-dollar contract . . . ." *Id.* ¶ 521. If that were so, then TCA should have inserted "voluntary resignation" into the exceptions to the key man provision. They did not.

The Troy Collins key man provision in the MM Contract gave the MercyMe Defendants the right to terminate the MM Contract should Troy Collins cease to be employed by TCA: The Complaint is clear that Collins did not die, become disabled, or perform a heinous act of moral turpitude. *Id.* ("On June 2, 2025, Troy Collins, whom the MM Contract designated as the 'Key Man,' voluntarily and for no reason resigned."). The Troy Collins key man provision was triggered, and MercyMe Defendants were within their right to terminate the MM Contract.

Plaintiffs allege that Collins' resignation was an act of moral turpitude because Collins "resigned to facilitate the setting up [of] separate contractual relations with [Children International] that was under contract with TCA and d[id] so for MercyMe . . . ." Compl. ¶ 520. The Complaint confirms that Collins did not set up contractual relations with Children International while they were under contract with TCA. *Id.* ¶ 554 (confirming that Children International signed with Collins and MercyMe Defendants after its contract with TCA

terminated). And even if this were true, this is not the kind of conduct contemplated by the MM Contract. Instead, the moral turpitude exception is meant to stop the key man trigger if the key man performs "some heinous act" that leads to his termination with TCA. *Id.* ¶ 522. No heinous act led to Collins' termination. Instead, he voluntarily resigned from TCA.

The MercyMe Defendants did not breach the MM Contract by terminating it.

**B. The MM Contract's cure period is inapplicable because Plaintiffs were incapable of curing the resignation of Troy Collins (Count XI, Section B(iv)).**

Plaintiffs also allege that MercyMe Defendants breached their contract with TCA because they did not observe the full 30-day cure period before terminating the contract after the Troy Collins key man provision was triggered. *Id.* ¶ 523. The cure period does not apply here because a cure was impossible. Plaintiffs invent out of thin air "the right to designate a qualified person who could perform Collins' functions." *Id.* ¶ 523. This invented cure right would nullify the key man provision, which was crafted for Troy Collins specifically because Scott Brickell and Troy Collins are "lifelong friends." *Id.* ¶ 611. There is no replacement for Collins. No cure period could have allowed TCA to cure the departure of Troy Collins.

**C. The MercyMe Defendants could not have breached Section 9(c) of the MM Contract because the MM Contract had already been terminated (Count XI, Section B(v)).**

Plaintiffs claim that MercyMe Defendants breached Section 9(c) of the MM Contract by "enter[ing] into arrangements with Children International and/or TPR during or immediately following the purported cure period . . . ." Compl. ¶ 525. Section 9(c) of the MM Contract provides that "during the Term hereof, [MM] shall not enter into any agreement that would interfere with the full and prompt performance of [MM's] obligations hereunder . . . ." *Id.* ¶ 524. But even if MercyMe Defendants contracted with parties immediately following the contract termination, the MM Contract, including Section 9(c), was no longer enforceable. Certain provisions of the MM Contract expressly survived termination of the agreement.

Section 9(c) is not one of those provisions. Plaintiffs cannot allege that a contractual provision was breached when it was not in effect.

Even if this Court were to accept the conclusory allegations that the MercyMe Defendants negotiated with other parties during the cure period, the MM Contract was already terminated because Plaintiffs could not cure the departure of Troy Collins. This Court should dismiss Plaintiffs' claim that MercyMe Defendants breached Section 9(c) of the MM Contract.

**D. TCA had no matching rights after the MM Contract was terminated (Count XI, Section B(vi)).**

Plaintiffs claim that MercyMe Defendants also breached the MM Contract because they did not allow TCA to match any offer made by a third-party after the MM Contract termination. *Id.* ¶ 528. Plaintiffs claim that before entering into any other contract, MercyMe Defendants should have furnished their offers to TCA. *Id.* ¶ 530–31.

This claim fails as a matter of law because the matching rights provision of the MM Contract was no longer operative when MercyMe Defendants contracted with Monroe-Collins and Children International. This is unlike when MercyMe Defendants furnished TCA competing offers from LiveCo/TPR when TCA was attempting to renew their contract with MercyMe Defendants. *Id.* ¶ 170. In that instance, the MercyMe/TCA contract was still operative and thus required matching rights. Here, however, the MM Contract was terminated.

Even if Plaintiffs were entitled to matching rights, they could not have possibly matched Monroe-Collins' offer because Monroe-Collins had Troy Collins and TCA did not. MercyMe Defendants' and Brickell Parties' intention of working with Collins was clear when they negotiated the Collins key man provision in the MM Contract. Without Collins, TCA could not match any competing offer sent to MercyMe Defendants by a company with Collins.

Because Plaintiffs were not entitled to matching rights, the MercyMe Defendants did not breach this provision of the MM Contract. This Court should therefore dismiss this cause of action against the MercyMe Defendants.

31

**E. The indemnity claim fails because the MercyMe Defendants did not breach the MM Contract (Count XI, Section F).**

Plaintiffs allege a claim for indemnity against the MercyMe Defendants for all "damages, liabilities, costs, losses and expenses . . . that TCA incur[red] . . . connected with the failure of the MM Defendants to perform under the MM Contract." Compl. ¶ 553. However, as analyzed above, the MercyMe Defendants did not breach their contract with TCA. Therefore, as a matter of law, this claim for indemnity fails and should be dismissed.

**VII. The Defend Trade Secrets Act against the MercyMe Defendants (Count XI, Section C) fails as a matter of law because they are a performing artist that does not use TCA's proprietary information.**

Plaintiffs allege that MercyMe Defendants violated the Defend Trade Secrets Act, 18 U.S.C. § 1836. This statute permits "[a]n owner of a trade secret that is misappropriated [to] bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Plaintiffs' alleged trade secrets are their "materials, information, and data developed, obtained, or generated in connection with the Sponsorship, including . . . sponsor information, donor data, campaign structures, and related materials . . . ." Compl. ¶ 541.

Even if these materials are trade secrets, this claim fails against MercyMe Defendants because they are not the entity that can misappropriate this information. TCA used this information as a nonprofit sponsorship intermediary to coordinate nonprofit sponsorships with MercyMe Defendants. But the MercyMe Defendants are a performing artist who contracted with a separate nonprofit sponsorship intermediary in Monroe-Collins.

MercyMe Defendants could not have misappropriated TCA's trade secrets because it could not put them to use. The alleged trade secrets are much more useful in the hands of a promoter or separate nonprofit sponsorship intermediary. Yes, MercyMe Defendants may benefit from the use of such information, but that does not mean that they can implement the information themselves. If anything, Plaintiffs' claim under the Defend Trade Secrets Act is

32

misdirected at a performing artist when it should be aimed at a competing nonprofit sponsorship intermediary. It is therefore much more likely that Troy Collins—former TCA employee and current nonprofit sponsorship intermediary of MercyMe Defendants—is the misappropriating party of that information, not MercyMe Defendants.

Because MercyMe Defendants are a performing artist that could not have misappropriated Plaintiffs' alleged trade secrets, this cause of action fails as a matter of law and should be dismissed.

**VIII. The Court lacks subject matter jurisdiction over the MercyMe Defendants and Brickell Parties because the federal claims against them fail as a matter of law.**

Plaintiffs note that this Court has subject matter jurisdiction over MercyMe Defendants and the Brickell Parties under federal question jurisdiction, 28 U.S.C. § 1331, for their claims arising under federal antitrust law and under the Defend Trade Secrets Act. Compl. ¶¶ 82–83. However, if this Court dismisses those claims as this brief argues that it should, it would no longer have subject matter jurisdiction over the Motion Defendants. Therefore, should this court dismiss the federal antitrust claims and the Defend Trade Secrets Act claim against Motion Defendants, it should dismiss the Complaint for lack of subject matter jurisdiction.

**IX. The tortious interference claim against the MercyMe Defendants regarding Troy Collins' TCA contract (Count XI, Section H) fails as a matter of law because Troy Collins did not breach that contract.**

To allege a claim for tortious interference with a contract, Plaintiffs, among other elements, must show "Defendant's intention to induce the breach" of the contract. *AmeriGas Propane v. Crook*, 844 F. Supp. 379, 388 (M.D. Tenn. 1993). Because Collins' voluntary resignation was not a breach of his employment contract, this claim fails as a matter of law.

Plaintiffs make no specific allegations regarding what specific contractual provisions Collins' resignation breached. Instead, they generally allege that Collins' resignation was a breach of "good faith in fair dealing in [the] contract." Compl. ¶ 557. An at-will employee resigning cannot be a breach of good faith and fair dealing. If Plaintiffs did not want Collins to

33

be able to leave and compete with them, the MM Contract should have said so. It did not, and Collins' departure was not a breach of his employment contract. Since there was no breach, this tortious interference claim against MercyMe Defendants should be dismissed.

**X. The Brickell Parties could not have conspired to breach the MM Contract (Count XV, Section A) because the MM Contract was not breached.**

The Complaint alleges that the Brickell Parties "conspired with the MM Parties to breach the MM Contract." Compl. ¶ 614. However, as argued above, the MercyMe Defendants did not breach the MM Contract with TCA. *See supra*, Section VI. Because there was no breach of contract, there cannot be a conspiracy to breach the contract. As such, this Court should dismiss this claim against the Brickell Parties for conspiracy to breach the MM Contract.

**XI. The tortious interference claim against the Brickell Parties regarding the MM Contract (Count XV, Section B) fails as a matter of law because the MM Contract was not breached.**

Plaintiffs also claim that the Brickell Parties tortiously interfered with the MM Contract by inducing the MercyMe Defendants to breach and prematurely terminate the contract. Compl. ¶ 615. Again, a claim for tortious interference with a contract requires the breach of such contract. *See AmeriGas Propane*, 844 F. Supp. at 388. The Brickell Parties could not have induced breach of the MM Contract because there was no breach. Troy Collins was within his right to voluntarily resign from TCA. According to the key man provision, the MercyMe Defendants were then within their right to terminate the MM Contract. Because there was no breach of contract by the MercyMe Defendants, the Brickell Parties could not have tortiously interfered with the MM Contract. Therefore, this claim fails as a matter of law and should be dismissed.

**XII. The Court lacks subject matter jurisdiction over the tortious interference claim against the Brickell Parties regarding the Tyler contract (Count XV, Section C).**

Plaintiffs assert an additional cause of action against the Brickell Parties for allegedly tortiously interfering with TCA's contract with Micah Tyler. This claim should be dismissed

34

for lack of subject matter jurisdiction. Should this Court dismiss the above claims, this Court will be deprived of all federal question jurisdiction and accompanying supplemental jurisdiction over the Brickell Parties. The claim for tortious interference with Micah Tyler's contract will be a state law claim that is unrelated to the remaining causes of action. Therefore, upon this Court's dismissal of the claims above, this Court should dismiss this particular cause of action for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, the above claims against the MercyMe Defendants, Brickell Parties, and Micah Tyler should be dismissed with prejudice.

Dated: July 23, 2026

Respectfully submitted,

GRIFFIN BOWEN PLLC

/s/ Jay S. Bowen
Jay S. Bowen (TN Bar No. 2649)
Connor Blair (TN Bar No. 031992)
48 Music Square East
Nashville, TN 37203
615.742.4800
jbowen@griffinbowen.com
cblair@griffinbowen.com

*Counsel for Defendants MercyMe, Inc., Bart Millard, Robin Shaffer, Nathan Cochran, Mike Scheuchzer, Scott Brickell, BrickHouse Entertainment, LLC, and Micah Begnaud*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of July 2026, a true and accurate copy of the foregoing was filed with the Court's CM/ECF filing system, which will send a notice of electronic filing to all counsel of record.

*/s/ Jay S. Bowen*
Jay S. Bowen

35