IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| THRIVING CHILDREN ADVOCATES, LLC, Et al. | § § § | |
| Plaintiffs | § | Civil Action No. 3:26-cv 00484 |
| v. | § | District Judge: Hon. Waverly D. Crenshaw, Jr. |
| WATERLAND PRIVATE EQUITY INVESTMENTS, B.V.; Et al. | § § | Magistrate Judge: Hon. Jeffrey S. Frensley |
| | § § | Jury Trial Demanded |
| Defendants. | | |

**PLAINTIFFS' RESPONSE TO WORLD VISION'S MOTION TO DISMISS [Dkt. No. 56]**

1.     The Motion to Dismiss ("MTD") of Defendant World Vision, Inc. ("WV") must be denied.  Violating the most basic principles of FRCP 12(b)(6) jurisprudence, the MTD contests facts asserted in the Complaint which this Court is required to accept as true.  Further, it disputes many facts asserted in the Complaint and inserts new "facts" in their place, all of which is inappropriate and must be ignored.  Moreover, the MTD is littered with factual and legal errors, some of which are blatant and obvious.

2.     More fundamentally, WV misstates (a) who Plaintiffs are and their businesses which have been destroyed; (b) who WV is and their role in the antitrust violations alleged; and (c) what antitrust violations have been alleged against them, which are more than sufficient to withstand a 12(b)(6) challenge.

    **I.   WORLD VISION, LIVECO AND TPR ARE MOST CERTAINLY HORIZONTAL COMPETITORS**

3.     WV claims that the Complaint alleges no facts establishing that WV "participated as a competitor in the very market Plaintiffs claim was monopolized."  MTD. p. 3.  This is wrong.

1

The Complaint sets forth in large part, antitrust claims involving the intentional creation of a monopoly of concert promoters in the United States, the creating sponsor of which was a Denmark hedge fund known generically as "Waterland." As set forth in the Complaint and explained in III.B hereafter, that monopoly power was illegally used to leverage competitive advantage in what the Complaint calls the NPS Market. *See Kerasotes Michigan Theatres, Inc. v. National Amusements, Inc.*, 854 F.2d 135, 137 (6th Cir. 1988) ("Kerasotes") which states antitrust law forbids the use of monopoly power in one market to amplify or "leverage," a position in another competitive market. Unquestionably, this was done and with WV's full-throated efforts in support, all as explained hereafter.

4. Waterland and its executives brought in personnel that had birthed Live Nation, an adjudicated antitrust violator in the secular markets. *United States v. Live Nation Ent., Inc.,* 2025 U.S. Dist. LEXIS 47262 (S.D.N.Y 2025). They then formed a holding company called "LiveCo," under which a host of other US entities were formed. Through those entities, they purchased the three leading Christian concert promoters in America: Transparent Productions ("Transparent"), Premier Productions ("Premier"), and Rush Concerts ("Rush"), along with other businesses related in the field. The consolidated group sometimes did business under the name of the US parent holding company -- LiveCo -- and sometimes under the name TPR, with TPR being an acronym for Transparent, Premier and Rush. These acquisitions resulted in that consolidated group gaining control of almost 80% of the US Contemporary Christian music concert touring market ("CCM Touring Market"). In short, their acquisitions created a monopoly.

5. As the MTD points out, the Complaint refers to the entities and executives associated with Waterland and above-listed companies as the "Waterland Defendants." For

simplicity and unless otherwise indicated they shall be referred to herein as "LiveCo" or occasionally TPR.

6. As alleged in the Complaint, musical groups perform in concerts that tour across the country. Promoters are responsible for the lion's share of the work and expense in a CCM Tour including securing the main performing music Artist, and paying the Artist a "Performance Fee" for each concert on the tour. Additionally, promoters historically (a) selected the geographic locations for tours, the order in which they will occur and specific venues within each geographic location; (b) arranged for and shipped lighting and equipment from one location to the others; (c) marketed performances; and (d) sold tickets to the public for each performance on the tour. Promoters typically paid all expenses, associated with these activities, including the performing Artists' Performance Fee, irrespective of audience attendance. The expenses, including Artists' Performance Fees, were put in a financial "pot" on a concert-by-concert basis. Revenue from ticket sales for each concert also went into the financial "pot" and were netted with show expenses. If a show produced more revenue than expenses, promoters recouped their expenses and traditionally split the excess in the pot, 15% for the promoter and 85% for the artist. If show expenses exceeded revenues, however, the promoter was on the hook.

7. The Complaint alleges that because audience sizes in the CCM Touring Market tended to be smaller compared to secular concerts, ticket revenues were also correspondingly smaller, as were upfront Performance Fees paid by promoters to the artists.

8. CCM music artists, such as Plaintiffs Newsboys, had what the industry calls "Public Platforms," understood in the industry as the general ability of an artist to attract audiences at faith-based CCM concerts. Access to Artists' Platforms for fundraising was coveted by Nonprofits as a fertile source of gaining new donors (called "Sponsors"). Typically, Sponsor-generation at all

3

CCM Tour concerts involved a spokesperson ("Spokesperson") making a presentation on stage on behalf of one nonprofit asking the audience to become Sponsors. "Volunteers" distributed and collected financial support pledge cards with Spokespersons and Volunteers being the nonprofit's responsibility.

9. Musical artists in the CCM Touring Market thus sold their Platform to one charity per tour to allow a charity to solicit donors during the headline artists' CCM concerts and were paid a fee based on the number of Sponsors generated at each concert.

10. The Complaint calls the market for the purchase of CCM artists' Public Platforms to generate Sponsors (donors) the "NPS Market." The NPS Market is inextricably tied to the CCM Touring Market. It is also characterized by price opacity as many charities and artists were unaware of what is a fair and lawful fee that should be to pay for Sponsors generated. It was also associated with information asymmetries particularly given the associated registration requirements required by each state in which a concert occurred. These factors impeded price competition among purchasers of Artists' Platforms. [Comp. ¶110].

11. Given the price opacity and information asymmetries, Plaintiff TCA's business model was to buy or acquire Artists' Public Platforms [1] and sell them to Nonprofits, as well as provide other services such as insuring compliance with the burdensome disclosure laws each state imposed on Artists who were deemed to be "professional solicitors" for charities. [Comp. ¶111-14]. Hence TCA was both a buyer of Artists' Platforms and a seller. *St. Luke's Hosp. v. ProMedica Health Sys*., 8 F.4th 479, 483 (6th Cir. 2021) ("*ProMedica*") ("Making matters more complicated,

---

[1] As the Complaint clearly alleges TCA would actually acquired Artists' Platforms [Comp. ¶118] it is both erroneous and surprising for WV to refer to TCA as a "broker" [MTD, p.1 ].

many players often take on more than one role...frequently acting as sellers and buyers."); *Id*. at 484 ("ProMedica acts as a healthcare buyer and seller.")

12. WV was likewise a buyer of Artists' Platforms. The Complaint alleges WV contracted with TCA to purchase some of the artists' Platforms TCA had acquired. The Complaint also alleges, and the MTD admits [MTD 3 & 4], that at one time, while TCA was acquiring artists Platforms and selling them to WV, WV also had its own an internal operations department that was, at the same time, negotiating to purchase the same artists' Platforms TCA was negotiating to acquire, and doing so in direct competition with TCA. In fact, TCA sometimes found itself attempting to purchase artists' Platforms for re-sale to WV, when the artists had very recently been approached by WV itself, creating market confusion and problems. Compl. ¶¶ 118-122, 130-136. This market tension led to the termination of TCA's sales to WV; WV nevertheless remained in the marketplace as a purchaser of Platforms.

13. WV repeatedly claims that it "does not compete with LiveCo or any other Defendant in any relevant market." [MTD 7]. This was simply not true, and the Complaint alleges otherwise, at least until WV and LiveCo conspired together as the Complaint alleges, at which time they became joint conspirators working together instead of against one another. Pre-merger promoters Transparent, Premier and Rush sought to buy rights in artists' Platforms so that some of the Nonprofits' payments would go to each show's financial "pot." Hence, they very much competed with WV and other charities like WV. LiveCo's efforts were difficult, however, given the competition among promoters, as in the face of demands by one of those promoters for sharing Nonprofit payments, artists would simply go to another promoter. However, pre-merger promoters Transparent, Premier and Rush did have some success in acquiring rights of some Artists' Platforms, particularly with Artists who were unaware that their Public Platforms could be so

monetized, and/or unaware of what an appropriate fee to be charged was and/or simply did not care. [Compl. ¶107].

14.     Post merger, LiveCo continued to be a purchaser of artists' Platforms.  As such they were in competition with WV for purchasing Platforms until they joined together.   The Complaint repeatedly alleges precisely that.  For example, Compl. ¶¶ 163-166 describe how artist Danny Gokey advised Plaintiffs that LiveCo demanded he relinquish to them Platform rights that he had previously sold to TCA. LiveCo offered Gokey a higher Performance Fee -- its purchase price -- if he surrendered his Platform rights to LiveCo.  Compl. ¶¶ 163-166.   LiveCo was thus competing to buy Artists' Platforms.  The same thing happened with artist Tauren Wells.

15.     The Complaint further alleges that LiveCo made those purchase demands with full knowledge that both Danny Gokey and Tauren Wells had previously sold their Platform rights to TCA, knowledge of that obtained during LiveCo's due diligence investigation of TCA. Compl. ¶¶ 160-166, 362.   The end result, was that both Artists sold their Platform rights which LiveCo then re-sold to WV.  So, when WV claims LiveCo is merely a concert promoter selling promotional services rather than as a purchaser of Artists' Platforms, that is flat out wrong.

16.     But as was TCA, LiveCo is both a buyer and seller.  The Complaint asserts that Gokey and Wells having sold their Platforms to LiveCo (doing so in violation of their contract with TCA who had previously purchased them), LiveCo then sold them to WV. This is known because when Gokey and Wells shortly thereafter went on tour, marketing flyers showed the tour was "brought to you by World Vision and Transparent Productions [Compl. ¶ 160]:



17. Notably, the above shows LiveCo and WV were coproducing the show. Hence WV's pronouncement that "[a]ny agreements World Vision allegedly entered into are thus vertical" [MTD, p. 7] is simply false.

18. In addition to showing LiveCo was very much in the business of buying Platforms, the Gokey/Wells matter demonstrated they were doing so with full knowledge that both Gokey and Wells had previously sold their Platform rights to TCA and were both thus tortiously causing Gokey and Wells to breach their contracts with TCA. They had knowledge that Gokey and Wells were under contract with TCA if for no other reason than the fact TCA's purchase and the details

of that purchase had been disclosed to them in their due diligence analysis of TCA [see, e.g., Compl. ¶ 362].

19. While these allegations plausibly support Plaintiffs' claims for antitrust violations, tortious interference, and conspiracy, they amply demonstrate that LiveCo were buyers of Platform rights.

20. Artists' Platforms constituted a critical input into the business models of each of WV, LiveCo and TCA and the Complaint so alleges. TCA acquired Platform rights as an intermediary, intending to market those rights to nonprofits in exchange for a per-donor fee while sharing the resulting revenue with the Artist. WV bypassed TCA by soliciting Artists directly and acquiring those same Platform rights for itself, often using its knowledge of TCA's pricing and contractual arrangements to compete against TCA. LiveCo likewise sought to acquire Artists' Platform rights, not to resell them to nonprofits, but to capture the economic benefits of those rights within its own concert promotion enterprise. While each sought to acquire those Platform rights for somewhat different downstream purposes, each competed directly to acquire the same exclusive contractual rights from the same pool of CCM Artists. Their differing methods of monetizing those Platform rights after acquisition did not alter the horizontal nature of that competition.

21. Thus, unlike what WV falsely claims, notwithstanding their differing downstream business models, TCA, WV, and LiveCo were all horizontal competitors in the upstream market for the acquisition of Artists' Platforms, each competing to acquire the same exclusive contractual rights from the same Artists. And agreements among horizontal competitors are not vertical.

II. **WV BADLY MISSTATES THE COMPLAINTS' ACCUSATIONS.**

22. Before addressing the individual arguments raised in the MTD, the Court should recognize that many of those arguments are premised upon a fundamentally inaccurate characterization of the Complaint itself. Rather than accepting the Complaint's factual allegations as true, the MTD repeatedly substitutes its own factual narrative, minimizes WV's alleged role, ignores the monopoly context in which the challenged conduct occurred, and omits numerous factual allegations pled throughout the Complaint. Rule 12(b)(6) does not permit a defendant to obtain dismissal by arguing against a materially different complaint than the one Plaintiffs actually filed.

23. The clearest example is WV's chart purporting to summarize the allegations asserted against it. That chart creates the impression that the Complaint contains only a handful of generalized allegations involving WV. It does not. Plaintiffs have separately identified every paragraph of the Complaint containing substantive allegations concerning WV, and those allegations span the entirety of the Complaint. Read as a whole, the Complaint alleges that WV was not merely a downstream charity purchasing fundraising services. Rather, it alleges that WV was an active market participant which: (a) competed directly with TCA to acquire Artists' Platforms; (b) established its own Platform acquisition program; (c) knowingly interfered with existing Platform agreements between TCA and Artists; (d) worked jointly with LiveCo after Waterland's acquisition of monopoly power in the CCM Touring Market; (e) participated in inducing Artists to breach Platform contracts; (f) participated in leveraging monopoly power from the CCM Touring Market into the NPS Market; and (g) knowingly benefitted from the resulting exclusion of TCA as a competitor, together with the additional allegations incorporated throughout the antitrust counts. Compl. ¶¶ 118-136, 160-166, 356-370

9

24.     Many of WV's remaining arguments similarly depend upon ignoring critical allegations contained elsewhere in the Complaint. For example, WV repeatedly analyzes its conduct in isolation, while the Complaint expressly alleges coordinated conduct among Waterland, LiveCo, WV, MercyMe, and others acting pursuant to a common anticompetitive scheme. Likewise, the MTD repeatedly discusses individual agreements as though each existed independently, while the Complaint alleges those agreements formed part of a broader effort to acquire, preserve, and exploit monopoly power in the CCM Touring Market and thereafter leverage that monopoly power into the NPS Market. The Court must evaluate the plausibility of those allegations collectively, not by artificially isolating individual transactions.

25.     Properly viewed, the Complaint alleges far more than isolated contractual disputes between private parties. It alleges the creation of a dominant concert-promotion monopoly through a series of acquisitions orchestrated by Waterland; the use of that monopoly by LiveCo to compel Artists to relinquish previously sold Platform rights; WV's participation in acquiring those same Platform rights and competing directly with TCA for their acquisition; and coordinated conduct designed to eliminate TCA as an independent competitor in the NPS Market. Those are the allegations that must be accepted as true in resolving the present Motion. The remainder of WV's arguments fail largely because they ignore that factual framework

### III.    WV IGNORES THE MONOPOLY HELD BY THE WATERLAND DEFENDANTS AND MONOPOLY LEVERAGE

**A. MONOPOLY (AND MARKET POWER) AND CONSPIRACY TO MONOPOLIZE HAS BEEN ADEQUATELY PLEADED.**

26.     A recurring defect throughout the MTD is its treatment of WV's conduct as though it occurred in an ordinary competitive market with WV an innocent buyer involved with the market machinations of LiveCo.  The Complaint alleges to the contrary, however, that the challenged

10

agreements and conduct occurred only after Waterland intentionally acquired the three dominant faith-based concert promoters in America—Transparent, Premier, and Rush—and combined them into the integrated monopoly enterprise now operating as LiveCo. Compl. ¶¶ 1, 90-109, 231-251. Those allegations provide the essential context within which WV's conduct must be evaluated.

27. Section 2 of the Sherman Act "prohibits three types of actions: monopolization, attempted monopolization, and a conspiracy to monopolize." *Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 318 (6th Cir. 2015). "Conspiracy to monopolize entails "proof of concerted activity..." *Id.* (citing *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 574 (6th Cir. 1986)). Allegations abound here of concerted action taken by WV in support of TPR's monopoly.

28. The Complaint chronicles many of the allegations showing concerted action taken by WV in conjunction with LiveCo. For example, as noted, in late January 2023 Waterland made an offer to purchase TCA which TCA accepted. [Compl. ¶ 145 & 183]. Waterland reneged. In April 2023, the Compl. ¶ 206 recounts Jacob Riser, principal of LiveCo telling Wes Campbell that since that time, WV had partnered with Waterland to secure control of all non-private sponsorships generated from CCM tours arising by, through or under LiveCo. This is not a simple vertical agreement.

29. Reiser confirmed that WV was going to pay TPR -- not any artist -- $500 per sponsor generated. WV's MTD p. 13, attempts to turn the table on this incredible sum per sponsor by claiming that they were a "victim" not a partner, and paying that much was no more than "inconsistent with sound economics" and "economically implausible." *Id.* Emotional retaliation has nothing to do with this. Compl. ¶ 236 states that Charitable organizations have conducted detailed analyses demonstrating that first-time donors frequently continue their monthly

contributions for many years. As a result, the NPS Market produces higher and more predictable donor retention rates and long-term revenue streams than other fundraising channels. Hence a donor giving a $50 a month pledge would make that payment over perhaps a 15-year period, resulting in WV receiving in that event, over $9000 -- a gift it paid only $500 to receive. There is nothing economically implausible about this and WV was more than a willing conspirator.

30. Reiser further stated that because of this, "TCA would not be able to re-sign any of its client artists or client nonprofits." *Id.* Not only is this an overt act in furtherance of TPR's monopoly, but it is also the clear and logical reason why TPR breached its contract of purchase at WV's instance. And moreover, when WV claims Plaintiffs cannot show any anticompetitive foreclosure [MTD, p. 3] it is patently false.

31. At its heart, the agreement between LiveCo and WV provided that WV would no longer buy Platform rights from Artists or their assigns, such as Plaintiffs, but instead, they would buy them from LiveCo only. LiveCo, on the other hand, would preclude artists from selling their Platforms to anyone other than LiveCo, including specifically a preclusion from selling to Plaintiffs, precisely as Reiser told Plaintiffs when he said that, as a result of the arrangement between LiveCo and WV, "TCA would not be able to re-sign any of its client artists or client nonprofits." This is not a "vertical" agreement. It is an agreement between two buyers of Platform rights both allocating the market between themselves, boycotting Plaintiffs, and agreeing to exclusively deal with one another.

32. Compl. ¶ 163 recounts that in 2024, Danny Gokey, one of Plaintiffs' artists who was under contract with TCA, explained precisely what TPR's monopoly was doing with WV; Gokey's representative writing that CCM promoters were "entering into their own sponsorship agreement with charities, supplanting the artists' (and by extension TCA's) ability to secure sponsorships."

Gokey went on to write that Promoters were making offers of Performance Fees to artists that "include high guarantees but conditioned on the promoter collecting sponsorships" and that if an artist chose to keep his sponsorships, "the guarantee is much lower." The end result, according to artist Gokey, it was "impossible for Danny to tour as a headlining act without losing money."

33.     Shortly thereafter, Danny Gokey and Tauren Wells, another TCA artist who had contracted with TCA, announced their upcoming joint tour with the flyer stating it was "brought to you buy WORLD VISION and TRANSPARENT PRODUCTIONS" with the capitalization being in the flyer itself. Obviously, WV's payment had brought it increased stature as the producer of the event, not merely a sponsoring charity, further demonstrating its voluntary and concerted action with TPR in furtherance of its monopoly. [2]

34.     Comp. ¶¶ 169-170 chronicle how, in August of 2024, Scott Brickell, the manager of TCA's long time client MercyMe ("MM"), told Plaintiffs that, as with Gokey, TPR had arranged for WV to pay TPR for sponsorships and if MM would relinquish its right to sell its Platform to TPR so TPR could contract directly with WV and receive those sponsorship payments, TPR would increase MM's Performance Fee and cover MM's production costs that MM would otherwise have to cover. While Comp. ¶ 169 asserts on information and belief, that the money to make these upfront payments was coming from WV, that is a more than reasonable belief given the amounts WV would be paying and in turn making, on MM concerts. [3]

---

[2] While it goes without saying it was impossible for more than one charity to make a presentation at each concert, given what was being said and shown and the sponsorship commitment cards distributed. Compl.¶ 234.

[3] WV seems to take issue with averments made on "information and belief," but those are more than enough to survive a 12(b)(6) motion when as here, the information is uniquely in the possession of the other side. It is even more justified when the circumstances surrounding the event circumstantially support the assertion, as here. *See Ahern Rentals, Inc. v. EquipmentShare.com, Inc.,* 59 F.4th 948, 953–955 (8th Cir. 2023).

35.     WV argues at MTD 14, that the agreement reached between WV and LiveCo" allows three interpretations." All three "interpretations" are wrong and red herrings. The first claimed interpretation that WV was made the only solicitor permitted at LiveCo shows [id.] which WV claims is "put to the lie" because of a flyer showing a MM concert that had been booked by MM literally months in advance. Compl. ¶99. Moreover, MM had received a $1, 500,000 advance paid by CI that could hardly be walked away from. Compl. ¶170. The second "interpretation" that LiveCo shows were the only ones WV could solicit at, is not a claim made. The third interpretation, that WV's arrangement with LiveCo was non-exclusive and therefore foreclosed nothing, is again false. Reiser himself told Plaintiffs that LiveCo had "locked up" WV and the machinations with artist Gokey where LiveCo told him he could either (1) forgo his sponsorships but get a much larger Performance Fee or (2) hold them and receive a much smaller Performance Fee [Compl. ¶163-164]. Predations of this kind are just the improper grist of a monopolist and its conspirators. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (1979) ("A variety of techniques may be employed to achieve this end predatory pricing, lease-only policies, and exclusive buying arrangements, to list a few.")

36.     And WV was fully engaged as a collaborating co-conspirator. In *United States v. Gibbs,* 1999 U.S. App. LEXIS 36343, *13-14 (6th Cir. 1999), the Sixth Circuit held "Once a conspiracy is shown, evidence connecting a particular defendant to the conspiracy **need only be slight**. The defendant need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement." (emphasis added; internal quotes and cites omitted). *Accord United States v. Rashaad Laray Laws,* 668 Fed. Appx. 240, 240 (9th 2016) (citing cases noting that even a slight connection between the defendant and the conspiracy is sufficient

to show knowing participation). The above is significantly more than "slight" and more than adequate to survive a 12(b)(6) challenge.

37. As the Sixth Circuit has also repeatedly stated, "Section 2 of the Sherman Act prohibits the acquisition or maintenance of monopoly power through exclusionary conduct rather than through "a superior product, business acumen, or historic accident." *St. Luke's Hosp. v. ProMedica Health Sys*., 8 F.4th 479, 486 (6th Cir. 2021) (*quoting United States v. Grinnell Corp*., 384 U.S. 563, 570-71 (1966)). Plaintiffs allege precisely that type of exclusionary conduct.

38. The Complaint clearly and repeatedly alleges the Waterland Defendants' monopoly power in the CCM Touring Market and efforts with Waterland to leverage that monopoly power into the NPS Market. With the acquisitions of Transparent, Premier and Rush in place -- or "TPR" as they came to call themselves -- Waterland completed its control of the CCM Touring Market operating under the general corporate umbrella name of "LiveCo" and so announced to the world [Comp, ¶132].

39. Having completed its acquisition of the three primary US faith-based concert promoters -- Transparent, Premier and Rush, and the ticketing agency for faith-based concerts – Waterland then began operating in 2024 under what is believed to be the assumed name/acronym "TPR" holding itself out as the "world's largest one-stop full service global faith-based promotion company" and that this monopoly was "formed through the merger of Transparent Productions, Premier Productions and Rush Concerts." [Comp, ¶136].

40. And the "world's largest one-stop, full service global faith-based promotion company" was the result of the "merger" of Transparent, Premier, and Rush. Further, the market share numbers would prove that boast to be fact, as Waterland through LiveCo itself reported its concert numbers to the industry publication Pollstar. Among other things, the Complaint sets

forth the number of Christian Concert performances reported to Pollstar by LiveCo through Transparent, Premier and Rush for three periods [Comp. ¶242], the first period being from 2018 through 2022 when Transparent, Premier and Rush were independent operators;  the second period was from November 2022 to November 2023 when they themselves reported their concert data to Pollstar as LiveCo/Transparent, LiveCo/Premier, and LiveCo/Rush showing an 81.48% market share;  and  the third period being from November 2023 through December 2025 where the overwhelming number of concerts were self-reported as LiveCo.

41.     The Complaint summaries these market share numbers [Comp, ¶¶246, 249 & 251]:



42.     These allegations are not conclusory but supported by market data derived from Pollstar, the concert industry's principal reporting service.  Further alleged with specificity, (a) before Waterland's acquisitions, Transparent, Premier, and Rush operated as separate competitors

within the CCM Touring Market;(b) following Waterland's acquisitions, those entities reported concert activity under the LiveCo umbrella and ultimately under the unified LiveCo enterprise; and (c) those self-reported Pollstar figures demonstrate that LiveCo controlled approximately eighty percent of all reported CCM concerts nationwide. Compl. ¶¶ 246-251.

43. The significance of those allegations cannot be overstated. Prior to Waterland's acquisitions, Artists dissatisfied with one promoter could simply contract with another promoter. The Complaint alleges that once Waterland consolidated Transparent, Premier, and Rush into LiveCo, that competitive alternative largely disappeared. LiveCo could therefore use its dominance in the CCM Touring Market to pressure Artists into surrendering Platform rights previously sold to TCA, threatening reduced touring opportunities or lower performance compensation if those Platform rights were retained. Compl. ¶¶ 160-166, 350-370. The Complaint further alleges that WV knowingly participated in that process. Rather than merely purchasing fundraising opportunities made available by independent Artists, WV allegedly acquired Platform rights after LiveCo exercised monopoly power over those same Artists, knowing that many of those Platform rights had previously been sold to TCA. Compl. ¶¶ 160-166, 356-370. Thus, the Complaint alleges coordinated conduct by a monopolist and a horizontal competitor in the acquisition of Platform rights—not isolated vertical purchasing arrangements. At the pleading stage, those allegations more than plausibly allege monopoly power.

**B. MONOPOLY LEVERAGE IN THE NPS MARKET IS CLEAR**

44. As a consolidated monopoly, LiveCo still competed for Nonprofit sponsorship money in the NPS Market, which money the Nonprofits generally directed to artists for their Platform, although LiveCo now competed from a position of monopoly power, threatening to boycott artists if their Nonprofit payments were not relinquished.

45. The Complaint alleges that the Waterland Defendants together with World Vision, "leveraged" their monopoly power in the CCM Touring Market to gain a competitive advantage in the NPS Market, with "leverage" being clearly defined in the Sixth Circuit as "the use of monopoly power in one market to amplify or 'leverage,' a position in another competitive market." *Kerasotes Michigan Theatres, Inc. v. National Amusements, Inc.*, 854 F.2d 135, 137 (6th Cir. 1988) (*Kerasotes*) (*citing White and White, Inc. v. American Hospital Supply, Co.*, 723 F.2d 495, 506 (6th Cir. 1983)).

46. Notably, "[t]o run afoul of the antitrust laws, it is not necessary that the party attempting to leverage its monopoly power from a given market into a second market possess monopoly power or dominant market position in that second market." *Kerasotes* at 137. *See also United States v. Griffith*, 334 U.S. 100, 92 L. Ed. 1236, 68 S. Ct. 941 (1948) ("It follows a fortiori that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful.").

47. The MTD claims the Complaint "alleges no fact showing market power." [MTD, p. 3]. With respect to the CCM Touring Market such is clearly incorrect; with respect to the leveraged NPS Market, it is not necessary.

IV. **THESE ARE PER SE VIOLATIONS BUT EVEN IF THE RULE OF REASON IS THE TEST, THE COMPLAINT MORE THAN ADEQUATELY ALLEGES RELEVANT FACTS.**

48. The MTD repeatedly characterizes WV as a purely vertical participant and LiveCo as merely a concert promoter. The Complaint alleges neither. It alleges that WV, TCA, and LiveCo each competed horizontally to acquire the same exclusive Platform rights from the same Artists. It further alleges that after Waterland acquired monopoly power in the CCM Touring Market, WV and LiveCo coordinated their conduct to divert those Platform rights away from TCA and to

18

foreclose TCA from competing in the NPS Market. Whether Plaintiffs ultimately prove those allegations is a matter for discovery and trial. At the pleading stage, however, those allegations must be accepted as true.

49. *Byars v. Bluff City News Co.*, 609 F.2d 843, 846 (6th Cir. 1979) is particularly instructive in categorically precluding a monopolist's refusal to deal holding "Concerted refusals to deal are in many situations Per se violative of section one of the Sherman Act." *Id* at 854.

50. WV cites *Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 730 n.4 (1988) [MTD p. 7] for the proposition " Any agreements World Vision allegedly entered into are thus vertical." Acknowledging that Sharp held that "there may be justifiable explanations and positive results from dealer termination agreements and other vertical agreements," but in *Kerasotes*, the Sixth Circuit held that it is the effects that matter, holding "In the case at hand, however, while the alleged agreement between Kerasotes and its film distributors is vertical, the effect is exclusively horizontal." *Kerasotes* at 137. As applicable here, while Plaintiffs adamantly maintain that the acts complained of are horizontal in nature, even were they held vertical, the effects are felt horizontally. Hence the per se rules should apply and certainly should not be discarded before any discovery has taken place in the case.

51. Even assuming, solely for purposes of this Motion, that the Rule of Reason governs all or part of Plaintiffs' claims, the Complaint both alleges the alternative application of the rule of reason [Comp. ¶203] and easily satisfies each element the Sixth Circuit requires be pleaded.

A. **THE DEFENDANTS HAVE CONTRACTED, COMBINED AND CONSPIRED**

52. The overt acts of WV have been chronicled in detail above including (a) Reiser telling Plaintiffs that the arrangement between LiveCo and WV that "TCA would not be able to re-sign any of its client artists or client nonprofits." [Compl. ¶206] Artists would not be given

traditional Performance Fees unless they surrendered their Platforms meaning LiveCo and WV were "supplanting the artists' (and by extension, TCA's) ability to secure sponsorships." Compl. ¶163.

## B. THEIR SCHEME PRODUCED ANTICOMPETITIVE EFFECTS

53. The anticompetitive effects have been enormous. Compl. ¶¶ 288-289 chronicle the anticompetitive effects on artists. The results in some cases have been aspiring artists who simply withdraw from the business leaving the public the worse because new talent has no effective means of exposure because their Platform is not yet big enough.

54. Compl. ¶¶ 290-294 chronicle the anticompetitive effects on charities particularly small charities, particularly the ones who do not have the financial capability to compete have been excluded robbing the public of the choice of worthwhile endeavors because of WV's deep pockets. Compl. ¶294.

## C. THE RESTRAINTS AFFECTED RELEVANT PRODUCE AND GEOGRAPHIC MARKETS

55. WV challenges Plaintiffs' definitions of the markets. As to Plaintiffs' definitions of the CCM Touring Market and NPS Market, the CCM Touring Market was carefully defined as explained in Compl. ¶¶218- 230] and explained that it was accompanied by detailed data presented by the Defendants themselves to Pollstar, [229] a respected industry publication. The geographic market as nationwide is explained at Compl. ¶ 230 and how it was determined, with key identifying factors being listed at Compl. ¶ 227.

56. The NPS Market was also carefully defined in Compl ¶¶231- 230, with a detailed explanation as to how this market is different from and not interchangeable with other forms of charitable fund raising. Compl. ¶¶235-241.

57.     Moreover, in the Sixth Circuit, the process of determining the relevant market is "fact-intensive and focused on the commercial realities of the industry." *Food Lion, LLC v. Dean Foods Co. (In re Southeastern Milk Antitrust Litig.),* 739 F.3d 262, 277 (6th Cir. 2014) (*quoting Brown Shoe Co. v. United States*, 370 U.S. 294, 336, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962)) (internal quotation marks omitted).   In *Food Lion*, the Sith Circuit thus concluded that "Multiple courts of appeal have held that market definition is a question of fact. Kolon Indus., 637 F.3d at 442 (citing cases from the First, Second, Third, Fifth, Ninth, and Tenth Circuits). Accordingly, that question is better left for a jury to decide." *Food Lion*, 282-283.

58.     As a result, "[r]elevant product or geographic markets are sufficiently alleged as long as the complaint bears a rational relation to the methodology courts prescribe to define a market." *Blue Cross Blue Shield of Michigan,* 809 F. Supp. 2d at 672 (*quoting Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)) (internal quotations omitted). The Court will only dismiss the complaint for failure to plead relevant markets if the definitions are "facially unsustainable." *CoStar Group, Inc. v. Commer. Real Estate Exch. Inc*., 2023 U.S. Dist. LEXIS 31279, 2023 WL 2468742, at *4 (C.D. Cal. 2023) (*quoting Newcal Indus., Inc. v. Ikon Off. Sol.,* 513 F.3d 1038, 1045 (9th Cir. 2008).

59.     Here the product markets and geographic markets have more than adequately been defined and supported by data.  All interchangeability issues have been addressed.

**D.     THE OBJECT OF THE SCHEME AND CONDUCT WAS ILLEGAL**

60.     As chronicled above the object of the conduct was in furtherance of a monopoly and an attempt to leverage that monopoly power into a related market. *Kerasotes Michigan Theatres, Inc. v. National Amusements, Inc*., 854 F.2d 135, 137 (6th Cir. 1988).

**E.     THE SCHEME WAS THE PROXIMATE CAUSE OF PLAINTIFFS' ANTITRUST INJURY**

61.     Compl ¶¶231- 230 set forth in detail the antitrust injury Plaintiffs have sustained, and the injury and damages proximately caused to Plaintiffs.  Those provisions contain such detail that it is unnecessary to repeat them here.  It does bear repeating that LiveCo's own Reiser told Plaintiffs that as a result of the arrangement between LiveCo and WV, that "TCA would not be able to re-sign any of its client artists or client nonprofits."  That is exclusion from the markets and it single handedly destroys WV's half-baked and unsupported suggestion that Plaintiffs have not been exclusion from the markets. [MTD p. 9].

62.     WV does make an argument at MTD p. 10 that is sufficiently ludicrous, Plaintiffs would like to address it.  MTD p. 10 states that because Plaintiffs are not charities their exclusion cannot be injurious to them.  This assertion ignores the obvious that if artists cannot sell their Platforms then Plaintiffs are destroyed.  This was precisely the holding in *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983) a case cited and discussed by the Sixth Circuit in *Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc*., 155 F.4th 795, 819 (6th Cir. 2025).

## V.     PLAINTIFFS' TENNESSEE ANTITRUST ACT CLAIMS ARE VALID

63.     Tenn. Code Ann. § 47-25-101 by its terms addresses all arrangements, contracts, agreements, trusts, or combinations between persons or corporations "which tend to advance, reduce, or control the price or the cost to the producer or the consumer of any product or service in trade or commerce affecting this state..."  Similarly Tenn. Code Ann. § 47-25-102 by its terms outlaws  monopolies, attempts to monopolize, and conspiracies to monopolize "....over any part of trade or commerce affecting this state."  These statutory terms control and clearly permit the claims asserted by Plaintiffs.

## VI.     PLAINTIFFS' TENNESSEE CHARITABLE SOLICITATION ACT CLAIMS ARE VALID

64. WV's argument under the Tennessee Charitable Solicitations Act ("TCSA") is based upon a fundamental misreading of the statute. WV argues that Plaintiffs lack standing because they were never solicited to contribute to WV and therefore are not "solicitees." That argument ignores the statute's plain language. The General Assembly created a cause of action not only for a "solicitee," but separately for "any ... person who suffers an ascertainable loss of money or property ... as a result of ... any other violation of this part." Tenn. Code Ann. § 48-101-520. Plaintiffs rely upon the latter category. WV's Motion effectively reads the words "or person" out of the statute altogether.

## VII. PLAINTIFFS' LANHAM ACT CLAIMS ARE VALID

65. WV argues it is not liable under the Lanham Act but it misses the entire point that as a co-conspirator, it is vicariously liable for the Lanham Act violations of other alleged co-conspirators. *Ketonatural Pet Foods, Inc. v. Hill's Pet Nutrition, Inc.*, 2026 U.S. App. LEXIS 20566, *24 (10th 2026). Further, the Complaint alleges that WV knowingly participated in the dissemination and exploitation of false commercial representations as part of a coordinated campaign to remove Plaintiffs from the marketplace.

## VIII. PLAINTIFFS' TORTIOUS INTERFERENCE CLAIMS ARE VALID

66. WV likewise seeks dismissal of Plaintiffs' tortious interference claims by characterizing the allegations as little more than ordinary business communications. The Complaint alleges considerably more. It alleges that WV knowingly intervened in LiveCo's proposed acquisition of TCA for the purpose of preventing that acquisition from occurring because TCA would remain a competitive obstacle to WV's and LiveCo's plans for the NPS Market. Those allegations, accepted as true, plausibly establish intentional interference.

67.     The Complaint does not plead an isolated conversation. It alleges that WV acted pursuant to an ongoing coordinated scheme involving LiveCo/TPR, Waterland, and others to eliminate Plaintiffs as independent competitors. Tennessee law evaluates alleged interference in light of the surrounding circumstances. The Complaint alleges those surrounding circumstances in considerable detail.

## CONCLUSION

For the foregoing reasons, WV's Motion to Dismiss should be denied.

Date: July 29, 2026

Respectfully submitted,
/s/Ben Broocks

_____

Ben Broocks
Ben Broocks (pro hac)
248 Addie Roy Road, Suite B-301
Austin, Texas
Tel: 512-201-2002
Fax: 512 201-2386

G. Kline Preston IV, Esq.
G. Kline Preston, IV, Esq. (#017141)
Belle Meade Office Park
4515 Harding Pike, Suite 107
Nashville, TN 37027
Tel: 615-649-8680
Fax: 866-610-9565
kpreston@klineprestonlaw.com
Attorneys for Plaintiffs

24

**CERTIFICATE OF SERVICE**

I hereby certify that on the date listed below, the undersigned filed the foregoing document using

the Court's CM/ECF system, which will send electronic notice to all counsel of record.

Dated: July 29, 2026

/s/Ben Broocks

_____

Ben Broocks