# Exhibit 1

**Response's Characterization of Allegations Compared with Plaintiffs' Actual Allegations**

| Statement in Response[1] | Actual Allegation(s)[2] | Implication(s) |
|---|---|---|
| "[P]re-merger promoters Transparent, Premier and Rush did have some success in acquiring rights of some Artists' Platforms . . . . Post merger, LiveCo continued to be a purchaser of artists' Platforms." ¶¶ 13–14. | "[I]t is clear that LiveCo/TPR had entered into its own sponsorship agreements with charities . . ., which is something they had *not been able to do* before their merger as they had no Public Platform to offer until then." ¶ 164. | Neither LiveCo nor its predecessors were ever competitors of World Vision. |
| "[The Complaint] alleges that WV, TCA, and LiveCo each competed horizontally to acquire the same exclusive Platform rights from the same Artists. It further alleges that after [the LiveCo Defendants][3] acquired monopoly power in the CCM Touring Market, WV and LiveCo coordinated their conduct to divert those Platform rights away from TCA and to foreclose TCA from competing in the NPS Market." ¶ 48. | The Complaint does *not* allege that World Vision and LiveCo ever sought to acquire Platform rights from the same artists. Further, no well-pleaded factual allegations support Plaintiffs' conclusion that World Vision "coordinated [its] conduct" with the LiveCo Defendants beyond simply purchasing non-exclusive rights from said defendants, which by definition would not have foreclosed TCA. Finally, TCA refused to do business with World Vision. ¶¶ 121–22. | World Vision was not a competitor of TCA or LiveCo, and no facts support that World Vision conspired to foreclose TCA from the alleged NPS market. |
| "*Pre-merger* promoters Transparent, Premier and Rush sought to buy rights in artists' Platforms so that some of the Nonprofits' payments would go to each show's financial 'pot.' Hence, they very much competed with WV [in the NPS market]." ¶ 13. | "Sponsorship fees paid to artists by nonprofits . . . are *not* typically contributed to the financial 'Pot.'" ¶ 115. "Concert promoters did *not* participate in th[e] nonprofit payments" prior to LiveCo's proposed acquisition of TCA that the alleged World Vision deal immediately followed. ¶¶ 10–11; *see also* ¶ 140. | Neither LiveCo nor its predecessors were ever competitors of World Vision. |

---

[1] Except where the source is identified, Paragraphs cited in this column refer to Plaintiffs' Memorandum in Response to World Vision's Motion to Dismiss for Failure to State a Claim. Emphases have been added.

[2] Except where the source is identified, Paragraphs cited in this column refer to Plaintiffs' Complaint. Emphases have been added.

[3] For the definition of the "LiveCo Defendants," see World Vision's Motion to Dismiss at 2 n.2.

1

| Statement in Response[1] | Actual Allegation(s)[2] | Implication(s) |
|---|---|---|
| "LiveCo and WV were *coproducing* the [Takeback tour] show." ¶ 17. | World Vision is alleged only to be a "nonprofit" (¶ 120), a term of art for "charities" that seek sponsors at CCM concerts, not promoters. ¶¶ 105, 107. | World Vision did not compete with LiveCo. |
| "The Complaint alleges that because audience sizes in the CCM Touring market tended to be smaller compared to secular concerts, ticket revenues were also correspondingly smaller, as were upfront Performance Fees paid by promoters to the artists." ¶ 7. | Smaller audiences never alleged in Complaint, which instead indicates "[b]oth CCM concerts and secular concerts involve . . . *large* audiences." ¶ 221; *see also* ¶ 7. | Alleged product market is implausible. |
| "TCA sometimes found itself attempting to purchase artists' Platforms for re-sale to WV, when the artists had very recently been approached by WV itself, creating market confusion and problems. Compl. ¶¶ 118-122, 130–36." ¶ 12. | Neither the cited paragraphs nor any others in the Complaint allege TCA found itself attempting to purchase artists' Platforms for re-sale to World Vision. | World Vision and TCA have never been competitors. |
| "Read as a whole, the Complaint alleges that WV . . . (c) knowingly interfered with existing Platform agreements between TCA and Artists; (d) worked jointly with LiveCo after Waterland's acquisition of monopoly power in the CCM Touring Market; (e) participated in leveraging monopoly power from the CCM Touring Market into the NPS Market; and (g) knowingly benefitted from the resulting exclusion of TCA as a competitor[.] Compl. ¶¶ 118-136, 160-166, 356-370." ¶ 23. | These allegations are made only as legal conclusions, unsupported by any facts—in any of the cited-to paragraphs or elsewhere in the Complaint—indicating World Vision participated or even approved of the alleged wrongful conduct. | The Complaint fails to properly plead any plausible allegations as to World Vision. |
| "The overt acts of WV have been chronicled in detail above including (a) Reiser[4] telling Plaintiffs that the arrangement between LiveCo and WV that [sic] 'TCA would not be able to re-sign any of its client artists or client nonprofits' [and] Artists would not be given traditional Performance Fees unless they surrendered their Platforms meaning LiveCo and WV were 'supplanting the artists' (and | The Complaint alleges only that Mr. Reiser "confirmed that the [LiveCo] Defendants had locked up *a nonprofit* who agreed to pay . . . in excess of $500 per sponsorship raised," a price TCA could not compete with. ¶ 206. The Complaint never alleges Reiser indicated LiveCo and World Vision | No well-pleaded facts support World Vision participating in exclusionary conduct. |

---

[4] "Reiser" is a reference to Jacob Reiser, the alleged owner and operator of one of LiveCo's predecessor promoters.

2

| Statement in Response[1] | Actual Allegation(s)[2] | Implication(s) |
|---|---|---|
| by extension, TCA's) ability to secure sponsorships." ¶ 52. | were supplanting artists' ability to secure sponsors. | |
| "The Complaint further alleges that WV knowingly participated in [LiveCo's alleged 'pressuring' artists to sell their platforms]. Rather than merely purchasing fundraising opportunities made available by independent Artists, WV allegedly acquired Platform rights after LiveCo exercised monopoly power over those same Artists, knowing that many of those Platform rights had previously been sold to TCA. Compl. ¶¶ 160-166, 356-370." ¶ 43. | No *factual* allegations—in the paragraphs of the Complaint cited or elsewhere—support that World Vision knowingly participated in any pressuring in which LiveCo allegedly engaged. | World Vision was not a co-conspirator. |
| "[T]he [LiveCo] Defendants together with World Vision, 'leveraged' their monopoly power in the CCM Touring Market to gain a competitive advantage in the NPS Market[.]" ¶ 45. | Only as a bare legal conclusion does the Complaint allege World Vision was involved in any leveraging. | No factual allegations support liability for World Vision. |
| "The anticompetitive effects have been enormous. Compl. ¶¶ 288-289 chronicle the anticompetitive effects on artists. The results in some cases have been aspiring artists who simply withdraw from the business[.]" ¶ 53. | Neither the cited-to paragraphs in the Complaint nor any others allege that, due to the purported scheme or for any other reason, "aspiring artists" withdrew from the business. | No anticompetitive effects on artists were alleged. |
| "[The Complaint] alleges that WV knowingly intervened in LiveCo's proposed acquisition of TCA for the purpose of preventing that acquisition from occurring because TCA would remain a competitive obstacle to WV's and LiveCo's plans for the NPS Market." ¶ 66. | The Complaint alleges no motive for World Vision to have allegedly "intervened." The Complaint characterizes any benefit to Defendants from LiveCo not purchasing TCA as one that would accrue to LiveCo alone. *See* Compl. ¶ 150. | Plaintiffs failed to plausibly allege conspiracy involving World Vision. |

3