**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| THRIVING CHILDREN ADVOCATES, LLC *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WATERLAND PRIVATE EQUITY INVESTMENTS, B.V., *et al.*,<br><br>Defendants. | 3:26-cv-00484<br><br>District Judge Eli J. Richardson<br>Magistrate Judge Jeffery S. Frensley |

**DEFENDANTS WATERLAND PRIVATE EQUITY INVESTMENTS, B.V., WATERLAND PRIVATE EQUITY APS, CHRISTIAN LUND MADSEN, AND NICKLAS GULDBERG'S MOTION TO DISMISS AND MEMORANDUM OF LAW**

**WATERLAND PARTIES' MOTION TO DISMISS**

Defendants Waterland Private Equity Investments, B.V.; Waterland Private Equity, ApS; Christian Lund Madsen; and Nicklas Guldberg (collectively, the "Waterland Parties"), by and through their undersigned counsel, respectfully move this Court pursuant to Federal Rule of Civil Procedure 12(b)(2) to dismiss the claims asserted against them in the Complaint for lack of personal jurisdiction. In the alternative, the Waterland Parties respectfully move this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims asserted against them in the Complaint with prejudice for failure to state a claim upon which relief can be granted. Per Local Rule 7.01(a)(2), the Waterland Parties herein file an incorporated Memorandum of Law.

September 18, 2026

Respectfully submitted,

By: /s/ *Ryan T. Holt*
Ryan T. Holt (#30191)
SHERRARD ROE VOIGT & HARBISON, PLC
1600 West End Avenue, Suite 1750
Nashville, TN 37203
Phone: (615) 742-4200
rholt@srvhlaw.com

Jonathan M. Sperling (*pro hac vice*)
John S. Playforth (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel.: (202) 662-6000
jsperling@cov.com
jplayforth@cov.com

*Counsel for the Waterland Parties*

**MEMORANDUM OF LAW IN SUPPORT OF**
**WATERLAND PARTIES' MOTION TO DISMISS**

**TABLE OF CONTENTS**


Introduction ........................................................................................................ 1

Background ........................................................................................................ 3

Legal Standard ........................................................................................................ 7

Argument ........................................................................................................ 8

I. Plaintiffs Fail To State a Prima Facie Case For Personal Jurisdiction Over The Waterland Parties. ........................................................................................ 8

II. Plaintiffs Fail To Allege Plausibly That Any Waterland Party Violated The Antitrust Laws. ........................................................................................ 14

A. Plaintiffs fail to allege any conduct by any Waterland Party that could give rise to antitrust liability. ........................................................................ 14

1. Plaintiffs' allegations against the "Waterland Defendants" do not implicate the Waterland Parties in any antitrust violation. ...................... 15

2. Plaintiffs' few remaining allegations regarding the Waterland Parties do not state a viable antitrust claim. ............................................ 17

B. Plaintiffs fail to allege viable antitrust claims based on acquisitions in the purported "CCM Touring" market. ............................................................ 20

1. Plaintiffs allege no conduct by Waterland Parties in the CCM Touring market. ........................................................................ 20

2. Plaintiffs allege no market power in any viable CCM Touring market. ........................................................................ 21

3. Plaintiffs allege no anticompetitive harm or exclusionary conduct in the purported CCM Touring market. .................................................. 23

C. Plaintiffs fail to allege viable antitrust claims in the purported "Nonprofit Sponsorship" market. ........................................................................ 24

1. Plaintiffs allege no conduct by the Waterland Parties in the NPS market. ........................................................................ 25

2. Plaintiffs allege no market power in any viable NPS market. .................. 25

3. Plaintiffs allege no anticompetitive harm or exclusionary conduct in the purported NPS market. ................................................................ 26

D. Plaintiffs fail to allege viable "market allocation," "boycott," or "conspiracy" claims. .......... 27

1. Plaintiffs allege no relevant conduct by the Waterland Parties. .......... 28
2. Plaintiffs allege no cognizable allocation or boycott conspiracy. .......... 28
3. Plaintiffs allege no overarching "anticompetitive scheme." .......... 29

E. Plaintiffs fail to allege viable "tying" or monopoly leveraging claims. .......... 30

1. Plaintiffs allege no relevant conduct by the Waterland Parties. .......... 30
2. Plaintiffs fail to allege the required elements for their claims. .......... 31

F. Plaintiffs lack standing to assert their antitrust claims. .......... 33

1. TCA lacks standing. .......... 33
2. Newsboys lack standing. .......... 34
3. Wesley Campbell and Thriving Charity Advocates lack standing. .......... 35

G. Plaintiffs' Tennessee state-law antitrust claims fail. .......... 36

III. Plaintiffs Fail To Allege Viable Non-Antitrust Claims Against Any Waterland Party. .......... 36

A. Plaintiffs fail to allege plausible claims arising from TCA's relationships with CCM artists. .......... 37

1. Plaintiffs have not plausibly alleged claims arising from TCA's contract or relationship with MercyMe. .......... 37
2. Plaintiffs have not plausibly alleged claims arising from TCA's relationship with other CCM Artists. .......... 40

B. The alleged negotiations regarding LiveCo's potential acquisition of TCA cannot give rise to liability for the Waterland Parties. .......... 44

C. Plaintiffs fail to state a defamation or false advertising claim. .......... 49

D. Plaintiffs fail to state a § 48-101-520 claim. .......... 55

Conclusion .......... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*,
155 F.4th 795 (6th Cir. 2025) ....................33

*Aegis Scis. Corp. v. Zelenik*,
2013 WL 175807 (Tenn. Ct. App. 2013) ....................52

*Anderson v. Musick*,
2024 WL 4564158 (Tenn. Ct. App. 2024) ....................45

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................8, 17, 18, 26, 39, 42

*Battle v. A & E Television Networks, LLC*,
837 F. Supp. 2d 767 (M.D. Tenn. 2011) ....................51

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................29

*Bennett v. Visa U.S.A., Inc.*,
198 S.W.3d 747 (Tenn. Ct. App. 2006) ....................36

*Blessing v. Chandrasekhar*,
988 F.3d 889 (6th Cir. 2021) ....................14

*Boxill v. O'Grady*,
935 F.3d 510 (6th Cir. 2019) ....................38, 40, 45

*Builders Insulation of Tenn., LLC v. S. Energy Sols.*,
2018 WL 5539805 (W.D. Tenn. 2018) ....................46

*Burgess v. Doji, Inc.*,
2025 WL 3006751 (M.D. Tenn. 2025) ....................52

*Cabinets to Go, LLC v. Qingdao Haiyan Real Est. Grp. Co., Ltd.*,
605 F. Supp. 3d 1051 (M.D. Tenn. 2022) ....................10, 11

*Camelo v. Pluese, Becker & Saltzman LLC*,
2024 WL 4299504 (E.D. Mich. 2024) ....................10

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*,
427 F.3d 1008 (6th Cir. 2005) ....................26, 27

*Carrier Corp. v. Outokumpu Oyj*,
673 F.3d 430 (6th Cir. 2012) ....................7

*Caruana v. Gen. Motors Corp.*,
204 F. App'x 511 (6th Cir. 2006) ....................35

*Chavez v. Broadway Elec. Serv. Corp.*,
245 S.W.3d 398 (Tenn. Ct. App. 2007) ....................46

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024) ....................15

*Clark v. EA Ent. Television, LLC*,
60 F. Supp. 3d 838 (M.D. Tenn. 2014) ....................51

*Clayton v. Hogan*,
753 F. Supp. 3d 629 (M.D. Tenn. 2024) ....................50

*Conti v. Pneumatic Prods. Corp.*,
977 F.2d 978 (6th Cir. 1992) ....................12

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) ....................20, 23

*Cupp v. Alberto-Culver USA, Inc.*,
310 F. Supp. 2d 963 (W.D. Tenn. 2004) ....................19, 21, 26

*Davidson v. Wilson*,
2010 WL 2482332 (Tenn. Ct. App. 2010) ....................45

*Dick Broad. Co., Inc. v. Oak Ridge FM, Inc.*,
395 S.W.3d 653 (Tenn. 2013) ....................42, 47

*Echo Mav, LLC v. Horizon31, LLC*,
2026 WL 2268175 (E.D. Tenn. 2026) ....................48

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
702 F.3d 860 (6th Cir. 2012) ....................29, 31, 32

*FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*,
97 F.4th 444 (6th Cir. 2024) ....................54, 55

*Fountain Leasing, LLC v. Kloeber*,
2013 WL 4591622 (E.D. Tenn. 2013) ....................47

*Glennborough Homeowners Ass'n v. U.S. Postal Serv.*,
21 F.4th 410 (6th Cir. 2021) ....................55

*Grant v. Tucker*,
57 F. Supp. 3d 852 (M.D. Tenn. 2014) ....................42

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
2009 WL 10687799 (N.D. Ala. 2009) .......... 19

*Hackman v. Dickerson Realtors, Inc.*,
557 F. Supp. 2d 938 (N.D. Ill. 2008) .......... 18

*Hauck Mfg. Co. v. Astec Indus., Inc.*,
375 F. Supp. 2d 649 (E.D. Tenn. 2004) .......... 43

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*,
608 U.S. 580 (2026) .......... 41

*Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*,
353 F. Supp. 3d 678 (M.D. Tenn. 2018) .......... 9

*Hunt v. Southern Baptist Convention et al.*,
2026 WL 2334124 (M.D. Tenn. 2026) .......... 50

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) .......... 31, 32

*It's My Party, Inc. v. Live Nation, Inc.*,
88 F. Supp. 3d 475 (D. Md. 2015) *aff'd*, 811 F.3d 676 (4th Cir. 2016) .......... 23

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) .......... 31

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) .......... 30

*Klein v. ProNova Sols., LLC*,
2024 WL 947438 (E.D. Tenn. 2024) .......... 45

*LeBlanc v. Bank of Am., N.A.*,
2013 WL 3146829 (W.D. Tenn. 2013) .......... 46

*Malone v. Stanley Black & Decker, Inc.*,
965 F.3d 499 (6th Cir. 2020) .......... 8

*McKnelly v. Wyndham Destinations, Inc.*,
2020 WL 1518624 (E.D. Tenn. 2020) .......... 43, 48

*McLoughlin v. Cantor Fitzgerald L.P.*,
162 F.4th 378 (3d Cir. 2025) .......... 18

*Means v. United States Conf. of Cath. Bishops*,
836 F.3d 643 (6th Cir. 2016) .......... 10, 11, 12, 14

*Med. Ctr. at Elizabeth Place v. Premier Health Partners*,
2016 WL 9460026 (S.D. Ohio 2016), *aff'd sub nom. Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713 ....................19

*Mfg. Repair & Overstock, Inc. v. Kasinger*,
2025 WL 1208690 (E.D. Tenn. 2025) ....................49

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
524 F.3d 726 (6th Cir. 2008) ....................31

*In re Microsoft Corp. Antitrust Litig.*,
127 F. Supp. 2d 728 (D. Md. 2001), *aff'd sub nom. Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) ....................18

*MTD Prods. Inc. v. Am. Honda Motor Co.*,
627 F. Supp. 3d 867 (N.D. Ohio 2022)....................45

*NicSand, Inc. v. 3M Co.*,
507 F.3d 442 (6th Cir. 2007) ....................33, 34

*NTCH-W. Tenn., Inc. v. ZTE Corp.*,
2017 WL 5196623 (W.D. Tenn. 2017), *aff'd*, 761 F. App'x 485 (6th Cir. 2019) ....................11

*OKI Distrib., Inc. v. Amana Refrigeration, Inc.*,
850 F. Supp. 637 (S.D. Ohio 1994) ....................42

*In re Omnicare, Inc. Secs. Litig.*,
769 F.3d 455 (6th Cir. 2014) ....................45

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)....................34

*PartyLite Gifts, Inc. v. Swiss Colony Occasions*,
246 F. App'x 969 (6th Cir. 2007) ....................44

*Peck v. Gen. Motors Corp.*,
894 F.2d 844 (6th Cir. 1990) ....................33, 35

*PGT Trucking, Inc. v. Jones*,
2015 WL 4094265 (W.D. Tenn. 2015)....................43

*Plateau Cas. Ins. Co. v. Securranty, Inc.*,
608 F. Supp. 3d 566 (M.D. Tenn. 2022)....................53

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)....................22

*Ramsbottom v. Ashton*,
2022 WL 106733 (M.D. Tenn. 2022) ........................................................................9

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
709 F. Supp. 3d 552 (M.D. Tenn. 2023) ..................................................................18

*Relyant Glob., LLC v. Gibraltar-Caddell*,
2023 WL 3267757 (E.D. Tenn. 2023) ........................................................................8

*Reynolds v. Int'l Amateur Athletic Fed'n*,
23 F.3d 1110 (6th Cir. 1994) ............................................................................13, 14

*Robinson v. City of Clarksville*,
673 S.W.3d 556 (Tenn. Ct. App. 2023) ....................................................................38

*Ross v. Am. Exp. Co.*,
35 F. Supp. 3d 407 (S.D.N.Y. 2014), *aff'd*, 630 F. App'x 79 (2d Cir. 2015)..........................30

*Santoni v. Mueller*,
2022 WL 97049 (M.D. Tenn. 2022) ....................................................................8, 9

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ............................................................................15, 19

*Serv. Jewelry Repair, Inc. v. Cumulus Broad., LLC*,
145 F. Supp. 3d 737 (M.D. Tenn. 2015) ..................................................................54

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*,
8 F.4th 479 (6th Cir. 2021) ....................................................................................35

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
697 F.3d 387 (6th Cir. 2012), *aff'd,* 572 U.S. 118 (2014) ..............................................33

*Sterling Merch., Inc. v. Nestle, S.A.*,
656 F.3d 112 (1st Cir. 2011) ..................................................................................34

*Sullivan v. LG Chem, Ltd.*,
79 F.4th 651 (6th Cir. 2023) ....................................................................................9

*Theunissen v. Matthews*,
935 F.2d 1454 (6th Cir. 1991) ..................................................................................8

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) ............................................................................ Passim

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*,
71 S.W.3d 691 (Tenn. 2002)...............................................................................39, 41

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ....................15, 29

*United Biologics, LLC v. Amerigroup Tenn., Inc.*,
2024 WL 770640 (E.D. Tenn. 2024), *aff'd sub nom. Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*, 155 F.4th 795 (6th Cir. 2025) ....................38

*United States v. Bestfoods*,
524 U.S. 51 (1998)....................18

*United States v. E.I. du Pont de Nemours & Co.*,
353 U.S. 586 (1957)....................20

*Univ. of Tenn. Rsch. Found. v. Caelum Biosciences, Inc.*,
2022 WL 19403695 (E.D. Tenn. 2022) ....................48

*Valley Prods. Co. v. Landmark*,
877 F. Supp. 1087 (W.D. Tenn. 1994), *aff'd*, 128 F.3d 398 (6th Cir. 1997)....................36

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)....................31, 32

*Victory Glob., LLC v. Fresh Bourbon, LLC*,
170 F.4th 1014 (6th Cir. 2026) ....................52, 54

*Wachter, Inc. v. Cabling Innovations, LLC*,
387 F. Supp. 3d 830 (M.D. Tenn. 2019)....................8, 43, 47

*White Mule Co. v. ATC Leasing Co. LLC*,
540 F. Supp. 2d 869 (N.D. Ohio 2008)....................53

*Wilson v. Reliance AG, LLC*,
2022 WL 20091640 (E.D. Tenn. 2022) ....................10, 13

*Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*,
388 F.3d 955 (6th Cir. 2004) ....................21, 22

*Yoe v. Crescent Sock Co.*,
2015 WL 13847410 (E.D. Tenn. 2015) ....................47

*In re Zinc Antitrust Litig.*,
155 F. Supp. 3d 337 (S.D.N.Y. 2016)....................30

**Statutes, Rules, and Regulations**

15 U.S.C. § 18 (Clayton Act § 7)....................7, 20, 21

15 U.S.C. § 1125 (Lanham Act § 43). ....................52, 53, 54

15 U.S.C. § 1 (Sherman Act § 1) ....................20, 21, 27, 28

15 U.S.C. § 2 (Sherman Act § 2) ....................20, 21

Fed. R. Civ. P. 12 ....................7, 8

Tenn. Code Ann. §§ 47-25-1701 *et seq.* (TUTSA) ....................43, 44, 47

Tenn. Code Ann. §§ 47-25-1702(4) ....................49

Tenn. Code Ann. §§ 48-101-501 *et seq.* ....................55

**Other Authorities**

Act of Apr. 23, 2024, ch. 776, §§ 1–2, 2024 ....................36

CPI Inflation Calculator, U.S. Bureau of Labor Statistics ....................24

## INTRODUCTION

This case arises from increasing competition in the Contemporary Christian Music industry—not from the absence of it. Having lost business to a new competitor, a former monopolist seeks to enlist the Court in restoring its privileged position. Its effort should be rejected.

Plaintiffs are (i) Wesley Campbell; (ii) Newsboys, a Contemporary Christian Music ("CCM") touring band owned by Campbell; and (iii) Thriving Children Advocates, LLC ("TCA"), a Campbell-owned intermediary that connects CCM artists with charities seeking to solicit donations at live concerts. Until 2023, TCA was—according to its own allegations—the sole company operating in this niche. According to the Complaint, TCA began to face competition for the first time after LiveCo acquired three CCM concert promoters and began to offer services similar to those of TCA. The competition allegedly was robust: TCA retained some major clients but lost others to LiveCo, and in the process, artists were able to negotiate for increased revenues.

In Plaintiffs' telling, however, each lost client was the product of a sprawling scheme involving more than thirty Defendants, who allegedly employed illegal acquisitions, boycotts, market allocations, stolen trade secrets, defamatory allegations of sexual assault, and an assortment of other torts to undermine Plaintiffs. Four of those thirty-plus defendants are the Waterland Parties: Waterland Private Equity Investments B.V. ("Waterland PEI"), the sole fund manager; Waterland Private Equity ApS ("Waterland ApS"), a Danish Waterland advisory entity; Christian Lund Madsen, a former Waterland ApS employee; and Nicklas Guldberg, a current Waterland ApS employee. Waterland PEI is based in the Netherlands, Waterland ApS is based in Denmark, and both individual defendants are Danish. None is a promoter, none is alleged to have interacted with artists or nonprofits, and none is alleged to have any meaningful presence in the United States.

Plaintiffs' allegations against the Waterland Parties suffer from three fundamental flaws, each warranting dismissal:

The Court Lacks Personal Jurisdiction. The Waterland Parties are foreign entities and individuals, and the Complaint alleges no conduct through which any of them purposefully availed themselves of Tennessee or the United States. Because Plaintiffs identify no forum-directed conduct by any Waterland Party, the claims against them should be dismissed in their entirety.

Plaintiffs' Antitrust Claims Lack Merit. Plaintiffs' antitrust claims against the Waterland Parties fail for three independent reasons. First, the Complaint alleges no conduct by any Waterland Party in any relevant market. Instead, Plaintiffs attribute the challenged acquisitions, competition with TCA, and alleged boycott of Newsboys to other Defendants. At most, the Waterland Parties are alleged merely to have played a role in providing "financing" to the LiveCo entities—conduct that cannot support antitrust liability. Second, Plaintiffs fail to plead essential elements of their antitrust claims, including a plausible relevant market, market power, and anticompetitive conduct. Third, and more fundamentally, Plaintiffs have antitrust law backwards. Their core grievance is that LiveCo's "entry into the NPS market as a competing Platform caused actual, immediate competitive harm to TCA." Compl. ¶ 293. That allegation describes injury *from* competition, not injury *to* competition, so Plaintiffs lack antitrust standing to bring their claims.

Plaintiffs' Non-Antitrust Claims Also Lack Merit. Plaintiffs also attempt to recast a hodgepodge of tort, contract, and statutory claims as components of a wide-ranging conspiracy to undermine their business. Those claims fare no better. The Complaint attributes no relevant conduct to the Waterland Parties: none is alleged to have entered or breached a contract, owed or breached a fiduciary duty, stolen or misused confidential information, tortiously interfered with any contract or business relationship, or published a defamatory statement. And in all events, Plaintiffs' non-antitrust claims lack essential elements and therefore fail on their own terms.

For all these reasons, as more fully set forth below, the Court should grant the Waterland Parties' motion to dismiss for lack of personal jurisdiction or, in the alternative, dismiss with prejudice for failure to state a claim.

## BACKGROUND

Defendants Waterland Private Equity Investments, BV and Waterland Private Equity ApS are based in the Netherlands and Denmark, respectively. Compl. ¶¶ 47–48. Waterland PEI is a Dutch fund manager and Waterland ApS is a Danish Waterland advisory entity. *See id.* ¶¶ 123–125 nn.4–5. Defendants Christian Lund Madsen and Nicklas Guldberg are Denmark residents. Christian Lund Madsen allegedly worked for Waterland ApS between 2020 and 2025 and Nicklas Guldberg is a current employee of Waterland ApS. *See* Compl. ¶¶ 50–51. Together, these two corporate entities and their two employees make up the "Waterland Parties"—a subset of the more than twenty parties the Plaintiffs repeatedly aggregate without distinction into the "Waterland Defendants." Compl. ¶ 68.[1]

Plaintiff Wesley Campbell claims to be a well-established figure in Contemporary Christian Music ("CCM"). Compl. ¶ 9. He co-founded the "Newsboys," a Christian music "mega-band," in 1986 and has controlled them and their brand ever since. *Id.* ¶¶ 46 n.2, 186. Plaintiffs Newsboys, Inc., and Newsboys Touring, LLC are the corporate entities that Campbell uses to run Newsboys tours, maintain the band's intellectual property, and collect revenue for their live performances. *Id.* ¶ 46 n.2. Newsboys are allegedly one of many prominent CCM bands that put on national tours. Plaintiffs refer to these Christian concert tours collectively as the CCM Touring Market, *id.* ¶ 95–96, and allege that they are distinct from secular concerts because they are focused less on

[1] An additional entity, Waterland Holdings, LLC, is named in the Complaint (Compl. ¶ 49) but has no relationship with the Waterland Parties. Plaintiffs seemingly never served Waterland Holdings, LLC, and it has not made an appearance in this litigation.

entertainment and more on bringing Christian followers together for shared worship, *id.* ¶¶ 222–223. According to the Complaint, each tour is curated by a promoter who selects the venues, dates, branding, and advertising, and works to maximize attendance. *Id.* ¶ 99. The Complaint also alleges that it is common within CCM shows for a representative for a charity to make a presentation about its work to ask the audience for donations. *Id.* ¶ 108. In exchange for the opportunity to present, the charity pays the artists a fee, often calculated on each donor ("sponsor") they generate. *Id.* ¶ 8.

Artists and charities alike invest time and effort to succeed in the CCM Touring Market. Artists must vet and select trusted charities to connect to their fans, while charities need to recruit enough volunteers to both present and collect donations at major shows. *Id.* ¶ 108–109. Seeing these demands on both sides, Campbell founded a company called Thriving Children's Advocates ("TCA") to act as an intermediary between artists and charities. *Id.* ¶ 117–118. The remaining two Plaintiffs (Thriving Children Advocates, LLC and Thriving Charity Advocates, LLC) are corporate entities through which Campbell runs TCA. *Id.* ¶¶ 9, 42–43. For each tour and show, TCA matches charities with artists; acquires rights to the artists' platforms for use by those charities; provides volunteers to collect money for each charity; and negotiates a per-sponsor fee to flow from nonprofits to artists. *Id.* ¶ 118. The Complaint alleges that this niche work falls into its own market for "Nonprofit Sponsorship," or NPS. Until 2023, TCA was allegedly the only business in the so-called NPS Market, *i.e.*, it was an alleged monopolist. *Id.* ¶¶ 119, 139.

The Waterland Parties, by contrast, are not alleged to play any role in the NPS or CCM Touring Markets. They are not alleged to have interacted with artists or nonprofits, secured venues, or solicited funds. Indeed, the Waterland Parties' only alleged connection to these markets began in 2021, when they allegedly facilitated the financing for LiveCo to purchase three CCM promoters (each also defendants)—Premier Productions, LLC (acquired in November 2021), *id.* ¶ 128; Rush

Concerts, LLC (acquired before January 2023), *id.* ¶ 130; and Transparent Productions (negotiations for acquisition completed in January 2023), *id.* ¶¶ 134, 136. LiveCo sought to offer a "one-stop full service" promotion company for CCM artists, *id.* ¶ 136, including connecting artists to nonprofits for their tours, *id.* ¶ 139. The Complaint refers to that new one-stop shop as "LiveCo" or "TPR." *Id.* ¶ 135.

In early 2023, LiveCo allegedly considered acquiring TCA. *Id.* ¶ 145–146. LiveCo/TPR, allegedly with some involvement by Madsen and Guldberg, discussed such an acquisition with TCA. *Id.* ¶ 143. Negotiations stalled in January 2023. *Id.* ¶ 146. In the last specific action allegedly taken by *any* Waterland Party, Madsen reached out to Campbell and TCA's representatives to put the acquisition on hold while LiveCo worked on additional funding. *Id.*

Having not completed the contemplated acquisition of TCA, LiveCo allegedly pursued the development of an NPS platform internally. *Id.* ¶¶ 149–150. It did so by reducing inefficiencies in the existing system: whereas artists previously relied on a concert promoter to organize their tours and a separate intermediary like TCA to secure nonprofit sponsorships, LiveCo combined both functions in a single platform. *Id.* ¶ 285. The efficient platform that LiveCo created was more attractive to non-profits, such as Defendant World Vision, than the old system in which TCA was dominant. *Id.* ¶¶ 150, 285–286, 320.

Its business model enabled LiveCo to offer "higher guarantees" to artists than TCA had offered its clients. *Id.* ¶ 288; *see also id.* ¶¶ 262, 293, 320, 323. This introduced competition into the NPS Market for the first time. *See id.* ¶ 162. The Complaint alleges that, in some instances, the resulting competition meant that TCA lost an unspecified number of artists to LiveCo's streamlined (and more lucrative) offering. *Id.* ¶ 191. These losses included two artists named Danny Gokey and Tauren Wells, who opted for a tour sponsorship provided by LiveCo and World Vision, rather

than TCA. *Id.* ¶¶ 160–161. Plaintiffs insist that this partnership violated Wells's and Gokey's exclusive contracts with TCA, although they do not attach the contracts or allege the contract language purportedly showing exclusivity. *Id.* ¶ 161. In other instances, TCA succeeded in the resulting competition. For example, TCA was able to retain "mega-band" MercyMe as a client when it offered the group a $1.5 million advance to keep its business. *Id.* ¶¶ 169–171, 185.

Campbell's businesses suffered a separate setback one year later, when The Roys Report, a Christian news publication, published two articles detailing sexual assault and harassment allegations against figures associated with Newsboys and their management. *Id.* ¶¶ 2, 4.

The first article, published in June 2025, detailed allegations of a 2014 sexual assault by a lighting technician who was touring with the Newsboys. *See* Compl. Ex. 1, ECF No. 1-1. After a show in Fargo, North Dakota, an employee of one of the promotion companies associated with the tour had a sexual encounter with the lighting technician. *Id.* ¶¶ 27, 432. She alleged that she had not consented to the encounter and that Newsboys lead singer Michael Tait had entered the room and watched this sexual encounter, also without her consent. *Id.* ¶¶ 418, 446, 448. The June 2025 article also included a response from Newsboys management, stating it would "conduct[] its own investigation into what happened" and "take necessary action against anyone who is currently affiliated with the Newsboys who proves to have been involved." Compl. Ex. 1 at 14.

The second article, published in February 2026, focused on Tait. *See* Compl. Ex. 3, ECF No. 1-3. In the months between the two articles' publications, The Roys Report had uncovered multiple allegations of sexual assault against Tait by both men and at least one woman over a ten-year period. Compl. ¶ 469; Compl. Ex. 3 at 2–3. This article mentioned Campbell by name, discussed his personal and professional relationship with Tait, and referred to the 2014 rape allegations and Tait's reported role. Compl. ¶ 470; Compl. Ex. 3. The article noted that the 2014

accuser and three witnesses claimed that Newsboys management had "covered up" the incident. Finally, the article stated that Tait had "admit[ted] guilt" when he confessed to "at times touch[ing] men in an unwanted sensual way." Compl. ¶¶ 454–455.

The articles allegedly impacted the businesses of Campbell. *Id.* ¶¶ 479–480. According to the Complaint, CCM artists and nonprofits alike were hesitant to continue working with TCA and Campbell, given their association with Tait and the allegations related to his conduct. *Id.* ¶¶ 479–480, 498–500. In July 2025, MercyMe allegedly terminated the contract with TCA and Campbell that the band had renegotiated the prior year—but the Complaint does not definitively allege that they ultimately signed with LiveCo, either. *Id.* ¶ 517. The February 2026 article noted this negative impact on Campbell's business ventures. Compl. Ex. 3 at 3–4.

Two months after the second Roys Report article, Campbell filed this lawsuit on behalf of himself and the four corporate entities associated with Newsboys and TCA. Compl. ¶¶ 42–46. According to the Complaint, The Roys Report's investigative journalism was not journalism at all, but instead the culmination of an anticompetitive scheme, orchestrated by private equity fund managers abroad and involving more than thirty defendants. *Id.* ¶¶ 481–489. Plaintiffs allege that everything from the Premier acquisition to the February 2026 article was part of a single, coordinated "scheme" to force TCA out of business. Based on those allegations, the Complaint alleges violations of the Sherman and Clayton Acts, and more than a dozen other claims under state and federal law.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(2), "[t]he plaintiff bears the burden of establishing that [personal] jurisdiction exists." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 449 (6th Cir.

2012) (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)).[2] Where, as here, the defendant challenges personal jurisdiction on the complaint alone, a plaintiff must "state a prima facie case for jurisdiction," meaning that the plaintiff's complaint must include allegations "which if believed, [are] sufficient to establish the existence of personal jurisdiction." *Santoni v. Mueller*, 2022 WL 97049, at *3–4 (M.D. Tenn. 2022) (Richardson, J.). If the complaint does not meet this initial burden, the complaint should be dismissed. *Relyant Glob., LLC v. Gibraltar-Caddell*, 2023 WL 3267757, at *2 (E.D. Tenn. 2023); *see also Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505–06 (6th Cir. 2020) (when considering prima facie showing, affidavits were "irrelevant").

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs cannot establish plausibility through "'bare assertions,' formulaic recitation of the elements, and 'conclusory' or 'bald' allegations." *Wachter, Inc. v. Cabling Innovations, LLC*, 387 F. Supp. 3d 830, 835 (M.D. Tenn. 2019) (Richardson, J.) (quoting *Iqbal*, 556 U.S. at 681). Nor must the Court accept legal conclusions as true, even when "couched" as factual allegations. *Wachter, Inc.*, 387 F. Supp. 3d at 835.

## ARGUMENT

### I. Plaintiffs Fail To State a Prima Facie Case For Personal Jurisdiction Over The Waterland Parties.

The Waterland Parties are not subject to this Court's personal jurisdiction. The two corporate Waterland Parties (Waterland PEI and Waterland ApS) are firms based in the Netherlands and Denmark. Compl. ¶¶ 47–48. The individual Waterland Parties are current or former employees of those entities, alleged to have done little more than work for foreign corporations. *See* Compl.

[2] Unless otherwise stated, emphasis is added and internal citations and quotation marks are omitted.

¶¶ 51–52. Yet Plaintiffs seek to hale them into United States federal court in Tennessee simply because that is where *Plaintiffs* are at home. Decades of precedent prohibit that result. Because the Complaint lacks allegations providing a sufficient relationship between the Waterland Parties to the United States—let alone to Tennessee or this District—they must be dismissed.

Before proceeding to the merits of a claim, a court "must have personal jurisdiction over each defendant and as to each asserted claim." *Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*, 353 F. Supp. 3d 678, 690 (M.D. Tenn. 2018). In each instance, that requires both statutory and constitutional authority for the exercise of personal jurisdiction. *See, e.g.*, *Ramsbottom v. Ashton*, 2022 WL 106733, at *15 (M.D. Tenn. 2022).

The Complaint does not identify any statutory basis for personal jurisdiction in this case, and even if Plaintiffs could establish such a basis, exercising jurisdiction over the Waterland Parties would violate due process. First, the Waterland Parties are all foreign entities, with no "continuous and systemic contacts" in Tennessee or the United States. *Santoni*, 2022 WL 97049, at *4 n.4. This Court can thus only exercise specific personal jurisdiction over the Waterland Parties, which requires a connection between the defendant's conduct, the claim, and the forum state. *Id.* at *4. To properly exercise specific jurisdiction, due process requires that each defendant have "minimum contacts" with a forum before it can be subject to suit in that forum. *See, e.g.*, *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 670, 673 (6th Cir. 2023) (requiring sufficient contacts with the forum).

The Sixth Circuit applies a three-prong test for assessing minimum contacts:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection

> with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Means v. United States Conf. of Cath. Bishops*, 836 F.3d 643, 649 (6th Cir. 2016). The first prong requires that the defendant's contacts with the forum "proximately result from actions by the defendant *himself* that create a substantial connection with the forum state." *Id.* This defendant-specific analysis means that when "alleg[ing] personal jurisdiction over a defendant, group pleading is not permitted." *Camelo v. Pluese, Becker & Saltzman LLC*, 2024 WL 4299504, at *7 (E.D. Mich. 2024); *Cabinets to Go, LLC v. Qingdao Haiyan Real Est. Grp. Co., Ltd.*, 605 F. Supp. 3d 1051, 1062 n.6 (M.D. Tenn. 2022) (references to "all the foreign defendants" were "of little help" in personal jurisdiction analysis). And the allegations must offer specific facts linking the defendant and the forum—"vague and conclusory" allegations will not suffice. *See Wilson v. Reliance AG, LLC*, 2022 WL 20091640, at *6 (E.D. Tenn. 2022).

Plaintiffs' Complaint falls well short of these standards. It refers almost exclusively to the "Waterland Defendants" in the aggregate, and it thus fails to allege any actions that any of the Waterland Parties took to establish a connection to this District, to Tennessee, or to the United States. Plaintiffs therefore have not established personal jurisdiction over the Waterland Parties. Plaintiffs do briefly mention the individual Waterland Parties in their background, antitrust, defamation, and contract claims. But for multiple reasons, those one-off allegations are insufficient to establish a prima facie case of "purposeful availment" sufficient to support personal jurisdiction over the Waterland Parties, as to any of Plaintiffs' claims.

**Background.** The few facts alleged in the background section as to the Waterland Parties explain why those Parties should *not* be subject to personal jurisdiction in this Court. Waterland PEI and Waterland ApS are merely alleged to be based in the Netherlands and Denmark, respectively. Compl. ¶¶ 47–48. Neither is alleged to have an office in Nashville, in Tennessee, or

anywhere else in the United States. And Madsen and Guldberg are alleged to be current (or former) employees of Waterland ApS, and both are alleged to be residents of Denmark. *Id.* ¶¶ 50–51.

**Antitrust.** Plaintiffs mention the Waterland Parties only twice in connection with their antitrust claims, and neither mention could support personal jurisdiction over any of the Waterland Parties in connection with their antitrust claims. *See* Compl. ¶¶ 92–347 (Article V and VI claims).

First, in framing their antitrust claims, Plaintiffs assert that Waterland PEI and Waterland ApS "developed and began implementing a strategy to gain control" of the alleged relevant markets. *Id.* ¶ 123; *see also* ¶¶ 126, 248, 314. This bald allegation does not establish personal jurisdiction over either entity, because "[c]onclusory allegations" without any specific factual support are insufficient to establish purposeful availment. *Cabinets to Go*, 605 F. Supp. 3d at 1061. Similarly, the Complaint alleges that Madsen and Guldberg "on information and belief" were "the driving force behind the entities and actions that are at the base of the claims asserted herein, particularly the antitrust claims." Compl. ¶ 124. That is likewise a textbook conclusory allegation that cannot demonstrate that either named individual's "contacts with the [forum] proximately result from actions by the defendant *himself* that create a substantial connection with the [forum]." *Means*, 836 F.3d at 649; *see also Cabinets to Go*, 605 F. Supp. 3d at 1061.

Second, Plaintiffs vaguely allege that Waterland PEI and Waterland ApS had an unspecified role in "financing" LiveCo, which in turn is alleged to have purchased certain concert promoters. Compl. ¶¶ 126, 128, 131, 138, 248, 314. But that financing is not alleged to have had any connection to Tennessee, and in all events, financing alone falls well short of the contacts needed to establish purposeful availment of a forum. Indeed, "[a] corporate entity does not purposefully avail itself merely by owning all or some of a corporation subject to jurisdiction." *NTCH-W. Tenn.,*

*Inc. v. ZTE Corp.*, 2017 WL 5196623, at *7 (W.D. Tenn. 2017), *aff'd*, 761 F. App'x 485 (6th Cir. 2019).

**Contract Claims.** Plaintiffs' allegations do not establish any of the required elements to exercise personal jurisdiction over their claims relating to LiveCo's proposed but unconsummated purchase of TCA. *See* Compl. ¶¶ 351–413 (Article VII claims). The Complaint asserts that the Waterland Parties "joined the negotiations" with respect to that potential purchase, requested some information from TCA, and later that Madsen "called TCA to say closing of the agreed acquisition needed to be delayed to allow the "Waterland Defendants" time to raise acquisition financing." Compl. ¶¶ 143, 146, 357, 400. None of these allegations indicate purposeful availment by any of the Waterland Parties. As an initial matter, the Complaint contains no allegations regarding the location of any of the relevant parties for these negotiations. Moreover, even if TCA's representatives were in Tennessee at the time of these negotiations—an allegation unsupported by the Complaint—due process does not permit an exercise of personal jurisdiction over a defendant based on contract negotiations where only the plaintiff was alleged to be present in the forum state. *See Conti v. Pneumatic Prods. Corp.*, 977 F.2d 978, 982–83 (6th Cir. 1992) (no purposeful availment where defendant "conducted extensive contract negotiations with [plaintiff] in [the forum state] through Management Recruiters"). Nor do these allegations indicate that any of Plaintiffs' purported misappropriation claims "arise from the defendant's activities" in the forum. *Means*, 836 F.3d at 649. To the contrary, those claims arise not from the ultimately unsuccessful negotiations, but rather from purported misappropriation of confidential information. *See* Compl. ¶¶ 369–399 (Article VII.B–D claims). And Plaintiffs allege that other parties improperly used the confidential information, *see*, *e.g.*, *id.* ¶395, not any of the Waterland Parties.

**Defamation and Conspiracy.** Plaintiffs next allege a variety of claims relating to assertions that some combination of defendants conspired to and did defame the Newsboys and Michael Tait. Compl. ¶¶ 481–503 (Article IX-X claims). The Complaint's allegations as to these claims fail to establish personal jurisdiction because they do not identify even a single purported act by any of the Waterland Parties, instead referring repeatedly to all twenty-one "Waterland Defendants" as having worked together to spread the Tait allegations. *See id.* ¶¶ 487–489. Such "vague and conclusory" allegations cannot establish personal jurisdiction. *See Wilson*, 2022 WL 20091640, at *6.

Nor could any of those allegations support a finding of personal jurisdiction even if Plaintiffs were to allege them specifically against the Waterland Parties. Campbell and Newsboys' Tennessee presence is the sole alleged nexus between these defamation claims and the forum. *See* Compl. ¶¶ 44–46. But Sixth Circuit defamation precedent is clear that a plaintiff's presence in the forum state is insufficient to establish personal jurisdiction over a foreign defendant. *See Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1114, 1120 (6th Cir. 1994). For example, in *Reynolds*, the Sixth Circuit held that a foreign defendant's allegedly defamatory press release about an Ohio resident did not establish personal jurisdiction in Ohio where the activities described in the release took place abroad, the plaintiff was an international athlete whose reputation was not centered in Ohio, and the defendants published the press release in Europe, not in Ohio. *Id.*

So too here. The Tait allegations are centered in North Dakota, Compl. ¶ 27; the Newsboys were a "mega-band" with a national presence, meaning Tennessee was not the "center" of their reputation, Compl. ¶¶ 46 n.2, 186; and the relevant articles were written by an Australian author and published by an Illinois newspaper, Compl. ¶¶ 2, 69–71. Finally, that the articles were published online does not alter this conclusion. In a recent application of *Reynolds*, the Sixth

Circuit held that in cases alleging online defamation, "personal jurisdiction is absent when the communication was not specifically directed at the forum state." *Blessing v. Chandrasekhar*, 988 F.3d 889, 905 (6th Cir. 2021); *see also id.* n.15 (collecting cases holding that "posting allegedly defamatory comments or information on an internet site does not, without more, subject the poster to personal jurisdiction wherever … the subject of the posting may reside[.]"). As in *Reynolds* and *Blessing*, Plaintiffs have thus failed to establish "purposeful availment" of the laws of Tennessee by any Waterland Party.

**Causes of Action Related to Artist Relationships.** Plaintiffs likewise fail to establish personal jurisdiction over the Waterland Parties relating to TCA's fledgling relationships with various artists, as those allegations fail to identify any conduct by any Waterland Party. *See* Compl. ¶¶ 564–582 (Article XII claims). To the contrary, that Article of the Complaint alleges only conduct attributed to "TPR" and thus cannot establish that any Waterland Party purposely availed itself of the privilege of acting in the forum state, that these causes of action arise from any of the Waterland Parties' activities there, or that there is a substantial enough connection between the Waterland Parties and the forum to make an exercise of jurisdiction reasonable. *See Means*, 836 F.3d at 649.

For these reasons, the Court should dismiss Plaintiffs' claims against the Waterland Parties in their entirety, as the Complaint fails to state a prima facie case for personal jurisdiction.

## II. Plaintiffs Fail To Allege Plausibly That Any Waterland Party Violated The Antitrust Laws.

### A. Plaintiffs fail to allege any conduct by any Waterland Party that could give rise to antitrust liability.

Plaintiffs fail to state a viable antitrust claim against any of the four named Waterland Parties because the Complaint fails to allege that any of them engaged in any conduct that could give rise to antitrust liability. Rather, nearly every allegation against the "Waterland Defendants" is pleaded vaguely and generically as to the *more than 20* entities and/or individuals that fall within

the Complaint's definition of "Waterland Defendants." Compl. ¶¶ 47–67, 68. Moreover, in nearly every instance, the Complaint makes clear that the "Waterland Defendant" at issue is not any one of Waterland PEI, Waterland ApS, Madsen, or Guldberg. The few allegations that remain, moreover, come nowhere close to implicating any of these Defendants in an antitrust violation. Plaintiffs' antitrust claims against the Waterland Parties should be dismissed for this reason alone.

### 1. Plaintiffs' allegations against the "Waterland Defendants" do not implicate the Waterland Parties in any antitrust violation.

Sixth Circuit law prohibits "[g]eneric pleading, alleging misconduct against defendants without specifics as to the role each played" in an alleged antitrust violation. *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008); *see also, e.g.*, *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 396–97 (2d Cir. 2024) ("failure to identify the involvement of particular defendants" in an alleged violation is "a basic pleading defect" that "dooms" any attempt to state a viable antitrust claim (collecting cases)); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) (if a complaint "fails to allege particular facts against a particular defendant, then the defendant must be dismissed" (citing *Total Benefits*, 552 F.3d at 436)); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (rejecting attempt to state an antitrust claim "relying on several vague allegations contained in the Amended Complaint that refer to 'defendants'"). Further, "the fact that two separate legal entities may have a corporate affiliation does not alter the pleading requirement to *separately* identify each defendant's involvement" in the alleged antitrust violation. *SD3*, 801 F.3d at 423 (citation modified).

The Complaint comes nowhere close to satisfying the requirement to "separately identify" how each of the named Waterland Parties purportedly had "involvement" in the alleged antitrust claims. In Plaintiffs' telling, their antitrust claims rely on four principal elements: (i) LiveCo's

acquisitions of concert promoters, (ii) LiveCo's competition with TCA for the sponsorship business of MercyMe and other artists, (iii) the breakdown in commercial relations between LiveCo and Newsboys, and (iv) the "Defamation Defendants"' publication of articles regarding Michael Tait. Across each of these elements, the Complaint makes clear that its allegations directed at the "Waterland Defendants" refer predominantly or exclusively to conduct by entities other than the named Waterland Parties.

**Acquisitions of Promoters.** Each of Plaintiffs' antitrust-related claims relies on allegations of the "acquisitions of Transparent, Premier, and Rush, and later merging of those three entities." *E.g.* Compl. ¶¶ 306, 314, 317, 326–327. But the facts alleged in the Complaint make clear that none of the Waterland Parties engaged in any such acquisition. Instead, the Waterland Parties are at most alleged to have financed the creation of a separate U.S. corporate entity, USLive, LLC, which in turn created certain subsidiaries, and which the Complaint typically refers to collectively as "LiveCo." *Id.* ¶¶ 123, 126–127. Those *LiveCo* entities, not any of the Waterland Parties, are then alleged to have purchased certain concert promoters. *See id.* ¶¶ 128, 130, 285 (referring to "LiveCo's acquisition of the major promoters").

**Competition with TCA.** Plaintiffs allege that the "Waterland Defendants" entered into "competition with TCA," and that their "entry into the NPS market as a competing Platform caused actual, immediate competitive harm to TCA." *E.g.*, Compl. ¶¶ 149, 293. That conduct is not alleged to have involved the Waterland Parties. Rather, the Complaint alleges that *LiveCo* entered into contract with the charity World Vision and competed for artists, including MercyMe—conduct that allegedly constituted injurious competition with TCA. *See id.* ¶ 153 ("LiveCo/TPR" entered into "deal" with World Vision), *id.* ¶ 169 ("LiveCo/TPR" competed for the business of MercyMe); *id.* ¶ 285 ("LiveCo then entered into direct competition with artists for sponsorship revenue.").

**Relationship with Newsboys.** Plaintiffs assert that "the Waterland Defendants" engaged in a "boycott" of Newsboys. But the factual allegations underlying that assertion do not refer to any of the Waterland Parties. Rather, Plaintiffs only allege that *LiveCo*'s incoming CEO informed Newsboys that Transparent "would no longer promote Newsboys' CCM concerts" in June 2023, and that *Rush* did not sufficiently "promote" Newsboys concerts in the fall of 2023. Compl. ¶¶ 154–157.

**Michael Tait Articles.** Plaintiffs allege that the "Waterland Defendants" had a vague and unspecified role in the publication of what it alleges are false articles regarding Michael Tait and that this role allegedly related to the hiring of "Nicole," the reported victim discussed in those articles. Compl. ¶ 176. Once again, this allegation does not allege any conduct by any of the Waterland Parties, as the Complaint specifies that it was "LiveCo/TPR," not any of the Waterland Parties, that allegedly hired Nicole. *See id.* ¶¶ 175–176. And none of the Waterland Parties are alleged to have shared or published the allegedly defamatory information either. *See*, *e.g.*, *id.* ¶ 485.

**2. Plaintiffs' few remaining allegations regarding the Waterland Parties do not state a viable antitrust claim.**

Plaintiffs fare no better with respect to the few instances in which the Complaint does refer to one or more of the Waterland Parties. Those few references fail to provide the alleged factual "specifics" that would be necessary to implicate any of the Waterland Parties in any purported antitrust violation. *See Total Benefits*, 552 F.3d at 436.

*First*, the Complaint asserts the conclusions that Waterland PEI and Waterland ApS had a "strategy to gain control" of the relevant markets, and that Madsen and Guldberg were "the driving force behind" the purported antitrust violations. Compl. ¶¶ 123–124; *see also id.* ¶¶ 125–126, 248, 314. Those conclusory assertions of strategy or intent cannot sustain a viable antitrust claim. Rather, as the Supreme Court held in *Ashcroft v. Iqbal*, allegations that defendants were "the

'principal architect[s]'" or "instrumental" to purportedly illegal conduct are "conclusory and not entitled to be assumed true." 556 U.S. 662, 680–81 (2009). Courts thus routinely dismiss antitrust claims founded on such mere conclusory assertions of strategy, intent, or motive. *See, e.g.*, *McLoughlin v. Cantor Fitzgerald L.P.*, 162 F.4th 378, 393 n.19 (3d Cir. 2025) (rejecting antitrust claim founded on "bald" and "conclusory" allegations regarding "purpose" that were "not entitled to be assumed true"); *Hackman v. Dickerson Realtors, Inc.*, 557 F. Supp. 2d 938, 953 (N.D. Ill. 2008) (refusing to infer participation in an antitrust conspiracy from a "conclusory assertion regarding [defendant]'s intent"); *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 732 (D. Md. 2001) (rejecting antitrust conspiracy allegations where plaintiffs failed to "identif[y] any facts to support their conclusory assertion that the [] defendants acted with specific intent"), *aff'd sub nom. Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002).

*Second*, the Complaint asserts that one or more of the Waterland Parties provided "financing" or "capital" to LiveCo. *See* Compl. ¶¶ 126, 128, 138, 314. Such allegations of mere "financing" cannot implicate any Waterland Party in an antitrust violation. To the contrary, even where a complaint seeks to state claims against a parent company based on its subsidiary's conduct, those claims fail in the absence of allegations that "*each* defendant independently participated in the enterprise's scheme," which requires "*more* than mere ownership." *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 552, 557 (M.D. Tenn. 2023) (citation modified). This rule derives from the "general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation is not liable for the acts of its subsidiaries." *Id.* at 558 (indirectly quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). That principle applies with even greater force here, where the Waterland Parties are merely alleged to have provided "financing." *E.g.*, Compl. ¶ 128. As with ownership, such mere provision of financing is the routine

kind of "corporate relationship" that cannot "implicate" one company in the actions of another. *See Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 974 (W.D. Tenn. 2004); *see also Med. Ctr. at Elizabeth Place v. Premier Health Partners*, 2016 WL 9460026, at *23 (S.D. Ohio 2016) (declining to hold company "liable for the purported antitrust violations of its affiliates simply by virtue of their corporate relationship" and quoting precedent for the proposition that "supervision of finance and capital budget decisions" was insufficient), *aff'd sub nom. Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713 (6th Cir. 2019); *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 2009 WL 10687799, at *6 (N.D. Ala. 2009) ("Just as we do not regard shareholder investors in a newly formed company as illegal conspirators with each other or the company, we should not make lender-investors conspirators with their borrowers." (quoting VII P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1474(d) (2007))).

*Finally*, the Complaint alleges that the Waterland Parties had some role in the ultimately unsuccessful discussions regarding LiveCo's potential purchase of TCA. *See* Compl. ¶¶ 143, 146–147, 151. There are no allegations, however, that those negotiations themselves constituted anticompetitive conduct. Rather, Plaintiffs assert only that certain "Waterland Defendants" later benefitted from information regarding TCA's business received during those negotiations, but the Complaint vaguely attributes the purported *use* of that "highly sensitive" information to "LiveCo/TPR," not any of the Waterland Parties. *See* Compl. ¶¶ 144, 148.

For all these reasons, Plaintiffs' allegations against the Waterland Parties boil down to "guilt by mere association," allegations of "legal conclusion[s]," and attempts to "lump[] [defendants] together without sufficient detail." *SD3*, 801 F.3d at 423. None of that is sufficient to "separately identify each [Waterland Party's] involvement" in the purported antitrust violations,

so the antitrust claims against them "must be dismissed." *Id.* Moreover, as demonstrated in the sections that follow, none of Plaintiffs' substantive antitrust theories could support a viable claim against any Waterland Party in any event.

### B. Plaintiffs fail to allege viable antitrust claims based on acquisitions in the purported "CCM Touring" market.

Plaintiffs' first antitrust theory is that LiveCo's acquisitions of three concert promoters reduced competition in the purported Contemporary Christian Music or "CCM" Touring market, Compl. ¶¶ 136, 197, 269, and they assert that these acquisitions thus violated Sherman Act § 1, Sherman Act § 2, and Clayton Act § 7. For any such theory to state a viable claim against the Waterland Parties, Plaintiffs would need to allege plausibly (i) that the Waterland Parties engaged in conduct in furtherance of these purported violations, (ii) a relevant antitrust market and Defendants' power in that market, and (iii) anticompetitive effects or exclusionary conduct that harms competition in that market.[3] Plaintiffs' allegations satisfy none of these requirements.

#### 1. Plaintiffs allege no conduct by Waterland Parties in the CCM Touring market.

As an initial matter, Plaintiffs have not alleged any facts indicating that the Waterland Parties engaged in conduct that would support an antitrust claim in the CCM Touring market. At most, Plaintiffs allege that the Waterland Parties provided "financing" to LiveCo relating to its promoter acquisitions, which is insufficient to state a cognizable antitrust claim. *See supra* at 16.

---

[3] *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) ("A claim under § 2 of the Sherman Act requires proof of two elements: (1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means[.]"); *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) ( "[D]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition within the area of effective competition."); *Total Benefits*, 552 F.3d at 436 (plaintiff must allege that "the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets" to state Sherman Act Section 1 claim).

Although Plaintiffs' failure to plead conduct by the Waterland Parties defeats all their CCM Touring market claims, the defect is especially notable with respect to their Clayton Act Section 7 claim. Section 7 applies only to the *acquirer* of shares that threaten competition. *See* 15 U.S.C. § 18 ("No person ... shall acquire ... the whole or any part of the stock or other share capital"); *Cupp*, 310 F. Supp. 2d at 975 (dismissing Section 7 claim where defendants were not alleged to have acquired the challenged assets). The Complaint contains no well-pled allegations that any Waterland Party acquired shares of any promoters; to the contrary, it alleges that LiveCo acquired these companies.[4]

**2. Plaintiffs allege no market power in any viable CCM Touring market.**

Plaintiffs also fail to allege that any Defendant has market power in a properly defined antitrust market, which independently warrants dismissal of their claims. *E.g.*, *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 961–62 (6th Cir. 2004) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim."). To sustain their claims, Plaintiffs must plausibly allege a relevant market that includes all products or services that are "reasonably interchangeable by consumers." *Id.* at 961. Without a plausible definition of the relevant market, the Court has no way to evaluate market power or assess anticompetitive effects. *See Cupp*, 310 F. Supp. 2d at 969. Plaintiffs' allegations concerning the CCM Touring market are insufficient for two glaring reasons.

*First*, Plaintiffs' definition of the CCM Touring market is both vague and incoherent. Nowhere in the Complaint do Plaintiffs define specifically what service is being offered and who the relevant customer is for that service. *See* Compl. ¶¶ 218–230. In many places, Plaintiffs appear

[4] *See*, *e.g.*, Compl. ¶ 269 ("LiveCo/TPR and thus the Waterland Defendants acquired by acquisition … monopoly power in the CCM Touring market[.]"); *id.* ¶ 285 ("LiveCo's acquisition of the major promoters created a single, unified enterprise[.]"); *see also supra* at 16.

to define that market as relating to ticketing transactions in which concertgoers purchase tickets from promoters. *E.g.*, *id.* ¶¶ 221, 224, 272, 274; *see also id.* ¶ 240 (describing the market as involving "ticket purchasers" as the "buyers," "ticket sales" as the "pricing structure[]," and "single-event ticket revenue" as the "economic output[]"). But elsewhere, Plaintiffs describe the CCM Touring market as involving performing artists, promoters, and nonprofit concert sponsors, with no mention of concertgoers or their purchases of tickets. *E.g.*, *id.* ¶ 96. The Court cannot determine what products or services are "reasonably interchangeable" without a clear identification of what the relevant products or services even are. *See Worldwide Basketball*, 388 F.3d at 961.

*Second*, Plaintiffs provide no plausible explanation for why they have excluded more than 100 concert promoters and hundreds of CCM concerts from their alleged market—other than the obvious effect of trying to inflate their allegations of LiveCo's purported market share. Plaintiffs first assert that they have used "judgment" to exclude more than 100 "other promoters." Compl. ¶¶ 244–245, 247 n.12, 250 n.14, 252 n.16. Plaintiffs assert that some of these "other" promoters are "small," *id.* ¶ 244, but their limited allegations as to these other CCM promoters make no attempt to explain why these promoters and their concerts would not be reasonably interchangeable to CCM musicians or concertgoers. Plaintiffs similarly exclude what they refer to as "one-off" events, but they offer only conclusory assertions that such events are not interchangeable from the perspective of a consumer seeking to attend a CCM concert. *Id.* ¶ 228. Plaintiffs' assertion of a market that excludes more than 100 promoters and hundreds of one-off concerts thus "clearly does not encompass all interchangeable substitute products," such that "the relevant market is legally insufficient." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

### 3. Plaintiffs allege no anticompetitive harm or exclusionary conduct in the purported CCM Touring market.

Even if Plaintiffs had plausibly defined the CCM Touring market, their claims still fail because they have not alleged anticompetitive harm or exclusionary conduct in the market. *See Conwood*, 290 F.3d at 782; *Total Benefits*, 552 F.3d at 436. To the contrary, Plaintiffs allege that the number of concerts in the purported CCM market *increased* following the challenged acquisitions.[5] Moreover, the Complaint admits that the one market participant that Plaintiffs do not arbitrarily exclude from their relevant market (a promoter called Awakening) has *gained* more than 4% market share since the acquisitions. Compl. ¶¶ 249, 251; *see also It's My Party, Inc. v. Live Nation, Inc.*, 88 F. Supp. 3d 475, 500 (D. Md. 2015) (no market power in a concert promotion market where rivals gained 6% of share from defendant), *aff'd*, 811 F.3d 676 (4th Cir. 2016).

As to pricing, moreover, the Complaint indicates that the payments that *artists*—like Plaintiffs—have received have increased, not decreased. In Plaintiffs' telling, the anticompetitive effects of LiveCo's acquisitions arise from the fact that LiveCo has shifted artist compensation to a model under which the promoter (like LiveCo), rather than an independent sponsorship partner (like TCA), purchases sponsorship rights. *See id.* ¶¶ 283–287. But that mere shift in compensation model does not mean that the artist is receiving less compensation. To the contrary, the core of TCA's theory of harm is that LiveCo has in fact offered artists more revenue in the form of "higher guarantees" than they previously had received, thus outcompeting TCA. *Id.* ¶ 288; *see also id.* ¶ 262 (alleging that LiveCo had revenue streams that provided "additional resources to pay increased amounts to artists"); *id.* ¶ 293 (alleging increase in "sponsor pricing" that created

---

[5] Plaintiffs allege that there were around 50 concerts per month in their purported CCM market prior to LiveCo's purchases of the three promoters, and around 65 concerts per month in the period after those purchases were completed. *Compare* Compl. ¶ 246 (alleging 2,924 concerts during a 59-month period) *with* Compl. ¶¶ 249, 251 (alleging 2,411 concerts during a 37-month period).

"market pressures on TCA to retain talent"); *id.* ¶ 320 (LiveCo offered artists "competitively higher guaranteed touring payments," thus "creating insurmountable competition with TCA"); *id.* ¶ 323 (LiveCo offered artists "lucrative offers" and "inflated flat fees to artists"). Indeed, in the one example that Plaintiffs offer, they complain bitterly regarding the fact that the higher sponsorship revenue that LiveCo offered the band MercyMe forced TCA to pay "increased rate for sponsorships," *id.* ¶ 170, reflecting increased competition that benefited, not harmed, artists.[6]

### C. Plaintiffs fail to allege viable antitrust claims in the purported "Nonprofit Sponsorship" market.

Plaintiffs next seek to allege a restraint of a purported "Nonprofit Sponsorship" (NPS) market, based on the assertion that LiveCo's "entry into the NPS market as a competing Platform caused actual, immediate competitive harm to TCA." Compl. ¶ 293. The Complaint alleges in particular that LiveCo's entry into that market disrupted TCA's previously uncontested position as the sole intermediary between CCM artists and nonprofit sponsors. Compl. ¶¶ 119, 139–141, 373. Plaintiffs claim that, following entry, LiveCo partnered with World Vision—a charity with which TCA previously had ceased contracting—to offer artists "competitively higher guaranteed touring payments" in exchange for their public-platform rights. *Id.* ¶¶ 121, 209, 320.

These allegations identify no conduct by any of the Waterland Parties, are not founded on viable allegations of a relevant market or market power, and in all events describe increased competition—not anticompetitive harm.

---

[6] Plaintiffs separately purport to allege an increase in the price of *consumer* tickets, but that claim is irrelevant to the question of whether artists, like the Plaintiffs, have suffered any harm. And in all events, that claim fails to allege a ticket price increase over the past eight years any greater than inflation. *See* Compl. ¶ 272 (alleging 23% increase in price over 8-year period); CPI Inflation Calculator, U.S. Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm (reflecting 31% consumer inflation over the same period).

### 1. Plaintiffs allege no conduct by the Waterland Parties in the NPS market.

Plaintiffs allege no specific conduct by the Waterland Parties in the purported NPS market. The Complaint does not allege that the Waterland Parties acquired artists' public-platform rights, solicited nonprofit sponsorships, or otherwise participated in the NPS market, much less that they participated in some way that harmed competition. This fact alone disposes of all NPS-related allegations against the Waterland Parties. *See Total Benefits*, 552 F.3d at 436–37.

### 2. Plaintiffs allege no market power in any viable NPS market.

Like their proposed CCM Touring market, Plaintiffs' purported NPS market is ill-defined, and they fail to allege plausibly that any Defendant possesses market power in it.

*First*, the proposed NPS market is impermissibly narrow. Plaintiffs allege that the NPS market "consists of charitable fundraising conducted at live CCM concert events" where "artists' Platforms are monetized by solicitations for charities." Compl. ¶ 231. That narrow definition, however, is not supported by any plausible allegations explaining why charities lack other reasonably interchangeable means of reaching donors, such as solicitations at other live events and fundraising through digital channels. For example, while Plaintiffs assert that CCM tour concerts provide access to a "captive, in-person" audience, *id.* ¶ 235, they fail to allege (i) why other in-person events, including non-tour CCM concerts or other religiously affiliated gatherings, would not offer comparable opportunities or (ii) why "in-person" audiences are a necessary element of charitable fundraising at all. Moreover, while Plaintiffs assert that CCM concerts uniquely "leverage the preexisting trust and goodwill" of an artist, the Complaint fails to explain why other forms of solicitation involving the CCM artists would not "leverage" the same trust and goodwill. *Id.* ¶ 235. Plaintiffs thus summarily exclude online advertising, email campaigns, social-media outreach, direct mail, television, and in-person solicitations at non-concert locations without

providing any factual, non-conclusory allegations that those channels do not produce comparable conversion rates, donor quality, or long-term retention. *See id.* Because these conclusory allegations fail to account for obvious reasonably interchangeable alternatives, their proposed NPS market is legally insufficient. *See Cupp*, 310 F. Supp. 2d at 970–71.

*Second*, and even if Plaintiffs had plausibly defined the NPS market, they have still failed to raise any plausible allegations that LiveCo (or any other Defendant) has power in that market. The Complaint conspicuously fails to assert any information regarding the purported share of charitable fundraising within the market that is controlled by LiveCo, instead offering only the conclusory assertion that LiveCo has "monopoly power." Compl. ¶ 277. That "conclusory" allegation is "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. Nor can Plaintiffs rely on alleged market power in the CCM Touring market to establish market power in the NPS market. As explained above, Plaintiffs have not plausibly alleged either a viable CCM Touring market or Defendants' power within it. *See supra* at 21–24. Moreover, as explained below, Plaintiffs have not identified a viable mechanism through which any Defendant could use any purported power in a CCM Touring market to gain or maintain power in the NPS market. *See infra* at 26–27.

**3. Plaintiffs allege no anticompetitive harm or exclusionary conduct in the purported NPS market.**

Even if Plaintiffs had plausibly defined the NPS market, they have not alleged harm to competition within it. To the contrary, Plaintiffs allege that the conduct of LiveCo *increased* competition at the expense of TCA's previously uncontested position. *See* Compl. ¶¶ 119, 139–41, 373. Indeed, the Complaint identifies two distinct ways in which the challenged conduct *intensified* competition—each independently fatal to Plaintiffs' claim of anticompetitive harm in the NPS market. *See Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1014 (6th Cir. 2005) ("[T]he foundation of an antitrust claim is the alleged adverse effect on the market.").

*First*, Plaintiffs allege that TCA historically had "essentially occupied alone" the NPS market, Compl. ¶ 139, and they conclude that their claims are founded upon LiveCo's "entry into the NPS market as a competing Platform," *id.* ¶ 293. According to Plaintiffs, LiveCo "offer[ed] artists competitively higher guaranteed touring payments" which created "competition with TCA." *Id.* ¶ 320. In other words, Plaintiffs allege that a new competitor entered a previously uncontested market and offered artists more competitive terms. The resulting "competitive pressure," *id.* ¶ 293, reflects competition at work—not harm to the competitive process.

*Second*, the Complaint alleges that LiveCo's conduct helped World Vision—allegedly the "world's largest charity," Compl. ¶ 15—reenter the market after TCA had sought to exclude it. The Complaint alleges that TCA had once "worked extensively" with World Vision. *Id.* ¶ 120. But after World Vision "set up its own internal department to directly solicit artists' Platforms," thus becoming a "competitor of TCA," their relationship was terminated, and "that termination was not friendly." *Id.* ¶¶ 121–122. In short, TCA had refused to work with the world's largest charity when it sought to compete with TCA. But after LiveCo's entry, LiveCo allegedly facilitated World Vision's return to the purported NPS market and partnered with it to offer artists higher payments. *Id.* ¶¶ 205, 209. Once again, permitting an additional participant in the market reflects more competition, not less.

In these two respects, the Complaint thus demonstrates intensified competition in the NPS market, even if that competition harmed TCA. Because antitrust law requires harm to "the market as a whole, not individual competitors," Plaintiffs' allegations fail. *Care Heating*, 427 F.3d at 1014.

### D. Plaintiffs fail to allege viable "market allocation," "boycott," or "conspiracy" claims.

Plaintiffs also attempt to allege a variety of Section 1 "agreement" claims. Specifically, they assert that the three promoters acquired by LiveCo agreed to allocate promotional services

among themselves, Compl. ¶¶ 326–331; that LiveCo "organized a boycott" of Newsboys, TCA, and associated entities, *id.* ¶¶ 332–337; and that Defendants generally engaged in a vaguely defined, overarching "anticompetitive scheme and conspiracy," *id.* ¶ 82. None of these theories states a plausible claim because (i) Plaintiffs allege no relevant conduct by the Waterland Parties, (ii) entities under common ownership cannot conspire with one another under Section 1, and (iii) the Complaint pleads no facts suggesting the existence of any overarching "conspiracy."

**1. Plaintiffs allege no relevant conduct by the Waterland Parties.**

Plaintiffs allege no specific facts connecting the Waterland Parties to the alleged market allocation, the alleged boycott, or to any purported "conspiracy." Nor could they: the Waterland Parties are not alleged to have participated in the allegedly allocated market; they are not alleged to have offered relevant services that could be withheld through a boycott; and they are not alleged to have engaged in any parallel conduct that could be indicative of participation in any kind of conspiracy. The Section 1 claims against the Waterland Parties should therefore be dismissed. *See Total Benefits*, 552 F.3d at 436.

**2. Plaintiffs allege no cognizable allocation or boycott conspiracy.**

Plaintiffs' claims of a purported allocation or boycott agreement among the promoters owned by LiveCo separately fail because the alleged participants are legally incapable of conspiring with one another. "[S]ister companies with the same parent" are "incapable, as a matter of law, of conspiracy." *Total Benefits*, 552 F.3d at 435. Here, Plaintiffs allege that Transparent, Premier, and Rush shared such "common ownership under LiveCo." Compl. ¶ 327. They therefore could not conspire among themselves to allocate the market or boycott Plaintiffs, rendering those Section 1 theories legally defective. *Id.* ¶¶ 328, 335.

Moreover, Plaintiffs fail to allege any facts that could suggest the existence of any "boycott," even among promoters sharing common ownership. Instead, while the Complaint

asserts the conclusion that the purported boycott involved "threatening other artists (including MercyMe and others) with exclusion from TPR's national touring network if they continued to work with TCA," *id.* ¶ 334, one of the Complaint's few factual allegations relevant to the purported boycott is that "[a]fter August 2024, MercyMe conducted approximately 32 performances with TCA pursuant to the MercyMe Contract, *each one of which performances were promoted by TPR*," *id.* ¶ 568 (emphasis added). So much for a boycott of anyone doing business with TCA.

### 3. Plaintiffs allege no overarching "anticompetitive scheme."

To the extent that Plaintiffs seek to allege Waterland's participation in some form of ill-defined "anticompetitive scheme," or other form of conspiracy, Compl. ¶ 82, those claims fail to state a viable claim under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007). To allege a viable claim of a "conspiracy" it is not sufficient merely to aver that an "agreement" exists. Such an "averment is nothing more than a legal conclusion 'masquerading' as a factual allegation." *Travel Agent*, 583 F.3d at 905. Thus, in the absence of allegations of direct evidence of a conspiracy, plaintiffs must plead both "parallel conduct" as well as contextual facts that "raise[] a suggestion of a preceding agreement," such as "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012) (citation modified).

Plaintiffs allege nothing of the sort here as to the Waterland Parties. They fail to identify any purported conduct by any Waterland Party taken in "parallel" with any other Defendant. And they allege no action by the Waterland Parties indicative of anything beyond their "natural and independent" business interests. *Erie Cnty.*, 702 F.3d at 871. Plaintiffs thus "fail to aver facts sufficient to implicate [the Waterland Parties] in any conspiracy." *Travel Agent*, 583 F.3d at 905.

Nor can Plaintiffs seek to implicate the Waterland Parties in any purported "conspiracy" based on the existence of lawful financing or other arrangements between the Waterland Parties and the LiveCo entities. There is no basis to infer from allegations of a mere financing arrangement that any Waterland Party entered into a wide-ranging "coordinated scheme involving anticompetitive misconduct, misappropriation of confidential information, contractual breaches, and the dissemination of statements known to be false." Compl. ¶ 1. Courts thus routinely refuse to infer the existence of a broad unlawful conspiracy merely from allegations of narrow, lawful agreements. *See, e.g.*, *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (declining to infer conspiracy from participation in a lawful joint venture); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 369–70 (S.D.N.Y. 2016) (allegations that defendants participated in a narrow and lawful agreement "cannot support the broad [antitrust conspiracy] alleged"); *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014) (refusing "to read evidence of [a] benign agreement as evidence of a separate, illegal agreement"), *aff'd*, 630 F. App'x 79 (2d Cir. 2015).

### E. Plaintiffs fail to allege viable "tying" or monopoly leveraging claims.

Plaintiffs finally assert that LiveCo engaged in "unlawful tying and leveraging" by employing its purported power in the CCM Touring market to gain market share in the NPS market. Compl. ¶ 216. To bring a "tying" or "leveraging" claim, Plaintiffs must plausibly allege that LiveCo possessed market (or monopoly) power in the CCM Touring market and wielded that power to impair competition in the NPS market. The Complaint alleges none of these elements.

#### 1. Plaintiffs allege no relevant conduct by the Waterland Parties.

As to their tying or leveraging theories, Plaintiffs allege no specific conduct by the Waterland Parties. The Complaint does not allege that the Waterland Parties offered services in either the purported CCM Touring or NPS market, much less tied services across those markets or

leveraged power from one into the other. The tying and leveraging claims against the Waterland Parties should therefore be dismissed. *See Total Benefits*, 552 F.3d at 436.

**2. Plaintiffs fail to allege the required elements for their claims.**

Even as to the LiveCo Defendants, Plaintiffs fail to allege the essential elements of a tying or leveraging claim. These theories turn on the assertion that a defendant used its power in one market to impair competition in the second. *See, e.g.*, *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) (tying claim is based on "the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product"), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). For tying, plaintiffs must also allege the use of "coercion" to force buyers in the tying market also to purchase a separate "tied" product. *See Jefferson Parish*, 466 U.S. at 13–14. For monopoly leveraging, plaintiffs must also allege exclusionary conduct used to obtain or maintain an advantage in the second market and "a dangerous probability of success in monopolizing [the] second market." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 415 n. 4 (2004); *Erie Cnty.*, 702 F.3d at 872. The Complaint fails to allege these elements.

*First*, as discussed above, Plaintiffs have not plausibly alleged that LiveCo possessed market power, much less monopoly power, in the purported CCM Touring market. *See supra at* 21–22. This alone is fatal to their tying or leveraging theory. *See*, *e.g.*, *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 732 (6th Cir. 2008) (market power is an essential element of a tying claim).

*Second*, Plaintiffs fail to allege the "coercion" necessary to state a tying claim. If the buyer is "free to decline the tied product or to purchase the two products separately, then by definition there is no unlawful tying." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir. 2016). That is precisely the case here. Even assuming that trading sponsorship rights could

constitute a "product" that artists "purchase," the Complaint alleges that artists may choose either (i) higher guaranteed performance payments conditioned on the promoter's right to sponsorship fees or (ii) lower guaranteed payments while retaining their sponsorship rights. *See* Compl. ¶¶ 162–164, 169, 288, 320. Far from alleging that all artists were "coerced" into obtaining promotional services from LiveCo and trading their sponsorship rights, the Complaint instead alleges that the most popular artist in the industry chose to forego the higher guaranteed payments offered by LiveCo in favor of striking their own separate sponsorship deals. In particular, the Complaint alleges that MercyMe chose to contract in August 2024 with TCA, and LiveCo nevertheless promoted all 32 concerts in its resulting tour. *Id.* ¶¶ 170–171, 568. This fact alone disproves any claim that LiveCo was engaged in coercive "tying." *See It's My Party, Inc.*, 811 F.3d at 684 (no tying where customers could choose whether or not to purchase the tied product).

Likewise, Plaintiffs have failed to allege any exclusionary mechanism through which LiveCo "leveraged" any purported power in the CCM market to distort competition in the NPS market. Absent anticompetitive, exclusionary conduct, Plaintiffs' leveraging theory also fails. *See Trinko LLP,* 540 U.S. at 415 n. 4 (holding that "leveraging presupposes anticompetitive conduct" and dismissing leveraging claim where underlying conduct claim was rejected).

*Third,* Plaintiffs have not plausibly alleged a dangerous probability that Defendants will monopolize the NPS market. *See Erie Cnty.*, 702 F.3d at 872 ("leveraging" theory requires "a dangerous probability of success in monopolizing a second market"). The Complaint provides no information regarding LiveCo's share of charitable fundraising in the purported NPS market. *See supra* at 25–26. Nor does it allege any anticompetitive harm to that market; to the contrary, the Complaint describes increased competition in the NPS market. *See supra* at 26–27. Without facts

supporting either LiveCo's ability to monopolize the NPS market or any anticompetitive mechanism through which it could do so, Plaintiffs' monopoly-leveraging claim fails.

**F. Plaintiffs lack standing to assert their antitrust claims.**

All of Plaintiffs' antitrust claims fail for the additional reason that they lack antitrust standing to assert them. *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007). To plead antitrust standing, Plaintiffs must allege that they suffered (i) "antitrust injury" which was (ii) "proximately caused" by Defendants. *Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.* ("*Amerigroup*"), 155 F.4th 795, 802 (6th Cir. 2025). Antitrust injury requires allegations of harm to the plaintiff that arises from harm to competition itself. *Id.* at 807–09. The Sixth Circuit "regularly reject[s] suits for the lack of an antitrust injury alone." *Id.* at 807. Proximate causation, in turn, depends on "the directness of the injury and whether more direct victims could sue." *Id.*

Antitrust standing is thus ordinarily found lacking when the plaintiff is not a participant in the relevant market, *see Peck v. Gen. Motors Corp.*, 894 F.2d 844, 847 (6th Cir. 1990), or where plaintiffs' purported injuries are not directly caused by defendants' purported misconduct, *see Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 405 (6th Cir. 2012), *aff'd,* 572 U.S. 118 (2014). Each Plaintiff fails to allege antitrust standing as they plead no cognizable antitrust injury and no proximate causal link to any conduct by the Waterland Parties.

**1. TCA lacks standing.**

TCA lacks antitrust standing to bring claims in either of the alleged relevant markets. TCA is not alleged to be a participant in the *CCM Touring* market. *See* Compl. ¶¶ 9, 96, 118. This alone disposes of TCA's claims relating to that asserted market. *See Amerigroup*, 155 F.4th at 809–10. Nor can TCA allege that it was the most directly harmed party with respect to a market in which it did not even participate, a separate fatal flaw. *See Static Control*, 697 F.3d at 405–06.

Nor does TCA allege any harm in the *NPS* market arising from any reduction in competition. To the contrary, TCA's alleged injury in the NPS market arises from increased "competitive pressure." Compl. ¶ 293; *see supra* at 26–27. But "one competitor may not use the antitrust laws to sue a rival merely for vigorous or intensified competition." *NicSand*, 507 F.3d at 450. Indeed, the Complaint makes clear that TCA previously was the sole intermediary operating in the NPS market, Compl. ¶¶ 119, 139, and alleges that LiveCo's "entry into the NPS market as a competing Platform caused actual, immediate competitive harm to TCA." *Id.* ¶ 293. Such harm allegedly arose from the fact that LiveCo "offer[ed] artists competitively higher guaranteed touring payments" which created "competition with TCA." *Id.* ¶ 320. Far from showing anticompetitive harm, these allegations reflect precisely the type of impermissible injuries that "flow from the kind of competition that the antitrust laws were designed to foster." *NicSand, Inc.*, 507 F.3d at 451; *see also, e.g.*, *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011) ("Even if a competitor is hurt because the merger of its rivals makes them more efficient or able to compete more aggressively, that harm is not an antitrust violation, and the competitor lacks standing.").

**2. Newsboys lack standing.**

Newsboys also lack antitrust standing in either alleged market. For the *CCM Touring* market, Newsboys do not allege injury from any reduction in competition. They instead allege a dispute with the promoters Transparent and Rush, which allegedly resulted in Rush's marketing the Newsboys only "minimally" with respect to a certain tour. Compl. ¶¶ 154–158. That alleged injury does not flow from any reduction in competition. To the contrary, Rush was free to exercise independent business judgment over whether, how, or on what terms to market a CCM artist's tour. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."). Nor was Rush's reduced promotional investment alleged to have been

irrational; the Complaint itself admits that there was a "rumor" then circulating regarding Newsboys' frontman Michael Tait, which rumor the Complaint later concedes led to admissions from Tait that "he had 'at times touched men in an unwanted sensual way.'" Compl. ¶¶ 154, 455. Newsboys therefore allege, at most, injury from Rush's business judgment—not injury from reduced competition in the CCM Touring market. That is not antitrust injury. *See St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 486 (6th Cir. 2021) (plaintiffs must allege "harm [to] the competitive *process* and thereby harm [to] consumers, as mere harm to one or more *competitors* will not suffice").

For the *NPS* market, Newsboys' allegations fare no better. As noted above, Plaintiffs allege that artist compensation in that market increased, not decreased, from LiveCo's participation, such that there are no allegations of any harm, much less harm from a reduction in competition. *Supra* at 26–27. Moreover, Plaintiffs cannot identify any "direct" connection between any Defendant's conduct and the Newsboys in the purported NPS market, as they allege that TCA had an "exclusive arrangement" with Newsboys for use of the group's public platform. Compl. ¶¶ 183, 186. Plaintiffs certainly cannot state a claim based on the suggestion that their co-Plaintiff failed to pay them adequate compensation. Thus, because the Complaint does not allege either a reduction in competition in the NPS market or any mechanism through which any conduct by Defendants directly harmed Newsboys, they lack standing to assert an antitrust claim in that market.

**3. Wesley Campbell and Thriving Charity Advocates lack standing.**

Finally, named Plaintiffs Wesley Campbell and Thriving Charity Advocates lack standing because any injury they allegedly suffered is purely as an owner or shareholder in either TCA or the Newsboys, and such owner or shareholder claims are "derivative of the injury to [the corporate entity] and do not support their claim to antitrust standing." *Peck*, 894 F.2d at 846–48; *see also Caruana v. Gen. Motors Corp.*, 204 F. App'x 511, 516–17 (6th Cir. 2006) (dismissing sole

shareholder's complaint where "the central defect" was that "his injuries are not antitrust injuries, but merely derivative injuries").

**G. Plaintiffs' Tennessee state-law antitrust claims fail.**

In a four-sentence passage of their 200-page Complaint, Plaintiffs allege that the conduct underlying their federal antitrust claims also violates Tennessee law. Compl. ¶¶ 348–50. Those claims fail for the same reasons as the federal claims. *See supra* 14–36. They also fail for two independent reasons. *First*, Tennessee's antitrust statute applies only to "transactions that are predominantly intrastate in character." *Valley Prods. Co. v. Landmark*, 877 F. Supp. 1087, 1094 (W.D. Tenn. 1994), *aff'd*, 128 F.3d 398 (6th Cir. 1997). Yet Plaintiffs allege nationwide markets, Compl. ¶¶ 230, 241, and they identify no Tennessee-specific conduct or competitive effects. *Second*, before April 23, 2024, Tennessee antitrust law applied only to tangible goods, whereas this case concerns concert-promotion services, artists' public-platform rights, and other intangible services. *See Bennett v. Visa U.S.A., Inc.*, 198 S.W.3d 747, 751 (Tenn. Ct. App. 2006). Although the statute was amended on April 23, 2024 to cover services,[7] the core substantive conduct underlying Plaintiffs' competition claims—the acquisitions and consolidation of Transparent, Premier, and Rush—is alleged to predate the amendment. *See* Compl. ¶ 132. Plaintiffs fail to allege any conduct by the Waterland Parties after April 23, 2024 that could independently support a viable antitrust claim.

**III. Plaintiffs Fail To Allege Viable Non-Antitrust Claims Against Any Waterland Party.**

Besides their antitrust claims, Plaintiffs allege wide-ranging claims against vague groupings of Defendants related to (i) Plaintiffs' relationships with various CCM artists, (ii) the

[7] Act of Apr. 23, 2024, ch. 776, §§ 1–2, 2024 Tenn. Pub. Acts (amending Tennessee Code Annotated, Title 8, Chapter 6, Part 4 and Title 47, relative to commerce) (available at https://publications.tnsosfiles.com/acts/113/pub/pc0776.pdf) (last visited Sept. 18, 2026).

potential acquisition of TCA, and (iii) the alleged defamation of Plaintiffs. As to each category, Plaintiffs fail to allege that *any* Waterland Party engaged in *any* purported illegal conduct, warranting dismissal of the claims against the Waterland Parties. Moreover, Plaintiffs' non-antitrust claims suffer from independent legal defects that warrant dismissal of the claims entirely.

### A. Plaintiffs fail to allege plausible claims arising from TCA's relationships with CCM artists.

Plaintiffs allege that Defendants interfered with TCA's contract and relationship with MercyMe, along with its relationships with other CCM artists. These conclusory allegations are insufficient to state a claim and should be dismissed because they (i) fail to identify any specific conduct by the Waterland Parties directed at those relationships and (ii) fail to allege facts sufficient to satisfy the elements of any cognizable cause of action based on such alleged interference.

#### 1. Plaintiffs have not plausibly alleged claims arising from TCA's contract or relationship with MercyMe.

According to Plaintiffs, MercyMe's August 2024 contract with TCA included a "Key Man" provision, which gave MercyMe the right to terminate the contract if then-TCA employee Troy Collins "cease[d] to be actively involved in [TCA's] operations other than for reasons of death, disability, or moral turpitude." Compl. ¶ 514. The Complaint further alleges that Collins resigned from TCA on June 2, 2025, *id.* ¶ 516, and that MercyMe notified TCA on July 18, 2025 that it was exercising its contractual right to terminate the agreement, *id.* ¶ 517. Plaintiffs nevertheless attempt to transform MercyMe's lawful termination of its contract and relationship with TCA into a host of contract and tort claims, including alleging that the "Waterland Defendants" conspired with MercyMe to breach the agreement, *id.* ¶ 570, and tortiously interfered with both the contract and TCA's "prospective contractual and business relations with [MercyMe]." *Id.* ¶¶ 570–572. But the Complaint fails to allege facts plausibly supporting these claims.

**No Waterland-Specific Allegations.** As an initial matter, all MercyMe-related claims fail because the Complaint does not allege any conduct by any Waterland Party relating to the termination of MercyMe's contract and relationship with TCA. *See Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) (a complaint must allege facts permitting a reasonable inference that the particular defendant engaged in the alleged misconduct). In fact, the Complaint alleges specifically that "TPR" engaged in the relevant conduct.[8] That defect alone warrants dismissal of these claims as to the Waterland Parties.

**No Breach of Contract.** Even setting aside the absence of any allegations against the Waterland Parties, Plaintiffs have not plausibly alleged a breach of the MercyMe contract, a required element of their "Tortious Interference with [Mercy Me] Contract" and "Conspiracy to Breach [Mercy Me] Contract" claims. *See Robinson v. City of Clarksville*, 673 S.W.3d 556, 574 (Tenn. Ct. App. 2023) (listing "the contract was breached" as an element of an interference with contract claim); *United Biologics, LLC v. Amerigroup Tenn., Inc.*, 2024 WL 770640, at *19 (E.D. Tenn. 2024) ("Liability for civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy."), *aff'd sub nom. Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*, 155 F.4th 795 (6th Cir. 2025).

Instead, MercyMe terminated the agreement pursuant to the "Key Man" provision in the contract, Compl. ¶¶ 514–517, which does not constitute a breach, *see United Biologics, LLC*, 2024 WL 770640, at *11 ("[T]erminating a contract pursuant to the contract's terms does not constitute a breach of the contract."); *see also* ECF No. 64 (MercyMe Defs.' Mot. to Dismiss), at VI.

---

[8] *See*, *e.g.*, Compl. ¶ 570 ("TPR counseled and worked with both [MercyMe] and Collins to achieve the termination of the [MercyMe] Contract through the voluntary resignation of Collins."); *id.* ¶ 572 (alleging that "TPR was telling/advising the [MercyMe] Parties" about the allegations against Tait and that "[MercyMe] and TPR must have worked through all facets of [MercyMe's] termination and post termination issues and resolved them prior to their exit").

Plaintiffs attempt to avoid this straightforward result by alleging threadbare legal conclusions, most notably that "Collins' departure involved an act of moral turpitude which meant his resignation did not trigger a right to terminate." Compl. ¶ 520. But such conclusory legal statements need not be accepted as true and cannot render Plaintiffs' breach allegations plausible. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Moreover, even if Plaintiffs alleged a plausible breach (which they have not), Plaintiffs fail to allege any form of "conspiracy" or "aiding and abetting" that could connect the LiveCo Defendants, much less the Waterland Parties, to any purported breach of contract. *See* ECF No. 109 (LiveCo Mot. to Dismiss) at 21–24.

**No Improper Conduct.** Nor have Plaintiffs properly alleged a claim of "tortious interference with prospective contractual and business relations." Compl. ¶ 572. To state such a claim under Tennessee law, a plaintiff must allege "the defendant's improper motive or improper means" to interfere with a known business relationship. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 & n.5 (Tenn. 2002) (defendant's "predominant purpose" must be to injure plaintiff). Here, Plaintiffs assert in a single paragraph that "TPR was telling/advising [MercyMe]" about the Tait allegations and that MercyMe's reputation would be at risk if it did not conclude its business with TCA. Compl. ¶ 572. At most, the Complaint suggests, without clearly alleging, that certain purportedly defamatory statements constitute the "improper means" of interference. *Id.* But because Plaintiffs have failed to plausibly allege defamation, that theory cannot salvage their tortious-interference claim. *See infra* at 49–52.

### 2. Plaintiffs have not plausibly alleged claims arising from TCA's relationship with other CCM Artists.

Plaintiffs next attempt to premise claims on TCA's relationships with CCM artists Brandon Lake, Tauren Wells, and Danny Gokey. Compl. ¶¶ 573–577, 581. But the Complaint fails to allege any specific involvement by any Waterland Party and does not plead facts sufficient to support any viable claim arising from those relationships.

**No Waterland-Specific Allegations.** Plaintiffs again do not allege any conduct by any Waterland Party relating to TCA's relationships with Brandon Lake, Tauren Wells, or Danny Gokey. A complaint must allege facts permitting a reasonable inference that the particular defendant engaged in the alleged misconduct, and a "[s]ummary reference to a single, five-headed 'Defendants' does not support a reasonable inference that each Defendant is liable." *See Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019). Because the Complaint fails to identify any conduct by any Waterland Party relating to these artist relationships, the claims should be dismissed.

**Brandon Lake.** According to the Complaint, Wesley Campbell met with CCM artist Brandon Lake to discuss the "revenue potential of nonprofit sponsorship arrangements" and the parties ultimately "reached an agreement in principle for Lake to become a TCA client for purposes of sponsorship solicitation and management in connection with his upcoming LiveCo-Promoted tour." Compl. ¶ 573. Soon after, however, "all communications ceased, and the relationship was abandoned." *Id.* From that sequence alone, Plaintiffs seek an inference of tortious interference. They speculate that "Defendants, including LiveCo, intervened to prevent Lake from proceeding with TCA," but the Complaint pleads no facts supporting that conclusory assertion. *Id.* Its sole basis for inferring misconduct is the assertion that "it would have been economically irrational for Lake to forgo the arrangement absent outside influence." *Id.* Yet the Complaint supplies a clear lawful explanation: LiveCo offered artists "competitively higher guaranteed touring payments."

*Id.* ¶ 320. Plaintiffs fail to allege any facts that could "rule out" this "obvious alternative explanation[]." *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 608 U.S. 580, 590 (2026).

Moreover, Plaintiffs do not allege that any Defendant was aware of the "agreement in principle" between Plaintiffs and Brandon Lake, Compl. ¶ 573, which is a required element for alleging tortious interference. *Trau-Med of Am., Inc.*, 71 S.W.3d at 701 (requiring defendants know of the business relationship with the specific third party). Because knowledge of the business relationship is an essential element of the claim, Plaintiffs' failure to allege plausibly that any Defendant was aware of the purported relationship also requires dismissal.

**Tauren Wells & Danny Gokey.** In February 2024, Plaintiffs allegedly told promoter Rush's owner, Jacob Reiser, about their idea for a tour featuring two TCA-contracted artists: Tauren Wells and Danny Gokey. Compl. ¶¶ 130, 575. Plaintiffs allege that they "disclosed confidential and sensitive information" about the prospective tour, including "data about sponsorships available" and "the amount of sponsorships Wells and Gokey owed from their contract." *Id.* ¶ 576. Allegedly, Rush then used that information to "preempt Plaintiffs' planned joint tour," "co-opting the ideas a[nd] date that have been shared in confidence." *Id.* ¶¶ 395(e), 577. From these circumstances, Plaintiffs allege that Rush and the "Waterland Defendants" breached a fiduciary duty owed to Plaintiffs and tortiously interfered with TCA's relationship with Gokey and Wells. *Id.* ¶¶ 575–577, 581. Neither of these claims are plausibly alleged.

As an initial matter, the Complaint does not plausibly explain how Rush could have "preempt[ed] *Plaintiffs'* planned joint tour." Compl. ¶ 395(e). TCA is not a concert promoter, and Plaintiffs do not allege that TCA was planning to arrange the tour absent Rush's involvement. Nor do Plaintiffs identify what "confidential information and data" Rush supposedly used to preempt the tour. Indeed, Plaintiffs admit that Wells and Gokey toured with World Vision—a charity with

which Plaintiffs refuse to work. *Id.* ¶¶ 122, 190. Plaintiffs' allegations thus appear to amount to nothing more than a complaint that they were outbid for providing sponsorship-related services as to one specific concert tour.

Plaintiffs' fiduciary duty allegations are likewise unsupported. Plaintiffs assert that a fiduciary relationship existed between "Plaintiffs" and "Promoter Rush" and that the resulting duty somehow "extended to the Waterland Defendants" because Rush was part of the purported "Waterland/LiveCo organization." *Id.* ¶ 574. Those are conclusory legal assertions that need not be accepted as true. *See Iqbal*, 556 U.S. at 678. Nor do Plaintiffs identify any legal authority suggesting that an arm's-length business relationship between a concert promoter and a sponsorship intermediary gives rise to fiduciary obligations. To the contrary, "[g]enerally, parties dealing at arm's length 'lack the sort of relationship of trust and confidence that gives rise to a fiduciary relationship.'" *Grant v. Tucker*, 57 F. Supp. 3d 852, 859 (M.D. Tenn. 2014) (quoting *Dick Broad. Co., Inc. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 674 (Tenn. 2013) (Koch, J., concurring)); *see also OKI Distrib., Inc. v. Amana Refrigeration, Inc.*, 850 F. Supp. 637, 647 (S.D. Ohio 1994) (collecting cases for the proposition that "it is well established that a manufacturer-distributor relationship, absent more, does not give rise to a fiduciary relationship").

Moreover, even assuming Plaintiffs had plausibly alleged a fiduciary relationship between TCA and Rush, the Complaint offers no basis for extending any such duty to the other "Waterland Defendants." Plaintiffs simply assert, without explanation, that Rush's alleged duty was imputed to all members of the purported "Waterland/LiveCo organization." Compl. ¶ 574. Such conclusory pleading is insufficient to state a plausible claim. *See Iqbal*, 556 U.S. at 678.

Even setting aside these pleading deficiencies, the only claimed breach of this duty in the Complaint is the alleged "co-opting" of "disclosed confidential and sensitive information." Compl.

¶¶ 576–577. But "a loyalty claim is preempted [by the Tennessee Uniform Trade Secrets Act (TUTSA)] when the alleged breach is based on a misappropriation of protected information." *PGT Trucking, Inc. v. Jones*, 2015 WL 4094265, at *4 (W.D. Tenn. 2015). Such preemption applies even where the plaintiff does not bring a trade secret claim or a trade secret claim would be unsuccessful—what matters is that all claims based on "confidential information" be brought under TUTSA or not at all, consistent with the statute's "goals of promoting uniformity and predictability." *Hauck Mfg. Co. v. Astec Indus., Inc.*, 375 F. Supp. 2d 649, 657 (E.D. Tenn. 2004). These claims should thus also be dismissed. *See*, *e.g.*, *PGT*, 2015 WL 4094265, at *5.

Plaintiffs' tortious interference claim is also deficient because the Complaint never clearly identifies the purported "improper means" by which Defendants allegedly interfered. To the extent the claim rests on a purported breach of TCA's contracts with Wells and Gokey, Plaintiffs have neither attached the relevant contracts nor identified the contractual provisions that were supposedly breached. *See McKnelly v. Wyndham Destinations, Inc.*, 2020 WL 1518624, at *3 (E.D. Tenn. 2020) (To allege a breach of contract, a "complaint must include the language of specific contract provisions which defendant has allegedly breached"). To the extent Plaintiffs' theory rests on Defendants' alleged misuse of "confidential" information, *id.* ¶¶ 575–577, 581, Plaintiffs fail to identify any specific confidential information that was misused. As discussed above, the Complaint does not explain what confidential TCA information Rush could have used to develop a World Vision-sponsored tour, given that TCA neither promotes concerts nor works with World Vision. Further, to the extent Plaintiffs' tortious interference theory is predicated on the alleged misuse of trade secrets, it is, like the fiduciary duty claim, preempted by TUTSA. *See supra* at 42; *see also Wachter*, 387 F. Supp. 3d at 845 ("TUTSA preempts common law causes of action if proof of those causes of action, in whole or in part, would constitute misappropriation of a trade secret.");

*PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 976 (6th Cir. 2007) (collecting cases holding that TUTSA preempts "all common law or other claims that would succeed or fail dependent upon proof of improper use of trade secrets").

### B. The alleged negotiations regarding LiveCo's potential acquisition of TCA cannot give rise to liability for the Waterland Parties.

Plaintiffs next assert a variety of claims based on the ultimately unconsummated negotiations regarding LiveCo's potential acquisition of TCA. According to Plaintiffs, Wesley Campbell and Dave Wagner entered negotiations with LiveCo for the potential acquisition in 2023. Compl. ¶¶ 142–143, 400. In the process, some parties (but not any of the Waterland Parties) allegedly signed non-disclosure agreements ("Confidentiality and Restricted Use Agreements"), *id.* ¶ 144, and TCA claims to have relied on those agreements in sharing its confidential business information with Premier and LiveCo, *id.* ¶¶ 355–357, 360, 370. Plaintiffs allege that "The Waterland Defendants" and Tim Taber (CEO of Transparent) then backed out of the TCA acquisition, only to use TCA's information to replicate its business model. *Id.* ¶¶ 175–149, 374–375. According to Plaintiffs, this amounted to breach of a contract, a breach of fiduciary duty, breach of the Confidentiality and Restricted Use Agreements, and misappropriation of trade secrets.

Plaintiffs' vague allegations establish no such claims. They should be dismissed as to the Waterland Parties because (i) Plaintiffs fail to allege any connection between these events and the Waterland Parties, (ii) they allege no enforceable contract to purchase TCA, (iii) Plaintiffs allege no confidentiality terms that any Waterland Party could have violated, and (iv) Plaintiffs cannot point to any actual "trade secrets" that could have been misappropriated.

**No Waterland-Specific Allegations.** Plaintiffs fail to allege that any of the Waterland Parties were signatories to any of the contracts at issue in their TCA-acquisition claims. The

Complaint concedes that it was not Waterland PEI or Waterland ApS that allegedly sought to purchase TCA—it was LiveCo. Compl. ¶¶ 145–146. And while Plaintiffs allege that Madsen and Guldberg were present during negotiations, *id.* ¶ 143, the Complaint does not allege that they (or the corporate Waterland Parties) were parties to any agreement to purchase TCA. Nor is any Waterland Party (corporate or individual) alleged to have signed either Confidentiality and Restricted Use Agreement. *Id.* ¶¶ 355, 358. Those agreements allegedly were signed by Premier (who allegedly did so on behalf of LiveCo) and USLive Opco. *Id.* Finally, no Waterland Party is alleged to be implicated in the alleged use of information gained pursuant to those Agreements. Instead, Plaintiffs allege in conclusory terms that Tim Taber, CEO of Transparent and later LiveCo, "used" that information. *See id.* ¶¶ 144, 148–149, 374–375. The claims based on the alleged failed acquisition should thus be dismissed as to the Waterland Parties. *See Boxill*, 935 F.3d at 518.

**No Breach of Purchase Contract.** Plaintiffs' claims of a "breach" of the contract to purchase TCA fail for the additional reason that the Complaint does not plead the existence of an enforceable contract. "For a contract to be enforceable under Tennessee law, it must result from a meeting of the minds." *Klein v. ProNova Sols., LLC*, 2024 WL 947438, at *3 (E.D. Tenn. 2024). This means parties must explicitly agree on "essential terms" of the contract, including "financing" and the specific property involved in the transaction. *Anderson v. Musick*, 2024 WL 4564158, at *5–6 (Tenn. Ct. App. 2024), *appeal denied* (Feb. 20, 2025); *Davidson v. Wilson*, 2010 WL 2482332, at *8 (Tenn. Ct. App. 2010) (purchase price was essential term).

The very documents on which Plaintiffs rely make clear that essential terms remained open and had not been agreed to by the parties.[9] *Compare* Compl. ¶ 403 (Dave Wagner "transmitted a

[9] Plaintiffs assert that Wagner's January 31, 2023 email is the basis for their claim that some subset of defendants breached a contract to purchase TCA, Compl. ¶¶ 403–404, so the Court may consider a copy of that email. *See In re Omnicare, Inc. Secs. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014); *MTD* (continued…)

written acceptance" of contract terms on January 31, 2023), *with* ECF No. 109-8 (Wagner's January 31, 2023 email describing the negotiations as having "one 'open' issue to be resolved before proceeding to paper," including the "TBD" dollar amount that "TCA would be credited"); ECF No. 109-8 (Wagner email indicating that "certain issues … require resolution prior to completing the TCA partnership … safe to say we aren't quite there yet"). With essential terms (including payment) in flux, Plaintiffs cannot establish the breach of an enforceable contract. *Cf. LeBlanc v. Bank of Am., N.A.*, 2013 WL 3146829, at *10 (W.D. Tenn. 2013) (conditional agreement cannot form enforceable contract absent fulfillment of those conditions).

**Not Otherwise Enforceable.** Plaintiffs make passing reference to two alternative theories—that even if a purchase contract did not exist, they were still entitled to enforcement of the alleged TCA purchase based on promissory estoppel or unjust enrichment. Neither claim has merit. To start, the same uncertainties that prevented contract formation, *see supra* at 45–46, also show that Plaintiffs have failed to allege the "key element" of a promissory estoppel claim—an "unambiguous" promise. *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404–405 (Tenn. Ct. App. 2007). Nor have plaintiffs pointed to any specific actions they took to their detriment in relying on any alleged "promise" to purchase TCA. *See Builders Insulation of Tenn., LLC v. S. Energy Sols.*, 2018 WL 5539805, at *4 (W.D. Tenn. 2018) ("simpl[e] … recitation" that party relied to its detriment was insufficient to plead promissory estoppel).

As for unjust enrichment, Plaintiffs' theory is premised on the allegations that "Waterland Defendants received and retained … TCA's proprietary business plans, operational plans, artist roster data, nonprofit relationship information, and competitive strategy," again reframing a trade

*Prods. Inc. v. Am. Honda Motor Co.*, 627 F. Supp. 3d 867, 876 (N.D. Ohio 2022) (considering emails attached to motion to dismiss in breach of contract claim); *see also* ECF No. 109-8 (referenced email attached to LiveCo's motion to dismiss).

secrets claim. This, too, is preempted by TUTSA and should be dismissed. *See Wachter*, 387 F. Supp. at 848 (TUTSA preempted unjust enrichment claims premised on "conversion of confidential information"). The merits of the argument fare no better, as Plaintiffs fail to allege any benefit that the *Waterland Parties* received. *See id.* at 847 (unjust enrichment requires conferral of a benefit to defendant).

**No Breach of Fiduciary Duty.** Plaintiffs next claim that the "Purchase Agreement" gave rise to a fiduciary duty between the "Waterland Defendants" and TCA, obligating the Waterland Parties to "advise the Plaintiffs of any concerns and/or risks they believed existed" related to the acquisition of TCA. Compl. ¶ 579. Plaintiffs further insist that the same duty obligated the "Waterland Defendants" to "completely advise the Plaintiffs" of anything they knew about the Tait allegations. *Id.* ¶ 580.

These claims plainly fail. First, as just explained, no "Purchase Agreement" existed, belying any possible creation of a fiduciary duty. But second, even if such a Purchase Agreement did exist, "the existence of a contract alone is insufficient to establish a fiduciary duty was owed." *Yoe v. Crescent Sock Co.*, 2015 WL 13847410, at *10 (E.D. Tenn. 2015). "[P]arties engaged in a commercial transaction pursue their own self-interest and understand and expect that the parties with whom they are dealing are doing likewise." *Fountain Leasing, LLC v. Kloeber*, 2013 WL 4591622, at *6 (E.D. Tenn. 2013) *(quoting Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 674 (Koch, J., concurring)). Plaintiffs' fiduciary duty claims are thus contrary to Tennessee law and to ordinary business practices, and should be dismissed. *See also* ECF No. 109 (LiveCo Mot. Dismiss) at 31–32.

**No Breach of Confidentiality Agreements.** Plaintiffs further allege that the "Waterland Defendants" violated confidentiality agreements signed during the negotiation process. Compl.

¶¶ 355–359, 395. These claims also fail. First, as outlined *supra* at 45–46, no Waterland Party was allegedly a party to either Confidentiality and Restricted Use Agreement. *Id.* ¶¶ 355, 358. Second, even if a Waterland Party had signed any confidentiality agreement, the Complaint fails to allege facts indicating that any such agreements were violated. To state a claim for breach of contract, a "complaint must include the language of specific contract provisions which defendant has allegedly breached." *McKnelly v. Wyndham Destinations, Inc.*, 2020 WL 1518624, at *3 (E.D. Tenn. 2020). Because Plaintiffs have not alleged the relevant language of any confidentiality terms, the claims should be dismissed. *See id.* ("allegations of defendant's nonperformance are vague, naked assertions that do not correspond to a defined contractual obligation," and therefore warranted dismissal).

**No Trade Secret Violations.** Finally, Plaintiffs contend that the Defendants violated both Tennessee and federal trade secrets law by improperly using information allegedly obtained in negotiations for the purchase of TCA to their own competitive advantage. Compl. ¶¶ 369–387. The lack of connection between these claims and any Waterland Party warrants dismissal. But even if this Court were to reach the merits, the lack of properly alleged trade secrets would mandate dismissal under both state and federal law. *See Echo Mav, LLC v. Horizon31, LLC*, 2026 WL 2268175, at *9 (E.D. Tenn. 2026) (federal and Tennessee misappropriation claims have "substantially the same elements").

*First*, Plaintiffs do not offer enough detail to identify any specific trade secret that any party could have misappropriated. *See Univ. of Tenn. Rsch. Found. v. Caelum Biosciences, Inc.*, 2022 WL 19403695, at *2 (E.D. Tenn. 2022) ("Parties alleging misappropriation of a trade secret must identify the trade secret with reasonable particularity."). Plaintiffs vaguely allege TCA's "confidential artist roster," "proprietary business model for serving as an exclusive intermediary,"

and "identification of its competitive risks and vulnerabilities," as appropriated trade secrets. Compl. ¶ 370. But referring to "customer lists, vendor lists, pricing structure, [or] sales strategies," without "elaborate[ing] on what [the underlying] alleged trade secrets are" or "supporting them with factual allegations," is insufficient to establish a trade secret. *Mfg. Repair & Overstock, Inc. v. Kasinger*, 2025 WL 1208690, at *13 (E.D. Tenn. 2025).

*Second*, these claims should be dismissed for the independent reason that the information allegedly misappropriated was not "secret" at all. Tenn. Code Ann. § 47-25-1702(4)(A) (trade secret defined as information that is not "readily ascertainable"). For example, while Plaintiffs have alleged that TCA divulged "specific terms, rates, and payment structures" for particular nonprofits, as well as its "historical and projected sponsorship volume data," Compl. ¶ 370(b), (e), Plaintiffs' contracts with many artists and sponsors are publicly available pursuant to state law because of their status as a solicitor. *See* ECF No. 109 (LiveCo Mot. Dismiss) at 18–19. By definition, then, this information can be "readily ascertain[ed] by proper means," Tenn. Code Ann. § 47-25-1702(4), and falls outside of the scope of both state and federal trade secret law, *Mfg. Repair*, 2025 WL 1208690, at *13 (defining "trade secret" under U.S. and Tennessee law).

**C. Plaintiffs fail to state a defamation or false advertising claim.**

Plaintiffs finally assert claims related to two articles published by the Roys Report, an Illinois-based Christian news publication. Compl. ¶¶ 2, 69. The first article, published in June 2025, conveys the story of "Nicole," a staffer for a CCM promoter, who alleged that she had been sexually assaulted by a Newsboys crewmember after a 2014 concert in Fargo, North Dakota. *Id.* ¶¶ 2, 27; Compl. Ex. 1. Plaintiffs concede that the underlying sexual encounter occurred and that Newsboys frontman Michael Tait was present during some portion of it (*id.* ¶ 452)—the dispute is whether it was (as Plaintiffs insist) consensual, or (as Nicole alleges) nonconsensual.

The second article, published in February 2026, again involves Tait. This article reports that multiple men and a woman had accused Tait of sexual harassment or assault. Compl. Ex. 1–3. It references the 2014 Fargo allegations, asserting that Nicole "and four witnesses told [The Roys Report] that Newsboys management covered up the incident." *Id.*; Compl. ¶ 470. Plaintiffs, by contrast, allege that there was no cover up and no underlying assault. Compl. ¶ 468. But the Complaint admits that Tait confessed to "at times touch[ing] men in an unwanted sensual way." *Id.* ¶ 455.

Allegedly because of the articles, Newsboys lost their "goodwill and reputation in the CCM Touring and NPS Markets," leading to the "destruction of Plaintiffs' business operations." *Id.* ¶ 479. Plaintiffs allege that Transparent, its CEO Tim Taber, and the "Waterland Defendants" used Nicole's story to dissuade key artists from working with Newsboys and Campbell, to convince Premier not to acquire TCA, and ultimately as an anticompetitive weapon to exclude Campbell and TCA from the CCM and NPS Markets. Compl. ¶¶ 173–182, 483–89.

Based on these two articles, Plaintiffs bring claims of aiding and abetting defamation and false advertising against the Waterland Parties. Both should be dismissed.

**No Defamation.** The Complaint fails to allege that any Waterland Party engaged in defamation. Under Tennessee law, defamation requires that "(1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement."[10] *Clayton v. Hogan*, 753 F. Supp. 3d 629, 637 (M.D. Tenn. 2024).

[10] In this instance, Plaintiffs would need to establish actual malice to state a claim, given Plaintiffs' role as public figures in the CCM Touring community. *See Hunt v. Southern Baptist Convention et al.*, 2026 WL 2334124, at *2–5 (M.D. Tenn. 2026). But given that the Waterland Parties did not allegedly publish or make any defamatory statements, the Court need not reach that issue now.

Here, Plaintiffs fail because they have not alleged that any Waterland Party published any statement (or had anything to do with the underlying defamation at all). It was not the Waterland Parties that allegedly spoke out about Tait, the alleged 2014 assault in Fargo, or any potential "cover up"—that was Nicole. Compl. Ex. 1 at 1–3; Compl. ¶ 470. Nor did any Waterland Party publish the information—that was the Roys Report. *Id.* ¶ 2. And although Plaintiffs allege that "the Waterland Defendants" hired Nicole, it elsewhere specifies that she was hired by "LiveCo/TPR," not any of the Waterland Parties. *See id.* ¶¶ 175–176. Finally, only Tim Taber is alleged to have "spread" any information about Nicole's sexual assault allegations. *See id.* ¶¶ 173, 484–486.

Nor can Plaintiffs establish the second element of their claims, as the underlying statements are not defamatory. *See Battle v. A & E Television Networks, LLC*, 837 F. Supp. 2d 767, 771 (M.D. Tenn. 2011) (deciding whether statements were capable of defamation on a motion to dismiss). Reporting on both sides of a public controversy cannot, as a matter of law, be defamatory. *See* ECF No. 109 (LiveCo Mot. to Dismiss) at 25 (collecting cases); *Clark v. EA Ent. Television, LLC*, 60 F. Supp. 3d 838, 849 (M.D. Tenn. 2014) (defamation claims dismissed where statements covered both allegations and denials of alleged affair, and "did not adopt [the witness]'s statements or claim that they were accurate"). Applying this standard, neither article here is defamatory: The author describes the underlying assault claims as "allegations," discloses the relevant police reports, and includes comments from Plaintiffs and the alleged perpetrators on the allegations. *See, e.g.*, Compl. Ex. 1 at 11–12, 14 (Newsboys Management); *id* at 13 (Steve Campbell); *id.* at 2, 14–15 (alleged perpetrator); Ex. 3 at 2–3 (citing Tait's public statement and describing conduct as "allegations"). This is a classic example of non-defamatory reporting on both sides of a controversy.

**No Conspiracy.** Plaintiffs also have not plausibly alleged conspiracy to defame or aiding and abetting defamation as to the Waterland Parties. First, these claims fail with the underlying

defamation claim; the lack of publication and defamatory content defeats these claims, as well. *See Aegis Scis. Corp. v. Zelenik*, 2013 WL 175807, at *7 (Tenn. Ct. App. 2013). Nor have Plaintiffs alleged any facts to support the existence of an agreement, a required element of any conspiracy claim. *See Burgess v. Doji, Inc.*, 2025 WL 3006751, at *4 (M.D. Tenn. 2025), *R. & R. adopted,* 2026 WL 174174 (M.D. Tenn. 2026) (conspiracy claims must be pleaded with specificity, and "[c]onclusory allegations ... unsupported by material facts will not be sufficient to state a claim").

**No Lanham Act Violation.** Unable to state a viable defamation claim, Plaintiffs attempt to repackage the same underlying allegations as false advertising under the Lanham Act. That theory also fails. Section 43(a) of the Lanham Act provides for civil liability where a competitor "uses in commerce … any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which … in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of [the business'] or another person's goods, services, or commercial activities." *Victory Glob., LLC v. Fresh Bourbon, LLC*, 170 F.4th 1014, 1020 (6th Cir. 2026) (quoting 15 U.S.C. § 1125(a)(1)(B) (excerpts in original)). Here, Plaintiffs allege that Defendants made "false and misleading statements of fact in commerce concerning Plaintiffs and Plaintiffs' commercial activities" to artists, nonprofit organizations, or others in the CCM Touring Market and NPS Market. Compl. ¶ 493. Those allegations fail for three independent reasons: (i) the Complaint does not allege any actionable conduct by the Waterland Parties, (ii) the Complaint does not allege any statements made in "commercial advertising or promotion," and (iii) the Complaint does not otherwise satisfy the statement-specific requirements of a Lanham Act false advertising claim.

*First*, the Complaint does not allege that the Waterland Parties engaged in the conduct giving rise to the false advertising claim. *See* Compl. ¶ 494 (explaining categories of conduct

underlying false advertising claim). It does not allege that any Waterland Party disseminated the Tait allegations, *see id.* ¶ 494(a), (e); told any artist or nonprofit that continued association with Plaintiffs after publication of the articles in question would "tarnish" their brand or jeopardize sponsorship relationships, *id.* ¶ 494(b), (d), or represented that the forthcoming articles would impair Plaintiffs' business viability, *id.* ¶ 494(c). The only specifically alleged conduct is attributed to Tim Taber, who works for Transparent, not any Waterland Party. *Id.* ¶¶ 485–487. That alone is sufficient to dismiss the Waterland Parties from Plaintiffs' false advertising claim.

*Second*, the Complaint fails to allege plausibly that any alleged statement was made in "commercial advertising or promotion." In the Sixth Circuit, "commercial advertising or promotion" requires "(1) commercial speech; (2) for the purpose of influencing customers to buy the defendant's goods or services; (3) that is disseminated either widely enough to the relevant purchasing public to constitute advertising or promotion within that industry or to a substantial portion of the plaintiff's or defendant's existing customer or client base." *Plateau Cas. Ins. Co. v. Securranty, Inc.*, 608 F. Supp. 3d 566, 569–70 (M.D. Tenn. 2022). The Complaint satisfies none of these requirements. It identifies no specific communications made for the purpose of influencing any potential customer to buy any Defendant's goods or services. *See, e.g.*, *White Mule Co. v. ATC Leasing Co. LLC*, 540 F. Supp. 2d 869, 894, 898 (N.D. Ohio 2008) (dismissing Lanham Act claim where defendants informed plaintiff's customers of legal action taken against plaintiffs, finding that "aim was not to persuade consumers to buy defendants' good"). Nor does it identify any specific statement by any Waterland Party that could be "commercial speech," much less communications made to "a substantial portion of the plaintiff's or defendant's existing customer or client base." Indeed, apart from vaguely alleged communications from Tim Taber of Transparent to *two* artists, Compl. ¶¶ 483–85, it does not identify purportedly relevant communications at all.

*Third*, the Complaint raises five theories for its Lanham Act claims, *see id.* ¶ 494(a)-(e), but fails to plead any actionable allegations under the statute. Two of the alleged Lanham Act violations, *id.* ¶ 494(a), (e), do not allege that the "Waterland Defendants"—and surely not any of the Waterland Parties—made a "statement of fact about the plaintiff's *product or service*." *FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 97 F.4th 444, 452–53 (6th Cir. 2024) (emphasis added). Plaintiffs claim that—by disseminating the allegations about Tait—the "Waterland Defendants" spread a "fabricated account of drugging, rape, and coverup involving Plaintiffs" that somehow amounted to a representation that "Plaintiffs' commercial activities were tainted by criminal conduct, moral turpitude, and institutional coverup." *Id.* ¶ 494(a), (e). But no part of these allegations concerns Plaintiffs' "product[s] or service[s]." Rather, it concerns an alleged incident that happened after hours, in a hotel, with individuals acting in their personal capacity outside of work, where no business was being conducted.

The remaining Lanham Act claims, Compl. ¶ 494(b), (c), (d), fail because they do not allege statements *of fact*. "In a false-advertising claim, only statements of fact are actionable." *FedEx*, 97 F.4th at 453. And the statement must "assert a specific and measurable claim" capable of being "reasonably interpreted as a statement of objective fact." *Id.* "Statements of opinion," "rhetorical hyperbole," and "[p]redictions of future events" are not qualifying statements of fact. *Id*; *see also Victory Glob., LLC*, 170 F.4th at 1021 (subjective opinion is not actionable); *Serv. Jewelry Repair, Inc. v. Cumulus Broad., LLC*, 145 F. Supp. 3d 737, 747 (M.D. Tenn. 2015) (statements of opinion are "unverifiable" and therefore not statements of fact).

The statements alleged in ¶ 494(b)-(d) are nonactionable opinions and predictions. *See* Compl. ¶ 494(b) (alleging opinion that continued association with Plaintiffs after publication of article could bring reputational risk); *id.* ¶ 494(c) (alleging statement calling into question

"Plaintiffs' Business Viability" in light of the forthcoming articles); *id.* ¶ 494(d) (alleging statement forewarning that "continued association with Plaintiffs would jeopardize" "relationships with donors and the public"). Such forward-looking assessments and opinions are not reasonably understood as assertions of "objective fact." *FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 97 F.4th 444 (6th Cir. 2024), is instructive. There, the Sixth Circuit held that similar statements that a company's "financial model" was "collapsing", that its rates were "soaring", and that contractors were "in financial distress" were immeasurable statements of opinion not capable of being interpreted as statements of fact. *Id.* at 456–57. So too here.

### D. Plaintiffs fail to state a § 48-101-520 claim.

Plaintiffs conclude their Complaint by alleging that "Defendants" solicited charitable donations without being "properly registered as professional solicitors" in violation of Tennessee law. Compl. ¶¶ 617–622; *see* Tenn. Code Ann. §§ 48-101-501, *et seq.* These allegations do not appear to be directed at any Waterland Party; nor could they be, as the Complaint does not allege that any Waterland Party engaged in "solicitation." These claims, too, should be dismissed.[11]

## CONCLUSION

For the foregoing reasons, the four Waterland Parties should be dismissed from the case for lack of personal jurisdiction. In the alternative, the Complaint against the Waterland Parties should be dismissed with prejudice for failure to state a claim.

[11] Further, Plaintiffs lack standing to bring a claim under Tennessee's charitable solicitation laws because they fail to allege an ascertainable loss "as a result of" any Defendant's registration status. Tenn. Code Ann. § 48-101-520(a)(1); *see Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 416–17 (6th Cir. 2021) (traceability and redressability require a nonspeculative connection between the challenged conduct, the alleged injury, and the requested relief).

September 18, 2026

Respectfully submitted,

By: /s/ *Ryan T. Holt*

Ryan T. Holt (#30191)
SHERRARD ROE VOIGT & HARBISON, PLC
1600 West End Avenue, Suite 1750
Nashville, TN 37203
Phone: (615) 742-4200
rholt@srvhlaw.com

Jonathan M. Sperling (*pro hac vice*)
John S. Playforth (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel.: (202) 662-6000
jsperling@cov.com
jplayforth@cov.com

*Counsel for the Waterland Parties*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2026, I filed the foregoing with the clerk of the court by using the CM/ECF system and sent via electronic transmission to the following counsel of record:

Ben C. Broocks
Broocks Law Firm, PLLC
248 Addie Roy Road
Suite B-301
Austin, TX 78746
512-201-2000
Fax: 512-201-2032
bbroocks@broockslawfirm.com

G. Kline Preston, IV
Kline Preston Law Group, PC
4515 Harding Pike
Suite 107
Nashville, TN 37205
(615) 649-8680
Fax: (866) 610-9565
kpreston@klineprestonlaw.com

*Counsel for Plaintiffs*

Todd R. Hambidge
Taylor J. Askew
David Joseph Zeitlin
David W. Campbell
Holland & Knight LLP
511 Union St
Suite 2700
Nashville, TN 37219
615-850-6013
todd.hambidge@hklaw.com
Taylor.Askew@hklaw.com
david.zeitlin@hklaw.com
will.campbell@hklaw.com

*Counsel for certain Defendants*

Justin N. Joy
Lewis, Thomason, King, Krieg & Waldrop, PC
2900 One Commerce Square
Memphis, TN 38103
901-525-8721
jjoy@lewisthomason.com

Kaitlyn McKinzee Phillips
Lewis Thomason, P.C.
1201 Demonbreun Street
Suite 1000
Nashville, TN 37203
615-574-6755
Fax: 615-259-1389
kphillips@lewisthomason.com

*Counsel for certain Defendants*

Jay Scott Bowen
Connor M. Blair
Griffin Bowen, PLLC
48 Music Square East
Nashville, TN 37203
615-742-4800
Fax: 615-742-4801
jbowen@griffinbowen.com
cblair@griffinbowen.com

*Counsel for certain Defendants*

Daniel R. Warncke
Benjamin S. Morrell
David E. Lamb
Taft, Stettinius & Hollister, LLP (MN)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 977-8400
warncke@taftlaw.com
bmorrell@taftlaw.com
dlamb@taftlaw.com

*Counsel for Defendant World Vision, Inc.*

/s/ *Ryan T. Holt*
Ryan T. Holt