**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION**

| | | |
|---|---|---|
| **THRIVING CHILDREN ADVOCATES, LLC, ET AL.** | ) | |
| **Plaintiffs,** | ) | **No. 3:26-cv-00484** |
| **v.** | ) | |
| | ) | **JUDGE RICHARDSON** |
| **WATERLAND PRIVATE EQUITY INVESTMENTS, B.V., ET AL.,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT JESSICA MORRIS'S MOTION TO DISMISS AND DEFENDANTS THE ROYS REPORT NFP AND JULIE ROYS'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Defendants The Roys Report NFP, Julie Roys, and Jessica Morris (the "Journalist Defendants") respectfully submit the following memorandum of law in support of their Motion to Dismiss and Motion for Judgment on the Pleadings.[1]

**SUMMARY OF RELEVANT ALLEGATIONS**

This action challenges courageous journalism by award-winning[2] reporter Jessica Morris for The Roys Report. The articles at issue are two pieces published by The Roys Report on June 19, 2025 (the "June 2025 Article") and February 12, 2026 (the "February 2026 Article", the June 2025 Article and February 2026 Article, together the "Articles"), concerning allegations involving

1. As noted in the Journalist Defendants' Motion, in addition to Rule 12(b)(2) and Rule12 (b)(3) grounds for dismissal, they also adopt by reference, to the extent applicable to them, defenses raised by other Defendants.

2. Religious News Association, "Announcing the Religion News Association 2026 Excellence in Religion Reporting Award Winners" (April 27, 2026), https://rna.org/news/announcing-the-religion-news-association-2025-excellence-in-religion-reporting-award-winners (last visited Sept. 18, 2026). A trial court may take judicial notice of matters of public record when reviewing a motion to dismiss and may consider such records for the truth of their statements when there is no reasonable question about the accuracy of the contents. Benderoff v. Johansen, No. 25-1315, 2026 U.S. App. LEXIS 1094, at *6 n.3 (6th Cir. Jan. 13, 2026).

former Newsboys frontman Michael Tait, an alleged 2014 Fargo, North Dakota hotel incident, and resulting fallout in the Contemporary Christian Music industry. The allegations in Plaintiffs' 204-page Complaint place the reporting within a nationwide controversy involving public accusations, law enforcement investigations, artist and promoter relationships, sponsorships, contractual disputes, alleged anticompetitive conduct, and widespread commercial consequences.

The Articles reflect sourced, attributed, and qualified reporting. The June 2025 Article attributed the central account to an alleged sexual assault victim, "Nicole;" quoted her and multiple witnesses; described hotel surveillance footage; and referenced police and medical records. It reported Matthew Brewer's denial of sexual assault and his account that the encounter involved "two consenting adults;" Steve Campbell's categorical denial that he covered up misconduct; and Newsboys management's statement that it first learned of alleged criminal activity in June 2025. (See generally Compl. Ex. 1 (ECF No. 1-1).) The Article further disclosed that Nicole declined contemporaneous toxicology and forensic testing, that her hospital record did not establish whether she had been drugged or raped, and that police concluded the encounter was consensual. (Id.) The February 2026 follow-up identified an investigation as preliminary and attributed the disputed cover-up account to "a woman and four witnesses." (See generally Compl. Ex. 3 (ECF No. 1-3).)

Plaintiffs' theory is dependent upon isolating selected statements in the Articles, stripping away their attribution, and disregarding the denials, contrary evidence, qualifications, and investigative limitations reported alongside them. But reporting the existence of serious accusations, particularly while identifying their sources and publishing competing accounts, is not equivalent to adopting those accusations as established fact. Read as a whole and in context, the Articles report a disputed public controversy involving, according to the Complaint, nationally

known figures. They do not make the unqualified defamatory declarations that Plaintiffs attempt to selectively construct.

## ARGUMENT

### I. Rule 12 standard

A trial court may dismiss an action if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). When considering a Rule 12(b)(6) motion to dismiss, the court accepts the factual allegations in a plaintiff's complaint but does not accept legal conclusions couched as factual allegations. Handy-Clay v. City of Memphis, 695 F.3d 531, 539 (6th Cir. 2012) (emphasis added). While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. Iqbal, 556 U.S. 662, 679 (2009). Bare allegations without a factual context do not create a plausible claim. Ctr. for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 374 (6th Cir. 2011). A complaint must "direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005).

A ruling on a motion for judgment on the pleadings under Rule 12(c) is generally reviewed under the same standard as a Rule 12(b)(6) motion. EEOC v. J.H. Routh Packing Co., 246 F.3d 850, 851 (6th Cir. 2001).

**II. Plaintiffs' selective reconstruction of the Articles provides no basis for their defamation claims.**

Tennessee law requires allegedly defamatory publications to be evaluated as a whole, in context, and according to the understanding of an ordinary reader. A court is not bound by a plaintiff's characterization of a publication and must consider the full communication rather than isolated excerpts. Even taking Plaintiffs' allegations as true, as this Court must at this juncture, immaterial inaccuracies in a publication do not provide the basis for a defamation claim. Instead, the "gist" or the "sting" of a publication "of and concerning" a plaintiff must be false. There is no such publication alleged in Plaintiffs' Complaint.

Here, there is neither a gist nor a sting in the Articles of and concerning any Plaintiffs. Specifically, the Articles do not present any accusation against any Plaintiff as an established fact. Both sides of the sexual assault allegation are presented, and the Articles clearly present the denial of any cover-up. Plaintiffs cannot selectively pick and choose parts and pieces from the Articles to transform a report of a contested account into a reporter's assertion that the accusation is true.

Contrary to Plaintiffs' characterization, the Articles do not present a one-sided account. Instead, the Articles provide the competing versions as well as the sources upon which those versions are based. Because the Articles accurately report the existence and substance of a disputed account, expressly attribute the accusation, present both sides, and do not adopt the accusation as true, the Complaint does not and cannot identify an actionable false statement by the Journalist Defendants related to Plaintiffs.

Contrary to Plaintiffs' pleading, Tennessee law requires the Court to evaluate an allegedly defamatory publication as a whole, in context, and according to the understanding of an ordinary reader. Finney v. Jefferson, No. M2019-00326-COA-R3-CV, 2020 Tenn. App. LEXIS 428, at *8 (Tenn. Ct. App. Sep. 23, 2020) (stating statements "should be read as a person of ordinary

intelligence would understand them in light of the surrounding circumstances" (internal quotations omitted)). The Court must give the words their plain and natural meaning in light of the surrounding circumstances, not isolate selected phrases or accept Plaintiffs' characterization, which is contradicted by the publication. As stated by the Tennessee Court of Appeals in Grant v. Commercial Appeal:

> [C]ourts are not bound to the plaintiff's interpretation of the allegedly defamatory material, and if the words do not reasonably have the meaning plaintiff ascribes to them, the court must disregard [a] plaintiff's interpretation. . . . [S]tatements must be taken in context in cases like this one. . . . [C]ourts reviewing defamation cases should review the statement in the full context of the communication in which the statement is made; and consideration of the broader social context surrounding the communication. Isolating statements and first extracting their express and implied factual statements, without knowing the full context in which they were uttered, indeed may result in identifying many more implied factual assertions than would a reasonable person encountering that expression in context. . . . This comports with our duty to consider not just isolated statements, but also the import of the language as a whole to determine whether a communication may be deemed defamatory. . . . [We] rely upon the context of the article as a whole.

No. W2015-00208-COA-R3-CV, 2015 Tenn. App. LEXIS 750, at *30–31 (Tenn. Ct. App. Sep. 18, 2015) (cleaned up with citations, quotations, and alterations in original omitted).

That rule is dispositive here. Plaintiffs' theory depends entirely on extracting selected accusations from the Articles while omitting the numerous attributions, denials, competing evidence, evidentiary limitations, and organizational distinctions contained in the publications. Read in their entirety, the Articles carefully, fairly, and thoroughly reported a disputed and developing matter with sourced allegations, witness accounts, referenced evidence, denials, management's response, an ongoing investigation, and the controversy's consequences. Nowhere in the Articles was there a proclamation of Plaintiffs' guilt or blame as an adjudicated fact. Because the Articles, according to their plain and natural meaning, are not reasonably capable of defaming

Plaintiffs in the manner pled and are not 'of and concerning' Plaintiffs, the Court should dismiss Plaintiffs' claim against the Journalist Defendants.

A. The June 2025 Article presented both sides of the sexual assault allegation.

From the headline down, the June 2025 Article presented the qualifications associated with the story. It reported that a woman, Nicole, "accuses" Michael Tait of drugging her and Nicole "says" a tour manager covered up the incident. (ECF No. 1-1, PageID 205.) The opening likewise stated that the woman "says" she was assaulted and "believes" she was drugged. (Id.) Those words matter. They identify the propositions as a source's allegations, not findings independently declared by a reporter or an adjudicative process. Throughout the June 2025 Article, the reporting continued to distinguish among what the accuser alleged, what witnesses recalled, what records and video showed, what investigators had and had not concluded, and what the accused parties denied. Attribution and source transparency are part of the communication that an ordinary reader of the June 2025 Article received and are therefore part of the context the Court must consider.

Significantly, the June 2025 Article presented Matthew Brewer's consent defense promptly and substantively. Near the outset, immediately after describing the principal allegations, the June 2025 Article reported that Brewer "denied any sexual assault" and maintained that the encounter involved "two consenting adults." (Id. at PageID 206.) The article then noted that, through counsel, Brewer stated that he was shocked by the police report, that the interaction was consensual, that Nicole never expressed concern or indicated that anything inappropriate had occurred, and that he had engaged in no misconduct. (Id. at PageID 218.) This was neither a buried disclaimer nor a token denial. The June 2025 Article placed the central competing account alongside the accusation with supporting detail. Plaintiffs cannot selectively remove that part of the story and then attribute only a one-sided presentation to the Journalist Defendants.

The June 2025 Article also disclosed evidence supporting competing interpretations. It described hotel surveillance footage showing the woman and Brewer walking apart without physical interaction as they entered the room. (Id. at PageID 209.) It later described her opening the door fully dressed, conversing in the hallway with Tait and Brewer, and then latching onto Brewer before he carried her back inside. (Id. at PageID 210.) The June 2025 Article reported the observable conduct and separately attributed to Nicole her belief that a drug, mixed with alcohol, had lowered her inhibitions. (Id.) It also reported her contemporaneous statement to friends that she "woke up" in the midst of a sexual act. (Id. at PageID 212.)

The reporting was equally candid about the limits of the medical and forensic evidence. It stated that Nicole declined both a rape kit and a toxicology test at the Fargo hospital. (Id. at 214.) The June 2025 Article went on to explain that timely testing might have shown whether Rohypnol or a similar drug was present. (Id.) It quoted Nicole's explanation that she did not want to say or believe she had been raped "because it's horrific if it's true." (Id.) The June 2025 Article then expressly told readers that the contemporaneous hospital record "does not say if she was drugged and raped" (id.) and reproduced the record's more equivocal account, including that she had been drinking, believed she had sexual contact with at least one man, was unsure whether another man was involved, and reported that a third person entered during the encounter. (Id.) Those disclosures foreclose Plaintiffs' selective and incorrect portrayal of the June 2025 Article as presenting drugging and rape as medically established facts.

Nor did the article conceal the law-enforcement outcome. It reported that the Fargo, North Dakota Police Department investigation had been shelved and that the detective concluded the interaction was consensual. (Id. at PageID 217.) It also disclosed limits in the investigation, including that Brewer and Tait were not interviewed, and presented the accuser's and her former

supervisor's criticisms of the detective's work. (Id.) Thus, readers received the official conclusion, the acknowledged investigative gaps, and the sources' reasons for disputing that conclusion. This, and the numerous other aspects of the June 2025 Article discussed above, is precisely the sort of full contextual presentation Tennessee law requires the Court to assess.

Tennessee law does not permit a plaintiff to convert reporting about allegations into an actionable assertion merely by removing the attribution or qualification. The June 2025 Article repeatedly informed readers that accusations were being made by identified sources. Reporting that a source accused Tait, Brewer, or Steve Campbell of misconduct is fundamentally different from the Journalist Defendants themselves asserting that the accusations were established facts.

Curiously, Plaintiffs invoke these same circumstances as supporting their preferred narrative, but readers learned them from the June 2025 Article itself. Rather, Plaintiffs are upset that the article did not adopt Plaintiffs' interpretation of those facts. Such a disagreement does not provide the basis for a defamation claim.

B. The June 2025 Article presented a plain denial of any alleged cover-up.

The same balance governed the alleged cover-up. The June 2025 Article reported witnesses' accounts of statements attributed to Steve Campbell but immediately published Campbell's denial that he made those remarks and his categorical response: "I also resent any implication that I would ever cover anything up." (Id. at PageID 217.) It further quoted Newsboys management's written statement that management first learned of alleged criminal activity when it received the police report on June 12, 2025 (id. at PageID 215); that the tour producer—not Newsboys management—appeared to have possessed earlier knowledge (id. at PageID 215–216); and that Steve Campbell neither maintained an office at Newsboys, Inc. or Newsboys Touring, LLC nor held a management position over those entities (id. at PageID 216). Management also

stated that it was investigating and would act against any currently affiliated person found to have been involved. (Id. at PageID 218.) Plaintiffs cannot isolate the phrase "covered up" while disregarding the categorical denials and organizational explanation printed with it.

The June 2025 Article likewise distinguished among the persons and entities involved rather than collapsing them into a single, collective wrongdoer. It separately identified Tait, Brewer, Steve Campbell, Newsboys management, the tour producer, and the current band members. At the outset, the article expressly stated that the allegations did not involve current Newsboys members Adam Agee, Duncan Phillips, Jody Davis, or Jeff Frankenstein. (Id. at PageID 206.) It also disclosed that Tait had been contacted repeatedly but did not respond. (Id.) Reporting a subject's refusal to comment after repeated requests is not impugnment or suppression of the subject's side. Instead, it accurately informs readers about the reporting process and the limits of the available information.

C. Nothing in the February 2026 Article provides a basis for Plaintiffs' claims.

The February 2026 Article does not change the analysis. Like the June 2025 Article, the February 2026 Article likewise centers on Tait. Its title states that Michael Tait left Nashville amid an investigation and that the Newsboys were left in limbo. (ECF No. 1-3 at PageID 250.) It described what a woman and four witnesses had told The Roys Report, again attributing the cover-up allegation to sources rather than presenting it as an adjudicated fact. (Id. at PageID 252.) It referred readers to earlier reporting and addressed subsequent developments, including a continuing police investigation which was specifically identified as preliminary. (Id. at PageID 250 & 251.) The follow-up must be read in that actual context, not as though, as Plaintiffs allege in their Complaint, the detailed qualifications, denials, and competing evidence in the underlying report never existed. A condensed reference in follow-up reporting does not become a materially

different communication merely because Plaintiffs want to isolate it from the reporting to which it refers. As with the June 2025 Article, nothing in the February 2026 Article can "reasonably be constru[ed] as holding the [Plaintiffs] up to public hatred, contempt or ridicule." Brown, 393 S.W.3d at 708.

Following their same tactic regarding the June 2025 Article, Plaintiffs attempt to create an accusation against Wesley Campbell from the February 2026 Article's condensed reference to a woman and four witnesses saying "Newsboys management" covered up the 2014 incident. But the words do not support the inference unreasonably advocated by Plaintiffs that Wesley Campbell personally participated in, directed, authorized, or knew about concealment. The referenced allegation originated in the June 2025 Article, which specifically identified Steve Campbell. Identifying Wesley Campbell elsewhere as the Newsboys' owner while discussing business consequences does not transform the phrase "Newsboys management" into a personal accusation against him.

Again, context controls. Grant, 2015 Tenn. App. LEXIS 750, at *30. An ordinary reader would understand the February 2026 Article as reporting the continuing investigation of Tait and the uncertainty that followed for the band. Reports that business ventures struggled, artists departed, assets were sold, or litigation followed describe commercial consequences. Even if Plaintiffs consider those statements embarrassing or harmful, offensiveness and economic injury alone do not establish defamatory capacity. Brown, 393 S.W.3d at 708. The published words must themselves convey the requisite disgrace concerning the particular plaintiff. These words do not.

D. Plaintiffs' rewriting of the Articles does not support their claims. Instead, it demonstrates why their claims should be dismissed.

Plaintiffs' allegations demonstrate the defect in Plaintiffs' theory. Many facts Plaintiffs invoke as proof of falsity or distortion came directly from the June 2025 Article detailed above.

Plaintiffs do not identify a one-sided article containing only negative, false statements allegedly damaging them. Instead, their theory is based on the emphasis or inference they choose to assign to material openly disclosed in the Articles. Plaintiffs are rewriting the Articles through selective omission, and then attempting to assert a claim on their selectively reconstructed version. Such a course is not supported under Tennessee law. See Grant, 2015 Tenn. App. LEXIS 750, at *30.

The Articles are incorporated into the Complaint. This Court should review and consider the contents of the Articles and disregard Plaintiffs' unfounded characterizations. Considered in their entirety, the Articles consistently attributed disputed assertions to their sources, disclosed the evidence and its limitations, reported contrary official and personal accounts, and carefully distinguished among the relevant individuals and organizations.

E. The Articles are not reasonably capable of a defamatory meaning concerning Plaintiffs.

Whether a publication is capable of conveying a defamatory meaning is a threshold question of law for the Court. Again, the Court must consider the publication as a whole, in context, and according to the plain and natural meaning an ordinary reader would give its words under the surrounding circumstances. Stones River Motors, Inc. v. Mid-South Publishing Co., 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983) ("In determining whether the published words are reasonably capable of such a [defamatory] meaning, the courts must look to the words themselves and are not bound by the plaintiff's interpretation of them."); Grant, 2015 Tenn. App. LEXIS 750, at *29–30. As also stated above, the Court is not bound by Plaintiffs' characterization of the Articles, and an innuendo may not enlarge, extend, or change the sense of the words actually published. See Pate v. Service Merchandise Co., 959 S.W.2d 569, 574 (Tenn. Ct. App. 1996) ("The extrinsic facts cannot be stretched to give the words a defamatory meaning that is not implied by the words.").

Plaintiffs have not met the demanding threshold of demonstrating that the Articles are capable of having a defamatory meaning. A publication is not defamatory merely because its subject considers it offensive, embarrassing, or economically harmful. The words must constitute a serious threat to the plaintiff's reputation and reasonably expose that plaintiff to public hatred, contempt, ridicule, or disgrace. Brown v. Mapco Express, Inc., 393 S.W.3d 696, 708 (Tenn. Ct. App. 2012) ("A libel does not occur simply because the subject of a publication finds the publication annoying, offensive or embarrassing. The words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule." (internal quotations omitted)); Stones River Motors, 651 S.W.2d at 719.

Here, as detailed above, the Articles report allegations against identified individuals, disclose the stated bases for those allegations, present denials and competing accounts, and describe the consequences of a public controversy. They do not reasonably accuse any Plaintiff of drugging or sexually assaulting anyone, nor do they reasonably accuse Wesley Campbell or the Plaintiff entities of concealing a crime.

F. The Articles are not "of and concerning" Plaintiffs.

Defamation requires a false and defamatory statement concerning Plaintiffs. See Pate, 959 S.W.2d at 573. Plaintiffs cannot transfer accusations expressly directed at Tait and Brewer to legally distinct persons or entities merely because Tait formerly performed with the band, or Brewer worked on a Newsboys tour. Likewise, any reputational fallout affecting an organization does not convert reporting about identified separate individuals into an accusation against every person or entity associated with the entity. The "of and concerning" requirement necessitates that distinction. Steele v. Ritz, No. W2008-02125-COA-R3-CV, 2009 Tenn. App. LEXIS 843, at *10 (Tenn. Ct. App. Dec. 16, 2009) (stating the of and concerning requirement "confines actionable

defamation to statements made against an ascertained or ascertainable person, and that person must be the plaintiff. . . . A plaintiff may not support a claim for defamation based on an alleged defamatory statement made ‘of and concerning’ a third party.” (internal quotes and citations omitted)).

The June 2025 Article removes any possible ambiguity by stating that the allegations do not involve the current band members and by again identifying Tait, Steve Campbell, and Brewer as the persons allegedly involved. (ECF No. 1-1 at PageID 206.) As detailed above, Plaintiffs' allegations in the Complaint highlight that the alleged assault concerned Brewer and that the alleged drugging concerned Tait. The June 2025 Article likewise does not accuse Wesley Campbell or the Plaintiff entities of a cover-up. A reasonable reader could not understand the June 2025 Article as accusing any Plaintiff in this action of committing those acts. Tennessee's “of and concerning” requirement prevents an individual or entity from recovering merely because allegations concerning a third party caused collateral economic harm.

The same conclusion applies with even greater force specifically to Thriving Children Advocates and Thriving Charity Advocates. Neither entity is identified as participating in the incident, the alleged drugging, the alleged assault, or the alleged cover-up. Even accepting Plaintiffs' version of events, the Articles contain no statement accusing either Thriving entity of wrongdoing and therefore fail the threshold “of and concerning” requirement as a matter of law.

G. Plaintiffs' defamation by omission theory fails under Tennessee law.

In Memphis Publishing Co. v. Nichols, the incomplete account created an implication that the omitted circumstances would have dispelled. 569 S.W.2d 412, 420 (Tenn. 1978) (“The publication of the complete facts could not conceivably have led the reader to conclude that [the subjects] had an adulterous relationship. The published statement, therefore, so distorted the truth

as to make the entire article false and defamatory."). Here, by contrast, the June 2025 Article supplied the circumstances necessary for an ordinary reader to evaluate the dispute: the accuser's allegations, Brewer's consent defense, Campbell's denial, management's response, the surveillance footage, the absence of toxicology and forensic testing, the equivocal hospital record, and the police conclusion. The Tennessee Court of Appeals' reasoning in Grant is likewise instructive. Grant, 2015 Tenn. App. LEXIS 750, at *33 (noting the "question raised does not constitute an 'assertion'" by the publisher that the subject was engaged in nefarious conduct). Grant emphasized that the article included the subject's own statements and left the central disputed question unresolved rather than converting it into a direct charge. Id. The June Article followed the same approach: it reported a serious accusation as an accusation, disclosed questions and contrary evidence, and published the principal denials.

**III. Even if the statements at issue are defamatory—which they are not—and are of and concerning the Plaintiffs—which they are not—Plaintiffs have not pled that the Journalist Defendants acted with actual malice in their publication of the Articles.**

A. Plaintiffs are public figures.

Plaintiffs cannot reasonably dispute that they are general purpose public figures. At a minimum, Plaintiffs' own allegations establish that they are limited-purpose public figures for the controversy addressed by the challenged reporting. A person who voluntarily assumes a prominent role in a public controversy must plead and prove actual malice. As stated by the Tennessee Supreme Court:

> General-purpose public figures are those who have achieved such pervasive fame or notoriety that they become a public figure for all purposes and in all contexts. . . . As the D.C. Circuit puts it, general-purpose public figures are celebrities or household names. . . Limited-purpose public figures include those who have voluntarily thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. . . . .[Accordingly] the scienter element of [a] defamation claim requires [a public figure plaintiff] to prove by clear and convincing evidence that [the publisher] acted with actual malice.

Charles v. McQueen, 693 S.W.3d 262, 274, 280 (Tenn. 2024) (cleaned up, with internal quotations, alterations in original, and citations omitted). The Complaint describes Newsboys as a nationally prominent "mega-band" with decades of touring and substantial public exposure. (Compl. ¶ 186.) It further alleges that contemporary Christian music artists cultivate a "Public Platform" through large, attentive audiences. (Compl. ¶¶ 106, 221 & 222.) Wesley Campbell allegedly founded and owns the Newsboys-related entities, directs the integrated enterprise, and founded Thriving Children Advocates, LLC. (Compl. ¶¶ 8 & 9.)

These allegations do not describe private parties involuntarily drawn into an obscure event. They describe persons and entities that deliberately built, managed, and monetized nationally visible platforms. The challenged Articles concern the conduct and management of that same public-facing enterprise. Plaintiffs' claimed injuries, as alleged, depend on the public reputation of Newsboys and Wesley Campbell's public-facing stewardship of the enterprise. Accordingly, Plaintiffs must plausibly allege actual malice.

B. The Complaint does not plausibly allege actual malice.

Actual malice is a demanding pleading standard. Plaintiffs must allege facts showing that each Defendant published a challenged statement with knowledge of falsity or while actually entertaining serious doubts about its truth. New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964) (stating that actual malice "with knowledge that it was false or with reckless disregard of whether it was false or not"); Charles, 693 S.W.3d at 281. Negligence, error, or even hostility is not enough. Tomlinson v. Kelley, 969 S.W.2d 402, 405 (Tenn. Ct. App. 1997) ("In order to recover damages, [public figure plaintiffs] must prove with convincing clarity that the defendant acted with actual malice. . . . The concept of actual malice in defamation cases connotes more than personal ill will, hatred, spite, or desire to injure." (citation omitted).) Nor does a failure to investigate,

standing alone, establish reckless disregard. Lewis v. NewsChannel 5 Network, L.P., 238 S.W.3d 270, 301 (Tenn. Ct. App. 2007) ("Failing to investigate information provided by others before publishing it, even when a reasonably prudent person would have done so, is not sufficient by itself to establish reckless disregard."). The pleading must contain facts about what Julie Roys, Jessica Morris, and The Roys Report actually believed regarding each Plaintiff. The Complaint does not plead actual malice as to each individual Defendant separately, as required; nor does it plausibly allege actual malice even when the allegations against the Journalist Defendants are considered collectively. See Holbrook v. Harman Auto., 58 F.3d 222, 225 (6th Cir. 1995) (stating "the question is whether the individual [not the entity] responsible for the statement's publication acted with the requisite culpable state of mind").

At most, the Complaint supplies conclusions, not facts. It repeatedly labels the Articles "fabricated," alleges that Defendants "knowingly omitted" information, and invokes "conscious avoidance" and "culpable malice." These legal conclusions couched as factual allegations do not satisfy the plausibility requirement. As to any of the Journalist Defendants, the Complaint identifies no admission that they believed a published statement was false, identifies no communication that they made expressing serious doubt about a source's veracity, and makes no allegation that these Defendants invented a witness, fabricated a quotation, or knowingly published an account a source had disavowed.

The incorporated materials instead show substantial sourcing detailed above. Again, the Complaint highlights the numerous attributions, competing accounts, multiple sources, limitations, and qualifications contained in the Articles. These pleaded sources defeat an inference that the account was so inherently improbable that publication itself demonstrated recklessness. See Charles, 693 S.W.3d at 281 ("The evidence must indicate that the defendant 'entertained serious

doubts' about the truth of her publication. . . . A speaker's failure to thoroughly investigate a claim, without more, does not establish actual malice." (citations omitted).).

Again, Plaintiffs' claim against the Journalist Defendants is premised on the Articles' refusal to accept Plaintiffs' preferred characterization of the disputed accounts. As established above, a dispute over how to weigh conflicting source material does not provide a basis for a defamation claim. It certainly is not evidence that the Journalist Defendants actually disbelieved the account they published. At the very most, conflicting evidence ordinarily establishes uncertainty, not knowledge of falsity. As with Plaintiffs' tactics in the context of the argument above, Plaintiffs cannot convert their preferred interpretation of a disputed record into actual malice by calling that interpretation "conclusive." Allegations of falsity do not establish the constitutionally required state of mind.

The allegations regarding supposed investigative omissions fare no better. Plaintiffs fault the Journalist Defendants for not interviewing additional witnesses before publication. A publisher has no obligation to exhaust every possible source or delay publication until every factual dispute is resolved. Most factual disputes are never resolved. Plaintiffs plead no facts showing that these Defendants deliberately avoided a source because they expected that source to establish falsity. The Articles' use of multiple sources and denials undermines purposeful avoidance.

Plaintiffs' objections to editorial emphasis and wording do not form the basis of a viable defamation claim. Those are editorial disagreements, not facts showing knowledge of falsity. Vivid language, an unfavorable perspective, or alleged sensationalism cannot substitute for actual malice, which concerns knowledge or serious doubt rather than ill will. Furthermore, repeating that the "Defamation Defendants" acted knowingly or recklessly cannot establish the required state of mind for each of the Journalist Defendants.

C. The commercial-dispute narrative does not cure the pleading defect. As to the Journalist Defendants, it amplifies it.

The Complaint's broader narrative confirms[3] that the alleged motive belongs to commercial actors, not the journalists. Most of the pleading across the Complaint's 632 numbered paragraphs concerns concert-promotion consolidation, sponsorship revenue, trade secrets, acquisition negotiations and contractual relationships. Plaintiffs allege that a proposed acquisition for approximately $50 million failed, competitors developed a rival sponsorship model, artist relationships ended, and third parties later used or "weaponized" the Articles for economic leverage.

Even if accepted, those allegations describe the motives of competitors and other commercial actors. They do not plausibly establish that Julie Roys, Jessica Morris, or The Roys Report concocted, joined, or participated in a commercial scheme by knowingly publishing false information. The Complaint does not allege that the journalists competed in the relevant markets, joined the contracts, possessed trade secrets, received payment, or stood to obtain the revenues. Nor does it identify an agreement or communication showing that they shared a competitor's purpose or motivation. A source's connections, timing, and speculation cannot impute a third party's motive to an independent publisher.

More fundamentally, even spite or intent to injure would not establish actual malice. Tomlinson, 969 S.W.2d at 405. The constitutional question is whether any of the Journalist Defendants knew a statement was false or seriously doubted it. Plaintiffs' allegations that commercial parties used or benefited from the reporting do not answer that question. They merely

3. As do the positions Plaintiffs take in response to the various motions to dismiss filed by other Defendants in this Action.

stack speculation about third-party motives atop conclusory speculation about the reporters' beliefs.

Despite hundreds of paragraphs of allegations, Plaintiffs ultimately allege nothing more than that the Journalist Defendants should have credited Plaintiffs' interpretation of disputed evidence, interviewed different sources, selected portions of different documents, and rejected contrary accounts. Those allegations may express disagreement with the reporting, but they do not plausibly show that the Journalist Defendants believed a challenged statement was actually false or even probably false. Because Plaintiffs, given their status as public figures, fail to plausibly plead actual malice, the defamation claim should be dismissed.

**IV. Plaintiffs fail to state a claim for false light.**

While Plaintiffs' false light claim is duplicative of their defamation claim, Plaintiffs' false light claim fails for several independent reasons. Under Tennessee law, a plaintiff must allege publicity that places him before the public in a false light that would be highly offensive to a reasonable person, together with knowledge of or reckless disregard for the falsity of the publicized matter and the resulting false light. Charles v. McQueen, 693 S.W.3d 262, 280 (Tenn. 2024). Where, as here, the speech concerns matters of public concern and involves public or limited-purpose public figures, Plaintiffs must plausibly plead actual malice. See West v. Media General Convergence, Inc., 53 S.W.3d 640, 647 (Tenn. 2001) (stating "actual malice is the appropriate standard for false light claims when the plaintiff is a public official or public figure").

A. Corporate entities have no false light claim as a matter of law.

False light is a personal privacy tort. Corporate entities do not possess a personal privacy interest and therefore cannot maintain a false light claim. West, 53 S.W.3d at 648 (stating, "[T]his Court adopts Section 652I of the Restatement (Second) of Torts (1977) which recognizes that the

right to privacy is a personal right. As such, the right cannot attach to corporations or other business entities."). Accordingly, Thriving Children Advocates, LLC, Thriving Charity Advocates, LLC, Newsboys, Inc., and Newsboys Touring, LLC lack standing to pursue this cause of action. Nor do the Articles place Wesley Campbell in the alleged false light. The articles identify Michael Tait, Matthew Brewer, and Steve Campbell as the individuals connected to the underlying allegations. As detailed above, the June 2025 Article expressly distinguished Steve Campbell from Wesley Campbell and from the Newsboys entities, while stating that the allegations did not involve the current members of Newsboys. The February 2026 Article likewise focused on Tait, the continuing investigation involving Tait, and the resulting business consequences. Neither publication accused Wesley Campbell of assault, concealment, or criminal wrongdoing.

B. <u>The Articles do not create an actionable false implication.</u>

Although a false light claim may arise from the overall implication conveyed by a publication, even where individual statements are literally accurate, the publication must nevertheless create a materially false and highly offensive impression. That standard is not met here. Again, the Articles consistently attributed allegations to identified sources rather than presenting them as established facts. They reported denials from Brewer and Steve Campbell, included management's responses, disclosed contrary evidence, identified limitations in the available evidence, discussed medical records, and reported the police conclusion that the encounter was consensual. Readers were informed throughout that the allegations were disputed and that competing evidence existed. Plaintiffs' theory depends on isolating selected allegations while disregarding the disclosures, denials, contrary evidence, and official findings that accompanied them. Tennessee law does not permit a plaintiff to manufacture a false implication by ignoring the context in which disputed allegations were reported. Reporting the existence of a

public controversy, while presenting competing accounts and relevant evidence, does not place Plaintiffs in a false light.

C. As with their defamation claim, Plaintiffs fail to plausibly allege actual malice.

The false light claim independently fails because Plaintiffs do not plausibly allege actual malice. Actual malice requires knowledge of falsity or reckless disregard for the truth of both the challenged statements and the allegedly false implication. Charles, 693 S.W.3d at 280 (noting plaintiff "likewise must prove actual malice as an element of his false light claim"). Plaintiffs fail to allege an actionable false implication, publication concerning Plaintiffs, a cognizable privacy interest for the entity Plaintiffs, or the actual malice required by Tennessee law. To the extent it is independent from Plaintiffs' defamation claim, the false light claim should be dismissed in its entirety.

## V. The Articles are independently protected by Tennessee's fair report privilege.

Even if Plaintiffs had plausibly alleged a defamatory statement, which they have not, their claims independently fail because the challenged reporting is protected by Tennessee's fair report privilege. Tennessee law protects fair and accurate reports of official proceedings and official records, even where those reports repeat allegations or statements that a plaintiff finds embarrassing or defamatory. Lewis v. NewsChannel 5 Network, L.P., 238 S.W.3d 270, 284 (Tenn. 2007) ("The Tennessee Supreme Court recognized the fair report privilege in 1871."). The privilege requires only that a publication convey a reasonable impression of the official report. It does not demand technical precision in every detail or adoption of a plaintiff's preferred interpretation of the underlying facts. Eisenstein v. WTVF-TV, News Channel 5 Network, LLC, 389 S.W.3d 313, 323–324 (Tenn. Ct. App. 2012) ("To qualify for the fair report privilege, a report

does not have to be technically accurate in every detail, as long as it conveys a correct and just impression of what took place.") (internal quotations omitted).

The Complaint repeatedly confirms that the Journalist Defendants reviewed and reported from official investigative materials, namely the Fargo Police Department file. Once again, Plaintiffs' principal grievance is not that the Journalist Defendants fabricated official records, but that the Defendants allegedly interpreted those records differently than Plaintiffs would prefer. Such a grievance does not defeat the privilege.

The June 2025 Article expressly disclosed the police investigation, reported the detective's conclusion that the encounter was consensual, described the disposition of the investigation, and identified perceived investigative limitations. Likewise, the February 2026 Article reported on a continuing investigation involving Michael Tait and developments arising from that controversy.

Tennessee's fair-report privilege focuses on the source of the information and the fairness of the report, not on whether a plaintiff agrees with the publication's characterization of official records. See Funk v. Scripps Media, Inc., 570 S.W.3d 205, 211–212 (Tenn. 2019) (stating one justification for the fair report privilege is that "newspapers should be allowed to report on publicly accessible information"). Plaintiffs' allegation that Defendants should have given greater weight to certain evidence or adopted Plaintiffs' preferred interpretation of official records does not transform privileged reporting into actionable defamation or false light. Because the challenged Articles fairly and substantially reported official investigative materials, law-enforcement findings, and related records, Plaintiffs' defamation and false light claims are barred by Tennessee's fair-report privilege and should be dismissed.

## VI. Plaintiffs do not plausibly tie their alleged damages to any supposedly actionable statement concerning them.

Plaintiffs' damages theory fails for the separate reason that it does not connect any alleged injury to a false and defamatory statement concerning Plaintiffs. Tennessee defamation law requires actual damage to be sustained and proved, and the alleged statement must constitute a serious threat to the plaintiff's character or reputation. Davis v. Tennessean, 83 S.W.3d 125, 128 (2001) ("Damages from false or inaccurate statements cannot be presumed; actual damage must be sustained and proved."). Recoverable defamation damages also must be the direct and proximate result of the alleged publication. Byrd v. State, 150 S.W.3d 414, 421 (Tenn. Ct. App. 2004) ("Under Memphis Publishing Co. v. Nichols, one must 'plead and prove injury from the alleged defamatory words.'") (quoting 569 S.W.2d 412, 420 (Tenn. 1978)).

Plaintiffs' own allegations and incorporated publications point elsewhere. The February 2026 Article describes the relevant commercial fallout following allegations and an investigation concerning Michael Tait: radio stations dropped the band, bookings were canceled, the label later dropped Newsboys, and Campbell's business ventures allegedly struggled "following the Tait allegations." (ECF No. 1-3 at PageID 252.) The Complaint likewise frames the alleged business losses as resulting from third parties' independent decisions—promoters, artists, nonprofits, and others allegedly distancing themselves from TCA, terminating relationships, or redirecting sponsorship opportunities in response to the controversy, not the Articles.

That is not a defamation-causation theory against the Journalist Defendants. It is a theory that third parties reacted to allegations against Tait and then made their own commercial decisions. Plaintiffs cannot convert marketplace fallout from reporting about Tait into damages from a false statement concerning Plaintiffs, including any republications. Because the pleaded injuries are not plausibly caused by any actionable statement of and concerning Plaintiffs, the defamation and derivative false light claims should be dismissed.

**VII. Plaintiffs fail to plausibly allege a conspiracy or aiding-and-abetting claim against the Journalist Defendants.**

Plaintiffs' conspiracy and aiding-and-abetting claim fails because the Complaint does not plausibly allege either an agreement involving the Journalist Defendants or an actionable underlying tort. Under Tennessee law, civil conspiracy requires a common design, concerted action, an overt act, and resulting injury. Conclusory allegations are insufficient. Kincaid v. SouthTrust Bank, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006) ("Conspiracy claims must be pled with some degree of specificity. . . . Conclusory allegations, . . . unsupported by material facts will not be sufficient to state such a claim." (citations omitted)). Aiding-and-abetting liability likewise requires knowledge of another's wrongdoing and substantial assistance in accomplishing it. PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp., 387 S.W.3d 525, 552 (Tenn. Ct. App. 2012) (stating "the common law civil liability theory of aiding and abetting, which requires that the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts." (internal quotations omitted)).

Plaintiffs' allegations demonstrate that the purported conspiracy concerns an alleged business scheme involving competitors, artist relationships, sponsorship revenues, and commercial displacement. (Compl. ¶¶ 623–629.) Count IX of the Complaint principally targets the Waterland Defendants and alleges efforts to circulate the purported "Fargo Fabrication" and interfere with Plaintiffs' business interests. Those allegations are asserted in an attempt to support Plaintiffs' broader antitrust narrative, but they do not plausibly allege that Julie Roys, Jessica Morris, or The Roys Report agreed to further any such scheme. Communications with sources during newsgathering activities do not establish a conspiratorial agreement. Nor have Plaintiffs alleged facts showing that the Journalist Defendants knowingly provided substantial assistance to any

alleged wrongful conduct. Instead, they rely on the publication of the Articles, reporting a matter of public concern. Exercise of the freedom of the press is not participation in a conspiracy.

The claim also independently fails because conspiracy and aiding and abetting liability are derivative. Tennessee law does not recognize civil conspiracy absent actionable underlying misconduct. Courts have specifically held that a conspiracy claim fails where the underlying defamation claim fails. Lane v. Becker, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010) ("A claim for civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy. . . . Conspiracy, standing alone, is not actionable where the underlying tort is not actionable." (internal quotes and citation omitted)). Because Plaintiffs have not stated a viable tort claim against the Journalist Defendants, their derivative conspiracy and aiding-and-abetting claim must also be dismissed.

## CONCLUSION

For the reasons set forth above, as well as the entire record in this cause, this Court should dismiss Plaintiffs' Complaint against the Journalist Defendants and grant them any other relief to which they may be entitled.

Respectfully submitted,

**LEWIS THOMASON, P.C.**

By: /s/ Justin Joy

Justin N. Joy, BPR #23722
40 South Main Street, Suite 2900
Memphis, TN 38103
(901) 525-8721
jjoy@lewisthomason.com

Kaitlyn M. Phillips, BPR #42449
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
(615) 259-1366
kphillips@lewisthomason.com

*Attorneys for Defendants The Roys Report, Julie Roys, and Jessica Morris*

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2026, I filed the foregoing document using the Court's CM/ECF system, which will send electronic notice to all counsel of record.

/s/ Justin Joy