**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| THRIVING CHILDREN ADVOCATES, LLC, THRIVING CHARITY ADVOCATES, LLC, WESLEY CAMPBELL, NEWSBOYS, INC., NEWSBOYS TOURING, LLC<br><br>Plaintiffs,<br><br>v.<br><br>WATERLAND PRIVATE EQUITY INVESTMENTS, B.V.; WATERLAND PRIVATE EQUITY APS.; WATERLAND MANAGEMENT HOLDING IV B.V.; WATERLAND MANAGEMENT HOLDING VI B.V.; WATERLAND MANAGEMENT HOLDING VII B.V.; CHRISTIAN LUND MADSEN; NICKLAS GULDBERG; USLIVE OPCO, INC. DBA LIVECO AND TPR.; USLIVE, LLC.; USLIVE HOLDING, LLC; USLIVE INTERMEDIATE HOLDCO, INC.; BRIAN BECKER; TPR ENTERTAINMENT, LLC.; PREMIER PRODUCTIONS HOLDINGS, LLC; MICHAEL PUGH; SHANE QUICK; USLIVE RUSH, LLC; RUSH CONCERTS, LTD.; JACOB REISER; USLIVE TRANSPARENT, LLC; TRANSPARENT PRODUCTIONS, LLC; TIMOTHY TABER; THE ROYS REPORT NFP; JULIE ROYS, JESSICA MORRIS; MERCYME, INC.; BART MILLARD; ROBIN "ROBBY" SHAFFER; NATHAN COCHRAN; MIKE SCHEUCHZER; SCOTT BRICKELL; BRICKHOUSE ENTERTAINMENT, LLC; MICAH BEGNAUD AKA MICAH TYLER; and WORLD VISION, INC.<br><br>Defendants. | § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 3:26-cv-00484<br><br>District Judge: Hon. Eli J. Richardson<br>Magistrate Judge: Hon. Jeffrey S. Frensley<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS


**Page**

I. INTRODUCTION AND STATEMENT OF THE CASE ..... 1

A. NICOLE TOLD FARGO POLICE THE ENCOUNTER WAS CONSENSUAL ..... 12

B. NICOLE WAS NOT DRUGGED ..... 13

C. THERE WAS NO COVER-UP AS THERE WAS NOTHING TO COVER UP ..... 14

II. PARTIES ..... 15

A. PLAINTIFFS ..... 15

B. DEFENDANTS ..... 16

a. The Waterland Defendants ..... 16

b. The LiveCo Defendants ..... 17

c. The Defamation Defendants ..... 19

d. The MercyMe Defendants ..... 20

e. The Other Defendants Including World Vision, Inc ..... 20

III. JURISDICTION AND VENUE ..... 20

IV. BACKGROUND FACTS OF THE CHRISTIAN CONCERT MARKET AND KEY PLAYERS ..... 23

A. CONTEMPORARY CHRISTIAN MUSIC ..... 23

B. CCM PERFORMING ARTISTS ..... 25

C. CCM PROMOTERS ..... 26

D. NON-PROFIT CHARITIES ..... 28

E. THRIVING CHILDREN ADVOCATES, LLC ..... 31

i. MercyMe ..... 34

ii. Newsboys ..... 34

V. HEDGE FUND WATERLAND ACQUIRES TRANSPARENT, PREMIER AND RUSH THE ROLL UP OF POWERFUL PROMOTERS INTO A MONOPOLIST -- LIVECO/TPR ..... 35

A. A MONOPOLY OF CCM PROMOTERS IS FORMED ..... 35

B. LIVECO/TPR CONTRACTS TO PURCHASE TCA AND THEN BREACHES ITS PURCHASE CONTRACT FOR ANTI-COMPETITIVE REASONS ..... 44

VI. WORLD VISION, THE MERCYME DEFENDANTS, THE DEFAMATION DEFENDANTS AND OTHERS JOIN IN THE CONSPIRACY ....46

A. WATERLAND INITIATES THE CONSPIRACY TO MONOPOLIZE ....47

B. WORLD VISION JOINS THE MONOPOLISTIC CONSPIRACY....48

a. Pugh's March 21 Meeting ....50

b. April 21 Reiser Meeting....53

c. The Timing Of The End Of Winter Jam Suggests Meetings....55

d. The Hobson's Choice ....55

e. Hidden Anticompetitive Implications Of Option One....57

f. Option Two Was An Uneconomical Hobson's Choice....58

C. MERCYME JOINS THE CONSPIRACY ....66

a. The August 2024 Contract Created Exclusivity Rights and Matching Rights In Favor Of TCA Precluding LiveCo/TPR and World Vision From Participating in MM's Sponsorships....67

b. MercyMe Defendants, LiveCo/TPR and World Vision Begin Planning A Joint MercyMe/TobyMac Tour ....73

D. THE DEFAMATION DEFENDANTS JOIN THE CONSPIRACY AND THE FARGO FABRICATION IS WEAPONIZED....75

E. THE PRETEXTUAL TERMINATION OF THE AUGUST 2024 CONTRACT RESULTING FROM THE CONSPIRACY ....77

VII. CLAIM FOR RELIEF FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT AND SECTION 7 OF THE CLAYTON ACT (ASSERTED AGAINST DEFENDANTS) ....81

A. CCM TOURING MARKET DEFINED AND ITS COMPONENT PARTS DEFINED....82

a. CCM Artists And Concerts Are Not Interchangeable With Secular Artists And Concerts....84

b. CCM Touring Market Is Not Interchangeable With "One-Off Events" Or Concerts....86

c. The Geographic Market Is Nationwide....87

d. Consolidation of CCM Concert Promoters In The CCM Touring Market....88

i. Period 1 -- From January 1, 2018, until November 15, 2022....90

ii. Period 2-- From November 16, 2022, to November 16, 2023....91

iii. Period 3-- From November 17, 2023, to December 31, 2025 .......... 92

e. Small "Other" Promoters And iTickets .......... 93

f. The TPR Conspiracy Group's Monopoly And Market Power Over CCM Touring Market .......... 96

g. Control of Vertical and Horizontal Essential Inputs .......... 98

B. THE NONPROFIT SPONSORSHIP MARKET AND ITS COMPONENT PARTS DEFINED .......... 99

a. Fundraising In The NPS Market By Means Of Artists' Platforms .......... 99

b. The NPS Market Is Interlinked With The CCM Touring Market And Monopoly/Market Power In The CCM Touring Market Has Ensured Monopoly/Market Power in the NPS Market .......... 100

C. SPECIFIC CLAIMS .......... 104

a. Acquiring The Principal Competing CCM Promoters Transparent, Premier And Rush And Eliminating Their Competition .......... 104

b. Agreeing Not To Submit Competing Offers For Artists During The Earnout Operations .......... 105

c. Acquiring Ticketing And Artist Management And Volunteer Businesses To Restrict Competitive Access .......... 105

d. World Vision and LiveCo/TPR agreeing to stop competing independently for Platforms .......... 106

e. Conditioning Economically Viable Touring On Surrender Of Separately Marketable Platforms .......... 107

f. Requiring artists to reserve their Platforms for the LiveCo and World Vision channel .......... 108

g. Using TCA’s Confidential Pricing To Make The Retained Platform Alternative Uneconomical .......... 108

h. Replacing Independent Buyer Bidding With Coordinated Platform Pricing .......... 109

i. Restricting Production Use So Artists Cannot Perform For Independent Regional Promoters .......... 110

j. Conditioning Ticketing Access On Exclusivity While Using Rival Audience Information To Exclude Promoters .......... 110

k. Using Control Of Nationwide Volunteers To Prevent Independent Sponsorship Operations .......... 111

l. Diverting The Wells And Gokey Platforms Already Committed To TCA; Reiser Conducts A Wells/Gokey Tour While Both Artists Were Under Exclusive Platform Contracts With TCA ................112

m. Preventing Nonprofits Other Than World Vision From Partnering With TCA On LiveCo/TPR Tours ................112

n. Coordinating MercyMe's Termination To Remove TCA's Most Important Competitive Platform ................113

o. Coordinating the Fargo publication and its use to drive artists away from TCA ................114

p. Newsboys Illegally Boycotted ................114

q. Withholding Newsboys' Promotion And Inducing Artists To Abandon TCA ................117

r. Deliberately withholding marketing from scheduled Newsboys' concerts ................118

s. Acquiring And Maintaining Control Of Both The Artist Side And The Audience And Ticket Side ................119

t. Joining The Common Plan To Acquire And Maintain Monopoly Control ................119

D. ANTICOMPETITIVE IMPACT ON COMMERCE AND THE MARKETS ................120

a. Anticompetitive Impact On Competition vis a vis Impact On Artists ................120

b. Anticompetitive Impact On Competition vis a vis Nonprofits ................120

c. Anticompetitive Impact On Competition vis a vis TCA and Plaintiffs ................120

d. Employing Dirty Tricks To Throttle Competition ................123

e. Insurmountable Barriers To Entry Have Been Erected ................123

E. ANTITRUST INJURY ................125

VIII. CLAIM FOR RELIEF FOR VIOLATIONS OF TENN. CODE ANN. §§ 47-25-101&102 [TENNESSEE ANTITRUST ACT] (ASSERTED AGAINST THE WATERLAND DEFENDANTS, WORLD VISION, THE MERCYME DEFENDANTS AND THE BRICKELL PARTIES) ................129

IX. CAUSES OF ACTIONS AND CLAIMS FOR RELIEF ASSERTED AGAINST WATERLAND DEFENDANTS FOR MISAPPROPRIATION OF TRADE SECRETS, BREACHES OF CONTRACTS AND RELATED CLAIMS ................130

A. BACKGROUND FACTS APPLICABLE TO ALL CLAIMS UNDER THESE CAUSES OF ACTON ................130

B. VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ET SEQ ....................135

C. VIOLATION OF THE TENNESSEE UNIFORM TRADE SECRETS ACT, TENN. CODE ANN. § 47-25-1701 ET SEQ ....................140

D. BREACH OF CONFIDENTIALITY AND RESTRICTED USE AGREEMENTS ....................141

E. BREACH OF CONTRACT TO ACQUIRE TCA ....................144

X. CAUSE OF ACTION AND CLAIM FOR RELIEF FOR DEFAMATION, FALSE LIGHT, ETC. ASSERTED AGAINST THE DEFAMATION DEFENDANTS ....................154

A. THE ARTICLE FALSELY ASSERTS NICOLE WAS RAPED BY NEWSBOYS' EMPLOYEE WHEN NICOLE TOLD THE POLICE AND OTHERS HER ENCOUNTER WAS CONSENSUAL - - A FACT THE ARTICLE KNOWINGLY OMITTED ....................155

a. The Article Did Not Disclose Nicole's Statements To Police Of Consensual Sex ....................156

b. Nicole Told The Fargo Hospital And Friends A Combination Of Stories Ranging From Consensual Sex To Amnesia ....................158

B. THE ARTICLE CLAIMS NICOLE MUST HAVE BEEN DRUGGED BASED ON NOTHING OTHER THAN NICOLE'S SELECTIVE, SELF-PROCLAIMED PARTIAL AMNESIA ....................161

C. THE ARTICLES FALSELY CHARACTERIZED TAIT'S JUNE 10, 2025 STATEMENT AS AN "ADMISSION OF GUILT" AND KNOWINGLY MISREPRESENT ITS CONTENTS ....................167

D. THE ARTICLES' CLAIMS THE NEWSBOYS "COVERED UP" NICOLE'S RAPE AND DRUGGING WAS A LITERAL IMPOSSIBILITY SINCE EVERYONE KNEW EVERYTHING ....................168

E. THE FEBRUARY 12, 2026, ARTICLE RESTATED THE ORIGINAL ARTICLE WITH MATERIALLY ALTERED AND EXPANDED DEFAMATIONS ABOUT THE ALLEGED "COVER UP" ALLEGATION IMPLICATING WES CAMPBELL PERSONALLY IN THE MATTERS COVERED BY THE ORIGINAL ARTICLE ....................171

F. DEFAMATION DEFENDANTS ARE RESPONSIBLE FOR EACH SUBSEQUENT REPUBLICATION ....................172

G. PLAINTIFFS HAVE BEEN DAMAGED BY THESE DEFAMATIONS ....................173

XI. CLAIM FOR RELIEF FOR CONSPIRACY AND AIDING AND ABETTING DEFAMATION AGAINST WATERLAND DEFENDANTS ....................174

XII. CLAIM FOR RELIEF FOR VIOLATIONS OF LANHAM ACT ASSERTED AGAINST THE WATERLAND DEFENDANTS AND WORLD VISION ....................176

XIII. CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST MERCYME DEFENDANTS ....182

A. BACKGROUND FACTS RELEVANT TO THE CAUSES OF ACTION AND CLAIMS HEREUNDER ....183

B. BREACH OF CONTRACT CLAIM AND RELATED CLAIMS AGAINST THE MM DEFENDANTS ....186

a. Collins's Resignation Involved An Act Of Moral Turpitude Triggering No Termination Right ....186

b. Collins's Resignation For No Reason Did Not Trigger Right To Terminate ....187

c. MM Parties Did Not Exercise Termination Right In Good Faith ....188

d. Plaintiffs Were Denied Contractual Cure Rights ....188

e. MM Defendants Breached (Ex. 4, p. 10, ¶9(c) of MM Contract ....189

f. MM Defendants Breached MM Contract By Denying Matching Rights ....190

g. MM Defendants Breach Of Duty Of Good Faith ....192

h. Conversion Of Plaintiffs' Property ....193

C. VIOLATION DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ET SEQ ....194

D. DAMAGES ....195

E. UNJUST ENRICHMENT AND IMPOSITION OF CONSTRUCTIVE TRUST AGAINST THE MM DEFENDANTS ....197

F. CLAIM FOR INDEMNITY ....198

G. TORTIOUS INTERFERENCE WITH TCA'S CONTRACT AND BUSINESS RELATIONS WITH CHILDREN INTERNATIONAL ....199

H. TORTIOUS INTERFERENCE WITH COLLINS' CONTRACT ....200

I. CLAIM FOR RELIEF FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF ASSERTED AGAINST MERCYME ....200

J. SUMMARY OF CLAIMS AGAINST THE MM DEFENDANTS ....200

XIV. CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST WATERLAND DEFENDANTS RELATED TO THE MM CONTRACT AND OTHER TORTIOUS ACTS ....202

A. GENERAL ALLEGATIONS APPLICABLE TO THESE CLAIMS ....202

B. CONSPIRACY TO BREACH MM CONTRACT ....203

C. TORTIOUS INTERFERENCE WITH MM CONTRACT ....203

D. TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL AND BUSINESS RELATIONS WITH MM .......................204

E. TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL AND BUSINESS RELATIONS WITH BRANDON LAKE AND OTHERS.......................204

F. BREACH OF FIDUCIARY DUTY .......................205

G. BREACH OF FIDUCIARY DUTY REGARDING CONCERT JOINTLY FEATURING ARTISTS TAUREN WELLS AND DANNY GOKEY WHO WERE UNDER CONTRACT WITH TCA .......................205

H. BREACH OF FIDUCIARY DUTY ARISING OUT OF THE PURCHASE AGREEMENT .......................206

I. TORTIOUS INTERFERENCE WITH WELLS AND GOKEY CONTRACTS.......................207

XV. CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST WORLD VISION RELATED TO THE TCA PURCHASE AGREEMENT AND OTHER TORTIOUS ACTS.......................207

XVI. CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST MICAH TYLER FOR BREACH OF CONTRACT.......................207

A. BACKGROUND FACTS RELEVANT TO THE CLAIMS AGAINST MICAH TYLER .......................210

B. BREACH OF CONTRACT BY MICAH TYLER.......................212

C. CLAIM FOR INDEMNITY AGAINST MICAH TYLER .......................213

D. SUMMARY OF RELIEF SOUGHT AGAINST MICAH TYLER .......................213

XVII. CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST THE BRICKELL PARTIES RELATED TO THE MM CONTRACT AND TYLER CONTRACT .......................213

A. CONSPIRACY TO BREACH MM CONTRACT .......................215

B. TORTIOUS INTERFERENCE WITH MM CONTRACT .......................215

C. TORTIOUS INTERFERENCE WITH THE TYLER CONTRACT.......................216

XVIII. DAMAGES FOR VIOLATIONS OF TENN. CODE ANN. § 48-101-520 IN CONNECTION WITH THE SOLICITATION OF CHARITABLE FUNDS .......................216

XIX. CONSPIRACY (ALL DEFENDANTS).......................217

XX. CONDITIONS PRECEDENT .......................218

XXI. ATTORNEYS FEES .......................218

JURY TRIAL DEMANDED ........................................................................... 219

PRAYER FOR RELIEF ............................................................................ 219

**EXHIBITS**

| Ex. No. | Description |
|---|---|
| 1 | Roys Report June 19, 2025 Article |
| 2 | Dec 16, 2014 Fargo Police Report |
| 3 | Roys Report Feb 12, 2026 Article |
| 4 | MercyMe Aug 1, 2024 Contract |
| 5 | Civil Cover Sheet |
| 9 | LiveCo Trademark/Service Mark Application |
| 10 | TPR. Website excerpt |
| 11 | Text Messages Between Tim Taber and Steve Campbell |
| 17 | TPR. Website excerpt |
| 19 | Pollstar Ticket Prices for Different Periods |
| 20 | Ramada Security Camera images showing Brewer and Nicole entering room |
| 21 | Ramada Security Camera images showing Brewer and Nicole talking with Tait outside room and Nicole jumping onto Brewer |
| 22 | Ramada Security Camera images showing Nicole jumping on Brewer and returning to room |
| 23 | Ramada Security Camera images showing Nicole leaving Brewer's room |
| 24 | Ramada Security Camera images showing Brewer and other talking at elevator after Nicole left |
| 25 | Ramada Security Camera images showing Brewer and others continuing to talk in front of elevator |
| 26 | Text messages between Matt Best and Steve Campbell setting up meeting |
| 27 | More Text messages between Matt Best and Steve Campbell |
| 28 | Text messages between Matt Best and Steve Campbell inviting Tait to meeting |
| 29 | Text message from Matt Best informing Steve that Tait is at the meeting |
| 30 | Text messages from Best telling Steve Campbell where the meeting is |
| 31 | MercyMe Nov 2025 Tour flyer. Presented by TPR. |
| 32 | Announcement of Transparent merging with LiveCo |
| 33 | Dec 19, 2022 Madsen Offer email to Dave Wagner and Wes Campbell |
| 34 | Jan 11, 2023 Madsen internal email re Offer to TCA |
| 35 | Jan 11, 2023 Becker response to Madsen internal email |

36 Jan 31, 2023 Wagner acceptance of offer

Plaintiffs Thriving Children Advocates, LLC ("TCA"), Thriving Charity Advocates, LLC, Wesley Campbell, Newsboys, Inc., and Newsboys Touring, LLC (collectively, "Plaintiffs") file this First Amended Complaint against Waterland Private Equity Investments, B.V.; Waterland Private Equity Aps; Waterland Management Holding IV B.V.; Waterland Management Holding VI B.V.; Waterland Management Holding VII B.V.; Christian Lund Madsen; Nicklas Guldberg; USLive OpCo, Inc. Dba LiveCo And TPR.; USLive, LLC; US Live Holding, LLC; USLive Intermediate HoldCo, Inc.; Brian Becker; TPR Entertainment, LLC; Premier Productions Holdings, LLC; Michael Pugh; Shane Quick; USLive Rush, LLC; Rush Concerts, Ltd; Jacob Reiser; USLive Transparent, LLC; Transparent Productions, LLC; Timothy Taber; The Roys Report NFP; Julie Roys; Jessica Morris; MercyMe, Inc.; Bart Millard; Robin "Robby" Shaffer; Nathan Cochran; Mike Scheuchzer; Scott Brickell; BrickHouse Entertainment, LLC; Micah Begnaud aka Micah Tyler; and World Vision, Inc. (collectively, "Defendants"). Plaintiffs allege as follows:

## ARTICLE I
## INTRODUCTION AND STATEMENT OF THE CASE

1. In this case, Wes Campbell, and the four musicians comprising the Christian musical artists known as the "Newsboys," their families, and the ministries they have dedicated their lives to build, have been destroyed by the actions of the Defendants, including the Defamation Defendants' publication of defamatory articles fueled by competitors with anticompetitive motives. These actions were not isolated, but part of a coordinated scheme involving anticompetitive misconduct, misappropriation of confidential information, contractual breaches, and the dissemination of statements known to be false. And there appears to be no end in sight. The Plaintiffs must thus turn to the courts to set forth the truth in a fair and impartial forum as

opposed to continually battling untrue rumors circulated with impunity by tabloids and competitors.

2. In brief summary of the facts set forth in this Complaint, on June 19, 2025, the Roys Report, a tabloid that proclaims itself to be a "watchdog" over the Christian world, published a false and defamatory article concerning the Plaintiffs, a copy of which is attached as **Exhibit 1**. They published a second, related defamatory article concerning the Plaintiffs on February 12, 2026, a copy of which is attached as **Exhibit 3**. Together they are called the "Articles." The defamatory Articles were written by Defendant Jessica Morris. The publisher and editor in chief of the Roys Report is Julie Roys, who approved their publication (the Roys Report, Julie Roys and Morris are herein sometimes collectively called the "*Defamation Defendants*"). The Articles concerned an event alleged to have happened almost 11 years earlier. The headline of the first defamatory Article read as follows and every word of it was false:

**Woman Accuses Michael Tait of Drugging Her and Watching While She Was Raped; Says Newsboys Tour Manager Covered It Up**

By Jessica Morris

June 19, 2025 8:16 pm CDT 62 Comments



3. The Article spread through the Christian community. It told a devastating but false story. Members of the Christian community reacted to the Article as if the story it told was factual. But this Complaint demonstrates that the story the Article told was not true. Contemporaneous police reports, video evidence from the hotel itself, and the accuser's own prior statements, tell a totally different story -- one that was intentionally hidden from the public. The Article identifies Plaintiff Wes Campbell by name as the owner of the Newsboys, refers throughout to the Newsboys and to "Newsboys management" which includes Wes Campbell, reports a statement from Newsboys management that refers to Plaintiffs Newsboys Inc and Newsboys Touring LLC by name, and reports that the Newsboys organization was conducting its own investigation and intended "to take necessary action against anyone who is currently affiliated with the Newsboys who proves to have been involved."

4. The woman the Defamation Defendants identified in the Articles was given the pseudonym "Nicole". [1] Although the headline and Article repeatedly proclaimed Nicole had been raped, Nicole had told the police in Fargo, North Dakota three short days after the events there, that her encounter with Matt Brewer in Fargo was "**consensual**." In other words, there had been no rape. Further, the evidence conclusively showed the Defamation Defendants knew there had been no rape -- they had the Police Report -- yet printed it any way. The question of why they reported this story when they knew it was false, is in part what this suit will reveal.

5. But in short summary, as this Complaint alleges, the "non-story" of Nicole's consensual liaison in 2014 that had 11 years later morphed into a story of rape, cannot be understood apart from the anticompetitive battle that was going on between on the one hand, Wes

[1] Nicole was the pseudonym used by the Defamation Defendants cloaking the identity of the actual person the Articles were about, and use of that pseudonym will be continued in this Complaint.

Campbell and his companies and on the other Waterland, a Dutch venture capital hedge fund. Solving the mystery starts and ends there.

6. Waterland was the primary antagonist behind the anticompetitive battle in which the defamatory Articles were to play a large part, as were its newly acquired subsidiaries, Transparent Productions, LLC ("Transparent"), Premier Productions Holdings, LLC ("Premier") and Rush Concerts, Ltd. ("Rush"). Transparent, Premier and Rush together promoted almost 80% of the Christian music concerts in America. And when Waterland acquired them in near simultaneous acquisitions through its newly formed holding company called "LiveCo" or "TPR," in one stroke Waterland had acquired almost an 80% market share in the Christian music concert market (the "CCM Touring Market). In short, it had created a monopoly.

7. Artists in the CCM Touring Market are dependent on nonprofit charities who, with the artists' consent, solicit donors during CCM concerts (donors are referred to as "sponsors"). CCM music artists had what the industry calls "Public Platforms." While explained in detail hereafter, that term refers to the general ability of an artist to attract large audiences at faith-based CCM concerts.

8. Nonprofit charities who have used artists' "Public Platforms" to generate donors or "sponsors," have historically paid the artists based on the number of sponsors generated at each concert. Nonprofits would normally pay approximately $200 per sponsor depending on the artist and other factors.

9. Campbell was both the founder of the highly successful Christian music group called the "Newsboys," and also the owner of another company named Thriving Children Advocates, LLC ("Thriving Children" or "TCA"). TCA had an established and profitable track record of acquiring artists' Public Platforms and effectively marketing them to nonprofits for

raising sponsors at CCM concerts but doing so in compliance with the numerous state law reporting requirements imposed on "Professional Solicitors" as defined in Tennessee law.

10. Concert promoters did not participate in those nonprofit payments. Artists would not typically share their sponsorship payments with promoters; and if a promoter tried to force them to do so, artists had several other promoters to whom they could turn.

11. The Waterland and LiveCo Defendants approached Campbell to acquire his company, TCA, in order to make TCA their "nonprofit" sponsorship arm. After the acquisition, with TCA operating as a part of LiveCo, the promoters would finally be able to participate to some degree in sponsorship payments.

12. After signing comprehensive confidentiality agreements, (defined hereafter as Confidentiality and Restricted Use Agreements), TCA disclosed its confidential information as to (i) artists TCA had contracted with, (ii) what those artists were being paid for use of their Public Platform to generate sponsors, (iii) the term of expiration of TCA's agreements, (iv) the revenues TCA made for services to nonprofits in connection with sponsorship generation, and (v) the candid competitive challenges TCA saw in the market place, all of which was disclosed by TCA in the strictest confidence.

13. Realizing TCA's value and the potential for the now-combined promoters to receive some benefit from nonprofit sponsorship payments, the Waterland and LiveCo Defendants offered to purchase TCA for well over $50,000,000, including the promised value of the LiveCo stock Plaintiffs would purchase. TCA accepted that offer.

14. A few days later, however, the Waterland and LiveCo Defendants told TCA they needed to postpone closing to allow them to raise more capital. That was not true. In truth they realized that they had actually formed a monopoly of America's top concert promoters with control

of over 80% of the domestic CCM touring market. With this newly created monopoly they now had collective power none of them had had before. They realized they could now dictate the terms on which CCM Touring occurred. And as a result of that control, they realized they had created a new "Platform" of their own which they could now market to nonprofits for sponsorship payments that would come directly to them, bypassing the artists. If artists did not like it, the artists had nowhere else to go. The monopoly they had created had turned the tables.

15. As certain of the Waterland and LiveCo Defendants would later admit to TCA, they had struck a secret deal with World Vision, the world's largest charity, who had agreed to pay the Waterland and LiveCo Defendants an astounding $500 (or more) for each sponsorship generated at concerts promoted by the Waterland and LiveCo Defendants, in exchange for exclusive or near exclusive rights.

16. To put that number into perspective, applying it to a mega group with a large Platform like MercyMe ("MM") -- a group then under contract with TCA --- is instructive. Such a group may have 60 concerts a year, with average attendance at around 4000 people per concert or 240,000 total annual concert attendees. If 6% of those attendees, or 14,400 people, became donors, with payments to the Waterland and LiveCo Defendants at $500 per donor, the annual payment the Waterland and LiveCo Defendants would receive would be $7,200,000. And that was just for one artist for one year. With Waterland and LiveCo Defendants promoting as many as 1000 concerts and selling as many as 2,000,000 tickets a year, as their website boasts, revenue from their annual ticket sales would be around $80,000,000. But a payment of $500 per sponsorship would add for Waterland and LiveCo Defendants an additional $60,000,000 annually to their top line -- almost a 75% increase in revenue at little to no extra expense.

17. While sponsorship money would have previously gone to artists, the monopoly power to control over 80% of the concerts allowed Waterland to not only now itself receive those payments but to receive them at a massive premium. The ability to charge a premium was tied to Waterland's control of the CCM concert market -- its monopoly. Without that control, lower amounts would have been paid, and they would have been paid to Christian artists.

18. Behind this paradigm shift in how the market worked, was World Vision who had made the offer to the Waterland and LiveCo Defendants and had thus become their horizontal partner and co-conspirator.

19. The Waterland and LiveCo Defendants now had the monopoly control, TCA's confidential information, and the financial backing of the largest nonprofit charity in the world, World Vision commitment by the largest nonprofit charity in the world, World Vision, to purchase from them the sponsorship rights to the concerts they promoted. At that point, TCA was no longer needed. Instead, the Waterland and LiveCo Defendants decided to use their monopoly, TCA's information and their partnership with World Vision, to begin to destroy the current business model and industry expectations which held that Platforms and sponsorship payments belonged to the artists, and to replace that with a new paradigm, which was that Platforms and sponsorship payments belonged to the promoter who held the power to decide if an artist toured or didn't and the terms on which they would be compensated.

20. That effort to re-write the current business model and re-shape industry expectations reached its zenith in August 2024. The Waterland and LiveCo Defendants knew that one of TCA's biggest contracted artists was the mega music group MercyMe whose contract with TCA was then up for renewal. From the confidential information TCA had given them, the Waterland and LiveCo Defendants knew the precise contours of MercyMe's sponsorship

compensation structure. The Waterland and LiveCo Defendants and World Vision thus approached MercyMe with an offer to pay for some of MM's production costs that MercyMe would otherwise have to pay themselves, but only if MM would forgo sponsorship payments from TCA. The amounts offered to MercyMe were intended to replace the sponsorship money TCA had offered and TCA would likely offer again, but the key was to modify MM's thinking so they would no longer think in terms of dollars per sponsor.

21. MercyMe's agent, Scott Brickell, took to TCA the Waterland and LiveCo Defendants' offer of significant production cost payments in exchange for a waiver of sponsorship money. TCA then translated that into a new per sponsorship payment, which MM agreed to. MercyMe then told the Waterland and LiveCo Defendants that MM was opting to re-sign with TCA, keeping its model of sponsorship revenue intact. This was a major competitive blow for the Waterland and LiveCo Defendants and World Vision.

22. Together, Waterland and LiveCo Defendants and World Vision thus realized that even with (i) TCA's plans and models acquired under strict confidentiality (ii) the financial backing of Waterland as a private equity firm and (iii) the financial backing of World Vision, the world's largest charity, Campbell, TCA, and the Newsboys, would still be an irritant to them in the competitive marketplace frustrating their ability to maximize the potential of their monopoly.

23. This led them to the realization they had to permanently remove Campbell, TCA and the Newsboys from the competitive markets. And to accomplish this, they began to search for any weapon they could find to destroy Campbell. This, in turn, led them to Nicole, who is believed to have surfaced via one of the bands Transparent promoted. They found her shortly after they lost their contracting possibility regarding MercyMe and by October 2024, Nicole was

conveniently working for them as a fulltime employee. Her consensual liaison in 2014 with Matt Brewer, thereafter, became in 2024 a false tale of drugging, rape, and coverup.

24. As a new employee, Nicole repeatedly met with the Defamation Defendants, with the full knowledge and blessing of the LiveCo/TPR Defendants, her employer, as was their plan. Other personnel of the Waterland and LiveCo Defendants, or close associates, also met with the Defamation Defendants, as arranged, encouraged and abetted by the Waterland and LiveCo Defendants.

25. A "whispering" campaign was initiated by the Waterland and LiveCo Defendants, telling parties looking to work with the Newsboys and/or TCA that there was a "devastating" article coming out. Prospective counterparties were told that when the defamatory Article did come out, Campbell and his companies would be pariahs, and anyone publicly associated with them would suffer as well. This resulted in a loss of business clients and customers from TCA and an effective boycott of the Newsboys music group, as they intended. This was not merely reputational harm, but exclusionary conduct that foreclosed Plaintiffs' ability to compete, restricted output, and impaired access to customers and essential commercial opportunities in the CCM Touring and Nonprofit Sponsorship Markets, as hereafter identified.

26. But it was also a constructed falsehood. What actually happened in that Ramada Inn in Fargo, North Dakota 11 years earlier, was far different than the story the defamatory Article, assiduously instigated by the Waterland and LiveCo Defendants, portrayed.

27. In reality, on December 16, 2014, in Fargo North Dakota, Nicole, a single woman, was captured by hotel video freely walking down hotel corridors to the hotel room of Matt Brewer, a single man who was an independent contractor lighting technician doing contract work for the Newsboys on their tour. It was after 1 a.m. In Brewer's room, Nicole and Brewer had ***consensual***

sexual interactions for approximately 30-45 minutes until shortly after 2 a.m., when she left and returned to her own hotel room.

28. For the brief time she was in Brewer's room, Nicole was apparently not answering her cell phone although hotel video footage showed her texting. Apparently, however, she had missed calls from her friends. Later, on the morning of December 16, after the brief tryst with Brewer, when Nicole's Christian friends, co-workers and employer asked her where she had been, she found herself deeply embarrassed and told them that she could not remember what had happened.

29. Because she claimed "amnesia," her employer drove her to a hospital in Fargo that very morning -- i.e., December 16. At the hospital that morning, Nicole made no claim she had been raped and refused to allow the hospital to do any testing that would have established or refuted any claims of having been drugged or raped. In fact, had she even insinuated she had been raped the hospital would have been required by law to contact the police and they did not. N.D.C.C. § 43-17.41 (mandating that medical personnel report sexual assault as soon as is practicable).

30. Her former employer who drove her to the hospital, Matt Best, the tour promoter/manager, would later deny he ever told anyone there had been a rape. In the aftermath, Best, in fact interviewed virtually everyone, including Newsboys Touring Manager Steve Campbell, and Nicole as well. Best, Steve Campbell, and Michael Tait also met together with the tour owner, Evangelist Nick Hall. The result of these meetings was that Nicole was terminated by her employer and sent home while the tour continued with Brewer staying on in his role as an independent lighting contractor. Sending Nicole home and continuing with Brewer, while harsh, was perhaps in keeping with punishment for consensual sex perceived as unbecoming in a Christian concert context, but it was not punishment for being a rape victim.

31. At home in Minnesota, Nicole was again confronted with the embarrassment of explaining to family/friends why she had been terminated and therefore again said she could not remember what had happened. In Minnesota, her family/friends, presumably, then made her go back to a hospital, the date now being December 19, three days after her voluntary sexual encounter with Brewer. Having gone to the hospital in Fargo the day of the incident (December 16), there would be no reason to go again three days later (December 19) unless she was forced by her family/friends.

### A. NICOLE TOLD FARGO POLICE THE ENCOUNTER WAS CONSENSUAL.

32. At the second hospital in Minnesota, Nicole told the hospital attendants she could not recall what happened, but someone appears to have mentioned the possibility of rape. Thus, the Minnesota hospital then called the Minnesota police as they were required to do by law, who then called the Fargo Police. The Fargo Police having now been notified, interviewed Nicole to take her "statement," which she gave under penalty of committing a crime if she made a false statement or reported a crime falsely. N.D. Cent. Code § 12.1-11-03.

33. In that interview with Fargo Police that occurred three days after the incident, Nicole repeatedly told the Fargo police that her encounter with Brewer had been **consensual**, the Fargo Police writing precisely what Nicole told them in their official Police Report:

> "*She does, agree, though that any interaction that she would have had with Matt* ***would have been consensual****...*" (Ex. 2, p. 5)

*****

> "*Matthew Best is not the same person as who [Nicole] was* ***having consensual relations with***." (Ex. 2, p. 6)

Thus, Nicole's own statements to the Fargo Police in 2014, three days after the incident, established there was no rape. Yet, while the Defamation Defendants had the very police report that so stated, the Article mentions none of this and instead proclaims that Nicole was victimized.

### B. Nicole Was Not Drugged.

34. The defamatory Article also falsely proclaimed she had been drugged, not because of any testing of her blood or urine (which she refused) or because anyone witnessed a drug being put in a drink. Rather, the allegation of drugging was made because before Nicole went to Brewer's room, she was in a bar in the hotel's lobby, where Michael Tait, then lead singer for the music group Newsboys music group, also happened to be. According to the Article, Tait ordered three tequila shots at the bar, one for himself and one for a co-worker named John Burch who was standing beside Tait at the bar. The Article then claims Tait "shouted" to Nicole to come join him and Burch for the third shot. Brewer was nowhere around.

35. The defamatory Articles essentially claimed Tait <u>*must have*</u> put some kind of date rape drug into one of the three tequila shots; a statement made with no evidence or support other than Nicole's self-proclaimed amnesia. It was not true. An independent observer, John Burch, was literally standing right beside Tait when the three shots were poured by the bartender and affirmatively confirmed nothing was put into those shot glasses, but the tequila poured by the bartender. Neither did the bartender see anything put in by anyone. Yet the Defamation Defendants did not make any attempt to speak to Burch or the bartender and neither did they disclose any of these facts.

36. Furthermore, the Fargo Police wrote in their official report, that Nicole had not been given any "date rape" drug, based in part on their own investigation, including their viewing of the hotel video footage after which the Fargo Police wrote in their report repeatedly:

> "*there is no indication of her being drugged in any way for this to have happened*"; (Ex. 2, p. 5)
>
> ***
>
> "[there was no] *indication that she had been given a date rape drug which would have incapacitated her*." (Ex. 2, p. 6)

And again, although the Defamation Defendants knew this because they had the Police Report, the Police Departments' own expert opinion was not disclosed in the defamatory Articles either. In further contradiction of the assertion, she had been given a "date rape" drug and raped, the Police Report stated that Nicole herself told the police she *"remembers 'Matt' trying to have sex with her and giving 'Matt' oral sex..."* (Ex. 2, p. 3). The defamatory Articles distort this by stating Nicole said all she remembered was "the feeling of my head being pushed down between someone's legs. I... guess oral sex, or an attempt, but I don't fully remember," which is starkly inconsistent with Nicole telling the Police she remembered giving Brewer oral sex.

37. Apart from that glaring inconsistency, had she been given a "date rape" drug, according to medical science, she would not have selectively remembered "giving Matt oral sex," as the Fargo Police Report states she told them. A person incapacitated by such a drug does not have "selective recall" and having "selective recall" is materially inconsistent with the effects of an incapacitating substance as alleged in the Articles. As a practical matter, neither would Nicole have remained in a room if she did suddenly awaken to find herself somehow "involuntarily" or unconsciously giving a stranger fellatio.

38. The Article perversely concluded Nicole *must have been* "drugged" because she proclaimed to them in 2025 that she had no attraction to Brewer and thus would not have been involved with him otherwise. It was a preposterous, baseless assertion but the Articles made it anyway.

### C. THERE WAS NO COVER-UP AS THERE WAS NOTHING TO COVER UP.

39. Neither was there any "cover-up," as there was nothing to be covered up. To the contrary, afterwards Nicole had talked to her friends, her employer, and evangelist Nick Hall who was the tour owner for whom Best worked. She had been to two different hospitals where she had

spoken with doctors and nurses in both and talked extensively to the Fargo Police. Multiple independent parties had direct knowledge of and involvement in the events. And none of that was within Plaintiffs' control.

40. But the real question was why a 2014 consensual liaison in Fargo, North Dakota between two consenting adults that lasted 30-45 minutes, was suddenly surfacing in 2025 and being morphed into a charge of drugging, rape, and cover-up, shortly after Nicole went to work for the Waterland and LiveCo Defendants. And as stated above, the answer is that the fabricated story was formed, facilitated and fomented, to destroy Campbell and his companies as a competitor, seize his business for themselves and thereby further consolidate and maintain their monopoly power.

41. And as will be demonstrated, when the defamatory Article came out in June 2025, it proved pivotal in the Waterland and LiveCo Defendants' efforts to convince MercyMe to terminate their August 2024 contract with TCA -- the very contract TCA had bested them to get -- and work with LiveCo/TPR. This Complaint addresses these facts and related causes of action arising from Defendants coordinated scheme.

## ARTICLE II
## PARTIES

### A. PLAINTIFFS

42. Plaintiff Thriving Children Advocates, LLC ("TCA") is a limited liability company organized under the laws of Tennessee, whose sole member is Thriving Charity Advocates, LLC.

43. Plaintiff Thriving Charity Advocates, LLC ("Thriving Charity") is a limited liability company organized under the laws of the US Virgin Islands. Its sole member is a US

Virgin Island trust and the residence of its trustees, one of whom is Wes Campbell, is: Tennessee and the US Virgin Islands.

44. Plaintiff Wes Campbell, the founder of the Newsboys and Thriving Children Advocates, LLC, is an individual who resides in Tennessee.

45. Plaintiff Newsboys, Inc. is a Tennessee corporation.

46. Plaintiff Newsboys Touring, LLC is a Tennessee limited liability company whose members are one individual who resides in Tennessee and a trust whose trustees are Tennessee residents. [2]

## B. DEFENDANTS

### *a.* ***The Waterland Defendants***

47. Waterland Private Equity Investments, B.V. ("Waterland PEI") is a private equity firm and has been served with process and appeared in the case.

48. Waterland Private Equity ApS ("Waterland PE") is a private equity firm and has been served with process and appeared in the case.

[2] Plaintiffs Newsboys, Inc. and Newsboys Touring, LLC, while separate legal entities formed for liability and operational purposes, function as a single, integrated economic enterprise in the marketplace. Newsboys, Inc. is wholly owned by Plaintiff Wes Campbell. Newsboys Touring, LLC is owned by Plaintiff Wesley Campbell and a trust, the trustees of which are Campbell and his wife. Both entities operate under the common direction and control of Campbell and function in a coordinated and interdependent manner as the musical group known commercially as the "Newsboys." Newsboys Touring, LLC conducts nationwide concert tours, generating live performance revenue and public exposure, while Newsboys, Inc. owns and exploits intellectual property rights in sound recordings, compositions, and related licensing, including those generated from live performances. These functions are economically inseparable: touring activity drives fan engagement, brand visibility, and demand for recorded music, while the popularity of recorded music drives ticket sales, sponsorship opportunities, and touring demand. Together, they comprise a unified commercial platform through which the Newsboys compete in the Contemporary Christian Music marketplace and will be referred to hereafter jointly as "Newsboys."

49. Waterland Management Holding IV B.V., is a private equity firm presumed to be organized under the law of The Netherlands. Waterland Management Holding IV B.V may be served pursuant to FRCP 4(h)(2) and 4(f), including through the Hague Service Convention, or by such other means as the Court may direct, including alternative service under Rule 4(f)(3).

50. Waterland Management Holding VI B.V., is a private equity firm presumed to be organized under the law of The Netherlands. Waterland Management Holding VI B.V may be served pursuant to FRCP 4(h)(2) and 4(f), including through the Hague Service Convention, or by such other means as the Court may direct, including alternative service under Rule 4(f)(3).

51. Waterland Management Holding VII B.V., is a private equity firm presumed to be organized under the law of The Netherlands. Waterland Management Holding VII B.V may be served pursuant to FRCP 4(h)(2) and 4(f), including through the Hague Service Convention, or by such other means as the Court may direct, including alternative service under Rule 4(f)(3).

52. Christian Lund Madsen ("Madsen") is an individual and an executive with Waterland PEI and Waterland PE and has been served with process and appeared in the case.

53. Nicklas Guldberg ("Guldberg”) is an individual and an executive with Waterland PEI and Waterland PE and has been served with process and appeared in the case.

***b. <u>The LiveCo Defendants</u>***

54. USLive OpCo, Inc., is a Delaware corporation and has been served with process and appeared in the case.

55. USLive, LLC is a Delaware limited liability company and has been served with process and appeared in the case.

56. USLive Holding, LLC is a Delaware limited liability company and has been served with process and appeared in the case.

57. USLive Intermediate HoldCo, Inc. is a Delaware corporation and has been served with process and appeared in the case.

58. Brian Becker is an individual and has been served with process and appeared in the case.

59. TPR Entertainment, LLC is a Delaware limited liability company and has been served with process and appeared in the case.

60. Premier Productions Holdings, LLC is a South Carolina corporation and has been served with process and appeared in the case.

61. Michael Pugh is an individual who has been served with process and appeared in the case.

62. Shane Quick is an individual who has been served with process and appeared in the case.

63. USLive Rush, LLC is a Delaware limited liability company and has been served with process and appeared in the case.

64. Rush Concerts, Ltd. is an Ohio limited liability company and has been served with process and appeared in the case.

65. Jacob Reiser is an individual who has been served with process and appeared in the case.

66. USLive Transparent, LLC is a Delaware limited liability company and has been served with process and appeared in the case.

67. Transparent Productions, LLC is a California limited liability company and has been served with process and appeared in the case.

68. Timothy Taber is an individual who has been served with process and appeared in the case.

69. The entities and individuals identified in ¶¶47-53 are referred to as the "Waterland Defendants."

70. The entities and individuals identified in ¶¶54-68 are referred to as the “LiveCo/TPR Defendants.” In 2024, the faith-based concert promotion operations of Transparent, Premier, and Rush were announced to have consolidated or merged into a single entity or division, which they publicly refer to as "TPR." The entity referred to as TPR Entertainment, LLC may be the entity that resulted from that merger. Third-party industry sources, including Pollstar, report that the Waterland and LiveCo Defendants’ concert promotion activity discussed hereafter has been self-reported by them as having been conducted under the designations "USLive" and "USLive/TPR." Therefore, referring to them as a unified group makes for easier digestion of this Complaint, and it is accurate.

***c. The Defamation Defendants***

71. The Roys Report NFP is an entity incorporated as a non-profit organization under the laws of the state of Illinois and has been served with process and appeared in the case.

72. Julie Roys is the founder and editor in chief of The Roys Report and publisher of the defamatory Articles identified herein. She has been served with process and appeared in the case.

73. Jessica Morris is a journalist for The Roys Report who on information and belief resides in Melbourne, Australia. She has been served with process and appeared in the case.

74. The Roys Report, Julie Roys and Morris are herein sometimes collectively referred to as the "Defamation Defendants."

***d. The MercyMe Defendants***

75. MercyMe, Inc. is a Texas corporation which has been served with process and appeared in the case.

76. Bart Millard is an individual who has been served with process and appeared in the case.

77. Robin "Robby" Shaffer is an individual who has been served with process and appeared in the case.

78. Nathan Cochran is an individual who has been served with process and appeared in the case.

79. Mike Scheuchzer is an individual who has been served with process and appeared in the case.

***e. The Other Defendants Including World Vision, Inc.***

80. World Vision, Inc. is a California nonprofit who has been served with process and appeared in the case.

81. Scott Brickell is an individual who has been served with process and appeared in the case.

82. BrickHouse Entertainment, LLC, is a Tennessee limited liability company who has been served with process and appeared in the case.

## ARTICLE III
## JURISDICTION AND VENUE

83. This Court has subject matter jurisdiction over the claims asserted against the Waterland and LiveCo Defendants, World Vision, the MercyMe Defendants, Scott Brickell and BrickHouse Entertainment, LLC, pursuant to 28 U.S.C. §1331 because Plaintiffs assert claims

against the Waterland and LiveCo Defendants, World Vision and the MercyMe Defendants, arising under the laws of the United States, including (a) Sections 1 and 2 of the Sherman Act [15 U.S.C. § 1 & 2]; and (b) Section 7 of the Clayton Act [15 U.S.C. § 18]. Plaintiffs assert claims against them arising under the Sherman Act and the Clayton Act based on their participation in the anticompetitive scheme and conspiracy alleged herein.

84. This Court has subject matter jurisdiction over the claims asserted against the Waterland and LiveCo Defendants, World Vision and the MercyMe Defendants pursuant to 28 U.S.C. §1331 because Plaintiffs assert claims against the Waterland and LiveCo Defendants, World Vision and the MercyMe Defendants, arising under the Federal Defend Trade Secrets Act, 18 U.S.C. §1836.

85. This Court has subject matter jurisdiction over the claims asserted against the Waterland and LiveCo Defendants, and World Vision pursuant to Section 43(a) of the Lanham Act [15 U.S.C.

§ 1051 et seq.].

86. This Court also has subject matter jurisdiction over the claims asserted against the Defamation Defendants, World Vision and Micah Tyler pursuant to 28 U.S.C. §1332 because the claims asserted against them by Plaintiffs are claims arising between citizens of different States and/or foreign states, and the amount in controversy exceeds $75,000, exclusive of interest and costs

87. This Court has supplemental jurisdiction over Plaintiffs' related state-law claims pursuant to 28 U.S.C. §1367(a), and Scott Brickell and BrickHouse Entertainment LLC because claims against those parties form part of the same case or controversy as Plaintiffs' federal claims, and arise from the same common nucleus of operative fact as Plaintiffs' federal antitrust and other

federal claims, including the coordinated course of conduct described in Section IV.M, through which the Waterland and LiveCo Defendants and others sought to impair Plaintiffs' business relationships, damage its reputation, and eliminate it as a competitive force in the relevant markets.

88. The claims asserted against the MercyMe Defendants likewise arise from the same series of transactions and occurrences as Plaintiffs' federal claims. As alleged herein, among other reasons, the termination of MercyMe's contractual relationship with Plaintiff TCA was induced and coordinated in connection with the same course of conduct through which the Waterland and LiveCo Defendants and sought to eliminate Plaintiff TCA as a competitor.

89. All claims asserted in this action involve overlapping parties, witnesses, communications, and documentary evidence, and will require resolution of common factual issues concerning Defendants' conduct, intent, and its effects on Plaintiffs' business. The exercise of supplemental jurisdiction will therefore promote judicial economy, convenience, and the consistent resolution of these claims in a single proceeding.

90. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (re because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

91. Venue is further proper in this District pursuant to 28 U.S.C. §1391(c) and (d) because the Defendants have engaged in substantial, continuous, and systematic business within this District.

92. Upon information and belief, each Defendant has committed acts in furtherance of the conduct alleged herein that were directed at, or had foreseeable effects within, this District, and has availed itself of the privilege of conducting business in this District such that the exercise of personal jurisdiction is proper.

## ARTICLE IV

## BACKGROUND FACTS OF THE CHRISTIAN CONCERT MARKET AND KEY PLAYERS.

93. Assertions are made in this Article IV that are elaborated on in the Causes of Action that follow particularly Article V which sets forth the Antitrust claims asserted. To make sense of this case and in particular to evaluate the antitrust claims, some basic industry terminology and business arrangements in the relevant markets are necessary.

### A. CONTEMPORARY CHRISTIAN MUSIC.

94. The matters herein addressed concern the concert market for Contemporary Christian music ("CCM"). As explained and refined more fully hereafter, the business of promoting, booking, marketing, and staging live CCM musical performances in a series of live concert series constitutes the "CCM Touring Market."

95. CCM is a universally recognized, commercially distinct genre of popular music. It is characterized by overtly Christian theological and lyrical themes overlaid onto mainstream popular musical structures (including pop, rock, hip-hop, and country). The genre is formally codified as a separate, distinct market by major music industry institutions. For example, the Recording Academy maintains separate Grammy Award fields for CCM (e.g., Best Contemporary Christian Music Album), completely independent from its Secular and Black/Traditional Gospel fields. Similarly, industry authority Billboard maintains dedicated, independent data-tracking frameworks—including the Top Christian Albums and Hot Christian Songs charts—which track the unique commercial performance of CCM artists based on their message-driven content rather than a singular musical style.

96. Within the live entertainment industry, a "CCM Tour" is a commercially promoted, series of live CCM performances by one or more performing artists whose music is generally

tracked on the industry-standard CCM charts. CCM Tours target multi-generational family units, young adults and youth, bound together by an identical commercial infrastructure involving primarily shared Christian faith and faith values. CCM Touring performances occur at multiple pre-selected venues in multiple cities or states, pursuant to a published route or date list multi-city live concert series headlined.

97. Operationally, a CCM Tour relies on a unique business model that separates it from standard secular touring. This includes: (a) a reliance on specialized, faith-based national radio networks (such as K-LOVE and Air1) for primary tour marketing and promotion; (b) a distinct institutional distribution channel where a substantial portion of ticket inventory is sold via bulk "block-booking" directly to church ministries and youth groups; and (c) a specialized routing footprint that frequently combines traditional commercial arenas with regional mega-church facilities.

98. CCM tours are vastly different from One-Off performances of CCM music (also called "CCM One-Off events,") with CCM One-Off events being CCM performances typically in a single hosted venue that occur on a stand-alone basis not as a part of an extended national tour. As such, CCM Touring concerts are not interchangeable with "CCM One-Off events."

99. Live CCM Touring concerts are the primary source of revenue for CCM artists in the CMM music industry, having replaced album sales which were replaced by digital downloads and music streaming.

100. Also as explained more fully hereafter, the CCM Touring market is not a subset of, or interchangeable with, the broader live secular music industry or concert tours of secular musicians but instead constitutes a fundamentally distinct commercial and cultural ecosystem as

virtually everything about secular concerts differs from CCM concerts including venues played, audiences and performances.

101. The commercial transaction underlying a CCM Tour is straightforward involving: (a) performing CCM artists who supply performances, and (b) promoters, who compete with one another to acquire, promote and present those performances of CCM artists and thereafter sell admission to the resulting CCM concerts to audiences who share the faith-based values of the CCM performing artists.

### B. CCM PERFORMING ARTISTS.

102. Artists perform live at each live CCM concert on a CCM Tour, and preparing for, travelling to and conducting live performances on a CCM Tour requires a significant expenditure of time, energy, skill, financial resources, and physical exertion from the CCM artist. CCM artists almost always have an accompanying retinue (instruments and vocals) that perform with them. Behind the scenes at each CCM performance is a coterie of necessary supporting equipment and services (collectively, "Production Services"), including sound and audio equipment, lighting and lighting rigs, staging and related equipment, video equipment, pyrotechnics and visual effects, and other staging effects. Production Services also include the necessary personnel, such as technical personnel, production and stage management personnel, makeup artists, costume designers, sound technicians, stagehands, and road crew, as well as the transportation necessary to move the production from venue to venue. They further include rehearsals and pre-tour lighting and video programming and editing, and other similar matters, which can take multiple weeks to perform and are quite expensive. The quality of these components of Production Services often distinguishes one CCM artists' performance from others. Each performing CCM artist is expected to pay for their own Production Services.

### C. **CCM PROMOTERS.**

103. CCM concert promoters are selected by the CCM artists or their representatives. Economically, CCM promoters purchaser CCM artists' anticipated tour concert performances. Operationally, once anticipated CCM performances are acquired, with artists' input, CCM promoters: prepare a plan identifying multiple pre-selected venues in multiple cities or states across different markets; a list of the route of performance dates which include scheduled performances within a defined tour window; generate a tour name for branding; and generate accompanying marketing artwork and other marketing materials. CCM Tour planning usually occurs several months in advance of a CCM Tour. The CCM promoter advertises and markets in each anticipated venue to ensure maximum audience attendance focusing on faith-based audiences.

104. Historically the CCM promoters bore location-specific expenses such as marketing, security costs, stagehand and other labor expenses, local catering costs and similar location-specific expenses. Performing CCM artists in the CCM Touring Market have historically been paid a "Performance Fee" (or Performance Guarantee) by CCM concert promoters, for each concert performance on a tour, from which artists paid their production costs. CCM artists' production costs are paid from advanced performance fees and without a significant Performance Fee, CCM artists have been unable to perform.

105. On the expense side, all amounts incurred by CCM promoters including, CCM artists' Performance Fees, are sometimes called "Show Costs" or "Pot Costs." On the revenue side, CCM promoters contract with a ticketing agency to sell tickets for the performances, the net revenues from which go into the "Pot" as "Show Revenues" or "Pot Revenues," from which promoters are reimbursed their Show Costs first.

106. While negotiable, Pot Costs and Revenues are sometimes kept on a concert-by-concert basis, meaning revenues from profitable concerts did not make up for concerts that lost money.

107. Once a CCM concert has concluded, Show Costs and Show Revenues are tabulated with distributions going first to the Promoter to repay Show Expenses and remaining balances have been split (the "***Back End Payment***") typically 85% for the artist and 15% for the promoter, although this was heavily negotiated as well. If Pot Revenues do not equal Show Costs the CCM promoter bears the loss, particularly since CCM Artist's Performance Fees in the Pot are guaranteed

108. Competition among CCM promoters has historically been intense. CCM promoters competitively bid against one another for CCM artists and CCM Tours.

109. That competition occurred on the buyer side of the CCM Touring Market with multiple promoters competing to acquire the same artists' tour concert performances by offering competing (a) Performance Fees, (b) backend percentages, (c) production arrangements and (d) other economic terms. If one CCM promoter offered unsatisfactory terms, other promoters were waiting to step in. On the seller side, CCM Promoters competed with one another for audiences as generally each market could only withstand so many CCM concerts within a given period of time before market saturation.

110. At all times before November 16, 2022, there were three primary promoters who controlled the vast majority of the CCM Touring Market: Transparent Productions, LLC, owned by Defendant Tim Taber ("Taber"); Premier Productions, LLC (previously "Premier") whose partner and CEO was Michael Pugh ("Pugh") and Rush Concerts, LLC ("Rush"), owned and operated by Jacob Reiser ("Reiser"). As will be demonstrated, these three promoters would all be

acquired in a series of related transactions, for the express purpose of monopolizing the CCM Touring Market and the related NPS Market.

111. Once joined, Transparent, Premier and Rush would initially operate under the general trade name LiveCo and later TPR (herein sometimes referred to as "LiveCo/TPR").

### D. NON-PROFIT CHARITIES

112. Because Nonprofit charities rely on public contributions from donors, accessing CCM artists' Public Platforms in a CCM concert is an ideal place for Nonprofits to source new donors particularly for child-focused charitable ministries. This is where Nonprofit charities ("*Nonprofits*") have played a crucial role in the economics of the CCM Touring Market establishing a second, related and dependent market herein called the NPS Market.

113. In fact, as Defendant Pugh, one of the founding members of the CCM promoter called Premier and also a founding member of the monopolist LiveCo/TPR acknowledged to Plaintiffs at a meeting in March 2023, Nonprofits and the payments they make "is part of the core business of our concerts..." Pugh went on to say that "this one piece determines our entire space" and that the CCM Touring Market would not be possible without the input and support from Nonprofit charities who participate in the separate but intricately tied NPS Market that functions symbiotically with the CCM Touring Market.

114. The CCM Touring Market and the NPS Market are economically interdependent because nonprofit fundraising occurs at CCM concerts and the CCM Touring Market could not exist without the NPS Market. This is not the case at secular concerts or any other entertainment performances and is another reason the CCM Touring Market is generally acknowledged to be a unique market all unto itself.

115. The mechanics of how Nonprofits make the CCM Touring Market possible are well established. A CCM artists' "**Public Platform**" is an important industry term that refers to an intangible feature of "goodwill" that translates into the commercially exploitable ability of a CCM artist to attract, assemble, and engage a live audience. It encompasses the ability to capture and direct audiences' time, attention, and trust, and then utilize it or allow its use, directly or indirectly, including for promotion, sponsorship, or other monetized engagement. This Public Platform has historically been referred to as the artist's Public Platform because, as a practical matter, it was created and controlled by the artist irrespective of performance venue or promoter.

116. At CCM concerts using performing artists' Platform the Nonprofit itself or through a spokesman, will make a presentation on stage at an intermission during a CCM Tour concert, presentations ranging in sophistication and elaborateness depending on a number of factors including the size of the audience. A spokesperson ("***Spokesperson***") makes a presentation about the nonprofit and the object of the nonprofit which is usually asking the audience to become Sponsors. "***Volunteers***" distribute financial support pledge cards and sit at tables in a foyer with information. It has normally been the nonprofit's responsibility to provide a Spokesperson and Volunteers at every concert, which is a particularly onerous task for which most nonprofits were not well suited.

117. During these presentations, Nonprofits generally seek to generate "confirmed sponsors," defined by contract to mean a donor who has (a) completed the Nonprofit's forms, (b) indicated a monthly pledged amount, usually around $39 and (c) made their first monthly gift donation by cash, check or credit card and such payment has cleared. And Nonprofits have paid handsomely to access those CCM Artists' Platforms to solicit donors at CCM Touring concerts.

118. Spokesmen for Nonprofits represent that a new sponsor or donor's money will be the cost the charity incurs in supporting a particular child which can be pooled with other donor funds, to provide tangible goods and benefits to children and their communities, including food and nutritional supplies, clean water, healthcare and medical services, educational materials and schooling, and other physical necessities, as well as child-protection and community programs. The sponsorship donation sought at a CCM Touring concert is personalized through a picture of an identified child, photographs, letters, progress reports, and other tangible materials connecting a particular child with a sponsor/donor generated at a CCM Touring concert.

119. Although cancellable, these sponsorships are recurring monthly commitments that can have substantial lifetime value. The economic value of acquiring a new sponsor therefore is not limited to the initial $39 payment but includes the expected stream of recurring monthly donations used, in substantial part, to provide these tangible goods and benefits. Most nonprofits have run studies showing that a donor who actually makes their first monthly donation, will continue to do so for many years. Thus, economically to a Nonprofit the $39 monthly donation is the acquisition of an income stream projected to last many years. As an example, a monthly donation of $40 if continued for 10 years (or 120 months) means contributions totaling $4000. This recurring value explains why a nonprofit would economically pay hundreds of dollars to acquire a new sponsor.

120. Promoters such as Transparent, Premier and Rush and later TPR, competed with each other to acquire artist Platforms as part of their concert transactions, then negotiated their sale to Nonprofits concerning the amount the Nonprofit would pay for access to Platforms associated with particular tours or concerts. Defendant Pugh told Plaintiffs at a meeting in March 2023 that Premier, for example, would routinely seek out and negotiate with Nonprofits for Artists'

Platforms. In some instances, these promoters shared the proceeds of Platform sales with artists placing those revenues into the tour Pot and sometimes the promoter retained all of nonprofit's Platform payments with no artist sharing.

121. Nonprofits, such as World Vision, were also direct purchasers of the same artist Platforms. During the relevant period before early 2023 many Nonprofits set up their own internal departments within the charity itself, for direct solicitation from CCM Artists of their Platforms. Defendant World Vision was one such Nonprofit who prolifically solicited Artists to acquire their Platforms at CCM concert. An artist could have its own relationship with a nonprofit under which the nonprofit itself acquired the right to use the artist's Platform. In that circumstance, the Nonprofit did not need a promoter or TCA to acquire that Platform for it.

122. As such promoters such as Transparent, Premier, and Rush -- later TPR -- and nonprofit organizations, such as World Vision were horizontal competitors on the buyer side of the market for artist Platforms. Although they employed different business models and could occupy different roles in other markets, each independently competed to acquire from artists the same product—the right to use the artist's Platform at concerts to solicit nonprofit sponsorships

### E. THRIVING CHILDREN ADVOCATES, LLC

123. Another horizontal competitor for artists' Platforms was Plaintiff Thriving Children Advocates, LLC (previously, "***<u>Thriving Children</u>***" or "***<u>TCA</u>***"). TCA was not and had never been a "CCM promoter." Rather it occupied a unique place in the CCM Touring and NP Markets in that it competed with promoters and nonprofits for the acquisition of artists' Platforms for the generation of sponsorship donors and then contracted with Nonprofits to supply them with guaranteed sponsorships its artists had contracted to deliver. However, in doing. so, TCA

employed a different model that Pugh himself proclaimed to Plaintiffs was unique and in fact superior, Pugh proclaiming: "I fully believe long-term, I think y'all's model is the best model."

124. TCA's basic business plan thus was to (i) independently source nonprofits and artists; (ii) secure purchase commitments at specified and higher rates from Nonprofits for the purchase of sponsorships actually generated -- not merely projected; (ii) independently acquire rights to artists' Public Platforms from the artists with artists committing to generate sponsorship numbers exclusively for TCA at a set and lower rate; (iv) take the responsibility of securing the Spokespersons and volunteers at each location for each concert; and (iv) register in each relevant state as a "professional solicitor" as Artists who are compensated for use of their Public Platforms for fundraising are required to be registered, with the results of each concert filed with the state and CCM artists are uniquely unqualified to comply with these laws.

125. The difference between what the nonprofits paid TCA and TCA paid artists, after expenses, was TCA's profit sometimes herein referred to as its "Delta" after deducing operating expenses.

126. TCA's business model was unique; no one else did this. In fact, TCA was considered such a "pioneer" in its field, the Defendants would themselves proclaim precisely this in a December 2022 letter to TCA writing that "We view TCA as a highly respected & pioneering sponsorship organiser, [sic] providing unique and turnkey solutions for its sponsorship partners."

127. So highly confidential was its model that artists and nonprofits were both required to sign confidentiality agreements pledging to maintain the secrecy of TCA's model, particularly what nonprofits paid and what artists received.

128. From 2016 to the end of 2022, TCA had contracted with over 50 artists, and at the end of 2022 had long-term agreements having contracted with TCA to sell TCA the specified number of sponsorships generally irrespective of the time within which such were to be delivered:

| | |
|---|---|
| Newsboys | 40,000 |
| MercyMe | 26,456 |
| Tauren Wells | 20,673 |
| David Crowder | 18,105 |
| Micah Tyler | 14,698 |
| Danny Gokey | 10,413 |
| Riley Clemmons | 6,000 |
| Cory Asbury | 4,728 |
| Sidewalk Prophets | 429 |

129. And the contracts these artists had with TCA contained exclusivity provisions in which such artists covenanted not to give their Platforms to anyone other than TCA. These artists also utilized TCA's "professional solicitor" registration for lawful fundraising as de facto agents of the bands. [3]And negotiations were ongoing with other with bands. These artists were some

[3] In Tennessee, for example, any person or entity who participates in the solicitation of contributions for a charity is defined by statute as a "professional solicitor." Tenn. Code Ann. §48-101-501 (15). "Professional solicitors" are required to register with state authorities, file applications and post a bond, among other requirements. Tenn. Code Ann. §48-101-507. Failure to do so the first time is a Class B misdemeanor [§48-101-515] punishable by imprisonment for no more than six months or a fine of $500 or both. A second violation is a Class E felony [§48-101-507] punishable by imprisonment for no less than one year nor more than six years and a fine which may not exceed $3000. Violations can also jeopardize the validity of Sponsorship contributions for which artists were paid. [§48-101-520]. One of the primary reasons states such as Tennessee adopted these kinds of laws was the potential for unfair, deceptive and fraudulent practices in soliciting charitable contribution in a manner where donors did not know who was

of the most notable artists in the CCM world and by 2022, TCA had paid many of these artists significant advances on their anticipated sponsorship generations.

i. *MercyMe.* One of the bands TCA had under contract and had worked with for many years was mega-band, MercyMe, a group managed by the Brickell Parties. MercyMe is the dominant economic driver of audience demand and monetizable engagement within the CCM Touring Market. By every objective measure that defines market power in a touring-driven industry, including radio airplay, audience reach, commercial sales, and sustained chart dominance, MercyMe stands alone, holding the all-time record for No. 1 songs on Billboard's Christian Airplay charts. MM has generated more than fifty No. 1 hits across Christian radio formats and has accumulated billions of streams and millions of units in sales. Its flagship song, "I Can Only Imagine," is among the most commercially successful and culturally recognizable works in the history of the genre. In the CCM ecosystem, where radio airplay plays a direct role in driving touring demand and in turn nonprofit sponsorship revenue, MercyMe's sustained control over audience attention functions as the equivalent of market share in an antitrust sense, giving it an unparalleled ability to attract, assemble, and monetize large-scale live audiences nationwide For nearly eight years, TCA had represented MercyMe under an exclusive contract where TCA alone controlled and monetized MercyMe's Public Platform. In exchange, during this time, MercyMe was paid approximately $16,000,000 from nonprofit sponsorships generated.

ii. *Newsboys.* TCA also had a similar exclusive arrangement with the mega-band known as "Newsboys." Formed in 1986, initially the legendary Peter Furler was both co-founder of Newsboys, Inc., with his partner Wes Campbell, and the lead singer for the group. Upon

getting paid what. Donors thinking their money would be used solely for the charities, needed to know precisely how much the artists were being paid for the solicitations.

Furler's retirement, in 2010 Michael Tait assumed the role of lead singer joining Newsboys after a highly successful career with another very popular Christian music group called DC Talk, where was joined by his college roommate, TobyMac. TobyMac has for many years had his own talent management company called "True Artist Management," a key employee of which is Dan Pitts. Faithful to the longstanding friendship of Tait and TobyMac, True Artist and its employee Dan Pitts also managed Tait. When Campbell was deliberating hiring Tait to sing with the Newsboys, Campbell consulted each of these respected persons and each of them personally assured Campbell of Tait's good reputation, character and integrity. Those assurances led to Tait's retention by the Newsboys in the first place.

130. Not only did TCA have artists on confidential contract, it had contracts with Nonprofits as well to purchase sponsorships TCA generated. Like the artists contracts, TCA's contractual arrangements, including its pricing levels was highly confidential and protected by express contractual confidentiality agreements.

131. Accordingly, promoters (i.e., Transparent, Premier and Rush and later TPR), nonprofits and TCA were not merely participants at different vertical levels of a single distribution chain, they were alternative purchasers of the same artists' platforms.

## ARTICLE V
## HEDGE FUND WATERLAND ACQUIRES TRANSPARENT, PREMIER AND RUSH THE ROLL UP OF POWERFUL PROMOTERS INTO A MONOPOLIST -- LIVECO/TPR.

### A. A MONOPOLY OF CCM PROMOTERS IS FORMED

132. Concerts and thus promoters suffered horribly under the Pandemic. Many smaller regional promoters were driven out of business. Small to midsize promoters were hanging by a thread.

133. Discussed more fully *infra*, amid this industry fallout, hedge funds from the Netherlands and Denmark known to be Waterland PEI and Waterland PE (who are part of group of Defendants referred to as the "Original Waterland Defendants") and the entities who guided them, referred to as the "Newly Added Waterland Defendants," (the Original Waterland Defendants and the Newly Added Waterland Defendants are sometimes collectively referred to as the "Waterland Defendants") developed and began implementing a strategy to gain control of the United States CCM Touring Market and the NPS Market.

134. At this stage in the litigation, it is not possible to differentiate among the various Waterland Defendants as they indiscriminately referred to themselves as "Waterland."

135. Legal counsel, for the Waterland Defendants in this suit is the law firm "Covington." They were also the legal counsel for "Waterland" in the actions herein complained of. The web site of Jared Manes, a partner at Covington, touts his historic representation of Waterland."




136. Public records show that Manes was the incorporator for several Delaware companies for "Waterland," including USLive, LLC., USLive Holding, LLC, USLiveOpCo, Inc., and USLive Intermediate Holdco, Inc., all LiveCo Defendants, who were formed in August 2021:




137. Financial advisers published their success in raising funds for "Waterland" in November 2021 shortly after these entities were formed:




138. Specifically, the above indicates that in November 2021 "Waterland" was introduced as a private equity firm who has made over 950 acquisitions and the tombstone notes that "Waterland" arranged a term loan and revolving line of credit, extended to "Waterland" to

enable "Waterland" to acquire Premier and other companies so that "Waterland" could provide the "initial platform" for LiveCo.

139. The above also indicates that in October 2022, eleven months later, "Waterland" refinanced and upsized its credit facility for LiveCo. Neither of these mention Waterland PEI or Waterland PE but only "Waterland."

140. As noted above and also as discussed in detail *infra*, the Waterland Defendants formed these interlocking series of US entities and proceeded implementing their methodical plan by acquisitions of Transparent, Premier, and Rush, the three largest independent CCM Touring promoters. These acquisitions created what they themselves call "the world's largest one-stop, full service global faith-based promotion company," themselves acknowledging this monopoly was formed "through the merger of Transparent Productions Premier Productions, and Rush Concerts." These entities were all of the creation of "Waterland."

141. In short, by acquisitions a monopoly in the CCM Touring Market was intentionally formed through a deliberate process of acquisitions, not organic growth, which wielded extreme if not virtually total market power.

142. Two of the known principals of some of the Waterland entities known to be relevant to the claims herein asserted are Christian Lund Madsen ("Madsen") and Nicklas Guldberg ("Guldberg"), who were the driving force behind the entities and actions that are at the base of the claims asserted herein, particularly the antitrust claims. Emails and correspondence to and from these individuals substantiate their personal involvement.

143. By its own statements, Waterland's self-proclaimed business model for acquisitions, looks for a fragmented market and then seeks to aggregate it. It is Waterland's stated

practice to itself find targets; targets don't find them. [4] And these statements do not differentiate between or among any of the entities known as "Waterland."

144. Waterland's first step in the US was to hire Brian Becker, who had been a principal architect of Live Nation's growth strategy. [5] As the initial CEO with Waterland financing, Becker began by forming a series of US companies. Public records reflect the formation of USLive, LLC, which is believed owns USLive Holding, LLC, which in turn owns USLive Intermediate Hold Co, Inc., which in turn owns USLive OpCo, Inc, which is believed to be the primary US operating entity. Emails and communication substantiate Becker's involvement in the formation of these entities and their subsequent acquisitions. Emails and communication also substantiate Becker's involvement in the dealings of those entities with Plaintiffs.

145. Based on filings with the US Patent and Trademark office, USLiveOpCo, Inc. filed a trademark for the name "LiveCo" which appears to be a "dba" under which it operates. See **Exhibit 9** hereto.

146. Based on corporate filings, USLive OpCo, Inc. then acquired CCM promoter Premier Productions, LLC (previously "Premier"), which acquisition was made with financing publicly described as having been provided by Waterland as public announcements proclaimed. See ART IV.

---

[4] Interview, Tomas Simons, managing partner, Waterland PEI, May 22, 2024, Faces Online ("Faces).

[5] Live Nation is currently a defendant in several antitrust actions filed by the Justice Department and many different states' Attorneys General. *See, e.g., United States v. Live Nation Ent., Inc.*, 2025 U.S. Dist. LEXIS 47262 (S.D.N.Y 2025).

147. With the acquisition of Pugh's Premier, Waterland had also acquired Premier's ticket issuing company known as Platform Tickets, LLC which owned the exclusive CCM ticketing company known as "iTickets."

148. This group later formed (a) Defendants US Live Rush, LLC through which Reiser's Rush Concerts, LLC, was acquired and (b) US Live Transparent, LLC, through which Taber's Transparent was acquired.

149. Other independent promoters were also acquired, including BASE Entertainment, Icon Concerts,[6] and Peachtree Entertainment, as well as other, smaller CCM promoters. By January 2023, the Waterland and LiveCo Defendants had substantially completed a series of acquisitions consolidating a significant portion of the CCM concert promotion market, as reflected in their public announcement of the new entity formed by their acquisitions:


Indie Promoters Consolidate To Form LiveCo; Brian Becker Leads New Venture (Exclusive)

DEBBIE SPEER / 7:00 AM, TUESDAY, 01/31/2023 / NEWS, PROMOTERS

LiveCo CEO Brian Becker (Front row, 2nd from R) joins his LiveCo team at a company retreat Jan. 30. L–R: Shane Quick, Premier Productions; Tim Ward, LiveCo; Jacob Reiser, Rush Concerts; Paul Meloche, Icon Concerts; Mark Maluso, BASE Entertainment; Becker; Mark Dinerstein, Live Co; Michael Pugh, Premier Productions; Dale Head, LiveCo and Bradley Jordan, Peachtree Entertainment. (*Photo courtesy of LiveCo*)

150. This announcement, dated January 31, 2023, was made at a LiveCo meeting at which all relevant LiveCo participants attended (the "January 31 LiveCo Meeting").

[6] Icon Concerts is a comedy promoter.

151. Negotiations for the acquisition of Transparent were substantially complete by then and formally completed in March 2023. See **Exhibit 32** Taber began serving as the de facto, and later formally declared, LiveCo/TPR’s "Chief Strategy Officer." He is believed to have been present at and to have participated in the discussions about the TCA acquisition that took place there.

152. Business was begun thereafter under the assumed name of "LiveCo" and its website advertises itself under that name touting ownership of certain "vertical" companies, one of which is listed as "TPR" which is an acronym of Transparent, Premier and Rush, self-proclaimed to be the "world’s largest one stop, full service global faith-based promotion company ..." See **Exhibit 10**

153. Before 2023, as explained more fully herein. Transparent, Premier, and Rush as the three leading CCM concert promoters in America controlled over 80% of the CCM Touring Market:

| Period 1<br>1/1/2018-- 11/15/2022 | | |
|---|---|---|
| COMPANY | NUMBER OF CONCERTS [1] | PERCENTAGE CONCERTS |
| AWAKENING | 538 | 18.39% |
| PREMIER | 1241 | 42.43% |
| TRANSPARENT | 765 | 26.15% |
| RUSH | 320 | 10.94% |
| CO-PROMOTIONS AMONG SOME COMBINATION OF TRANSPARENT, PREMIER, RUSH AND/OR LIVECO | 60 | 1.85% |

TPR Entities Percentage

81.61%

[1] During the COVID-19 period CCM concerts were illegal in some places and greatly discouraged in others. CCM concert events therefore occurred at Drive in Theaters and/or online or in virtual form, all of which were emergency techniques employed almost exclusively during the COVID-19 period. As such, numbers and data concerning such unique and transient emergency performances have been omitted from the Pollstar data shown.

154. The only other significant CCM promoter doing nationwide CCM Tours was a company named "Awakening," which, as explained *infra*, was not truly comparable to Transparent, Premier and Rush as its business model was focused on mainly "events" and festivals, like in the secular sense, Woodstock.

155. When these acquisitions were announced, LiveCo CEO Brian Becker stated that the "combination of these brands and talent represents a full complement of live entertainment options," and that LiveCo intended to expand partnerships across the industry. Becker, who his successor stated, "was the driving force for the creation of LiveCo," [7] announced owners of each of these acquired companies were "now partners of LiveCo" backed by Waterland Private Equity which was providing them all capital and that the "partners will continue to operate their predecessor companies under the LiveCo umbrella and utilize their established brands. In 2024,

[7] TPR web site, April 16, 2024.

Becker was replaced as CEO with Chuck Steedman, who had been Global Executive Vice President for ASM Global, touted as the world's largest live event company. [8]

156. Although TPR is referenced as the result of a "merger," no true "merger" occurred, but it refers to their union as such colloquially. Each of Transparent, Premier and Rush were acquired under an "earn out" arrangement where Waterland paid certain amounts up front and the balance paid based on these companies' independent operations during the earnout period. In March 2023, Pugh explained to Plaintiffs that operationally, each of Transparent, Premier and Rush were operating separately, explaining it made sense to "operate independently" and they were doing just that because Transparent and Rush were still in earn out scenarios. He went on to explain that nevertheless each saw the others' deals but that "it would make no sense for us to compete with each other on a submission."

157. Transparent, Premier and Rush would continue to operate as separate decision-making centers until at the earliest September 2024 when they announced that their operations under the LiveCo banner had been merged into "TPR":

[8] TPR web site, April 16, 2024.

## LiveCo Creates Global Faith-Based Promotion Company TPR

September 6, 2024 by Lorie Hollabaugh



*Pictured (L-R, top row): Bobby Talley, Senior Vice President, Operations; Jacob Reiser, President, Global Touring; Jared Gibo, CEO and Todd Stepp, Senior Vice President, Global Marketing. (L-R, bottom row): Kyle Burnside, Executive Vice President, Global Touring and Mike Deckard, Senior Vice President, Events.*

Specialty live entertainment company LiveCo will increase its presence in the faith space both in the U.S. and internationally by merging recent acquisitions Transparent, Premier and Rush Concerts into the newly created TPR. The rapidly-expanding Christian and gospel audience currently enjoys the fourth-fastest U.S. growth rate of any genre according to Luminate Data service. ...TPR's roster also includes Anne Wilson, Cece Winans, Chris Tomlin, Forrest Frank, Gaither Vocal Band, Jeremy Camp, MercyMe, Tauren Wells, We the Kingdom and many more. ... "The unveiling of TPR allows us to seamlessly streamline the experience for artists, agents, managers, and venues, delivering the artists that fans most want to see.

Jared Gibo, who will serve as CEO of the new TPR endeavor, says, "Our joint volume from the combination of Transparent, Premier and Rush will not only keep us No. 1 in faith but also a top 10 overall worldwide promoter.

158. Thus, while they were owned under the same corporate umbrella they operated separately as separate decision makers.

### B. LiveCo/TPR Contracts To Purchase TCA And Then Breaches Its Purchase Contract For Anti-Competitive Reasons

159. In its quest to become "the world's largest one-stop full service global faith-based promotion company," LiveCo had one glaring deficiency: lack of control of the nonprofit world, which was crucial to CCM Touring Market and a niche segment of the market which Thriving Children (TCA) essentially occupied alone.

160. Given TCA's status as a one-of-a-kind professional fundraising company connecting CCM artists and live events with nonprofit sponsorship opportunities, the Waterland and LiveCo Defendants approached TCA about purchasing TCA.

161. Two separate confidentiality agreements were signed (more particularly identified and defined hereafter as Confidentiality and Restricted Use Agreements), and protected by those agreements, TCA made extensive disclosures of its confidential and trade secret business methods, data and know how, including the highly confidential names of artists it had under contract, the number of sponsorships they had conveyed exclusively to TCA and the amounts TCA paid for such sponsorships. Similarly, TCA disclosed the amounts Nonprofits were willing to pay for actual, not projected, sponsorships.

162. After such disclosures, meetings began first with Premier, which included Michael Pugh and Shane Quick, both of whom took an active role. Brian Becker, the CEO of LiveCo, shortly thereafter became involved and then Christian Madsen and Nicklas Guldberg, executives with Waterland PEI, and Waterland PE respectively joined the negotiations.

163. Armed with TCA's highly proprietary information, made their first offer (the "First Offer") to purchase TCA, first extolling the unique and valuable nature of TCA acknowledging TCA as a "highly respected & pioneering sponsorship organiser [sic]" whose business methods were "unique" writing in the opening paragraph of its First Offer:

**From:** Christian Lund Madsen
**Sent:** Monday, December 19, 2022 8:41 PM
**To:** David Wagner <davewagner@me.com>; Wesley Campbell <wes.campbell@me.com>
**Cc:** 'Kevin Kookogey' <kevin@kookogey.com>; Brian Becker <Brian@baseentertainment.com>; Michael Pugh <michael.pugh@premierproductions.com>; Nicklas Guldberg <Guldberg@waterland.dk>
**Subject:** TCA x USLive: Partnership proposal

Dave and Wes –

We remain highly excited by the prospect of partnering with both of you and the TCA team, and are highly appreciate of your engagement and interest in working with USLive. We view TCA as a highly respected & pioneering sponsorship organiser, providing unique and turnkey solutions for its sponsorship partners. Together with USLive's strategic growth efforts within sponsorships across faith, country and other genres, we believe a partnership to be highly valuable to all parties.

164. The details of the First Offer as well as a Second Offer made on January 26, 2023 -- just a few days before their January 31 LiveCo Meeting -- are set forth *infra*. In essence, the Waterland and LiveCo Defendants offered to purchase TCA for well over $50,000,000, including the promised value of the LiveCo stock Plaintiffs would purchase. This offer was consistent with Pugh's acknowledgement of TCA's superior methods and models. It demonstrated the Waterland and LiveCo Defendants' decision to purchase TCA rather than attempt to build its own nonprofit-gathering organization from scratch. And TCA accepted that offer of purchase on January 31, 2023, as elaborated *infra*. There was no rational reason for such offer apart from a recognition of TCA's unique market position and value.

165. As explained *infra* which asserts claims for breach of this contract of purchase, a few days after the contract was formed for the acquisition of TCA who would thus function as the nonprofit sponsorship arm of the Waterland and LiveCo Defendants' operations, Christian Madsen of the Waterland and LiveCo Defendants called TCA to say closing of the agreed acquisition needed to be delayed to allow the Waterland and LiveCo Defendants time to raise acquisition financing, even though nothing in their writings had indicated any need for acquisition financing or any "outs" if such was not available. It is now known and alleged herein, that this was a prevarication. Madsen's statement about postponing closing because more capital was needed, was not the real reason for the Waterland and LiveCo Defendants about face. The real reason was its newly formed partnership with former horizontal competitor, World Vision, which is alleged to have joined in conspiracy with the Waterland and LiveCo Defendants, as did the MercyMe Defendants, the Defamation Defendants and certain specified artists.

## ARTICLE VI
## WORLD VISION, THE MERCYME DEFENDANTS, THE DEFAMATION DEFENDANTS AND OTHERS JOIN IN THE CONSPIRACY.

166. The facts alleged above and hereafter were not isolated or unrelated events but components of a coordinated and intentional course of conduct to eliminate TCA as a competitor in the CCM Touring Market and the related NPS Market, using the integrated structure created through the acquisitions described above. As a related component, it also involved removal of the Newsboys, a prominent CCM artist under common ownership with TCA and closely associated with TCA and their common owner, as a participant in the CCM industry.

167. Upon information and belief, the Waterland and LiveCo Defendants recognized that TCA posed a competitive threat to their monopoly and market power by virtue of its relationships with more than a dozen performing artists, including MercyMe and the Newsboys, and its ability to secure and monetize nonprofit sponsorship opportunities through those artists' public platforms which stood as an obstacle to maintenance of their illicitly acquired market power, thus requiring elimination of TCA as a key component to the establishing, maintaining and expanding the monopoly and market power in the Markets acquired by the Waterland and LiveCo Defendants.

### A. WATERLAND INITIATES THE CONSPIRACY TO MONOPOLIZE

168. As indicated in Article IV, Waterland initiated the conspiracy to restrain trade and monopolize the market through the acquisitions they organized and financed. Pugh confirmed to Plaintiffs at a meeting in March 2023, that "Waterland" was initially nervous about the nonprofit aspect of the business as it was so dissimilar to the secular concert market.

169. As also referenced herein, Waterland initiated and negotiated the Purchase Agreement with TCA and made the decision to renege on that commitment.

170. The combined promoters Transparent, Premier and Rush had previously competed horizontally with one another in the Markets. When the original acquisitions were completed

Transparent, Premier and Rush still competed in promoting while they attempted to figure out how to internally coordinate, which Pugh said prompted Waterland to instruct them to get themselves organized and get things "better than what it is." Also they competed with World Vision, other nonprofits, and TCA as buyers of Platforms in the Markets. The combined promoters Transparent, Premier and Rush had also competed with other promoters, artists (including the Newsboys) and TCA as sellers of Platforms to nonprofits who monetized those Platforms at CCM Touring concerts.

171. The common scheme employed by LiveCo/TPR and World Vision was to use the monopoly and market power of LiveCo/TPR gained through the combination of Transparent, Premier and Rush who were previously competing CCM Touring concert promoters, into LiveCo/TPR and then to (a) foreclose artists from selling their Platforms to anyone other than LiveCo/TPR for resale of those Platforms to World Vision and instead coercing artists into relinquishing or selling their Platforms to LiveCo/TPR thereby foreclosing artists from selling their Platforms to TCA and nonprofits competing to acquire those Platforms; (b) foreclose and preclude other buyers of Platforms, including TCA and nonprofits, from obtaining them through independent competition; (c) foreclose other, smaller and less profitable nonprofits as competitors in the market for Platforms; (d) foreclose the competitive input of smaller regional promoters, in part by making it inordinately expensive for them to participate in the Markets; and (e) remove other market supports for TCA and its owners through the destruction of the Newsboys as artists denying them participation in the Markets.

### B. WORLD VISION JOINS THE MONOPOLISTIC CONSPIRACY

172. As herein set forth, World Vision, TCA and Transparent, Premier and Rush before their combination and LiveCo/TPR thereafter, had competed horizontally to acquire artists'

Platforms. World Vision had itself previously directly solicited and acquired artists' Platforms. In fact, TCA, acting as an intermediary, had in the past acquired artists' Platforms and sold them to World Vision. Contracting artists would then separately and successfully contract with promoters, such as Transparent, Premier and Rush (and then following their joinder, LiveCo/TPR) to promote CCM concerts on CCM Tours.

173. The agreement entailed World Vision's commitment to cease independent horizontal competition for Platforms and instead for LiveCo/TPR to acquire such rights to Platforms from artists and sell them to World Vision for monetization at CCM Touring concerts. This was done for a fee paid by World Vision. The agreement thus provided World Vision access to the acquired Platforms and resulting sponsorships. These promises were complementary undertakings toward that shared objective. Their unity of purpose and meeting of the minds concerned that exclusionary arrangement, even though each expected a different economic benefit.

174. As specified hereafter the agreements entered by World Vision were such that World Vision would cease competing with LiveCo/TPR for the acquisition of artists' Platforms and instead, would support LiveCo's efforts to use its monopoly/market powers to block competition and competitors so that LiveCo/TPR could acquire artists' Platforms and then sell them to World Vision for their exploitation in the Markets.

175. These agreement(s) were not the product of independent competition but were the result of the monopoly and market power LiveCo/TPR possessed and wielded in the CCM Touring Market and by leveraged extension, the NPS Market, which enabled them to coerce artists into conveying their Platforms to LiveCo given the absence of meaningful competitive alternatives so LiveCo/TPR could sell them to World Vision.

176. At some point between March 21, 2023, and April 21, 2023, LiveCo/TPR and World Vision reached their specific agreements, as herein set forth, March 21 being the date Defendant Pugh met with Plaintiffs and made statements demonstrating an agreement with World Vision had not yet been reached and April 21 being the date Reiser met with Plaintiffs revealing facts demonstrating that the agreement had been reached.

177. For reasons hereafter set forth, it is alleged that the agreement between LiveCo/TPR and World Vision was reached between the above dates, with negotiations begun by Transparent's founder and CEO Tim Taber who had begun serving as the de facto, and later formally declared "Chief Strategy Officer" of LiveCo/TPR. In that role with LiveCo/TPR, Taber was tasked with "driving innovation and strategic growth across the company's portfolio" and "focusing on cross-company, strategic partnerships and revenue-generating opportunities."

178. It is believed that while the agreement may have been in negotiation before March 21, on that date Pugh met with Plaintiffs and made a series of statements/admissions.

***a. Pugh's March 21 Meeting***

179. For starters, at that March 21 meeting Pugh advised that LiveCo/TPR had essentially never taken 100% of the sponsorship rights and money, as their agreement with World Vision would contemplate them doing.

180. Pugh explained to Plaintiffs how LiveCo/TPR's then-existing nonprofit sponsorship model functioned.

181. Pugh explained that if the artist had not first sold its sponsorship rights to a nonprofit or an intermediary like TCA, an artist for a CCM Tour would demand a guaranteed per-show Performance Fee from LiveCo/TPR as the promoter. LiveCo/TPR then approached World Vision or another nonprofit with the artist's guaranteed Performance Fee, advising the nonprofit

of the capacity of the proposed venues and LiveCo/TPR's estimate of likely attendance at planned concerts. LiveCo/TPR would agree to a "benchmark" rate to be paid by the nonprofit, which almost invariably was between $175 to $200 per sponsorship donor generated at a CCM Concert. The nonprofit then ***projected*** from the anticipated audience sizes how many sponsorships a concert might generate and multiplied that number by the agreed benchmark rate. The resulting amounts became the nonprofit's guaranteed per-show payments, payable regardless of how many sponsorships any concert ***actually*** generated.

182. Thus, the $175-to-$200 benchmark was not the price World Vision paid for each sponsorship actually ***generated***. World Vision bore the performance risk in that if actual sponsorships were only one-half of the ***projection***, its effective cost per sponsorship doubled; if only one-third, its effective cost tripled. If the number of sponsorships generated exceeded the projected amount, the nonprofit would simply pay the benchmark rate for those exceeding the projection.

183. Pugh explained that, with only one or two exceptions in the companies' history, LiveCo/TPR did not retain the nonprofit's guaranteed payment for itself. Instead, the money "flows through the show," where together with revenues from ticket sales, it helped fund the artist's guaranteed Performance Fees and mitigate the risk to LiveCo/TPR from disappointing ticket revenues. While Pugh said there was "a lot of value in risk mitigation," it was not particularly profitable as LiveCo/TPR ordinarily participated only through its disappointingly low 15% backend interest in the Pot.

184. Pugh acknowledged that the nonprofits had repeatedly complained about the projection-based guarantee model and that LiveCo/TPR regarded its methods of operation as unsustainable. Pugh said a "market correction" was inevitable and "was coming," as nonprofits

like World Vision were "not going to guarantee us that kind of money." For 2022, Pugh said, "we heard more complaints last year than ever about how people were overpaying on our tours."

185. He identified World Vision's Winter Jam payments as an example. World Vision had committed a $125,000 projection-based guaranteed payment per show for LiveCo/TPR's 2022 Winter Jam. After the tour generated fewer sponsorships than projected, World Vision reduced the guarantee for the 2023 Winter Jam to $75,000 per show. Even with that reduction, with only 140 sponsors per show generated, World Vision's effective cost was approximately $535 per actual sponsor.

186. And Pugh explained that reducing the nonprofits' upfront guarantees as World Vision had done would necessarily reduce what LiveCo/TPR could guarantee artists: "there's just no way it doesn't." Conversely, LiveCo/TPR could not solve that problem by continuing to guarantee artist compensation while itself assuming the risk that actual sponsorship generation would fall below projections; Pugh described this as "monster, monster risk."

187. Pugh therefore regarded the existing model and the financial tension it generated as ultimately unsustainable: "At some point, it is going to break. It's going to. I just don't know when." He said that could occur in two years, three months, or sooner, all that was required was "one whistleblower." In so doing he referenced the lawsuits and investigations that had come from the Australian-based CCM artists known as "Hillsong," whose fundraising partially in conjunction with CCM concerts had come to the attention of regulators examining compliance with fundraising laws.

188. TCA was well aware of the necessity of compliance with state charitable solicitation laws, and particularly that violations can also jeopardize the validity of Sponsorship contributions for which artists were paid. [§48-101-520]. CCM artists are uniquely unqualified

to comply with these laws. One of the primary reasons states such as Tennessee adopted them was the potential for unfair, deceptive and fraudulent practices in soliciting charitable contributions where donors did not know who was getting paid what. Donors thinking their money would be used solely for the charities, needed to know precisely how much the artists were being paid for the solicitations. TCA had gone to great lengths to set up a compliance department so that interested donors could determine the details of their contributions -- a feature which most CCM Touring artists working through LiveCo/TPR were ignorant of and/or neglected.

189. Against that background, Pugh told Plaintiffs that he believed TCA's model provided the long-term solution: "I fully believe long-term, I think y'all's model is the best model. I think it's what makes the most sense for the nonprofit."

190. But Pugh concluded by asking rhetorically, if LiveCo/TPR acquired TCA and adopted its proprietary business model, the key questions were: "how does the artist get compensated? How do we get compensated? And how do we mitigate risk?"

***b. <u>April 21 Reiser Meeting</u>***

191. Having TCA's proprietary business model and data, including the amounts TCA paid artists and in turn received from nonprofits which LiveCo/TPR had been advised was soon to be $500 per sponsor, LiveCo/TPR would get the "answers" which involved discarding the business model they had used forever and instead adopting TCA's confidential and proprietary model and underlying data.

192. Less than 30 days after meeting with Pugh, Plaintiffs met with Jacob Reiser -- owner of Rush, who was the "R" in TPR -- who then advised Plaintiffs that World Vision had committed to pay LiveCo/TPR $500 per sponsor. It is known that that number was based on LiveCo/TPR's disclosure to World Vision that that was what TCA was getting, as it was precisely

the amount TCA told LiveCo/TPR and also Reiser stated that "World Vision hates you guys." There would have been no reason for TCA's name to even come up if LiveCo/TPR was not using TCA data to move World Vision's number up to the same. Tellingly, Reiser also said that "they say" Plaintiffs will not be able to re-sign the artists presently under contract with TCA even though TCA had had no difficulties retaining artists or signing new artists. Reiser knew TCA would not be able to "re-sign" artists and purchase their Platforms, because LiveCo/TPR's new plan was to advise artists that to tour, the artists would receive a relatively higher guaranteed Performance Fee but had to relinquish to LiveCo/TPR -- in other words sell -- their Platforms. LiveCo/TPR in turn was going to sell those Platform rights to World Vision.

193. In addition to Reiser's admissions concerning contracts between LiveCo/TPR and World Vision, Pugh acknowledged that World Vision had repeatedly complained about the *projected* per-show payment structure under which sponsorship payments were based on *projected* sponsors at the $175–$200 benchmark rate when projections were not met. Those complaints were sufficiently serious that Pugh advised that for Winter Jam, World Vision reduced its per-show payment by 40%—from $125,000 in 2022 to $75,000 in 2023. To have agreed to $500 per sponsor as Reiser himself stated means that the old payment method based on projected per-show sponsorships had been abandoned. This is obvious as, with World Vision already unhappy with and in fact cutting its upfront payments, for it to then *increase* the benchmark rate to $500 with no other adjustment would mean World Vision could pay $1000 per sponsor if actual sponsorships were half those projected. Thus, such an increase with no other adjustment would have been implausible and impossible to justify-- in short, that did not occur.

194. Not only did Reiser make this plain to Plaintiffs, but it also later became known throughout the industry, such that Plaintiffs had to return to their then-primary nonprofit to adjust

the economics of their deal because certain unnamed child sponsorship organizations were now making direct sponsorship payments to promoters, TCA writing:

> THRIVING CHILDREN ADVOCATES, LLC
> 7106 Crossroads Blvd, Suite 215
> Brentwood, TN 37027
>
> As of July 17, 2023
>
> A M E N D M E N T
> to
> CONFIDENTIAL MEMORANDUM OF UNDERSTANDING #2
>
> Children International
> 2000 E. Red Bridge Road
> Kansas City, MO 64131
>
> Ladies and Gentlemen:
>
> Reference is made to that Confidential Memorandum of Understanding #2 between Thriving Children Advocates, LLC ("TCA") *and* Children International ("Client"), dated as of January 1, 2023 ("Memo #2").
>
> WHEREAS, due to the escalation of sponsor pricing offered by certain child sponsorship organizations directly to promoters and the resulting market pressures on TCA to retain talent as a consequence thereof, TCA and Client each hereby desire to amend Memo #2 in accordance with the terms and conditions set forth herein (the "Amendment").
>
> Now, therefore, in consideration of the terms and conditions hereof, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, TCA and Client hereby mutually agree as follows:

195. This contemporaneous writing materially corroborates the allegation that the industry which LiveCo/TPR controlled had shifted toward direct nonprofit-to-promoter sponsorship payments.

### *c.* ***The Timing Of The End Of Winter Jam Suggests Meetings***

196. Also, Winter Jam 2023 was a 40-city nationwide CCM Tour and after Pugh's March 21 meeting with Plaintiffs, there were only four concerts left, the last being on March 26, 2023, in Spokane, Washington, not far from World Vision's home offices. After the Tour, there were meetings between LiveCo/TPR and World Vision involving financial settlements and other remaining Winter Jam issues, meaning the parties were meeting during that period. The timing of these events coupled with Taber taking over as LiveCo/TPR's Chief Strategy Officer leads to the conclusion the contract(s) in question were reached at that time.

### *d.* ***The Hobson's Choice***

197. As stated, at the March 21 meeting Pugh had advised that LiveCo/TPR had essentially never taken 100% of the sponsorship rights and money. The agreement reached with World Vision contemplated a complete reversal of this, namely that LiveCo/TPR would acquire 100% of Artists' Platforms and then sell them to World Vision.

198. Once artists' Platform rights were thus acquired, LiveCo/TPR agreed to sell them to World Vision, providing guaranteed sponsorship flows to World Vision, in exchange for which World Vision provided substantial financial advances and backend payments and support to LiveCo/TPR. This, in turn, enabled LiveCo/TPR to secure and control artists' Platforms.

199. This coercive sale was brought about by a "Hobson's Choice" put to artists if they wanted monopolist LiveCo/TPR to promote such artists' CCM Tours, giving artists two options should they want to tour, the second of which made CCM Touring impossible:

Option One: an artist wishing to tour must forego any sponsorship rights or funds associated therewith in favor of LiveCo/TPR, in exchange for which LiveCo/TPR would promote their CCM Touring concerts paying a higher Performance Fee and providing Production Services, the arrangement being tantamount to a purchase of the artists' Platforms; [9] or

Option Two: an artist wishing to tour could keep its sponsorship rights but was required to provide their own Production Services and would receive a Performance Fee that was so low that it would prevent artists from

[9] As discussed in herein, in August 2024 when the MercyMe Defendants were in discussions with LiveCo/TPR about promoting MercyMe's 2025 CCM Tour, LiveCo/TPR gave MercyMe the "Choice" and TCA was able to acquire the extra funds to meet that price by getting an amendment to its contract with its nonprofit. However, as explained in Section __ TCA obtained a new contract with MercyMe that expressly gave TCA a right to "match" any future offer to acquire MercyMe's Platform in connection with child sponsorships. By its terms this "matching right" applied whether the offeror was ""a non-profit organization or a for-profit promoter, artist, marketing firm, ... or any other third party" indicating the broad nature of competitors for an artist's sponsorship rights. It also applied irrespective of the form in which the consideration was paid expressly covering "whether or not such offer is in the form of a direct sponsorship relationship, a package deal, buy-out, or other mechanism wherein the acquisition and accumulation of sponsorships are addressed..." (Exhibit 4 hereto, Section 3A).

participating in CCM Tours, thus practically foreclosing performing in nationwide CCM Tours.

200. The "Hobson's Choice" was delivered with the sometimes expressed and at all times understood implication that LiveCo/TPR would not agree to promote artists who chose to keep their sponsorship rights, except under extraordinary circumstances.

***e. Hidden Anticompetitive Implications Of Option One***

201. The portion of Option One where LiveCo/TPR provided Production Services had particularly anticompetitive consequences including further excluding the independent regional promoters who remained after the formation of the monopoly that was LiveCo/TPR, from the CCM concert market and drive many of them out of business.

202. Normally, an artist is responsible for providing at its expense, its own touring Production Services. The artist otherwise paid for Production Services from the Performance Fee it received from the promoter. With an intentionally lower payment contemplated in Option Two, artists were coerced into selecting Option One.

203. When an artist provided its own Production Services for a tour, the production remained under the artist's control, and its fixed costs were amortized over the entire tour. Adding another concert for an independent regional promoter during an otherwise open tour date therefore entailed comparatively little additional production expense.

204. As part of Option One in the Choice, LiveCo/TPR said it would provide the Production Services the artist otherwise would be responsible for providing. However, LiveCo/TPR's production equipment and personnel were available only for LiveCo/TPR-promoted concerts, and not for independently promoted concerts undertaken during the Tour. Therefore, an Artist wishing to perform a CCM concert for an independent promoter during an open date on a LiveCo/TPR CCM Tour had to separately obtain the necessary production

equipment and personnel, the additional costs for which increased the Performance Fee the Artist then quoted the independent promoter for that performance.

205. Costs for Production Services amortized over a 40-city tour could not economically be replicated for a single concert. The resulting Performance Fee a small, regional promoter would have to pay made "carve out" performances during a LiveCo/TPR tour, prohibitively expensive and thus economically impracticable for independent regional promoters.

206. By controlling the Production Services aspect of the CCM Touring infrastructure on which the Artist relied, LiveCo/TPR thus (a) increased the costs to artists and small regional promoters for concerts within tours to a preclusive level; (b) further reduced the ability of smaller, regional promoters to compete for Artist performances even on dates LiveCo/TPR itself was not promoting; and (c) created practical barriers preventing Artists committed to LiveCo/TPR tours from performing concerts with regional promoters.

207. Thus, LiveCo/TPR created a partnership with World Vision under which World Vision advanced money against aggregate sponsorships, just as CI had done, rather than providing concert-by-concert projection-based guarantees. Critically, the new arrangement was based on actual sponsorships generated, not projected sponsorships. It addressed World Vision's complaint about overpaying when projections failed, and LiveCo's need to fund artist guarantees without taking the "monster, monster risk" on individual shows, by instead spreading sponsorship performance across all the artists whose Platforms LiveCo/TPR acquired.

***f. Option Two Was An Uneconomical Hobson's Choice***

208. Artists who did not choose Option One and thus did not want to sell their Platforms to TCA, would still need to make arrangements with a CCM promoter, as before. Plaintiffs had

made clear to Pugh that TCA was not a CCM promoter -- a fact that had always been the case, so they could not serve in that role.

209. That left LiveCo/TPR, who as the holder of monopoly and market power over CCM promotions, artists still had to make financial arrangements with to serve as artists' promoter. Thus LiveCo/TPR and artists wishing to tour still had to negotiate the artist's Performance Fee.

210. Armed with TCA's data on what artists were being paid separately for platforms, LiveCo/TPR advised artists who wished to retain their sponsorships and still use the monopolist who controlled the only truly viable CCM Touring ability that they would be paid a much lower Performance Fee than the promoter had paid in the past and also bear the costs of its Production Services. The disclosures made to LiveCo/TPR in connection with the failed purchase arrangement allowed LiveCo/TPR to set the Performance Fee for Option Two of the Hobson’s Choice low enough so that their retained sponsorship fees would not allow that artist to tour. Artists were thus coerced into foregoing their Platform rights just to be able to afford to tour

211. This was contemporaneously confirmed by Artist Danny Gokey who had both conveyed his sponsorship rights to TCA and previously toured with LiveCo/TPR and would do so again, albeit in violation of his agreements with TCA, when he wrote this precisely to Plaintiffs:

> *Promoters Controlling Sponsorships*. The events between 2019 and early 2022 made performance under the Agreement incredibly difficult. However, next came a systemic, industry-wide change that eroded the foundation on which the Agreement was built: CCM promoters started entering into their own sponsorship agreements with charities, supplanting the artists' (and by extension, TCA's) ability to secure sponsorships.
>
> Promoters now make offers to artists that include higher guarantees but conditioned on the promoter collecting sponsorships. If the artist is allowed to retain sponsorship rights, the guarantee is much lower. For Danny, the difference has been as much as $8,500 per show. Without this sponsorship revenue to help offset touring expenses, it becomes impossible for Danny to tour as a headlining act without losing money.

212. Gokey's specific report of a difference of "as much as $8,500 per show" which was so significant that it became impossible for him to tour as a headliner without losing money, is direct factual support for the coercive differential-pricing mechanism alleged here, not merely an inference from the economics of LiveCo/TPR.

213. The same complaints were voiced by Tauren Wells, another artist under contract with TCA.

214. Given the disclosures made to LiveCo/TPR in connection with the failed purchase arrangement as to pricing, LiveCo/TPR and its new partner, World Vision knew what TCA had contracted to pay artists and this knowledge allowed LiveCo/TPR to set the cash price for Option Two low enough that they knew any sponsorship revenue the artist retained would not make it a meaningful economic alternative to Option One.

215. For artists that had contracted with TCA and thus already received advance payments for sponsorships, LiveCo/TPR could calibrate that price even more precisely, knowing the artist's existing contractual obligation to TCA.

216. Furthermore, knowing the price at which TCA sold artists' Platforms to nonprofits told LiveCo/TPR how much economic latitude TCA had to increase its payments to an artist by foregoing some of its own profit in an effort to preserve the artist's sponsorship business. LiveCo/TPR therefore could set the Option One price sufficiently high to account for TCA's ability to compete for the artist's Platforms while simultaneously setting the Option Two price sufficiently low to make retaining them economically unattractive.

217. Possession of this non-public information thus enabled LiveCo/TPR to calibrate both sides of the Choice so that the purported alternative offered to artists was economically illusory—a true Hobson's choice.

218. Superimposed on all of the above was LiveCo/TPR's monopsony and market power to threaten noncompliant artists with the inability to tour.

219. World Vision was therefore neither merely providing funding like a bank or lending institution nor an "innocent" market purchaser. Rather, it started as a buyer of Platforms horizontally with LiveCo/TPR and TCA and then shifted into a partnership arrangement with LiveCo/TPR by joining with co-buyer LiveCo/TPR to acquire these Platforms, exploit them, exclude competitors, and negatively impact competition and the Markets.

220. Given LiveCo/TPR's monopoly and market power to acquire what they had previously competed for, LiveCo/TPR and World Vision were able to effectively fix the pricing for Platforms as other nonprofits and intermediaries like TCA would be unable to offer higher prices.

221. Here, however, the economic structure of World Vision's agreement with LiveCo/TPR meant that whereas LiveCo/TPR and World Vision had been horizontal competitors, they ceased competing independently for those Platforms. World Vision certainly would have ceased its independent solicitation of Platforms because simultaneously funding LiveCo/TPR's acquisition of them while independently bidding for those same artists' Platforms would have meant competing against the very arrangement it was financing. Among other things, this would mean World Vision would be potentially increasing LiveCo/TPR's cost of acquiring the Platforms for its own benefit.

222. Further evidencing the conspiracy between LiveCo/TPR and World Vision, although they would later prove to have been a sham, in late 2023 and early 2024, conversations and tour planning began with Dave Wagner for Plaintiffs and Reiser, principal of Rush. Wagner for the Plaintiffs, came up with the idea for a tour featuring Tauren Wells and Danny Gokey, two

of TCA's artists who were both under contract with TCA having sold to TCA their sponsorships for which they had received advance payments. Reiser was enthusiastic and even wanted to include the Newsboys in the tour as well, the Newsboys being another client of TCA. Reiser's desire to include the Newsboys indicated there was no "branding" or perception problem with the Newsboys. Detailed planning began with Plaintiffs concerning that tour.

223. However, in early 2024 Reiser/Rush went radio silent on the planned tour of Wells and Gokey. It was only later that the Plaintiffs saw a marketing flyer for the branded "Takeback" tour Wagner and Reiser for Rush had been discussing that LiveCo/TPR and World Vision were co-sponsoring:



224. The portion of the above-reproduced flyer circled states "brought to you by WORLD VISION and TRANSPARENT PRODUCTIONS." While Plaintiffs had been discussing this very tour with Rush/Reiser involving artists whose sponsorships TCA controlled, the fact that Transparent would then "co-sponsor" the joint tour, excluding TCA and directing all sponsorships under Option One to LiveCo/TPR and then World Vision who purchased those sponsorships providing the necessary funding to accomplish the tour, further corroborates that Transparent/Taber were the driving force behind the efforts to both foster World Vision's joinder into the illicit partnership and financially ruin TCA and thus Plaintiffs.

225. Notably, neither TCA nor its nonprofit (Children International) is mentioned, and neither was involved. Instead, although both Wells and Gokey were under exclusive contract with TCA, a fact Live/Co/TPR knew from TCA's acquisition disclosures and from conversations with Reiser that started the idea in the first place, the tour idea had been misappropriated, and TCA's contracts had been interfered with.

226. This tour was a multi-venue tour planned in late 2023 or early 2024, and occurred from September through October 2024, with CCM Touring concerts being performed in Alabama, Florida, South Carolina, North Carolina, New Jersey Michigan, Ohio, Virginia, Georgia, Louisiana, and Texas.

227. In promoting this tour co-sponsored by World Vision and LiveCo/TPR, Wells would write in public marketing:

> "'I'm excited for Danny and I along with Ryan [Ellis] to bring our passion for music and inspiration to every city we visit," shares Tauren Wells. "Get ready for a tour that will touch your heart, lift your spirits, and leave you feeling empowered!" "The Takeback Tour" will be a night filled with contagious energy and heartfelt worship, designed to uplift the church and the community beyond. Concertgoers will be moved and inspired by their chart-topping hits.... "

228. Gokey would write:

> "Ever since Tauren and I toured together back in 2018, I've wanted the chance to do it again, not only because we have such a blast but, more importantly, because of our shared heart for impacting people with the love and hope of Jesus through music that is both entertaining and worshipful..."

229. And Ryan Ellis, an accompanying artist who would also be performing called it an "epic tour," writing:

> "I'm truly grateful and excited for the opportunity to join such an epic tour with Tauren and Danny this fall! I hope this tour is impactful to everyone who joins us."

230. And World Vision was the centerpiece of this "epic tour", using these concepts to pitch for sponsorships, as one attendee would later write:

> **Thumbs Down**
>
> by Suzi-q on 9/16/24 • NorthRidge Church - Plymouth
>
> Tauren Wells followed World Vision and a LOT of intensive pleas and envelope passing for donations & subscriptions. Prior to that Danny Gokey was inappropriately POLITICAL. I won't return, what's the point of buying a good seat if you can only see butts when you sit in it. I'm handicapped & NEED to sit.

231. Later in 2024, Wells would continue the "Takeback Tour," replacing Gokey with Jordan Feliz as the other featured artist, with Ryan Ellis and Davies, as one such ad demonstrated:




232. These tours occurred even though artists Wells and Gokey had sold their Platforms to TCA and covenanted to raise sponsorships exclusively for TCA, facts that were known to LiveCo/TPR and World Vision, if for no other reason it had been disclosed in the due diligence associated with the breached Purchase Agreement.

233. Through these coordinated contractual arrangements, World Vision and LiveCo/TPR (and thus the Waterland and LiveCo Defendants) reinforced each other's control over the Markets thereby excluding competition and preserving their shared dominance in the CCM Touring Market and the NPS Market as it operates through the CCM Touring Market.

234. World Vision knowingly joined LiveCo/TPR's exclusionary scheme: it agreed to cease competing independently for artists' Platforms and instead purchase those acquired through

LiveCo/TPR's coercive touring terms; LiveCo/TPR agreed to acquire and supply them. Their reciprocal commitments and performance, corroborated by Reiser's statements, the Choice, and their joint tours, manifested a shared commitment to use LiveCo/TPR's monopoly and market power to foreclose artists' alternative sales, competing intermediaries and nonprofits, and smaller regional promoters. World Vision remained an independent decision maker whose separate financial or charitable motives did not negate that agreement. Its knowing participation did not require involvement from the outset, knowledge of every detail, or performance of every exclusionary act. World Vision is jointly and severally liable for injuries caused by the common conspiracy.

235. World Vision is thus jointly and severally liable with the Waterland and LiveCo Defendants for the acts herein set forth.

### C. MERCYME JOINS THE CONSPIRACY

236. The MercyMe Defendants knew of this common scheme and knowingly and willingly joined it. With full knowledge of the monopoly created by the Waterland and LiveCo Defendants, as herein set forth, the MercyMe Defendants joined the schemes to assist the Waterland and LiveCo Defendants in establishing and maintaining their monopoly and restrain trade and that the natural, probable and foreseeable consequences of the agreements they reached as herein described was to exclude and/or destroy competition without legitimate business justification including the acts of wrongfully terminating their recently executed contract with TCA, agreeing and contracting to convey their Platform to LiveCo/TPR for exploitation by World Vision. The facts supporting this are clear.

237. In terms of fame and following, it is no exaggeration to compare the CCM music group MercyMe to the Beatles or the Rolling Stones in the secular world, the group dominating

the CCM Market. By [10] August 2024, Plaintiffs had worked with MM for nearly eight years. Solely in terms of sponsorships and the NPS Market TCA had paid MM over $16MM.

238. Prior to August 2024, MercyMe and TCA were operating under a contract entered in 2019 (the "Prior MM Agreement") under which MM agreed to generate a set number of sponsors, initially 22,500 and later increased to 45,000, with no set deadline for doing so. MM was initially receiving approximately $230 per sponsorship from TCA which by 2024 had increased to $337.50 MM's sponsorship rights purchased by TCA had been sold to a nonprofit. MM had used Rush as its virtually exclusive promoter for many years and there had been no sharing with Rush by (a) MM of sponsorship money it received from TCA nor (b) TCA of sponsorship money it had received from the purchasing nonprofit.

***a. The August 2024 Contract Created Exclusivity Rights and Matching Rights In Favor Of TCA Precluding LiveCo/TPR and World Vision From Participating in MM's Sponsorships***

239. Discussions and negotiations for nationwide CCM Tours are initiated months in advance of the planned CCM Tour. In or around late spring or early summer 2024, MM and LiveCo/TPR began discussions for MM's 2025 CCM Tour calendar consisting of concerts in the spring and fall. At that time, LiveCo/TPR and World Vision presented an offer to promote MercyMe's 2025 Tour that contemplated (a) payment of a large Performance Fee, (b) the provision by LiveCo/TPR at its expense of most of MMs Production Services, and (c) MercyMe's waiver of sponsorships it had already sold to TCA. In essence MM was offered Option One of the Hobson's Choice.

---

[10] MercyMe Defendants were the subject of two nationally released feature films, "I Can Only Imagine," and a direct sequel, "I Can Only Imagine 2," further demonstrating the MercyMe Defendants' exceptional prominence, audience recognition, and commercial value within the CCM industry

240. MM's manager, Defendant Brickell who owns and operates the managing entity, Defendant Brickhouse, communicated that offer to Plaintiffs, advising that under the proposed arrangement World Vision was to be the affiliating nonprofit. Brickell made clear that World Vision was advancing the funds LiveCo/TPR was offering.

241. Brickell converted the offer of LiveCo/World Vision into an equivalent per-sponsor amount and advised TCA it would have to increase MM's per sponsor payment from $230 to $525 per sponsor to beat LiveCo/TPRs offer. Brickell said that he knew there was "no way" TCA could do that, indicating he knew how much TCA was receiving from the purchasing nonprofit which served as a de facto ceiling as to how far TCA could go. It was LiveCo/TPR that told MM's manager, Scott Brickell, that TCA would not be able to top their offer, and Brickell later repeated that same position to Plaintiffs.

242. However, Brickell had never been told that TCA was receiving $500 per sponsorship from its supporting nonprofit, as that amount was confidential. LiveCo/TPR, however, had been told that amount in TCA’s prior confidential disclosures and therefore knew the "spread," between what TCA received from its nonprofit and what it paid MM for sponsorships. Knowing that spread and the amount TCA was paid, allowed LiveCo/TPR to determine how much profit TCA could forgo to compete for MM’s sponsorships and to price its offer at a level it believed TCA could not beat.

243. That information was highly confidential, proprietary and in the nature of a trade secret, and had only been disclosed to LiveCo/TPR pursuant to strict agreements of confidentiality. Its use by LiveCo/TPR and World Vision to frame their bid to MM and the disclosure of TCA's financial information to the MM Defendants constituted an unlawful use of TCA’s confidential and proprietary information.

244. Brickell stated that MM's 2025 CCM Touring calendar contemplated a minimum of 48 concerts across the spring and fall tours, during which a minimum of 8,000 sponsorships would be generated. Brickell further told TCA that MM wanted $1,500,000 paid upfront as an advance to help offset Production Services expenses for those 48 concerts.

245. Based on the numbers and amounts Brickell provided, such an arrangement was uneconomical for TCA if all MM generated was the minimum 8,000 sponsors MM had covenanted to provide. TCA nevertheless agreed to it simply to keep MM as a client artist and in the hope that 8000 sponsorship number would be exceeded. Thus gambling, TCA found a way to beat the Hobson's Choice, but only by agreeing to an otherwise uneconomical arrangement.

246. Even though MM still owed ~5.297 sponsors under the Prior Agreement, TCA agreed, resulting in a new MM contract between TCA and the MercyMe Defendants signed in August 2024 (the "MM Contract" or "August 2024 Contract"), a copy of which is attached hereto as **Exhibit 4**.[11] Unlike the Prior Agreements, the August 2024 Contract was for a defined period, ending December 31, 2025. Notably, all four (4) MM members of the group called "MercyMe" as well as the corporate entity itself (previously, the "MercyMe Defendants"), signed the MM Contract. Those persons signed individually and as "authorized representatives" of MM, with the Contract defining each singularly as "Professional." Plaintiffs therefore allege that each became jointly and severally liable as an executing party and not merely on a vicarious agency or respondent superior basis.

247. In the August 2024 Contract, among other related things, MM (i) sold its "Public Platform" to Plaintiffs, agreeing it would be used exclusively for Plaintiffs' purposes in seeking

[11] This agreement was signed not only by the entity MercyMe, Inc but by each band member personally.

charitable donors; and (ii) granted Plaintiffs exclusive worldwide rights to the "MercyMe" name for charitable solicitations.

248. Additionally, the August 2024 Contract contained at least two critical provisions: (a) agreements giving TCA exclusivity rights, essentially as had been done in the Prior Agreement and (b) a right to match any other offer MM may receive after the Term for their Platform.

249. The grant of exclusivity rights (the "Exclusivity Rights") appeared in several places in the August 2024 Contract, one which read as follows: [12]

> MERCYME hereby agrees to furnish, exclusively to TCA MERCYME's Public Platform (as defined below) in order to promote and assist TCA's efforts to secure child, family, community, victim, or similar charitable sponsors for Children International (the "Nonprofit")...[and] MERCYME's Public Platform shall not be used, associated with, or otherwise made available during the Term for promoting, educating, making appeals, or otherwise securing child, family, community, victim, or similar charitable sponsors for any party other than TCA..."

250. This Exclusivity Right essentially meant that MercyMe could not enter into any sponsorship arrangement with anyone other than TCA while the August 2024 contract remained in effect.

251. The newly added Matching Rights provision reads as follows (emphasis and color added): [13]

> 3A. Matching Right. If at any time MERCYME receives an offer to make MERCYME's Public Platform available after the Term to a third party (*whether a non-profit organization or a for-profit promoter, artist, marketing firm, manager, music and/or entertainment company of any nature, or any other third party)* in order to promote, educate, make an appeal for, or otherwise assist in the securing of child, family, community, victim, or similar charitable sponsors (*and whether or not such offer is in the form of a direct sponsorship relationship, a "package deal," "buy-out," or other mechanism wherein the*

[12] The term" MercyMe" was substituted for the contract term "Professional" and the term "TCA" was substituted for the contract term "Client."

[13] The term" MercyMe" was substituted for the contract term "Professional" and the term "TCA" was substituted for the contract term "Client."

> *acquisition and accumulation of sponsorships are addressed)*, or in the event MERCYME on its own behalf seeks or desires after the Term to promote, educate, make an appeal for, or otherwise assist in the securing of child, family, community, victim, or similar charitable sponsors (all of the above being individually and collectively deemed a "Sponsorship Offer"), MERCYME will not accept any such Sponsorship Offer unless and until the terms and conditions of this paragraph have been fulfilled and TCA(Wes)'s exclusive rights under this Agreement have been addressed to its satisfaction.[14]

252. Notably, because the Matching Right was newly added, Brickell's presentation of LiveCo/TPR's offer was not contractually required at that time, although it would be required for offers made thereafter after the Term expired.

253. The portion highlighted in yellow above-quoted portion of the Matching Right, identifies potential buyers of MM's Platform as "a non-profit organization or a for-profit promoter, artist, marketing firm, manager, music and/or entertainment company of any nature, or any other third party "demonstrating that it was understood that nonprofits and for-profit promoters like LiveCo/TPR were competing purchasers of MM's Platform.

254. The portion highlighted in blue indicates the common-sense proposition that sponsorship payments could take many forms including "the form of a direct sponsorship relationship, a 'package deal,' 'buy-out,' or other mechanism wherein the acquisition and accumulation of sponsorships are addressed..." Thus, an Option One offer where a higher Performance Fee was to be paid coupled with an effective relinquishment of sponsorship rights would clearly fall within these terms and trigger a post-Term Matching Right.

255. After the August 2024 Contract was executed, MM advised LiveCo/TPR and World Vision that it would not be selecting Option One but contracted with LiveCo/TPR solely to provide promotion services for its 2025 CCM Tour at the greatly reduced Performance Fee.

---

[14] The Matching Right applied only to financial terms. See ¶3A(a).

256. LiveCo/TPR already knew from the due diligence disclosures previously made by TCA, that MercyMe had exclusivity obligations to deliver sponsorships to TCA.

257. By rejecting the LiveCo/TPR and World Vision proposal involving the sale or relinquishment of MM's sponsorship rights, MM made clear that its 2025 sponsorship rights had been acquired by TCA.

258. The math associated with the August 2024 Contract is important. In that contract, the $525 per sponsor number Brickell had told TCA it had to pay to beat the LiveCo/TPR offer, multiplied by the guaranteed minimum of 8,000 sponsors, equaled $4,200,000. TCA agreed to pay MercyMe a $1,500,000 Production Fee upfront for the projected 48 concerts, leaving $2,700,000 to be paid at $337.50 for each sponsorship generated during 2025. Thus, the arithmetic in the August 2024 Contract tied exactly: 8,000 sponsorships at $337.50 equaled $2,700,000 which together with the $1,500,000 Production Fee, produced total compensation of $4,200,000—exactly $525 for each of the 8,000 sponsorships. Consistent with that calculation, MercyMe agreed to use its best efforts to generate "at least" 8,000 sponsorships during 2025. See **Exhibit 4.**

259. Notably, the August 2024 Contract contained no provision for increased compensation if MM generated more than 8,000 sponsorships, however unlikely that may have seemed at the time of signing. Thus, once MercyMe generated 8,000 sponsorships, each additional sponsorship generated paid them only $337.50.

260. MercyMe's success in 2025 caused MM to reach the 8,000-sponsor guaranteed "minimum" at or around the conclusion of the 32-concert spring portion of the 2025 CCM Tour. Sixteen (16) concerts remained in the fall of 2025 and based on the number of sponsorships generated during the spring, meant at least 4,400 additional sponsorships were projected for the fall tour.

261. Each of those additional 4,400 sponsorships would pay MercyMe $337.50, not the $525 equivalent Brickell had sought -- a 35.7% reduction -- which meant that instead of $2,310,000 at the $525 equivalent rate, MM would contractually receive only $1,485,000 for those fall sponsorships. The difference was <$825,000>.

***b. <u>MercyMe Defendants, LiveCo/TPR and World Vision Begin Planning A Joint MercyMe/TobyMac Tour</u>***

262. MercyMe realized the changed economics in early 2025 when they began discussions regarding MM's 2026 tour and also began discussions about a proposed joint tour with MM touring with another notably CCM artist, TobyMac. Although not to start until late September 2025, it was publicly announced in April 2025, and it was to be jointly sponsored by World Vision and LiveCo/TPR:




263. As to this planned CCM Tour, World Vision is clearly stated to be the Nonprofit sponsor and LiveCo/TPR the promoter. If it occurred, MM would convey its sponsorship rights

to LiveCo/TPR who in turn would convey them to World Vision who would provide the necessary funding.

264. Although the MercyMe/TobyMac tour contemplated eight concerts commencing in September 2025, pairing two artists with the fame of MercyMe and TobyMac meant that audience sizes would likely be at least double what they would be if either artist performed alone. This concert would further ensconce and establish the monopoly and market power of LiveCo/TPR.

265. The impediment to such an important concert to all three of LiveCo/TPR World Vision and MercyMe, was TCA who had been granted MM's the Exclusivity Rights in the August 2024 Contract.

266. Given the MM August 2024 Contract MercyMe entered when TCA bested LiveCo/TPR and World Vision a few short months before, MM could not convey its sponsorships to LiveCo/TPR and thus World Vision, to take advantage of Option One for a MercyMe/TobyMac tour. Rather, if the tour was to occur at all, MercyMe would have to accept a much lower, uneconomical Performance Fee under Option Two, while continuing to receive $337.50 per sponsorship pursuant to the August 2024 Contract. As importantly, MercyMe's grant of the Exclusivity Right to TCA precluded World Vision's involvement.

267. The magnitude of the economic impact of these two developments was substantial and LiveCo/TPR, World Vision and MercyMe knew it.

268. From MercyMe's economic perspective, the lost income from the inability to work with LiveCo/TPR and World Vision on the TobyMac tour taken together with the lost income from the August 2024 Contract, was going to cost MercyMe approximately $1,794,300 in sponsorship compensation.

269. From the economic perspective of LiveCo/TPR, it had already contracted for 2025 to receive only the smaller Performance Fees, without MM's sponsorships, and was locked into that arrangement. The proposed MercyMe/TobyMac concerts would likewise provide LiveCo/TPR only the smaller Performance Fees, without acquiring MM's sponsorships.

270. From the economic perspective of World Vision, it would have no participation at all in MM's sponsorships in 2025 as LiveCo/TPR would have nothing to sell them.

271. But that was not the only problem the August Contract posed. Given the Matching Right MercyMe had agreed to, when the 2026 touring schedule was proposed TCA would have the absolute right to match any offer made by LiveCo/TPR and World Vision as its partner.

272. Thus, in future years, neither LiveCo/TPR nor World Vision would be unable to acquire MercyMe's sponsorships given TCA's Matching Right.

273. This result created a powerful alignment of economic interests that bubbled to the surface in early 2025 and led the MercyMe Defendants, LiveCo/TPR, and World Vision to the joint decision that they had to find a way to get rid of the August 2024 Contract.

### D. THE DEFAMATION DEFENDANTS JOIN THE CONSPIRACY AND THE FARGO FABRICATION IS WEAPONIZED

274. Further exacerbating this economic/financial problem was the Fargo Fabrication.

275. Obviously having been bested in August 2024, LiveCo/TPR and MercyMe knew LiveCo/TPR having to be content with agreeing to conduct MercyMe's 2005 CCM Tour, divided into spring and fall segments, without participation in sponsorships.

276. In its days prior to joining the Waterland and LiveCo Defendants and what would become LiveCo/TPR, Transparent was one of many CCM concert promoters. It had promoted a small band, one of whose members had later married Nicole. As such, Taber become aware of the Fargo Fabrication; in fact, it is alleged he was one of its propagators. Taber had known Wes

Campbell, TCA, and the Newsboys for many, many years, although had grown somewhat antagonistic when Campbell chose that the Newsboys would work first with Premier and later Rush. In fact, Taber threatened that Campbell would regret that decision.

277. But Taber was a particularly close friend with Michael Tait having spent time with Tait at Tait's home, even enjoying evenings with Tait in Tait's hot tub. As indicated above, Taber had told Plaintiffs that "rumors" about the Newsboys and Tait were insignificant and lacked substance. See **Exhibit 11**

278. Yet after having been beaten in the marketplace by TCA in August 2024, it is a known fact that by October 2024, Nicole had gone to work for LiveCo/TPR in their "marketing department," a position she was unqualified for, having come to LiveCo/TPR from a nonmusical employer for whom she is alleged to have had little relevant responsibilities.

279. LiveCo/TPR, on information and belief, thus hired Nicole, then took her face-saving, unverified story, inflated and amplified it, and then worked to turn that story into a false but damaging public indictment of Campbell, TCA and the Newsboys.

280. Now employed by LiveCo/TPR, Nicole began meeting with the Defamation Defendants while she was an employee of LiveCo/TPR. From all appearances, while Nicole lacked all requisite job qualifications except one: she could supply competitive "dirt" on the Newsboys organization and the owner, Wes Campbell, who also owned indirectly TCA.

281. Their having fostered it, LiveCo/TPR then began to actively circulate the "Fargo Fabrication," particularly to artists LiveCo/TPR knew to be under contract with TCA, as a part of their anticompetitive scheme to destroy TCA as their primary competitor where nonprofit sponsorships were concerned.

282. Predictably, one such targeted artist was MercyMe.

283. As concerts take weeks, even months, to plan in advance, Plaintiffs allege on information and belief, that LiveCo/TPR was telling/advising the MM Parties (i) about the Fargo Fabrication and that LiveCo/TPR employees (including Nicole) were meeting with the Defamation Defendants, (ii) about the impending Article that, once published, would severely defame Plaintiffs, (iii) that MercyMe would be tarnished in the world of Christian music if it were publicly associated with Plaintiffs, and (iv) that the MercyMe Parties needed to exit their contract with TCA as soon as possible for these reasons, as well as because of the significant economic benefits they would receive if they did so.

284. The Fargo Fabrication provided an additional economic incentive for MercyMe to disassociate TCA to avoid the negative publicity, and additional motivation for MercyMe to desire to terminate the August 2024 Contract which not coincidentally would allow them to enter into a contract with LiveCo/TPR and World Vision, which in turn would assist LiveCo/TPR and World Vision in their efforts to solidify the existing monopoly and market power of LiveCo/TPR in which World Vision shared.

### E. THE PRETEXTUAL TERMINATION OF THE AUGUST 2024 CONTRACT RESULTING FROM THE CONSPIRACY

285. As a result of the foregoing, LiveCo and World Vision counseled and assisted MM in concocting a pretense for MercyMe to breach their contract with TCA so MercyMe could contract with them and that centered around a TCA employee named Troy Collins.

286. The August MM Contract gave MM one and only one way to terminate that contract, which all of them recognized. Troy Collins, a person who had been a TCA employee 2017 and was a close and longstanding friend of MM's manager, Scott Brickell, had to resign as

an employee of TCA. [15] Under ¶14A of the August Contract, Collins' resignation could afford MM the opportunity to end the Term of that contract prematurely, which provision states:

> 14A. Key Man
>
> Subject to the cure provisions described in Paragraph 14(a) of this Agreement, Professional shall have the right to terminate this Agreement and to retain all monies theretofore paid to Professional by Client, if Troy Collins shall at any time during the Term cease to be actively involved in Client's operations other than for reasons of death, disability, or moral turpitude.

287. And on June 2, 2025, approximately 42 days after LiveCo/TPR, World Vision, and MercyMe announced their planned MercyMe/TobyMac tour for September 2025 through October 5, 2025, Collins abruptly and without explanation voluntarily quit his job at TCA. His resignation was followed by a letter from MM's legal counsel advising that MM was electing to terminate the August Contract for no reason stated other than it could do so, and that TCA had a right to cure.

288. When TCA attempted further contact regarding this termination, MM's counsel wrote that no more communications where need as the Term of the MM Contract had expired on July 1, when MM's first letter came:

[15] Collins's job at TCA involved Collins serving as TCA's Vice President of Live Acquisitions, Troy ran the day-to-day LIVE Department, which meant negotiating with artists and lead opportunities, managing campaign budgets, choosing the reps and spokespersons for the NGO partners, and coordinating logistics between TCA, those NGOs and the live partners. While he was not even close to being irreplaceable, he had never indicated any intention of quitting his job at TCA

> The Contract's Term expired on July 1, 2025. Each of MercyMe's obligations to TCA pursuant to the Contract terminated that same day.
>
> MercyMe encourages TCA to accept that the Contract is terminated and that MercyMe has no continuing obligations to TCA. Pursuant to the broadly written Indemnification provision, MercyMe will seek any and all attorneys' fees TCA's demand, which is inconsistent with the Contract, causes MercyMe to incur.
>
> All rights of MercyMe and BrickHouse are reserved.
>
> Yours very truly,
>
> *Jay S. Bowen*
>
> Jay S. Bowen

289. This paved the way for the MercyMe/TobyMac tour to take place in September/October 2025 to the full financial advantage of MercyMe, LiveCo/TPR and World Vision, which further established their monopoly and market power. [16]

[16] The fact that MercyMe completed the fall tour dates with LiveCo/TPR using Children's International with whom TCA and contracted for MM's partial benefit is nothing more than the economic recognition that MercyMe had in late 2024, already contracted with LiveCo/TPR to conduct their 2025 tour and had negotiated the terms at that time which did not include MM sponsorship rights.







290. The timing of the chronology makes implausible any claim that these events were the result of independent action, considering that

- In August 2024, LiveCo/TPR, and World Vision, had unsuccessfully attempted to induce MercyMe to abandon TCA and surrender the sponsorship rights associated with its concerts and TCA and the MercyMe Defendants signed a new contract;
- LiveCo/TPR thereafter promoted approximately 32 MercyMe concerts under the very TCA contract it had tried unsuccessfully to prevent;
- on April 21, 2025, while the August 2024 Contract remained in force, LiveCo/TPR and MercyMe announced their joint fall MercyMe/TobyMac tour, indicating a contract among them was signed;
- A few short days later, on June 2, Collins abruptly resigned without explanation, ostensibly triggering the Collins-specific Key Man provision and providing MercyMe the contractual mechanism it needed to escape TCA;
- Seventeen days later, the Roys Report published the Fargo Article LiveCo/TPR had been circulating in advance;
- MercyMe thereafter terminated its contract with TCA;
- Collins went to work for MercyMe, and LiveCo/TPR continued promoting MercyMe performances.

These were not disconnected events or actors independently responding to market events. Before the event supposedly triggering MercyMe's termination ever occurred, LiveCo/TPR—the party that had previously tried and failed to separate MercyMe from TCA—was already contractually and operationally joined with MercyMe in planning the performances that would follow that termination.

291. The sequencing and interdependence of these acts plausibly support the inference that Collins's resignation and MercyMe's termination were steps in a coordinated plan rather than independent conduct.

292. Any suggestion these interlocking events were random or independent is implausible. Rather, MM and LiveCo/TPR must have worked through all facets of MM's termination and post-termination issues and resolved them prior to their MM exiting the MM Contract and signing new contracts with LiveCo/TPR given that these events were preceded by their planning, contracting for, and even announcing a MercyMe/TobyMac CCM Tour, followed by MercyMe's fulfillment of that agreement with LiveCo/TPR and World Vision. The commercial and financial incentives and the timing of events make coordinated action undeniable.

## ARTICLE VII

## CLAIM FOR RELIEF FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT AND SECTION 7 OF THE CLAYTON ACT (ASSERTED AGAINST DEFENDANTS).

293. Plaintiffs incorporate the preceding allegations, including Articles IV, V, and VI as if fully set forth here. Without limiting the foregoing, the particular factual allegations cited below support the respective antitrust claims and are incorporated into those claims. However, to avoid repetition, where specific factual allegations herein have been asserted elsewhere in this

Complaint, the article and paragraph numbers will be referenced and the detailed pleadings found in those places are specifically incorporated by reference.

294. These claims are asserted under Sherman Act § 1, 15 U.S.C. § 1, Sherman Act §1, 15 U.S.C. §2, and the Clayton Act § 7, 15 U.S.C. §18.

295. Articles Vand VI hereof, which is incorporated herein by reference, sets forth the nature of the conspiracy that was formed and still exists between and among all Defendants making them jointly and severally liable for all acts set forth in the antitrust claims in this article. Without limitation, those found to be conspirators (a) need not have come to agreement in any formal written document and can even done so by unspoken agreement; (b) need not have come to agreement at the same time; (c) need not share the same motives; (d) need not have possessed full knowledge of all the details of the conspiracy, the identity of all it members or the parts each member played; and (e) need not have met together directly, stated what their object or purpose was to one another, stated the details or the means by which they would accomplish their purpose. A conspirator is responsible for all actions taken by all other conspirators during the continuation of the conspiracy from inception, irrespective of when those actions occurred and irrespective of when the conspirator joined. One who joins a conspiracy, or who even only participates in part of the conspiracy, is just as responsible as if he or she had been one of those formed or began the conspiracy and participated in every part of it irrespective of when he or she joined.

296. Based on the foregoing, Plaintiffs assert these claims against all Defendants who will jointly be referred to herein sometimes as the "TPR Conspiracy Group."

297. As alleged herein, there are two relevant markets: the CCM Touring Market and the NPS Market.

### A. CCM TOURING MARKET DEFINED AND ITS COMPONENT PARTS DEFINED

298. Faith-based music, musicians (or artists), their listening audiences, which are almost exclusively Christian, and promoters of those faith-based artists' concerts are a unique and distinct market, separate from mainstream music and musicians/artists. In fact, this genre has a name: Contemporary Christian Music or "CCM."

299. The relevant product or service market identified herein is the “CCM Touring Market,” which is the nationwide market for CCM Tours, which encompasses the concerts that are a part of such CCM Tours and the components thereof.

300. This market encompasses and includes the nature of the competition between and among promoters who compete for CCM performing artists to engage them for their promotional services in CCM Tours, to acquire, produce, route, promote, and present those CCM artists' concert performances in multi-city concert tours before ticket-purchasing audiences. CCM promoter competition for CCM artists' business encompasses offering CCM artists more favorable terms than their competitors on terms such as the amount of artists' guaranteed Performance Fees per concert a promoter will pay a CCM Artist; other financial remunerations and terms including backend participation in concert-generated revenue (including ticket sales revenues); location and prominence of concert venues; booking of and routing between concert venues; concert advertising and promotion a promoter will provide; and assistance in artists' performance production arrangements. This market also encompasses and includes competition between and among CCM promoters for venue locations and availability dates, particularly as the CCM Market in most venues can only take so many CCM concerts within certain periods of time which otherwise would result in too many clustered concerts, lower attendance, and lower ticket revenues.

301. Some of the key identifying factors of the “CCM Touring Market,” are tours of CCM artists that (a) occur pursuant to a written or published plan developed in advance with a

concert promoter in consultation with the artists that identifies multiple pre-selected venues in multiple cities or states across different markets (rather than a single metro area or campus of venues), in a published route or date list, (b) involve scheduled performances occurring within a defined tour window, such as a spring or fall leg, rather than intermittently over a year as unrelated bookings, (c) may have a common tour name or branding, artwork, and substantially consistent production including set, crew, and backline, (d) employ centralized or coordinated ticketing, presales, and pricing strategies, managed at the tour level, and (e) use advance and coordinated marketing such as internet and social media notices to targeted, receptive potential CCM concert attendees, public announcements, simultaneous date drops, shared web hubs, and unified public relations and/or media notices.

302. Except where deletions therefrom are noted herein, all market share and concert performance data referenced herein are derived from Pollstar, a widely used third-party source for nationwide concert and ticketing statistics across all genres, including CCM. It is considered in the industry to be a reliable source of concert information. Importantly, the information in Pollstar is self-reported by promoters, thus LiveCo/TPR themselves provided the data on which Pollstar relies as it pertains to their activities.[17]

### ***a. <u>CCM Artists And Concerts Are Not Interchangeable With Secular Artists And Concerts</u>***

303. A CCM performance of CCM artists is, at its core, a communal worship experience. Artists pray openly with audiences, share personal testimony, and generally direct attention toward faith rather than themselves as performers. Audiences that attend CCM performances of CCM

[17] Certain exclusions from Pollstar Data used, include data for (a) international concerts and Puerto Rico; (b) non-CCM artists who belong to what the CCM industry recognizes as non-CCM genres; (c) comedy shows; and (d) gospel music styles other than "Southern" gospel (i.e, "Southern" gospel data is included).

artists on CCM Tours participate not merely as concertgoers, but as members of a shared faith community.

304. The CCM Touring Market thus is a legally distinct relevant market that differs from its secular counterpart. While both CCM concerts and secular concerts involve ticketed live performances, amplified music, sophisticated production, and audiences, those are surface similarities that mask fundamentally different products offered to fundamentally different consumers for fundamentally different purposes. The distinction includes but is not limited to lyrical content, audience demographics, purpose, atmosphere, commercial structure, and the very reason consumers attend.

305. While CCM performances are essentially a communal worship experience, by contrast, a secular concert is centered on entertainment and spectacle. The artist is the focal point, and audiences attend as fans rather than participants in a shared belief system. These differences materially affect consumer demand, consumer expectations, and commercial viability. Consumers do not substitute between CCM and secular concerts, and in particular there is no substitution in response to price, availability or promotional differences. CCM and secular concert performances are marketed through different industry channels.

306. Consistent with these commercial realities, while CCM promoters compete against other CCM promoters to acquire CCM artists and tours, they do not compete with promoters of mainstream secular tours. Similarly, CCM artists or concerts do not compete for audiences with secular artists or concerts and a promoter seeking to acquire and present a CCM tour cannot substitute a secular artist's performance for a CCM artist's performance. Further, there is no material cross-elasticity of demand between CCM and secular tour performances on either the promoter/buyer side or the concertgoer side of the CCM Touring Market.

307. Because substitution between CCM and secular concerts does not occur, the CCM Touring Market described herein constitutes a distinct relevant product market not interchangeable with secular concerts.

### ***b. CCM Touring Market Is Not Interchangeable With "One-Off Events" Or Concerts***

308. The CCM live event industry falls generally into one of two categories: (i) CCM Touring Market (also occasionally called "CCM Tours") (ii) and One-Off Events. They are not interchangeable.

309. "CCM One-Off Events," unlike CCM Tours, encompass concert performances limited to specific venues where each location serves as a true one-off performance. Typically, CCM One-Off Events are (i) arranged directly between the artist and the hosting venue, often a church, or local civic facility, (ii) negotiated, advertised, and ticketed on a standalone basis without a pre-committed sequence of future dates in other cities, and (iii) involve no centralized routing, branding, or sponsorship across multiple markets. CCM One-Off Events typically (i) have production models, financial responsibilities, and audience bases that differ from CCM Tours, (ii) serve consumer and promoter needs that differ from those associated with CCM Touring, and (iii) show virtually no cross elasticity of demand with CCM Tours.

310. Accordingly, a One-Off performance is not a reasonably interchangeable substitute for either artists or promoters, with coordinated multi-city touring promoted in the CCM Touring Market. From artists' perspective, an artist seeking the coordinated routing, financing, production, marketing, ticketing, and nationwide presentation of a multi-city tour cannot reasonably substitute a stand-alone One-Off Event for such a tour in response to changes in price or other terms. From promoters' perspective, a multi-city CCM tour cannot substitute an isolated One-Off Event for the

tour performances. Thus, CCM Tours and One-Off Events do not constrain one another, and clearly not sufficiently to constitute reasonably interchangeable products.

311. Applying the above criteria to Pollstar data, concert and promoter data have been excluded from the data presented herein where the Pollstar data reasonably indicates events appeared to be or have been, as judged by the Plaintiffs who have industry expertise to make such assessments (a) a One Off Event; (b) promoted as an "in house promotion," or by an individual venue, such as a specific church or theater (unless Pollstar coupled that venue with a third-party promoter); and/or (c) events owned or co-owned by the entity identified by Pollstar as the promoter in which that entity holds an ownership or equity interest in the event itself rather than acting as an independent third-party promoter hired to acquire, organize, promote, and present an artist's tour in return for negotiated promoter compensation. These owned or co-owned events are excluded from the promoter-market calculations because the owner is not competing in the same arm's-length transaction to acquire the right to promote another party's CCM Tour; it is promoting an event in which it has a proprietary interest.

312. To the extent any particular owned or co-owned event otherwise satisfies the criteria for a CCM Tour and reflects an arm's-length competitive acquisition of artists' tour performances, Plaintiffs do not exclude it merely because an entity involved in its promotion also possesses an ownership interest.

### *c.* ***The Geographic Market Is Nationwide***

313. The geographic market for the CCM Touring Market is nationwide, as CCM artists, promoters, and nonprofits participate in opportunities and evaluate engagements across the entire United States. The nationwide scope of the geographic market reflects the commercial realities of CCM touring especially given how CCM tours are planned, routed, and marketed on a nationwide

basis, as explained herein. The nationwide geographic market is further confirmed by the Pollstar data utilized herein, which reflects nationwide concert activity as a single integrated competitive landscape, and by the characterization by LiveCo/TPR of their enterprise as a nationwide, one-stop, full-service promotion company serving artists and nonprofits across the United States.

### *d.* ***<u>Consolidation of CCM Concert Promoters In The CCM Touring Market</u>*.**

314. From 2018 to the present, the leading CCM promoters whose activities are reflected in Pollstar have been Transparent, Premier, and Rush (collectively sometimes referred to as "LiveCo/TPR").

315. The Pollstar data referenced herein is set forth in three separate time periods demonstrating the market power of each of Transparent, Premier, and Rush as a combined group, operating separately and then later together in each of those periods:

> Period 1 concert data shows CCM concert data from January 1, 2018, through November 15, 2022, in which the self-reported Pollstar data shows operating results for these three promoters operating as separate, competing promoters;
>
> Period 2 s concert data shows CCM concert data from November 16, 2022, through November 16, 2023, in which the self-reported Pollstar data shows that while related to LiveCo, they reported their operations as separate promoters, (e.g., LiveCo/Transparent or LiveCo/Premier or LiveCo/Rush); and
>
> Period 3 concert data shows CCM concert data for the period from November 17, 2023, through December 31, 2025, in which the self-reported Pollstar data is presented as "LiveCo/TPR," indicating unity.

316. During these same three periods, Pollstar also reflects CCM concert data for Awakening Events (also called simply "Awakening"), a unique CCM concert promoter. Awakening is not truly similar to Transparent, Premier, and Rush individually or LiveCo/TPR as a group, as it is principally a festival-based promoter and works in conjunction with a primary radio station. Many of Awakening's concerts were and are solely owned or co-owned by

Awakening, rather than promoted solely on behalf of an artist's concert Platform. This creates unique performance and financial circumstances making its operations not directly comparable to that of LiveCo/TPR. Awakening data is nevertheless included in the analysis of the CCM Touring Market despite these dissimilarities, thus making the antitrust analysis very conservative.[18]

317. Besides Transparent, Premier, Rush and Awakening, there were many promoters generically referred to herein (not in Pollstar) as "Others" or "Other Promoters." Promoters in the "Other" category, have historically been very small operators who promoted events that (i) supported their own local or regional venues, radio stations, churches, or causes; (ii) worked with or for (or even owned) a few music groups whose performances they controlled and thus promoted; and/or (iii) promoted usually a very small number of local concerts annually, often only one or two. Their limited numbers and nature of their operations are noted hereafter in the detailed analysis of their dwindling numbers and limited activities in each of the relevant periods. See, footnotes 23, 25 and 26 below for each of Periods 1, 2 and 3, respectively.

318. For example, footnote 23 below demonstrates that during the almost five-year period constituting Period One, of the 126 promoters have been identified by Plaintiffs and reasonably determined to fall into the "Other" category, 80% of them produced on average one (1) or fewer concerts a year for the five-year period demonstrating they were neither capable of, nor conducted, nationwide CCM Tours.

319. Many of the events promoted by promoters in the "Other" category were CCM One-Off Events as herein defined, although some were occasionally combined into a short tour when regional routing coincidentally arose. Promoters properly included in this grouping typically had short commercial lives and were much more subject to and affected by market conditions, such as

[18] Plaintiffs reserve the right to alter the data presented to exclude Awakening.

COVID. While data on these eclectic promoters is intermixed on Pollstar, Plaintiffs have used their reasonable judgment to identify and remove that data from Pollstar market data used herein and in the market analyses herein contained.

*i.* *PERIOD 1 -- FROM JANUARY 1, 2018, UNTIL NOVEMBER 15, 2022.*

320. As to the four CCM promoters -- Transparent, Premier, Rush and Awakening -- the chart below reflects the resulting CCM Tour Market landscape during the five-year period constituting Period 1, beginning January 1, 2018, through November 15, 2022:

| Period 1<br>1/1/2018-- 11/15/2022 | | |
|---|---|---|
| COMPANY | NUMBER OF CONCERTS[1] | PERCENTAGE CONCERTS |
| AWAKENING | 538 | 18.39% |
| PREMIER | 1241 | 42.43% |
| TRANSPARENT | 765 | 26.15% |
| RUSH | 320 | 10.94% |
| CO-PROMOTIONS AMONG SOME COMBINATION OF TRANSPARENT, PREMIER, RUSH AND/OR LIVECO | 60 | 1.85% |

TPR Entities Percentage

81.61%

[1] During the COVID-19 period CCM concerts were illegal in some places and greatly discouraged in others. CCM concert events therefore occurred at Drive in Theaters and/or online or in virtual form, all of which were emergency techniques employed almost exclusively during the COVID-19 period. As such, numbers and data concerning such unique and transient emergency performances have been omitted from the Pollstar data shown.

321. During the First Period, or Period 1, the U.S. faith-based concert promotion market was obviously dominated by Transparent, Premier and Rush who together accounted for approximately 81.61% of CCM tours. While they operated as distinct, unrelated promoters and as vigorous competitors, they would on rare occasions co-promote certain performances within a

CCM Tour. Their market dominance is clear particularly when it is considered Awakening likely is not even comparable. [19]

322. The acquisitions and transactions that resulted in the acquisition of Transparent, Premier and Rush as previously competing promoters are set forth herein in numerous places including in Article V.A. The Period 1 data here show the competitive shares brought under common control through those acquisitions.

*ii.* *PERIOD 2-- FROM NOVEMBER 16, 2022, TO NOVEMBER 16, 2023*

323. The chart below reflects the self-reported data for Period 2, which is from November 16, 2022, through November 16, 2023, which dates correspond to a change in the self-reporting of the LiveCo/TPR to Pollstar reflecting both the continued operational independence of Transparent, Premier, and Rush, but also their common association via "LiveCo" as they reported their tour concerts as "LiveCo/Transparent" or "LiveCo/Premier" or "LiveCo/Rush": [20]

[19] During the almost five-year period constituting First Period, 126 promoters have been identified by Plaintiffs and reasonably determined to fall into the "Other" category as defined. Their data has thus been excluded. Demonstrating the de minimis activity of these "Other" promoters making them not comparable to the TPR Conspiracy Group and thus reasonably justifying their exclusion from the market analysis, is the fact that as reasonably determined by Plaintiffs: (a) 80% of them produced on average one (1) or fewer concerts a year for the five-year period; (b) 91% of them produced on average two (2) or fewer concerts a year for the five-year period; and (c) 94% of them produced on average four or fewer concerts a year for the five-year period. Also notable is the fact that 63% of these 126 "Other" promoters did not exist-- or did not promote concerts -- after the end of Period 1. Further, 73% did not promote into Period 3.

[20] Concerts indicated as "co-promoted" are those where the indicated entities essentially jointly promoted and so self-reported.

| Period 2<br>11/16/2022 -- 11/16/2023 | | |
|---|---|---|
| Company | Number of Concerts | Percentage Concerts |
| Awakening | 175 | 18.52 % |
| LiveCo/Transparent | 364 | 38.52 % |
| LiveCo/Premier | 227 | 24.02 % |
| LiveCo/Rush | 145 | 15.34 % |
| LiveCo/TPR | 24 | 2.54% |
| Co-Promotions Among Some Combination of Transparent, Premier, Rush and/or LiveCo | 8 | 0.85 % |
| Transparent | 1 | 0.11% |
| Rush | 1 | 0.11% |

TPR Entities Percentage 81.48%

324. During Period 2, the LiveCo/TPR collectively accounted for more than 81% of the reported concerts. The companies' separate operations, earnout incentives, exchange of deal information, and agreement not to submit competing offers are alleged in Article V.A and discussed hereafter. [21]

*iii.* *Period 3-- From November 17, 2023, to December 31, 2025*

325. During Period 3, the chart below reflects the self-reported data which is from November 17, 2023, through December 31, 2025:

| Period 3<br>11/17/2023 -- 12/31/2025 | | |
|---|---|---|
| Company | Number of Concerts | Percentage Concerts |
| Awakening | 333 | 22.71 % |
| LiveCo/TPR | 1127 | 76.88% |
| Premier/LiveCo/TPR | 3 | 0.20 % |
| Transparent | 2 | 0.14 % |
| Rush | 1 | 0.07% |

TPR Entities Percentage 77.29%

[21] During Period 2, Pollstar reflects of the 55 promoters who were reasonably determined by Plaintiffs to fall into the "Other" category. Their data has thus been excluded. Demonstrating the de minimis activity of these "Other" promoters making them not comparable to the TPR Conspiracy Group and thus reasonably justifying their exclusion from the market analysis is the fact that as reasonably determined by Plaintiffs, (a) 70% of them promoted on average one (1) or fewer concerts for that period; (b) 20% of them promoted between two (2) and three (3) concerts; and (c) 9 of them promoted between eleven (11) and nineteen (19) concerts.

326. The Period 3 data reflect increasingly unified reporting under LiveCo/TPR. Art. V.A, ¶157 describes their later announcement of combined operations. Plaintiffs rely on the chart for the combined competitive share after which separate corporate decision-making appears to have ended, if in fact it did.[22]

327. There can be no question that the referenced acquisitions and agreements between and among Transparent, Premier, Rush and the Waterland and LiveCo Defendants gave them monopoly and market power in the CCM Touring Market. While market share is a viable indicator of market power, here there are other relevant market dynamics including their partnership with World Vision on the nonprofit side [see Art. VI], that gives them market power greatly beyond the percentages herein stated.

***e. Small "Other" Promoters And iTickets***

328. As to the group of "Other" promoters, they were and are small, regional promoters, in the days before and during Period 1, when the CCM touring landscape was highly regionalized. Because no single company had "boots on the ground" or the church relationships to seamlessly run a 40-city coast-to-coast arena tour in the faith -based community alone, they would sometimes affiliate with small promoters in the Other category. A local promoter's primary value lay in their personal Rolodex of potentially interested CCM Tour attendees and a physical presence in the community giving them access to local pastors, local Christian radio stations and Christian bookstores in which they could hang flyers and place bulletin inserts, helping drive local ticket sales to the faith-based community.

[22] During Period 3, of the 77 promoters that fall into the "Other" category as defined, (a) 88% of them promoted one (1) to five (5) concerts over the two-year period.

329. In 2022, as LiveCo/TPR was being assembled, LiveCo/TPR acquired iTickets, an established ticketing and marketing business serving Christian concerts, churches, ministries, and faith-based events. iTickets was more than a means of processing ticket purchases. It had detailed records of event listings, customer relationships, CCM Tour concert ticket-buyers' histories, email addresses for targeted marketing, and group-sales capabilities, all of which permit LiveCo/TPR to identify and reach CCM potential audiences in particular local markets.

330. Before this consolidation, smaller regional promoters supplied local relationships with pastors, churches, Christian radio stations, bookstores, and church groups to generate attendance. By combining iTickets' customer information and marketing capabilities with the regional relationships acquired through Premier, Transparent, Rush, and other promoter acquisitions, LiveCo/TPR could perform much of that work centrally—identify prospective buyers, target advertising, organize church and group outreach, and direct customers to tickets—without retaining independent local promoters.

331. iTickets did not need to process every ticket sale to serve this purpose. Where an arena required another ticketing provider, LiveCo/TPR would market the concert and direct purchasers to that provider process sales itself. Through this, LiveCo/TPR gained access to faith-based ticket-buyer and venue information, including information revealing geographic markets where independent promoters were attracting audiences. Plaintiffs allege that LiveCo/TPR could and did use that competitively sensitive information to target and enter those markets, without providing rival promoters' comparable access, which they refused to do.

332. Where iTickets did issue CCM Tour concert tickets, ticketing generated revenues beyond the ticket's face value, including service, processing, delivery, and other charges, upgraded seating, and artist meet-and-greet packages (collectively, "Ticketing Surcharges"). By acquiring a

ticketing business, LiveCo/TPR was enabled to capture applicable Ticketing Surcharges on transactions they handled, in addition to obtaining the associated customer information. Plaintiffs further allege that LiveCo/TPR used their control over ticketing access to condition participation on promoter or artist exclusivity, thereby further disadvantaging independent promoters that were otherwise dependent on that access.

333. The market areas served by small local promoters typically could only withstand so many CCM concerts within a given period of time before the market was saturated. With iTickets, LiveCo/TPR was able to send out advance "blasts" to the potential audience members in locales, thus preempting the market further harming and ultimately destroying small, local promoters.

334. Thus, the acquisitions did more than increase LiveCo/TPR's revenues or improve its marketing efficiency. Combined with LiveCo/TPR's control of national CCM tours, LiveCo/TPR was able to bypass the local promoters who previously provided access to regional audiences, appropriate the commercial value of those audiences and their purchasing information, and reduce opportunities for independent promoters to participate profitably in the Markets, putting many of them out of business. Plaintiffs allege that this was another means by which LiveCo/TPR foreclosed the competitive participation of the Other promoters and maintained its market dominance.

335. Yet another means employed by LiveCo/TPR of foreclosing competition was in giving artists the "Hobson's Choice," described VI.B.d, ¶¶199–200. As a part of Option One of the Hobson's Choice, LiveCo'/TPR covered certain production costs that artists had previously covered from their Performance Fees which artists would otherwise amortize over all the concerts within a CCM Tour. As described in Art. VI.B.e, ¶¶203–206, however, in LiveCo/TPR providing

those additional production services, this meant that artists could not afford to conduct a "One Off Concert" for a local promoter while on a CCM Tour, as the artist would then have to provide its own production services for that one show, which could not be amortized over other shows. When these costs were attempted to be passed on to interested local promoters in the form of increased Performance Fees quotes for effectively single concert performances, it was quickly realized that promoting local concerts during intermittent days of a CCM Tour, was not financially feasible, which further destroyed the small, local promoters.

### f. ***The TPR Conspiracy Group's Monopoly And Market Power Over CCM Touring Market***

336. LiveCo/TPR was attempting and intending to and did in fact monopolize the CCM Touring Market. In the alternative, if they have not already, there was/is a dangerous probability that they will/would succeed in monopolizing the CCM Touring Market particularly given the concrete steps they have/had taken to accomplish that objective.

337. LiveCo/TPR's monopoly and market power is further demonstrated by its disproportionate capture of ticket revenue and ability to impose higher ticket prices on the market. Although LiveCo/TPR promoted approximately 77% of CCM concerts in Period 3, during that same period they captured approximately 87% of ticket revenue:

| Market Percentage | | | |
|---|---|---|---|
| COMPANY | NUMBER OF CONCERTS | NUMBER OF TICKETS SOLD | TICKETS REVENUE |
| AWAKENING | 22.71% | 16.15% | 13.32% |
| TPR | 77.29% | 83.85 % | 86.68% |

338. LiveCo/TPR's outsized revenue share is not accidental; it corresponds with their ability to charge ticket prices that were materially higher than Awakening, its only significant even arguable rival. The above chart also demonstrates that Awakening had lower attendance reflected in a lower number of ticket sales compared to the number of concerts it promoted.

339. Below is a chart showing average ticket pricing for Transparent, Premier, Rush and Awakening across the three periods:

| Average Ticket Prices | | |
|---|---|---|
| | AWAKENING | ALL TPR |
| **PERIOD 1** 1/1/18- 11/15/22 | $35.99 | $37.38 |
| **PERIOD 2** 11/16/22 - 11/16/23 | $41.39 | $39.01 |
| **PERIOD 3** 11/17/23 - 12/31/25 | $36.67 | $45.98 |

340. During Period 1 when Transparent Premier, Rush and Awakening competed in the marketplace, LiveCo/TPR's combined average ticket prices were only slightly higher than Awakenings. In Period 2 as Transparent Premier, and Rush began their consolidating activity, their ticket pricing was somewhat lower than Awakenings. However, in Period 3 after their combination appears to have been completed, the average ticket prices for their CCM Tour concerts were dramatically higher than Awakenings.

341. In a competitive market, revenue share and concert share would tend to move in tandem because buyers could substitute toward lower-priced alternatives. That did not happen here. Instead, because of its market dominance, LiveCo/TPR extracted materially more ticket revenue per concert and per attendee while still retaining dominant share. A promoter subject to real competitive discipline cannot systematically charge higher prices for similar offerings without losing business. LiveCo/TPR has been able to do so here because concertgoers lack meaningful alternatives. This is direct economic evidence that LiveCo/TPR possesses and exercises monopoly power to impose supra-competitive prices.

342. Furthermore, controlling ticket sales and receiving Ticket Surcharge revenue provided LiveCo/TPR more revenue than the face amount of tickets. Thus, even though the chart above shows elevated ticket prices which itself is indicative of supra-competitive pricing, the

predatory effect is significantly greater when these additional monopoly driven revenue components like Ticket Surcharges are taken into account.

343. LiveCo/TPR cannot escape this inference by claiming they promote "better" artists. Even if LiveCo/TPR was able to secure the most commercially valuable artists, that outcome itself reflects its dominance and the structural advantages flowing from its control of the CCM Touring market, as well as their ability to pay artists more with their increased revenues.

*g.* ***CONTROL OF VERTICAL AND HORIZONTAL ESSENTIAL INPUTS.***

344. In addition to acquiring a monopoly in the CCM Touring Market by acquiring the three largest CCM market promoters (Transparent, Premier and Rush), LiveCo/TPR expanded their monopoly through a host of other acquisitions (herein called " TPR Vertical Acquisitions").

345. One TPR Vertical Acquisition was LiveCo/TPR's acquisition of Round Table Management, an artist management firm. By this acquisition, LiveCo/TPR gained management of artists and thus a significant voice in each artists' operational decisions related to their Platforms. Control of this further constricted competition and ensconced their market control as artist management firms guided artists to promoters in the first place.

346. These and other TPR Vertical Acquisitions allowed LiveCo/TPR to control critical upstream and downstream channels of ticketing, staffing, and artist representation that competitors needed to promote successful tours in competition with LiveCo/TPR, and the ability to either provide those services (for a fee) or deny competitors the services of these necessary corollary services, thus eliminating viable competitive alternatives. It also gave them the associated revenue streams of money generated by these activities, which increased their competitive advantage particularly in terms giving them additional resources to pay increased amounts to artists for express or understood exclusivity.

347. As an additional TPR Vertical Acquisition, LiveCo/TPR also acquired a company called "Loop Events," a third-party vendor who was one of the only companies that could provide Volunteers required at every concert nationwide. Control of one of the only entities that could provide Volunteers at CCM concerts nationwide has given LiveCo/TPR a strangle hold over nonprofits and TCA, forcing them to deal with LiveCo/TPR. Even those competitors who could overcome all of the other insurmountable obstacles, nevertheless found themselves without Volunteers who were critical to the ability to contract with nonprofits, absent dealings with LiveCo/TPR.

348. These upstream and downstream TPR Vertical Acquisitions, often referred to as "vertical squeezes," collectively and individually, squeezed multiple competitive points in the Markets simultaneously.

349. Through control of (a) the CCM Touring Market, (b) many of the essential vertical inputs necessary to compete, and (c) management of many artists and artists' Platforms in connection with CCM tours, LiveCo/TPR acquired the ability to determine whether and how nonprofit sponsorship fundraising activities, discussed *infra*, could even occur during CCM tours as well as the ability to exclude all competition and competitors, such as TCA.

### B. The Nonprofit Sponsorship Market And Its Component Parts Defined.

350. Another market relevant in this case is the Non-Profit Sponsorship Market (previously, “NPS Market”). The NPS Market is the market for the acquisition, provision of, and access to, CCM artists' Public Platforms -- the ability to attract and hold an audience -- for the purpose of conducting charitable fundraising from audiences at live CCM concert events by means of which artists' Platforms are monetized by solicitations for charities and the enrollment of

audience members as donors -- referred to as "sponsors," -- reflecting that they are signing up to support a child or other charitable cause.

***a. Fundraising In The NPS Market By Means Of Artists' Platforms***

351. Fundraising in the NPS Market is more effective for nonprofits than traditional methods because charities are able to leverage the preexisting trust and goodwill between the performing artist and the audience. This form of solicitation is fundamentally different and distinct from other marketing or fundraising channels nonprofits employ, such as online advertising, email campaigns, social media outreach, direct mail, television, setting up tables in front of retail stores, and thus those aspects of fundraising do not provide reasonably interchangeable substitutes for live-event donor acquisition where nonprofits leverage the good will of performing CCM artists' Platforms.

352. These alternative fundraising activities do not provide access to a captive, in-person audience, do not leverage the trust relationship between artist and audience, and do not achieve similar conversion rates, donor quality, or long-term retention. As a result, nonprofits allocate dedicated budgets to this fund-raising channel which is separate from other fundraising methods

***b. The NPS Market Is Interlinked With The CCM Touring Market And Monopoly/Market Power In The CCM Touring Market Has Ensured Monopoly/Market Power in the NPS Market***

353. The NPS Market and the CCM Touring Market are inextricably linked through the common economic input of artists' Platforms making them structurally interdependent. In fact, without the CCM Touring Market, there is no NPS Market, and without the NPS Market, there is no CCM Touring Market.

354. Defendant Pugh, one of the founding members of the CCM promoter called Premier and also a founding member of LiveCo/TPR acknowledged to Plaintiffs at a meeting in March

2023, that Nonprofits and their involvement in the CCM Touring Market "is a part of the core business or our concerts..." Pugh went on to say that "this one piece determines our entire space" and that the CCM Touring Market would not be possible without the input and support from Nonprofit charities who participate in the separate but intricately tied NPS Market that functions symbiotically with the CCM Touring Market. The nature of the linkage and structural interdependence arises from the fact that CCM concert promoters have competed for access to artists' Platforms for concert ticket sales, and nonprofit charities compete for access to those same artists' Platforms to gain sponsors for their charitable endeavors.

355. Artists' public Platforms supply the separately marketable rights used for nonprofit solicitations at CCM concerts. Their ownership, commercial value, and fundraising mechanics are described in Article IV.D. Artists' Platforms were a critical input into the business models of World Vision, LiveCo/TPR, and TCA.

356. LiveCo/TPR has gained control of the NPS Market by gaining control of artists' Platforms as a result of their agreement with World Vision, a former horizontal competitor for the acquisition of Platforms.

357. While explained in detail in Art. IV.D–E, ¶¶115, 120–123 supra, which is incorporated by reference herein, in summary, Artists are the creators and sellers of Platforms. Initially there were many horizontally competitive purchasers. Promoters as a group were historically purchasers of Platforms who competed horizontally with "intermediaries," like Plaintiff TCA who also sought to purchase artists' Platforms. Both bought and then sold Platforms they acquired to nonprofits for fundraising.

358. Also, Nonprofits themselves purchased Platforms directly from artists, as known from Plaintiffs' first-hand experience, making Nonprofits also direct purchasers, and thus

horizontal competitors with promoters and TCA for the acquisition of Platforms and also depending on the circumstances, vertical purchasers.

359. As alleged herein and explained in detail in Art. IV.D, ¶¶120–122, LiveCo/TPR entered this competitive process of acquiring and/or controlling artists' Platform rights initially as a horizontal competitor of both TCA (who was an intermediary purchaser/seller) and also nonprofits, most importantly World Vision. Thus, TCA, LiveCo/TPR, World Vision (and other nonprofits) competed on the buyer side to obtain those rights; artists, TCA and LiveCo/TPR also competed in selling access to acquired Platforms to nonprofits.

360. The "currency" for purchasing Platforms took many forms as described in detail in Art. IV.C, ¶109 hereof. As explained in Art. VI.B, ¶¶176–177, 221, at some point between March and April 2023, World Vision and LiveCo/TPR ceased to compete for Platforms and reached an agreement where artists' Platforms were acquired by LiveCo/TPR who by pre-established agreement sold them to World Vision.

361. LiveCo/TPR was able to acquire those Platforms for resale to World Vision, by paying artists a higher Performance Fee and providing Production Services the costs of which artists would otherwise have to absorb. In exchange for these, the artists surrender their Platform rights as consideration. This sale was a coercive sale, presented to artists in the form of the Hobson's Choice described in detail in Article VI, coupled with a direct or implied additional coercive threat of artists being denied the ability to use LiveCo/TPR's promotional services unless they capitulated.

362. Calling the consideration LiveCo/TPR "offered" an increased Performance Fee did not eliminate the separate Platform transaction or the competition among purchasers for that input. LiveCo/TPR's agreement with World Vision displaced that independent competition with

coordinated acquisition and resale under the Hobson's Choice described in detail in Article VI.B.d–f, ¶¶197–218.

363. Control over access to nationwide CCM touring platforms and artist relationships, constitutes control over inputs essential to effective competition in the NPS Market. Because access to the CCM Touring Market is an essential input to competition in the NPS Market, a party that controls the CCM Touring Market possesses the ability to control entry, participation, and competitive dynamics in the NPS Market. Rivals to LiveCo/TPR who do not have access to these inputs that have been artificially acquired by purchase, cannot practically compete.

364. In summary, LiveCo/TPR coercively required artists to convey their Platforms to LiveCo/TPR for resale to nonprofit World Vision, who acquired those same rights directly for its own use. Although their downstream uses differed, each competed to acquire the same exclusive contractual rights from the same CCM artists.

365. As the NPS Market is interlinked with the CCM Touring Market, the geographic market for the NPS Market is also nationwide and co-terminus with the CCM Touring Market.

366. At the same time, the two markets are distinct. Their participants, transactions, and competitive dynamics, involve different buyers (nonprofits rather than ticket purchasers), different pricing structures (payments tied to donor acquisition rather than ticket sales), and different economic outputs (long-term donor revenue streams rather than single-event ticket revenue). Nevertheless, because the NPS Market cannot exist without the CCM Touring Market within which sponsorships are sought and the CCM Touring Market cannot exist without the NPS Market, although distinct, the NPS Market operates in practical conjunction with the CCM Touring Market, operating horizontally alongside, and in functional interdependence with, the CCM Touring Market. In the alternative, and to the extent the broader CCM Touring ecosystem is regarded as

the relevant frame of reference, the NPS Market constitutes a cognizable submarket within the broader CCM Touring Market.

367. Because the NPS Market is intricately and irrevocably intertwined with the CCM Touring Market, monopoly control over the CCM Touring Market has provided LiveCo/TPR with leveraged monopoly power over the NPS Market. In the alternative, LiveCo/TPR together with its partner, World Vision, has gained through leverage, monopoly and market power over the NPS Market. In the alternative, if they have not already, there was/is a dangerous probability that they will/would succeed in monopolizing the NPS Market.

### C. SPECIFIC CLAIMS

#### *a.* ***Acquiring The Principal Competing CCM Promoters Transparent, Premier And Rush And Eliminating Their Competition***.

368. The Waterland Defendants, acting through the acquisition entities they formed, and the LiveCo Defendants identified in Article V.A, contracted to acquire Transparent, Premier, and Rush, initially operate them separately and ultimately combine their previously competing businesses under common control. Those transactions removed the principal alternatives through which artists could obtain competing offers for their performances and Platforms, as more fully explained in Art. IV.C, ¶¶108–110; Art. V.A, ¶¶139–158 hereof which are incorporated by reference. Those businesses when acquired accounted for approximately 81.61% of the reported CCM concerts before consolidation; their combined share remained approximately 77.29% in Period 3, as more fully explained in Art. VII.E.d, ¶¶320–327 which are incorporated by reference, including the accompanying charts. Plaintiffs challenge the acquisitions individually and collectively because they constitute agreements in restraint of trade or commerce, and substantially lessened competition and tended to create a monopoly in the CCM Touring Market and, through control of touring Platforms, the NPS Market. These acquisitions violate Clayton Act §7, 15 U.S.C.

§18; the acquisition agreements forming the exclusionary combination also violate Sherman Act §1, 15 U.S.C. §1, and the deliberate acquisition of monopoly power through that combination violates Sherman Act §2, 15 U.S.C. §2

*b.* ***Agreeing Not To Submit Competing Offers For Artists During The Earnout Operations***.

369. While Transparent, Premier, and Rush continued operating separately, with earnouts tied to their respective operations, they exchanged deal information and agreed not to compete on artist offers. Pugh explained in March 2023 that the businesses operated independently because of the earnouts, and that "it would make no sense for us to compete with each other on a submission" as more fully explained in Art. V.A, ¶¶156–158; Art. VII.E.d, ¶¶323–326 hereof which are incorporated by reference. By withholding competing submissions, the promoters deprived artists of the bidding over Performance Fees, backend participation, and other terms that had previously occurred, as more fully explained in Art. IV.C, ¶¶108–109 hereof which are incorporated by reference. Plaintiffs allege that the agreement joined separate economic decision makers pursuing the distinct interests described in Article V.A and constituted horizontal bid suppression and allocation of artist business in violation of Sherman Act §1, 15 U.S.C. §1. Plaintiffs seek per se treatment of that horizontal noncompetition agreement and alternatively relief under the rule of reason

***c. Acquiring Ticketing And Artist Management And Volunteer Businesses To Restrict Competitive Access.***

370. In addition to acquiring the leading promoters, the Waterland and LiveCo Defendants acquired Tickets/iTickets, Round Table Management, and Loop Events. Those transactions placed local audience and ticketing information, influence over artists' promoter and Platform decisions, and one of the few nationwide sources of fundraising Volunteers within the

same enterprise controlling national CCM tours as more fully explained in Art. V.A, ¶147; Art. VII.E.e, ¶¶329–334; Art. VII.E.g, ¶¶344–349 hereof which are incorporated by reference. Their combined effect was to leave competing promoters, intermediaries, and nonprofits dependent on LiveCo/TPR for multiple inputs needed to acquire performances and monetize Platforms, while LiveCo/TPR could condition or deny access to those inputs as more fully explained in Art. VII.E.g, ¶¶346–349 hereof which are incorporated by reference. Plaintiffs challenge these acquisitions individually and in combination with the promoter acquisitions as transactions substantially lessening competition or tending to create a monopoly in the Markets, in violation of Clayton Act §7, 15 U.S.C. §18, and as components of the willful acquisition and maintenance of monopoly power in violation of Sherman Act §2, 15 U.S.C. §2.

*d.* ***World Vision and LiveCo/TPR agreeing to stop competing independently for Platforms***.

371. World Vision and the promoters had competed with each other and TCA to buy the same artists' Platforms. They agreed with LiveCo/TPR instead that World Vision would cease independent acquisition, LiveCo/TPR would acquire the Platforms using its touring power, and World Vision would purchase the acquired rights from LiveCo/TPR as more fully explained in Art. IV.D–E, ¶¶120–123, 131; Art. VI.B, ¶¶172–178; Art. VII.F.b, ¶¶357–361 hereof which are incorporated by reference. Reiser's April 2023 disclosure of World Vision's $500-per-sponsor commitment, his statement that TCA would be unable to re-sign its artists, and the ensuing joint tours conducted by LiveCo/TPR and World Vision, corroborate that agreement as more fully explained in Art. VI.B.b, ¶¶191–195; Art. VI.B.f, ¶¶226–234; Art. VII.G.p, ¶¶388–390 hereof which are incorporated by reference. The agreement removed World Vision as an independent bidder and allocated acquisition and subsequent access to Platforms between the two buyers, while excluding TCA and alternative purchasers. These acts constitute an agreement restraining

horizontal purchasing competition and allocating Platform acquisition and access in violation of Sherman Act §1, 15 U.S.C. §1, and participation in a conspiracy to monopolize the Markets in violation of Sherman Act §2, 15 U.S.C. §2.

***e. Conditioning Economically Viable Touring On Surrender Of Separately Marketable Platforms.***

372. LiveCo/TPR offered artists the Hobson's Choice: receive the higher Performance Fee and Production Services only by conveying their Platforms to LiveCo/TPR or retain those rights and receive a Performance Fee so low, coupled with their own production expense, that touring became uneconomical. The communicated consequence was that artists retaining their rights ordinarily could not obtain viable LiveCo/TPR promotion, as more fully explained in Art. VI.B.d–e, ¶¶197–202 and the stated Options One and Two; Art. VI.B.f, ¶¶199 hereof which are incorporated by reference. Gokey reported a difference of as much as $8,500 per show and an inability to tour as a headliner without losing money as more fully explained in Art. VI.B.f, ¶¶211–212 and the reproduced correspondence; Newsboys subsection, ¶¶NB9–NB14 hereof which are incorporated by reference. LiveCo/TPR and World Vision presented the same Option One proposal to MercyMe in 2024 and later in 2025, which TCA could meet only by accepting an uneconomical minimum, and Wells voiced the same complaints as Gokey as more fully explained Art. VI.C.a, ¶¶239–241, 245; Art. VI.B.f, ¶213 hereof which are incorporated by reference. LiveCo/TPR thus conditioned viable touring arrangements in the CCM Touring Market on the artist's conveyance of distinct, independently traded Platform rights in the NPS Market, across its dominant touring network as more fully explained in Art. VII.E.d, ¶¶320–327; Art. VII.F.b, ¶¶357–366 hereof which are incorporated by reference. These coercive agreements constitute unlawful tying under Sherman Act §1, 15 U.S.C. §1, and exclusionary use of monopoly and monopsony power under Sherman Act §2, 15 U.S.C. §2

***f. Requiring artists to reserve their Platforms for the LiveCo and World Vision channel.***

373. Through the artist agreements implementing Option One and the reciprocal World Vision purchase arrangement, LiveCo/TPR acquired the artists' fundraising rights for its own resale, rather than leaving artists free to sell those rights independently to TCA or competing nonprofits as more fully explained in Art. VI.B, ¶¶173–175, 197–200; Art. VI.B.f, ¶¶219–221, 233–234; Art. VII.F.b, ¶¶360–364 hereof which are incorporated by reference. Artists consequently lost competing buyers for their Platforms; intermediaries such as TCA lost the rights they bought and resold; and other nonprofits lost the opportunity to obtain those rights directly from artists or through an independent intermediary. The restrictions operated over the affected tours within the dominant network described in this Complaint as more fully explained in Art. VI, ¶¶166–171; Art. VII.E.d, ¶¶320–327 hereof which are incorporated by reference. These agreements substantially restricted independent Platform transactions and constitute exclusive dealing and concerted exclusion in violation of Sherman Act §1, 15 U.S.C. §1, and exclusionary acquisition and maintenance of control over the NPS Market in violation of Sherman Act §2, 15 U.S.C. §2

*g.* ***Using TCA's Confidential Pricing To Make The Retained Platform Alternative Uneconomical***.

374. The Waterland and LiveCo Defendants obtained TCA's confidential artist commitments, purchase prices, and nonprofit resale prices under restricted-use agreements during the proposed TCA acquisition, then abandoned that acquisition in favor of the World Vision arrangement as more fully explained in Art. V.B, ¶¶159–165 hereof which are incorporated by reference. LiveCo/TPR used the disclosed spread to set the lower Performance Fee so that retained sponsorship income would not make touring viable and to frame competing offers with knowledge

of how much profit TCA could surrender to retain an artist. World Vision participated with knowledge of those economics as more fully explained in Art. VI.B.f, ¶¶210–217 hereof which are incorporated by reference. The same information was used and disclosed in the competing MercyMe proposal, which Brickell said TCA could not beat as more fully explained in Art. VI.C.a, ¶¶239–245 hereof which are incorporated by reference. This conduct disabled the independent sponsorship alternative and advanced the agreed removal of TCA from the NPS Market. The concerted use of that information to implement the exclusionary arrangement violates Sherman Act §1, 15 U.S.C. §1, and its use to acquire and maintain monopoly and monopsony power violates Sherman Act §2, 15 U.S.C. §2.

*h.* ***Replacing Independent Buyer Bidding With Coordinated Platform Pricing*.**

375. World Vision and LiveCo/TPR ceased bidding independently for artists' Platforms and implemented the common acquisition-and-resale arrangement, using their knowledge of TCA's prices to calibrate the consideration offered through the Hobson's Choice as more fully explained in Art. VI.B, ¶¶173–175; Art. VI.B.f, ¶¶214–221; Art. VII.F.b, ¶¶360–362 hereof which are incorporated by reference. Plaintiffs allege on information and belief that their commitment included coordinated artist-side acquisition terms in place of the competing offers these buyers otherwise would have made; the alleged coordination is reflected in their joint proposals and use of the disclosed pricing spread as more fully explained in Art. VI.B.f, ¶¶214–221; Art. VI.C.a, ¶¶239–243 hereof which are incorporated by reference. This restraint suppressed independent bidding over what artists, including the Newsboys, received for their Platforms and allowed the common channel to determine terms without the competitive constraint previously supplied by World Vision and TCA. Plaintiffs challenge that buyer-side price coordination and suppression of

bidding under Sherman Act §1, 15 U.S.C. §1, and its implementation as part of the exclusionary monopolization scheme under Sherman Act §2, 15 U.S.C. §2.

### *i.* ***Restricting Production Use So Artists Cannot Perform For Independent Regional Promoters.***

376. Under Option One, LiveCo/TPR supplied Production Services but restricted their use to its own concerts. An artist accepting an independent regional engagement on an open tour date therefore had to obtain separate equipment and personnel for that single concert, rather than use the production already traveling with the tour. Those additional costs produced Performance Fee quotes that regional promoters could not economically pay as more fully explained in Art. VI.B.e, ¶¶203–206; Art. VII.E.e, ¶335 hereof which are incorporated by reference. The restriction effectively committed artists to LiveCo/TPR even on dates it was not promoting, deprived artists of additional purchasers of their performances, and prevented regional promoters from competing for those engagements. (Id.) This practical touring exclusivity reinforces LiveCo/TPR's control over performances and the Platforms presented at those concerts and constitutes exclusive dealing in violation of Sherman Act §1, 15 U.S.C. §1, and exclusionary maintenance of monopoly and monopsony power in violation of Sherman Act §2, 15 U.S.C. §2

### *j.* ***Conditioning Ticketing Access On Exclusivity While Using Rival Audience Information To Exclude Promoters.***

377. Through iTickets, LiveCo/TPR obtained local ticket-buyer, audience, venue, and marketing information, including information identifying geographic markets served by independent promoters. It used that information to enter and preempt those limited-demand markets while refusing rivals comparable access, and conditioned ticketing participation on promoter or artist exclusivity as more fully explained in Art. VII.E.e, ¶¶328–334 hereof which are incorporated by reference. In conjunction with its touring and production restrictions, those

conditions reduced the remaining promoters' ability to obtain artists and reach viable audiences as more fully explained in Art. VII.E.e, ¶¶332–335; Art. VI.B.e, ¶¶203–206 hereof which are incorporated by reference. Plaintiffs challenge the restrictive access and exclusivity arrangements as part of the conduct removing regional promotional alternatives, rather than treating ordinary centralized marketing as unlawful by itself. The exclusivity agreements violate Sherman Act §1, 15 U.S.C. §1, and the exclusionary use of ticketing control within the broader monopolization scheme violates Sherman Act §2, 15 U.S.C. §2

***k. Using Control Of Nationwide Volunteers To Prevent Independent Sponsorship Operations.***

378. Loop Events was one of the few businesses able to supply the Volunteers required at concerts nationwide. After acquiring it, LiveCo/TPR controlled that source along with the tours and Platform access, leaving TCA and nonprofits unable to obtain the necessary Volunteers without dealing with LiveCo/TPR as more fully explained in Art. VII.E.g, ¶¶344–349 hereof which are incorporated by reference. Volunteers were needed to distribute pledge materials and staff the nonprofit information tables, so a competitor that secured artist and nonprofit commitments still could not carry out the nationwide sponsorship operation without that staffing as more fully explained in Art. IV.D, ¶116; Art. VII.E.g, ¶347 hereof which are incorporated by reference. Plaintiffs challenge the use of that control to block the independent Platform channel described above and reinforce the LiveCo/World Vision arrangement as more fully explained in Art. VI.B, ¶¶173–175; Art. VI.B.f, ¶¶233–234 hereof which are incorporated by reference. This exclusionary restriction of a necessary operational input, as part of the conduct maintaining control of the Markets, violates Sherman Act §2, 15 U.S.C. §2; its agreed implementation through the LiveCo/World Vision restraint also violates Sherman Act §1, 15 U.S.C. §1

***l. Diverting The Wells And Gokey Platforms Already Committed To TCA; Reiser Conducts A Wells/Gokey Tour While Both Artists Were Under Exclusive Platform Contracts With TCA.***

379. Reiser stopped communicating with Plaintiffs and for LiveCo/TPR produced without Plaintiffs the tour that appeared as the Takeback Tour noted as having been sponsored by World Vision and Transparent, without TCA or its nonprofit, Children International as more fully explained in Art. VII.G.p, ¶¶388–390; Art. VI.B.f, ¶¶223–225 hereof which are incorporated by reference. LiveCo/TPR and World Vision knew of the artists' exclusive commitments and advances from TCA's acquisition disclosures and the tour-planning discussions, yet the joint tours used the Platforms for World Vision as more fully explained in Art. VII.G.p, ¶¶387–390; Art. VI.B.f, ¶¶230–234 hereof which are incorporated by reference. Those coordinated transactions removed rights from the independent TCA channel and prevented TCA from performing its corresponding nonprofit commitments while supplying the same fundraising opportunities through defendants' channel as more fully explained in Art. IV.E, ¶¶124, 129–130; Art. VII.G.p, ¶390; Art. VI.B.f, ¶¶232–234 hereof which are incorporated by reference. The concerted diversion and refusal to honor TCA's independent Platform channel violate Sherman Act §1, 15 U.S.C. §1, and constitute exclusionary conduct maintaining LiveCo/TPR's market control under Sherman Act §2, 15 U.S.C. §2

***m. Preventing Nonprofits Other Than World Vision From Partnering With TCA On Liveco/TPR Tours.***

380. The LiveCo/TPR tours that used Platforms TCA held were sponsored by World Vision, not by TCA or it's nonprofit. On the Takeback Tour, neither TCA nor Children International was mentioned or involved, although Wells and Gokey were under exclusive contract to TCA, and the announced MercyMe/TobyMac tour named World Vision as the nonprofit sponsor. Reiser told Plaintiffs that "World Vision hates you guys." as more fully explained in Art.

VII.G.p, ¶¶388–390; Art. VI.B.f, ¶¶225, 232; Art. VI.C.b, ¶¶262–263; Art. VI.B.b, ¶192 hereof which are incorporated by reference. Plaintiffs allege that Defendants thereby prevented TCA and its nonprofit partners from participating on LiveCo/TPR-controlled tours and denied TCA access to those tours' audiences as more fully explained in Art. VII.H.c, ¶410(b), (d) hereof which are incorporated by reference. This concerted exclusion violates Sherman Act §1, 15 U.S.C. §1, and, as exclusionary conduct maintaining LiveCo/TPR's control of the NPS Market, Sherman Act §2, 15 U.S.C. §2

***n. Coordinating MercyMe's Termination To Remove TCA's Most Important Competitive Platform.***

381. MercyMe's August 2024 contract preserved TCA's exclusive access to its Platform and granted a post-Term matching right after TCA met the competing LiveCo/World Vision proposal as more fully explained in Art. VI.C.a, ¶¶239–258 hereof which are incorporated by reference. Those rights prevented the contemplated MercyMe/TobyMac sponsorship arrangement from proceeding through World Vision and constrained subsequent offers as more fully explained in Art. VI.C.b, ¶¶262–273 hereof which are incorporated by reference. LiveCo/TPR, World Vision, and the MercyMe Defendants, including the participating managers, conspired to agree to remove that obstacle, and the announced tour, Collins's resignation, the purported termination, and the ensuing performances implemented that plan as more fully explained in Art. VI.E, ¶¶285–292 hereof which are incorporated by reference. Removing MercyMe deprived TCA of its commercially central Platform and impaired the alternative that had enabled artists to retain sponsorship rights while touring as more fully explained in Art. VI.C, ¶¶236–238; Art. VI.C.a, ¶¶244–245 hereof which are incorporated by reference. The coordinated termination and replacement arrangements constitute concerted exclusion and refusal to deal under Sherman Act

§1, 15 U.S.C. §1, and exclusionary monopoly maintenance and conspiracy to monopolize under Sherman Act §2, 15 U.S.C. §2.

***o. Coordinating the Fargo publication and its use to drive artists away from TCA.***

382. LiveCo/TPR hired Nicole, used and amplified the alleged Fargo Fabrication, and participated in the sequence through which its employee met with the Defamation Defendants. It circulated the narrative to the market and to artists under TCA contracts and advised MercyMe about the impending article and the asserted danger of continued association with Plaintiffs as more fully explained in Art. VI.D, ¶¶276–284 hereof which are incorporated by reference. Publication then occurred within the coordinated sequence leading to MercyMe's purported termination as more fully explained in Art. VI.E, ¶¶290–292 and the accompanying chronology hereof which are incorporated by reference. Plaintiffs allege on information and belief that the participating Defamation Defendants joined this coordinated course of conduct toward the shared purpose of removing TCA and the Newsboys as competitive forces, and that defendants used the narrative to enforce that exclusion as more fully explained Art. VI, ¶¶166–171; Art. VI.D, ¶¶279–284 hereof which are incorporated by reference. This coordinated mechanism for disrupting the independent Platform channel constitutes concerted restraint under Sherman Act §1, 15 U.S.C. §1, and exclusionary monopoly maintenance and conspiracy to monopolize under Sherman Act §2, 15 U.S.C. §2

***p. Newsboys Illegally Boycotted.***

383. In June 2023, Jared Gibo, who worked with Transparent and would shortly become CEO of LiveCo/TPR, told Dave Wagner that Transparent would no longer promote Newsboys' CCM concerts. Gibo attributed the decision to a "rumor" but refused to provide details

384. Earlier in 2023, Transparent's founder and president, Tim Taber, had mentioned a vague rumor to Steve Campbell, the Newsboys' road manager and Wes Campbell's brother. When Steve asked Taber to investigate, Taber replied that it was "probably just gossip," as the following exchange shows. **See Exhibit 11.**

385. At the time, Rush was promoting Newsboys' CCM tours under an agreement with Jacob Reiser that Rush would be the group's exclusive promoter.

386. In fall 2023, Plaintiffs discovered that Rush had done virtually no marketing for Newsboys concerts it had scheduled. Confronted in December 2023, Reiser admitted he had been "instructed" to schedule those concerts but market them only enough to cover Rush's costs. The Newsboys nevertheless incurred their own production expenses, and disappointing ticket revenues left Plaintiffs and particularly Wes Campbell to fund the shortfall. Plaintiffs allege that the instruction was intended to drain the group's resources and financially cripple Plaintiffs and to remove them from the market as competitors.

387. Reiser expressed remorse and promised to improve the marketing. As disclosed to the Waterland and LiveCo Defendants during the proposed TCA acquisition, TCA held exclusive Platform contracts with numerous artists, many of whom had received advances against commitments to generate sponsorships. LiveCo/TPR's predominance in CCM touring left those artists dependent on its promotion to fulfill their commitments as more fully explained in Art. IV.E, ¶129; Art. V.B, ¶¶159–165; Art. VI.B.f, ¶¶209, 215, 225hereof which are incorporated by reference.

388. After Reiser's assurances, Wagner and Rush resumed tour planning. Wagner proposed a joint tour featuring Tauren Wells and Danny Gokey, both under TCA contracts and owing sponsorships for which TCA had advanced payment. Reiser was enthusiastic and proposed


Case 3:26-cv-00484 Document 133-1 Filed 10/09/26 Page 124 of 231 PageID #: 1741

including the Newsboys, another TCA client. His proposal was inconsistent with the suggestion that a branding or perception problem barred promoting the Newsboys.

389. In early 2024, Reiser/Rush stopped communicating about the proposed Wells/Gokey tour. Plaintiffs later saw the following flyer for the "Takeback" tour they had discussed, which was now promoted through LiveCo/TPR and World Vision, as the flyer reproduced at Art VI.B.f, ¶224 demonstrates.

390. The flyer identified World Vision and Transparent Productions, while neither TCA nor Children International was mentioned or involved. LiveCo/TPR knew of Wells' and Gokey's exclusive commitments from TCA's acquisition disclosures and the planning discussions. Plaintiffs allege that the tour diverted their contracted sponsorship opportunities to LiveCo/TPR and World Vision, actions that were intended to destroy Plaintiffs as competitors and remove them from the markets.

391. Throughout 2023 and 2024, TCA's contracted artists began abandoning their exclusive agreements while continuing to tour with LiveCo/TPR, which was intended to destroy Plaintiffs and remove them from the market. They stopped returning TCA's calls or explaining their conduct. Plaintiffs' investigation revealed that the Waterland and LiveCo Defendants and World Vision conditioned economically viable touring on surrender of the artists' sponsorship arrangements. Artists retaining their Platforms received substantially lower Performance Fees while remaining responsible for production expenses as more fully explained in Art. VI.B.d–f, ¶¶197–202, 208–218 hereof which are incorporated by reference.

392. Gokey's representative described that pressure in the correspondence set forth in Art. VI.B.f, ¶¶211–212, hereof which are incorporated by reference.

393. The correspondence reports that promoters, meaning LiveCo/TPR, conditioned higher guarantees on collecting sponsorships themselves. For Gokey, retaining sponsorship rights reduced the guarantee by as much as $8,500 per show, making headlining tours unprofitable. Plaintiffs allege that LiveCo/TPR used those terms to obtain Platforms for its World Vision arrangement as more fully explained in Art. VI.B.f, ¶¶210–221 hereof which are incorporated by reference.

394. This tied economically viable touring in the CCM Touring Market to surrender of separately marketable Platform rights in the NPS Market as more fully explained in Art. VII.B.b, ¶¶155–164 hereof which are incorporated by reference.

395. TCA's confidential acquisition disclosures identified its contracted artists, their financial terms, and their sponsorship commitments, allowing LiveCo/TPR to calibrate the competing offers as more fully explained in Art. V.B, ¶¶159–165; Art. VI.B.f, ¶¶214–217 hereof which are incorporated by reference.

396. Plaintiffs allege that the same conditions were imposed across TCA's disclosed artist roster, removing the independent sponsorship arrangements those artists had made with TCA as more fully explained in Art. VI.A.f, ¶¶12–16 hereof which are incorporated by reference.

***q. <u>Withholding Newsboys' Promotion And Inducing Artists To Abandon TCA.</u>***

397. Transparent advised Wagner in June 2023 that it would no longer promote the Newsboys, citing an undisclosed rumor after Taber had characterized the earlier rumor as probably gossip. Rush then failed to meaningfully market Newsboys concerts it had scheduled, and Reiser later proposed including the group in the Wells/Gokey tour as more fully explained in Art. VII.G.p, ¶¶383–388 hereof which are incorporated by reference. Meanwhile, TCA's contracted artists abandoned its arrangements while continuing to tour with LiveCo/TPR, under terms conditioning

viable touring on surrender of sponsorship rights as more fully explained in Art. VII.G.p, ¶¶391–396; Art. VI.B.f, ¶¶210–218hereof which are incorporated by reference. Plaintiffs allege that these acts implemented the agreement between LiveCo/TPR and World Vision to eliminate TCA's independent Platform channel and suppress the Newsboys' performances and Platform, reducing artists' alternative purchasers and audiences' performance choices as more fully explained in Art. VI, ¶¶166–171; Art. VI.B.f, ¶¶219–221, 232–234; Art. IV.E, ¶¶123–131 hereof which are incorporated by reference. The refusal to deal with the Newsboys is pleaded at Art. VII.H.c, ¶410(a), and their resulting injury Art. VII.I, ¶¶423–425, 433–434 hereof which are incorporated by reference. That concerted exclusion and refusal to deal violate Sherman Act §1, 15 U.S.C. §1; their use to maintain monopoly power and implement the conspiracy to monopolize violates Sherman Act §2, 15 U.S.C. §2

***r. Deliberately withholding marketing from scheduled Newsboys' concerts.***

398. Rush scheduled Newsboys concerts under its exclusive promotion arrangement but did virtually no marketing. In December 2023, Reiser admitted he had been instructed to market only enough to cover Rush's costs, while the Newsboys remained responsible for production costs and Wes Campbell funded the shortfall as more fully explained in Art. VII.G.p, ¶¶385–387 hereof which are incorporated by reference. Plaintiffs allege that this deliberate reduction of promotion was intended to exhaust Plaintiffs' resources and disable their performances and independent Platform, reinforcing the dominant enterprise's control of touring and the LiveCo/World Vision sponsorship channel as more fully explained in Art. VII.G.p, ¶¶386–387; Art. VI, ¶¶166–171; Art. VI.B.f, ¶¶219–221, 232–234; Art. VII.E.d, ¶¶320–327 hereof which are incorporated by reference. Plaintiffs challenge that exclusionary use of an existing exclusive promotion relationship as part of the willful maintenance of monopoly power in violation of Sherman Act §2, 15 U.S.C. §2

### *s. Acquiring And Maintaining Control Of Both The Artist Side And The Audience And Ticket Side.*

399. The acquisitions removed competing purchasers of artists' performances, and the Choice, production restrictions, ticketing restrictions, and coordinated Platform diversions prevented the remaining purchasers and sponsorship intermediaries from restoring those alternatives as more fully explained in Art. V.A, ¶¶139–158; Art. VI.B.e–f, ¶¶203–218, 226–234; Art. VII.G.p, ¶¶388–390; Art. VII.E.e–g, ¶¶328–349 hereof which are incorporated by reference. LiveCo/TPR thereby controlled what artists had to accept to tour and independently sell Platforms, while its dominant share of concerts and disproportionate ticket revenues reflected power on the audience/ticket side as more fully explained in Art. VI.B.f, ¶¶210–218; Art. VII.E.f, ¶¶336–343 hereof which are incorporated by reference. Entry barriers protecting that power are pleaded at Art. VII.H.e, ¶¶415–420 hereof which are incorporated by reference. Plaintiffs challenge that course of conduct as willful acquisition and maintenance of monopoly power in the CCM Touring and NPS Markets, including dominant buyer power over performances and Platforms, in violation of Sherman Act §2, 15 U.S.C. §2. Alternatively, the same exclusionary acts, specific intent to monopolize, concentrated shares, and restrictions on competing access establish attempted monopolization, including attempted monopolization, under Sherman Act §2, 15 U.S.C. §2

### *t. Joining The Common Plan To Acquire And Maintain Monopoly Control.*

400. The Waterland and LiveCo Defendants assembled the dominant touring enterprise; World Vision agreed to cease independent bidding and purchase the acquired Platforms; the MercyMe Defendants and participating managers agreed to remove TCA's competing contractual rights; and the participating Defamation Defendants supplied the coordinated publication mechanism used to disrupt Plaintiffs' market relationships as more fully explained in Art. V.A–B, ¶¶139–165; Art. VI.B, ¶¶173–178; Art. VI.B.f, ¶¶233–234; Art. VI.C, ¶236; Art. VI.D–E, ¶¶276–

292 hereof which are incorporated by reference. Plaintiffs allege that these participants agreed with the specific intent to acquire or maintain LiveCo/TPR's monopoly control in the Markets, and that the Hobson's Choice, joint tours, Platform diversions, Newsboys marketing suppression, Fargo campaign, and coordinated MercyMe termination were overt acts implementing that agreement as more fully explained in Art. VI, ¶¶166–171; Art. VI.B, ¶¶197–202; Art. VI.B.f, ¶¶227–234; Art. VII.G.p, ¶¶383–396; Art. VI.D–E, ¶¶279–292 hereof which are incorporated by reference. These complementary undertakings removed independent competitive alternatives and constitute a conspiracy to monopolize under Sherman Act §2, 15 U.S.C. §2, and a combination and conspiracy in unreasonable restraint of trade under Sherman Act §1, 15 U.S.C. §1

### D. ANTICOMPETITIVE IMPACT ON COMMERCE AND THE MARKETS

#### *a. Anticompetitive Impact On Competition vis a vis Impact On Artists*

401. The Hobson's Choice made economically viable touring compensation conditional on sale or relinquishment of the artist's separately marketable Platform rights. Retention of those rights instead brought reduced Performance Fees and responsibility for Production Services that made touring uneconomical. Art. VI.B.d–e, ¶¶197–206 and the ensuing Option Two allegations in Art. VI.B.f, ¶¶208–218explain this. The Gokey correspondence and use of TCA's confidential pricing to calibrate both options are alleged there as well.

402. MercyMe's exceptional 2024 renewal with TCA required TCA to accept otherwise uneconomical minimum economics to preserve that critical relationship. Art. VI.C.a, ¶¶245–246That isolated response did not restore independent bidding or make the retained-rights option a practical alternative throughout the market.

#### *b. Anticompetitive Impact On Competition vis a vis Nonprofits*

403. As to nonprofits, the negative impact of the actions of LiveCo/TPR has had a profound impact on them, which in turn has damaged Plaintiffs. Particularly during Period Three, a substantial percentage of CCM Touring concerts included nonprofit participation and fundraising presentations. These concerts constitute the primary platform through which nonprofit sponsorship activity occurs.

404. Because LiveCo/TPR control more than 77% of CCM tours and substantially all NPS Market activity occurs in connection with CCM Touring platforms, LiveCo/TPR control incontestable.

405. LiveCo/TPR approached nonprofits directly, soliciting arrangements under which LiveCo/TPR would be the direct beneficiaries of sponsorship revenue generated from CCM concerts which by definition precluded nonprofits contracting with artists or intermediaries, like TCA or at the very minimum served to greatly increase the amounts nonprofits had to pay to even attempt to stay in the game.

406. The contemporaneous amendment to TCA's nonprofit agreement confirms actual market pressure from direct nonprofit-to-promoter sponsorship pricing and the resulting need to increase compensation to retain artists. Art. VI.B.b, ¶¶194–195. This was a market-wide change in the terms on which Platforms could be acquired, not simply the loss of one customer, although Plaintiffs and the market were profoundly affected.

407. The amounts nonprofits were charged for access to those platforms LiveCo/TPR now controlled, effectively precluded participation by smaller but nonetheless worthy charities, who could not match the rates demanded by LiveCo/TPR, from participating in the NPS Market at all, thus affecting Plaintiffs. On information and belief, TPR personnel have acknowledged to third parties that TPR's pricing structure was set at levels that smaller nonprofits could not meet.

408. The exclusion of smaller nonprofits did not arise solely because one charity had greater resources. It arose because the arrangement foreclosed independent purchases from artists and intermediaries and placed access to the available Platforms under the control of LiveCo/TPR and its agreed purchaser, World Vision.

### *c. Anticompetitive Impact On Competition vis a vis TCA and Plaintiffs*

409. TCA was an independent buyer and reseller of artists' Platform rights, compensated through the spread between its purchase and resale prices and providing the necessary sponsorship infrastructure. Its exclusion removed that independent transaction channel and the competitive constraint it supplied.

410. TCA was thus a direct participant in the NPS Market and a specific target of Defendants' conduct. Defendants sought to eliminate TCA as a competitive intermediary by (a) refusing to deal with TCA and the Newsboys; (b) denying TCA and affiliated artists access to TPR-controlled tours or imposed economically prohibitive terms; (c) coercing and pressuring artists and nonprofits to cease doing business with TCA; (d) preventing nonprofits from partnering with TCA on TPR-controlled tours; (e) denying TCA access to spokespersons and volunteers; and (f) restricting access to essential inputs necessary to compete.

411. LiveCo/TPR' conduct was aimed at eliminating TCA from the NPS Market in order to capture as much as 100% of the sponsorship revenue streams and entrench their monopoly power in both the NPS Market and the CCM Touring Market. While the injury has been to competition, not merely competitors, the harm to TCA has been direct.

412. LiveCo/TPR' leveraging control over essential inputs for artists and their intermediary assigns, like TCA, and nonprofits has had the effect of: (a) increasing LiveCo/TPR' total revenues and profits without a corresponding increase in concert output; (b) foreclosing

competitors, including TCA, from access to nonprofit sponsorship opportunities; (c) reducing output and resulting in fewer market participants; and (d) forcing artists out of the market or preventing them from touring economically reducing nonprofits' participation.

413. The same restraints raised entry barriers by requiring a rival to reproduce both touring access and sponsorship infrastructure. LiveCo/TPR's control of Production Services also made independent concerts during its tours prohibitively expensive, foreclosing smaller regional promoters and artists' alternative engagements. Art. IV.B, ¶102 and Art. VI.B.e, ¶¶203–206. This created de facto touring exclusivity even on dates LiveCo/TPR was not itself promoting.

### *d. Employing Dirty Tricks To Throttle Competition*

414. Defendants also used the Fargo Fabrication to disrupt artists' and nonprofits' relationships with TCA and to remove the Newsboys and TCA as competitive forces. Art. VI.D, ¶¶274–284. Plaintiffs allege that this coordinated campaign served the exclusionary scheme and enforced the refusal to deal, rather than treating every defamatory statement as an antitrust violation by itself.

### *e. Insurmountable Barriers To Entry Have Been Erected*

415. With the consolidation of market power in LiveCo/TPR, competition in both the CCM Touring Market and the NPS Market was dramatically curtailed, if not eliminated and extensive barriers to entry have been erected.

416. The barriers to entry in the CCM Touring Market itself are substantial and have been materially heightened by LiveCo/TPR' acquisitions. A new entrant seeking to promote CCM tours at meaningful scale must independently establish relationships with major CCM artists, secure access to venues in multiple markets simultaneously, develop national routing and logistics infrastructure, obtain access to ticketing platforms capable of serving nationwide audiences, and

assemble the marketing relationships necessary to generate sufficient advance ticket sales to sustain a national tour. Prior to LiveCo/TPR' consolidation, these barriers were surmountable because multiple promoters competed for artist relationships, providing artists with alternatives and new entrants with the possibility of securing talent. New entrants could co-promote with established promoters. Following consolidation, the dominant position of the LiveCo/TPR Conspiracy Group has made it virtually impossible for a new entrant to assemble a competitive roster of artists, as artists face significant financial penalties, in the form of substantially reduced guarantees, for declining to tour with LiveCo/TPR. The acquisition of iTickets has further foreclosed new entrants from access to the dominant ticketing infrastructure serving the CCM market. These barriers, individually and collectively, render the CCM Touring Market effectively closed to new competition, confirming the durability of Defendants' monopoly power.

417. The barriers to entry into the NPS Market are equally insurmountable. A new entrant into the NPS Market cannot gain access to the alternative platform created by LiveCo/TPR which is literally impossible to recreate, thus impacting the market by removing/precluding buyers for TCA's services.

418. As to artist's platforms, whatever remaining value they have, access to these on a nationwide basis requires access to a nationwide CCM touring infrastructure now controlled by LiveCo/TPR. Even if obtainable, it also requires the expensive capital outlay of registration and compliance as a professional solicitor across numerous states. It requires the operational capacity to field spokespersons and volunteers at every concert venue nationwide. Fundamentally it requires establishing relationships with nonprofits which in most cases is required to be built over years of performance. Each of these barriers is individually significant; collectively they are prohibitive for any new entrant operating independently of LiveCo/TPR. Artists and their

assignees such as TCA, who are dependent on CCM promoters to wield their own Platform's economic power, have no alternatives. New promoters seeking to secure artists for nationwide tours now find it virtually impossible to recreate the large volume of venue relationships and market access needed to assemble a nationwide CCM Tour on an economic basis.

419. These barriers to entry have meant that LiveCo/TPR control the Markets, and no rival can reach scale without their permission.

420. By these acts LiveCo/TPR have willfully acquired and maintained monopoly power through exclusionary conduct, eliminating independent competition in the Markets, reducing output, increasing effective pricing to nonprofits, and concentrating control of sponsorship access in LiveCo/TPR.

### E. ANTITRUST INJURY

421. Plaintiffs have suffered antitrust injury of the type the antitrust laws were intended to prevent and that flows directly from Defendants' unlawful conduct.

422. As a direct and proximate result of this conduct, Plaintiffs have been foreclosed from competing for artist platforms and nonprofit sponsorship opportunities, from meaningful participation in the nonprofit sponsorship market, all of which were previously available to them. Plaintiffs have lost existing and prospective contractual relationships with artists and nonprofit organizations and have suffered substantial loss of revenues and business value. In fact, Defendants had previously offered to purchase TCA for over $50,000,000 including the value of LiveCo stock Plaintiffs were to receive, whereas now its value is zero. This loss of value is antitrust damage. These injuries are the direct result of Defendants' exclusionary control over the channels through which competition in these markets occurs, and not the product of independent business decisions or market forces.

423. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff Newsboys has suffered substantial injury to its business and property. Defendants' exclusionary control over the CCM Touring Market has foreclosed Newsboys from access to commercially viable concert promotion channels, resulting in the loss of touring opportunities, a reduced number of concerts, suppressed ticket revenues, diminished participation in sponsorship revenue tied to live events, and the inability to compete for and secure tour placements on commercially reasonable terms. These injuries include both realized losses and the loss of future touring opportunities that would have occurred in a competitive market absent Defendants' conduct.

424. As a further direct and proximate result of the same anticompetitive conduct, Plaintiff Newsboys has suffered distinct injury to its intellectual property and licensing business. The suppression of touring activity and public exposure caused by Defendants' exclusionary conduct has directly reduced demand for Newsboys' recorded music, streaming, licensing, and related revenue streams, diminished the value of its catalog, impaired brand goodwill, and foreclosed licensing and promotional opportunities that depend upon sustained public visibility through live touring and public performance — the principal channels through which recorded music demand is created and maintained. These injuries are concrete, quantifiable, and flow directly from the TPR Conspiracy Group's foreclosure of those channels.

425. The injuries suffered by Plaintiffs Newsboys are distinct, direct, and non-duplicative. Newsboys have been injured in live performances, touring business, and in its ownership and exploitation of intellectual property and recorded music assets. Although these injuries arise from the same exclusionary scheme, each Plaintiff suffers harm in a separate line of commerce and through separate revenue streams. These injuries are not the result of internal allocation or corporate structuring, but instead reflect independent economic harm inflicted on

each Plaintiff by Defendants' conduct. Recovery by each Plaintiff is therefore based on its own direct injuries and does not constitute double recovery or derivative harm of another entity.

426. The TPR Conspiracy Group's conduct has also reduced output and competition in the relevant markets by eliminating an independent competitor that developed and operated an alternative sponsorship platform, thereby depriving artists and nonprofit organizations of competitive choices and reducing the availability of independent sponsorship opportunities.

427. The TPR Conspiracy Group's conduct foreclosed an independent competitor from Artist Platforms and nonprofit sponsorship opportunities, suppressed touring output, reduced competition, increased ticket prices, impaired artists' ability to negotiate competitive Performance Fees and sponsorship terms, and impaired nonprofits' ability to obtain Platforms independently. TCA's loss mattered because it eliminated the independent mechanism through which Platform rights were purchased and resold to competing nonprofits.

428. TCA bought rights in artists' Platforms and resold their use to nonprofits, earning the spread and supplying the infrastructure to monetize them. Its compensation was separate from the Performance Fees paid by promoters. The challenged conduct destroyed that independent purchase-and-resale mechanism as part of a broader exclusionary scheme; it did not merely replace a distributor in an otherwise competitive distribution system.

429. The harm to competition is further demonstrated by the effect on artists and nonprofit organizations themselves. Under the prior competitive regime, nonprofits could negotiate with TCA and artists independently, on the basis of actual sponsorships generated and at rates disciplined by competition. Under the TPR Conspiracy Group's controlled structure, nonprofits are required to transact through LiveCo/TPR on terms dictated by a monopolist, at prices that smaller and mid-sized charities are unable to meet, as LiveCo/TPR personnel have

acknowledged to third parties. This reduction in nonprofit participation constitutes a direct, measurable reduction in output in the Nonprofit Sponsorship Market and distorts the previous competitive pricing structures that previously controlled and disciplined the Markets.

430. These restraints injured competition at four points: artists lost alternative buyers for their Platforms; TCA and other intermediaries lost access to the inputs they competed to acquire; competing nonprofits lost independent access to those Platforms; and smaller regional promoters faced prohibitive costs in securing artists' performances removing them from TCA and Newsboys. The elimination of those choices reinforced LiveCo/TPR's control over both concert performances and sponsorship opportunities.

431. In addition, the TPR Conspiracy Group's conduct has resulted in the extraction of supra-competitive profits by enabling the TPR Conspiracy Group to capture multiple revenue streams, including sponsorship revenues, without increasing output, and by insulating the TPR Conspiracy Group from competitive constraints that would otherwise discipline pricing, structure, and participation in both the CCM Touring Market and the NPS Market.

432. Given TCA's stated purpose, it is inextricably connected to the CCM Touring and NPS Markets such that its entire existence depended on the competitive health of the Markets. The injuries suffered by Plaintiffs are thus inextricably intertwined with the injury to competition caused by the TPR Conspiracy Group's conduct, are the direct and foreseeable result of the TPR Conspiracy Group's violations of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act and such an integral aspect of the conspiracy alleged, there can be no question but that Plaintiffs' loss was precisely the type of loss that violations of the Sherman and Clayton Acts anticipated were likely to cause.

433. Plaintiffs are efficient enforcers of the antitrust laws. TCA was the only independent intermediary operating in the NPS Market and was the direct target of the TPR Conspiracy Group's exclusionary conduct. TCA's injuries are the precise injuries the antitrust laws were designed to redress, not incidental competitive harm, but the deliberate foreclosure of the firm that created the market the TPR Conspiracy Group sought to capture. Plaintiffs Newsboys are likewise efficient enforcers, as direct targets of the same exclusionary scheme whose commercial viability depended upon access to the competitive market the TPR Conspiracy Group destroyed.

434. TCA's exclusion was the means by which the scheme removed an independent competitive channel. The Newsboys' exclusion likewise removed an artist and its Platform from that channel and deprived the audience of otherwise available performances. Plaintiffs' own losses therefore arose from the same foreclosure and suppression of competitive choices alleged to injure the Markets.

## ARTICLE VIII

## CLAIM FOR RELIEF FOR VIOLATIONS OF TENN. CODE ANN. §§ 47-25-101&102 [TENNESSEE ANTITRUST ACT] (ASSERTED AGAINST THE WATERLAND DEFENDANTS, WORLD VISION, THE MERCYME DEFENDANTS AND THE BRICKELL PARTIES).

435. In all claims in this Article VIII, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein. Without limiting the foregoing, Plaintiffs assert the same facts as set forth in Article V of this Complaint here, which are incorporated by reference herein as if fully set forth independently.

436. Such acts constitute violations under TENN. CODE ANN. §§ 47-25-101 &1 02.

437. Plaintiffs have been proximately damaged by the acts of the named Defendants for which full relief is herein sought.

## ARTICLE IX

## CAUSES OF ACTIONS AND CLAIMS FOR RELIEF ASSERTED AGAINST WATERLAND DEFENDANTS FOR MISAPPROPRIATION OF TRADE SECRETS, BREACHES OF CONTRACTS AND RELATED CLAIMS

438. In all claims in this Article IX, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

439. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV-VI above and arises from the same common nucleus of operative fact as Plaintiffs' other claims. Specifically, and without limitation to the terms of Art. I, ¶12, 20; Art. IV.E ¶127, 130; Art. V.B. ¶161; Art. V.C.a ¶241-243; Art.VII.C.g.; Art.VII.C.p. ¶395; Art.VII.D.a. ¶401.

### A. BACKGROUND FACTS APPLICABLE TO ALL CLAIMS UNDER THESE CAUSES OF ACTON.

440. Starting as soon as 2016, Premier had agreed to be the exclusive promoter for the Plaintiff Newsboys, as a result of which Premier, and later the Waterland Defendants because of the merger, undertook fiduciary duties to the Plaintiffs. Defendant Rush later replaced Premier as Plaintiffs' exclusive promoting agent, but (a) because Defendant Rush was without any background with or detailed knowledge of the NPS Market, (b) Premier had been the first promoter acquisition undertaken by LiveCo, (c) Premier had had prior dealings with the Plaintiffs and their artists whose sponsorship rights TCA had acquired, and (d) its knowledge in very general terms of the profitable operations of TCA, Premier took the lead in approaching Plaintiffs about the acquisition of Plaintiff TCA.

441. Premier initiated contact with the Plaintiffs and requested detailed financial, operating information and data from TCA to determine what had made Plaintiffs in general, and TCA in particular so successful -- in fact so successful that LiveCo would approach Plaintiffs about an acquisition and do so almost immediately after LiveCo's formation and initial funding. There would be no reason to request the information from TCA if it was otherwise known or readily available.

442. Before any disclosures, Plaintiffs insisted on a broad and all-encompassing confidentiality agreement, which forbade LiveCo/Premier and any of its affiliates from using and/or disclosing any information Plaintiffs may present, and an agreement entitled "Nondisclosure and Restrictive Covenant Agreement" was signed by Premier for itself and any and all of its affiliates which included LiveCo (the "First Confidentiality Agreement").

443. Following execution of the First Confidentiality Agreement, Plaintiffs begin to disclose highly sensitive and confidential information about its operations and business and did so for the single and sole purpose of facilitating a sale transaction.

444. After these disclosures, Premier decided it was necessary to involve Waterland as the founding equity owner of LiveCo. After doing so, Waterland requested even more detailed information about TCA and its operations and business.

445. Given the involvement of Waterland and the highly confidential nature of the information being requested, Plaintiffs required an additional agreement of confidentiality be executed to ensure limited access to and use of any information it may disclose. Thus, an additional agreement of confidentiality was signed, this time by USLive OpCo, the entity represented by the Defendants to be the operating holding company who would actually make the acquisition of TCA,

although in binding affiliates as well, it bound all Waterland Defendants (the "Second Confidentiality Agreement").

446. The first confidentiality agreement and the second confidentiality agreement or here sometimes referred to collectively as the "Confidentiality and Restricted Use Agreements."

447. The Confidentiality and Restricted Use Agreements having been. signed, TCA provided confidential information to the Waterland Defendants which was not general industry knowledge, but highly specific, non-public, and economically valuable information, including without limitation detailed data and methodologies concerning: (i) nonprofit sponsorship structures; (ii) amounts and ranges of payments made by nonprofits for access to artists' public platforms; (iii) revenue-sharing arrangements among TCA, artists, and nonprofit entities; (iv) performance metrics and conversion rates associated with sponsorship solicitations; and (v) the scalability, predictability, and profitability of sponsorship revenues across multiple tours and markets.

448. Without limitation, the Waterland Defendants were given the amounts nonprofits were paying TCA for sponsorships. This information was embodied in contracts TCA had signed with nonprofits which contained explicit confidentiality restrictions against disclosure. As to nonprofits, armed with this information, a competitor would know maximum amounts nonprofits would pay for sponsorships allowing the Waterland Defendants to compete against TCA by charging more in their dealings with nonprofits to increase the Waterland Defendants' own profits, and also achieve a competitive advantage against TCA when bidding head-to-head for nonprofits' business.

449. As to artists, the Waterland Defendants were provided with the number of artists TCA then had under contract and each contracts' duration and sponsorship commitments. TCA

started first with disclosures of artist listings anonymously, followed later by the name of the contracting artist with detailed information about sponsorship numbers each artist had committed to and the rates they were being paid both individually by artist and in the aggregate as an average for all artists. This information is embodied contracts with artists that also contained explicit confidentiality restrictions against disclosure. Armed with such important competitive information, the Waterland Defendants knew precisely which artists were under contract with TCA (and which were not), the number of sponsorships each artist was committed to raise, and the rates TCA was paying them.

450. Although precluded by the Confidentiality and Restricted Use Agreements, this information would enable TCA competitors (a) to glean knowledge of what sums they could demand the artist contribute to them to the "pot" should the acquisition not proceed, as happened in the case of one artist who was specifically told later his sponsorship revenue would have to be given up in order to receive any guaranteed payments; (b) to know when to target specific artists s to secure future rights; and (c) to know the competitive bidding range which they would need to outbid TCA in dealing with artists in the future.

451. TCA's revenue payments disclosed in the aggregate and on average from nonprofits along with the amounts paid to specific artists individually, and in the aggregate told the Waterland Defendants as competitors, TCA's actual profit structure and provided key insight into just how that structure could be utilized.

452. This information was not known in the marketplace, and neither could it be determined. It empowered the Waterland Defendants as a competitor to more effectively bid for nonprofits and artists to undercut TCA. The Waterland Defendants' ability to use TCA's confidential disclosures to compete directly against TCA is illustrated by TCA's dealings with

artist Brandon Lake. [23] Through a series of meetings, TCA, by and through Wes Campbell, educated Lake and his management regarding the structure, availability, and revenue potential of nonprofit sponsorship arrangements, information that was not previously known to them. Following these disclosures, Lake and Campbell reached an agreement in principle for Lake to engage TCA to solicit and manage sponsorships in connection with his upcoming tour, which was to be promoted by LiveCo. Lake indicated that he would advise LiveCo that sponsorship solicitations would be conducted through TCA as part of the upcoming the tour so LiveCo as the event promoter would understand those logistical requirements. After having reached agreement in principle, however, Lake ceased communications and the contemplated relationship did not proceed. Given the significant incremental revenue associated with sponsorships, knowledge of which Lake had only recently acquired through TCA's disclosures, the abrupt termination is explainable only with Defendants' use of TCA's confidential information to internalize or redirect those sponsorship opportunities rather than permit TCA to perform that function. [24]

453. Prior to obtaining TCA's confidential information, the Waterland Defendants had no comparable operational experience, established platform or meaningful access to the NPS Market. Their participation in concert promotion had been limited to the traditional ticket-based model described above. TCA's confidential disclosures provided the Waterland Defendants with an economic roadmap for a market they had not previously navigated and could not have entered at comparable speed or effectiveness without the benefit of TCA's proprietary data and methodology. The Waterland Defendants could not have developed or implemented this

---

[23] Brandon Lake is a nationally recognized contemporary Christian music artist with a substantial public following and frequent appearances at large-scale events. His prominence is reflected, for example, by his selection as one of a limited number of well-known artists invited to lead portions of the musical program at a widely attended public memorial service for Charlie Kirk.
[24] The only other possible explanation is that LiveCo passed on the Fargo Fabrication to him.

competing model within the same time frame, or with the same effectiveness, absent their access to TCA's confidential information obtained under the guise of acquisition negotiations and subject to strict confidentiality obligations.

454. Following this, the Waterland Defendants made a significant offer to purchase the equity interest in TCA starting initially with an offer made on December 19, 2022. Later, on January 26, 2023, the Waterland Defendants increased that offer in total to approximately $50,000,000 for the acquisition of TCA, which offer TCA accepted.

455. As explained herein, the Waterland Defendants decided to breach their contract to purchase TCA in large part, intending to use the confidential information they had acquired from TCA to replicate TCA's business model in direct competition with TCA, rather than paying the agreed acquisition price.

### B. VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ET SEQ.

456. TCA is the owner of trade secrets as defined under the Defend Trade Secrets Act, 18 U.S.C. § 1839(3) ("DTSA"). These trade secrets are related to services used in, or intended for use in, interstate and foreign commerce, in that TCA's operations span the United States nationwide and involve contractual relationships with artists, charities and promoters across multiple states, and the Waterland Defendants' own operations likewise involve interstate commerce in the same markets.

457. In addition to the trades listed in the background section of this cause of action, TCA's trade secrets include, without limitation, the following categories of information (collectively, the "Trade Secrets"):

a. TCA's proprietary business model for serving as an exclusive intermediary between performing artists and nonprofit charities, including TCA's methodology for monetizing artist public platforms through live-event charitable sponsorship solicitations and its "turnkey" operational model;

b. TCA's confidential customer lists identifying the nonprofit charities with whom TCA had established or was developing contractual relationships, including the specific terms, rates, and payment structures negotiated with each nonprofit;

c. TCA's confidential artist roster, including the identities of performing artists under contract with TCA, the specific terms of each artist agreement, per-unit CTA rates, initial and recurring advances, option structures, and outstanding sponsorship commitments;

d. TCA's proprietary per-sponsorship pricing model, including its internal cost structure per confirmed sponsor (comprised of artist costs and in overhead, compliance, and campaign-related expenses), and its strategies for increasing per-sponsorship rates charged to nonprofits above the then-current rate;

e. TCA's historical and projected sponsorship volume data, including its pre-pandemic performance of over 40,000 confirmed sponsorships annually and its projections for 2022 through 2024;

f. TCA's proprietary compliance infrastructure, including its registration as a "professional solicitor" in the relevant states, its in-house compliance department, and the details of its operational processes for deploying spokespersons and volunteers at concerts nationwide;

g. TCA's identification of its competitive risks and vulnerabilities, including its reliance on Loop Events as a third-party vendor for volunteer recruitment and its plans to build an in-house department to reduce that exposure;

h. TCA's strategies for expanding its artist roster, increasing per-sponsorship rates, and penetrating additional genres and nonprofit sectors beyond its existing partnerships; and

i. TCA's methods for complying with charitable solicitation registration requirements in states where concerts occur and solicitations for sponsorships were made.

458. TCA took reasonable measures to maintain the secrecy of the Trade Secrets. Among other things, artists and nonprofits contracting with TCA were bound by confidentiality agreements prohibiting disclosure of the terms and nature of their arrangements with TCA. TCA required all parties with whom it shared confidential information to execute nondisclosure agreements before receiving such information. When TCA provided financial and operational information to the Waterland Defendants in connection with the proposed acquisition, TCA did so

expressly subject to the terms of the Confidentiality and Restricted Use Agreements described herein, and initially withheld artist names until it was assured that an offer of purchase was about to be forthcoming. TCA further maintained the confidentiality of its business model and operations through internal practices limiting access to sensitive information.

459. The ongoing operative character of TCA's confidentiality measures is further confirmed by Defendant Pugh's own admissions at a March 21, 2023, meeting where Pugh expressly acknowledged that he personally remained still functioning "under the NDA," and the participants collectively confirmed the same. These statements establish that TCA's requirement that all parties execute the Confidentiality and Restricted Use Agreements before receiving confidential information constituted a reasonable protective measure that was understood, acknowledged, and accepted as binding by the recipients at the time of that meeting. A trade secret claimant's reasonable measures are sufficient where, as here, the counterparty expressly acknowledges the operative obligations in real time.

460. The Trade Secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons or entities who could obtain economic value from their acquisition or use. Until the later actions by the Waterland Defendants herein complained of, TCA's proprietary business model, pricing structures, artist and nonprofit relationships, and operational infrastructure gave TCA a unique competitive position as it was the only entity in the NPS Market who bought and sold artist platform rights and solicited charitable sponsorships on behalf of nonprofit charities. This competitive position had quantifiable economic value, the Waterland Defendants' own valuation of TCA and offers to purchase at approximately $50,000,000 alone demonstrate. in fact, there was no other reason why the Waterland Defendants would offer such sums absent such value.

461. The Waterland Defendants misappropriated TCA's Trade Secrets within the meaning of 18 U.S.C. § 1839(5) by the following means, among others:

a. Acquiring TCA's Trade Secrets through improper means, in that the Waterland Defendants obtained access to the Trade Secrets ostensibly for the purpose of evaluating and consummating a bona fide acquisition of TCA, while in fact intending, or later deciding, to use the Trade Secrets to replicate TCA's business model without completing the acquisition or paying the agreed consideration, thereby obtaining the Trade Secrets through deception;

b. Disclosing and using TCA's Trade Secrets without consent, in that after abandoning the acquisition, the Waterland Defendants used TCA's Trade Secrets to develop and implement their own competing nonprofit sponsorship platform, to approach nonprofit charities with whom TCA had existing or developing relationships, and to offer artists higher guaranteed payments conditioned on the promoter capturing sponsorship revenues, all directly replicating the business model and competitive strategies TCA had disclosed in confidence; and

c. Disclosing TCA's Trade Secrets to Defendant Timothy Taber, who as the de facto and then formally appointed Chief Strategy Officer of LiveCo/TPR, received access to TCA's confidential information and who on information and belief used that information to persuade the Waterland Defendants not to acquire TCA and instead to replicate its model using TCA's misappropriated operational plan as a blueprint. That Taber did so is the only logical explanation for why the Waterland Defendants would (a) initiate sales dialogue with TCA; (b) request TCA's highly confidential information; and (c) make a significant offer of purchase, which was unilaterally increased, only to in retrospect abandon the acquisition after Taber 's Transparent was acquired. The Waterland Defendants asserted that their excuse for delaying closing was the need to arrange financing, which was later determined to be a canard when Plaintiffs discovered in preparing this lawsuit that in October 2022, the Waterland Defendants' financial advisors had filed a tombstone ad stating that they had assisted the Waterland Defendants in actually already arranging acquisition financing.

462. The Waterland Defendants' misappropriation was willful and malicious, in that the Defendants obtained TCA's Trade Secrets under the false pretense of a bona fide acquisition, shared those Trade Secrets with Taber and others who had competitive interests adverse to TCA, and thereafter deliberately implemented TCA's business model to compete with and ultimately destroy TCA as a market participant, while simultaneously taking steps to damage TCA's reputation and commercial relationships to prevent TCA from mounting effective competition.

463. The Waterland Defendants' misappropriation was willful and malicious, in that the Defendants obtained TCA's Trade Secrets under the false pretense of a bona fide acquisition, shared those Trade Secrets with Taber and others who had competitive interests adverse to TCA, and thereafter deliberately implemented TCA's business model to compete with and ultimately destroy TCA as a market participant, while simultaneously taking steps to damage TCA's reputation and commercial relationships to prevent TCA from mounting effective competition. As a direct and proximate result of the Waterland Defendants' misappropriation of TCA's Trade Secrets, Plaintiffs have suffered and continue to suffer damages including, without limitation: lost revenues from the loss of artist contracts and nonprofit partnerships; loss of the consideration promised in connection with the acquisition of TCA; loss of the value of TCA's business and competitive position in the NPS Market; and costs incurred in connection with investigating and responding to the Waterland Defendants' conduct. In fact, Plaintiffs' valuation went from approximately $50,000,000 as established by the Waterland Defendants themselves to zero. The exact amount of these damages will be established at trial.

464. Because the Waterland Defendants' misappropriation was willful and malicious, Plaintiffs are entitled to an award of exemplary damages in an amount not exceeding two times the actual damages awarded, pursuant to 18 U.S.C. § 1836(b)(3)(C).

465. Plaintiffs are also entitled to an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

466. In addition to damages, Plaintiffs are entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to prevent the Waterland Defendants' continued use and disclosure of TCA's Trade Secrets, including without limitation an order requiring the Waterland Defendants to cease operating any nonprofit sponsorship platform developed using TCA's confidential

information, to return or destroy all materials containing or derived from TCA's Trade Secrets, and to refrain from further disclosure or use of TCA's Trade Secrets.

### C. VIOLATION OF THE TENNESSEE UNIFORM TRADE SECRETS ACT, TENN. CODE ANN. § 47-25-1701 ET SEQ.

467. Plaintiffs assert the same facts of this Complaint here, which are incorporated by reference herein as if fully set forth independently

468. TCA's Trade Secrets as described above constitute "trade secrets" as defined under the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1702(4), in that they constitute information, including formulas, patterns, compilations, programs, devices, methods, techniques, and/or processes that (a) derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) was/is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

469. The Waterland Defendants misappropriated TCA's Trade Secrets within the meaning of Tenn. Code Ann. § 47-25-1702(2) by acquiring TCA's Trade Secrets through improper means, and by disclosing and using TCA's Trade Secrets without TCA's consent, as more particularly alleged in Article VII.B hereof, which is incorporated herein by reference.

470. The Waterland Defendants' misappropriation was willful and malicious within the meaning of Tenn. Code Ann. § 47-25-1704(b).

471. As a direct and proximate result of the Waterland Defendants' misappropriation, Plaintiffs have suffered damages as alleged hereinabove, for which they are entitled to recover under Tenn. Code Ann. § 47-25-1704(a), including both actual damages and, to the extent actual damages are insufficient to compensate for the unjust enrichment the Waterland Defendants derived from the misappropriation, unjust enrichment damages. Such damages are at a minimum

$50,000,000, which is the value the Waterland Defendants themselves established through their own offers, and which has since been reduced to zero.

472. Plaintiffs are further entitled to an award of exemplary damages in an amount not exceeding two times the actual damages awarded, pursuant to Tenn. Code Ann. § 47-25-1704(b), on account of the Waterland Defendants' willful and malicious misappropriation.

473. Plaintiffs are also entitled to an award of reasonable attorneys' fees pursuant to Tenn. Code Ann. § 47-25-1705.

474. Plaintiffs are further entitled to injunctive relief pursuant to Tenn. Code Ann. § 47-25-1703 to prevent the Waterland Defendants' actual and threatened continued misappropriation of TCA's Trade Secrets.

### D. BREACH OF CONFIDENTIALITY AND RESTRICTED USE AGREEMENTS.

475. Two written nondisclosure agreements govern the disclosure and use of TCA's confidential information by the Waterland Defendants and their affiliates; both collectively defined previously as the Confidentiality and Restricted Use Agreements.

476. Pursuant to the First Confidentiality Agreement, Premier Productions LLC agreed to hold all Confidential Information in strict confidence and "not use any Confidential Information for any purpose except to carry out discussions and/or negotiations concerning or undertaking any mutually agreed obligation relating to or in furtherance of, the Relationship." The First Confidentiality Agreement expressly provides that these obligations "shall remain in full force and effect in perpetuity, unless the Disclosing Party specifically and in writing agrees to release all or any part of the Confidential Information from the restrictions imposed hereunder." The First Confidentiality Agreement also included a non-solicitation covenant prohibiting the Recipient

from causing or attempting to cause any employee, agent, or advisor of TCA to terminate his or her relationship with TCA.

477. Pursuant to the Second Confidentiality Agreement, the Waterland Defendants agreed to treat and hold TCA's Confidential Information in the strictest confidence and "not to use it other than in connection with the Transaction or potential Transaction." The Second Confidentiality Agreement requires the same and further provides that the Receiving Party's obligations to keep Confidential Information confidential survive any termination of the agreement.

478. Because Premier Productions, LLC was subsequently acquired by and merged into LiveCo and ultimately TPR, and because the First Confidentiality Agreement expressly binds the parties' "successors and assigns," TPR and the Waterland Defendants are bound by the obligations of the First Confidentiality Agreement as successors to Premier Productions, LLC.

479. Similarly, because signatory USLive OpCo, Inc. is believed to be an entity operating under the assumed names "TPR" and "LiveCo," TPR and the associated Waterland Defendants are bound by the obligations of the Second Confidentiality Agreement.

480. TCA performed all conditions, covenants, and obligations required of it under the Confidentiality and Restricted Use Agreements, including by providing the Confidential Information and Trade Secrets described herein to the Waterland Defendants in reliance on the confidentiality obligations of the Confidentiality and Restricted Use Agreements.

481. The NDA obligations described herein remained operative beyond the formal period of acquisition negotiations. At a meeting held on March 21, 2023, Defendant Pugh expressly acknowledged his continuing obligations under both the First Confidentiality Agreement and the Second Confidentiality Agreement (previously, the Confidentiality and Restricted Use

Agreements) stating that he was "still functioning under [the] NDA." The other participants in that meeting likewise acknowledged their shared understanding, confirming that "[w]e're all under the NDA." These statements confirm that the Confidentiality and Restricted Use Agreements were understood by all parties in attendance to remain in full force and effect as of March 2023, nearly two months after Plaintiffs' acceptance of the acquisition offer, and that the disclosures TCA had made in connection with the acquisition negotiations remained subject to strict confidentiality obligations at the time of that meeting.

482. The Waterland Defendants materially breached the Confidentiality and Restricted Use Agreements by, among other things:

a. Using TCA's Confidential Information for purposes other than evaluation of the proposed acquisition of TCA, specifically by using TCA's business model, pricing structure, customer relationships, artist roster information, and operational methodology to develop and implement their own competing nonprofit sponsorship platform, in direct competition with TCA;

b. Disclosing TCA's Confidential Information to Defendant Timothy Taber and other personnel of the Waterland Defendants who were not party to the original acquisition negotiations and whose interests were averse to TCA, without TCA's consent;

c. Failing to return or destroy TCA's Confidential Information upon abandonment of the proposed acquisition, as required by both NDAs;

d. Through Defendant Timothy Taber, using TCA's disclosed competitive vulnerabilities, which the Defendants converted into a weapon against TCA's competitive position; and

e. Use by Rush of confidential information and data to preempt Plaintiffs planned joint tour featuring artists Tauren and Danny Gokey, the details of which are set forth in Article IV.I and XIII.F hereof, which are incorporated by reference.

483. The First Confidentiality Agreement further provides that the non-solicitation covenant prohibits the Waterland Defendants from interfering with TCA's employee relationships. The Waterland Defendants breached this provision by, among other things, counseling and

working with MercyMe to terminate/breach their contract and Troy Collins to resign from TCA for the purpose of enabling the termination of the MercyMe contract and facilitating the transfer of the MercyMe and Children International relationship to the Waterland Defendants.

484. As a direct and proximate result of the Waterland Defendants' breaches of the Confidentiality and Restricted Use Agreements, Plaintiffs have suffered damages including, without limitation, loss of their confidential business model and competitive position, loss of artist and nonprofit relationships enabled by the Waterland Defendants' misuse of TCA's confidential information, and loss of the benefit of the bargain of the proposed acquisition. The exact amount of these damages will be established at trial.

485. The Confidentiality and Restricted Use Agreements expressly provide that breach would cause immediate and irreparable harm for which money alone may not fully compensate, and that the Disclosing Party shall be entitled to seek injunctive relief without posting any bond or other security. Plaintiffs are therefore entitled to injunctive relief, in addition to damages, to prevent the Waterland Defendants continued use and disclosure of TCA's Confidential Information.

486. Pursuant to the Confidentiality and Restricted Use Agreements, the party that substantially prevails in any action to enforce shall recover all costs and attorneys' fees incurred in connection with the action. Plaintiffs are therefore entitled to recover their costs and attorneys' fees upon prevailing on this claim.

### E. BREACH OF CONTRACT TO ACQUIRE TCA

487. Beginning in or about October 2022, the Waterland Defendants, through their principals Christian Lund Madsen and Nicklas Guldberg of Waterland PEI and Waterland PE respectively, and the LiveCo/TPR Defendants through Brian Becker and Michael Pugh, entered

into discussions and negotiations with Plaintiffs for the acquisition of Plaintiff TCA. For purposes of the claims in this Article __, the Waterland Defendants and LiveCo Defendants are sometimes referred to as the "Acquirors."

488. The Acquirors requested disclosure of virtually every aspect of TCA's operations, including (a) from an operations standpoint, the names of Artists under contract, the number of sponsorships each Artist had committed to generate and actually generated, the amounts paid to each Artists, contracting nonprofits with whom TCA had contracted for generation of sponsors, and staff required for operations; and (b) from a financial standpoint past revenues and profits and projected profits from continued operations. All of the foregoing was highly confidential and proprietary.

489. Before making any such disclosures TCA was assured all such disclosures of TCA's confidential information would be held in complete confidence by means of execution of not one but two confidentiality agreements previously identified as the First Confidentiality Agreement and the Second Confidentiality Agreement.

490. Discussions and negotiations ensued involving from the Acquirors side, Christian Madsen, Nicklas Guldberg, Brian Becker and Michael Pugh and from TCA's side, Wes Campbell, Dave Wagner and their attorney Kevin Kookogey.

491. Following those negotiations, the Acquirors made a formal written offer to purchase TCA on December 19, 2022 (the "First Offer") acknowledging TCA was "highly respected" and a "pioneering sponsorship organizer offering unique and turnkey solutions for nonprofit sponsorship partners that was crucial to Acquirors, and writing to express the "deal terms" of their offer:

From: Christian Lund Madsen
Sent: Monday, December 19, 2022 8:41 PM
To: David Wagner <davewagner@me.com>; Wesley Campbell <wes.campbell@me.com>
Cc: 'Kevin Kookogey' <kevin@kookogey.com>; Brian Becker <Brian@baseentertainment.com>; Michael Pugh <michael.pugh@premierproductions.com>; Nicklas Guldberg <Guldberg@waterland.dk>
Subject: TCA x USLive: Partnership proposal

Dave and Wes –

We remain highly excited by the prospect of partnering with both of you and the TCA team, and are highly appreciate of your engagement and interest in working with USLive. We view TCA as a highly respected & pioneering sponsorship organiser, providing unique and turnkey solutions for its sponsorship partners. Together with USLive's strategic growth efforts within sponsorships across faith, country and other genres, we believe a partnership to be highly valuable to all parties.

Please find below an outline of proposed overall deal terms, as well as an attached spreadsheet to illustrate underlying financial assumptions. If useful to walk through on a call, we'd happily do so.

See **Exhibit 33.**

492. The First Offer was signed by all four of Madsen, Guldberg, Becker and Pugh and there was no doubt it was an "offer" of purchase setting out the material "deal terms," such offer being made after the Acquirors had conducted extensive due diligence:

Looking forward to continuing the dialogue, Dave and Wes – please let us know you have received the offer. Thank you!

Kind regards and Merry Christmas,
Christian, Brian, Michael and Nicklas

**Waterland Private Equity ApS**
Neroport, Kay Fiskers Plads 9
West Tower, 7th floor
2300 Copenhagen S
Denmark

493. The First Offer proposed a purchase price payable in two tranches/. The first tranche was offered at USD $15MMat closing. The second tranche was an earn-out payment calculated as five times the difference between TCA's average EBITDA for 2023-2024 and its last

twelve months EBITDA at closing. Based on TCA's projections that second tranche payment would be $20MM in addition to the $15MM which would have previously been paid.

494. The First Offer included a "cap" in the total acquisition price of $45MM. Acquirors explained that the acquisition would result in TCA becoming part of the overall operations and that TCA's earnings and thus its earnout would open the possibility for TCA to outperform its projections twice explaining that the "synergies" of partnering with Acquirors would affect TCA's earnout hence the need for a cap:

> - Cap: USD 45m
>     - This enabling the ability to earn upside on overperforming budget incl. the strengthened possibility of doing so **by virtue of the synergies from our partnership**
>     - We propose a deal cap at in all transactions to provide balance in event unusually high / non-normalized results occur during the acquisition period, **incl. synergistic results, which would boost EBITDA and 2nd tranche payment**

495. Hence, it was expected that TCA, its business model and operations would financially participate in the other aspects of Acquirors' businesses, and their earnout would include that participation, and the earnout would not be simply limited to TCA's own business it brought to the arrangement.

496. The Acquirors had gone to great lengths discussing their plans for an IPO of LiveCo and the value and wealth stock ownership gained at the outset would later generate when LiveCo went public. To that end TCA would be required to re-invest a portion of their proceeds of the sale into the purchase of LiveCo stock which would later be monetized by an IPO, Acquirors setting the range of reinvestment:

- Re-invest into USLive:
  - Upfront: Min. 10% and up to 40%
  - 2nd Tranche payment: 20%-40%

497. Within that range, TCA could select the level it wanted to reinvest. Acquirors then concluded totaling the consideration they were offering TCA and were careful to note that this did not include appreciation of the LiveCo stock TCA would also be able to acquire, Acquirors again writing:

> In total, the upfront and 2nd tranche payments yield a USD 35m-45m consideration, and that excludes value upside in USLive stock, which we expect to appreciate significantly between now and monetization.

498. The First Offer made on December 19, 2022, concluded by noting merely that Acquirors would separately be interested in exploring the possibility of an acquisition of another of Plaintiffs' companies, Fist Company Management, ("FCM") which was an artist management company. At no time was acquisition of FCM a requirement or condition of their acquisition of TCA/

499. Discussions between the Acquiror and TCA ensued following their First Offer. As the Acquirors themselves internally acknowledged in an email dated January 11, 2023 [**Exhibit 34**] and in those discussions TCA had countered Acquirors proposed upfront payment of $15MM with a counteroffer of $20MM:

However, if Dave/Wes re-confirms that 2022 EBITDA is tracking on 3.7m on accrual basis AND they are still on track to the USD 6m+ EBITDA for 2023, then we can offer an upfront of USD 17m (w before offered 15m and they asked for 20m). If they push back and remain firm on USD 20m, then we might do an advance of USD 3m against the earn-out (i.e., they get USD 3m more at close, but counts against earn-out amount AND we can claw back if earn-out of at least USD 3m is then not achieved).

Together w/ increasing our upfront, we remain at min 10% re-invest upfront. If we need to do the advance to get them USD 20m, i.e. the USD 3m advance, then the min re-invest upfront is 15%. SO we are offering USD 17m, hereof 1.7m in stock and 15.3m in cash; we can, if they counter, go to USD 20m (of which 3m is advance) and then 16m cash, 4m stock. In other words, we are not going beyond 16m cash upfront, of which 6m would be used to pay down Worldvision, then USD 10m left to the guys.

500. As their internal email shows Acquirors were preparing to counter at $17MM for the first tranche payment but were prepared to go to $20MM if TCA "pushed back."

501. That their positions were intended to be "offers" is confirmed in the very first sentence of their January 11, 2023, email (**Exhibit 34**) in which Madesen so states to the other Acquirors, suggesting to wait for their counter until "next week" writing:

**From:** Christian Lund Madsen <Madsen@waterland.dk>
**Sent:** Wednesday, January 11, 2023 12:49 PM
**To:** Nicklas Guldberg <Guldberg@waterland.dk>; Dale A. Head <Dale@baseentertainment.com>; Timothy P. Ward <tward@baseentertainment.com>; Brian Becker <Brian@baseentertainment.com>
**Cc:** Michael Pugh <michael.pugh@premierproductions.com>
**Subject:** FW: TCA x USLive: Partnership proposal

Y'all,

Let's wait until our conversation next week to offer an updated proposal to Dave and Wes, as we there also can shed more light on USLive.

502. Also on January 11, 2023, Becker voiced his approval. See **Exhibit 35**.

503. TCA then provided updated financial disclosures reflecting a projected accrual EBITDA of $3,600,000 for 2022 and a trajectory toward $7,000,000 for 2023. Based on this on January 26, 2023, the Acquirors gave another formal written offer (the "Second Offer" or "Offer"),

the Second Offer being virtually identical to the First offer -- addressing all material terms-- but increased the upfront payment they would make from USD $15,000,000 to USD $17,000,000, maintaining the same earn-out formula, cap, reinvestment requirements, and other key terms as the First Offer. Notable are the facts that (a) the First Offer covered all material deal terms is clear as the Second Offer includes no more; (b) neither the First Offer nor the Second Offer mentioned any financing contingencies; (c) neither the First Offer nor the Second Offer mentioned any need ore requirement for any subsequent or additional approvals (the reason being that all relevant decision makers were involved in the discussions and exchange of terms), and (d) the First and Second offers as well as the two January 2023 internal Waterland/LiveCo communications refer to "offers" and "deal terms" demonstrating everyone understood these communications to embody offers and acceptances.

504. On January 31, 2023, Dave Wagner, as authorized agent and representative of Plaintiffs, transmitted a written acceptance of that offer mirroring the terms contained in the First Offer that Acquirors had modified in the Second Offer (the "Acceptance") [**Exhibit 36**] which all parties understood to be a contractual acceptance. In the Acceptance, Wagner confirmed that TCA's projections could be achieved on a stand-alone basis provided only that TCA's trade secrets were not improperly exploited by others and/or actions used for the sole purpose of reducing the earn-out, which was not a material variation of the Waterland Defendants' offer as otherwise the "offer" would have been in bad faith and illusory.

505. Both the First and Second Offers contained a consideration cap of $45MM and explained that this was due to the increased likelihood TCA's earnings would go beyond those TCA projected for itself "by virtue of the synergies from our partnership," that "synergistic results" to TCA's EBITDA and thus its earnout would occur. The Acceptance merely reiterates these points

and TCA's expectation that as both offers clearly expressed, opportunities to increase TCA's EBITDA would result from its model and personnel being used in other facets of the Acquirors' sponsorship-generation activities, thus simply repeating for emphasis what the Acquirors had already themselves stated.

506. Only confirmatory due diligence verifying the material accuracy of Plaintiffs' prior disclosures remained to be completed, and no material fact existed that any subsequent due diligence would have uncovered that would have changed the fundamentals of Plaintiffs' prior disclosures.

507. As to acquisition of the artist management company called First Management Company (previously, "FCM"), also owned by Plaintiffs, the acquisition of FCM was not an expressed or implied condition of the purchase of TCA. Rather, it was an offer for an additional, standalone purchase.

508. Plaintiffs expressed enthusiasm for the partnership and stated that Plaintiffs were "ready to proceed to the MOU phase for TCA," and as stated, by industry standards and custom and usage, a Memorandum of Understanding is a term of art used to describe binding agreements. In the context of these negotiations and as used between these sophisticated commercial parties, the reference to subsequent documentation reflected the parties' mutual intent to memorialize and be bound by the material terms already agreed upon, rather than to reopen or renegotiate those terms. The Acceptance did not reopen, contest, or qualify any material economic term of the Second Offer, including price, earn-out formula, cap, reinvestment obligations, salary terms, or employment agreement structure.

509. The exchange of written communications constituting the First Offer, the Second Offer and the Acceptance resulted in a meeting of the minds of all parties, to the formation of a

binding contract between Plaintiffs and the Acquirors for the acquisition of TCA (the "Purchase Agreement"). The essential terms of the Purchase Agreement were definite and certain, including: (a) the identity of the parties; (b) the subject matter of the acquisition; (c) the purchase price; (d) the reinvestment obligation/opportunity to acquire LiveCo stock, the range of which was determined by the Acquirors as therein set forth and the amount chosen within that range to be determined by TCA; (e) salary and employment continuity; and (f) an earn-out protection covenant prohibiting the Acquirors from taking actions with the sole purpose of reducing the earn-out.

510. The fact that the parties contemplated the execution of a subsequent written memorandum of understanding and/or definitive agreements did not and does not preclude the fact that a binding contract was formed upon acceptance of the material terms, the parties having reached agreement on all essential terms. The remaining items were ministerial matters of implementation rather than substantive agreement having been reached on all essential terms.

511. Nevertheless, the Acquirors breached the Purchase Agreement by repudiating and failing to perform their obligation to close the acquisition of TCA and pay the agreed consideration. The Acquirors abandoned the transaction they had agreed to and refused to close or pay any portion of the agreed consideration, thereby breaching the Purchase Agreement.

512. Rather, the Waterland Defendants asserted a delay for closing claiming that their excuse for delaying closing was the need to arrange financing, which was later determined to be a canard when Plaintiffs discovered in preparing this lawsuit that in October 2022, the Waterland Defendants’ financial advisors had filed a tombstone ad stating that they had assisted the Waterland Defendants in actually arranging acquisition financing.

513. The Acquirors' breach of the Purchase Agreement was not the result of any legitimate business justification or changes in TCA's representations or performance. Rather, as

alleged herein, the Acquirors abandonment of the acquisition was caused, in part, by the improper intervention of Defendant Timothy Taber, who convinced the Acquirors to replicate TCA's business model in partnership with World Vision and who further discouraged the acquisition by circulating the Fargo Fabrication as a pretext for abandonment, thus misappropriating TCA's confidential information.

514. As a direct and proximate result of the breach of the Purchase Agreement, Plaintiffs have suffered damages including, without limitation: loss of the agreed purchase price of approximately $45,000,000; loss of the USLive equity appreciation that would have accrued to Plaintiffs as reinvestment participants; loss of the earn-out payments that would have been earned through TCA's continued operations as part of the USLive platform; loss of the employment agreements and salary continuity contemplated by the Purchase Agreement; and consequential damages flowing from the Acquirors' subsequent competitive use of TCA's confidential information and destruction of TCA's market position. The exact amount of these damages will be proven at trial.

515. In the alternative, to the extent a court determines that the Purchase Agreement did not constitute a fully binding contract for the acquisition of TCA, Plaintiffs assert a claim for promissory estoppel and/or detrimental reliance, in that the Waterland Defendants made clear and definite promises to acquire TCA on the agreed terms, Plaintiffs reasonably and foreseeably relied on those promises by disclosing their confidential information, foregoing alternative business opportunities, and investing time and resources in the anticipated transaction, and Plaintiffs suffered substantial detriment as a result of that reliance, such that injustice can be avoided only by enforcement of those promises.

516. In the further alternative, to the extent a court determines that neither a binding contract nor promissory estoppel applies, Plaintiffs assert a claim for unjust enrichment, in that the Waterland Defendants received and retained substantial benefits from TCA, including TCA's proprietary business model, operational plans, artist roster data, nonprofit relationship information, and competitive strategy, without paying the agreed consideration or any compensation therefor, and it would be unjust and inequitable to permit the Waterland Defendants to retain those benefits without compensation to Plaintiffs.

## ARTICLE X

## CAUSE OF ACTION AND CLAIM FOR RELIEF FOR DEFAMATION, FALSE LIGHT, ETC. ASSERTED AGAINST THE DEFAMATION DEFENDANTS.

517. In all claims in this Article X, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

518. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV-VI above and arises from the same common nucleus of operative fact as Plaintiffs' other claims. This claim is based on the same series of communications, transactions, and events through which the Waterland Defendants restrained competition, impaired Plaintiffs' business relationships, eliminated Plaintiffs as a competitive force in the relevant markets. Without limiting the generality of the foregoing, this claim is based on the same series of communications, publications, and events through which the Waterland and LiveCo Defendants published and amplified false statements concerning Plaintiffs, causing reputational harm and contributing to the disruption of Plaintiffs' business relationships and competitive position.

519. Plaintiffs allege that the Defamation Defendants published statements that were false and defamatory as to the Plaintiffs and presented Plaintiffs in a false light. As to the Defamation Defendants' culpability, as none of the Plaintiffs is a public figure, it is alleged that the Defamation Defendants were negligent in failing to ascertain the truth of the statements.

520. In the alternative, if it is determined any of the Plaintiffs is a public figure or limited purpose public figure, it is alleged the Defamation Defendants published the defamatory statements with knowledge that the statements were false or with reckless disregard for the truth of the statements. While there are many facts that demonstrate the Defamation Defendants' reckless disregard, the most conspicuous one is the fact that the police report specifically stated that Nicole called her liaison "consensual" and the Defamation Defendants consciously chose to omit not just that that phrase was in the police report, but that it was attributed to Nicole herself.

### A. THE ARTICLE FALSELY ASSERTS NICOLE WAS RAPED BY NEWSBOYS' EMPLOYEE WHEN NICOLE TOLD THE POLICE AND OTHERS HER ENCOUNTER WAS CONSENSUAL - - A FACT THE ARTICLE KNOWINGLY OMITTED

521. The Article repeatedly states that Nicole was raped, not by Michael Tait but by a man named Matt Brewer, who was an independent contractor who worked with numerous artists (not an employee of Plaintiffs) making such assertions as (a) "Woman Accuses Michael Tait of Drugging Her and Watching While She Was Raped" (Article Title, Ex. 1, p.1); (b) "... a woman who worked with the band [the Newsboys] says she was raped while Tait watched." (Ex. 1, p.1); and (c) "In my head I'm thinking, did he help feed the (rape)? (Ex. 1, p. 11). [25] These are clearly per se defamatory and they are false.

---

[25] The word "rape" has been supplied in parentheticals indicating the victim did not use that term, and it was intentionally inserted by the Defamation Defendants.

522. The Article's implication of criminal conduct by Tait is further undermined by the Article's own account. The Article does not allege, and no evidence supports, any physical interaction between Tait and Nicole. Tait's alleged involvement was limited to observing two adults who were, as the Fargo Police confirmed, engaged in consensual sexual relations. That alleged conduct, even as described by the Article itself, is not a crime. By saturating the Article with the words "rape" eighteen times, "raped" seven times, "sexually assaulted" nine times, "assault" thirty-eight times, "assaulted" thirteen times, and "victim" nine times, the Article creates a false and defamatory impression that Tait engaged in or facilitated criminal conduct when even the Article's own narrative alleges no such thing.

***a. The Article Did Not Disclose Nicole's Statements To Police Of Consensual Sex.***

523. The Article states that a few weeks after December 18, Nicole filed a police report with the Fargo Police, but that is blatantly false as Nicole spoke to the Fargo Police three days later (December 19) and her statement to them contradicts these assertions.

524. The Article states that Nicole continued on the concert tour from Fargo, a fact discussed infra, but her continued travel with a man she later accused of rape contradicts that assertion. The Article further states that two days later, on December 18, she was terminated from her employment, which also conflicts with the narrative of an immediate and reported assault. The Article then states that she returned to her home in Minnesota, where a friend took her to St. John's Hospital, and that she was "diagnosed with sexual assault." (Ex. 1, p. 13) A diagnosis of sexual assault, if accurate, does not mean there were objective findings confirming rape or assault, but only that the patient reported such an incident and that there were no clinical findings that contradicted herself report.

525. In Minnesota, with even the possibility of rape having been suggested, a health care professional was required by law to notify the Minnesota police, who in turn contacted the Fargo Police. The Fargo Police then contacted Nicole and Matt Best, all of which occurred three days after the events in question. The Fargo Police documented these contacts, yet the Article omits these facts. The police investigative report made on December 19, along with another report prepared shortly thereafter, both of which were in the Defamation Defendants' possession, clearly state that Nicole told the Police her interactions with Brewer were consensual. These facts were omitted from the Article in a manner that demonstrates culpability beyond negligence and rises to the level of culpable malice. The Fargo Police recorded these statements, but the Article did not disclose them. "'Nicole' said she remembered 'Matt' trying to have sex with her and giving ● 'Matt' oral sex"; (Ex. 2, p. 3) ● "She ['Nicole'] does, agree, though that any interaction that she would have had with Matt would have been consensual...."; and (Ex. 2, p. 5) ● "Matthew Best is not the same person as who 'Nicole' was having consensual relations with..." (Ex. 2, p. 6)

526. The Police Reports contain statements Nicole made to the Police that her sexual acts with Brewer were consensual, and the Article does not mention these admissions Nicole made to the Fargo Police. Instead, the Article misstates that the Fargo Police "concluded that -- despite 'Nicole's' testimony to the contrary, her interactions with Brewer had been consensual." (Ex. 1, p. 13)

527. Further demonstrating culpability beyond negligence, rising to the level of culpable malice, are the following facts. The Article's use of the term "testimony" connotes that Nicole told the police under oath she had been raped, but that was not true; Nicole never told the police that. In stating that: " The detective... concluded that - despite 'Nicole's' testimony to the contrary - her interactions with Brewer had been consensual ," (Ex. 1, p. 13) the Article conveys that the

conclusion of consensual sex was the officers' subjective conclusion reached in the opposition to "Nicole's" assertions but omits to disclose that the determination of consensual sex was based on "Nicole's" ow n statements to the police as reported by the police in their official report after interviewing Nicole. Thus, what the police recorded were statements Nicole made to them, not the officer's conclusions or opinions as falsely reported. Further indicating culpable knowledge, the Defamation Defendants never questioned the Police, even though she had their contact information clearly stated in the Police Reports, thus evidencing conscious avoidance of the true facts, evidencing legal malice. Additional evidence of legal malice is the failure of the Defamation Defendants to confronted Nicole with her own statements.

528. Compounding these failures, the Defamation Defendants also failed to make any meaningful pre-publication attempt to contact Wesley Campbell and afford him an adequate opportunity to respond to the specific accusations being directed at him personally. Despite repeatedly naming Campbell, publishing his photograph, identifying him as Newsboys owner, and attributing responsibility for the events in Fargo to him, the Defamation Defendants made no good-faith effort to present those accusations to Campbell before publication and obtain his response. This failure is an additional indicium of culpable malice.

### ***b. Nicole Told The Fargo Hospital And Friends A Combination Of Stories Ranging From Consensual Sex To Amnesia***

529. Not only did Nicole tell the police her involvement with Brewer was consensual, the morning of the incident, she claimed to her friends that she could only remember giving Brewer fellatio ("I woke up giving Matt Brewer a blow job...") (Ex. 1, p. 9), and also over breakfast that morning, claimed she was trying to figure out what happened. She did not tell her friends she had been raped.

530. Thus, Nicole told the police three days after the incident that her interaction with Brewer had been consensual, and she told friends the next morning she "woke up giving Matt Brewer a blow job." Eleven years later, however, she told the Defamation Defend ants: "The next thing that I remember is being on a bathroom floor and feeling like a 1,000 pounds were on me. My body was so heavy I could hardly move. I hear Matt Brewer's voice, and I remember (Tait) being in there." "I remember the feeling of my head being pushed down between someone's legs. I . . . guess oral sex, or an attempt, but I don't fully remember." (Ex. 2, p. 8) These stories stand in stark contrast to one another yet the Defamation Defendants neither pressed nor qualified the tabloid story of rape.

531. Further contradicting the allegation of a rape and supporting the notion that the Defamation Defendants pushed to fabricate a story eleven years afterwards, later on the morning of the incident when Nicole claimed she could not remember what happened, her employer took her to a Fargo hospital where Nicole declined any medical tests that would have confirmed whether she had been drugged and raped, -- itself deeply suggesting fabrication -- but she explained her declining of tests stating: "I did not want to say that I was raped or even believe it, because it's horrific if it's true ." (emphasis added) (Ex. 1, p. 10). The Defamation Defendants seeing and hearing the "if it's true" demonstrates that at the very best, Nicole did not know or believe she had been raped.

532. The Fargo Hospital itself reported that "Nicole's" sexual encounters were consensual, the hospital writing: "[Nicole] was out drinking with co -workers... Thinks she had sex with at least one other male. Unsure if it was more than one person. States there was at least a third person that walked into the room during the sexual encounter. [Nicole was] concerned that there was a tampon inserted during the entire sexual encounter last night." (Ex. 1, p. 10)

533. Nothing suggesting rape was stated by Nicole to the Fargo hospital, who would have had a duty to report any possible rape had Nicole said so. In fact, the Article states the hospital records from the Fargo hospital "does not say if she was drugged and raped in the Ramada." (Ex. 1, p. 10).

534. Other inconsistencies in Nicole's story strongly implicate a fabrication between Nicole and the Defamation Defendants. One of the reasons Nicole felt she may have been "raped" has to do with the location of a tampon she claimed had been inserted at the time of the incident. She told the Defamation Defendants that "she was - or had been - a virgin..." (Ex. 1, p. 9) and later, on the morning of the incident, "woke up and discovered that a tampon she had been wearing was shoved up her vagina as if by force." (Ex. 1, p. 9) But in her statement to the Fargo Police, she told them the opposite, the police writing: " She also said that her tampon was shoved deep up into her vagina, which she would not do under normal circumstances if she was preparing or planning on having vaginal intercourse. She would have removed the tampon prior to this ...." (Ex. 2, p. 4)

535. The Article states that Nicole worked for a small concert promoter named Pulse Evangelism, that her boss was a man named Matt Best, and that Best was promoting a multicity tour for an evangelist named Nick Hall at which the Newsboys were performing before Hall preached. After playing in Fargo, North Dakota on December 15, the tour had December 16 off and was scheduled to perform in Williston, North Dakota on December 17, St. Paul, Minnesota on December 18, Eau Claire, Wisconsin on December 19, and Paducah, Kentucky on December 20. When "Nicole's" immediate supervisor, Matt Best, and the tour sponsor, Nick Hall, learned of the incident, they conducted an internal inquiry, terminated her employment, and sent her home. The Article attempts to minimize this as a "mutual decision," but that characterization reflects the Defamation Defendants' bias, as the action was a termination based on conduct the tour deemed

inconsistent with a Christian music tour, not a punishment of a rape victim. The tour then continued with the Newsboys and with Brewer fully participating and interacting with the touring personnel.

536. These facts, all known to the Defamation Defendants, demonstrate culpability beyond negligence, rising to the level of culpable malice.

### B. The Article Claims Nicole Must Have Been Drugged Based On Nothing Other Than Nicole's Selective, Self-Proclaimed Partial Amnesia.

537. The Article claimed Nicole was drugged by Newsboys' singer Michael Tait. Yet the Article cites no evidence of a drugging and certainly none by the Newsboys singer. The Defamation Defendants did not contact health care experts to determine the likelihood of a "date rape" drug having been used, which constitutes conscious disregard. Had the Defamation Defendants contacted a health care expert, she would have been told it was somewhere between extremely unlikely and impossible.

538. The Article asserts that Nicole must have been drugged and, because it presents no other explanation, implies that the substance must have been administered by Newsboys member Michael Tait. Moments before, while at the hotel bar, Tait ordered three tequila shots, one for himself, one for John Burch, and one for Nicole. The Article claims that Tait put some kind of date rape drug into one of the three shots, despite offering no evidence or support for that claim other than Nicole's self -reported amnesia. In fact, John Burch was standing immediately beside Tait when the three shots were poured by the bartender and affirmatively states that nothing was put into the shot glasses other than the tequila poured by the bartender. Neither Burch nor the bartender saw anything added by anyone. The defamatory Article discloses none of these facts, and the Defamation Defendants did not contact either Burch or the bartender even though the Defamation Defendants knew their full names and had their contact information.

539. The Articles also sought to enhance the drugging narrative by minimizing Nicole's acknowledged alcohol consumption, stating that Nicole remained "well within legal drinking limits" that evening. That characterization is false and presents the events in a false light. There are no applicable "drinking limits" for a hotel guest. More importantly, the Fargo Police Report — in the Defamation Defendants' possession, documents that Nicole told the Fargo Police she "had quite a bit to drink" (Ex. 2, p. 3) that evening. The Defamation Defendants knowingly substituted a minimizing characterization of Nicole's alcohol consumption for her own contrary admission to law enforcement, further inflating an already speculative drugging claim.

540. And the Fargo Police concluded Nicole had not been given any "date rape" drug, based in part on their own investigation, including their viewing of the hotel video footage, the Fargo Police writing in their report repeatedly " there is no indication of her being drugged in any way for this to have happened." [Ex. 2, p. 5]; "[there was no] indication that she had been given a date rape drug which would have incapacitated her." [Ex. 2, p. 6] Although the Defamation Defendants knew this, she did not disclosure it in her article, because she did not want to include anything that negated or contradicted the story line.

541. To further ensure readers would discount the Fargo Police's conclusions, the Article falsely portrayed the Fargo Police as appearing "unwilling to pursue any leads", a characterization designed to present the police investigation in a false light. That characterization was false and defamatory. The Fargo Police conducted a thorough, multi-faceted investigation that included: (a) traveling to the Ramada Inn and viewing hotel video footage of all relevant areas in coordination with hotel management; (b) interviewing the bartender at the hotel bar where the Article alleges Tait administered a drug to Nicole; (c) retrieving the billing records of all relevant parties; (d) interviewing Nicole's employer, Matt Best, and recording his statement; (e)

interviewing other witnesses; and (f) attempting to interview additional out-of-state witnesses. The Article's false portrayal of the Fargo Police as disinterested investigators was a deliberate device to cause readers to dismiss the very findings — that Nicole had not been drugged and that her encounter was consensual, that directly defeated the defamatory narrative.

542. Perversely, the Article claims one of the "indicators" that Nicole had been "drugged" by someone comes from the hotel security video of the corridor outside Brewer's hotel room. The Article does not show the video or any clips; rather it verbally describes Nicole and Matt both coming out of Matt's room whereupon she leaped up on him and wrapped her legs around him, at which point they re-entered the room for consensual sex.

543. The Police Report particularly noted this, writing: ".. all three of them are standing outside of the hotel room and it's about that time that [Nicole] jumps up on Matt and straddles him, and they walk into the hotel room." (Ex. 2, p. 5) The Article notes this, but without showing the video or any shots records Nicole as saying 11 years later, that "she did not remember this moment, the Article stating: " While viewing the footage, Nicole told TRR that she did not remember this moment but said she unequivocally would not have wanted to be taken back into the room. She believes a date rape drug, like Rohypnol, GHB, or Ketamine, mixed with alcohol, lowered her inhibitions." (Ex. 1, p. 6)

544. While leaping into Brewer's arms exhibits motor skills that are not consistent with any incapacitating date rape drug. Even more importantly, a video of an affectionate embrace -- fully consistent with consensual sex -- has now become evidence of being drugged, because, the Article states, Nicole "said she unequivocally would not have wanted to be taken back into the room [and therefore] ...believes a date rape drug, like Rohypnol, GHB, or Ketamine, mixed with

alcohol, lowered her inhibitions." In other words, she claims she would have never done this unless she was drugged and therefore must have been.

545. The published accusation of "drugging" did not rest on toxicology, medical evidence, eyewitness testimony, or contemporaneous complaint. It rested solely on the accuser's retrospective assertion that she would not have gone to Plaintiff's hotel room "in her right mind." That is not evidence of drugging; it is an inference drawn from conduct she later regretted. The Defamation Defendants knew this. The Defamation Defendants also knew the allegation was unsupported by any objective indicia of intoxication by surreptitious drugs. Yet Defendant presented the claim as a factual occurrence rather than a speculative belief. Publishing a serious criminal accusation while aware that it rests only on such ipse dixit constitutes reckless disregard for the truth.

546. Further revealing this as a preposterous claim comes from even a cursory viewing of the video taken by the hotel's security cameras, which the Defamation Defendants had. This footage showed Nicole arriving at Brewer's room texting on her phone:

547. Then hotel video footage shows Nicole walking out of Brewer's room in the middle of her time there, leaping into Brewer's arms.

548. Not only were Nicole's motor skills inconsistent with a claim of having been drugged, but her entire demeanor was also nothing remotely resembling a drugged victim. To the contrary, she seemed alert, texting, talking, leaping and on leaving Brewer's room turns to speak to him as she has left the room.

549. Also inconsistent with a claim of having been drugged was Nicole's suspiciously selective recall. Unlike a person who had been administered a date rape drug and has no memory at all, Nicole had precise, albeit selective, recall of events. For example, Nicole claimed to know

the precise time Tait offered tequila shots was 1:17 AM: "...Tait saw her stand up at 1:17 a.m., he yelled for her across the bar...." (Ex. 1, p. 4) No one drugged would have that precise a memory of time. Similarly suspicious, Nicole knew the precise time she had "blacked out" and what she remembered seeing when she "woke up," the Police writing: Nicole [26] said she "blacked out" around 0200 hours [i.e., 2 AM]. Nicole said the next thing she remembers is being in a hotel room bathroom with a male named "Matt." Nicole said "Matt" was a white male, 6’5", very large, and had brown curly hair pulled back into a "bun." Nicole said she also remembers a black male entering the hotel room at some point (unknown description) Nicole said she remembers "Matt" trying to have sex with her and giving "Matt" oral sex. Nicole is concerned there were sexual acts completed by one or more males (Ex. 2, p. 3) Even a normal person let alone a true victim of a date rape drug, will not be able to recall the precise time they "blacked out" -- here Nicole recalled it being 2 AM. As to what Nicole said about what she "remembered" when she "woke up," Nicole described to the Fargo Police with incredible detail her now-alleged assailant, Matt and what they were doing: "the next thing she remembers is being in a hotel room bathroom with a male named ‘Matt.’ Nicole said ‘Matt’ was a white male, 6’5", very large, and had brown curly hair pulled back into a "bun." Nicole said she also remembers a black male entering the hotel room at some point (unknown description) Nicole said she remembers ‘Matt’ trying to have sex with her and giving ‘Matt’ oral sex.” (Ex. 2, p. 3)

550. Medically, the recall of (a) the precise time of "blacking out," (b) the minute details of her surroundings; (c) her paramour’s size and hair style; and (d) what was being done sexually, are not consistent with any kind of incapacitating date rape drug.

[26] In the copy of the Police Report attached hereto as Exhibit 2 the victim’s name has been redacted. The pseudonym Nicole has replaced "[REDACTED] as it actually appears in the Police Report.

551. And her account to the Fargo Police, stated immediately above, and what she told the Defamation Defendants 11 years later are different, the Defamation Defendants stating: "Nicole told TRR that after taking the Tequila from Tait, 'The next thing that I remember is being on a bathroom floor and feeling like a 1,000 pounds were on me. My body was so heavy I could hardly move. I hear Matt Brewer's voice, and I remember (Tait) being in there.' 'I remember the feeling of my head being pushed down between someone's legs. I . . . guess oral sex, or an attempt, but I don't fully remember." (Ex. 1, p. 8)

552. Also contradicting claims of rape versus consensual sex are the references to oral sex, with a. Nicole telling the police according to the "...she remembers 'Matt' trying to have sex official police report: with her and giving 'Matt' oral sex" (Ex. 2, p.3) b. Nicole telling her friend Elizabeth Chan: "I woke up to giving Matt Brewer a blow job'" (Ex. 1, p. 9) c. Nicole telling the Defamation Defendants "I remember the feeling of my head being 11 years later: pushed down between someone's legs. I . . . guess oral sex, or an attempt, but I don't fully remember." (Ex. 1, p. 8)

553. These accounts of memory recall are not only inconsistent with a date rape drugging but internally inconsistent with one another, creating the immediate sense of fabrication. Nicole's discussions with her friend in 2014 clearly state she was "giving" fellatio to Matt Brewer while her statements 11 years later to the Defamation Defendants was of her "head being pushed down between someone's legs...:" (Ex. 1, p. 8). This starkly inconsistent rendition of events creates the immediate sense of fabrication.

554. Also, dramatically inconsistent with claims of nonconsensual rape from a drugging, are the facts that when she "woke up," a. Nicole did not cry for help, as the entire reason they were in the bathroom was someone was asleep in the bedroom next to the bathroom and b. Nicole did

not immediately leave the room when she woke up if her encounters had not been voluntary; Indeed, the hotel video footage captures Nicole's leaving Brewer's room which show her calm and in control and even turning to chat with Brewer after she exited his room:

555. Directly contradicting Nicole's account to the Defamation Defendants that she was on a "bathroom floor" is the eyewitness account referenced in the Article itself. The Article states that video footage shows Jack Campbell following Tait to Brewer's hotel room, opening the door, and — after only six seconds — fleeing. (Ex. 1, p. 6) That six-second observation nonetheless afforded Jack Campbell a direct view into the room. As reflected in the Article, Jack Campbell observed Nicole and Brewer engaged in consensual sexual activity on a couch in the living room area of the hotel room, with Tait watching. That is irreconcilable with Nicole's claim, made eleven years later, that she was on a bathroom floor with Brewer on top of her. The Article neither acknowledges this contradiction nor attempted to reconcile Nicole's account with the eyewitness evidence the Article itself recites. Furthermore, the Article's own timeline renders the bathroom floor account physically implausible. The Article places Jack Campbell's observation of Nicole and Brewer in the living room at approximately 2:00 AM and records Nicole exiting the room fully dressed at 2:21 AM, approximately twenty minutes elapsed. It is implausible that Nicole and Brewer relocated from the living room couch to the bathroom, engaged in the acts Nicole described, and fully redressed and exited within that window

556. The entire story of drugging was fabricated based entirely on Nicole's self-reported amnesia, and unverified preposterous assertions in other publications that few young men reported doing things they would not otherwise have done, so they "must" have been drugged.

### C. THE ARTICLES FALSELY CHARACTERIZED TAIT'S JUNE 10, 2025 STATEMENT AS AN "ADMISSION OF GUILT" AND KNOWINGLY MISREPRESENT ITS CONTENTS.



Case 3:26-cv-00484 Document 133-1 Filed 10/09/26 Page 176 of 231 PageID #: 1793

557. The Article contains a bolded sub-headline reading "Tait's alleged admission of guilt" and states that Tait's "admission of guilt came only after The Roys Report (TRR) published the stories." These statements are false and defamatory. Tait never admitted to having drugged Nicole, never admitted to watching while Nicole was raped, and never admitted to any participation in concealing such events. The characterization of Tait's post-publication statement as an "admission of guilt" for the specific acts alleged in the Article has no factual support and constitutes defamation per se.

558. The Article further falsely states that in his June 10, 2025, statement Tait "admitted he has preyed sexually on other men." Tait's actual statement was that he had "at times touched men in an unwanted sensual way." The Article's substitution of "preyed sexually" with its connotation of predatory, criminal conduct for Tait's own words is a knowing misrepresentation of the source the Article purports to quote, and constitutes actual malice

### D. THE ARTICLES' CLAIMS THE NEWSBOYS "COVERED UP" NICOLE'S RAPE AND DRUGGING WAS A LITERAL IMPOSSIBILITY SINCE EVERYONE KNEW EVERYTHING.

559. The Article falsely and defamatorily proclaims that the Plaintiffs then perpetrated a "cover up" of these events, a preposterous and particularly damaging false accusation. But a "cover up" was legally and factually impossible. There was no cover up and the Defamation Defendants knew it.

560. First, a cover up was impossible because Plaintiffs controlled no one and were in no position to cover anything up had they wanted to. The Article claims that two of Nicole's friends were concerned in the early morning hours of December 16, the Article writing about Nicole's two friends, Jesi Jones and Elizabeth Chan: By the time [Elizabeth] Chan and [Jesi] Jones arrived back on the floor two minutes later, they found Nicole crumpled on the floor by her door. Chan and

Jones told TRR that she had blacked out and her pants were unzipped. 'Even if you're black-out drunk,' said Chan, 'I've never seen anyone to that point of having no motion.' At that moment, Brewer left his hotel room. Chan pulled Nicole into their room, while Jones doubled back to ask Brewer what happened. She told TRR, 'He was wasted.' A video feed shows Brewer fully dressed and talking on his phone with Nicole's crumpled body still visible in the hallway. To this day, Chan and Jones say they wish they had called an ambulance. 'I wasn't very familiar with what roofying looked like versus just being fully intoxicated,' said Chan, who was 22 at the time. 'I checked and knew that she was breathing. I brought her into the suite area of the hotel (room), and I put her on the couch. 'I couldn't get her to talk or really be coherent at all. But I knew she had a pulse, was breathing normally, and perhaps had too much to drink. So, Jesi and I decided we would just let her sleep it off, hoping maybe the next morning, she'll be able to tell us what really happened." (Ex. 1, Pgs. 8-9)

561. This, plus the fact that later that morning Nicole told Elizabeth Chan and Jesi Jones that she "woke up to giving Matt Brewer a blow job..." (Ex. 1, p. 9) clearly show that there was nothing to "cover up": Nicole told her friends and would within a short time span tell her boss, the evangelist for whom they worked, a hospital, and the Fargo Police. But the account of Jones and Chan is false and misleading with the hotel video footage showing a different story.

562. The hotel video shows Nicole walking straight down the corridor to her room and when she cannot get in, sitting down by the door waiting for someone to let her in. Elizabeth and Jesi arrive in moments and let her in, then Jesi walks down the hall towards Brewer who is now waiting for the elevator and John Burch who has just gotten off the elevator, whom she approaches smiling and hands Burch Tait's glasses:

563. Jones then engages in playful banter, smiling and chatting:

564. Chan arrives moments later similarly smiling and laughing: These images, not shown by the Defamation Defendants, clearly contradict assertions of worried friends who thought Nicole should be hospitalized.

565. The Article reports that later that morning, "As soon as [boss Matt Best] found out about Nicole's memory of Brewer and Tait in the bathroom, he leaped into action. He drove Nicole to the emergency room at Essential Health West in Fargo..." (Ex. 1, p. 10) So, her boss knew what had transpired and allegedly drove her to the hospital. Then Best and Steve Campbell had a series of meetings, starting that evening when Best texted Steve Campbell wanting to meet and talk before they left:

566. Not only did Best meet with Steve Campbell on the evening of December 16, on the 17th they met again. Tait was to be included, and Best wanted to meet without involving Hall, and Tait disagreed wanting everyone there:

567. On the evening of December 17, Steve Campbell, Best and Tait met with evangelist Hall and wanted Nicole's friend Jesi Jones to be there:

568. And shortly thereafter Matt Best again texted Steve Campbell that he, Tait and evangelist Hall were all together:

569. Then on December 18, they met again:

570. Following this, Nicole met with Best and likely Hall, where they discussed the incident and Nicole was dismissed, certainly not because she was raped.

571. Thus, if the incident occurred around 2:00 AM on December 16, within three days, Nicole had (a) freely talked to her friends, (b) freely talked to her employer, (c) talked to evangelist Nick Hall who was the tour owner, (d) been to two different hospitals where she had spoken with doctors and nurses in both, and (e) importantly talked extensively to the Fargo Police. The

Plaintiffs not only had done nothing to "cover up" Nicole's encounter, but there was nothing to "cover up" as everyone relevant was involved and fully informed. The only actual "cover-up" was done by the Defamation Defendants who "covered up" the relevant facts.

### E. THE FEBRUARY 12, 2026, ARTICLE RESTATED THE ORIGINAL ARTICLE WITH MATERIALLY ALTERED AND EXPANDED DEFAMATIONS ABOUT THE ALLEGED "COVER UP" ALLEGATION IMPLICATING WES CAMPBELL PERSONALLY IN THE MATTERS COVERED BY THE ORIGINAL ARTICLE.

572. In a new article dated February 12, 2026, entitled "Michael Tait Flees Nashville Amid Investigation, Newsboys Left in Limbo," (the "New Article"; Ex. 3, p. 1) the most recent of at least fifteen articles published by The Roys Report since June 19, 2025, the Defamation Defendants both restates and republishes the defamatory allegations found in the original Article, adding materially expanded accusations targeting Wes Campbell and the Newsboys.

573. The New Article repeats the defamations in the original Article and adds broadly that "a woman and four witnesses told TRR that Newsboys management covered up the incident." (Ex. 3, p. 3). The new Article also identifies Wes Campbell as the owner of the Newsboys and repeatedly discusses him in connection with the band's leadership, management, finances, business operations, litigation, and industry consequences. In fact, he is the only "Campbell" named or discussed in the New Article. In that context, the phrase "Newsboys management" is understood to refer to Wes Campbell personally.

574. Through this reframing, the Defamation Defendants has conveyed to readers that Wes Campbell personally participated in, directed, authorized, ratified, or was responsible for a criminal cover-up of alleged sexual assault. That implication is false.

575. Wes Campbell did not engage in, authorize, direct, ratify, or participate in any concealment of alleged criminal conduct. He did not obstruct any investigation, interfere with law enforcement, suppress evidence, or otherwise engage in criminal wrongdoing.

576. By publishing and republishing this accusation in this expanded form, the Defamation Defendants falsely imputed obstruction of justice and complicity in criminal conduct to Wes Campbell. Such accusations constitute defamation per se. This has caused substantial and ongoing damage to Wes Campbell's personal and professional reputation and business interests.

577. The Articles additionally reference Wes Campbell's sale of a home to Tait, a private real estate transaction bearing no connection to the events in Fargo, for no apparent purpose other than to insinuate, without any factual basis, that the sale price was below market value and thus constituted a form of hush money. The Articles offer no evidence that the transaction was at below-market value and offer no evidence connecting the transaction to the events described in the Articles. The insinuation is fabricated from the juxtaposition of unrelated facts and constitutes a false and defamatory implication presenting Wes Campbell in a false light.

578. The Articles also falsely assert or imply that the Brentwood Police Department or other Tennessee law enforcement authorities were investigating Tait in connection with the allegations described in the Articles. That assertion is false and defamatory. No Tennessee law enforcement agency conducted any investigation of the allegations made by Nicole as described in the Articles. The Defamation Defendants either knew this to be false at the time of publication or acted with reckless disregard for the truth in asserting or implying the existence of such an investigation.

### F. Defamation Defendants Are Responsible For Each Subsequent Republication.

579. The Defamation Defendants are liable for the defamations herein set forth and those that shall be adduced at trial. The Defamation Defendants are also liable for each and every republication of these defamations, as they were published knowing republication would occur.

580. The February 12, 2026, article republished multiple prior sexual assault allegations previously disseminated by the Defamation Defendants and again referenced allegations from multiple accusers and witnesses, including the alleged 2014 tour incident involving “four witnesses.” By republishing and reframing these accusations in connection with “Newsboys management,” the Defamation Defendants further entrenched and expanded the defamatory narrative directed at Wes Campbell. The Defamation Defendants are liable for this republication and for each subsequent repetition of these false and defamatory statements.

581. Additionally, the February Article republishes, and references alleged prior conduct by Tait involving other individuals and other circumstances. All such alleged conduct, even if accurate, occurred years before Tait joined the Newsboys in 2010. The Articles attribute responsibility for that prior conduct to Wes Campbell and the Newsboys without disclosing — and apparently with the purpose of concealing — that all such alleged events predated Tait’s affiliation with the Newsboys entirely. Campbell had no knowledge of, and no legal or factual responsibility for, any conduct of Tait’s that preceded Tait’s 2010 engagement by the Newsboys. The Articles’ attribution of responsibility to the Campbell Parties for conduct predating Tait’s Newsboys tenure presents the Campbell Parties in a false and defamatory light.

**G. PLAINTIFFS HAVE BEEN DAMAGED BY THESE DEFAMATIONS.**

582. Plaintiffs have suffered substantial damages as a direct and proximate result of Defendants’ defamatory statements, including but not limited to the loss of existing and prospective contractual relationships with performing artists and nonprofit organizations, the

destruction of goodwill and reputation in the CCM Touring and NPS Markets, and the impairment and ultimate destruction of Plaintiffs' business operations. These injuries were caused both by the immediate reputational harm inflicted by Defendants' false statements and by the foreseeable commercial consequences of those statements, including the withdrawal, termination, or refusal of business relationships by market participants who relied upon or were influenced by Defendants' defamatory communications.

583. To the extent the same course of conduct by Defendants also constitutes anticompetitive conduct giving rise to Plaintiffs' antitrust claims, Plaintiffs do not seek duplicative recovery for the same injury but rather seek recovery under all applicable legal theories for the full measure of harm caused by Defendants' wrongful conduct. The defamatory statements and the anticompetitive scheme operated in tandem, each reinforcing the other, such that Defendants' defamation both independently caused injury to Plaintiffs' business and reputation and served as a mechanism through which Defendants achieved and maintained their anticompetitive objectives. Plaintiffs therefore seek all damages permitted by law, with any necessary adjustments to prevent double recovery to be addressed at the appropriate stage of the proceedings.

## ARTICLE XI
## CLAIM FOR RELIEF FOR CONSPIRACY AND AIDING AND ABETTING DEFAMATION AGAINST WATERLAND DEFENDANTS

584. In all claims in this Article XI, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

585. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV-VI above and arises from

the same common nucleus of operative fact as Plaintiffs' other claims. Without limiting the generality of the foregoing, this claim is based on the same series of communications, coordination, and actions through which Defendants, acting in concert, facilitated and amplified the publication of defamatory statements and the resulting harm to Plaintiffs' business and reputation.

586. Transparent and Tim Taber and later because of the merger, the Waterland Defendants, are jointly and severally liable for fomenting, encouraging, aiding and abetting the scandalously false defamations set forth in the previous cause of action.

587. Transparent/Taber were also keen to separate themselves from the Fargo Fabrication because Taber had been in hot tub with Tait and knew if he and thus Transparent and then by extension, other musical groups with which they were associated, were publicly associated in ongoing business with Tait, Transparent/Taber would be hurt, and thus spread the defamatory Fargo Fabrication to others to justify their separation.

588. Transparent/Taber republished the defamatory Fargo Fabrication to musicians and others that were doing business with Plaintiffs and those that were thinking about doing business with the Plaintiffs, including without limitation, MercyMe, Brandon Lake, and others to induce them to cease doing business with Plaintiffs, telling them, among other things, that their brands would be tarnished on publication of the Fargo Fabrication, endeavoring to use this as a means of contracting themselves with such bands.

589. While Plaintiffs were negotiating for the sale of TCA, Transparent and Taber and later because of the merger, the Waterland Defendants, told the defamatory Fargo Fabrication to Premier and Rush and induced them to halt acquisition conversations, as the Fargo Fabrication, which they were assiduously circulating, would mean Plaintiffs would suffer economically in the future, making an acquisition less attractive.

590. The Waterland Defendants told the defamatory Fargo Fabrication to Premier and Rush, encouraging them to breach their contracts and duties to Plaintiffs, such that they ceased marketing the Newsboys and other groups under contract with TCA, telling them that the Fargo Fabrication would mean far smaller audiences and thus marketing money spent would be wasted.

591. The Waterland Defendants hired Nicole and while on TPR's payroll, authorized, assisted, facilitated and encouraged Nicole to meet with the Defamation Defendants to further the Fargo Fabrication and encourage and abet the creation and dissemination of the Article, also assisting, facilitating and encouraging other individuals witnesses in the Article to meet with the Defamation Defendants.

592. In addition to aiding and abetting the defamation, under respondeat superior, they are responsible for the resulting defamatory Articles, which were the intended result of such conduct.

## ARTICLE XII

## CLAIM FOR RELIEF FOR VIOLATIONS OF LANHAM ACT ASSERTED AGAINST THE WATERLAND DEFENDANTS AND WORLD VISION

593. In all claims in this Article XII, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

594. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV-VI above and arises from the same common nucleus of operative fact as Plaintiffs' other claims. This claim is based on the same series of communications, transactions, and events through which the Waterland Defendants restrained competition, impaired Plaintiffs' business relationships, eliminated Plaintiffs as a competitive force in the relevant markets. Without limiting the generality of the foregoing, this

claim arises under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which prohibits any person from using in commerce any false or misleading representation of fact that is likely to cause confusion, mistake, or deception as to the nature, characteristics, or qualities of another person's goods, services, or commercial activities, and which further prohibits false or misleading statements that misrepresent the nature, characteristics, or qualities of a person's own or another person's goods, services, or commercial activities. The purpose of Section 43(a) is to protect persons engaged in commerce within the control of Congress against unfair competition. 15 U.S.C. §1127. The Waterland Defendants and World Vision are direct competitors of Plaintiffs in the CCM Touring Market and the NPS Market as defined and described herein, and their false and misleading statements were made in the context of that competitive relationship for the purpose of obtaining competitive advantage. Plaintiffs fall within the zone of interests protected by the Lanham Act, and their injuries were proximately caused by Defendants' violations. Defendants' conduct constitutes unfair competition in its classic form—competition by falsehood rather than by merit

595. Because of the partnership/joint venture arrangements which had been entered between the Waterland Defendants and World Vision, World Vision is responsible for each, and every statement and act undertaken by the Waterland Defendants, as they were taken in furtherance of their partnership.

596. The Defendants made false and misleading statements of fact in commerce concerning Plaintiffs and Plaintiffs' commercial activities, widely disseminated to performing artists, nonprofit organizations, and others operating in the CCM Touring Market and the NPS Market.

597. The conduct of the Defendants is not merely defamatory speech but constitutes commercial advertising and promotion within the meaning of Section 43(a), because Defendants carried out a deliberate market-facing campaign of false factual representations, disseminated to Plaintiffs' customers, prospective customers, and purchasing decision-makers, for the purpose and with the effect of altering purchasing decisions and diverting business; accordingly, this case arises under the Lanham Act's prohibition on unfair competition through false advertising, not merely under principles of defamation, including, without limitation, the following categories of conduct:

a. *The Fargo Fabrication as Commercial Disparagement*. The false narrative described herein as the "Fargo Fabrication," namely, the fabricated account of drugging, rape, and coverup involving Plaintiffs, was repeatedly and deliberately disseminated to performing artists, nonprofit organizations, and other commercial counterparties, while knowing that narrative to be false. These statements were not mere expressions of opinion but false statements of purported fact, made in a commercial context, in interstate communications directed to current and prospective customers, for the express purpose of inducing artists and nonprofits to terminate or decline business relationships with Plaintiffs and to redirect those relationships to the Defendants. As alleged herein, the Waterland Defendants were a participating and motivating cause of the fabrication and dissemination of the Fargo Fabrication, rendering their subsequent circulation of it as a purportedly independent fact particularly egregious, acts joined in by World Vision. By presenting the Fargo Fabrication to commercial counterparties as factual information bearing on Plaintiffs' fitness as business partners, the Defendants made false and misleading representations of fact concerning the nature and character of Plaintiffs' commercial activities within the meaning of 15 U.S.C. § 1125(a)(1)(B).

b. *False Statements Concerning Impending Reputational Harm*. The Defendants told performing artists and nonprofit organizations that a devastating published article was imminent concerning Plaintiffs, and that continued association with Plaintiffs would tarnish those artists' and nonprofits' own brands and reputations, causing their careers and charitable missions to suffer. These statements were false and misleading in that the Defendants knew the article being anticipated was based on fabricated allegations that they themselves had helped construct and promote and thus were representing to third parties as an independent, adverse factual development something that was in fact the product of their own wrongful conduct. These statements were further misleading in that they presented the anticipated reputational harm to Plaintiffs as an objective market condition rather than a manufactured outcome orchestrated by the very parties making the representation.

c. *False Statements Concerning Plaintiffs' Business Viability*. The Defendants told performing artists and nonprofit organizations that Plaintiffs' business would be destroyed upon publication of the anticipated article, that audiences would diminish, that marketing dollars spent on Plaintiffs' concerts would be wasted, and that Plaintiffs would become pariahs in the Christian concert market. These statements were specific, verifiable statements of fact and false predictions presented as existing market realities concerning the nature and future character of Plaintiffs' commercial activities, made without basis other than the plan of the Defendants to destroy Plaintiffs, and were designed to induce commercial counterparties to act on those false statements to Plaintiffs' detriment and the benefit of the Defendants.

d. *False Statements Concerning Nonprofit Sponsorship Relationships*. The Defendants told nonprofit organizations with whom Plaintiffs had existing or prospective contractual relationships that money spent on sponsorships through Plaintiffs would not be recouped, and that continued association with Plaintiffs would jeopardize those nonprofits' relationships with donors and the public. These statements were false statements of fact concerning the nature and quality of Plaintiffs' commercial services, made for the purpose of diverting those nonprofit relationships to the Defendants.

e. *False Statements Concerning the Character of Plaintiffs' Commercial Activities*. By disseminating the Fargo Fabrication and related false statements in a commercial context, the Defendants made false and misleading representations that Plaintiffs' commercial activities were tainted by criminal conduct, moral turpitude, and institutional coverup — representations that were false, that the Defendants knew to be false, and that directly concerned the nature and character of Plaintiffs' commercial activities within the meaning of Section 43(a).

f. *Statements Constituting Commercial Advertising or Promotion*. The foregoing statements were part of an organized and systematic campaign to penetrate the relevant market, directed to a substantial portion of Plaintiffs' actual and potential customers, and therefore constitute "commercial advertising or promotion" within the meaning of Section 43(a).

598. These foregoing statements were not subjective opinions or non-actionable predictions but were presented as statements of existing fact or inevitable market outcomes and were understood as such by their recipients.

599. The false and misleading statements were made in the context of commercial competition. As alleged herein, the Defendants were direct competitors of Plaintiffs in both the CCM Touring Market and the NPS Market. Their false statements were made for the express

purpose of obtaining competitive advantage by diverting artists and nonprofits from Plaintiffs to the Defendants. The commercial motivation underlying these statements, and the competitive relationship between the parties, satisfies the commercial nexus required under Section 43(a). Defendants' statements were not merely incidental speech but were integral to a broader scheme of market displacement. Defendants' false and misleading statements were thus a central mechanism by which Defendants executed and maintained their exclusionary scheme in the relevant markets.

600. This campaign was sufficiently disseminated to the relevant purchasing public to constitute commercial advertising or promotion and was made in commerce. The CCM Touring Market and the NPS Market operate on a nationwide basis, as alleged herein, and the Defendants' communications were directed to artists, nonprofits, and commercial counterparties across the United States. These statements therefore occurred in interstate commerce within the meaning of the Lanham Act.

601. The Defendants' false and misleading statements actually deceived, and in any event had the tendency and capacity to deceive, a substantial segment of their intended audience. As alleged herein, performing artists including MercyMe terminated or declined contractual relationships with Plaintiffs in direct response to the Defendants' false statements. Nonprofit organizations similarly declined to enter into or renew contracts with Plaintiffs as a direct result of these statements. These outcomes demonstrate both the materiality of the false statements and their actual deceptive effect on commercial decision-making.

602. The deception caused by the Defendants' false statements was material in that it was likely to, and did, influence the purchasing and contracting decisions of performing artists, nonprofit organizations, and other commercial counterparties who were the intended audience of

those statements. Such influence on purchasing decisions necessarily and foreseeably caused injury to Plaintiffs' commercial interests. Artists who would otherwise have contracted with Plaintiffs declined to do so or breached existing contracts. Nonprofits who would otherwise have renewed or extended their arrangements with Plaintiffs declined to do so. These were precisely the commercial outcomes the Defendants intended their false statements to produce.

603. The Defendants' false and misleading statements injured Plaintiffs in their commercial activities. As a direct and proximate result of those statements, Plaintiffs suffered, without limitation: loss of performing artists under contract, including MercyMe and others; loss of nonprofit sponsorship relationships; loss of prospective contractual relationships with artists including Brandon Lake and others; loss of revenues from sponsorship arrangements that were diverted to the Waterland Defendants; damage to Plaintiffs' commercial reputation in the CCM Touring Market and the NPS Market; and the destruction of Plaintiffs' business and competitive position, the value of which had been independently established at approximately $50,000,000 by the Waterland Defendants' own acquisition offer. Plaintiffs have suffered injuries to their business reputation and to their present and future sales and commercial relationships within the meaning of Section 43(a). These injuries were a direct and foreseeable result of Defendants' false advertising and competitive misconduct, including the diversion of sales and business opportunities from Plaintiffs to the Waterland Defendants.

604. The Defendants' violations of Section 43(a) were willful. As alleged herein, the Defendants knowingly fabricated or participated in the fabrication of the false statements they disseminated, understood those statements to be false at the time they made them, and made them for the express commercial purpose of destroying Plaintiffs as competitors and capturing their


Case 3:26-cv-00484 Document 133-1 Filed 10/09/26 Page 190 of 231 PageID #: 1807

business relationships and revenue streams. This willfulness entitles Plaintiffs to enhanced damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

605. As a direct and proximate result of the Defendants' violations of Section 43(a) of the Lanham Act, Plaintiffs have suffered damages in an amount to be proven at trial, but in no event less than the value of the business and commercial relationships destroyed by Defendants' conduct, which the Waterland Defendants themselves valued at approximately $50,000,000. Plaintiffs are further entitled to disgorgement of the Defendants' profits attributable to their wrongful conduct, enhanced damages for willful violation, and an award of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

606. In addition to damages, Plaintiffs are entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116 enjoining the Defendants from continuing to make false or misleading statements of fact concerning Plaintiffs or their commercial activities, from continuing to disseminate the Fargo Fabrication or any variation thereof in a commercial context, and from continuing to use false or misleading representations to divert artists, nonprofits, or other commercial counterparties from Plaintiffs. Plaintiffs further seek corrective advertising and such other equitable relief as the Court deems just and proper. Plaintiffs have suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law absent such injunctive relief.

## ARTICLE XIII
## CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST MERCYME DEFENDANTS.

607. In all claims in this Article XIII, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

608. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Article VI and VII above and arises from the same common nucleus of operative fact as Plaintiffs' other claims.

### A. BACKGROUND FACTS RELEVANT TO THE CAUSES OF ACTION AND CLAIMS HEREUNDER.

609. On or around August 2024, Plaintiff TCA and the music group MercyMe ("MercyMe" or "MM") and the group's four members, namely Bart Millard, Robby Shaffer, Nathan Cochran, and Mike Scheuchzer (collectively, the "MercyMe Defendants") signed a contract (that contract is herein called the "MM Contract"). A true and correct copy of the MM Contract is attached hereto as **Exhibit 4**. The background of that contract has been set forth *supra*, and it is incorporated herein by reference.

610. By virtue of its prior dealings with LiveCo/TPR, in or around August 2024 in connection with the Waterland and LiveCo Defendants' efforts to at that time ~~to~~ acquire MM's Public Platform and obtain a relinquishment of MM's rights to generate sponsorship revenues in favor of LiveCo/TPR and World Vision, MercyMe had knowledge of the structure and purpose of the scheme, including that LiveCo and World Vision had entered into an agreement whereby LiveCo/TPR would acquire MM's sponsorship rights enabling the Waterland and LiveCo Defendants' strategy to maintain its monopoly and market power. By its acts herein complained of, the MM Defendants joined that conspiracy by agreeing to unlawfully terminate the MM Contract, enter into new contracts with LiveCo/TPR and World Vision, and did so knowing such acts would aid and abet the Waterland and LiveCo Defendants and World Vision.

611. The MM Contract was signed not only by MercyMe, Inc. as an entity, but personally and individually by each of Bart Millard, Robby Shaffer, Nathan Cochran, and Mike Scheuchzer. The signature page of the MM Contract (Ex. 4, p. 15) expressly reflects their

individual execution "personally and individually," separate from and in addition to MercyMe, Inc.'s execution. Each of these individuals therefore undertook personal contractual obligations to TCA co-extensive with those of MercyMe, Inc. Their individual liability for the breaches alleged herein arises directly from their personal execution of the Agreement and is not derivative of MercyMe, Inc.'s liability. Each of these individuals is therefore jointly and severally liable with MercyMe, Inc. for all damages and equitable relief sought herein.

612. Furthermore, in numerous places in the MM Contract, the MM Defendants agreed to provide its Public Platform only to TCA. For example, MercyMe agreed:

a. in (Ex. 4, p.1, ¶1(a)), "to furnish, exclusively to TCA, MercyMe's Public Platform....";

b. in (Ex. 4, p. 1, ¶1(b)) that MM's concerts, conferences, or similar events would only be used, associated with, or otherwise made available for promoting, educating, making appeals, or otherwise securing child sponsorships for TCA;

c. in (Ex. 4, p. 1, ¶1(b)) MM would not make its concerts, conferences, or similar events available to promote and assist any party other than TCA in connection with securing child, family, community, victim, or similar charitable sponsors for nonprofits; and

d. in (Ex. 4, p. 2, ¶1(c)) the charitable sponsor(s) named by and contracted with TCA, would be the exclusive charitable sponsor at, on, or in connection with MercyMe's concerts, conferences, or similar events.

613. TCA advised the MM Defendants on numerous occasions that the nonprofit TCA had contracted with was "Children International," and thus this fact was known by them,

614. MM gave TCA the right to use the MM name (Ex. 4, p.2, ¶1(d)) and all information and materials "developed, obtained or generated in connection with" the agreement (Ex. 4, p.2, ¶1(e)) and no other person or entity other than TCA and the nonprofit(s) TCA designates, has or will have the right to use MercyMe's name in connection with child, family, community, victim, or similar charitable sponsorship (Ex. 4, p.2, ¶1(d)).

615. The MM Contract further precluded MM from creating or using any materials except that which TCA approved. (Ex. 4, p.2, ¶1(f)). And MM agreed to be available for all marketing activities and even agreed to travel to other locations for such marketing. (Ex. 4, p. 9, ¶8).

616. MM promised they would conduct a minimum 48 concerts for TCA, the associated expenses for these MM was to pay itself. The 48 concerts was a minimum number, and MM undertook a duty to do even more if at all possible. (Ex. 4, p. 1, ¶1(b)). A $1.5M payment was made to MM "intended to assist MM with the tour production and related expenses" they were going to incur in conducting the concerts MM was required to conduct. (Ex. 4, p. 6, ¶5). MM agreed to use its "best efforts" to generate at least 8,000 sponsorships during 2025. (Ex. 4, p. 6, ¶4(c)). This was a minimum number and the parties' reasonable expectations were that far more than 8000 sponsorships would be generated.

617. The MM Defendants knew full well these commitments were in turn made by TCA to Children International as the MM Agreement specifically so states. See (Ex. 4, p. 1, ¶1(a)). At almost the end of the MM Contract there is a provision called the "key man" provision (the "Key Man Proviso") that reads:

> 14A. Key Man**. Subject to the cure provisions described in Paragraph 14(a) of this Agreement**, Professional [i.e. MM] shall have the right to terminate this Agreement and to retain all monies theretofore paid to Professional [i.e. MM] by Client [i.e., TCA], if Troy Collins shall at any time during the Term cease to be actively involved in Client 's [i.e., TCA], operations other than for reasons of death, disability, or moral turpitude." (emphasis added)

618. The opening sentence of the above states that the Key Man Proviso clearly references that it is "subject to" the cure provisions set forth in (Ex. 4, p. 12, ¶14(a)) which immediately precedes (Ex. 4, p. 13, ¶14A). The cure provisions of (Ex. 4, p. 12, ¶14(a)) read as follows:

> 14(a) ... the failure by either Client (TCA) or Professional (MM) to perform any of their respective obligations hereunder shall not be deemed a breach of this Agreement unless the party claiming breach gives the other party written notice of such failure to perform and such failure is not corrected within thirty (30) days ... from and after the receipt of such notice, or, if such breach is not reasonably capable of being cured within such thirty (30) day ..., the party receiving notice does not commence to cure such breach within such thirty (30) day ... period and proceed with reasonable diligence to complete the curing of such breach thereafter.

619. On June 2, 2025, Troy Collins, whom the MM Contract designated as the "Key Man," voluntarily and for no reason resigned.

620. Acknowledging that TCA had at least a contractual thirty day right to cure,[27] on July 1, 2025, MM sent a letter to TCA advising of Collins's voluntary resignation and alerting TCA to its 30-day right to cure. Nevertheless, on July 18, 2025, well before the cure period expired, the MM Defendants repudiated and thus breached the MM Contract by purportedly immediately terminating the MM Contract stating:

> "The Contract's Term expired on July 1, 2025. Each of MercyMe's obligations to TCA pursuant to the Contract terminated that same day. MercyMe encourages TCA to accept that the Contract is terminated and that MercyMe has no continuing obligations to TCA." 518.

## B. BREACH OF CONTRACT CLAIM AND RELATED CLAIMS AGAINST THE MM DEFENDANTS.

621. Plaintiffs allege that these acts constitute a repudiation and breach of contract.

### *a.* ***Collins's Resignation Involved An Act Of Moral Turpitude Triggering No Termination Right***

622. On information and belief, Plaintiffs allege Collins's departure involved an act of moral turpitude which meant his resignation did not trigger a right to terminate. Collins resigned

[27] The cure provisions of (Ex. 4, p. 12, ¶14(a)) could actually be longer than 30 days if TCA needed more time to effect a cure.

to facilitate the setting up of separate contractual relations for MM with LiveCo/TPR and World Vision and himself, which he has done as MercyMe began touring with TobyMac, and later continued involvement with Children International as a pertinent charity. Collins is known to be a participant in all those arrangements. Particularly given his fiduciary and other duties to his employer, his departure for these nefarious reasons was a deceptive and dishonest act of moral turpitude. Therefore, it did not give MM a right of termination.

***b. <u>Collins's Resignation For No Reason Did Not Trigger Right To Terminate</u>***

623. In the alternative, apart from the issue of moral turpitude, Plaintiffs assert that the resignation of Collins, particularly for no reason, was not a proper ground for terminating the MM Contract. Plaintiffs assert that the voluntary resignation of Troy Collins was never intended to be a basis for MM to terminate a multimillion-dollar contract where significant amounts of money had been advanced and may be effectively deemed forfeited. That the trigger of a massive forfeiture cannot have meant to be precipitated by Collins's whim to quite is clear. It is unreasonable and not in keeping with the "spirit" of either the Key Man provision or the MM Contract as a whole to say Collins could trigger a forfeiture simply because Collins wanted to retire, or as here, to accomplish a means for the MM Defendants to garner a release from their contract so they could contract directly with LiveCo and World Vision, and later with Children International. This is particularly so, since under Tennessee law contract interpretations that effect a forfeiture are strictly construed. Because Collins voluntarily resigned and was not removed by TCA, the actions of the MM Defendants terminating the MM Contract, particularly prior to the end of the cure period, were invalid, a repudiation of the MM Contract and a material breach of contract. In summary, the voluntary resignation of Collins did not trigger the Key Man Provision in (Ex. 4, p. 13, ¶14A).

### *c. MM Parties Did Not Exercise Termination Right In Good Faith*

624. In the alternative, TCA asserts that the Key Man provision does not state that the agreement automatically terminated, but that upon Collins's ceasing to be involved MM had the *right* to terminate. But in exercising that right, MM was required to act reasonably and in good faith. Thus, MM had to have had a good faith reason why Collins's resignation should reasonably trigger a termination and TCA alleges that there was no good faith reason, thus rendering any purported termination of the MM Contract invalid, a repudiation of the MM Contract and a material breach of contract. Interpreting the "Key Man Provision" in the context of the entire agreement, Collins's role and functions for TCA was not so important to the entire agreement that his departure would justify a termination and ensuing forfeiture of a very large sum of money. Collins's voluntary departure in no way interfered with or made performance of the MM Contract more problematic for either TCA or MM. For example, if Collins ceased to be actively involved because he died, or became disabled, or was guilty of some heinous act of "moral turpitude," there was no trigger and therefore he cannot have been somehow "irreplaceable," by the agreement's own words to either party. Because Collins voluntary departure had no material impact on the MM Contract or performance of its terms, there was no good faith reason for the MM Defendants to exercise a right of termination, and thus the actions of the MM Defendants terminating the MM Contract, constitute a further breach of contract.

### *d. Plaintiffs Were Denied Contractual Cure Rights*

625. In the alternative, Plaintiffs assert that the MM Defendants repudiated and breached the MM Contract in terminating it without allowing Plaintiffs to cure, which Plaintiffs had a right to do under paragraph 14A, which Plaintiffs were ready, willing and able to do and would have done, but for the repudiation and breach by the MM Defendants. This is particularly true given

that "cure" had nothing to do with trying to convince Collins to change his mind. For that matter, it had nothing to do with Collins at all, as if it did it would make cure rights illusory. Instead, TCA's cure right simply meant at most that TCA had the right to designate a qualified person who could perform Collins's functions. Moreover, the MM Defendants even acknowledged on July 1, 2025, in writing that TCA had *__at least__* a contractual thirty day right to cure,[28] and in fact the cure provisions of (Ex. 4, p. 12, ¶14(a)) could actually be longer than 30 days if TCA needed more time to effect a cure. Nevertheless, on July 18, 2025, well before the cure period expired, the MM Defendants repudiated and thus breached the MM Contract by purportedly immediately terminating the MM Contract.

***e. __MM Defendants Breached (Ex. 4, p. 10, ¶9(c) of MM Contract__***

626. MercyMe further breached the MM Contract by its independent violation of (Ex. 4, p. 10, ¶9(c)), which provides that "during the Term hereof, Professional shall not enter into any agreement that would interfere with the full and prompt performance of Professional's obligations hereunder, and Professional shall not make Professional's Public Platform available to promote and assist any party other than Client in connection with securing child, family, community, victim, or similar charitable sponsors for Nonprofits."

627. Plaintiffs allege on information and belief that MercyMe entered into arrangements with LiveCo/TPR and World Vision, and also Children International during or immediately following the purported cure period, in violation of (Ex. 4, p. 10, ¶9(c)), and that such arrangements were planned and coordinated prior to MercyMe's purported notice of termination. These actions constitute an independent material breach of the MM Contract.

---

[28] The cure provisions of (Ex. 4, p. 12, ¶14(a)) could actually be longer than 30 days if TCA needed more time to effect a cure.

628. The provisions of (Ex. 4, p. 10, ¶9(c)) are absolute and contain no exceptions or qualifications and certainly none tied to the Key Man provision or any termination right. Even to the extent the MM Contract remained in effect during the cure period, MercyMe's concurrent negotiations with and arrangements for Children International and/or LiveCo/TPR during that period constitutes an independent violation of (Ex. 4, p. 10, ¶9(c)), separate from and in addition to the wrongful termination itself. MercyMe could not simultaneously purport to exercise a right of termination while also entering into arrangements that violated its continuing exclusivity obligations under a contract it had not yet validly terminated.

### *f. **MM Defendants Breached MM Contract By Denying Matching Rights***

629. The MM Contract contains a provision called the "Matching Right" that reads as follows:

> 3A. Matching Right. If at any time Professional (MM) receives an offer to make Professional's Public Platform available **after the Term** to a third party ... in order to promote, educate, make an appeal for, or otherwise assist in the securing of child, family, community, victim, or similar charitable sponsors ..., or in the event Professional on its own behalf seeks or desires **after the Term** to promote, educate, make an appeal for, or otherwise assist in the securing of child, family, community, victim, or similar charitable sponsors ..., Professional will not accept any such Sponsorship Offer unless and until the terms and conditions of this paragraph have been fulfilled and Client's exclusive rights under this Agreement have been addressed to its satisfaction. (emphasis added)

630. The MM Contract contains a Matching Right provision at (Ex. 4, p. 4, ¶3A) that survives the termination or expiration of the Agreement and operates independently of any termination dispute. The scope of (Ex. 4, p. 4, ¶3A) is deliberately and expressly broad. It covers offers from any third party "whether a non-profit organization or a for-profit promoter, artist, marketing firm, manager, music and/or entertainment company of any nature, or any other third party." It covers any arrangement "whether or not such offer is in the form of a direct sponsorship

relationship, a ‘package deal,’ ‘buy-out,’ or other mechanism wherein the acquisition and accumulation of sponsorships are addressed." And it covers MercyMe acting entirely on its own initiative to secure sponsorships, without any third-party offer at all.

631. Immediately before or immediately after termination, MM entered into touring contracts with LiveCo and World Vision so they could tour with Toby Mac. This triggered the Matching Right, even if the MM Contract was terminated as MM gave its Platform to LiveCo/TPR and World Vision. Moreover, as the MM Contract had not terminated, and their entering into contract with LiveCo/TPR and World Vision violated the exclusivity and other provisions of the MM Contract.

632. Further, the MM-CI direct arrangement constitutes a "Sponsorship Offer" within the meaning of (Ex. 4, p. 4, ¶3A) on multiple independent grounds. First, it involves MercyMe making its Public Platform available to Children International, a non-profit organization, for the purpose of securing charitable sponsors, precisely the relationship (Ex. 4, p. 4, ¶3A) was designed to address. Second, to the extent TPR is involved in the arrangement, as TCA alleges, that involvement constitutes an arrangement with a "for-profit promoter" and "any other third party" within the express language of (Ex. 4, p. 4, ¶3A). Third, even if MercyMe characterizes the arrangement as self-initiated rather than offer-based, (Ex. 4, p. 4, ¶3A) expressly captures the situation where "Professional on its own behalf seeks or desires after the Term to promote, educate, make an appeal for, or otherwise assist in the securing of... similar charitable sponsors."

633. Before termination, MM could not accept or enter into any Sponsorship Offer or arrangement. After termination, MM could not accept or enter into any Sponsorship Offer or arrangement unless it (a) provided TCA with a copy of any bona fide third-party Sponsorship Offer, presented in a manner allowing TCA to identify all financial terms and conditions; and (b)

afforded TCA thirty (30) days from receipt to match the Sponsorship Offer. MercyMe provided no such notice and afforded TCA no such opportunity. Instead, MercyMe proceeded directly to contract with Children International, and, on information and belief, with TPR, in plain violation of (Ex. 4, p. 4, ¶3A).

634. MercyMe's failure to provide notice and matching opportunity is an independent, freestanding breach of the MM Contract, separate from and in addition to MercyMe's wrongful termination of the Agreement. It is not merely an alternative theory; it is a distinct contractual violation with its own damages. By denying TCA its matching right, MercyMe deprived TCA of the contractual right to continue, or to reinstate, the exclusive economic relationship TCA had built, funded, and was entitled to protect.

635. TCA's damages from MercyMe's breach of the Matching Right include, without limitation, the value of the sponsorship arrangement TCA was denied the opportunity to match, including all revenues generated by MercyMe, LiveCo/TPR, World Vision and Children International from the post-termination sponsorship arrangement that TCA would have obtained had the matching right been honored

636. Plaintiffs further allege that the breach of the MercyMe Agreement did not merely deprive TCA of discrete per-sponsorship payments but instead enabled MercyMe to appropriate and internalize the entirety of the sponsorship platform, revenue stream, and economic model that TCA had created, funded, and contractually secured. This included, without limitation, the benefit of TCA's upfront Production Fee of $1,500,000, the Minimum Event Commitment of forty-eight (48) events, and the structured conversion of attendees into Confirmed Sponsors, all of which were integral components of TCA's proprietary business model.

***g. <u>MM Defendants Breach Of Duty Of Good Faith</u>***

637. The MM Contract contains an implied covenant of good faith and fair dealing both in the performance and in the interpretation of the contract that protects the parties' reasonable expectations and their right to benefit from their agreement. Furthermore, the duty of good faith requires a contracting party to do nothing that will have the effect of impairing or destroying the rights of the other party to receive the benefits of the contract. The MM Defendants have breached the duty of good faith.

638. Without limitation, the MM Defendants induced and persuaded Collins to resign from his employ with TCA and did so for the express purpose of attempting to enable the MM Defendants to terminate the MM Contract. These actions were specifically intended to deprive TCA of its benefits under the MM Contract, which was especially in bad faith given the huge advances of money TCA had made to MM based on anticipated expenses of a minimum of 48 concerts, which at the time of purported termination, MM was not close to achieving. These actions violated the duty of good faith.

***h. <u>Conversion Of Plaintiffs' Property</u>***

639. TCA asserts a claim for conversion and theft against the MM Defendants based on their continued use and exploitation of materials, data, and information that are the express property of TCA under the MM Contract.

640. Paragraph 1(e) (Ex. 4, p. 2) of the MM Contract unambiguously provides that "as between Professional and Client, Client shall own all right, title, and interest in and to all information and other materials developed, obtained or generated in connection with this Agreement and the Sponsorship." The materials so owned by TCA include, without limitation, all sponsor information, donor data, personally identifiable information of Confirmed Sponsors and pledging donors, campaign structures, event execution materials, and any other materials or

information generated in connection with MercyMe's performances actually or intended to be performed under the MM Contract. Paragraph 1(e) (Ex. 4, p. 2) further provides that its ownership provisions "shall survive expiration or termination of this Agreement."

641. TCA therefore owns these Materials as a matter of express contract, and that ownership is unaffected by any purported termination of the MM Contract.

642. Following purported termination, the MM Defendants have continued to use, exploit, and derive economic benefit from TCA's Materials including without limitation the donor pipeline, sponsor conversion data, and event execution systems developed during the term, in connection with their ongoing sponsorship arrangement with LiveCo/TPR, World Vision and Children International, and others The MM Defendants have done so without TCA's authorization, without compensation to TCA, and in direct violation of TCA's ownership rights under (Ex. 4, p. 2, ¶1(e)).

643. The MM Defendants' unauthorized use and retention of TCA's property, including their transfer or use of that property in connection with their arrangement with LiveCo/TPR, World Vision and Children International, and others constitutes conversion and/or theft of TCA's property under Tennessee law. TCA is entitled to recover the full value of the converted and/or misappropriated property, including the economic value of the donor data, sponsor pipeline, and campaign materials misappropriated by the MM Defendants, as well as all revenues derived from the exploitation of those converted and/or misappropriated assets

### C. VIOLATION DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ET SEQ.

644. The Agreement expressly provides that all materials, information, and data developed, obtained, or generated in connection with the Sponsorship, including, without

limitation, sponsor information, donor data, campaign structures, and related materials, are the property of TCA and constitute its proprietary and confidential information. (Ex. 4, p. 2, ¶1(e)).

645. Even if the MM Contract was terminated, such termination did not extinguish TCA's ownership rights in the materials, data, and sponsorship infrastructure created pursuant to the Agreement, nor did it permit MercyMe to appropriate and continue to exploit that platform for its own benefit.

646. Following termination, MercyMe continued to utilize the same sponsorship model, donor pipeline, and event-based conversion system that had been created and implemented by TCA, including in connection with its ongoing relationship with Children International and also with LiveCo/TPR and World Vision.

### D. DAMAGES.

647. The damages arising from MercyMe's breach are not limited to lost per-sponsorship payments at the New Sponsor Rate of $337.50 per Confirmed Sponsor. Plaintiffs' damages include, without limitation, each of the following independent components:

a. MercyMe committed to a minimum of forty-eight (48) separate events during 2025, with a corresponding commitment to use its best efforts to generate no fewer than eight thousand (8,000) Confirmed Sponsors. Based on the parties' contractual economics and reasonable performance expectations derived from historical results, TCA's lost revenue from MercyMe's failure to perform the Minimum Event Commitment, including both per-sponsor payments and the economic value of the sponsorship pipeline those events would have generated, constitutes a separately recoverable component of damages, the precise amount of which will be established at trial.

b. Lost revenue from lost opportunities from wrongfully touring with TobyMac.

c. The MM Contract expressly provides at (Ex. 4, p. 5, ¶4(b)) that pledges obtained during events, defined as situations where a potential donor expresses sincere interest in sponsoring a child but cannot or will not make payment at that moment, "shall be counted for all purposes of this Agreement, even if converted following the termination or expiration of this Agreement." Pledges collected during the approximately thirty-two (32) events MercyMe performed in connection with the

MM Contract that have converted, or will convert, to Confirmed Sponsors following MercyMe's purported termination remain contractually owed to TCA as Confirmed Sponsors. MercyMe's failure to account for and pay these post-event conversions constitutes an independent breach of (Ex. 4, p. 5, ¶4(b)) and a separately recoverable component of damages.

d. The MM Contract's payment structure was designed to recoup prior advances through ongoing sponsor generation. MercyMe's premature termination of the Agreement before the Minimum Event Commitment was fulfilled deprived TCA of the recoupment mechanism built into the contractual economics, including TCA's right to apply New Sponsor Rate payments toward the outstanding balance of Prior Advances, causing TCA additional economic harm beyond lost forward revenue.

e. MercyMe's breach did not merely deprive TCA of a revenue stream; it enabled MercyMe, LiveCo/TPR, World Vision and Children International to capture and internalize the entirety of the sponsorship platform, operational model, and ongoing economic relationship that TCA had created, funded, and contractually secured through its $1,500,000 Production Fee payment and years of prior performance. The loss of this platform, including its long-tail donor retention value, its replicable conversion model, and its enterprise worth as an ongoing revenue-generating system, constitutes a separately cognizable and recoverable component of TCA's damages.

f. To the extent MercyMe, LiveCo/TPR, World Vision and Children International have realized revenues, profits, or economic benefits from the continued exploitation of the sponsorship platform, donor pipeline, and operational model that TCA created and funded, TCA is entitled to disgorgement of those ill-gotten gains as an alternative or additional measure of damages.

648. The exact amount of each foregoing component of TCA's damages will be proven at trial. Plaintiffs expressly reserve the right to present expert testimony and financial modeling on each component.

649. Because the MM Contract has not been terminated, the MM Defendants still have continuing duties to TCA which they are not fulfilling or performing, and TCA has continuing rights, including providing TCA with the exclusive right to their Public Platform and MM is required to refrain from providing their Public Platform to others or otherwise work with others

including nonprofits, which requirements the MM Defendants have violated. Their actions and inactions constitute a continuing breach of the MM Contract

### E. Unjust Enrichment And Imposition Of Constructive Trust Against The MM Defendants

650. TCA asserts a claim for unjust enrichment against the MM Defendants, in the alternative and without limitation to TCA's contract-based claims, and independently of whether the MM Contract was validly terminated.

651. TCA created, developed, funded, and operationalized the sponsorship relationship between MercyMe and Children International. Through its $1,500,000 Production Fee payment, its years of prior investment in the MM-CI relationship, its proprietary sponsorship model, its compliance infrastructure, its donor pipeline, and its event-execution systems, TCA generated the economic platform through which MercyMe's Public Platform was monetized for charitable sponsorship purposes.

652. Following MercyMe's purported termination of the MM Contract, MercyMe, LiveCo/TPR, World Vision and Children International directly assumed and continued the sponsorship relationship that TCA had built, utilizing the same structural model, the same event-based conversion system, and the same donor pipeline that TCA had created and funded. MercyMe and Children International have thereby received and retained substantial economic benefits, including ongoing sponsorship revenues, donor relationships, and the operational platform TCA developed, without compensating TCA for those benefits.

653. It would be unjust and inequitable to permit MercyMe, LiveCo/TPR, World Vision and Children International to retain these benefits without compensation to TCA. MercyMe, LiveCo/TPR, World Vision and Children International knowingly accepted these benefits with full awareness that they were derived from TCA's investment, performance, and proprietary model.

The retention of those benefits at TCA's expense constitutes unjust enrichment under Tennessee law.

654. TCA is further entitled to the imposition of a constructive trust overall revenues, sponsorship payments, and economic benefits that MercyMe, LiveCo/TPR, World Vision and Children International have derived, and continue to derive, from the sponsorship platform, donor pipeline, and operational model created by TCA. Where a party has been unjustly enriched through the appropriation of another's work, investment, and proprietary systems, equity recognizes the imposition of a constructive trust as an appropriate remedy to prevent the unjust retention of those benefits. *See Intersparex Leddin KG v. Al-Haddad*, 852 S.W.2d 245, 249 (Tenn. Ct. App. 1992). Because MercyMe, LiveCo/TPR, World Vision and Children International are currently receiving ongoing revenues from the platform TCA built, revenues that flow directly and traceable from TCA's prior investment and performance, a constructive trust is warranted over those revenue streams pending adjudication of TCA's rights.

655. The damages and equitable relief sought under this count include: (a) the reasonable value of the benefits conferred by TCA upon MercyMe, LiveCo/TPR, World Vision and Children International, including without limitation the value of TCA's $1,500,000 production investment, the value of the sponsorship platform and donor pipeline TCA created, and the value of the operational model TCA provided; (b) disgorgement of all revenues and profits MercyMe, LiveCo/TPR, World Vision and Children International have realized from the continued exploitation of that platform; and (c) imposition of a constructive trust over those revenues pending the Court's determination of TCA's rights.

### F. Claim For Indemnity

656. TCA asserts a claim for indemnity against the MM Defendants, for all claims, damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorneys' fees) arising to third parties, that TCA incurs, arising out of or connected with the failure of the MM Defendants to perform under the MM Contract. Without limitation, this includes any and all claims asserted against TCA by LiveCo/TPR, World Vision and/or Children International who the MM Defendants knew to be the beneficiaries of the promises MM made to TCA and on which TCA relied in contracting with both the MM Defendants and Children International.

### G. TORTIOUS INTERFERENCE WITH TCA'S CONTRACT AND BUSINESS RELATIONS WITH CHILDREN INTERNATIONAL

657. TCA had a longstanding relationship with Children International, having contracted with them repeatedly over the years. TCA's current contract with Children International terminated by its terms on September 30, 2025, but as with every other time in the past, TCA had a very reasonable expectation that to a high degree of probability that contract would be extended or renewed. However, the MM Defendants wanted to remove and replace TCA in its relations with Children International and thus orchestrated Collins voluntary resignation to enable themselves to do just that, which the MM Defendants have done.

658. Through the actions of the MM Defendants, they have tortiously interfered with TCA's contract with Children International, violating Tenn. Code Ann. § 47-50-109 and constituting common law tortious interference.

659. Additionally, the actions of the MM Defendants constitutes tortious interference with business relationships as (1) TCA had an existing business relationship with Children International as well as a prospective relationship with Children International into the future; (2) the MM Defendants had specific knowledge of these relations; (3) the MM Defendants intended to cause the breach and termination of the business relationship; (4) the MM Defendants' improper

motive was to illicitly take those rights and opportunities for themselves and also did so by improper means, including inducing Collins to voluntarily resign and then re-engaging Collins themselves for assistance in themselves getting the relationship with Children International; and (5) TCA has suffered extensive damages resulting from these tortious actions.

### H. Tortious Interference With Collins' Contract.

660. Collins was an employee of TCA having started with a contract in 2017, which expired by its terms, but which TCA and Collins had nevertheless been operating under by extension. Collins's contract carried with it a duty of good faith and fair dealing. For Collins to quit for the sole reason of allowing MM a right to terminate the MM Contract and to enable himself to step into the shoes of TCA with relations to MercyMe, LiveCo/TPR, World Vision and Children International, is a violation of the duty of good faith in fair dealing in that contract. MercyMe conspired with Collins with a view towards interference with TCA's contract with Collins and to assist in their interference with TCA's contract with Children International.

### I. Claim For Relief For Preliminary And Permanent Injunctive Relief Asserted Against MercyMe.

661. In (Ex. 4, p. 12, ¶13) of the MM Contract, the MM Defendants explicitly covenant and agree that their breach as has happened, will cause TCA irreparable injury which it has. In that provision of the MM Contract, the MM Defendants also explicitly covenant and agree that TCA is entitled to be granted injunctive relief, in addition to damages. Plaintiffs therefore request that this Court issue a preliminary and permanent injunctions against the MM Defendants, precluding them from conducting concerts with either Children International, World Vision and/or LiveCo/TPR, in violation of the MM Contract.

### J. Summary Of Claims Against The MM Defendants

662. Without limiting the generality of the foregoing, by way of summary, for the reasons set forth above, Plaintiffs request declarations from this Court as follows:

a. Collins's purported resignation was an act of moral turpitude which meant the Key Man provisions of ¶14A of the MM Contract was not triggered;

b. the voluntary termination of Troy Collins was never intended to be a basis for MM to terminate a multimillion-dollar contract, particularly where significant amounts of money had been advanced and may be effectively deemed forfeited;

c. the Key Man provisions of (Ex. 4, p. 13, ¶14A) of the MM Contract were not triggered by Collins's resignation but only gave rise to a right of termination which the MM Defendants had a duty to exercise reasonably and in good faith and for just cause;

d. the voluntary resignation of Collins did not interfere with or make performance of the MM Contract more problematic for either TCA or MM;

e. the MM Defendants had a covenant of good faith and fair dealing in the performance and interpretation of the MM Contract and inducing and/or persuading Collins to resign from his employ with TCA to enable the MM Defendants to terminate the MM Contract was a violation of that duty;

f. if Collins's resignation was effective, TCA had a 30-day (or more) cure right; and

g. the MM Defendants anticipatorily breached the MM Contract by not affording TCA its cure rights.

663. Without limiting the generality of the foregoing, by way of summary, for the reasons set forth above, Plaintiff TCA alleges the MM Defendants have breached the MM Contract by (a) terminating the MM Contract and doing so without affording TCA its rights to cure; and (b) denying TCA its Matching Rights post termination.

664. Without limiting the generality of the foregoing, by way of summary, for the reasons set forth above, Plaintiff TCA requests the MM Defendants be determined to be liable for tortious interference in TCA's relations with Children International and/or Troy Collins

665. Without limiting the generality of the foregoing, by way of summary, for the reasons set forth above, Plaintiff TCA requests this Court grant injunctive relief as herein requested.

666. Without limiting the generality of the foregoing, by way of summary, for the reasons set forth above, Plaintiff TCA requests that injunctive relief be granted them.

## ARTICLE XIV

## CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST WATERLAND DEFENDANTS RELATED TO THE MM CONTRACT AND OTHER TORTIOUS ACTS

### A. GENERAL ALLEGATIONS APPLICABLE TO THESE CLAIMS.

667. In all claims in this Article XIV, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

668. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV.M above and arises from the same common nucleus of operative fact as Plaintiffs' other claims.

669. Plaintiffs allege that the Waterland Defendants had full knowledge of the MM Contract. Among other things, the MM Parties and TCA have been engaged in a business relationship since at least 2017. On December 8, 2022, TCA sent a letter to Rush Concerts and Jacob Reiser, who are now officers of TPR, giving notice of the contractual relationship between MM and TCA after discovering that MercyMe's manager, Scott Brickell, had engaged in business negotiations with Rush Concerts and Jacob Reiser for a potential tour that would violate the exclusivity provisions of the Agreement ("Notice of Exclusive Relationship"). Because Rush was

owned by LiveCo and merged into TPR, and because Reiser is an executive officer, this knowledge is imputed to TPR.

670. Prior to the execution of the MM Contract in August 2024, the MM Parties were in negotiations with TPR for a new contract. During those negotiations, TPR was informed that the MM Parties would not contract with TPR because they had entered into the MM Contract with TCA.

671. After August 2024, MercyMe conducted approximately 32 performances with TCA pursuant to the MercyMe Contract, each one of which performances were promoted by TPR. As such, TPR had actual knowledge that TCA and the MercyMe Parties were in a contractual relationship, and certainly constructive notice and in the alternative, inquiry notice.

672. Furthermore, as a part of the proposed acquisition of Plaintiff TCA, agreements of confidentiality were entered both in writing and verbally. These agreements created duties of good faith and fair dealing and corresponding duties of disclosure which were fiduciary in nature.

### B. CONSPIRACY TO BREACH MM CONTRACT.

673. The Waterland Defendants conspired with the MM Parties to breach the MM Contract. They did so without justification. With full knowledge of the MM Contract, TCA alleges on information and belief that TPR counseled and worked with both MM and Collins to achieve the termination of the MM Contract through the voluntary resignation of Collins. This allegation is supported by the fact that MM and Collins have continued to work with Children International and are doing so in coordination with TPR, which is continuing to promote MM performances at which Children International is seeking sponsorships.

### C. TORTIOUS INTERFERENCE WITH MM CONTRACT

674. These same facts give rise to claims that the Waterland Defendants have tortiously interfered with TCA's contract with MercyMe, in violation of Tenn. Code Ann. § 47-50-109 and under common law tortious interference principles. Specifically, if the MM Contract was not validly terminated as alleged herein, then the Waterland Defendants tortiously interfered by contracting with MercyMe for concerts in violation of the contract's exclusivity provisions. If the contract was terminated, then the Waterland Defendants induced and participated in that termination.

### D. Tortious Interference With Prospective Contractual And Business Relations With MM.

675. As concerts take weeks or months to plan in advance, Plaintiffs allege on information and belief, that TPR was telling/advising the MM Parties (i) about the Fargo Fabrication that their employees (including Nicole) were meeting with the Defamation Defendants, (ii) about the impending Article that once published would severely defame Plaintiffs, (iii) that MercyMe would be tarnished in the world of Christian concerts if they were publicly associated with Plaintiffs, and (iv) that the MercyMe Parties needed to exit their contract with TCA as soon as possible. Knowing that concerts require nonprofit involvement, and that the fall tour was imminent, as a matter of commercial necessity, MM and TPR must have worked through all facets of MM's termination and post-termination issues and resolved them prior to their exit.

### E. Tortious Interference With Prospective Contractual And Business Relations With Brandon Lake And Others.

676. Defendants' interference with TCA's prospective business relationships is further demonstrated by TCA's dealings with Brandon Lake. As alleged, TCA, through Wes Campbell, engaged in multiple discussions with Lake and his management, during which Campbell introduced and explained the availability and revenue potential of nonprofit sponsorship

arrangements—an opportunity of which they were previously unaware. Lake and Campbell thereafter reached an agreement in principle for Lake to become a TCA client for purposes of sponsorship solicitation and management in connection with his upcoming LiveCo-promoted tour. Lake stated that he would inform LiveCo that sponsorship activities would be conducted through TCA as part of the tour structure. Shortly thereafter, however, all communications ceased, and the relationship was abandoned. Given the substantial revenue opportunity at issue, it would have been economically irrational for Lake to forgo the arrangement absent outside influence. On information and belief, Defendants, including LiveCo, intervened to prevent Lake from proceeding with TCA, including by exerting pressure or otherwise discouraging any association with Campbell or TCA, thereby disrupting a concrete and imminent business expectancy.

### F. BREACH OF FIDUCIARY DUTY

677. At all relevant times, a fiduciary relationship existed between the plaintiffs on the one hand and promoter Rush on the other. Because of Rush's relationship to and part of the Waterland/LiveCo organization, that fiduciary duty extended to the Waterland Defendants.

### G. BREACH OF FIDUCIARY DUTY REGARDING CONCERT JOINTLY FEATURING ARTISTS TAUREN WELLS AND DANNY GOKEY WHO WERE UNDER CONTRACT WITH TCA

678. In or around February 2024, with this fiduciary relationship in place, as well as the protective and restrictive provisions of the Confidentiality and Restricted Use Agreements were still enforced, Plaintiffs had detailed discussions with Jacob Reiser about a tour featuring two headline acts both of whom the Waterland Defendants knew were under contract with TCA: Tauren Wells and Danny Gokey ("Wells/Gokey Tour").

679. In the exchanges that occurred with Reiser concerning this project, Plaintiff, disclosed confidential and sensitive information, including among other things, information and

data about sponsorships available, and the amount of sponsorships Wells and Gokey owed from their contracts with Plaintiffs and how these tours could assist both the Waterland Defendants, Plaintiffs, and also the performing artists.

680. Notwithstanding the fiduciary relationships and agreements of confidentiality the Waterland Defendants proceeded to take that information and conduct their own Wells/Gokey touring concert featuring Wells and Gokey jointly, thus co-opting the ideas a date that have been shared in confidence and causing Wells and Gokey to violate their contracts with Plaintiffs.

### H. Breach Of Fiduciary Duty Arising Out Of The Purchase Agreement

681. Given this relationship of trust and confidence and connection with the negotiation of the Purchase Agreement, the Waterland Defendants undertook duties of candor, which included the obligation to fully disclose all material issues and risks in connection with the negotiation and agreement of the Purchase Agreement. This duty of candid disclosure was further compounded as the Purchase Agreement contemplated the purchase the membership interests of TCA as well as the sale of LiveCo equity to the plaintiffs, both of which are securities transactions, which created its own set of disclosure obligations imposed by law.

682. Among other things, the Waterland Defendants breached these duties of full disclosure by failing to advise the Plaintiffs of their plans concerning the acquisition of TCA, as those plans changed overtime. Without limitation, the duty of disclosure obligated the Waterland Defendants to advise the Plaintiffs of any concerns and/or risks they believed existed, including truthful and faithful disclosure of all events associated with their announced decision to delay closing. Instead, the Waterland Defendants misrepresented the issues precipitating delay as needing to require additional capital, which was false when they had already done so as the

tombstone advertisement placed by their financial advisors discovered in preparing this lawsuit, so stated.

683. Furthermore, the duty of disclosure obligated the Waterland Defendants to fully and completely advise the Plaintiffs with all the information they had regarding the Fargo Fabrication to extent that it could or would have an impact on their negotiations. Instead, defendant Taber who would short thereafter become the chief strategy officer for the Waterland Defendants specifically represented to the Plaintiffs that the Fargo Fabrication was "merely a rumor," while at the same time advising other people that it was a serious and potentially damaging truthful publication.

### I. TORTIOUS INTERFERENCE WITH WELLS AND GOKEY CONTRACTS

684. The Waterland Defendants had full knowledge that Tauren Wells and Danny Gokey were bound by contract to deliver sponsorships to TCA and also to not allow their Public Platforms to be used for solicitation of sponsorships for any other nonprofits. Yet notwithstanding this knowledge they were contractually bound, the Waterland Defendants conducted their own Wells/Gokey touring concert featuring Wells and Gokey jointly, thus causing Wells and Gokey to violate their respective contracts with Plaintiffs.

685. Plaintiffs have been damaged by this conduct.

## ARTICLES XV

## CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST WORLD VISION RELATED TO THE TCA PURCHASE AGREEMENT AND OTHER TORTIOUS ACTS.

686. In all claims in this Article XV, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs in this Complaint as if fully set forth herein.

687. Plaintiffs allege that World Vision had full knowledge of the Purchase Agreement that Plaintiffs had reached with the Waterland Defendants and the prospects and opportunities represented by the Purchase Agreement for the Plaintiffs.

688. World Vision conspired with the Waterland Defendants to affect a breach of the Purchase Agreement. They did so without justification and with full knowledge of the fact that the Purchase Agreement had been in negotiation, material terms had been agreed to, and execution of a definitive writing was imminent. Plaintiffs allege on information and belief that World Vision convinced the Waterland Defendants not to execute such formal written contract embodying what had been agreed to and not to proceed any further with any discussions or negotiations with the Plaintiffs involving their purchase of TCA or even to transact business with Plaintiffs.

689. On information and belief, Plaintiffs allege that World Vision represented, advised and counseled the Waterland Defendants that if they proceeded to purchase TCA and/or document the agreement reached regarding TCA's purchase, then the antitrust plans and goals they had reached could not be accomplished. Among other things, on information and belief, World Vision also falsely and maliciously defamed Plaintiffs and misrepresented World Vision's prior dealings with Plaintiffs.

690. On information and belief, World Vision advised the Waterland Defendants that TCA would resist the Waterland Defendants setting up their own internal competing recruitment programs to sell their own platform to nonprofits which would compete with the proper and lawful acquisition of artist platforms. As such, the Waterland Defendants would therefore not be able to enter into agreements with World Vision involving World Vision paying the Waterland Defendants for sponsorship arrangements while TCA was a functioning affiliate.

691. World Vision is alleged to have presented to and entered into agreements and coordinated arrangements with the Waterland Defendants pursuant to which World Vision would serve as the exclusive, or near-exclusive, nonprofit partner for the solicitation of sponsorships in violation of state and federal antitrust laws, through the use of the Markets, structured to foreclose competing nonprofit intermediaries, including TCA, from access to the commercially essential Performing Platforms controlled by the Waterland Defendants.

692. World Vision is alleged to have provided substantial financial support and guaranteed sponsorship flows that enabled the Waterland Defendants to acquire and secure, control contracts with artists negating or forfeiting those artists' Performing Platforms, and to make payments and economic commitments, directly or indirectly, to artists conditioned upon limiting or forfeiting relationships with competing sponsorship intermediaries and/or foregoing sponsorship participations entirely. Through these coordinated arrangements, World Vision and the Waterland Defendants reinforced each other's market positions, Waterland by consolidating control over touring access, and World Vision by securing dominant control over nonprofit sponsorship opportunities, thereby excluding competition and preserving their shared dominance in the NPS Market as it operates through the CCM Touring Market.

693. These same facts give rise to claims that World Vision has tortiously interfered with TCA's contract with the Waterland Defendants in violation of Tenn. Code Ann. § 47-50-109 and under common law tortious interference principles.

694. In the alternative, if a valid purchase agreement had not been reached regarding the purchase and sale of TCA to the Waterland Defendants, then World Vision tortiously interfered with the prospective contractual and business relations between Plaintiffs and the Waterland Defendants.

695. Plaintiffs and the Waterland Defendants had proceeded in their negotiations to the point that all material terms had been agreed to between them regarding future business and operations, such that all that was left to do was sign the paperwork evidencing what the parties had verbally already agreed to regarding TCA providing the Waterland Defendants access and services with respect to the nonprofit sponsorship market, that they did not possess.

696. On information and belief, when World Vision found out about what was transpiring and/or the state of the negotiations, they intervened to prevent the Waterland Defendants from proceeding with TCA, including by offering to make payments on behalf of the Waterland Defendants, discouraging any association with Campbell or TCA, and defaming Campbell and/or TCA, thereby disrupting their relations causing a concrete and imminent business expectancy to be lost.

697. Plaintiffs have been damaged by this conduct, including the loss of the purchase agreement with the contract price at $50,000,000 as well as the loss of other valuable rights and opportunities, which losses would not have occurred, but for the tortious conduct of World Vision.

## ARTICLE XVI

## CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST MICAH TYLER FOR BREACH OF CONTRACT

698. In all claims in this Article XVI, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs in this Complaint as if fully set forth herein.

699. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV.M above and arises from the same common nucleus of operative fact as Plaintiffs' other claims.

### A. BACKGROUND FACTS RELEVANT TO THE CLAIMS AGAINST MICAH TYLER.

700. On January 1, 2022, Plaintiff TCA and Micah Begnaud, professionally known as "Micah Tyler" ("Tyler"), entered into a written Exclusive Platform Agreement (the "Tyler Contract"). The Tyler Contract was managed on Tyler's behalf by Scott Brickell, who served as Tyler's manager and who is also the manager of the MercyMe Parties and a named defendant herein.

701. Pursuant to the Tyler Contract, Tyler agreed to furnish, exclusively to TCA, his Public Platform — defined as all musical concerts, conferences, or similar events featuring or headlined by or under Tyler's control — for the purpose of generating charitable sponsorships for Children International or such other nonprofit designated by TCA. [Ex¶1(a)-(b)]. Tyler expressly agreed that the nonprofit designated by TCA would be the exclusive charitable sponsor in connection with his Public Platform during the Term. [¶1(c)].

702. Tyler further agreed that during the Term he would not enter into any agreement interfering with the full and prompt performance of his obligations to TCA and would not make his Public Platform available to promote or assist any party other than TCA in connection with securing charitable sponsors for nonprofits. [¶10(c)].

703. The Tyler Contract further expressly warranted and required Tyler to diligently, competently, and to the best of his ability pursue on a full-time basis his recording and live musical performing career, it being expressly acknowledged that Tyler's full-time commitment was the essence of the Agreement. [¶10(a)].

704. In consideration of Tyler's obligations under the Tyler Contract, TCA agreed to pay Tyler a non-recoupable signing bonus of Twenty-Five Thousand Dollars ($25,000.00) and recoupable advances totaling Eighty Thousand Dollars ($80,000.00) — specifically, $40,000.00 upon execution and $40,000.00 upon Tyler's request — with additional per-batch advances of

$80,000.00 payable as each increment of 500 Confirmed Sponsors was credited to TCA's account. [¶¶5, 5A]. TCA paid the signing bonus and the initial advances as required.

### B. BREACH OF CONTRACT BY MICAH TYLER.

705. Following TCA's payment of the signing bonus and initial advances under the Tyler Contract, Tyler ceased performing under the Agreement. Tyler failed to conduct sufficient concert performances to generate the Confirmed Sponsors required under the Tyler Contract and to allow TCA a reasonable opportunity to recoup the advances it had paid. Despite having received TCA's advances and signing bonus, Tyler did not fulfill his contractual obligation to pursue his live touring career on a full-time basis as expressly required by ¶10(a) of the Tyler Contract and did not make his Public Platform available to TCA in the manner and to the extent the Tyler Contract required.

706. Tyler's failure to perform constitutes a material breach of the Tyler Contract, including without limitation his breach of: (a) his obligation to furnish his Public Platform exclusively to TCA for sponsorship purposes [¶1(a)]; (b) his obligation to diligently pursue his live touring career on a full-time basis [¶10(a)]; and (c) his obligation not to enter into agreements that would interfere with his performance obligations to TCA [¶10(c)].

707. As a direct and proximate result of Tyler's breach, TCA has suffered damages including without limitation: (a) the full amount of all unrecouped advances paid to Tyler, which Tyler is contractually obligated to repay pursuant to ¶10(a) and ¶10(d)(ii) of the Tyler Contract upon his failure to perform; (b) the value of the sponsorships TCA would have generated had Tyler performed as required; and (c) the loss of the economic value of Tyler's Public Platform for the duration of the Term, including the Initial Period and any Option Periods TCA would have exercised. The exact amount of TCA's damages will be proven at trial.

708. TCA further asserts that, pursuant to ¶14 of the Tyler Contract, Tyler's breach has caused and will continue to cause TCA irreparable injury for which monetary damages alone may not fully compensate, and TCA is therefore entitled to seek injunctive relief in addition to damages.

### C. CLAIM FOR INDEMNITY AGAINST MICAH TYLER.

709. TCA asserts a claim for indemnity against Tyler for all claims, damages, liabilities, costs, losses, and expenses (including legal costs and reasonable attorneys' fees) arising to third parties that TCA incurs arising out of or connected with Tyler's failure to perform under the Tyler Contract, including without limitation any claims asserted against TCA by Children International or any other nonprofit that relied on Tyler's performance commitments.

### D. SUMMARY OF RELIEF SOUGHT AGAINST MICAH TYLER.

710. Without limiting the generality of the foregoing, TCA requests:

a. judgment against Tyler for breach of the Tyler Contract and an award of all damages caused thereby, including recovery of all unrecouped advances, lost sponsorship revenues, and consequential damages in an amount to be proven at trial;

b. judgment requiring Tyler to repay all unrecouped advances paid by TCA pursuant to the Tyler Contract;

c. injunctive relief as warranted pursuant to ¶14 of the Tyler Contract; and

d. an award of attorneys' fees and costs pursuant to ¶18 of the Tyler Contract, which provides that the prevailing party shall recover its reasonable attorneys' fees.

## ARTICLE XVII

## CAUSES OF ACTION AND CLAIMS FOR RELIEF ASSERTED AGAINST THE BRICKELL PARTIES RELATED TO THE MM CONTRACT AND TYLER CONTRACT

711. In all claims in this Article XVII, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

712. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV-VI above and arises from the same common nucleus of operative fact as Plaintiffs' other claims. Without limiting the generality of the foregoing, this claim is based on the same series of communications and actions through which Defendants participated in and furthered the disruption of Plaintiffs' contractual relationships and business operations.

713. Collins was an employee of TCA having started with a contract in 2017, which expired by its terms, but which TCA and Collins had nevertheless been operating under by extension. Collins's contract carried with it a duty of good faith and fair dealing. For Collins to quit for the sole reason of allowing MM a right to terminate the MM Contract and to enable himself to step into the shoes of TCA with relations to MercyMe and Children International, is a violation of the duty of good faith in fair dealing in that contract.

714. Scott Brickell himself and through his company, BrickHouse Entertainment, LLC. (together the " Brickell Parties") was lifelong friends with Collins who had secured Collins his employment with TCA. The Brickell Parties were also associated with as a manager, the group MercyMe. On information and belief Collins and the Brickell Parties at all times work together to accomplish the goals of the tortious conduct herein alleged and are jointly and severally liable as such.

715. Through the actions of the Brickell Parties, they have tortiously interfered with TCA's contract with Children International, violating Tenn. Code Ann. § 47-50-109 and constituting common law tortious interference.

716. Additionally, the actions of the Brickell Parties constitutes tortious interference with business relationships as (1) TCA had an existing business relationship with Children

International as well as a prospective relationship with Children International into the future; (2) the Brickell Parties had specific knowledge of these relations the Brickell Parties were part of TCA's interface with CI in fulfilling his duties and reported regularly about such; (3) the Brickell Parties intended to cause the breach and termination of the business relationship; (4) the improper motive of the Brickell Parties was to illicitly take those rights and opportunities for themselves and also do so by improper means, including inducing MM to attempt to terminate their contract and then re-engaging with MM to usurp the relationship with Children International; and (5) TCA has suffered extensive damages resulting from these tortious actions.

### A. CONSPIRACY TO BREACH MM CONTRACT.

717. The Brickell Parties conspired with the MM Parties to breach the MM Contract. They did so without justification. With full knowledge of the MM Contract, the Brickell Parties counseled and worked with MM to achieve the termination of the MM Contract through Collins's voluntary resignation. This allegation is supported by the fact that MM, Collins and the Brickell Parties have continued to work together even after Collins's "resignation" and are doing so in coordination with LiveCo/TPR and CI.

### B. TORTIOUS INTERFERENCE WITH MM CONTRACT.

718. These same facts give rise to claims that the Brickell Parties have tortiously interfered with TCA's contract with MercyMe, in violation of Tenn. Code Ann. § 47-50-109 and under common law tortious interference principles. Specifically, if the MM Contract was not validly terminated as alleged herein, then the Brickell Parties tortiously interfered by causing MercyMe to contract with others for concerts in violation of the contract's exclusivity provisions. If the contract was terminated, then the Brickell Parties induced and participated in that termination.

### C. Tortious Interference With The Tyler Contract.

719. The Brickell Parties served as Tyler's manager and, on information and belief, was the primary point of contact through whom Tyler's contractual relationship with TCA was established and through whom Tyler's departure from his performance obligations was managed. As alleged in this Complaint in connection with the MercyMe claims, the Brickell Parties were simultaneously managing MercyMe's relationship with TCA and coordinating the termination of the MM Contract. TCA alleges on information and belief that the Brickell Parties' management of both Tyler and MercyMe, combined with his role in the Waterland Defendants coordinated strategy to displace TCA, was not coincidental — and that the Brickell Parties advised, directed, or facilitated Tyler's cessation of performance under the Tyler Contract in furtherance of the same scheme. To the extent the Brickell Parties tortiously interfered with or aided and abetted Tyler's breach of the Tyler Contract, the Brickell Parties are individually liable for TCA's resulting damages on the same theories alleged in Article XI with respect to his conduct in connection with the MM Contract

## ARTICLE XVIII

## DAMAGES FOR VIOLATIONS OF TENN. CODE ANN. § 48-101-520 IN CONNECTION WITH THE SOLICITATION OF CHARITABLE FUNDS

720. In all claims in this Article XVIII Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs in this Complaint as if fully set forth herein

721. Tenn. Code Ann. § 48-101-520 provides a private right of action to any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another

person of an unfair, false, misleading or deceptive act or practice declared to be unlawful by this part or any other violation of rules and regulations on the solicitation of charitable funds.

722. Plaintiffs have been so damaged.

723. On information and belief, the Defendants have engaged in a practice and pattern of engaging in professional solicitation as defined in Tenn. Code Ann. § 48-101-501 (15) through which they have engaged in solicitations for contributions as defined in Tenn. Code Ann. § 48-101-501 (17).

724. On information and belief, among other things, the Defendants have not properly registered as professional solicitors, completed the necessary applications, paid the filing fees nor posted a bond.

725. Plaintiffs had gone through the entire process entitling them to engage as professional solicitors under the statute, and have had their business destroyed by the Defendants' unlawful actions in violation of Tenn. Code Ann. § 48-101-501, et seq.

## ARTICLE XIX
## CONSPIRACY (ALL DEFENDANTS)

726. In all claims in this Article XIX, Plaintiffs reallege and incorporate by reference all of the (a) preceding paragraphs and (b) following paragraphs, in this Complaint as if fully set forth herein.

727. Without limitation, Plaintiffs further allege that the conduct giving rise to this claim forms part of the coordinated course of conduct described in Section IV-VI above and arises from the same common nucleus of operative fact as Plaintiffs' other claims. Without limiting the generality of the foregoing, this claim is based on the same series of communications and actions

through which Defendants participated in and furthered the disruption of Plaintiffs' contractual relationships and business operations.

728. Defendants' conduct described herein constitutes a civil conspiracy and aiding and abetting each other to accomplish the causes and claims made in this Complaint, including without limitation, to violate the Sherman and Clayton Acts, breach and conspire to breach contracts, and tortiously interfere with the contracts and opportunities (current and prospective).

729. In furtherance of their conspiracy, Defendants have undertaken efforts to eliminate competition and output in the CCM Touring Market and the NPS Market, by eliminating the Newsboys and TCA from those Markets, forcing their exit from those markets.

730. As a direct result of the overt acts taken in furtherance of Defendants' conspiracy, Plaintiffs have suffered considerable injury to their businesses and their ability to compete in the Markets.

731. Defendants are all jointly and severally liable for the actions taken in furtherance of their joint conduct.

732. Defendants are all jointly and severally liable for the actions taken in furtherance of their joint conduct.

## ARTICLE XX
## CONDITIONS PRECEDENT

733. All conditions precedent has been performed, have occurred, or have been excused.

## ARTICLE XXI
## ATTORNEYS FEES.

734. Plaintiffs pray for the recovery of all attorney's fees and expenses to which they show themselves justly entitled.



Case 3:26-cv-00484 Document 133-1 Filed 10/09/26 Page 227 of 231 PageID #: 1844

## JURY TRIAL DEMANDED

735. Plaintiffs demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and grant the following relief:

a. For judgment on all Counts in favor of Plaintiffs and against Defendants;

b. For an award of compensatory damages in an amount to be determined at trial sufficient to compensate Plaintiffs for all injuries suffered, including but not limited to reputational harm, loss of business, lost profits, loss of goodwill, loss of the agreed acquisition price of approximately $50,000,000, and other economic damages;

c. For an award of damages under the antitrust laws, including treble damages pursuant to 15 U.S.C. § 15, together with all recoverable costs;

d. For an award of damages for misappropriation of trade secrets, including actual damages, unjust enrichment, and, to the extent permitted by law, exemplary damages equal to exceed two times the actual damages awarded, pursuant to 18 U.S.C. § 1836(b)(3)(C) and Tenn. Code Ann. §47-25-1704(b) or such greater amounts as allowed by law;

e. For an award of damages for breach of contract and tortious interference, including all direct, consequential, and expectancy damages recoverable under applicable law, including without limitation, damages for breach of the Confidentiality and Restricted Use Agreements, breach of the Purchase Agreement, breach of the MM Contract, and tortious interference with TCA's contracts and business relations with Children International and others;

f. For an award of damages under the Lanham Act, including Defendants' profits, any damages sustained by Plaintiffs, and trebling of such damages as permitted by law

g. For an award of a reasonable royalty should such be appropriate;

h. For an award of punitive or exemplary damages to the fullest extent permitted by law based on Defendants' willful, malicious, and intentional conduct;

i. For preliminary and permanent injunctive relief prohibiting Defendants from continuing their unlawful conduct, including but not limited to:

    i. Continuing to publish or republish defamatory statements about Plaintiffs;

ii. Using or disclosing Plaintiffs' confidential and proprietary information and requiring Defendants to return or destroy all materials containing or derived from TCA's Trade Secrets;

iii. Engaging in anticompetitive conduct in violation of the antitrust laws;

iv. interfering with Plaintiffs' contractual and business relationships;

v. Conducting any nonprofit sponsorship platform developed using TCA's confidential information or Trade Secrets; and

vi. MercyMe conducting concerts with Children International and/or LiveCo/TPR in violation of the MM Contract, as more particularly set forth in this Complaint;

j. For an order requiring Defendants to retract the defamatory statements and to publish corrective statements in a manner reasonably calculated to reach the same audience as the original publications;

k. For a declaration of Plaintiffs' rights as requested herein, including rights under the MM Contract, including but not limited to a declaration that (i) the voluntary resignation of Troy Collins did not validly trigger the Key Man provision of the MM Contract so as to permit termination, and/or (ii) TCA's right to cure was not extinguished by MercyMe's premature repudiation, and/or (iii) MercyMe's Matching Right obligations survive any purported termination of the MM Contract;

l. For an award of attorneys' fees, costs, and expenses to the fullest extent permitted by law, including but not limited to those recoverable under the antitrust laws, the Defend Trade Secrets Act (18 U.S.C. §1836(b)(3)(D)), the Tennessee Uniform Trade Secrets Act (Tenn. Code Ann. § 47-25-1705), the Lanham Act (15 U.S.C. § 1117(a)), and the Confidentiality and Restricted Use Agreements;

m. For an award of damages pursuant to Tenn. Code Ann. § 48-101-520 arising from Defendants' unlawful solicitation of charitable funds in violation of Tenn. Code Ann. §48-101-501 et seq.;

n. For pre-judgment and post-judgment interest as permitted by law; and

o. For such other and further relief, at law or in equity, as the Court deems just and proper.

Respectfully submitted,

_________________________

G. Kline Preston, IV, Esq. (#017141)
Belle Meade Office Park
4515 Harding Pike, Suite 107
Nashville, TN 37027
Tel: 615-649-8680
Fax: 866-610-9565
kpreston@klineprestonlaw.com

/s/ Ben Broocks__________
Ben Broocks (pro hac pending)
248 Addie Roy Road, Suite B-301
Austin, Texas
Tel: 512-201-2002
Fax: 512 201-2386
Attorney for Wesley Eugene Campbell

## CERTIFICATE OF SERVICE

I hereby certify that on the date listed below, the undersigned filed the foregoing document using the Court's CM/ECF system, which will send electronic notice to all counsel of record.

Dated: October 9, 2026

/s/Ben Broocks

________________

Ben Broocks